IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Alisha Johnson, | ) | Case No. 1:24-cv-02612-JDA-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTION FOR** |
| Savannah River Nuclear Solutions, LLC, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Defendant Savannah River Nuclear Solutions, LLC ("SRNS") moves this Court for summary judgment, pursuant to Rule 56, F.R.C.P., as to all causes of action in the complaint of Plaintiff Alisha Johnson ("Plaintiff"). In her complaint, Plaintiff alleges race and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

## <u>INTRODUCTION</u>

SRNS terminated Plaintiff for a second violation of a work rule after it had previously counseled her in writing that a further violation of the rule could lead to her termination. During an investigation into Plaintiff's second violation, she also lied to an SRNS investigator, providing further grounds for her termination.

In particular, in 2021, SRNS conducted an investigation that revealed Plaintiff used her government-issued computer to conduct personal, outside business activities for some half-dozen businesses. Because Plaintiff's activities violated SRNS's policies, it issued her a corrective document. In response, Plaintiff committed to henceforward abide by SRNS's policies prohibiting such activities. Eighteen months later, the Office of the Inspector General—a federal government entity completely separate from SRNS—alerted SRNS about a federal criminal investigation into

1

Plaintiff's misuse of government resources, prompting SRNS to conduct a second investigation. That second inquiry uncovered that Plaintiff continued to utilize her work computer to conduct personal business activities in violation of company policy. SRNS's investigator also determined that Plaintiff lied to him during the course of this second investigation. Following these new revelations, SRNS convened an independent disciplinary review panel (composed of employees outside of Plaintiff's department), which recommended her termination. The designee of SRNS's Chief Executive Officer accepted that recommendation, resulting in Plaintiff's termination.

Plaintiff filed suit asserting that her termination and earlier employment actions taken against her were motivated by race, sex, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended. As a matter of law, Plaintiff cannot support her causes of action, and summary judgment should be granted to SRNS.

## FACTUAL BACKGROUND

When viewed in the light most favorable to Plaintiff, *see* Rule 56, F.R.C.P., the facts in the record reveal the following.

### I. Plaintiff's Employment History and SRNS's Computer Use Policy

Plaintiff was a long-time employee of SRNS and its predecessor, Westinghouse Savannah River Company. [Plaintiff's deposition ("P. dep."), pp. 24-25] As a private entity, SRNS manages and operates the Savannah River Site (the "Site") pursuant to a management and operations contract with the United States Department of Energy, the owner of the Site.[1] [Sprague Declaration] SRNS's mission includes producing and protecting nuclear materials for the nation's

---

[1] U. S. Department of Energy Savannah River Operations Office Management & Operating (M&O) Contract DE-AC09-08SR22470. [chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.energy.gov/sites/prod/files/2019/09/f66/SRS-DE-AC09-08SR22470-SRNS-contract-management-plan.pdf]

security. [*Id*.]  To discharge that mission, SRNS's employees use government-issued equipment, including computers, whose use is subject to certain restrictions.  [*Id*.]

Around 2017, Plaintiff began working in SRNS's maintenance department, being promoted to the position of Principal Engineer and Tech Support Specialist. [P. dep., pp. 27-28; D. Ex. 3, p. 01AA000045-46]  Edward Bodie and Frederick Porter Youngblood interviewed Plaintiff, and Bodie decided to promote her. [Bodie Declaration; Youngblood Declaration]  In 2023, Plaintiff's position title was changed to work window coordinator (also sometimes referred to as a work window manager). [P. dep., D. Ex. 3, p. 01AA000040]

Given the need to comply with conflict of interest rules and to appropriately use tax dollars, and given the sensitivity of the work SRNS carries out, it restricts certain employee activities, such as some personal business activities as well as employees' use of its government-issued information technology resources, including computer systems. [Sprague Declaration] Under SRNS's code of ethics policy, Plaintiff had to annually complete a conflict of interest questionnaire, which included questions about personal business activities. [P. dep., pp. 156-57; D. Ex. 18]  SRNS also had a "Use of Unclassified Information Technology Resources" policy, under which employees were "strictly forbidden" from certain "incidental personal use" of technology equipment.  [Blankenship Declaration, Attachment A (sec. 5.23.3) (pp. 20, 22-23)] The prohibited uses included those that "[i]n any way facilitate the employee's outside, personal business." [*Id*., Attachment A (sec. 5.23.3.2.A.4) (p. 23)]  Unauthorized use of computers or telephones could lead to discipline, up to termination. [*Id*., Attachment A (sec. 5.1.5.CC) (pp. 4, 6); P. dep., pp. 159-60]  Plaintiff knew about SRNS's policy regarding computer use.  [P. dep., p. 158]  And SRNS regularly monitored computer usage and had processes in place to audit misuse of government information systems. [Blankenship Declaration, Attachment A (5.23.1.2) (p. 20)]

SRNS also has a policy concerning cooperating with investigations. Pertinent to this matter, SRNS was required to cooperate with the Office of the Inspector General and investigate matters brought to its attention by that office. [P. dep., pp. 37-39; Blankenship Declaration, Attachment A (sec. 4.1) (p. 2)]

## II. Investigations into Plaintiff's Outside Business Practices and Computer Use

### A. Investigation in 2021

In 2021, Plaintiff completed SRNS's annual conflict of interest policy questionnaire. That questionnaire required Plaintiff to answer whether she was employed or received compensation for any partnership, organization, or other business enterprise. [P. dep., pp. 156-57; D. Ex. 18, question 10] Plaintiff answered "No." [*Id.*, pp. 157-158; D. Ex. 18, question 10] But, in fact, she owned two businesses at the time: a bar called Bea's Place, LLC, and a mobile home park. [*Id.*, pp. 155-56]

Besides failing to disclose her outside business activities, Plaintiff had also been engaging in unauthorized use of SRNS's computers. SRNS had issued Plaintiff a government-owned desktop computer and an iPhone. [P. dep., p. 187] As part of SRNS's regular monitoring and auditing of employees' computer use, an April 2021 report showed that Plaintiff was among users who had been accessing business registration and tax websites. [Wright Declaration, Attachment A, p. 2; P. dep., pp. 166-67] After a preliminary review showed that Plaintiff's computer activity may have been related to managing a business, the internal investigations section of SRNS's Office of General Counsel requested a computer security engineer to conduct a forensic examination of Plaintiff's computer; the objective was to determine the extent to which Plaintiff used computer resources for personal business purposes. [Wright Declaration, Attachment A, p. 2; Carter Declaration, Attachment A, pp. 1-2] The computer security engineer forensically examined

