# PLAINTIFF'S DEP.

```
              IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF SOUTH CAROLINA
                        AIKEN DIVISION

                          CASE NO.:  3:22-cv-03898-MGL

Alisha Johnson,                    )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
Savannah River Nuclear             )
Solutions,                         )
                                   )
          Defendant.               )
```

DEPOSITION OF

ALISHA JOHNSON

********

Wednesday, January 8, 2025

10:00 a.m. - 6:40 p.m.


       The deposition of ALISHA JOHNSON was

    taken on behalf of the Defendant at the law

    offices of Fisher & Phillips, LLP, 1320 Main

    Street, Suite 750, Columbia, South Carolina,

    on the 8th day of January, 2025, before

    Cassandra E. Vance, Court Reporter and Notary

    Public in and for the State of South

    Carolina, pursuant to Notice of Deposition.

1/8/2025                     ALISHA JOHNSON

```
 1                     APPEARANCES:

 2   Julius W. "Jay" Babb IV, Esquire
     Cromer, Babb & Porter, LLC
 3   1418 Laurel Street
     Columbia, South Carolina  29201
 4   Counsel for the Plaintiff

 5   Phillips L. McWilliams, Esquire
     Fisher & Phillips, LLP
 6   1320 Main Street, Suite 750
     Columbia, South Carolina  29201
 7   Counsel for the Defendant

 8                       INDEX
                                             PAGE
 9   Direct Examination by Mr. McWilliams..............4
     Cross-Examination by Mr. Babb.....................270
10   Redirect Examination by Mr. McWilliams............275
     Recross-Examination by Mr. Babb...................281
11   Further Redirect Examination by Mr. McWilliams....282
     Certificate.......................................285
12   Verification of Deponent..........................286
     Errata Page.......................................287
13
                       EXHIBITS
14                                           PAGE

15   Defendant's Exhibit 1, (2 pages).............22
        - 01AA000088-89
16   Defendant's Exhibit 2, (1 page)..............24
        - 01AA000101
17   Defendant's Exhibit 3, (4 pages).............26
        - 01AA000045-46, 40, 36
18   Defendant's Exhibit 4, (33 pages)............36
        - 01AQ000001-33
19   Defendant's Exhibit 5, (8 pages).............46
        - 01AR000001-8
20   Defendant's Exhibit 6, (8 pages).............53
        - 01AW000001-8
21   Defendant's Exhibit 7, (8 pages).............56
        - Summons and Complaint
22   Defendant's Exhibit 8, (6 pages).............105
        - 01AG000032-37
23   Defendant's Exhibit 9, (6 pages).............111
        - 01AG000038-43
24   Defendant's Exhibit 11, (12 pages)...........113
        - Plaintiff's Responses to Defendant's First Set of
25   Discovery Requests
```

1/8/2025                    ALISHA JOHNSON

```
 1              EXHIBITS (Continued)
                                         PAGE
 2
    Defendant's Exhibit 12, (5 pages)............119
 3     - Plaintiff's First Supplemental Responses to
    Defendant's First Set of Discovery Requests
 4  Defendant's Exhibit 13, (6 pages)............123
       - Johnson, A. 1010-1015
 5  Defendant's Exhibit 14, (3 pages)............134
       - Johnson, A. 1018, 1017, 1016
 6  Defendant's Exhibit 15, (1 page).............145
       - 01AN000004
 7  Defendant's Exhibit 16, (1 page).............149
       - 01AN000005
 8  Defendant's Exhibit 17, (1 page).............154
       - 01AC000001
 9  Defendant's Exhibit 18, (3 pages)............156
       - 01AK000004-6
10  Defendant's Exhibit 19, (3 pages)............160
       - 01AK000001-3
11  Defendant's Exhibit 20, (31 pages)...........164
       - 01AL000001-31
12  Defendant's Exhibit 21, (5 pages)............186
       - 01AF000001-5
13  Defendant's Exhibit 22, (2 pages)............190
       - 01AB000030-31
14  Defendant's Exhibit 23, (18 pages)...........202
       - 01AM000001-18
15  Defendant's Exhibit 24, (9 pages)............227
       - 01AF000006-15
16  Defendant's Exhibit 25, (1 page).............237
       - 01AB000025
17  Defendant's Exhibit 26, (7 pages)............239
       - 01AB000003-9
18  Defendant's Exhibit 27, (2 pages)............252
       - 01AB000027-28
19
                   STIPULATIONS
20

21         It is stipulated and agreed that this
       deposition is being taken pursuant to the
22     South Carolina Rules of Civil Procedure.

23         It is stipulated by and between counsel
       and the witness that the reading and signing
24     of the following deposition be, and the same
       are, hereby reserved.
25
```

1/8/2025                    ALISHA JOHNSON

```
 1     Q    All right.  What's your date of birth?
 2     A    September 26, 1972.
 3     Q    Do you have any children?
 4     A    I do.
 5     Q    How many?
 6     A    Three.
 7     Q    And what are their names?
 8     A    Dehavelyn Barnes, Fredericka Tucker, and
 9   Frelicia Tucker.
10     Q    And, I'm sorry, what was the first child's
11   name again?
12     A    Dehavelyn, D-E-H-A-V-E-L-Y-N.
13     Q    Dehavelyn.  And that was with your first
14   husband?
15     A    That's correct.
16     Q    Okay.  And how old is Dehavelyn?
17     A    Thirty-two.
18     Q    And how old's Fredericka?
19     A    Twenty-six.
20     Q    And how old's Felicia [sic]?
21     A    Twenty-six.
22     Q    And where does Dehavelyn live?
23     A    In Maryland.
24     Q    Okay.  And Fredericka?
25     A    Tallahassee.
```

1/8/2025                         ALISHA JOHNSON

```
 1        A      That's correct.
 2        Q      And that's the job that we talked about
 3    earlier at the South Carolina State Prison?
 4        A      That's correct.
 5        Q      And here it says you left voluntarily because
 6    of the difficult pregnancy, correct?
 7        A      That's correct.
 8        Q      All right.  And those are the only two work
 9    experiences you had after high school before going
10    to work on the Savannah River Site?
11        A      That's correct.
12               (DEFENDANT'S EXHIBIT 2 WAS MARKED FOR
13    IDENTIFICATION PURPOSES (1 page) - 01AA000101)
14        Q      All right.  So, if you could flip to
15    Exhibit 2, what's been marked as Defendant's
16    Exhibit 2.  Have you ever seen this document
17    before?
18        A      Yes.
19        Q      What is it?
20        A      It was the offer letter for the position at
21    Savannah River Site.
22        Q      Okay.  At the time, it says you were employed
23    by Westinghouse Savannah River Company; is that
24    correct?
25        A      That's correct.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    All right.  And then at some point,
 2   Westinghouse Savannah River Company became SRNS,
 3   correct?
 4      A    That's correct.
 5      Q    All right.  But you didn't have to reapply.
 6   You just stayed employed the whole time?
 7      A    Yes.
 8      Q    Okay.  It says your start date was about
 9   August 18, 1998; is that correct?
10      A    That's correct.
11      Q    That's when you started?
12      A    Yes.
13      Q    All right.  And you started as a Production
14   Operator Trainee, correct?
15      A    Yes.
16      Q    All right.  What were your duties and
17   responsibilities generally as a Production
18   Operator Trainee?
19      A    Basically, I took rounds in the facility.  I
20   worked in the Tritium facility, which it was
21   classified.  I held a Q clearance.  So, a lot of
22   the things I did, it's like a need-to-know.  But
23   to sum it up, I took rounds and did
24   troubleshooting and...
25      Q    When you say take rounds, what do you mean?
```

1/8/2025                    ALISHA JOHNSON

```
 1     01AA000040, 01AA000036)
 2     A    Yes.
 3     Q    All right.  Have you seen this document
 4     before?
 5     A    Is there something else to it?
 6     Q    There's a second page to it.
 7     A    I can't recall to say that I saw this
 8     particular document.
 9     Q    Okay.  Well, I'll represent to you, this is a
10     Change of Status form that SRNS maintains in the
11     regular course of business and that we produced to
12     your attorney during discovery.
13          And can you see this particular one, it looks
14     like -- if you look under the kind of like second
15     group of stuff on the right-hand side under
16     Effective Date, it looks like this change was
17     effective February 1st, 2017.  Do you see that?
18     A    I see it.
19     Q    All right.  And it says that at the time,
20     your current job up top looks like Lead Ops
21     Specialist C.
22     A    Where is that?
23     Q    Up in the blue thing, you see current job
24     title?
25     A    I see it.
```

1/8/2025                    ALISHA JOHNSON

```
1     Q     And was that a job that you held?
2     A     Okay.  So that Lead Ops Specialist C,
3     that's -- I was Shift Operations Manager, so
4     maybe -- that's correct.
5     Q     Okay.  So that's correct?  And your grade at
6     that time, you can see right next to it, was 33?
7     A     Yes.
8     Q     All right.  And then we go down under -- it
9     says like Promotion.  It looks like that you were
10    promoted to looks like Print [sic] Engineer and
11    Tech Support Specialist; is that correct?
12    A     A Principal Engineer.
13    Q     Principal Engineer?  Okay.
14    A     That's correct.
15    Q     All right.  And above that, it looks like you
16    got that promotion through the posting system; is
17    that correct?
18    A     That's correct.
19    Q     So does that mean that this job was posted
20    somewhere on SRNS like intranet and you applied
21    for it?
22    A     That's correct.  Yes.
23    Q     Okay.  And how did you know about this
24    posting?
25    A     It came out on Brass Ring.
```

1/8/2025                    ALISHA JOHNSON

```
1     Q     And tell us what Brass Ring is.
2     A     It's where the jobs appear, the open jobs
3     appear and you can -- anybody can apply for them.
4     Q     So that's like an internal system that SRNS
5     has?
6     A     That's correct.
7     Q     Okay.  So if you see a job on there, you can,
8     I don't know, click a link and then apply?
9     A     That's correct.  It's not just internal.
10    It's external, too.
11    Q     Okay.
12    A     Meaning that if you don't work there, you can
13    also -- you also have access to the Brass Ring.
14    Q     Okay.  All right.  Thank you.  What were your
15    job duties and responsibilities as the Principal
16    Engineer and Tech Support Specialist?
17    A     To scope and -- scope, lock in, and execute
18    the day-to-day activities in the facility.
19    Q     What do you mean by "scope and execute"?
20    A     So you work on a eight -- a rolling
21    eight-week schedule.  And my task was to
22    communicate with Operations, RADCON, Maintenance,
23    Construction, and any type -- any outside work
24    facilities to coordinate any work that was
25    scheduled during that week.
```

1/8/2025                          ALISHA JOHNSON

```
 1      the time this happened?
 2      A    That's correct.  Because initially I was
 3      getting about 81.
 4      Q    Okay.  And so you don't know who made the
 5      decision to up your pay?
 6      A    Like I said, the -- an assessment team came
 7      in and they were looking at people, you know, just
 8      looking at the different salaries.
 9           Because, evidently, complaints were out about
10      people not getting adequate pay or not being paid
11      what some of the counterparts that were doing the
12      same positions were being paid.  And from that
13      assessment, thus, I received the raise.
14      Q    Okay.  If you could look at what's been
15      marked as -- sorry, never mind, excuse me.
16      A    Okay.
17      Q    There's one more page on this exhibit, the
18      final page.  And this, I'll represent to you, is
19      another Change of Status form that SRNS maintained
20      in the ordinary course of business that we
21      produced to your attorney.
22           And this one just lists your termination
23      date.  It says it's effective 3/1/2023, was
24      your -- was your last day of work; is that
25      correct?
```

1/8/2025                    ALISHA JOHNSON

```
 1        A     That's correct.

 2        Q     And that was your last day of work?

 3        A     To the best of my knowledge, what happened

 4     is, they sent me home and -- after my Disciplinary

 5     Review Board for about a week, and I was called in

 6     to meet them at the badge office, you know, on or

 7     about March 1st or February the 28th, one of those

 8     days, somewhere close.  And that's when I signed

 9     the -- well, that's when they told me I was

10     terminated.

11        Q     Okay.  So it's around about the date that's

12     listed on here.

13        A     That's correct.

14        Q     Okay.  All right.  Do you know, did SRNS have

15     an employee handbook?

16        A     Yes.

17        Q     Okay.  Did you review the employee handbook?

18        A     Yes.

19        Q     Okay.  And you could look at it whenever you

20     wanted electronically?

21        A     Yes.

22              (DEFENDANT'S EXHIBIT 4 WAS MARKED FOR

23     IDENTIFICATION PURPOSES (33 pages) -

24     01AQ000001-33)

25        Q     Okay.  I'm going to show you what's marked
```

1/8/2025                ALISHA JOHNSON

```
 1      Exhibit 4.
 2      A     Okay.
 3      Q     And I'm going to direct you to section 4.1,
 4      which is on page four of this document.  Or,
 5      sorry, have you seen -- have you seen this before?
 6      A     Yes.
 7      Q     And what is this?
 8      A     The 5B.  It's is the -- the policy for SRNS.
 9      Q     Okay.  So this is part of the SRNS handbook?
10      A     That's correct.
11      Q     Okay.  All right.  And so section 4.1, do you
12      see where it states, "All managers, Personnel, and
13      Organizations"?  And then underneath it, it says,
14      "All managers, personnel, and organizations are
15      responsible for..."  Do you see that?
16      A     I see it.
17      Q     All right.  So the first bullet point says,
18      "Notifying their immediate manager and the
19      SRNS-M&O or SRNS" -- or, excuse me -- "or SRNL-M&O
20      Office of General Counsel of any Office of
21      Inspector General or General Accounting Office
22      requests for information, reports, interviews, et
23      cetera -- et cetera, pertaining to audits,
24      reviews, inspections, and investigations."  Did I
25      read that correctly?
```

1/8/2025                        ALISHA JOHNSON

```
 1    A     The best -- from what I heard.

 2    Q     Is that a "yes"?

 3    A     Yes.

 4    Q     Okay.  So, is it your understanding from this

 5    bullet point that we just looked at, that if SRNS

 6    receives a request from the OIG, the Office of

 7    Inspector General, to investigate a matter, they

 8    are required to investigate that issue?

 9          MR. BABB:  Object to the form.

10    A     Can you repeat that?

11    Q     So if -- per this policy that we just read,

12    if SRNS receives a request to investigate from the

13    Office of Attorney -- Office of Inspector General,

14    they're required to cooperate with that?

15    A     Yes.

16    Q     Okay.  All right.  So the second bullet point

17    underneath 4.1 states, "Complying with the OIG or

18    GAO requests for interviews and briefings and

19    providing affidavits, sworn statements, if so,

20    requested by designated personnel of the OIG and

21    GAO who are authorized to administer oaths or

22    affirmative [sic] or take affidavits."  Is that --

23    did I read that correctly?

24    A     Yes, you read it correctly.

25    Q     Okay.  So does this second bullet point state
```

1/8/2025                    ALISHA JOHNSON

```
 1        that SRNS employees are required to comply with
 2        the OIG if they request to interview an SRNS
 3        employee?
 4        A    Can you repeat that again?
 5        Q    So, looking at the second bullet point, does
 6        this say that SRNS employees are required to
 7        comply with an OIG request to interview that
 8        employee?
 9        A    Yes.
10        Q    Okay.  All right.  So then the third bullet
11        point says, "Giving full and prompt attention to
12        providing pertinent documentation, other
13        information to the OIG and GAO under the direction
14        of appropriate M&O management."  Did I read that
15        correctly?
16        A    Yes.
17        Q    All right.  And so, basically, based on these
18        three bullet points that we've just looked over,
19        SRNS is required to investigate a matter brought
20        to them by the OIG, correct?
21             MR. BABB:  Object to the form.  You can
22        answer.
23        A    Yes.
24        Q    Okay.  All right.  So if we turn to page six.
25        All right.  You see section 5.1, Rules of Conduct?
```

1/8/2025                        ALISHA JOHNSON

 1    process, correct?

 2    A    Yes.

 3    Q    All right.  Are you generally familiar with

 4    what the discipline process used by SRNS is?

 5    A    I am.

 6    Q    Okay.  So, there are occasions when a manager

 7    can institute discipline, correct?

 8    A    That's correct.

 9    Q    But there's other times where a Disciplinary

10    Panel has to be convened to issue any sort of

11    discipline; is that correct?