Plaintiff's computer and produced a detailed report of his findings. [Wright Declaration, Attachment A] The examination revealed that Plaintiff used her work computer in connection with multiple business entities: (1) Bea's Place, (2) Barnes Mobile Home Park, (3) Deuce's Bar and Lounge, (4) Mjohnson Enterprises, (5) Mayhem Productions, and (6) FT Squared. [*Id.*, Attachment A, p. 2] Plaintiff owned Bea's Place and Barnes Mobile Home Park. [P. dep., pp. 167, 168] Deuce's Bar and Lounge was the same as Bea's Place, and Mjohnson Enterprises owned the physical bar and land for Bea's Place. [*Id.*, pp. 167-69] Mayhem Productions was an entity Plaintiff's husband owned. [*Id.*, p. 168] And FT Squared was an event-planning business owned by Plaintiff's twin daughters. [*Id.*, pp. 11, 169]

The forensic examination also uncovered that Plaintiff printed over 200 documents for one or another of the above business entities, including profit and loss statements, restaurant menus, shift and employee wage reports, inventory reports, business contracts, and webpages from Clover and Square Dashboard (credit card processing/point-of-sale services). [Wright Declaration, Attachment A, p. 2; P. dep., pp. 169-73] She used the computer to save and edit a rental contract for Bea's Place, [P. dep., pp. 174-75], to email a menu update for the business, [*Id.*, p. 175], and to attempt to hire a bartender for the same entity. [*Id.*, pp. 180-81] Further, Plaintiff searched the website of the S.C. Department of Revenue to file taxes for Bea's Place. [*Id.*, p. 178] As for her government-issued iPhone, Plaintiff loaded onto it a cash app linked to Bea's Place. [*Id.*, p. 189] The forensic examination report—which included listings and copies of select documents extracted from Plaintiff's computer—concluded that Plaintiff "used the site Internet, email, a printer, and possibly a government iPhone to manage outside businesses." [Wright Declaration, Attachment A, p. 30]

An investigator in the Office of General Counsel's internal investigations section reviewed the forensic report. As part of his investigation, he interviewed Plaintiff. [Carter Declaration, Attachment A, p. 3] She admitted to the investigator that she had, through her government computer, used websites such as Clover and Square Dashboard to manage various aspects of Bea's Place. [*Id*., Attachment A, p. 4; P. dep., pp. 188-89] Plaintiff claimed she did not know she was violating any rules through the use but represented that she would remove all her personal business documents from her computer immediately and cease all use of government resources in operating her business. [Carter Declaration, Attachment A, p. 4] The investigator found, by "[c]lear and convincing evidence," Plaintiff's conduct violated SRNS's rules of conduct policy forbidding use of computer resources for facilitating an employee's outside, personal business. [*Id*., Attachment A, pp. 4-5]

In light of the investigation's findings, in May 2021, SRNS issued Plaintiff a "Corrective" contact, which stated:

> You are being given this contact as a result of a legal investigation finding you used government resources for personal business in which you receive income. You understand all use of government property for running personal businesses must desist immediately. You understand that future use of government property for personal businesses will result in disciplinary action up to and including termination. [P. dep., p. 190; D. Ex. 22]

Plaintiff signed the corrective document and "agree[d] to stop using government resources for personal businesses immediately" and further committed to reviewing SRNS's rules of conduct policy (sections 5.1, 5.23), ethics code, and policy concerning use of computers. [P. dep., D. Ex. 22]

### B. Investigation in 2023

In January 2023, a special agent with the federal government's Office of Inspector General informed SRNS that Plaintiff was the subject of a criminal investigation related to misuse of

government resources. [Carter Declaration, Attachment B, p. 1]  Plaintiff was being investigated for potential falsification of a government loan application, which may have been completed on her government-issued computer. [*Id.*, Attachment B, p. 2]  In light of this development, and in accordance with SRNS's policy, the investigator who had worked on SRNS's 2021 investigation requested another forensic examination of Plaintiff's computer. [*Id.*]

This second forensic examination covered Plaintiff's computer use from June 2021 onward, that is, the period after her receipt of the May 2021 corrective document. [Wright Declaration, Attachment B, p. 2]  Like the previous examination, the 2023 one showed that Plaintiff continued to use her computer for personal business activities—despite having promised in 2021 to cease such activities—including sending or receiving some 80 emails directly related to her or her husband's personal business activities.  [*Id.*, Attachment B, p. 17]  For example, in December 2021, Plaintiff sent an email to her work computer regarding Bea's Place. [P. dep., p. 221]  She visited the S.C. Department of Revenue website to sign a form for her husband's business. [*Id.*, pp. 211-13]  She emailed regarding an insurance policy for Mjohnson Enterprises and received a response. [*Id.*, pp. 219-220] She sent an email to her work computer concerning a "TreSounds/Walker" contract for live performances at Bea's Place. [*Id.*, pp. 218-19; Carter Declaration, Attachment B, pp. 3-4]  Also found on her computer was an Excel spreadsheet titled "Beas2022," which appeared to be a profit and loss statement for Bea's Place for January to May 2022—income, expenses, and taxes. [Carter Declaration, Attachment B, p. 3] Other business-related documents on Plaintiff's computer included vendor price lists, business license forms, and business insurance forms. [*Id.*, Attachment B, p. 4] The documents showed that on May 31, 2022, the alcohol license of Bea's Place had been revoked for violation of a gambling law, so Plaintiff transferred ownership of the business to her husband and changed the entity name to "306 on

York." [*Id.*, Attachment B, pp. 4, 8; P. dep., p. 201] She even used her work computer to communicate with a law firm to facilitate this change in business ownership. [Carter Declaration, Attachment B, p. 5] Unsurprisingly, during the investigation, Plaintiff told the investigator: "I know that I am in jeopardy of possibly losing my job." [Carter Declaration, Attachment B, p. 9; P. dep., pp. 233-34]