12    A    That's correct.

13    Q    All right.  And before your termination with

14    SRNS, you were heard by a Disciplinary Panel?

15    A    I was.

16    Q    Okay.  So let's look at page four of this

17    exhibit.  And you see section 4.4?  That talks

18    about what the Disciplinary Panel is responsible

19    for; is that correct?

20    A    That's correct.

21    Q    All right.  And the second bullet point under

22    4.4 says, "The Disciplinary Panel is responsible

23    for determining appropriate disposition of the

24    case."  Did I read that correctly?

25    A    Yes, you read that correctly.

1/8/2025                    ALISHA JOHNSON

1    Q    Okay.  So if someone's to be terminated, the

2    CEO or the COO has to make the final determination

3    about termination?

4    A    With the HR Policy person and the Line

5    Management of the person they're terminating in

6    attendance, that's what I understand.

7    Q    Okay.  So the final decision, though, is up

8    to the CEO or the COO?

9    A    Per this policy.

10    Q    Do you have anything to dispute or to prove

11    that SRNS does not follow this policy when

12    terminating employees?

13    A    At this time, I don't have anything in

14    concrete at this time.

15    Q    Are you actively looking for something to

16    disprove it?

17    A    Let's just say there are things going on and

18    that have been going on at SRNS that are beyond

19    the policies that are listed here.

20    Q    What are those things?

21    A    It's just different practices and -- that are

22    carried out by different people out there.

23    Q    What practices?

24    A    The "good old boy" system is one of the ones.

25    Q    So there's a "good old boy" system where

1/8/2025                    ALISHA JOHNSON

```
1    the Summons and the Complaint that your attorney

2    filed on your behalf in this action?

3    A    Yes.

4    Q    Did you review it before it was filed?

5    A    I looked at it with my attorney before it was

6    filed.

7    Q    And were -- are all the allegations in this

8    Complaint accurate?

9    A    They're accurate as to the best of what my

10   recollection was at the time.

11   Q    Okay.  So, if you look at page six and seven

12   of the Complaint, they're numbered, it looks like

13   you've asserted three causes of action; is that

14   correct?

15   A    That's correct.

16   Q    And the first one is Race Discrimination in

17   violation of Title VII, correct?

18   A    That's correct.

19   Q    The second is Sex Discrimination in violation

20   of Title VII?

21   A    That's correct.

22   Q    And the third is Retaliation in violation of

23   Title VII?

24   A    That's correct.

25   Q    And those are the only three causes of action
```

1/8/2025                    ALISHA JOHNSON

```
1      you've asserted in this Complaint?
2           MR. BABB:  Object to the form of the
3      question.  Answer, if you can.
4      A    Those are the three that are listed here.
5      Q    Are you aware of any other causes of action
6      that you've brought against the company?
7      A    Not at this time.
8      Q    Okay.  And are you making any other claims in
9      this lawsuit against SRNS?
10     A    Not at this time.
11     Q    Okay.  So, if you look at paragraph 11 of the
12     Complaint...
13     A    So go back another page?
14     Q    Yeah, you'll go back to page two of the
15     Complaint.  It's where paragraph 11 is.
16     A    (Witness complies.)
17     Q    So, paragraph 11, you allege, "Upon
18     information and belief, it is the practice within
19     the maintenance department in which Plaintiff
20     worked for the most senior Work Window Manager to
21     be promoted to spot manager in the same department
22     when the position became available."  Did I read
23     that correctly?
24     A    Yes.
25     Q    And when you say "spot manager," did you mean
```

1/8/2025                                    ALISHA JOHNSON

```
 1        SPOC, S-P-O-C, Single Point of Contact manager?
 2        A     That's correct.
 3        Q     Okay, just wanted to make sure.  What's your
 4        basis for the allegation in paragraph 11?
 5        A     My basis for the -- for that allegation in
 6        paragraph 11, whenever I started training back in
 7        initially 2016, James Barnes was a Work Window
 8        Manager at the time, and he was the one that
 9        trained me.
10             And during the training process, as he was
11        describing my roles and responsibilities, he also
12        told me that the common practice was, the most
13        senior Work Window Manager would -- if a lead
14        planning position opened up, or if the SPOC
15        position opened up, the most senior Work Window
16        Manager at the time would take that position.
17             To further defend this allegation, Porter
18        Youngblood was the Lead Planner whenever I took
19        this position, and whenever the SPOC manager left,
20        Porter took the SPOC position, because he was the
21        most senior, and Scott Brown, Michael Brown, took
22        the Lead Planner position, because at that time,
23        he was the most senior Work Window Manager.
24             Well, when Porter was promoted to -- let me
25        go back.  So when Porter was the SPOC, somebody
```

1/8/2025                         ALISHA JOHNSON

```
 1    left that position.  I forget that guy's name.
 2    Porter got that position because he was the -- he
 3    was the most senior.  Mike Brown was next in line,
 4    so he took the Lead Planner position.  So that
 5    left James Barnes as the most senior Work Window
 6    Manager, and I was next in line behind James
 7    Barnes.
 8         So whenever Scott Brown was moved to an
 9    Outage Coordinator, the Lead Planner position came
10    open, and James Barnes was moved to the Lead
11    Planner position.
12         When James Barnes was moved to the Lead
13    Planner position, at that time that left me as the
14    most senior Work Window Manager.
15         After a while...
16    Q    So hold up for a second.  All these changes
17    that you've just discussed, of people move to the
18    SPOC or the Lead Planner position, were you privy
19    to any of the discussions on, "Hey, this is why
20    we're deciding to move these people there"?
21    A    No, other than the discussion that was had
22    with me with other Work Window Managers, as well
23    as even Porter, the most senior Work Window
24    Manager would move up.
25    Q    But when the decision was made, did they say,
```

1/8/2025                          ALISHA JOHNSON

```
 1        "We're moving this person because he's the most
 2     senior"?
 3     A    I believe that it wasn't in context as just
 4     as you're putting it.  But what was relayed to me
 5     by Porter Youngblood was, that the most senior
 6     Work Window Manager would be moved to these
 7     positions to put them in the spotlight so that
 8     they would have more responsibility and work in
 9     that job capacity, so when the position became
10     open for a Work Center Manager position, the
11     person that was put in that spot would already
12     have the capabilities and the knowledge to be able
13     to succeed as a Work Center Manager.
14     Q    And Work Center Manager is the step above
15     where you were as a Work Window Manager?
16     A    That's correct.
17     Q    Okay.  And when Porter told you this, what
18     was his position?
19     A    He said this several times.  So maybe he was
20     the SPOC at the time or maybe he was the Lead
21     Planner at the time, but he said this on -- at
22     different points.
23     Q    And does the SPOC position, does it have more
24     pay than a Work Window Manager position?
25     A    I'm not sure that it has more pay at the
```

1/8/2025                    ALISHA JOHNSON

```
 1        time.  But, again, being put in that position will
 2        get you to where you can get more pay.
 3        Q     Okay.  Does the Lead Planner position come
 4        with more pay than --
 5        A     I'm not sure, but it will put you in a
 6        position that you can get more pay.
 7        Q     Did Porter tell you that he was told that,
 8        "Hey, I got the SPOC position or the Lead Planner
 9        position," because he was the most senior Work
10        Window Manager?
11        A     Yes, he did.
12        Q     When did he tell you that?
13        A     Back whenever he got it -- whenever -- again,
14        whenever I started working over there between 2016
15        and '17.
16        Q     So he told you that in 2016 or '17?
17        A     Whenever I started working in 2016 and '17, I
18        was told that the most senior Work Window Manager
19        moves up when those positions become open, by
20        James Barnes, by Michael Brown, by Porter
21        Youngblood on different occasions.
22        Q     But it was all when you first started?
23        A     When I first started and throughout my tenure
24        over there.
25        Q     How many times throughout your tenure?
```

1/8/2025                    ALISHA JOHNSON

```
 1      Lead Planner"?
 2      A    I'm not sure if they did or not.
 3      Q    Okay.  And so paragraph 12, we've already
 4      talked about that.  You're saying that's the same
 5      practice as when the Lead Planner position became
 6      available, correct?
 7      A    That's correct.
 8      Q    Okay.  So on paragraph 13, you say that the
 9      spot -- SPOC manager and the Lead Planner
10      positions became available in June of 2022.  How
11      did you become aware of these vacancies?
12      A    It was around that time, and I became aware
13      of those vacancies whenever -- it was a rumor
14      mill, but when I became aware of them is when an
15      email was sent out saying that Michael Brown had
16      received -- he was going to take a Work Center in
17      one area, and James Brown was going to take a Work
18      Center in another area, which means they were
19      leaving the area that we were in, and that Porter
20      Youngblood was going to assume command of the Work
21      Center that I currently worked in.  And Russell
22      Overton would become the SPOC, and William Owensby
23      would become the Lead Planner.
24          I think it was through an email or maybe a
25      meeting, one of our morning meetings, that all of
```

1/8/2025                    ALISHA JOHNSON

```
 1    meeting with Tamara Blankenship, David Hart, Eddie
 2    Bodie, and Porter Youngblood.
 3    A    So that meeting was in a different area.  I
 4    think, I want to say, N Area.
 5         THE COURT REPORTER:  I'm sorry, what
 6    area?
 7         THE WITNESS:  N.
 8         THE COURT REPORTER:  N Area?
 9         THE WITNESS:  N as in November.
10         THE COURT REPORTER:  Thank you.
11    A    So, in that meeting, everything that I just
12    discussed with you about the conversation I had
13    with Porter was the exact same conversation I had
14    with all of the people I just mentioned.
15    Q    Okay.  So how did they respond to your
16    statement that, "Hey, the only reason I didn't get
17    this is because I'm a black woman"?
18    A    So, of course, they denied that that was the
19    case.  Eddie at the time said that Porter effed up
20    because he didn't follow practice as it happened.
21         He also said that he did not sign off for
22    Porter's actions as far as the way he chose the
23    SPOC and the Lead Planner.  However, it was some
24    changes that they had discussed, but that was just
25    a discussion.
```

1/8/2025                          ALISHA JOHNSON

```
1    Q    Okay.  And you would figured out about when
2    they were open because you could look on Brass
3    Ring, correct?
4    A    Yes.
5         (DEFENDANT'S EXHIBIT 8 WAS MARKED FOR
6    IDENTIFICATION PURPOSES (6 pages) - 01AG000032-37)
7    Q    Okay.  All right.  Can you turn to Exhibit 8
8    in your notebook, what's been marked as
9    Defendant's Exhibit 8?
10   A    (Witness complies.)
11   Q    Okay.  So I'm going to represent to you that
12   this is the job posting for the job that you
13   allege you were passed over for that Russell
14   Overton applied for and received.  We produced
15   this document to your attorney during discovery.
16        At the top, this says that it's for
17   requisition number 6785BR, Work -- a Work Center
18   Manager; is that correct?
19   A    That's what that says.
20   Q    Okay.  And if you look at the second page of
21   this requisition, you've got the Functional Org
22   Code and Name.  It says it's in H Area Planning,
23   correct?
24   A    That's correct.
25   Q    And H Area Planning was the -- H Area
```

1/8/2025                           ALISHA JOHNSON

```
 1    Planning was the area you were in, correct?
 2    A    That's correct.
 3    Q    Okay.  And towards the top of the page -- the
 4    same page you're on, sorry.
 5    A    Oh, okay.
 6    Q    So this is about four lines down.  It says
 7    number of positions, three.  Do you see that?
 8    A    I do.
 9    Q    But you didn't apply for this position, did
10    you?
11    A    So, here's the thing.  Before this position
12    was posted, Porter had already handpicked Russell
13    Overton to do this job.  He was already in the
14    SPOC position.
15    Q    How do you know he had already picked Russell
16    Overton for the job?
17    A    Because this posting didn't come out until at
18    least six to nine weeks after he had put Russell
19    in that position, and after he had placed Owensby
20    into the position of Lead Planner.
21    Q    So you're saying that Russell had to apply
22    for a job he already had, and they went through a
23    whole application process for a position he
24    already had obtained?
25    A    That's correct.
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                           ALISHA JOHNSON

```
1    Q    Okay.  So, if you turn to the third page.
2    Can you look about four or five lines down?  It
3    says the date needed was July 1st, 2022, right?
4    A    That's correct.
5    Q    That's about when Russell Overton started
6    working in H Area?
7    A    No, he had been working in H Area before July
8    of 2022.
9    Q    So is that about when he became the -- I
10   can't remember which one he was -- the SPOC or the
11   Lead Planner?
12   A    He became that sometime around June before --
13   Q    So you're saying -- so this -- this all was
14   just a sham application process that they went
15   through?
16   A    That's not what I'm saying.  What I'm saying
17   is this:  Whenever that position became open, when
18   Porter was made Work Center Manager, Scott Brown
19   left and went to one area, James Barnes left and
20   went to another area.
21        Porter handpicked Russell Overton and William
22   Owensby for the Lead Planner position and for the
23   SPOC position.
24   Q    So --
25   A    I wasn't finished.  So, just to let you know,
```

1/8/2025                          ALISHA JOHNSON

1        So Owensby put in for the position.  Whenever
2    he interviewed for the position, he ended up being
3    the top candidate.  And because it was multiple
4    positions -- another area actually wanted him.
5    Porter had to go to the other person in the other
6    area and plead to keep Owensby in H Area.
7        So what I am saying is this:  Owensby and
8    Overton were handpicked for these positions by
9    Porter before the positions were ever posted.
10        When the positions were posted, to answer
11    your question, I did not apply for them because he
12    had already put these people in a position.  And
13    by that time, Porter and I were already talking
14    about how I felt that things were -- that things
15    were going on.
16    Q    So when did you have this conversation with
17    Owensby?
18    A    I had that conversation with Owensby more
19    than once, because I was trying to figure out
20    exactly what was going on, how he got the
21    position.
22    Q    So, all the stuff you just talked about,
23    Owensby is the one who told you that?
24    A    That's correct.
25    Q    Okay.  Did you have this conversation before

1/8/2025                    ALISHA JOHNSON

```
1    A    He -- no.

2    Q    So he didn't make a decision on who to hire

3    for this?

4         MR. BABB:  Object to the form of the

5    question.

6    A    That's not what I'm saying.  I don't know

7    if -- he's not one of the panel members, but,

8    again, he handpicked Russell and Owensby for those

9    jobs.

10        (DEFENDANT'S EXHIBIT 9 WAS MARKED FOR

11   IDENTIFICATION PURPOSES (6 pages) - 01AG000038-43)

12   Q    Okay.  So can you turn to Exhibit 9, please?

13   A    Yes.

14   Q    So I'm going to tell you, this is documents

15   kept in the ordinary course of business by SRNS.

16   We produced it in discovery to your attorney.  And

17   I'll represent to you, this is the job posting --

18   A    Uh-huh (affirmative response).

19   Q    -- for the job that you allege you were

20   passed over for that William Owensby applied for

21   and received.

22        And at the top, it says requisition number

23   6786BR, Work Window Coordinator; is that correct?