After considering the information the forensic examination had discovered and after interviewing Plaintiff twice, the investigator reported: "Clear and convincing evidence was obtained proving that [Plaintiff] used her government issued computer and government issued e-mail account to conduct operations solely related to her personal business, Bea's Place, and her husband's personal business, 306 on York," in violation of SRNS's rules of conduct, which prohibit use of government computers and resources to facilitate employees' outside, personal business. [Carter Declaration, Attachment B, pp. 9-10] The investigator further found that Plaintiff made inconsistent and false statements to him, such as representing that she had not visited the Clover website or the S.C. Department of Revenue website, though the forensic evidence showed otherwise. [*Id.*, p. 10]

### III. Disciplinary Review Board and Plaintiff's Termination

After the 2023 investigation, SRNS convened an internal disciplinary review process to consider Plaintiff's discipline. Under SRNS's policies, for cases involving a recommendation of time off without pay or action beyond a corrective action (e.g., probation or termination), a disciplinary review board was required to be convened. [Blankenship Declaration, p. 2] The convening of the board provides an employee and her supervisors the opportunity to present their versions of the facts and removes the decision-making authority from the employee's supervisors—conferring it initially on an independent panel (the "Panel"). [*Id.*] When termination

is recommended for the employee, the Panel can make only a recommendation, with SRNS's Chief Operating Officer or Chief Executive Officer or their designee making the final decision on termination. [*Id.*]  While the disciplinary board process involves representation of the Equal Employment Opportunity Office, Security, Human Resources, an independent manager, and others, there are only three voting members on the Panel. [Blankenship dep., p. 55] The Panels in such disciplinary board processes often decide matters differently than that recommended by the employees' supervisors. [Blankenship Declaration, p. 2]

In late February 2023, a Panel heard the issue of the second investigation into Plaintiff's computer use. [P. dep., p. 47; Natalia Johnson Declaration, Attachment A][2]  It received testimony from Plaintiff, her character witness, and SRNS's internal investigator. [Natalia Johnson Declaration, Attachment A, p. 2] The Panel considered information about comparators who had committed similar offenses. [*Id.*, Attachment A, p. 3]  And it received the recommendations of three advisors—management, the Office of the General Counsel, and the EEO office—who all supported Plaintiff's termination.  [*Id.*]  During the disciplinary review board process, Plaintiff admitted she had sent paperwork using her computer in violation of SRNS's policy, [Complaint, ¶ 46], and conceded to responding to personal emails using government equipment. [P. dep., p. 242] But Plaintiff denied that she had provided false information during the investigation.  [*Id.*] Further, Plaintiff did not tell the Panel that she was being retaliated against because of her race or sex. [*Id.*, p. 244]

After considering all of the information presented to it, the Panel took a day to consider the evidence before reaching a decision on Plaintiff's possible discipline.  The Panel unanimously

---

[2] Plaintiff does not have any evidence SRNS failed to follow its disciplinary process. [P. dep., p. 52]

concluded that "[g]iven that this same behavior was addressed and attempted to [be] correct[ed] less than 18 months ago and based on totality of circumstances—operating her personal business using government resources and providing false information, the DRB [disciplinary review board] panel is recommending termination." [Natalia Johnson Declaration, Attachment A, p. 7; Henderson Declaration; Whitcomb Declaration] This recommendation was forwarded to Rick Sprague, the designee of SRNS's Chief Executive Officer; Sprague accepted the recommendation and terminated Plaintiff. [Sprague Declaration]  SRNS terminated Plaintiff effective March 1, 2023. [P. dep., pp. 35-36; D. Ex. 27]

Plaintiff has no evidence that any member of the Panel recommended termination because of her race or sex. [P. dep., p. 250] She also admitted she has no evidence the Panel recommended termination in retaliation for any alleged protected activity. [*Id.*]

**IV. Plaintiff's Allegations of Discrimination**

On May 19, 2023—months after her termination—Plaintiff filed a Charge of Discrimination against SRNS alleging it had discriminated and retaliated against her based on race, sex, and disability. [P. dep., D. Ex. 6] Specifically, she claimed she was discriminated and/or retaliated against when SRNS terminated her in March 2023. [*Id.*] She also asserted that SRNS had earlier discriminated against her when in June 2022—more than 300 days before filing her Charge—it failed to promote her to either of two positions. [*Id.*] As to her failure to promote claim, Plaintiff alleged that Youngblood, who was the work center manager and her supervisor, promoted two less experienced, white males to the positions of lead planner and single point of contact ("SPOC") manager. [*Id.*; P. dep., pp. 58-59] Moreover, she claimed that she was subject to discrimination when disciplined for an incident involving a white employee (Terry Stoudemire)

but did not know whether that other employee had been disciplined.[3] [P. dep., D. Ex. 6]  Finally, she asserted SRNS retaliated against her after she complained in July, October, and November 2022, to her supervisor, other supervisory personnel, and/or a human resources representative about raising her discrimination concerns. [*Id.*]

In the current lawsuit, Plaintiff alleges similar claims.  Her complaint presents three Title VII causes of action:  discriminatory termination, failure to promote, and disparate discipline based on (1) race, (2) sex, and (3) retaliation, for opposing race and sex-based discrimination.[4] [Complaint, ¶¶ 49-69]  As Plaintiff has not presented direct evidence of discrimination, analysis of her claims must proceed under the *McDonnell Douglas* framework.  *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

## LAW/ANALYSIS

## I. Title VII Discriminatory Termination (Race and Sex)

**The Court should grant summary judgment to SRNS on Plaintiff's discriminatory termination claim because (A) she is unable to establish a *prima facie* case of discrimination inasmuch as there is no evidence of a comparator who was treated more favorably, and (B) she is unable to rebut SRNS's legitimate, non-discriminatory reasons for terminating her—using her government-issued computer for personal business activities and making false statements to the investigator—both of which violate SRNS's policies.**

### A. No *Prima Facie* Case of Discriminatory Termination

To establish a *prima facie* case of discriminatory discharge, a plaintiff is required to show, among other elements, that "other employees who are not members of the protected class were

---

[3] The white employee, in fact, received the same "discipline" as Plaintiff.  [Section III.B, *infra*]