24   A    That's correct.

25   Q    All right.  So this is the posting for the
```

1/8/2025                          ALISHA JOHNSON

```
 1       same job you already held?
 2       A     Yes, it is.
 3       Q     Okay.  Did you apply for this job?
 4       A     I didn't apply for this particular job.
 5       Q     Okay.  And if you look at the third page of
 6       this exhibit, who are the panel members?
 7       A     Robert Williamson, Jim Peters, Doug Gregory,
 8       and Danny Auvenshire.
 9       Q     So Porter Youngblood is not one of the
10       members of the panel?
11       A     He's not on the panel.  But, again, he had
12       already handpicked both of these guys, and they
13       were already in the position.
14       Q     So he was able to override the panel and get
15       who he wanted?
16       A     Again, before this convened, he had already
17       put both gentlemen in those positions.
18       Q     I understand that you're saying someone
19       worked there potentially temporarily or not.  I
20       mean, I don't -- I don't know.  But I'm saying how
21       did -- if these people are the panel members --
22       A     Uh-huh (affirmative response).
23       Q     -- what is your evidence that Porter
24       Youngblood was just able to override them and
25       place who he wanted in the position?
```

1/8/2025                    ALISHA JOHNSON

```
 1      A    My --
 2           MR. BABB:  Hold on.  Object to the form
 3      of the question.  Now you can answer.
 4      A    Okay.  So my evidence is this:  From the time
 5      before I ever came over to H Area Work Center, the
 6      practice was for the senior Work Window Manager to
 7      be placed in any open Lead Planner position and/or
 8      SPOC position.
 9           Placing the most senior Work Window Manager
10      in these positions would give them the ability to
11      perform the job, to get on-the-job training, so
12      that when these positions became open, they would
13      get the positions.  They would have already been
14      in the spotlight, and they would get those
15      positions.
16      Q    You mean get a position above Work Window
17      Manager?
18      A    That's correct.
19      Q    Okay.  Not the SPOC or Lead Planner position.
20      That's --
21      A    The SPOC and Lead Planner position were
22      stepping stones that were not posted, but it was
23      the common practice.
24           (DEFENDANT'S EXHIBIT 11 WAS MARKED FOR
25      IDENTIFICATION PURPOSES (12 pages) - Plaintiff's
```

1/8/2025                          ALISHA JOHNSON

```
 1      A    At this time, I can't name a specific
 2   incident.
 3      Q    Okay.  Can you turn to the third page of your
 4   calendar entries?  So for any of these -- well,
 5   what can you read what it's on December 1st?
 6      A    There's an appointment with somebody and I
 7   guess I had to be off and I worked that next day
 8   for makeup time, but --
 9      Q    That's what it says on the 2nd?
10      A    Yeah.
11      Q    Does that have anything to do with your
12   lawsuit against SRNS?
13      A    No.  Again, this was just my
14   day-to-day activities.
15      Q    Okay.  And these are the only calendar
16   entries you have that are relevant to your lawsuit
17   against SRNS?
18      A    That's correct.
19           (DEFENDANT'S EXHIBIT 15 WAS MARKED FOR
20   IDENTIFICATION PURPOSES (1 page) - 01AN000004)
21      Q    Okay.  Can you turn to Exhibit 15?  Have you
22   seen this document before?
23      A    I have.
24      Q    What is it?
25      A    That is my personal statement of what
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                        ALISHA JOHNSON

 1      happened with Stoudemire and myself to the best of
 2      my recollection.
 3      Q    Okay.  And is that your signature at the
 4      bottom?
 5      A    That's correct.
 6      Q    And did you fill this out on November 22nd,
 7      2022?
 8      A    That's correct.
 9      Q    And that's the day the Terry Stoudemire
10      incident occurred?
11      A    That's correct.
12      Q    So your recollection would have been the very
13      best when you filled this out?
14      A    Again, I was really upset, so to the best of
15      my ability.
16      Q    Yeah.  So, I mean, you wrote at the bottom,
17      "This statement is true to the best of my
18      recollection;" is that right?
19      A    That's correct.
20      Q    And that's true?
21      A    That's true.
22      Q    Okay.  Looking at the sentence that starts on
23      the fourth line down -- one, two, three, four.
24      It's the very -- one word's on there, it says
25      "Stoudemire," is how it starts.  Do you see that

1/8/2025                         ALISHA JOHNSON

```
 1    same.
 2    Q    Okay.
 3    A    So that's what I mean.  I mean the same thing
 4    now in this that I told you previously today.
 5    Q    Okay.
 6    A    And, again, with me -- with Stoudemire, the
 7    reason why I felt like he was coming to me in a
 8    negative racial manner is because it's based on
 9    the fact of what I overheard with my ears and the
10    fact that I stayed away from them because of this.
11    Q    Okay.  So you received a Informative Contact
12    for us?
13    A    I did.
14         (DEFENDANT'S EXHIBIT 17 WAS MARKED FOR
15    IDENTIFICATION PURPOSES (1 page) - 01AC000001)
16    Q    And looking at Exhibit 17, have you seen this
17    document before?
18    A    Yes.
19    Q    And is this that Informative Contact you
20    received?
21    A    Yes, it is.
22    Q    Okay.  Are you aware that Terry Stoudemire
23    also received an Informative Contact for this
24    incident?
25    A    I wasn't aware of -- if anything happened to
```

1/8/2025                              ALISHA JOHNSON

```
 1    him, because that's not information that was
 2    shared with me.
 3    Q    Okay.  Do you dispute that he received an
 4    Informative Contact?
 5    A    I don't dispute it because now, I see that he
 6    did whenever -- with the information that came
 7    over.
 8    Q    Okay.
 9    A    At the time, I did not know.  I did not know
10    until we received it.
11    Q    So he received the same write-up you
12    received?
13         MR. BABB:  Object to the form.
14    A    I'm not going to say he received the same
15    write-up.
16    Q    Well, received the same level of contact.
17    A    Is that one of the exhibits?
18    Q    Do you dispute he received the same level of
19    contact?
20    A    I don't know.
21    Q    Okay.  So in 2021, did you own, either by
22    yourself or with others, any personal businesses?
23    A    I did.
24    Q    What businesses did you own?
25    A    I owned Bea's Place, LLC, and a mobile home
```

1/8/2025                    ALISHA JOHNSON

```
 1    park.
 2    Q    Okay.  Did you earn any money from those
 3    businesses?
 4    A    When you say any money earned, do you mean
 5    did I make money?
 6    Q    Yes.
 7    A    Not as far as like profit.  I did not profit
 8    at the end of the year.
 9    Q    Were you trying to make money with them?
10    A    Yes.
11    Q    So they were -- even if they weren't
12    profitable, they were operated for profit?
13    A    That's correct.
14         (DEFENDANT'S EXHIBIT 18 WAS MARKED FOR
15    IDENTIFICATION PURPOSES (3 pages) - 01AK000004-6)
16    Q    Okay.  So will you turn to Exhibit 18,
17    please?
18    A    Yes.
19    Q    Have you seen this document before?  It's
20    several pages.
21    A    Yes.
22    Q    What is this?
23    A    That's the Conflict of Interest
24    Questionnaire.
25    Q    You have to fill this out annually at SRNS?
```

1/8/2025                    ALISHA JOHNSON

```
 1      A     That's correct.
 2      Q     Is this your Conflict of Interest
 3      Questionnaire for 2021?
 4      A     That's it.
 5      Q     And you filled it out, it looks like, on
 6      February 22, 2021?
 7      A     That's correct.
 8      Q     And it's your name and employee ID at the
 9      top?
10      A     That's correct.
11      Q     All right.  Can you look at question ten?
12            So question ten states, "While an employee of
13      SRNS, were you employed by or have you received
14      compensation, directly or indirectly within the
15      last two years, for services rendered to any
16      corporation, partnership, organization, or other
17      business enterprise or individual (this could
18      include a second job)?"  Did I read that
19      correctly?
20      A     That's correct.
21      Q     And how did you respond to that?
22      A     "No."
23      Q     But you did own a business on February 22nd,
24      2021?
25      A     I owned a business, but with reading that at
```

1/8/2025                    ALISHA JOHNSON

1    that time, I did not totally understand.  What I

2    thought was if I had something that was directly

3    related to SRNS.

4    Q    Okay.

5    A    But I did not clearly understand.

6    Q    So you thought it had to be in competition

7    with SRNS?

8    A    That's correct.

9    Q    Okay.  All right.  Paragraph 11, the first

10   sentence says, "I have read the SRNS Ethics

11   pledge, SRNS Ethics code, SRNS Policy concerning

12   the use of computers on the SRS Ethics website."

13   Did I read that correctly?

14   A    Yes.

15   Q    And then it gives you how to locate the --

16   those policies; is that correct?

17   A    That's correct.

18   Q    And how did you respond to question 11?

19   A    "Yes."

20   Q    So on February 22nd, 2021, you had read and

21   had knowledge of the SRNS policy concerning the

22   use of computers?

23   A    Yes.

24   Q    All right.  And we looked at that policy

25   earlier, didn't we?

1/8/2025                    ALISHA JOHNSON

```
 1        A    Yes.
 2        Q    Okay.  All right.  So question 12, it states,
 3        "I certify that I've read, understood, and agreed
 4        to comply with the SRNS Ethics pledge, the SRNS
 5        Ethics code, and the SRNS Policy concerning the
 6        use of computers."
 7             "I understand that I may be subject to
 8        discipline up to and including termination for
 9        failure to comply with SRNS Ethics pledge, the
10        SRNS Ethics code, and the SRNS Policy concerning
11        use of computers."  Did I read that correctly?
12        A    Yes.
13        Q    And how did you respond to that?
14        A    "Yes."
15        Q    So you agreed that you were going to apply
16        by -- comply with the SRNS policy concerning the
17        use of computers?
18        A    Yes.
19        Q    And you understood that one of the potential
20        consequences for failing to comply with the SRNS
21        policy concerning the use of computers is
22        termination, correct?
23             MR. BABB:  Object to the form of the
24        question.
25        A    Can you...
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    So, in this thing where you answered "yes,"
 2   is one of the things you answered to was that you
 3   understand that if you don't comply with the SRNS
 4   policy concerning the use of computers, you can be
 5   terminated?
 6      A    Yes.
 7          (DEFENDANT'S EXHIBIT 19 WAS MARKED FOR
 8   IDENTIFICATION PURPOSES (3 pages) - 01AK000001-3)
 9      Q    Okay.  Let's turn to Exhibit 19, please.
10   Have you -- do you know what this document is?
11      A    The same thing, the Conflict of Interest
12   Questionnaire.
13      Q    Is this your Conflict of Interest
14   Questionnaire for 2022?
15      A    Yes.
16      Q    And it looks like you filled it out on
17   April 19th, 2022?
18      A    That's correct.
19      Q    And that's your name and an employee UserID
20   number at the top?
21      A    That's correct.
22      Q    All right.  Do you recall completing this
23   questionnaire on April 19th, 2022?
24      A    I do.
25      Q    Okay.  So let's look at question ten.  Is
```

1/8/2025                           ALISHA JOHNSON

```
 1        A     That's correct.
 2        Q     Okay.  So on page two, there's a summary of
 3   the examination and findings.  And so the first
 4   sentence says, "SRNS employee Alisha Johnson, site
 5   ID A2765, was included on a report showing users
 6   accessing business registration and tax websites
 7   in April 2021."  Did I read that correctly?
 8        A     Yes.
 9        Q     All right.  So is it your understanding that
10   you were included -- your activities were included
11   on a report of multiple people at SRNS who were
12   accessing improper websites with their government
13   computer?
14        A     I don't understand the question.
15        Q     So, is it your understanding that you weren't
16   singled out, that there was a report of various
17   people who were possibly misusing their government
18   equipment and that's how you came to SRNS's
19   attention?
20             MR. BABB:  Object to the form.  You can
21   answer.
22        A     I don't agree with the "misusing" part of
23   what you said in your statement.
24        Q     Okay.  Did your name show up on a report of
25   various individuals that SRNS wanted to look
```

1/8/2025                          ALISHA JOHNSON

```
1        further into for potential misuse of their

2        government equipment?

3            MR. BABB:  Object to the form.  Answer,

4        if you can.

5        A    I agree that my name came up or was included

6        on a report showing users accessing business

7        registration and tax websites in April 2021.

8        Q    Okay.  So, if you look at the first -- or the

9        second full paragraph, that first sentence, it

10       states, "An examination of Johnson's site computer

11       revealed documents for five businesses, Bea's

12       Place, Deuce's Bar and Lounge, Barnes Mobile Home

13       Park, Mayhem Productions, Mjohnson Enterprises,

14       and FT Squared."  Did I read that correctly?

15       A    Yes.

16       Q    Are you familiar with each one of these

17       businesses?

18       A    I am familiar with each one of the

19       businesses, but I don't own all five of those.  I

20       never owned all five of those businesses.

21       Q    Okay.  So Bea's Place, that's the bar that

22       you used to own.

23       A    That's correct.

24       Q    Okay.  And Deuce's Bar and Lounge, what is

25       that?
```

1/8/2025                    ALISHA JOHNSON

```
 1      A    That's the same as Bea's Place.

 2      Q    Did you own it?

 3      A    I did.  But it's the same place.

 4      Q    You just changed the name?

 5      A    That's correct.

 6      Q    Okay.  Barnes Mobile Home Park?

 7      A    Yes.

 8      Q    What is that?

 9      A    That's the mobile home park that I referred

10      to earlier.

11      Q    So you own it?

12      A    I don't have it anymore.

13      Q    But you did at the time?

14      A    At the time, yes.

15      Q    Mayhem Productions?

16      A    I didn't own that one.

17      Q    What is it?

18      A    That Mayhem Productions was something that my

19      husband at the time owned, and the Mjohnson

20      Enterprises.

21      Q    What did Mayhem Productions do?

22      A    I'm not completely sure.

23      Q    Was Mjohnson Enterprises the entity that

24      owned the land your bar was on?

25      A    That -- yeah, that's correct.  Mjohnson
```

1/8/2025                    ALISHA JOHNSON

```
 1        Enterprises, LLC, owns the -- owns the bar, the
 2        physical bar and the land.  That's correct.
 3   Q    They did in 2021, as well?
 4   A    I'm not sure when Mjohnson Enterprises -- it
 5        was owned by someone else before.
 6   Q    So you're just not sure when they did?
 7   A    I'm not sure when Mjohnson Enterprises
 8        acquired it.
 9   Q    All right.  What's FT Squared?
10   A    That was a business that my twins owned.
11   Q    What did it do?
12   A    They just did event planning.
13   Q    Did they host events at Bea's Place?
14   A    Bea's Place wasn't there when FT Squared was
15        there.  They never hosted any events there.
16   Q    They hosted at Deuce's or whatever the --
17   A    No, they rented venues.
18   Q    Okay.  So, if you look at the third paragraph
19        down, it states that, "Since December 2020,
20        Johnson printed over 200 documents for Barnes
21        Mobile Home Park (BMP) and Bea's Place (Bea's or
22        B's).  Examples include profit and loss
23        statements, webpages from Clover and Square
24        (credit card processing and point-of-sale
25        companies), restaurant menus, shift and employee
```

1/8/2025                    ALISHA JOHNSON

```
 1        reports, inventory reports, and business
 2        contracts."  Did I read that correctly?
 3        A    Yes.
 4        Q    And is that a true statement?  Did you print
 5        over 200 documents related?
 6        A    Yes.
 7        Q    Okay.  And then the last paragraph here on
 8        this page, the first two sentences says,
 9        "Johnson's internet activity for March 2021
10        includes frequent visits to Clover.com to manage
11        Bea's Place, in addition to browsing
12        AugustaCrime.com and various news and travel sites
13        (searches indicate a planned trip to Mexico).
14        Other browsing and searches relate to job
15        descriptions for bar staff, employment contracts,
16        and shopping for supplies for a bar."  Did I read
17        that correctly?
18        A    Yes, you did.
19        Q    And is that true?  Did you visit Clover.com
20        often?
21        A    I did visit Clover.com often.
22        Q    Okay.  And did you browse and search related
23        to job descriptions for bar staff, employment
24        contracts, and shopping for supplies for a bar?
25        A    I did browse for the bar staff, but I didn't
```

1/8/2025                          ALISHA JOHNSON

```
 1     shop for supplies online for the bar.
 2     Q     Okay.  And did you take a trip to Mexico?
 3     A     I didn't take a trip to Mexico.
 4     Q     Well, you should have.
 5     A     I didn't.
 6     Q     And so the searches and the visits to
 7     Clover.com, that was part of managing Bea's Place?
 8     A     That was my POS system, and I would go and I
 9     would look at it.
10     Q     And "POS" is point of sales?
11     A     That's correct.
12     Q     Okay.  And the printing of menus and employee
13     reports and everything, that was part of managing
14     those businesses, as well?
15     A     Can you rephrase that?
16     Q     So the one, two, three -- you agreed that
17     third paragraph down starts, "Since December 2020"
18     is accurate, that you printed over 200 documents.
19     And those were all -- those documents you printed,
20     those were related to your outside businesses,
21     Bea's Place and the mobile park, correct?
22     A     And I don't know if it was all 200 documents
23     related just to those, but I did agree to that I
24     know that I printed out over 200 documents.
25     Q     And some of them at least were related to
```