[4] Plaintiff's complaint does not allege disability discrimination.  Also, neither her complaint nor her earlier Charge of Discrimination alleged a discriminatory hostile environment claim. [Complaint; P. dep., D. Ex. 6]  In her deposition, Plaintiff confirmed that her complaint does not set forth a cause of action for discriminatory hostile work environment. [P. dep., pp. 57-58, 267-68]

retained under apparently similar circumstances." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004). SRNS terminated Plaintiff's employment when—after she had already received a corrective document for the same conduct—she again misused government-issued computers for personal business purposes and made false statements to an investigator. Plaintiff cannot offer any evidence that SRNS ever retained any employee who had (1) violated SRNS's technology resources policy a second time and (2) made false statements during an investigation. In her deposition, Plaintiff admitted that she is not aware of anyone outside of her protected classes who violated the policy on using government resources for personal businesses that did not receive any discipline. [P. dep., p. 279] Of particular significance is that Plaintiff's termination was for a second offense—a fact that influenced all three members of the Panel in their unanimous recommendation to terminate her. [Natalia Johnson Declaration, p. 2; Attachment A, p. 4; Henderson Declaration, p. 2; Attachment A, p. 4; Whitcomb Declaration, Attachment A, p. 4] Plaintiff cannot identify any comparator who, having violated SRNS's computer use policy for the second time, was not terminated. Thus, Plaintiff's discriminatory termination claim fails because she cannot establish her *prima facie* case. *Kun v. Berkeley Cnty. Gov't*, 214 F. Supp. 2d 559, 564 (D.S.C. 2001) (holding "plaintiff has failed to establish a *prima facie* case of discrimination because he has failed to show that he was treated differently than other similarly situated employees.") (italics added), *aff'd*, 32 Fed. Appx. 689 (4th Cir. 2002).

### B. SRNS's Legitimate Non, Discriminatory Reasons for Termination

The Court should also grant summary judgment to SRNS on Plaintiff's discriminatory termination claim because she is unable to rebut SRNS's legitimate, non-discriminatory reasons for terminating her—using her government-issued computer for personal business activities and making false statements to the investigator.

Under the *McDonnell Douglas* framework, to avoid summary judgment, an employee must show that the employer's proffered legitimate, non-discriminatory explanation is pretextual. *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004). As detailed earlier, in 2021, SRNS issued Plaintiff a "Corrective" document when an investigation, which included forensic examination of Plaintiff's computer, revealed that she used her government-issued computer to engage in personal business activities related to a half-dozen businesses belonging to her, her husband, or her children in violation of company policy. [P. dep., D. Ex. 22] In response, Plaintiff agreed to "stop using government resources for personal businesses immediately" and to review SRNS's rules of conduct bearing on such practices. [*Id.*] Unfortunately, the corrective document did not cause Plaintiff to cease her conduct, and Plaintiff continued to use her computer for personal business activities. A 2023 investigation, which again included forensically examining Plaintiff's computer, confirmed her use of SRNS's computer resources for personal business activities: She emailed and saved documents and visited websites to conduct business activities for her own bar and her husband's businesses. [Wright Declaration, Attachment B, p. 17] The investigator interviewed Plaintiff as part of SRNS's investigation into her activities. While she represented that she had not visited certain websites, forensic evidence confirmed the contrary, leading the investigator to conclude that Plaintiff made false statements to him during her interview.[5] [Carter Declaration, Attachment B, p. 10]

The independent Panel recommended termination of Plaintiff for two reasons: (1) "operating her personal business using government resources" and (2) "providing false

---

[5] SRNS's policies provided that an employee's "[f]ailure to fully cooperate and/or provide requested information, including but not limited to, making false statements or intentionally misleading management or investigators during the course of a company investigation" may warrant disciplinary action, "up to and including termination of employment." [Blankenship Declaration, Attachment A (sec. 5.1.5.Q) (pp. 4-5)]

information" to the investigator—both of which are violations of SRNS's policies. [Natalia Johnson Declaration, Attachment A, p. 7]  Rick Sprague, the designee of SRNS's Chief Executive Officer, accepted this recommendation and terminated Plaintiff. [Sprague Declaration] Thus, SRNS has articulated two legitimate, non-discriminatory reasons for terminating Plaintiff.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004); *see also Kunda v. Honeywell Int'l, Inc.*, C/A No. 2:17-CV-03134-BHH-MGB, 2019 WL 4280161, at *6 (D.S.C. Feb. 27, 2019) ("It is well established that discharging an employee for violations of company policy is a legitimate non-discriminatory reason for such discharge."), *report and recommendation adopted by*, 2019 WL 3369453 (D.S.C. July 25, 2019); *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (affirming summary judgment for the defendant, where there was clear evidence that the plaintiff "violated a clearly communicated company policy forbidding delivery records falsification").[6]

Plaintiff cannot show that either of SRNS's legitimate, non-discriminatory reasons for terminating her is pretextual.  To establish that an employer's "proffered reason for the challenged action was pretext for discrimination, the plaintiff must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Steinhilber v. Yanfeng US*

---

[6] Bearing on Plaintiff's sex and race discrimination claims, two of the three members of the Panel, Natalia Johnson and Adryan Henderson, are female, and Ms. Natalia Johnson is Black—further undercutting any inference that the Panel's decision suffered from discriminatory animus. [Natalia Johnson Declaration; Henderson Declaration; P. dep., p. 247]; *Coggins v. Gov't of D.C.*, No. 97-2263, 1999 WL 94655, at *4 (4th Cir. Feb. 19, 1999) (stating, in a Title VII case, that the fact that the decision-makers were of the same race as the plaintiff made it "unlikely" that their decision was motivated by racial animus); *Adams v. 3D Sys., Inc.*, Case No. 0:19-cv-00663-JMC-KDW, 2021 WL 5311256, at *16 (D.S.C. June 24, 2021) (noting that fact that the decision-maker was a member of Plaintiff's protected class under Title VII "belies Plaintiff's allegation that he suffered discrimination based on his race"); *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 724 (D.S.C. 2014) (noting that when the decision maker is a member of the plaintiff's own protected class, it "weakens any possible inference of discrimination") (citation omitted).