1/8/2025                    ALISHA JOHNSON

```
 1      Bea's Place?
 2      A    That's correct.
 3      Q    Okay.
 4      A    Uh-huh (affirmative response).  Yes.
 5      Q    All right.  So page three.  So you see
 6      Printed Items and there's a table underneath it?
 7      A    Yes.
 8      Q    Would you agree that this appears to show the
 9      time and date stamp of documents that you printed
10      from your SRNS-issued computer?
11      A    Yes.
12      Q    Okay.  And so it also has the name of what
13      you were printed?
14      A    Yes.
15      Q    Okay.  So it looks like every single one of
16      these is related to one of these outside business
17      entities here on this first page three; is that
18      correct?
19      A    That's correct.
20      Q    And then you even printed some stuff for --
21      what's this M -- if you look on 4/22/21, the first
22      entry, it says "Mjohnson Enterprises, LLC, P&L
23      2020."  What is that?
24      A    To be honest, I'm not sure.
25      Q    Is it a profit and loss statement?
```

1/8/2025                          ALISHA JOHNSON

```
1    A    P&L stands for profit and loss, but I don't
2    remember exactly what it contained.
3    Q    Okay.  And then you have here Mayhem
4    Productions also on 4/22, it's a couple down, P&L
5    2019.  Is that another profit and loss statement?
6    A    That's what it appears to be.  Again, I don't
7    know exactly.  And one page, I don't know what
8    would...
9    Q    Understand.
10        THE COURT REPORTER:  I'm sorry, can we
11   just pause for a second?  I have a tickle.
12        MR. MCWILLIAMS:  Yes.
13                   (Off the Record)
14   BY MR. MCWILLIAMS:
15   Q    All right.  What is these -- you know, the
16   last several entries are Square Dashboard.  What's
17   Square Dashboard?
18   A    Square, that was another point-of-sales --
19   point-of-sales software.  I think I was just
20   looking at it to see what it entailed.
21   Q    Okay.  But all these here on page three had
22   to deal with one of those outside businesses we
23   already discussed, whether owned by you, your
24   husband, or your daughters.
25   A    Yes, that's correct.
```

1/8/2025                    ALISHA JOHNSON

```
 1    Q    All right.  And this goes on for several

 2    pages here.  And it looks like every single one of

 3    these -- page four, page five, page six, page

 4    seven, and page eight, almost every single one of

 5    them -- besides I see on page seven, there's

 6    something that says "McNamaraGuiltyPlea" -- looks

 7    like they have to deal with running one of those

 8    outside businesses that we discussed, that either

 9    you own, your husband owns, or your twins own; is

10    that correct?

11    A    That's correct.

12    Q    Okay.  All right.  So, page nine.  Starting

13    on page nine, would you agree this looks like we

14    get some excerpts from some of the documents that

15    were discovered, and some brief notes about that

16    from the analyst of what those documents are?

17    A    Yes.

18    Q    All right.  So, on page nine, for example, it

19    looks like this is a facility rental contract for

20    Bea's Place.

21    A    Yes.

22    Q    Okay.  And so you had that on your computer,

23    your SRNS work computer?

24    A    Yes.

25    Q    Okay.  And did you edit it on your work
```

1/8/2025                    ALISHA JOHNSON

```
1    computer?
2    A    Yes.
3    Q    Okay.  So, then we go to page 16.  And this
4    shows a screenshot of an email; is that correct?
5    A    That's correct.
6    Q    Is that an email that you sent?
7    A    Yes.
8    Q    All right.  Is that your picture?
9    A    That's me.
10   Q    Is that -- so you're sending this from your
11   SRNS email?
12   A    I am.  And I'm looking at the timestamp.
13   It's after work hours.  It's after my normal
14   working hours.
15   Q    Okay.  So you sent it on March 15th, 2021, at
16   4:26 p.m.?
17   A    That's correct.
18   Q    Okay.  And what was this email about?
19   A    It says a menu update doc.  So, it had to be
20   a menu.
21   Q    So, were you updating the menu at Bea's
22   Place?
23   A    Yes.
24   Q    And did you send this email?
25   A    I did.  I sent it after work hours.
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                     ALISHA JOHNSON

```
1        A     It does.

2        Q     And the term that you searched?

3        A     Yes.

4        Q     All right.  So, the first search that you did

5     was for SCDOR; is that correct?

6        A     That's correct.

7        Q     Is that the South Carolina Department of

8     Revenue?

9        A     That's correct.

10       Q     Why'd you search for SCDOR?

11       A     SCDOR, that's -- I was filing my taxes, and I

12    was -- that's why I searched SCDOR --

13       Q     Okay.  Taxes for --

14       A     -- on this part.

15       Q     Personal taxes or taxes for Bea's Place, LLC?

16       A     Both.

17       Q     Is filing taxes part of running Bea's Place,

18    LLC?

19       A     Filing taxes is part of something that I was

20    required to do.

21       Q     All right.  So, then on the 5th, it looks

22    like you did a couple searches about 1099 forms

23    for independent contractors; is that correct?

24       A     That's correct.

25       Q     Why did you search for those?
```

1/8/2025                          ALISHA JOHNSON

```
1    certain things, or maybe somebody's talking about
2    something, or maybe I just think about something,
3    I Google it.
4    Q    Okay.  I was just curious.  So, if you go on
5    to the next page, page 25, the very last search on
6    February 11th, do you see that?
7    A    Yes.
8    Q    Is that a search for SBA PPP loan?
9    A    That's correct.
10   Q    Did you run that search?
11   A    I did.
12   Q    Why were you searching for an SBA PPP loan?
13   A    I wanted to find out more about what it was.
14   Q    Were you thinking of getting one for Bea's
15   Place?
16   A    No, I wasn't thinking of getting one for
17   Bea's Place.  Everybody was talking about the PPP
18   loans versus the other loans.  So, I just wanted
19   to educate myself.
20   Q    Did you download documents about it?
21   A    I don't remember downloading any documents
22   about the SB -- about the PPP loan that I can
23   remember.
24   Q    Okay.  And then, if you look down at the
25   bottom, the second -- well, the first two searches
```

1/8/2025                          ALISHA JOHNSON

```
1       for -- on March 1st, we have one for employee

2       contract, and the next one is bartender

3       description.  Do you see those?

4       A    I do.

5       Q    Did you conduct those searches?

6       A    I did.

7       Q    What did you conduct them for?

8       A    Because I was looking up information for a

9       contract for different jobs and a bartender was

10      one of them.

11      Q    For a bartender possibly that you were going

12      to hire at Bea's Place?

13      A    Just in general, and that could have been a

14      possibility.  But, again, I like to find out more

15      about things, so I Google stuff.

16      Q    Okay.  So, on page 26, we've got -- if you

17      look down, the first search on March 31st, you

18      searched the term "Clover;" is that correct?

19      A    Yes.

20      Q    And did you conduct that search?

21      A    I did.

22      Q    And is that part of just going to the

23      point-of-sale website?

24      A    I'm not sure what it was at that time, but

25      that's very well what it could have been.
```

1/8/2025                          ALISHA JOHNSON

```
 1        SRNS.  We produced it to your attorney.  Do you
 2        see the date on there?
 3        A     May 20, 2021.
 4        Q     Okay.  So that's when he prepared it.  So if
 5        you can go to page three, please.
 6        A     (Witness complies.)
 7        Q     So the first -- or the second paragraph, that
 8        first sentence says that you told him you were
 9        issued a government-owned desktop computer and a
10        government-owned iPhone; is that correct?
11        A     Paragraph one?
12        Q     Paragraph -- the second paragraph.
13        A     Okay.
14        Q     The first sentence.
15        A     (Reading.)  I -- I agree.  I did meet with
16        him and I did tell him that.
17        Q     Okay.  And then the last sentence of the next
18        paragraph, the third paragraph, says you described
19        your role as the owner and manager of Bea's Place.
20        A     That's correct.
21        Q     And did you tell him that?
22        A     I did.
23        Q     And that's accurate?  That's...
24        A     Yes, that's accurate.
25        Q     Okay.  So let's go to the next page, page
```

1/8/2025                    ALISHA JOHNSON

```
 1     four.  And it said -- the last sentence of the
 2     first full paragraph says you denied using
 3     government resources to facilitate the operation
 4     of businesses other than Bea's Place; is that
 5     accurate?  Did you tell him that?
 6          MR. BABB:  Where are you looking?  I'm
 7     sorry.
 8          MR. MCWILLIAMS:  Page four, first full
 9     paragraph, last sentence.
10     A    (Reading.)  I don't understand the question.
11     Q    So the last sentence --
12     A    Okay.
13     Q    -- of paragraph four, this is Investigator
14     Carter's summary of things that you said.  Did he
15     summarize that correctly?
16     A    I'm not sure about that last statement.  I'm
17     not sure if that's correct or not.
18     Q    Okay.  Because you did print documents for
19     Mjohnson Enterprises, correct?
20     A    I printed, yes, something, but I don't know
21     exactly what it was.
22     Q    Okay.  And then the next paragraph, that
23     first sentence says what we've already talked
24     about, that you admitted to Investigator Carter
25     that you used websites, such as Clover and Square,
```

1/8/2025                          ALISHA JOHNSON

```
 1        to manage various aspects of Bea's Place using
 2        your government computer.
 3        A     That's correct, I did.
 4        Q     Okay.  And so then the next paragraph, the
 5        third full paragraph says that you had loaded a
 6        cash app onto your government-issued iPhone that
 7        was linked to Bea's Place and I think for your
 8        personal use; is that correct?
 9        A     That's correct.
10        Q     And you did that?
11        A     Yes.
12        Q     Okay.  So -- and then the last paragraph --
13        last full paragraph says that you didn't know you
14        were violating any rules and that you would remove
15        all personal business documents from your computer
16        and stop using government resources in the
17        operation of your business; is that correct?
18        A     Oh, that's correct.  I didn't realize that,
19        and I removed all of the files that I -- you know,
20        I saw at the time.
21        Q     And you told Investigator Carter you were
22        going to do that?
23        A     That's correct.
24        Q     Okay.  So at the bottom of page four onto
25        page five is Investigator Carter's conclusion,
```

1/8/2025                       ALISHA JOHNSON

```
 1     correct?
 2     A     That's correct.
 3     Q     And if you go onto page five, he determined,
 4     the last sentence, that you violated the SRNS
 5     Rules of Conduct, didn't he?
 6     A     That's what it says here.  However, again, I
 7     never saw this while I was working at SRNS.  This
 8     was never shown to me in detail like this.
 9     Q     Well, the -- I got you.  So you received a
10     Corrective Contact in May 2021 for your --
11     A     I did.
12     Q     -- use of government resources?
13           (DEFENDANT'S EXHIBIT 22 WAS MARKED FOR
14     IDENTIFICATION PURPOSES (2 pages) - 01AB000030-31)
15     Q     Can you turn to Exhibit 22?
16     A     (Witness complies.)
17     Q     Is this that Corrective Contact?
18     A     Yes, this is the Corrective Contact that I
19     received.  But in -- as far as in my defense, when
20     I received this Corrective Contact, I was not
21     aware of the severity of it.
22           Simply because when Eddie and Porter, they
23     called me into the office, into I'm going to say
24     Eddie's office at the time, and whenever they were
25     talking to me about this, it was not like -- it
```

1/8/2025                    ALISHA JOHNSON

```
 1     website?
 2     A     I did because that's the truth.
 3     Q     And when you told him you hadn't been on
 4     those websites again, you were referring to Clover
 5     and the SCDOR, right?
 6     A     That's correct.
 7     Q     Okay.  So your husband took over Bea's Place
 8     and changed the name to 306 On York, correct?
 9     A     That's correct.
10     Q     And so your Facebook page is named "Threeosix
11     Onyork," correct?
12     A     Now it is.
13     Q     So that started in January of...
14     A     That started in -- this is 2025 -- 2024.
15     That just started in like March of 2024 --
16     Q     Okay.
17     A     -- that I did that.  Because, again, like I
18     told you, my husband and I had separated because
19     of everything that was going on and I wasn't
20     mentally there.  I had to just concentrate on what
21     I needed to concentrate on and that was pretty
22     much my daughter and my job.  That's why I let the
23     business side go and I let my husband go.  I was
24     not in...
25     Q     So just to clarify, May 2021 is when you
```

1/8/2025                          ALISHA JOHNSON

```
 1      Q    Page two, right there.
 2      A    Okay.  So -- and I told Bill about that that
 3      day.  I had to go to SCDOR because it was a form
 4      that I needed to sign to get over to SCDOR.
 5           I was in execution that week.  I worked in a
 6      limited area, meaning I cannot have a personal
 7      cell phone, I can't have a personal iPad, or a
 8      personal computer.  They needed that document
 9      right away.
10      Q    Do you remember what document it was?
11      A    It was -- I had to -- I was on the phone.
12      They told me how -- whatever the form number was.
13      And I just typed in the number, got the document,
14      signed the document, and I emailed it to them.
15           All of this took maybe two or three minutes,
16      and, to me, I didn't own the business anymore.  I
17      wasn't -- didn't do it for, like, any -- for
18      personal gain on my part.  It was de minimis use,
19      and I thought that it was okay.
20      Q    The policy, though, doesn't say -- excuse de
21      minimis use, does it?
22      A    I don't understand what you're saying.
23      Q    You said this is de minimis use, is what you
24      thought, but the policy doesn't excuse de minimis
25      use.
```

1/8/2025                          ALISHA JOHNSON

```
 1            MR. BABB:  Object to the form.
 2    Q    It says strictly forbidden, right?
 3            MR. BABB:  Same objection.
 4    A    So, from what I -- what I'm understanding, it
 5    says completely forbidden if you're operating your
 6    business.  At this time, I did not own the
 7    business anymore.
 8    Q    You got rid of the business when?
 9    A    May 2022.
10    Q    Okay.
11    A    October 2022, I did not own that business
12    anymore.
13    Q    So, that was to facilitate your husband
14    owning the business?
15    A    That was -- that was to facilitate -- not
16    to -- it didn't sell.  It was just a form that was
17    needed.
18    Q    For what?
19    A    It was needed for my husband to do something
20    with that, with the business.
21    Q    So, for him to run the business.
22    A    Not to run the business, no.
23            MR. BABB:  Object to the form.
24    A    The form he needed, it's a form that had to
25    be signed with the selling of the business that --
```

1/8/2025                          ALISHA JOHNSON

```
 1    I cannot remember the exact form it was.  But,
 2    again, it went directly to SCDOR.
 3    Q    So, it was part of transferring the business
 4    to him?
 5    A    I don't -- I don't know how to answer that.
 6    Let me see.  The business was already in his name.
 7    He already owned the business.  This had nothing
 8    to do with the sale of the business.
 9         I started the sale of the business in January
10    of 2022.  It concluded in May of 2022.  The
11    business was sold.  It was gone in May '22.
12    May 1st, 2022, Bea's Place, LLC, no longer
13    existed.  My husband and I were separated.  We
14    were not -- we were not really, like,
15    communicating like that.
16         So, something was going on.  I cannot
17    remember exactly what it was.  It was some type
18    of -- it was some type of legal form, and they
19    needed it.
20    Q    Needed it for the business?
21    A    SCDOR needed it.
22    Q    If you hadn't given it to them, would the
23    business have been just fine?
24    A    The business was already sold.  The business
25    would have been just fine, I guess.  You know, I
```

1/8/2025                         ALISHA JOHNSON

```
1      again in June after your Corrective Contact.
2      A    So, with the emails, again, I did not know
3      that I could not send or receive emails.  That's
4      not what I took away from the contact.
5      Q    Well, SRNS's policy says that ignorance of a
6      rule isn't an excuse, correct?  We looked at that
7      earlier?
8      A    We looked at that rule earlier.  But, again,
9      with using my email, it didn't -- I was not trying
10     to operate a business with using my emails.
11     Q    Okay.
12     A    And, again --
13     Q    I understand.
14     A    It's just --
15     Q    I understand.
16     A    It's so --
17     Q    Let me -- please let me ask the questions.  I
18     understand that you -- your position on it.  Now,
19     please let me ask my specific questions.
20          So, June 30th, 2021, looks like there was an
21     email from beasplacellc@gmail.com to your SRNS
22     website; is that correct?
23     A    That's correct.
24     Q    Who has the email for Bea's Place, LLC?
25     A    That was my email.
```

1/8/2025                          ALISHA JOHNSON