*Auto. Interiors I, LLC*, C.A. No. 6:18-cv-2966-TMC-KFM, 2020 WL 6219421, at *9 (D.S.C. May 11, 2020) (M.J.) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). As to the improper computer use, the above-discussed facts from the record undeniably establish that Plaintiff used her government-issued computer to conduct extensive personal business activities in violation of SRNS's policy. Plaintiff admitted to using her work computer to send a number of emails or visit websites related to her or her husband's personal businesses. [P. dep., pp. 211-12, 218-21] Even during the disciplinary board proceedings, Plaintiff conceded that she had violated SRNS's policy by sending an email (but claimed she did not know it was a violation).[7]

As for making false statements to the investigator regarding visiting the Clover and S.C. Department of Revenue websites, the investigator confirmed indisputable time-and-date stamped forensic evidence of Plaintiff visiting these sites, which established the falsity of her representations. [Carter Declaration, Attachment B, p. 10]

Moreover, Plaintiff acknowledged that she has no evidence that the members of the Panel decided to recommend termination because of her race or sex. [P. dep., p. 250] And there is no record evidence that the designee of the Chief Executive Officer harbored such animus. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("[A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

---

[7] Plaintiff's ignorance argument fails because under SRNS's policy, "[i]gnorance of work rules is not an acceptable excuse for violation." [Blankenship Declaration, Attachment A (sec. 5.1.4) (p. 4)] Plaintiff was aware of this standard. [P. dep., p. 253] Moreover, in response to her 2021 corrective document, SRNS required her, and she committed, to review SRNS's relevant policies. [*Id*., D. Ex. 22] Indeed, in February 2021, she confirmed that she had read and had knowledge of SRNS's policy concerning use of computers. [*Id*., p. 158; D. Ex. 18, question 11]

In sum, Plaintiff must show that both of SRNS's legitimate, non-discriminatory reasons for her termination are pretextual. She cannot do so as to either reason. Further, she admitted that she has no evidence of discriminatory animus by the Panel. Nor does such evidence exist as to the designee of the Chief Executive Officer. Accordingly, the Court should grant summary judgment in SRNS's favor on Plaintiff's discriminatory discharge claim.

## II. Title VII Discriminatory Failure to Promote (Race and Sex)

**The Court should grant summary judgment to SRNS on Plaintiff's failure to promote claims because (A) the claims are time-barred, (B) Plaintiff failed to apply for the positions in question, and (C) Plaintiff cannot rebut SRNS's legitimate, non-discriminatory reason for its actions.**

Plaintiff alleges that SRNS denied her two promotional opportunities—to the position of SPOC manager and lead planner, which were awarded to two white males, Russell Overton and William Owensby—even though she was the most senior work window manager. [Complaint, ¶ 53; P. dep., p. 64; D. Ex. 6] Plaintiff is unsure whether either of these positions had a higher salary, but in her view, they would have placed the employee in a position for greater promotions. [*Id*., pp. 61-62, 113] She believed that SRNS's practice was to award the SPOC manager or lead planner positions to the most senior work window manager, which she was at the relevant time. [*Id*., 60, 113] However, her supervisor, Youngblood, did not offer her these positions, having preselected Overton and Owensby for the two positions. [*Id*., pp. 107, 111] As discussed below, Plaintiff's failure to promote claims should be rejected for three reasons: it is time-barred; Plaintiff failed to apply for the positions; and SRNS had a legitimate, non-discriminatory reason for selecting others.

### A. Time-Barred

Because Plaintiff's failure to promote claims are based on allegedly adverse employment actions that occurred more than 300 days before she filed her May 19, 2023 Charge of

Discrimination, her claims are time-barred.

In a deferral state such as South Carolina, the charging party must file a Charge of Discrimination within 300 days of the allegedly discriminatory act; otherwise, the claim is barred. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1988). The United States Supreme Court has identified a failure to promote as a "discrete … discriminatory act" that "'occurred' on the day that it 'happened.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-14 (2002); *see Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) ("Because failure to promote is a discrete act of discrimination, the continuing violation doctrine does not apply here and cannot save [the plaintiff's] untimely claims.") (citing *Morgan*).

Plaintiff filed her Charge of Discrimination on May 19, 2023; thus, only discrete discriminatory acts occurring within the prior 300 days (i.e., on or after July 23, 2022) would be timely. However, the two promotional positions about which Plaintiff complains were awarded to others in June 2022, and no later than July 1, 2022. [P. dep., pp. 105-07, 111-12; D. Ex. 6, p. 01AW000001; D. Ex. 8, p. 01AG000034; D. Ex. 9, p. 01A000040] Even assuming the adverse actions occurred on July 1, 2022, Plaintiff's Charge was untimely by at least 22 days (to July 23, 2022). Accordingly, the Court should grant summary judgment to SRNS on Plaintiff's failure to promote claims because they are time-barred. *Toro v. Science Applications Int'l Corp.*, C/A No. 2:12-1833-DCN-BM, 2012 WL 7176826, *4 (D.S.C. Dec. 7, 2012) ("[S]ince Plaintiff failed to file her administrative charge within three hundred (300) days of the discriminatory conduct alleged, and in light of the applicable caselaw and statutory requirements, the undersigned has no choice but to find that Plaintiff's claims, to the extent they are asserted under Title VII or the ADA, are time barred and subject to dismissal."), *adopted by*, 2013 WL 65268 (D.S.C. Feb. 21, 2013).

### B. Plaintiff's Failure to Apply for Positions

Even if Plaintiff's claims for denied promotions were not time-barred, they would not succeed on the merits because Plaintiff failed to apply for either the SPOC or lead planner positions, which means no showing of a *prima facie* case of discrimination.

To prove a *prima facie* case of discriminatory failure to promote under Title VII, an employee must show that she "applied for the position in question." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998); *Honor*, 383 F.3d at 189; *Williams*, 370 F.3d at 430 (enunciating that if "an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a *prima facie* case of discriminatory failure to promote") (italics added). Plaintiff was familiar with SRNS's job posting system, as she had previously applied for her current position after learning about it through that system. [P. dep., pp. 28-29] However, Plaintiff admitted that she did not apply for the SPOC manager or lead planner positions. [*Id*., p. 109] Given her failure to apply for the positions, she cannot show a *prima facie* case of discrimination.

In opposition, Plaintiff may argue that she did not apply for the two positions because it would have been futile to do so, given that Youngblood had already preselected Overton and Owensby for the positions. Such an argument would fail for three reasons.