```
 1      Q    Okay.  So you sent an email to your SRNS
 2      website [sic]?
 3      A    I had that Bea's Place email on my cell
 4      phone.
 5      Q    And -- but you sent it to your SRNS website,
 6      correct?  I mean, email address.
 7      A    And, again, I had that on my cell phone.
 8      Q    And what's the subject of that?
 9      A    TreSounds/Walker contract.
10      Q    What's that?  What was that for?
11      A    (Reading.)
12      Q    Is it a contract for something with Bea's
13      Place?
14      A    It says TreSounds/Walker contract, so.  I'm
15      not sure exactly what that is.
16      Q    Okay.  So, on July 14th, 2021, you see an
17      email from ahaltiwanger@securityfederalbank.com?
18      A    That's the insurance.  That's who all the
19      insurance is through.
20      Q    Okay.  And that was the insurance that was --
21      and it was sent to your SRNS government email,
22      correct?
23      A    That's correct.
24      Q    And it looks like that's some sort of
25      insurance policy to do with Mjohnson Enterprises,
```

1/8/2025                    ALISHA JOHNSON

```
 1     LLC, correct?
 2     A     That's correct.
 3     Q     Okay.  And then on the 16th, ahaltiwanger
 4     sent your SRNS email something that says --
 5     something they wanted either you or your husband
 6     to sign.  It doesn't look like your husband's
 7     email is on there, that August 16th, 2021 email,
 8     is it?
 9     A     No, his email is not on there.
10     Q     Okay.  So it was sent to you.
11     A     Yeah, it was sent to me.
12     Q     Okay.
13     A     And it was sent to all the email addresses.
14     I mean, my other email address, my personal email
15     address, as well as my government email address.
16     Q     Uh-huh (affirmative response).  So, on
17     August 30th, 2021 -- or, sorry, the June 30th and
18     the July 14th -- or never mind.  It's a bad
19     question.
20           So, August 30th, 2021, looks like your
21     personal Gmail address, you sent something to your
22     SRNS email address; is that correct?
23     A     That's correct.
24     Q     And it's something to do with Mjohnson
25     Enterprises?
```

1/8/2025                    ALISHA JOHNSON

```
 1        A     That's what it says.
 2        Q     Okay.  And did you send that email?
 3        A      If it's on here, I'm sure I did.  I just
 4        don't know exactly what it is.
 5        Q     Okay.  But it had something to do with
 6        Mjohnson Enterprises?
 7        A     That's what's in the subject.
 8        Q     Okay.  So, on December 14th, 2021, you sent
 9        something from your personal email address, it
10        looks like, to your SRNS email address at 11:29,
11        and the subject is Bea's Place, TBD.
12        A     That's what it says.
13        Q     Did you send that?
14        A     I had to.
15        Q     Does it appear --
16        A     That's what it says.
17        Q     Does it appear to be about Bea's Place?
18        A     That's what the subject is.
19        Q     Do you remember what the email is?
20        A     I don't remember what the email is.
21        Q     Okay.  So, the next page, we've got
22        January 26th, 2022, another -- at 10:32, there's
23        a -- beasplacellc@gmail.com sent an email to your
24        SRNS website titled "Frontline price list;" is
25        that correct?
```

1/8/2025                          ALISHA JOHNSON

```
 1    getting ready to lose my job.  And it was just a
 2    frenzy from everything that was going on and
 3    everything started coming back, so it was a
 4    whirlwind.  So, no, I don't know which one it was,
 5    sir.  I don't.
 6    Q    Would you agree in here, though, that the
 7    phrase "I am in violation" --
 8    A    If you're --
 9    Q    -- says that you're in violation of SRNS's
10    rules?
11         MR. BABB:  Object to the form of the
12    question.
13    A    If I said that, it's because that's what --
14    for the last three and a half hours, that's what I
15    had been told.  I was in violation.  I'm in
16    violation.  I'm in violation.  That's what I
17    was -- in that -- when I was being interrogated.
18    Q    Was the OIG -- when they interrogated you,
19    they weren't interrogating you about SRNS rules.
20    They were interrogating you about the PPP loan,
21    correct?
22    A    Oh, that went together for me as far as when
23    I was sitting in there talking to Bill right after
24    that.  Everything just ran together for me.
25    Q    Okay.  So the last line of the paragraph,
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                    ALISHA JOHNSON

```
 1    that same paragraph, he has you saying, "I know
 2    that I am in jeopardy of possibly losing my job."
 3    Is that true?  Did you make that statement to him?
 4    A    Yes, I did.
 5    Q    Okay.  So we've got the Conclusion here down
 6    at the bottom of page nine onto page ten.  Do you
 7    see that?
 8    A    I see it.
 9    Q    And starting with the second sentence, which
10    goes onto page ten, it says, "Clear and convincing
11    evidence was obtained proving that Johnson used
12    her government-issued computer and
13    government-issued email account to conduct
14    operations solely related to her personal
15    business, Bea's Place, and her husband's personal
16    business, 306 On York."  Did I read that
17    correctly?
18    A    Yes.
19    Q    All right.  And I know that you dispute that
20    you did that, but that conclusion is a violation
21    of our SRNS's rules, correct?
22    A    And that's Bill's conclusion.
23    Q    Yeah, and the conclusion that he came to was
24    that you violated SRNS's rules, correct?
25    A    That was Bill's conclusion that he came to.
```

1/8/2025                    ALISHA JOHNSON

```
 1      meeting?
 2              MR. BABB:  Object to the form.
 3      A    Oh, those are the things that I said during
 4      the meeting.
 5      Q    So that's a "yes," they are?
 6      A    Yes, they are.
 7      Q    Okay.  So the first bullet point says,
 8      "Employee stated she wasn't totally sure why she
 9      was at the DRB, felt that she did not provide
10      false information, however misuse of government
11      resources could be warranted."  Did I read that
12      correctly?
13      A    You read that correctly.
14      Q    Is that what you said at the DRB?
15      A    That's what I said.
16      Q    Okay.  And then if you look further down,
17      it's the -- under Employee Briefing, it's the one,
18      two -- seventh bullet point down.  It says,
19      "Admitted to responding to personal emails onsite
20      using government equipment."  Did I read that
21      correctly?
22      A    Yes.
23      Q    And is that true?  Did you tell that to the
24      DRB?
25      A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
 1    should be at a Disciplinary Review Board.
 2    Q    Okay.  Did you tell the panel that you felt
 3    you were being retaliated against because you
 4    brought up issues related to your race?
 5    A    I did not tell the panel anything along those
 6    lines.  I was trying to be as humble as I could be
 7    and just concentrate on trying to keep my job, and
 8    bringing up any type of negative connotation, that
 9    would have, in my mind, solidified that I -- or it
10    would make me seem confrontational.  I don't know.
11         I didn't tell the panel that.  Nobody asked
12    me that during the panel.  I never told anybody on
13    that panel on that day anything about what I was
14    going through with the discrimination process.
15    Q    Okay.  And that includes anything with --
16    related to sex discrimination?
17    A    I didn't tell them anything that I was going
18    through.
19    Q    Okay.  You had a character witness speak on
20    your behalf, correct?
21    A    That's correct.
22    Q    Who was that?
23    A    John Litchfield.
24    Q    Why'd you choose John Litchfield?
25    A    Because of -- he's a very truthful person.  I
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                    ALISHA JOHNSON

```
 1      Natalie Johnson?
 2      A    I do.
 3      Q    Is Natalie Johnson a woman?
 4      A    Yes.
 5      Q    What's her race?
 6      A    Black.
 7      Q    Okay.  How do you know Natalie?
 8      A    We worked together in -- during ARRA.  She
 9      worked -- I think she was a scientist and I was a
10      firstline.  And we bumped heads on a few occasions
11      over like different aspects of the job over in the
12      burial ground.  We were not on good terms.
13      Q    What year was that?
14      A    2010-11, somewhere around that.
15      Q    Okay.  So, you weren't on good terms.  So,
16      you bumped heads just based on what the nature of
17      the job was and y'all's personalities or...
18      A    Yeah, that we -- it, to me, appeared she
19      didn't care for me; I didn't care for her.
20      Q    Okay.  All right.  So, then the next one, it
21      looks like it's Adryan Henderson.  Do you know who
22      that is?
23      A    That was -- I don't know who she is or he is.
24      I don't know if it's a girl or a guy.
25      Q    So, you don't know gender or race?
```

1/8/2025                    ALISHA JOHNSON

```
1    least -- yes, each one of them said, this is your
2    second time with this same violation, correct?
3    A    (Reading.)  All of them referenced that, yes.
4    Q    Okay.  So, they felt the correct decision was
5    to terminate you, correct?
6         MR. BABB:  Object to the form of the
7    question.
8    A    They all said terminate.
9    Q    Is there anything based on this or any
10   evidence you have at all that Natalie Johnson,
11   Adryan Henderson, and Steve Whitcomb decided to
12   terminate you because of your race?
13   A    Not either of them, no.
14   Q    Is there -- do you have any evidence at all
15   that Natalie Johnson, Adryan Henderson, and Steve
16   Whitcomb decided to terminate you because of your
17   sex?
18   A    No, I don't.
19   Q    Do you have any evidence that Natalie
20   Johnson, Adryan Henderson, and Steve Whitcomb
21   decided to terminate you because you made
22   complaints about racial slurs at work?
23   A    No, I don't have any evidence.
24   Q    Do you have any evidence they even know that
25   you made complaints about racial slurs at work?
```

1/8/2025                    ALISHA JOHNSON

```
 1      A    Natalia -- I'm not for certain, but Natalia
 2   may know something about that.
 3      Q    How would Natalia know something about that?
 4      A    She could have been privy to talking to
 5   somebody else that knew something about it.
 6      Q    Do you have any evidence that she was privy
 7   to talking to someone else about it?
 8      A    I don't have any concrete evidence.
 9      Q    Do you have any evidence, even if it's
10   non-concrete?
11      A    Not that I can produce at this time.
12      Q    Are you actively looking for evidence that
13   Natalie Johnson spoke to someone about your
14   complaints?
15      A    Not at this moment.  Not at this time.
16      Q    Okay.  And when I asked -- do you have any
17   evidence that Natalie Johnson, Adryan Henderson,
18   and Steve Whitcomb terminated you because you
19   complained about being overlooked for the SPOC or
20   the Lead Planner position?
21      A    I don't have any evidence.
22      Q    Do you have any evidence they even knew that
23   you were overlooked for the SPOC or Lead Planner
24   position?
25      A    Not that I know of.
```

1/8/2025                    ALISHA JOHNSON

 1      in any way, facilitate the employee's outside
 2      personal business."  Did I read that correctly?
 3      A    Yes.
 4      Q    And we looked at that rule earlier, correct?
 5      A    Yes.
 6      Q    Okay.  And then it also says, "Manual 5B,
 7      Procedure 1-4, Section 5.15(Q), which prohibits
 8      failure to fully cooperate and/or provide
 9      requested information, including but not limited
10      to, making false statements or intentionally
11      misleading management or investigation [sic]
12      during the course of a company investigation."
13      Did I read that correctly?
14      A    Yes.
15      Q    And we looked at those rules before, correct?
16      A    That's correct.
17      Q    And SRNS has a rule that says ignorance of a
18      rule is not an excuse for not violating it,
19      correct?
20      A    That's correct.
21      Q    Okay.  And those policies we looked at,
22      there's no requirement for you to intend to
23      violate the rule, is there?
24           MR. BABB:  Object to the form of the
25      question.  Answer, if you can.

1/8/2025                        ALISHA JOHNSON

```
 1      A     I don't remember verbatim, but it was because
 2   I kept telling him that I was being truthful and
 3   he kept saying that I was not, that I was being
 4   untruthful, maybe even use the word "lying," I'm
 5   not sure, but he was extremely intimidating.
 6      Q     Okay.  What specific acts of SRNS caused you
 7   emotional harm?
 8      A     The discrimination; then having to actually
 9   train the person for the position that I should
10   have received; being not heard as far as when --
11   especially with the situation with Terry
12   Stoudemire.
13         And when I say I wasn't being heard, it's
14   because, to me, it didn't matter to them that he
15   came over into my space, even after I asked him to
16   leave several times, but it still turned out that
17   I was in the wrong, no matter what.
18      Q     Okay.  When you say the discrimination, are
19   there any acts of discrimination that you allege
20   on the part of SRNS that we have not discussed
21   today?
22      A     Not that I'm aware of at this time.
23      Q     Okay.  When you say discrimination, do you
24   mean the racial slurs that you overheard, as well
25   as the being passed over for the SPOC and Lead
```

1/8/2025                    ALISHA JOHNSON

```
 1    Planner position?
 2    A    The racial slurs and all of that stuff that I
 3    overheard, to me, that was a hostile work
 4    environment.  It wasn't discrimination.
 5    Q    So you haven't asserted a hostile work
 6    environment claim in your Complaint, have you?
 7         MR. BABB:  Object to the form of the
 8    question.
 9    A    No, I don't -- it's not in there.
10    Q    Okay.  Are you claiming physical injuries as
11    part of your lawsuit against SRNS?
12    A    No, not that I'm aware of.
13    Q    Okay.  How much income did you receive in
14    2023, approximately?
15    A    When you say income, what does that all
16    entail?
17    Q    Any money that came to you from any source.
18    A    Okay.  I received -- I took all the money
19    that I had in my 401(k) out, and it was like only
20    126,000.  And that was taxed, and I only received
21    like maybe 90.  And then I received two months'
22    pay, which was about 19,000.
23    Q    So that's all the income you received in
24    2023?
25    A    Oh, no, no, no, no.  And I received $2,098 a
```

1/8/2025                    ALISHA JOHNSON