First, in her deposition, Plaintiff denied that Overton and Owensby had gone through a sham application process. [P. dep., p. 107]

Second, even if she felt that others may have been preselected, she still had the obligation to apply for or, at least, to express specific interest in the positions. Where, as is the case here, a plaintiff fails to express specific interest in a position, courts have rejected failure to promote claims similar to Plaintiff's. *See Culpepper v. Vilsack*, 664 F.3d 252, 258 (8th Cir. 2011) (rejecting

plaintiff's claim for failure to receive promotion because she "did not make every reasonable attempt to convey [her] interest in … promotion") (internal citation and quotations omitted); *Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) (finding plaintiff did not establish "application" element of his *prima facie* case when evidence showed that he asked supervisors "general questions regarding [employer's] plans for filling the vacant position" but never "submitted an application … or ever indicated to anyone in … management that he wanted the job"); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) ("We hold that [plaintiff's] failure to apply and be rejected for a specific position or positions is fatal to her failure to promote … claims.").

Third, as Fourth Circuit cases establish, preselection is not evidence of discrimination. *Blue v. United States Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990) ("If one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job, black and white alike."); *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979) ("Although the pre-selection … may have violated the rules and regulations of the Department of Corrections, it does not evidence the type of discrimination that is prohibited by Title VII."); *see Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005); *Mackey*, 360 F.3d at 468-69.

Given that Plaintiff cannot establish a *prima facie* case of discrimination on her failure to promote claims, the Court should grant SRNS's motion for summary judgment on these claims.

### C. SRNS's Legitimate, Non-Discriminatory Reason

Even if Plaintiff could demonstrate a *prima facie* case of discrimination, her claim would fail as a matter of law because she cannot rebut SRNS's legitimate, non-discriminatory reason for its decision.  While Overton and Owensby were hired, respectively, for a work center manager

position and work window coordinator position, Youngblood mistakenly thought these were for the lead planner and SPOC manager positions, which, in fact, did not exist at the time.

A discrimination claim fails if an employer can demonstrate a legitimate, non-discriminatory justification for its employment decision. *See Hux v. City of Newport News, Va.*, 451 F.3d 311, 314-15 (4th Cir. 2006).  The employer's reason need not be "wise, fair, or even correct, ultimately, so long as it truly was the reason" for the adverse action taken against the employee. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation omitted).

Youngblood thought he was filling a SPOC manager position and a lead planner position. However, no such discrete positions existed. [Bodie dep., p. 27 ("The SPOC position had been done away with …."); *id.*, p. 32 ("So that conversation [with Youngblood and Owensby] was [that] we had a bad management practice, that there was no SPOC position.  It had been written out of the procedures.  It didn't exist.  It is certainly incorporated into the work window duties …."); *id.*, p. 36 ("[T]he SPOC and lead planner roles were shelved.  They're not being filled ….  They are not part of the operation."); Youngblood dep., p. 48].  In her deposition, Plaintiff confirmed this reason: "Eddie [Bodie] at the time said that Porter [Youngblood] effed up because he didn't follow practice as it happened.  He also said that he did not sign off for Porter's actions as far as the way he chose the SPOC and the Lead Planner." [P. dep., p. 72] After Plaintiff informed Bodie of what Youngblood had done, Bodie counselled Youngblood about his management practices. [Bodie dep., p. 37; Youngblood dep., P. Ex. 1 (Youngblood acknowledging in writing that he "was counseled on management practices and instructed to place all WWMs [work window managers] back in rotation as business needs will allow.")].  Bodie instructed that the lead planner and SPOC duties be rotated among the work window managers. [Bodie dep., p. 33; Youngblood dep., p. 45, P. Ex. 1]

As noted above, in Title VII cases, the employer's reason for its adverse actions against an employee need not be "correct, ultimately, so long as it truly was the reason" for the adverse action taken against the employee. *Hawkins*, 203 F.3d at 279; *Vaughan v. MetraHealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir. 1998) ("The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent.") (citation omitted) (emphasis in original); *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("[J]ust because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual.").

Here, Youngblood deviated from policy in awarding the SPOC manager and lead planner positions to anyone, given that they did not exist. When his supervisor, Bodie, learned of the mistake, he counselled Youngblood about his bad management practice. Youngblood's decision deviated from policy, but it was not discriminatory. Therefore, SRNS has articulated a legitimate, non-discriminatory rationale, which entitles it to summary judgment on Plaintiff's failure to promote claim.

### D. Same-Actor Inference of Non-Discrimination

A further barrier prevents Plaintiff from establishing that SRNS's actions were discriminatory: the same-actor inference. Under Fourth Circuit law, when the same individual hires and then subjects someone to an adverse employment action, this fact "creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (recognizing that "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing"). The Fourth Circuit has applied this presumption in the failure to promote context. *Evans*, 80 F.3d at 959 (establishing that when a supervisor is the same person who hires an individual and

subsequently fails to promote him, there is a "powerful inference" the failure to promote "was not motivated by discriminatory animus"); *see Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1130 (4th Cir. 1995) (finding it "especially unlikely" that the plaintiff was denied a promotion because of the employer's national origin bias where the employer was aware of the plaintiff's national origin upon hiring and allegedly promising him a promotion).

Youngblood and Bodie interviewed Plaintiff, and Bodie decided to hire her for the position of Principal Engineer and Tech Support Specialist. [P. dep., D. Ex. 3; Youngblood Declaration; Bodie Declaration]  Because Youngblood recommended Plaintiff's hire as a Principal Engineer and Tech Support Specialist and subsequently allegedly failed to promote her, there exists a powerful presumption that his decision was not motivated by any discriminatory animus, and this presumption prevents Plaintiff from establishing pretext. *See Proud*, 945 F.2d at 798; *Evans*, 80 F.3d at 959.

This inference, therefore, provides further grounds for the conclusion that SRNS has offered a legitimate, non-discriminatory reason for its actions and is entitled to summary judgment on Plaintiff's failure to promote claims.