```
1    A    That's correct.
2    Q    He got the exact same Corrective you did,
3    didn't he?
4    A    It is what it appears to be.
5    Q    So, if he got the exact same discipline, how
6    were you disciplined more harshly than him?
7    A    I don't feel I should have been disciplined
8    in that.  I feel like if I was a white female and
9    Stoudemire approached me, the way -- if he would
10   have approached a white female the way he
11   approached me, it would have been totally
12   different.
13   Q    Are you aware of any non-African American
14   females who violated the policy on using
15   government resources for personal businesses that
16   didn't receive any discipline at all?
17   A    I am not aware of this -- at this time.
18   Q    Okay.
19   A    But I'm pretty sure that there are for
20   instances out there.
21   Q    So, you're just speculating?
22   A    Not speculating.  When I -- when I started
23   working at SRNS in Tritium, 1998, early 2000, it
24   was certain incidents that took place that were
25   totally off -- you know, off board.
```

Official Use Only

**Administration**

OSR 5-8 #    Status: Approved    Submitter: Logan Mauldin    Tracking #: COS-2017-00499

# Change of Status

**Name (Last, First, MI, Suffix)**
Johnson, Alisha

| User ID | EmplID | Organization Code & ID | Company |
|---|---|---|---|
| A2765 | 036394 | C2321AA (11738) | SRNS |

**Current Roll**  ○ Exempt  ○ Nonexempt  ● SOP  ○ First Line Manager

**COCS Code** P000    **COCS Type** M    **COCS Description** FLS/Accnts/HR/AdmInEx/AlOtherEx

| Current Job Code | Current Job Title | Current Grade | Current Paygroup | Current Pay Frequency |
|---|---|---|---|---|
| 007795 | Lead Ops Specialist C | 33 | S06 | M |

| Current Sen Unit/Job Family | Current Compensation Rate | Current Shift Schedule | |
|---|---|---|---|
| OPNSLD Operations Lead | 6831 | 32 | Type  P |

---

**Promotion (PRO)**

○ Normal Career Progression (NCP)  ● Mgt/Prof Promotion - Posting Sys (PST)    **Effective Date** 02/01/2017
○ Nonexempt Upgrade (NTE)

| Job Code | Job Title/Description | Current Status (Required) | Part-Time (Standard) Hours |
|---|---|---|---|
| 007807 | Prin Engg & Tech Suppt Spclst | ● Full-Time  ○ Part-Time | |

**New Roll**  ● Exempt  ○ Nonexempt  ○ SOP  ○ First Line Manager

**New Sen Unit/Job Family**   - Engineering & Technical Suppt

| Pay Group | SRNS ● Monthly - M06  ○ SOP - S06 ○ Weekly - W06  ○ Hourly - H06 | SRR ○ Monthly - M07 ○ Hourly - H07 ○ Weekly - W07 ○ SOP - S07 |
|---|---|---|

| Grade  34 | Step |
|---|---|

**Seniority Data**

| Old Unit | Old Unit Start Date | 1st Day Out of Old Unit | SRR Retained Seniority? ○ Yes ○ No | New Unit - | New Unit Start Date |
|---|---|---|---|---|---|
| OPNSLD | | | | | |

| COCS Code | COCS Type | Description | | | |
|---|---|---|---|---|---|

---

**Pay Rate Change (PAY)**

○ Adjustment (ADJ)   ○ Feather (FEA)   ○ First Line Manager Adjustment (FLM)
○ Adjustment - Nonexempt (ADN)   ○ Job Reclassification (REC)   ○ Removal of Component of Pay (RMV)
○ Closure Qual Pay (QLP)   ● Posting Promotion Inc. (PST)   ○ Step Progression (SPG)
○ Demotion (DEM)   ○ Promotion (PRO)

| Effective Date | Reason |
|---|---|
| 02/01/2017 | employee accepted job through BR on 2/7/17. Employee has currently been on rotation doing the assignment for a while |

| Rate Code | Compensation Rate Type | Pay Rate | Grade |
|---|---|---|---|
| ○ Hourly (NAHRLY)  ○ Craft Employee (SRCRFT) | ○ Current  ○ Hourly | 7000 | 34 |
| ● SRS Exempt (SRMNTH)  ○ Select OT Position (SRSOP) | ● New  ● Monthly | | |

**Title**  Prin Engg & Tech Suppt Spclst

---

**Transfer (XFR)**

● Department Transfer (DPT)  ○ Medical Disqualification (MDQ)  ○ Reorganization (ROR)    **Effective Date** 02/01/2017
○ LSE to Perm Full Service (LSE)  ○ Reaffiliation (TAF)    ○ Transfer - Excess (XCS)

**Work Location Page**

| ● SRNS (006) ○ SRR (007) | Department Code (Transfer To) | Department ID (Transfer To) |
|---|---|---|
| Department Name  H Canyon WPC | C2321A | 11362 |

| COCS Code | COCS Type | Description |
|---|---|---|

[D. Ex. 3]

**Official Use Only**

**Comments & Attachments**

**Approver List**

*Change of Status:* **Approved on 02/14/2017**

| Approvers | Assigned | Notified | Received | Status Changed | Status |
|---|---|---|---|---|---|
| Edward Bodie | 02/07/2017 10:18:01 AM | 02/07/2017 10:18:01 AM | 02/09/2017 02:25:44 PM | 02/09/2017 02:26:40 PM | Approved |
| James Byrd | 02/09/2017 02:26:41 PM | 02/09/2017 02:26:41 PM | 02/13/2017 02:22:09 PM | 02/13/2017 02:22:18 PM | Approved |
| Logan Mauldin | 02/13/2017 02:22:19 PM | 02/13/2017 02:22:19 PM | 02/14/2017 07:47:11 AM | 02/14/2017 07:47:29 AM | Approved |
| Bryan Bennett | 02/14/2017 07:47:29 AM | 02/14/2017 07:47:29 AM | 02/14/2017 07:55:20 AM | 02/14/2017 07:55:59 AM | Approved |

Official Use Only

*Hope Walton*

CS ✓    1/9/2023

**Administration**

OSR 5-8 #    Status: Approved    Submitter. Tamara Blankenship    Tracking #: COS-2023-00037

## Change of Status

| Name (Last, First, MI, Suffix) | User ID | EmplID | Organization Code & ID | Company |
|---|---|---|---|---|
| Johnson, Alisha | A2765 | 036394 | C2321AB (11739) | SRNS |

Current Roll ● Exempt    ○ Nonexempt    ○ SOP    First Line Manager

| COCS Code | P170 | COCS Type | M | COCS Description | Other Prof. Admin. & Related Occupations |

| Current Job Code | Current Job Title | Current Grade | Current Paygroup | Current Pay Frequency |
|---|---|---|---|---|
| 007807 | Prin Engg & Tech Suppt Spclst | 34 | M06 | M |

Current Sen Unit/Job Family    Current Compensation Rate    Current Shift Schedule
ENGTSP Engineering & Technical Suppt    8924.34    32    Type    P

**Job Reclassification**

| ● Lateral (JRC/JRC) | ○ Downward (JRC/JRD) | Effective Date |
|---|---|---|
| ○ Exempt to Nonexempt (DEM/ETN) | ○ Upward (JRC/JRU) | 12/01/2022 |

| Job Code | Job Title/Description | Current Status (Required) | Part-Time (Standard) Hours |
|---|---|---|---|
| 010585 | Work Window Coordinator | ● Full-Time    ○ Part-Time | |

New Roll ● Exempt    ○ Nonexempt    ○ SOP    First Line Manager

New Sen Unit/Job Family    - Work Control

| Pay Group | SRNS | | SRMC | | BSRA | |
|---|---|---|---|---|---|---|
| | ● Monthly - M06 | SOP - S06 | Monthly - M09 | SOP - S09 | Monthly - M08 | SOP - S08 |
| | Weekly - W06 | Hourly - H06 | Weekly - W09 | Hourly - H09 | Weekly - W08 | Hourly - H08 |

| Grade  34 | | Step | |

**Seniority Data**

| Old Unit | Old Unit Start Date | 1st Day Out of Old Unit | SRMC/BSRA Retained Seniority? | New Unit | New Unit Start Date |
|---|---|---|---|---|---|
| ENGTSP | | | Yes    No | . | |

| COCS Code | COCS Type | Description | |
|---|---|---|---|
| P070 | M | Cost Estimators & Planners & Schedulers | |

**Comments & Attachments**

Title reclass to align employee with a title that is more representative of the scope fulfilled. No Sal or Grade Change.

**Approver List**

*Change of Status: Approved on 01/05/2023*

| Approvers | Assigned | Notified | Received | Status Changed | Status |
|---|---|---|---|---|---|
| David Hart | 01/05/2023 01:52:31 PM | 01/05/2023 01:52:31 PM | 01/05/2023 03:33:29 PM | 01/05/2023 03:33:33 PM | Approved |
| Donald Barfield | 01/05/2023 03:33:34 PM | 01/05/2023 03:33:34 PM | 01/05/2023 03:36:36 PM | 01/05/2023 03:36:41 PM | Approved |
| Tamara Blankenship | 01/05/2023 03:36:42 PM | 01/05/2023 03:36:42 PM | 01/05/2023 03:37:25 PM | 01/05/2023 03:37:30 PM | Approved |
| Beth Westelaken | 01/05/2023 03:37:31 PM | 01/05/2023 03 37:31 PM | 01/05/2023 03:46:02 PM | 01/05/2023 03:46:13 PM | Approved |

*Previous Process -  Change of Status:  Approved on 01/05/2023*

| Approvers | Assigned | Notified | Received | Status Changed | Status |
|---|---|---|---|---|---|
| David Hart | 01/04/2023 07:48:09 AM | 01/04/2023 07 48:09 AM | 01/04/2023 12:31:37 PM | 01/04/2023 12:32:13 PM | Approved |
| Donald Barfield | 01/04/2023 12:32:13 PM | 01/04/2023 12:32:14 PM | 01/04/2023 04:46:11 PM | 01/04/2023 04 46:23 PM | Approved |
| Tamara Blankenship | 01/04/2023 04 46:24 PM | 01/04/2023 04:46:24 PM | 01/04/2023 04:56:20 PM | 01/04/2023 04:56:28 PM | Approved |
| Beth Westelaken | 01/04/2023 04:56:28 PM | 01/04/2023 04:56:29 PM | 01/05/2023 07:48:52 AM | 01/05/2023 07:49:34 AM | Approved |

*Connie Quarles*

3/2/23

*CM ✓*

**Official Use Only**

**Administration**

OSR 5-8 #          Status: Approved          Submitter: Tamara Blankenship          Tracking #: COS-2023-01103

## Change of Status

**Name (Last, First, MI, Suffix)**
Johnson, Alisha

**User ID** A2765     **EmplID** 036394     **Organization Code & ID** C2321AB (11739)     **Company** SRNS

**Current Roll** ● Exempt     ○ Nonexempt     ○ SOP     ○ First Line Manager

**COCS Code** P070          **COCS Type** M          **COCS Description** Cost Estimators & Planners & Schedulers

**Current Job Code** 010585
**Current Job Title** Work Window Coordinator

**Current Grade** 34
**Current Paygroup** M06
**Current Pay Frequency** M

**Current Sen Unit/Job Family**
WRKCTL  Work Control

**Current Compensation Rate** 8924.34

**Current Shift Schedule** 32          **Type** P

**Termination (TER) / Completion (COM)**          **Discharge (DSC)**

| Effective Date of Termination | Last Day Worked | Death (DEA) (Date of Death) |
|---|---|---|
| 03/01/2023   3/2/23 | 03/01/2023 | |

**Comments & Attachments**

**Approver List**

**Change of Status:  Approved on 03/01/2023**

| Approvers | Assigned | Notified | Received | Status Changed | Status |
|---|---|---|---|---|---|
| Frederick Youngblood | 03/01/2023 08:57:20 AM | 03/01/2023 08:57:20 AM | 03/01/2023 11:35:12 AM | 03/01/2023 11:35:37 AM | Approved |
| Tamara Blankenship | 03/01/2023 11:35:37 AM | 03/01/2023 11:35:37 AM | 03/01/2023 11:37:44 AM | 03/01/2023 11:37:55 AM | Approved |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| | South Carolina Human Affairs Commission | and EEOC |
|---|---|---|
| | State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Alisha Johnson | (803) 295-8395 | 09/26/72 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 342 Bedford Place | Aiken, SC 29803 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Savannah River Nuclear Solutions (corporate office) | 500+ | (803) 643-4570 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 203 Laurens Street SW | Aiken, SC 29801 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Savannah River Nuclear Solutions | 500+ | () |

| Street Address | City, State and ZIP Code | |
|---|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN

☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION

☐ (Pregnancy)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **June 2022**    Latest: **3/1/2023**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Ms. Johnson, a black female, began working for Savannah River Nuclear Solutions (SRNS) on August 18, 1998, after a career in the U.S. Navy. In October 2016, Ms. Johnson began working in the maintenance department as an engineering specialist a/k/a work window manager. It was the practice within the maintenance department for the most senior work window manager to be promoted to spot manager when the position became available. This was the same practice when a lead planner position became available.

In June 2022, the spot manager and lead planner positions became vacant. Ms. Johnson was the most senior work window manager at the time. She was not promoted to either position. Russell Overton (white, male) was promoted to spot manager, and William Owensby (white, male) was promoted to lead planner. Overton had been working as a work window manager for approximately two years at the time of his promotion. Owenby was laterally transferred from the planning department and had never worked as a work window manager.

Ms. Johnson spoke to the Work Center Manager, Frederick "Porter" Youngblood (white, male), in July 2022 about why these individuals were promoted over her. He responded that he could staff the positions however he wanted to. Ms. Johnson then reached out to Eddie Bodie (white, male), Level III manager, about the failure to

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 5/19/2023 _____ *Alisha Johnson* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) 5/10/23 |
| Date    Charging Party Signature | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **South Carolina Human Affairs Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

promote. She brought up race in both of these conversations. Bodie acknowledged that Youngblood had failed to follow the standard practice for promotion.

In October 2022, Ms. Johnson was required to train Owensby because he was not qualified as a work window manager, which is a requirement for the lead planner position. Ms. Johnson again contacted Youngblood and Bodie about the discrimination that had occurred. She also took her complaint to David Hart (white, male), Bodie's direct supervisor. Hart involved Tamara Baldwin (black, female), HR Representative. Ms. Johnson met with Baldwin to discuss her concerns of discrimination.

In November 2022, Ms. Johnson met with Youngblood, Bodie, Hart, and Baldwin. During this meeting, management acknowledged that the situation was handled incorrectly but was not intentional. Ms. Johnson expressed that she felt if she were a white, male she would have received a promotion. She asked to be moved to another department because she felt maintenance was a "good old boy" system, and coworkers were consistently using racial slurs. She reported these instances to Youngblood, but the environment did not change. SRNS kept providing Ms. Johnson with shifting reasons for why she could not be transferred.

On November 22, 2022, Terry Stoudemire (white, male) came into Ms. Johnson's work area and began asking her about a bar she used to own in an area of Aiken with a predominantly black population. Stoudemire was asking if he would be welcome there and referenced that it was on a "bad side of town." Ms. Johnson stated that anyone who could fit through the door was welcome. Ms. Johnson reported this incident to Youngblood and HR because she felt the interaction with Stoudemire was racially motivated on his part. He had been involved in conversations in the past using racial slurs, which she reported. Ms. Johnson was issued a write-up for this incident. She does not know if Stoudemire was disciplined.

On February 2, 2023, Ms. Johnson met with three members of SRNS's general counsel about accusations that she used a government computer to apply for a PPP loan for her personal business. General counsel stated that they had received an anonymous tip regarding this. Ms. Johnson stated that she had not applied for a PPP loan but had submitted paperwork for a separate loan from her work computer.

Ms. Johnson was then required to appear before a review board regarding the use of her work computer. During this hearing, she was transparent and acknowledged that she had violated policy, though she did not know sending the documents in question was a policy violation at the time. Ms. Johnson also expressed to the board that she was experiencing significant personal and family issues and that she had recently been diagnosed with PTSD and depression. However, she did not allow any of these to interfere with her work performance.

On March 1, 2023, Ms. Johnson was terminated for providing false information during an investigation and misuse of a government computer. She was never provided an explanation regarding the accusation of providing false information.

Ms. Johnson was discriminated against based on her race, sex, and disability in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act. She was also retaliated against in violation of Title VII for raising good faith concerns of race and gender discrimination in the workplace.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 5/19/2023          *Alesha L Johnson*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year)<br>5/19/23 |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.    **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Norfolk Local Office
200 Granby Street, Suite 739
Norfolk, VA 23510
(757) 600-4720
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/26/2023

**To:** Alisha Johnson
342 Bedford Place
Aiken, SC 29803
Charge No: 436-2023-01562

EEOC Representative and email:    RORRIE JEFFERIES
Investigator
Rorrie.Jefferies@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 436-2023-01562.

On behalf of the Commission,

Digitally Signed By:Norberto Rosa-Ramos
12/26/2023
Norberto Rosa-Ramos
Local Office Director

**Cc:**
James M Lightbourne
SRNS
PO Box 616
Aiken, SC 29802

Lane Boone
Savannah River Site
P.O. Box 616 SRS Bldg 703-47A
Aiken, SC 29802

Merrell Grice
Cromer Babb Porter & Hicks, LLC
1418 Laurel St. Suite A
Columbia, SC 29201

Elizabeth Millender
Cromer, Babb, & Porter
1418 Laurel Street Suite A
Columbia, SC 29211

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 436-2023-01562 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Elizabeth "Betsy" Rader, 129 West Trade Street Suite 400, Charlotte, NC 28202.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 436-2023-01562 to the District Director at Elizabeth "Betsy" Rader, 129 West Trade Street Suite 400, Charlotte, NC 28202.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

-  **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

-  In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

-  **Only one** major life activity need be substantially limited.

-  Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

Enclosure with EEOC Notice of Closure and Rights (01/22)

> **are not considered** in determining if the impairment substantially limits a major life activity.

> An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

> An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

> "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

> The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

> A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# 6785BR - Work Center Manager

Status: Closed

Job req template: External/Internal Req

Job Abbreviation : 010433 Group Mgr, Site Services

Job Abbreviation Title : Work Center Manager

Job Description : Maintain overall authority and responsibility for the direction and control of multiple Site Services crews. Oversee all major evolutions undertaken by assigned personnel to ensure activities are safely conducted according to approved procedures and work execution documents. May serve as the senior Site Services manager onsite during nights, weekends and holidays.