### III. Title VII Discriminatory Discipline (Race and Sex)

**The Court should grant summary judgment to SRNS on Plaintiff's discriminatory discipline claim because (A) she did not suffer an adverse employment action, (B) she was treated identically as the white, male employee who participated in the same dispute, so she cannot demonstrate a *prima facie* case, and (C) she is unable to rebut SRNS's legitimate, non-discriminatory reason for issuing a corrective action to her.**

### A.  No Adverse Employment Action

Plaintiff is unable to demonstrate that the "Informative" contact she received constituted an adverse employment action, which is fatal to her discriminatory discipline claim.  As the Fourth Circuit Court of Appeals has explained, "[r]egardless of the route a plaintiff follows in proving a

Title VII action, … the existence of some adverse employment action is required." *Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).  Initially, SRNS does not consider an "Informative" contact to constitute discipline. [Blankenship dep., pp. 44-45 (explaining the difference between an Informative contact, such as what Plaintiff and Stoudemire received, which is "documentation for information," and a Corrective contact, "which starts the disciplinary process")].  Even if it were assumed that the "Informative" contact constituted a written warning, that would still be insufficient to give rise to an adverse employment action.  As case law has recognized, a "written warning does not constitute an adverse employment action because it does not affect the terms, conditions, or benefits of employment." *Heyward v. Careteam Plus, Inc.*, C.A. No. 4:21-cv-0754-SAL-TER, 2022 WL 5434251, at *9 (D.S.C. July 27, 2022), *report and recommendation adopted*, 2022 WL 4103121 (D.S.C. Sept. 8, 2022), *aff'd*, 2023 WL 3581693 (4th Cir. May 22, 2023) (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651–52 (4th Cir. 2002) and *Jensen-Graf v. Chesapeake Emp's' Ins. Co.*, 616 Fed. Appx. 596, 598 (4th Cir. 2015)).

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) does not alter that analysis.  Post-*Muldrow* cases have found that such reprimands do not consist of adverse employment actions. *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024) ("A mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment."); *McNeal v. City of Blue Ash*, 117 F.4th 887, 903 (6th Cir. 2024) (finding that a written reprimand—without more—is insufficient to amount to an adverse employment action); *Credle v. Va. Cmty. Coll. Sys.*, C.A. No. 3:24cv233 (DJN), 2025 WL 27827, at *8 (E.D. Va. Jan. 3, 2025) ("While Plaintiff alleges that the Letter of Reprimand caused her 'emotional

distress' and 'the loss of career path opportunities,' neither of these allegations show that the Letter o[f] Reprimand detrimentally altered the terms and conditions of Plaintiff's employment .... As such, the Letter o[f] Reprimand did not constitute an adverse employment action for purposes of a Title VII discrimination claim."); *Wilson v. Noem*, Case No. 20-cv-100 (GMH), 2025 WL 1000666, *24 (D.D.C. Apr. 3, 2025) ("Even ... post-*Muldrow* ..., courts have found that to be considered an adverse employment action, a letter of reprimand must lead to some deleterious change in the terms, conditions, or privileges of employment.").

Given the absence of an adverse action related to the corrective document, Plaintiff is unable to make out a discrimination claim.

### B.  No *Prima Facie* Case

Plaintiff is unable to establish a *prima facie* case of discrimination because she did not suffer more severe discipline than a comparator.

To establish a *prima facie* case of discriminatory discipline, the employee must show that (1) she is a member of a protected class, (2) the prohibited conduct in which she is engaged was comparable in seriousness to misconduct of employees outside of the protected class; and (3) she suffered more severe discipline for her misconduct as compared to those outside of the protected class. *Cook v. CSX Trans. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *see Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 264-65 (4th Cir. 2008); *Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

In this case, analysis of the second and third factors of the *prima facie* case could not be simpler because they concern the *identical* incident and discipline in which Plaintiff was involved. Plaintiff cannot show she was treated differently than Terry Stoudemire, a white, male coworker. As Plaintiff herself described the situation in a written statement she provided on the day of her

altercation, Stoudemire repeatedly asked her about her privately owned bar. In response to his further question of whether he could come to her bar, she responded to Stoudemire (who is heavyset), "if you can fit in the door you can come there." [P. dep., pp. 145-46, D. Ex. 15; Youngblood Declaration]. He further allegedly asked, "have you had any killings?" [P. dep., D. Ex. 15] She replied, "white people." Plaintiff found Stoudemire's comments to be offensive. [*Id.*]

After Youngblood, Plaintiff's supervisor, learned about the incident, he separately met with Plaintiff and Stoudemire, requested a written statement from each, and instructed and received from witnesses their written accounts of what they had seen and heard. [Youngblood dep., P. Ex. 3; P. dep., D. Ex. 15] Based on Youngblood's investigation and following consultation between his supervisors and human resources, Youngblood issued a separate "Informative" record to Plaintiff and to Stoudemire about the verbal altercation, which had escalated with voices being raised and disturbing other workers and that involved a narrative that could be interpreted as discriminatory and racial. [Youngblood dep., pp. 63-64; Bodie Declaration; P. dep., D. Ex. 17; Blankenship dep., p. 25, P. Ex. 1, p. 01AU000081] Plaintiff's response on the document was: "I understand the potential perception and the significance of this situation and the importance of maintaining a good work environment." [P. dep., D. Ex. 17]

Plaintiff does not now dispute that Stoudemire also received an "Informative" record. [P. dep., pp. 154-55] A review of the documents issued to Plaintiff and Stoudemire show they are nearly identical, with Stoudemire being provided slightly more counsel. [*Id.*, D. Ex. 17; Blankenship dep., P. Ex. 1, p. 01AU000081] Given these facts, Plaintiff has not suffered more severe discipline for her misconduct as compared to someone outside of the protected class; therefore, she is unable to demonstrate a *prima facie* case of discriminatory discipline. *Cook*, 988 F.2d at 511.

SRNS is also entitled to summary judgment on Plaintiff's discriminatory discipline claim because SRNS had a legitimate, non-discriminatory reason for issuing the "Informative" record to Plaintiff (and Stoudemire). As Youngblood's investigation confirmed—which included interviewing Plaintiff and Stoudemire and obtaining written statements from them and from other witnesses—these two employees engaged in a verbal altercation where voices were raised and that disturbed others. *See Boyd v. Nephron Pharms. Corp.*, C/A No. 3:21-4385-MGL, 2022 WL 2500341, at *5 (D.S.C. May 19, 2022) ("Disruptive and unprofessional workplace behavior is a legitimate, non-discriminatory reason to terminate employment."), *report and recommendation adopted in relevant part*, 2022 WL 2302199 (D.S.C. June 27, 2022) (citing *Pearlman v. Pritzker*, 564 Fed. Appx. 716, 719 (4th Cir. 2014)). Plaintiff cannot show SRNS's reason for issuing the "Informative" record was pretextual. *See Hawkins*, 203 F.3d at 279.