- Manage and supervise Site Services personnel including some shift operations.
- Responsible for maintaining knowledge on existing systems as they are modified, new procedures and learning new systems as they are installed. - Responsible for meeting day-to-day needs of multiple customers
- Responsible for authorization and initiation of work release for jobs in area of responsibility
- Making timely, informative notifications when required by facility events and procedures.
- Initiate emergency actions as necessary to prevent or mitigate the consequences of an abnormal event and placing the work activity in a safe, stable condition following the event.
- Performing periodic facility tours and log book reviews to ensure good conduct of operations
- Identifying housekeeping and facility material condition deficiencies to the appropriate team for corrective actions
- Ensuring personnel are trained and fit for duty to perform the assigned job responsibility
- Lead assigned team based assessments and develop appropriate corrective action plans.
- Consistently perform BBS observations, management field observations (MFOs) and assigned monitored evolutions (ME's).
- When assigned as shift manager ensure conduct of operations are in accordance and compliance with appropriate site manuals.

Who We Are :

01AG000032
24064.0083

[D. Ex. 8]

What We Offer :

Recruiter : Scott, Betty

Hiring Manager /Project Manager : Williamson, Robert

Reason for Vacancy : Non-COVID-19 Vaccine Mandate Attrition

No. of Positions : 3

SPD Acceleration :

SRPPF (Sav Riv Plutonium Proc Fac) :

Other New Mission :

Positions Remaining : 0

Business Unit : Savannah River Nuclear Solutions

Deptid : 12252

Functional Org Code & Name : C2321AD-H Area Planning

Matrix Org Code :

Speed Chart Code (Must be 10 Digits) : 046WFNTMNT

Employment Type : Manager

Onboard Employee Type : Full Service Employee

Job Category : Technical Services

Shift : 32

Position Requirements

Basic Education Qualifications : High School Diploma, GED, or other equivalent State Credential

Other Required Qualifications :

Preferred Qualifications : Bachelors degree in engineering , technical management or related field preferred.
DOE or other industrial facility experience preferred.
Comprehensive knowledge of site infrastructure systems or Site Services Operations.
Possess an in-depth knowledge of management principles, site rules, regulations, procedure requirements.
Good written and oral communication skills as well as skills in planning, time management and negotiation.
Possess knowledge of DOE notification criteria

01AG000033
24064.0083

Direct or Indirect Position(s)? : Direct

Does this position allow for telework? :

Security Clearance Information :

Clearance Required to Perform Job? : L

Does DOE Order 426.2 apply to this posting? : No

Date needed : 01-Jul-2022

Posting Location/s : Internal

Other :

These fields are set up to automatically populate. They are for Human Resources use only.

Job Type : Regular

Job Group (AAP) : 1M

FLSA : Executive

Job Family : MGMT

EEO-1 Category : B

Grade : 35

Comp Frequency : Monthly

Internal Job Category : Operations

Panel Members : Robert Williamson, Eddie Bodie, Danny Auvenshine

Standards of Excellence Competencies

Standards of Excellence :

Competency #1 : Deliver Results

Competency Weight #1 : 5

Competency Description #1 : Understand job responsibilities and be accountable for results.
Meet goals and strive for customer satisfaction and corporate success.
Make sound workplace and business decisions.
Keep commitments and promises.
Plan work in a responsible manner, balancing company

01AG000034
24064.0083

goals vs. schedule, budget, safety and resources.
Elevate issues early to avoid surprises.

Competency #2 :  Shape the Future

Competency Weight #2 :  4

Competency Description #2 :  Adapt and perform consistently under changing
requirements and dynamic work situations.
Take initiative to offer or try a new approach to make the
team and the company more successful.
Foster business success by offering and supporting
different perspectives.
Continuously improve in job performance.
Take on stretch or rotational assignments to support
company initiatives and achieve self development.

Competency #3 :  Build Relationships

Competency Weight #3 :  5

Competency Description #3 :  Build and maintain good working relationships with
everyone.
Maintain a customer-focused attitude and strive to satisfy
the customer.
Communicate in a clear, respectful manner with everyone.
Publicly recognize others for a job well done.
Provide open and timely feedback regarding meeting and
delivering commitments.

Competency #4 :  Energize & Recognize Team

Competency Weight #4 :  3

Competency Description #4 :  Work with team members to ensure team, department,
and divisional goals are met.
Communicate in a clear, respectful manner with team and
management.
Collaborate and share with other team members to
promote knowledge transfer.
Mentor, guide, and provide assistance to newer employees.
Promote teamwork and support other members of the
organization.
Ask for help and support when needed.
Recognize colleagues for their achievements.

Competency #5 :  Model Excellence

Competency Weight #5 :  5

Competency Description #5 :  Behave in a professional manner demonstrating integrity,
ethics, and a high standard of values. Deliver your work

01AG000035
24064.0083

with pride and ownership. Respect others' knowledge, skills, and experiences. Seek to appropriately identify and resolve challenges. Work to make the organization, company, and mission more successful. Apply Continuous Improvement processes to work scopes to improve efficiency and reduce unnecessary costs. Strive to exceed expectations in task completion. Embrace the company's culture of service, excellence, and stewardship. Take personal responsibility to care for equipment and resources. Adhere to conduct of operations principles.

DISCLAIMER : Submittal of this requisition to Employment signifies your authorization to search for qualified candidates.

Comments : Attrition:1 posting promotion Johnny Anderson and 1 for SRPPF, 1 for backfill of Doug Gregory

Req team : Cheeks, Stephen
Scott, Betty
Hart, David
Williamson, Robert
Bodie, Edward
Blankenship, Tamara
Dudley, Stuart
Cummings, Velice

Background Check Packages : Standard BGC Package

Turn off Autofiler notification for this req

If applicable, have candidates in the People Dev Forum been considered? : N/A

Approval routing

| Job title | User | Date |
|---|---|---|
| Approver 1 | Bodie, Edward | 31-Mar-2022 |
| Approver 2 | Williamson, Robert | 31-Mar-2022 |
| Approver 3 | Elmgreen, Marguerite | 08-Apr-2022 |
| Approver 4 | Bypass | 31-Mar-2022 |
| Approver 5 | Bypass | 31-Mar-2022 |
| HR Representative | Blankenship, Tamara | 11-Apr-2022 |

Notify upon approval completion  Dudley, Stuart

01AG000036
24064.0083

EEO Statement : SRNS is an Equal Opportunity/Affirmative Action employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, disability, or protected veteran status. SRNS is also committed to making our workplace accessible to individuals with disabilities and will provide reasonable accommodations, upon request, for individuals to participate in the application and hiring process. To request such an accommodation, you may contact us by phone at 803-952-8207, or by e-mail at hrrecruiting@srs.gov.

# 6786BR - Work Window Coordinator

Status: Closed

Job req template: External/Internal Req

Job Abbreviation : 010585 Work Window Coordinator

Job Abbreviation Title : Work Window Coordinator

Job Description : Provide advanced coordination and scheduling expertise in support of Site Operations in resolving very broad to abstract
technical issues due to equipment failure, equipment upgrade, or new component installation that could have division and/or
site wide implications.
Specific support provided will differ according to assignment, but will generally include directing, planning, and development
of a task level work schedule.
This position is responsible for the implementation of the schedule during its execution week along with resolving issues
encountered during its progression.
Implement work schedules for nuclear and other facilities as required
Plan, develop, and ensure task readiness of a daily work schedule
Interact with the Work Control Planners, Procurement Personnel, the Operations Organization, the Maintenance Organization, as well as other support groups to ensure schedule readiness
Ensure the Work Packages or Technical Work Documents have been approved, parts have been procured and are correct, all
support groups have available manpower, the task(s) are scheduled and the equipment will be available for the activity.
Work to ensure technical aspects of operations or maintenance programs are in compliance with governing directives,
procedures, and policies.

Who We Are :

What We Offer :

Recruiter : Scott, Betty

01AG000038
24064.0083

<span style="color:red">[D. Ex. 9]</span>

Hiring Manager /Project Manager : Williamson, Robert

Reason for Vacancy : Non-COVID-19 Vaccine Mandate Attrition

No. of Positions : 5

SPD Acceleration :

SRPPF (Sav Riv Plutonium Proc Fac) :

Other New Mission :

Positions Remaining : 0

Business Unit : Savannah River Nuclear Solutions

Deptid : 11765

Functional Org Code & Name : C2321BA-E3S WMC

Matrix Org Code :

Speed Chart Code (Must be 10 Digits) : 046WFNTMNT

Employment Type : Professional/Exempt

Onboard Employee Type : Full Service Employee

Job Category : Technical Services

Shift : 32

Position Requirements

Basic Education Qualifications : High School Diploma, GED, or other equivalent State Credential

Other Required Qualifications :

Preferred Qualifications : Bachelors degree in electrical or mechanical engineering or associates degree in a technical area preferred.
Related maintenance experience, construction or maintenance trades scheduling/coordination experience preferred.
Comprehensive familiarity with facility processes, systems, and equipment is preferred.  The ability to gain a clear knowledge and understanding of site work control procedures and practices for both maintenance and operations must be obtained within one year of hire.
Thorough understanding of work hazards, safety programs, operating configuration and lockout/hold identification.

01AG000039
24064.0083

Additional specialized knowledge varies with the particular technical assignment.

Direct or Indirect Position(s)? : Direct

Does this position allow for telework? :

Security Clearance Information :

Clearance Required to Perform Job? : L

Does DOE Order 426.2 apply to this posting? : No

Date needed : 01-Jul-2022

Posting Location/s : Internal

Other :

These fields are set up to automatically populate. They are for Human Resources use only.

Job Type : Regular

Job Group (AAP) : 2X

FLSA : Professional

Job Family : WRKCTL

EEO-1 Category : 2

Grade : 34

Comp Frequency : Monthly

Internal Job Category : Operations

Panel Members : Robert Williamson, Jim Peters, Doug Gregory, Danny Auvenshine

Standards of Excellence Competencies

Standards of Excellence :

Competency #1 : Deliver Results

Competency Weight #1 : 4

Competency Description #1 : Understand job responsibilities and be accountable for results.
Meet goals and strive for customer satisfaction and corporate success.
Make sound workplace and business decisions.

01AG000040
24064.0083

Keep commitments and promises.
Plan work in a responsible manner, balancing company
goals vs. schedule, budget, safety and resources.
Elevate issues early to avoid surprises.

Competency #2 : Shape the Future

Competency Weight #2 : 3

Competency Description #2 : Adapt and perform consistently under changing
requirements and dynamic work situations.
Take initiative to offer or try a new approach to make the
team and the company more successful.
Foster business success by offering and supporting
different perspectives.
Continuously improve in job performance.
Take on stretch or rotational assignments to support
company initiatives and achieve self development.

Competency #3 : Build Relationships

Competency Weight #3 : 3

Competency Description #3 : Build and maintain good working relationships with
everyone.
Maintain a customer-focused attitude and strive to satisfy
the customer.
Communicate in a clear, respectful manner with everyone.
Publicly recognize others for a job well done.
Provide open and timely feedback regarding meeting and
delivering commitments.

Competency #4 : Energize & Recognize Team

Competency Weight #4 : 4

Competency Description #4 : Work with team members to ensure team, department,
and divisional goals are met.
Communicate in a clear, respectful manner with team and
management.
Collaborate and share with other team members to
promote knowledge transfer.
Mentor, guide, and provide assistance to newer employees.
Promote teamwork and support other members of the
organization.
Ask for help and support when needed.
Recognize colleagues for their achievements.

Competency #5 : Model Excellence

Competency Weight #5 : 5

01AG000041
24064.0083

Competency Description #5 : Behave in a professional manner demonstrating integrity, ethics, and a high standard of values.Deliver your work with pride and ownership.Respect others' knowledge, skills, and experiences.Seek to appropriately identify and resolve challenges.Work to make the organization, company, and mission more successful.Apply Continuous Improvement processes to work scopes to improve efficiency and reduce unnecessary costs.Strive to exceed expectations in task completion.Embrace the company's culture of service, excellence, and stewardship.Take personal responsibility to care for equipment and resources.Adhere to conduct of operations principles.

DISCLAIMER : Submittal of this requisition to Employment signifies your authorization to search for qualified candidates.

Comments : Attrition: Bill Hutcheson, Porter Youngblood promoted to other positions 3 took WCM posting positons

Req team : Scott, Betty
Hart, David
Williamson, Robert
Bodie, Edward
Blankenship, Tamara
Dudley, Stuart
Cummings, Velice

Background Check Packages : Standard BGC Package

Turn off Autofiler notification for this req

If applicable, have candidates in the People Dev Forum been considered? : N/A

Approval routing

| Job title | User | Date |
|---|---|---|
| Approver 1 | Williamson, Robert | 31-Mar-2022 |
| Approver 2 | Bodie, Edward | 31-Mar-2022 |
| Approver 3 | Elmgreen, Marguerite | 11-Apr-2022 |
| Approver 4 | Bypass | 31-Mar-2022 |
| Approver 5 | Bypass | 31-Mar-2022 |
| HR Representative | Blankenship, Tamara | 11-Apr-2022 |

Notify upon approval completion  Dudley, Stuart

01AG000042
24064.0083

EEO Statement :  SRNS is an Equal Opportunity/Affirmative Action employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, disability, or protected veteran status. SRNS is also committed to making our workplace accessible to individuals with disabilities and will provide reasonable accommodations, upon request, for individuals to participate in the application and hiring process. To request such an accommodation, you may contact us by phone at 803-952-8207, or by e-mail at hrrecruiting@srs.gov.

PERSONAL STATEMENT

Alisha Johnson

11/22/2022- @1500 Hours


@1500, I Alisha Johnson, walked back to my desk coming from the bathroom. At this time I noticed Terry Stoudemire talking to Mike Garrett 2 Garret's desk. During their conversation Stoudemire started asking me about a bar that I own- I ignored him. A few seconds later, Emily Skelley asked me how long I've owned the bar—I responded to her immediately. Stoudemire continued to 'Pick' at me asking at least 5 times if 'he' could come to my bar- I personally felt as if he was trying to push the white-black issue so I finally answered – "if you can fit in the door you can come there", he immediately replied-"have you had any killings?"- I took this as an offensive statement and replied "white people?' I then asked him to discontinue the conversation because I did not like the way the conversation was going- he continued to Pick-Pick-Pick- I told him at least 7 times to leave me alone I was feeling offended- He then told me that he didn't feel like he was being offensive- again I verbalized that what he was saying was offensive to me- he continued to say different things to me and because at this point I was so upset; - I even told him I was going to contact HR- he said he was at 100% and that didn't matter to him- I told him just because he could retire that didn't give him the right to keep attacking me vocally after I had verbally told him more than once what/how he was saying things were offensive to me. Tim Sears finally asked him to please go back to his area.. During this time I called Porter Youngblood- out of the office- Russell Overton- answered.

I have personally tried to avoid Stoudemire and a few other co-workers due to the fact I overheard them talking in an inappropriate manner a while ago- At the time, I went to my management with the concern and he addressed it- so I decided to not spend any additional time around these people and Stoudemire is one of them- this is the exact reason I attempted to ignore him today.

11/22/2022          This statement is true to the best of my recollection

[D. Ex. 15]

OSR 5-317 (Rev. 07-10-2019)
Page 1 of 1

Proc. Ref. 5B

| Routing | Initial | Date |
|---|---|---|
| Employees Field File | | |
| Business Unit HR | | |
| Personnel Coordinator | | |
| HR Records, 703-47A | | |

Personal and Confidential
# M&O Employee Information Record

NOTE OSR 5-317 is to be used by M&O Employees and OSR 5-317A is to be used by LW Employees.

## Instructions
Section 1  If Employee is on loan, manager should consult with home department.
Section 2  Indicate type of record.
Section 3  Manager will give a brief summary of the discussion.
Section 4  Manager will outline specific mutually agreed upon goals and should make every effort to assist the employee in meeting these goals, if applicable.
Section 5  Employee and manager should sign and date the completed form.
See instructions in the top right-hand corner of this form for routing. Reference Manual 5B, Human Resources, for distribution of copies.