Thus, the Court should grant summary judgment to SRNS on Plaintiff's discriminatory discipline claim.

## IV. Title VII Retaliation

**The Court should grant summary judgment to SRNS on Plaintiff's Title VII retaliation claim because she cannot show causation or overcome SRNS's legitimate, non-discriminatory reasons for its actions.**

To support a claim for retaliation under Title VII, a plaintiff must show "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *Mackey*, 360 F.3d at 469); *Barnhill v. Bondi*, No. 23-1901, 2025 WL 1408890, *6 (4th Cir. May 15, 2025).

Plaintiff claims that in July, October, and November 2022, she complained to SRNS's supervisory employees about alleged discrimination. [P. dep., D. Ex 6] As discussed earlier, the

alleged failures to promote occurred no later than July 1, 2022. [*Id.*, D. Ex. 6, p. 01AW000001; D. Ex. 8, p. 01AG000034; D. Ex. 9, p. 01A000040]   Because these alleged adverse actions predated the protected activity, they cannot give rise to a retaliation claim. *Morrall v. Gates*, 370 Fed. Appx. 396, 398 n.2 (4th Cir. 2010) (finding retaliation claim failed as a matter of law where the protected activity occurred after the alleged retaliatory conduct); *Drotleff v. Michelin Tire Co.*, C.A. 6:01-2496-25AK, 2002 WL 32332183, at *4 (D.S.C. Apr. 1, 2002) (rejecting retaliation claim where "the plaintiff's protected activity did not occur until after the alleged retaliation"), *aff'd sub nom.*, *Drotleff v. Michelin N. Am., Inc.*, 48 Fed. Appx. 70 (4th Cir. 2002).

As to whether Plaintiff's November 2022 "Informative" record for engaging in a heated conversation with Stoudemire constituted retaliation, initially, SRNS did not take an adverse employment action against Plaintiff. *See* Section III.A, *supra*. Regardless, Plaintiff cannot show that her engagement in a protected activity was causally linked to her receipt of the "Informative" record.  As discussed earlier, Plaintiff and Stoudemire were both given "Informative" records when they engaged in an inappropriate conversation that involved shouting and disturbance of other employees; that caused SRNS to issue the "Informative" record to Plaintiff.  There is no evidence that SRNS's issuance of that "Informative" record was motivated by any alleged complaints of discrimination.

Finally, Plaintiff's termination does not support her claim of retaliation because it occurred on or around March 1, 2023—some six months after Plaintiff's last alleged complaint of discrimination in November 2022. [P. dep., D. Ex. 6, 27]  As the Fourth Circuit Court of Appeals has recently confirmed in analyzing Title VII retaliation claims, "[w]hile there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action

can generally be no longer than two months." *Barnhill*, 2025 WL 1408890, at \*6 (citing *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021)).

Plaintiff's retaliation claim related to her termination also falters because she cannot show that those who were involved in her termination were aware of her protected activity.[8] The Fourth Circuit has declared that in making a retaliation claim, "the plaintiff must show that a relevant decisionmaker was actually aware of the protected activity before making their decision." *Barnhill*, 2025 WL 1408890, at \*6 (citing *Roberts*, 998 F.3d at 124); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (observing that knowledge of the alleged protected activity by the decision makers is "essential to a retaliation claim"). Here, Plaintiff has offered no evidence that the decision-makers—the members of the Panel, who recommended her termination, and the designee of the Chief Executive Officer, who accepted the termination recommendation—were aware of her protected activity. Indeed, they have all confirmed that they were unaware of any discrimination complaints by Plaintiff before they made their respective decisions. [P. dep., pp. 250-51; Natalia Johnson Declaration, p. 2; Henderson Declaration, p. 2; Whitcomb Declaration, p. 2; Sprague Declaration, p. 3]

Finally, as discussed above, SRNS had legitimate, non-retaliatory reasons for issuing the "Informative" record to Plaintiff and for terminating her. *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001). Plaintiff cannot show

---

[8] Plaintiff also cannot demonstrate SRNS initiated the investigation that led to her termination because of any protected activity. A third-party, the Office of Inspector General, notified SRNS of Plaintiff's suspicious conduct. [Carter Declaration, Attachment B, pp. 1-2] Consistent with SRNS's policy requiring compliance with Office of Inspector General requests, [Blankenship Declaration, Attachment A, (sec. 4.1) (p. 2)], SRNS began an investigation into Plaintiff's conduct.

SRNS's reasons were pretextual; therefore, SRNS is entitled to summary judgment on Plaintiff's retaliation claims.

## **CONCLUSION**

Plaintiff's troubles are her own handiwork. After SRNS's 2021 investigation revealed hundreds of documents on Plaintiff's computer evidencing her personal business activities for a half-dozen businesses she or her family members operated, SRNS issued to her a corrective document, which called on her to desist immediately and study the relevant policies prohibiting such conduct. Plaintiff ostensibly agreed to do so, but a subsequent investigation—prompted by a criminal inquiry from an outside entity into Plaintiff's computer use—revealed that she had been recalcitrant. She had continued to use her work computer to conduct personal business activities. An independent disciplinary Panel considered Plaintiff's policy violations, and influenced by her same misconduct just 18 months earlier, recommended her termination, which the designee of SRNS's Chief Executive Officer accepted. Thus, Plaintiff has no one to blame but herself for her termination, and her attempt to shift responsibility for her termination is unavailing. Her ancillary discriminatory failure to promote and discipline claims similarly fail because she cannot establish *prima facie* cases of discrimination nor overcome SRNS's legitimate, non-discriminatory and non-retaliatory reasons for its actions.

SRNS is entitled to summary judgment. The Court is respectfully urged to so order.

Respectfully submitted,

s/ Phillips L. McWilliams
Phillips L. McWilliams (FID No. 11992)
pmcwilliams@fisherphillips.com
Shahin Vafai (FID No. 7518)
svafai@fisherphillips.com
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
Telephone: (803) 255-0000
Facsimile: (803) 255-0202

ATTORNEYS FOR DEFENDANT

June 12, 2025