### Section 1 – Employee Information

| Name | User ID | Employee Type | Job Title |
|---|---|---|---|
| Alisha Johnson | A2765 | ● Exempt ○ SOP ○ Nonexempt | Work Window Manager |

| Business Unit | Org Code | Loaned Org Code | ASD | PSD |
|---|---|---|---|---|
| Maintenance WPC & Site Services | C2321A | | 08/08/1998 | 08/08/1998 |

### Section 2 – Type of Record and Routing

| ☐ Commendatory | ☒ Informative | ☐ Qualifying or Trying Appraisal | ☐ Discontinuance |
|---|---|---|---|
| • HR Records<br>• Employee's Field File | • Business Unit HR<br>• Personnel Coordinator<br>• Employee's Field File | • Personnel Coordinator<br>• HR Records<br>• Employee's Field File | • Business<br>• Personnel Coordinator<br>• HR Records |

○ Pay Approved  ○ Pay Denied

Days/Months _____

### Section 3 – Summary

You are being given this informative as a result of a verbal altercation with a fellow employee on 11/22/22 in H-Area. This altercation escalated to a point where voices were raised that began to disturb the surrounding workers. This altercation also involved a narrative that could be interpreted as discriminatory and racial. You should ensure that your actions and discussions in the work place remain professional and respectful. If you find yourself in a situation where you feel someone else is not treating you respectfully you should immediately report the circumstances to your supervision. You understand that any future activity of this nature could result in additional disciplinary actions.

### Section 4 – Recommend Development Actions

1. Review the Rules of Conduct, Human Resources Manual 5B, Procedure 1-4, Section 5.1
2. Review the Rules of Conduct, Human Resources Manual 5B, Procedure 1-4, section 5.13.2
3. Review the Work Place Violence Policy Manual 1-01, Procedure 2.19, • Actions disrupting normal work activities, such as yelling, wild gestures, or demands for an immediate answer, • Telling jokes or making offensive comments regarding violence or violent events, • Harassment, surveillance, or stalking.

### Section 5 – Employee Comments (Optional)

I understand the potential perception and the significance of this situation and the importance of maintaining a good work environment.

### Section 6 – M&O Signatures

| M&O Employee (Print) | Signature | Date |
|---|---|---|
| Alisha Johnson | | 11/28/22 |
| M&O Manger (Print) | Signature | Date |
| Frederick P. Youngblood | | 11/28/22 |

**OFFICIAL USE ONLY**
May be exempt from public release under the Freedom of Information Act (5 U.S.C. 552), exemption number and category 6 - Personal Privacy. Department of Energy review required before public release.

Name/Org: _____    Date: _____    Guidance (if applicable): _____

OFFICIAL USE ONLY
(When Filled In)

[D. Ex. 17]

## Savannah River Nuclear Solutions LLC
## Conflict of Interest Questionnaire

Submission Date: 02/22/2021

| Name | Employee UserID |
|---|---|
| JOHNSON, ALISHA | A2765 |

| Department | Position |
|---|---|
| HB LINE TEAM WPMC | HB LINE TEAM WPMC |

**PURPOSE:**

The purpose of this questionnaire is to implement Management Policy, "Conflict of Interest," by identifying situations which create a conflict of interest or the appearance of a conflict so that any appropriate remedial action may be taken by Savannah River Nuclear Solutions (SRNS) and/or the employee to avoid such conflicts; to preserve the reputation of SRNS among customers, suppliers and the public; and to comply with DOE requirements.

**GUIDANCE:**

- The term "family member" includes: spouse, mother, mother-in-law, father, father-in-law, brother, brother-in-law, sister, sister-in-law, child, grandparent, grandparent-in-law, son-in-law, daughter-in-law, stepchild, stepparent, stepbrother, stepsister, or grandchild, as well as any other person residing in the same household as the employee.
- If you answer "Yes" to any question, please provide explanations where noted on the form in sufficient detail for evaluation.
- It is your responsibility to update this questionnaire as soon as facts or circumstances arise which would create an actual or perceived conflict of interest, or would render the following responses invalid or incomplete. Because the policy protects you as well as Savannah River Nuclear Solutions (SRNS), you are to include anything you are in doubt about as applicable.

Read the following questions carefully.

1. Are you or is any member of your family an employee, officer, or director of any corporation or other business enterprise, organized for profit, that does or seeks to do business with, or is in competition with, SRNS?  ○ Yes  ◉ No

2. Do you or does any member of your family own, directly or indirectly, a significant financial interest in any supplier, customer, or competitor? A financial interest is significant if it represents 1 percent or more of the equity in, or outstanding securities of, the business. (However, if the employee/contractor is in a position to influence SRNS's relationship with the company, disclosure is required regardless of ownership percentage.)  ○ Yes  ◉ No

3. During the last two years, have you or has a member of your family received, directly or indirectly, any commissions, fees, free or discounted service, compensation, or payments of any kind from a business which does or seeks to do business or is in competition with SRNS?  ○ Yes  ◉ No

4. During the last two years have you or has a member of your family received directly or indirectly from or provided to any business which does or seeks to do business or is in competition with SRNS, any gifts, favors, or anything of value, except advertising tokens having little or no commercial value?  ○ Yes  ◉ No

[D. Ex. 18]

5. Has a debtor-creditor relationship existed at any time within the last two years between you or any member of your family and a business which does or seeks to do business or is in competition with SRNS? This does not apply to normal and customary loan or credit transactions at prevailing interest rates.

○ Yes
◉ No

6. Do you have knowledge that a SRNS employee knowingly made a false claim or representation that resulted, or could have resulted, in the government paying to SRNS, or allowing SRNS to retain, federal funds?

○ Yes
○ No

7. Have you directly or indirectly revealed SRNS confidential matters to persons not entitled to know the same, or have you used SRNS confidential information in any way to promote your own interests? (This includes stock purchases or sales.)

○ Yes
◉ No

8. Are you currently participating, or have you within the past year participated, in a "Foreign Government-Sponsored Talent Recruitment Program" or "Other Foreign Government-Sponsored or Affiliated Activity?" (For purposes of this question, a "Foreign Government-Sponsored Talent Recruitment Program" is a program directly or indirectly organized, managed, or funded by a foreign government to recruit science and/or technology professionals or students. "Other Foreign Government-Sponsored or Affiliated Activity" includes employment, positions and appointments, participation in or applications for grants, or other support directly or indirectly involving a foreign country, often part of a foreign government's broader strategy to reduce costs associated with research while focusing investment on military development or dominance in emerging technology sectors.) DOE O 486.1A

○ Yes
○ No

9. Is there a reporting/oversight relationship, direct or otherwise, between you and any member of your family as an employee of SRNS or a subcontractor?

○ Yes
◉ No

10. While an employee of SRNS, were you employed by or have you received compensation, directly or indirectly within the last two years, for services rendered to any corporation, partnership, organization, or other business enterprise, or individual (this could include a second job)? Exclude compensation from military service.

○ Yes
○ No

11. I have read the SRNS Ethics pledge, SRNS Ethics Code, and SRNS Policy Concerning the Use of Computers on the SRNS Ethics website. This information is available at http://web.srs.gov/ethics/index.html. The Ethics Pledge is available on the introductory screen; the Ethics Code and Use of Computers readings may be accessed via tabs across the top of the webpage.

◉ Yes
○ No

12. I certify that I have read, understood, and agree to comply with the SRNS Ethics Pledge, the SRNS Ethics Code, and the SRNS Policy Concerning the Use of Computers. I understand that I may be subject to discipline, up to and including termination, for failure to comply with the SRNS Ethics Pledge, the SRNS Ethics Code, and the SRNS Policy Concerning the Use of Computers.

◉ Yes
○ No

If you answered YES to any of questions 1 through 10, above, please reference the question number(s) and explain below in sufficient detail for proper evaluation. Otherwise, please leave the area below blank.

ALISHA JOHNSON

Comments from the ethics office:

No Comment

Approved By: undefined on: undefined

01AK000006
24064.0083

OSR 5-318 (Rev. 11-25-2019)
Page 1 of 2

| Routing | Initial | Date |
|---|---|---|
| HRO | | |
| Personnel Coordinator | | |
| HR Policy | | |
| HR Records | | |

Personal and Confidential

# Constructive Discipline Assessment and Development

Proc. Ref. 5B, 2-14

**Instructions**

Section 1   If employee is on loan the manager should consult with home department.
Section 2   Manager should consult with HR Operations (HRO) regarding the constructive discipline process. Written documentation for follow-up is required every month for employees on Probation. Reasons for Discipline - See Procedure Manual 5B.
Section 3   Manager will give a brief summary describing the violation and indicate what disciplinary action will be taken.
Additional Comments - See instructions in the top right-hand corner of this form for routing.  NOTE The original form must be routed.

### Section 1 - Employee Information

| Name | User ID | Employment Type | Job Title |
|---|---|---|---|
| Alisha Johnson | A2765 | ⦿ Exempt   ○ Nonexempt   ○ SOP | Work Window Manager |

| Business Unit | Org. Code | Loaned Org. Code | ASD | PSD |
|---|---|---|---|---|
| HB Line Team WP&C | C2321A | | 08-18-1998 | 08-18-1998 |

**Purpose** To provide employee and their manager an opportunity to meet, discuss, and document constructive discipline assessment and development opportunities.

### Section 2 - Constructive Discipline Action – Review with HR Operations (HRO)

| Effective Date of Discipline | Reason for Discipline |
|---|---|
| 05/24/2021 | Unauthorized Personal Use of Government Resources |

Indicate Type of Constructive Discipline or Follow-up

☒ Corrective
☐ Corrective (Remainder of Shift without Pay)
☐ Corrective (1 Full Shift without Pay)
☐ Corrective (2 Full Shifts without Pay)
☐ Corrective (1 Full Week without Pay)

☐ Probation
☐ Probation (Remainder of Shift without Pay)
☐ Probation (1 Full Shift without Pay)
☐ Probation (2 Full Shifts without Pay)
☐ Probation (1 Full Week without Pay)

☐ Probation Follow-up
☐ Probation (Greater Than 1 Full Week without Pay)
☐ Final 90 Day Commitment
☐ Final 90 Day Commitment Follow-up
☐ Termination

### Section 3 - Summary Assessment Between Employee and Line Management

You are being given this contact as a result of a legal investigation finding you used government resources for personal business in which you receive income.  You understand all use of government property for running personal businesses must desist immediately.  You understand that future use of government property for personal businesses will result in disciplinary action up to and including  termination.

### Section 4 - Recommended Development Actions and Specific Mutually Agreed Upon Goals

By signing this agreement you agree to stop using government resources for personal businesses immediately and you agree to the following:
1. Review the Rules of conduct: Human Resources Manual 5B, Procedure 1-4, Section 5.1
2. Review the Rules of conduct: Human Resources Manual 5B, Procedure 1-4, Section 5.2
3. Read the SRNS Ethics pledge, SRNS Ethics Code, and SRNS Policy Concerning the Use of Computers on the SRNS Ethics website. This information is available at http://web.srs.gov/ethics/index.html. The Ethics Pledge is available on the introductory screen; the Ethics Code and Use of
    Computers readings may be accessed via tabs across the top of the webpage.
4. Complete a correct new Annual Ethics Reading and Conflict of Interest Questionnaire and submit it to the legal department for review

### Section 5 - Employee Comments (Optional)

**OFFICIAL USE ONLY**

May be exempt from public release under the Freedom of Information Act (5 U.S.C. 552), exemption number and category 6 - Personal Privacy. Department of Energy review required before public release.
Name/Org: _____   Date: _____   Guidance (if applicable): _____

**OFFICIAL USE ONLY**
(When Filled In)

[D. Ex. 22]

OBR 5-316 (Rev. 11-25-2019)
Page 2 of 2

Personal and Confidential

# Constructive Discipline Assessment and Development
## (Continued)

Proc. Ref. 5B, 2-14

| Name<br>Alisha Johnson | User ID<br>A2765 | Manager's Name<br>Frederick Porter Youngblood | Date<br>05/24/2021 |
|---|---|---|---|

**Section 6 – Signatures**

This Constructive Discipline Assessment and Development has been reviewed and discussed with me. I have been offered the opportunity to include written comments and sign the form.

**NOTE** Your signature does not necessarily signify agreement with this assessment, but documents that a discussion was held.

| Employee (Print) *Alisha Johnson* | Signature *Alisha Johnson* | Date 5/24/2021 |
|---|---|---|
| Manager (Print) *Frederick P. Youngblood* | Signature *F.P. Ygld* | Date 5/24/2021 |
| Next Higher Level Manager (Level 2 if Final 90 Commitment) (Print) *Kenneth L. Gibbons* | Signature *Kenneth L. Gibbons* | Date 5/24/2021 |

**OFFICIAL USE ONLY**
*(When Filled In)*

01AB000031
24064.0083

OSR 5-318 (Rev. 11-25-2019)
Page 1 of 2

Personal and Confidential

# Constructive Discipline Assessment and Development

Proc. Ref. 5B, 2-14

| Routing | Initial | Date |
|---|---|---|
| HRO | TB | 3/1/23 |
| Personnel Coordinator | | |
| HR Policy | | |
| HR Records | | |

**Instructions**

Section 1   If employee is on loan the manager should consult with home department.
Section 2   Manager should consult with HR Operations (HRO) regarding the constructive discipline process. Written documentation for follow-up is required every month for employees on Probation. Reasons for Discipline - See Procedure Manual 5B.
Section 3   Manager will give a brief summary describing the violation and indicate what disciplinary action will be taken.
Additional Comments - See instructions in the top right-hand corner of this form for routing. **NOTE** The original form must be routed.

## Section 1 - Employee Information

| Name Alisha Johnson | User ID A2465  27965 | Employment Type ● Exempt ○ Nonexempt ○ SOP | Job Title Work Window Coordinator | |
|---|---|---|---|---|
| Business Unit Technical Services | Org. Code C2321AB | Loaned Org. Code | ASD 8/18/1998 | PSD |

**Purpose** To provide employee and their manager an opportunity to meet, discuss, and document constructive discipline assessment and development opportunities.

## Section 2 - Constructive Discipline Action – Review with HR Operations (HRO)

| Effective Date of Discipline 03/01/2023 | Reason for Discipline Rules of Conduct Violations |
|---|---|

Indicate Type of Constructive Discipline or Follow-up

| | |
|---|---|
| ☐ Corrective | ☐ Probation |
| ☐ Corrective (Remainder of Shift without Pay) | ☐ Probation (Remainder of Shift without Pay) |
| ☐ Corrective (1 Full Shift without Pay) | ☐ Probation (1 Full Shift without Pay) |
| ☐ Corrective (2 Full Shifts without Pay) | ☐ Probation (2 Full Shifts without Pay) |
| ☐ Corrective (1 Full Week without Pay) | ☐ Probation (1 Full Week without Pay) |

| |
|---|
| ☐ Probation Follow-up |
| ☐ Probation (Greater Than 1 Full Week without Pay) |
| ☐ Final 90 Day Commitment |
| ☐ Final 90 Day Commitment Follow-up |
| ☒ Termination |

## Section 3 - Summary Assessment Between Employee and Line Management

Your employment is being terminated effective today, 3/1/2023, for violation of the SRNS Rules of Conduct.

It was determined by a company investigation that the following Rules of Conduct were violated:
Manual 5B, Procedure 1-4, Section 5.23.3(2)(A)(4) which states that "All users of Government computers and network resources for incidental personal use are strictly forbidden to…In anyway facilitate the employee's outside, personal business.
Manual 5B, Procedure 1-4, Section 5.1.5 (Q), which prohibits "Failure to fully cooperate and/or provide requested information, including but not limited to, making false statements or intentionally misleading management or investigators during the course of a company investigation.

## Section 4 - Recommended Development Actions and Specific Mutually Agreed Upon Goals

## Section 5 - Employee Comments (Optional)

I fully understand what's happening, but I don't feel like I intentionally misled or vidated the policy. I also don't feel I should be terminated.

BT

**OFFICIAL USE ONLY**

May be exempt from public release under the Freedom of Information Act (5 U.S.C. 552), exemption number and category 6 - Personal Privacy. Department of Energy review required before public release.

Name/Org: _____  Date: _____  Guidance (if applicable): _____

**OFFICIAL USE ONLY**
*(When Filled In)*

[D. Ex. 27]

OSR 5-318 (Rev. 11-25-2019)
Page 2 of 2

Personal and Confidential

# Constructive Discipline Assessment and Development
## (Continued)

Proc. Ref. 5B, 2-14

| Name | User ID | Manager's Name | Date |
|------|---------|----------------|------|
| Alisha Johnson | A2465 | F. Porter Youngblood | 03/01/2023 |

| Section 6 - Signatures |
|---|

This Constructive Discipline Assessment and Development has been reviewed and discussed with me. I have been offered the opportunity to include written comments and sign the form.

**NOTE** Your signature does not necessarily signify agreement with this assessment, but documents that a discussion was held.

| Employee (Print) Alisha Johnson | Signature | Date 3/1/2023 |
|---|---|---|
| Manager (Print) F. P. Youngblood | Signature | Date 3/1/2023 |
| Next Higher Level Manager (Level 2 if Final 90 Commitment) (Print) | Signature | Date |

**OFFICIAL USE ONLY**
*(When Filled In)*

01AB000028
24064.0083