# UNPUBLISHED CASES

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

2019 WL 4280161
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Charleston Division.

David M. KUNDA, Plaintiff,
v.
HONEYWELL INTERNATIONAL, INC.,
Defendant.

C/A No. 2:17-CV-03134-BHH-MGB
|
Signed 02/27/2019

**Attorneys and Law Firms**

Emily Hanewicz Tong, Stephen Joseph Ryan, Wigger Law Firm, North Charleston, SC, for Plaintiff.

Benjamin P. Glass, Ogletree Deakins Nash Smoak and Stewart, Charleston, SC, Leah Freed, Pro Hac Vice, Ogletree Deakins Nash Smoak and Stewart, Phoenix, AZ, for Defendant.

**REPORT AND RECOMMENDATION**

MARY GORDON BAKER, UNITED STATES MAGISTRATE JUDGE

**\*1** This matter is before the Court on the Defendant's Motion for Summary Judgment (Dkt. No. 25.) In his Complaint, Plaintiff alleges claims based on his race in violation of Title VII of the Civil Rights Act of 1964. (Dkt. No. 1.) He seeks compensatory damages, back pay, front pay, attorneys' fees, costs and punitive damages. (*Id.* at 4.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to the United States Magistrate Judge. For the reasons stated herein, the undersigned recommends Defendants' Motion for Summary Judgment (Dkt. No. 25) be granted and this action be dismissed with prejudice.

**BACKGROUND**[1]

[1] The factual background is taken from the Complaint (Dkt. No. 1) and the various exhibits attached by Defendant to its Motion for Summary Judgment. (Dkt. Nos. 25-2 through 25-16), including Plaintiff's deposition testimony (Dkt. No. 25-2.)

**A. Plaintiff's Employment History with Defendant**

Plaintiff is Asian-American and worked for Defendant Honeywell International, Inc. ("Defendant" or "Company") from April of 2010 through August 20, 2016. (Dkt. No. 1 ¶¶ 10, 15.) Plaintiff was initially hired as an installation/project manager. (Dkt. No. 25-2 at 3.) In this role, Plaintiff was responsible for the implementation and management of various installation projects for both government and non-government customers. (*Id.*) He was also responsible for reporting financial information for these projects, such as profit and loss data. (*Id.*) Plaintiff had approximately six "direct reports" in this position, the majority of whom were technicians. (*Id.*) Plaintiff was responsible for providing his subordinates with leadership and serving as their role model. (*Id.* at 4.) He also reviewed his direct reports' timesheets on a weekly basis, which identified the projects on which his subordinates were working. (*Id.*)

In November of 2012, Plaintiff was promoted to Project Management Leader ("PML"). (Dkt. Nos. 25-2 at 4; 25-3 at 6.) In this position, Plaintiff had broader management and oversight responsibility on the contracts in the Gulf South District and managed anywhere from 35 to 60 project managers. (Dkt. No. 25-2 at 5.) As PML, Plaintiff was responsible for providing his direct reports with leadership, performance feedback, coaching, and discipline, and for ensuring they complied with company policy. (*Id.*) Plaintiff reported to Sean Mahoney, who in turn reported to Regional General Manager Dennis Wallrath. Mr. Wallrath is Caucasian. (Dkt. Nos. 1 ¶ 12; 25-2 at 16.) Plaintiff received a positive performance review from Mr. Mahoney in 2014. (Dkt. Nos. 25-2 at 16; 25-4.) Mr. Wallrath approved Plaintiff's 2014 performance review. (Dkt. No. 25-5.)

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

In June of 2015, Plaintiff was promoted to Manager Field Operations for the Gulf South District. (Dkt. Nos. 25-2 at 5; 25-3 at 8.) Plaintiff continued "similar oversight responsibilities" for his direct reports while in this role. (Dkt. No. 25-2 at 7.) On August 31, 2015, Plaintiff was promoted to District General Manager ("DGM") for the Gulf South District. (Dkt. No. 25-3 at 10.) Plaintiff participated in numerous interviews for this position, including with Mr. Wallrath and Senior Human Resources Manager, Sara Clark. (Dkt. No. 25-2 at 7–8, 14.) Mr. Wallrath was involved in the decision to offer Plaintiff the DGM position. (Dkt. No. 25-5 ¶ 3.)

**\*2** As DGM, Plaintiff was responsible for overseeing the sales and service of contracts throughout the Gulf South District, which at that time included Georgia, South Carolina, Tennessee, Alabama, and the panhandle of Florida. (Dkt. No. 25-2 at 10.) His responsibilities also included ensuring that Company policies and procedures were followed at all times. (*Id.* at 11.) In September of 2015, Plaintiff began reporting directly to Mr. Wallrath. (Dkt. Nos. 25-2 at 9; 25-5 ¶ 3.) Plaintiff received an "overall ... positive" performance review for 2015. (Dkt. Nos. 25-2 at 16; 25-3 at 11–15.) As discussed further below, Plaintiff's employment was terminated on August 20, 2016 for being in violation of Defendant's Code of Business Conduct; more specifically, the Company's books and records policy. (Dkt. No. 1 ¶ 15.)

**B. Plaintiff's Alleged Employment Infractions**
During his employment with Defendant, Plaintiff was familiar with the Company's Code of Business Conduct. (Dkt. Nos. 25-2 at 15; 25-6.) He reviewed this policy annually and understood that all of Defendant's employees "were expected to comply with the code of conduct." (Dkt. No. 25-2 at 15.) Relevant here, the Code of Business Conduct provides for the maintenance of "Honest and Accurate Books and Records," stating in part:

> We have a duty and a legal obligation to make sure that the information we submit in all Company records is complete, accurate and understandable. This includes, but is not limited to, all of the information we provide in the following records: Accounting and financial records; timecards and

> time recording systems; Travel and expense reports[; and] ... Customer and supplier records. *Honest and accurate books and records play a significant role in our Company's reputation. As such, we must never make a false representation in Company documents.*

(Dkt. No. 25-7 (emphasis added)) (referred to as the "books and records policy").

On August 12, 2015, Defendant received an anonymous complaint addressed to its Access Integrity Hotline alleging that, for several years, Plaintiff had been improperly transferring the costs of labor on contracts from one project to another with the intention of making certain projects appear more profitable. (Dkt. No. 25-10 at 2.) The complaint also alleged that Plaintiff improperly directed other project managers to reallocate costs within their project portfolios "to show a more profitable overall district bottom line." (*Id.*) Defendant investigated the complaint—several interviews were conducted, including with Plaintiff. (*Id.* at 4.) No action was taken against Plaintiff as a result of the investigation—it was recommended that project managers "be trained on when to transfer costs, send back to supplier, or write off to burden." (Dkt. Nos. 15-2 at 17; 15-10 at 4.)

In February of 2016, while Plaintiff was the DGM, Defendant received another anonymous complaint alleging that Plaintiff mismanaged costs by directing project managers to inaccurately post labor costs to jobs on which employees did not work in an effort to make projects appear profitable. (Dkt. No. 25-11.) Bill Humphreys conducted an investigation into the complaint, with the assistance of Ms. Clark. (Dkt. No. 25-12.) In the course of their investigation, they interviewed Gary Pomerleau. Mr. Pomerleau had been one of Plaintiff's project manager subordinates for a Bureau of Prisons ("BOP") project in May of 2013. (*Id.* at 20.) During his interview, Mr. Pomerleau stated that when he first became project manager for the BOP project, "he did a cost review and discovered personnel labor costs were charged to BOP for employees who worked on other projects." (*Id.*) Mr. Pomerleau stated that he raised this issue with Plaintiff—he shared with the investigation a copy of a May 23, 2013 email exchange he had with Plaintiff:

**\*3** [From Mr. Pomerleau]

Dave

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

Why do I have 8hrs for Mark Jackson again on the 10th and 3hrs for a Chris Laurel on the 13th. Actually I know why but it would be nice to know when this is going on and why. That is another 1k in labor.

[Plaintiff's response]

This is direction I gave to Keith. If I did not speak to you about it, that is my mistake. Please stop yelling at me.

(*Id.*) Mr. Pomerleau also shared a spreadsheet demonstrating the cost reallocation from one project to the BOP project. (Dkt. Nos. 25-12 at 20; 25-13.)

Mr. Humphreys and Ms. Clark also interviewed Keith Grindstaff, who was a project manager in "Gulf South" for eight years. (Dkt. No. 25-12 at 21.) Mr. Grindstaff stated that "he didn't remember specifics, but he knew what the [May 23, 2013] email referred to." (*Id.*) He explained that Plaintiff "re-allocated some of the labor costs from the project Grindstaff was working on over to the BOP project." (*Id.*) Mr. Grindstaff also shared the details of an instance when Plaintiff directed him to delay reporting actual costs "on the Boeing project" to prevent showing a negative deviation in the financial reporting. (*Id.* at 21–22.)

As part of the investigation, Mr. Humphreys and Ms. Clark interviewed Plaintiff on two occasions. During the first interview, Plaintiff denied being aware of any "employees posting of labor to jobs that were never worked on." (*Id.* at 17.) During the second interview, Plaintiff denied having "ever heard of labor costs being re-allocated from one project to another" and denied "ever direct[ing] or ask[ing] a [project manager] to re-allocate[ ] labor costs from one project to another." (*Id.* at 23.) When asked about the May 23, 2013 email, Plaintiff stated he did not know what projects were being referred to or what the email meant. (*Id.*) Plaintiff denied directing Mr. Grindstaff to re-allocate the labor costs of the two employees referenced in the email to Mr. Pomerleau's project. (*Id.*)

At the end of the investigation, Mr. Humphreys concluded that "[b]ased on the evidence reviewed and the interviews of two separate [project managers] who both corroborated that [Plaintiff] directed labor costs be re-allocated from one project to another, [Plaintiff] violated the Honeywell books and records policy. [Plaintiff] was not truthful during his interview when asked about the re-allocation of labor costs." (*Id.* at 25.)

While the above investigation was pending, two additional issues regarding Plaintiff's behavior were

separately brought to Ms. Clark's attention. (Dkt. No. 25-14 ¶ 6.) First, Plaintiff met with Ms. Clark on May 3, 2016, to discuss his appointment of Gerg Dymski as a new project manager without following Defendant's staffing processes. (*Id.* ¶ 7; *see also* Dkt. No. 25-3 at 24.) Specifically, Plaintiff failed to post Mr. Dymski's position internally for five days prior to extending him an offer. (*Id.*) Ms. Clark avers that "Directly prior to Mr. Dymski's appointment, I had informed [Plaintiff] of the importance of following the Company's staffing processes, specifically its practices with regard to posting open requisitions internally prior to extending any offers." (*Id.*) Under the "employee comments" of Plaintiff's "Mid-Year Update," Plaintiff wrote that "Regarding the PML announcement, you can call it miscommunication, but discussions were had between HR, Region Ops and myself regarding moving Dymski to a [project manager] position and this would be done internally to keep him with HBS." (Dkt. No. 25-3 at 24.)

**\*4** Second, in May of 2016, Ms. Clark received a report that Plaintiff was allowing an employee in Duluth, Georgia to bring her children to work with her. (Dkt. No. 25-14 ¶ 8.) Ms. Clark avers that Plaintiff "confirmed that his administrative assistant would work from home while watching her children or bring her children with her to the office and that he approved this arrangement." (*Id.*) Ms. Clark avers that she informed Plaintiff "that this arrangement was distracting for other employees in that office and created a feeling of inequity in the way policies are administered." (*Id.*) Under the "employee comments" of Plaintiff's "Mid-Year Update," Plaintiff wrote "I did confirm the employee worked from home with HR as this did not affect their performance and they were to return to the office once adequate day care was found. I disagree with the notion I agreed with the employee watching their children while working and approved this arrangement. At no time was this ever approved. When this was discovered, it was rectified immediately. The employee works full time from the office." (Dkt. No. 25-3 at 24–25.)

Mr. Wallrath terminated Plaintiff's employment on August 20, 2016 "for violating Honeywell's Books and Records policy." (Dkt. No. 25-5 ¶ 6.) He made this decision with input from Ms. Clark. (*Id.*; *see also* Dkt. No. 25-14 ¶ 9.)

On November 17, 2017, Plaintiff filed this civil action alleging employment discrimination based on his race in violation of Title VII of the Civil Rights Act of 1964. (Dkt. No. 1.) The Complaint alleges that in August of 2016, "Plaintiff's division was divided up and distributed to the Caucasian District General Manager and other

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

Caucasians." (*Id.* ¶ 12.) The Complaint alleges that during that same time period, "Plaintiff was investigated for an alleged anonymous complaint for an incident that occurred over three years prior to August 2016. Plaintiff requested information regarding the alleged anonymous complaint, including what the accusation was, but was denied information. The Plaintiff could never determine what the alleged anonymous complaint referred to." (*Id.* ¶ 13-14.) The Complaint further alleges that "Plaintiff was terminated for being in violation of Defendant's Books and records policy. Plaintiff's termination was pretextual in nature, and not the true reason for terminating Plaintiff ... [T]he true reason was because of his race, Asian." (*Id.* ¶ 15.) Plaintiff seeks compensatory damages, back pay, front pay, attorneys' fees, costs and punitive damages. (*Id.* at 4.)

On December 28, 2018, Defendant filed the instant Motion for Summary Judgment. (Dkt. No. 25.) Plaintiff filed a response in opposition on January 11, 2019. (Dkt. No. 26.) The Motion is ripe for disposition.

**STANDARD OF REVIEW**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, " 'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.' " *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

A court must take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987). This does not mean that summary judgment is never appropriate in these cases. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–47.

**DISCUSSION**

**\*5** Plaintiff alleges employment discrimination based on his race in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1).

Plaintiff's discrimination claims require proof of intentional discrimination, either by direct evidence or by the structured procedures set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Supreme Court of the United States articulated a three-part formula for analyzing discrimination cases in *McDonnell Douglas*. First, a plaintiff must establish a *prima facie* case of discrimination. If a *prima facie* case is established, a rebuttable presumption is created that the defendant unlawfully discriminated against him. Second, once this presumption has been established, the burden of production shifts to the defendant to show a legitimate, non-discriminatory reason for its actions. Third, if the defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the plaintiff to come forward with evidence that the defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the defendant were really based on plaintiff's race. *McDonnell Douglas Corp.*, 411 U.S. at 802–05; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 234–35 (4th Cir. 1991). Despite these shifting burdens of production, however, a plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. *Texas Dep't of Community Affairs*, 450 U.S. at 252–53; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

In order to meet the first prong of the *McDonnell Douglas* formula and establish a *prima facie* case of race discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See, e.g.*, *McDonnell Douglas*, 411 U.S. at 802; *Allen v. BMW Mfg.*

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

Co., LLC, 260 F. App'x 623, 624 (4th Cir. 2008); *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 214 (4th Cir. 2007); *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 188 (4th Cir. 2004); *Goodman v. Family Dollar Stores, Inc.,* No. 8:06-cv-2605-RBH-BHH, 2008 WL 4200160, at *6 (D.S.C. May 7, 2008), *adopted in part by,* 2008 WL 4200158 (D.S.C. Sept. 2, 2008). In the case at bar, Defendant does not dispute that Plaintiff is a member of a protected class and was subjected to an adverse employment action. (Dkt. No. 25-1 at 14.)

The undersigned therefore turns to whether a genuine issue of material fact exists as to Plaintiff's job performance. In *Goodman v. Family Dollar Stores, Inc.,* another court in this district stated that the issue here "is not whether the termination of the plaintiff was 'wise, fair or correct,' but whether [the defendant] honestly believed those reasons and acted in good faith upon those beliefs." 2008 WL 4200160, at *6 (quoting *Kaster v. Safeco Ins. Co. Of Am.,* 212 F. Supp. 2d 1264, 1274 (D. Kan. 2002)). In *Goodman,* the record demonstrated that the plaintiff had held onto "merchandise for her own personal purpose, in violation of company policy." *Id.* The court ultimately found that the plaintiff could not establish that she met the defendant's "legitimate expectations" because she had failed to produce "any evidence from which a jury could conclude that the defendant did not honestly believe that she had violated the company policy on the occasions alleged, regardless of whether or not she did." *Id.* (citing *Brown v. Conopco, Inc.,* 2007 WL 3224586, at *8 (D. Md. October 24 2007)) ("What matters is that Unilever honestly believed she was, and believed Mr. Brown had fraudulently claimed the day as FMLA leave when in fact it was not being used for that purpose."); *Waggoner v. City of Garland,* 987 F.2d 1160, 1156–56 (1993) ("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief."); *see also King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir. 2003) (stating the plaintiff's "own testimony, of course, cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer defendant's] expectations."). In addition, the Fourth Circuit Court of Appeals has stated that an employer may focus on such factors as an employee's "poor job performance or infractions of company rules" in determining whether its expectations are being met. *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 515 (4th Cir. 2006).

**\*6** Here, the record indicates that Defendant received two anonymous complaints alleging that Plaintiff was violating Company policy by directing project managers to improperly reallocate costs among projects in their financial records. After the second complaint was made in

February of 2016, Defendant conducted a lengthy investigation into this allegation, among others. During the investigation, an email was produced indicating that Plaintiff directed labor costs be reallocated from one project to another, and two of Defendant's employees gave interviews corroborating that Plaintiff had given at least one employee such directions in violation of Company policy. Plaintiff denied the allegations when interviewed during the investigation; however, Defendant concluded Plaintiff was lying based on the above evidence and interview testimony. Defendant argues that such evidence establishes that Plaintiff's job performance failed to meet the Company's reasonable expectations. (Dkt. No. 25-1 at 14.) However, Plaintiff argues that a genuine issue of material fact exists as to his job performance because he "adamantly denies" the allegations that he violated the Company's books and records policy. (Dkt. No. 26 at 4.)

Given that Plaintiff has offered nothing more than his own assertions to dispute the allegations at issue, the undersigned finds there is no evidence from which a jury could conclude that Defendant did not honestly believe Plaintiff had violated the Company's books and records policy. *See Goodman,* 2008 WL 4200160, at *6. Thus, Plaintiff cannot establish that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action. *See id.; Warch,* 435 F.3d at 515.

Even to the extent Plaintiff could create a genuine issue of fact as to his job performance, he has produced no evidence that other employees outside of the protected class were retained under similar circumstances. Here, Plaintiff asserts that four Caucasian employees of Defendant "received more favorable treatment than Plaintiff and had a closer relationship with their common supervisor, Mr. Dennis Wallrath." (*Id.* at 5.) The only evidence Plaintiff cites in support is his deposition testimony stating that Mr. Wallrath had "a lot closer relationship" with Plaintiff's peers in the district manager role. (*Id.* (citing Dkt. No. 25-2 at 28).) However, Plaintiff also testified in his deposition that he was not aware of any other employees who were alleged to have violated the Company's books and records policy. (Dkt. No. 25-2 at 21.) In short, there is no evidence indicating that Caucasian employees were retained under circumstances similar to those surrounding Plaintiff's termination. *See, e.g., Goodman,* 2008 WL 4200160, at *6 (finding the plaintiff cannot "establish a *prima facie* case of discriminatory discharge under Title VII" where "she has produced no evidence that other employees outside of the protected class were retained under similar circumstances"); *Gilbert v. Penn-Wheeling Closure*

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 4280161

*Corp.*, 917 F. Supp. 1119, 1127 (N.D.W. Va. 1996) (finding Plaintiff cannot establish "a *prima facie* case of discriminatory termination" where he failed to establish "that black or female employees were retained under circumstances similar to those surrounding [the plaintiff's] termination").

Even assuming *arguendo* that Plaintiff can establish a prima facie case for race discrimination, Defendant has met its burden of showing a legitimate, non-discriminatory reason for its actions. Specifically, Defendant cites the above mentioned evidence regarding the complaints made against Plaintiff and claims that Plaintiff was fired because the Company found he violated the Company's books and records policy. (Dkt. No. 25-1 at 19.) It is well established that discharging an employee for violations of company policy is a legitimate non-discriminatory reason for such discharge. *Gilbert*, 917 F. Supp. At 1128 ("This Court finds that discharging an employee for violations of an established disciplinary policy is a legitimate non-discriminatory reason for such a discharge.") (citing *Nelms v. Ross Stores, Inc.*, 853 F. Supp. 883, 885 (M.D.N.C. 1994)) (absenteeism and poor job performance are legitimate non-discriminatory reasons for discharge); *Strickland v. Sears, Roebuck & Co.*, 693 F. Supp. 403, 407 (E.D. Va. 1988) (poor work performance is legitimate non-discriminatory reason for discharge); *Cunningham v. Owens–Illinois*, 669 F. Supp. 757, 763 (S.D.W.V. 1987) (poor attendance record is legitimate non-discriminatory reason for discharge).

**\*7** Accordingly, the burden of proof reverts to Plaintiff to come forward with evidence that Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that Defendant's actions were really based on Plaintiff's race. Here, Plaintiff has put forth no evidence that Defendant's actions were based on his race outside of his own opinion he testified to in his deposition. (Dkt. No. 26 at 5–6.) "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for an adverse employment action." *Gilbert*, 917 F. Supp. At 1128 (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)). Thus, Plaintiff has not met his burden of demonstrating that the real reason for his termination was, in fact, an unlawful one.

Based on the foregoing and viewing the evidence in a light most favorable to Plaintiff, the undersigned recommends Defendant is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that Defendants' Motion for Summary Judgment (Dkt. No. 25) be **GRANTED** and this action be dismissed with prejudice.

**IT IS SO RECOMMENDED.**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina**
**29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

**Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)**

2019 WL 4280161

Not Reported in Fed. Supp., 2019 WL 4280161

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3369453

2019 WL 3369453
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Charleston Division.

David M. KUNDA, Plaintiff,
v.
HONEYWELL INTERNATIONAL, INC.,
Defendant.

Civil Action No. 2:17-cv-3134-BHH
|
Signed 07/25/2019

**Attorneys and Law Firms**

Emily Hanewicz Tong, Stephen Joseph Ryan, Wigger
Law Firm, North Charleston, SC, for Plaintiff.

Benjamin P. Glass, Ogletree Deakins Nash Smoak and
Stewart, Charleston, SC, Leah Freed, Pro Hac Vice,
Ogletree Deakins Nash Smoak and Stewart, Phoenix, AZ,
for Defendant.

## ORDER

The Honorable Bruce Howe Hendricks, United States
District Judge

**\*1** This matter is before the Court upon Plaintiff David
M. Kunda's ("Plaintiff" or "Kunda") complaint against
Defendant Honeywell International, Inc. ("Defendant" or
"Honeywell"), alleging racial discrimination in violation
of Title VII of the Civil Rights Act of 1964. On December
28, 2018, Defendant filed a motion for summary
judgment, to which Plaintiff responded.

In accordance with 28 U.S.C. § 636(b)(1)(A) and (B) and
Local Civil Rule 73.02(B)(2)(g), D.S.C., United States
Magistrate Judge Mary Gordon Baker issued a Report and
Recommendation ("Report") on February 27, 2019,
outlining the issues and recommending that the Court
grant Defendant's motion for summary judgment.
Plaintiff filed written objections to the Report, but for the
reasons set forth below, the Court finds Plaintiff's

objections without merit, and the Court adopts the
Magistrate Judge's Report in full and grants Defendant's
motion for summary judgment.

## STANDARDS OF REVIEW

### I. The Magistrate Judge's Report
The Magistrate Judge makes only a recommendation to
the Court. The recommendation has no presumptive
weight, and the responsibility to make a final
determination remains with the Court. *Mathews v. Weber*,
423 U.S. 261 (1976). The Court is charged with making a
*de novo* determination only of those portions of the
Report to which specific objections are made, and the
Court may accept, reject, or modify, in whole or in part,
the recommendation of the Magistrate Judge, or recommit
the matter to the Magistrate Judge with instructions. 28
U.S.C. § 636(b)(1).

### II. Federal Rule of Civil Procedure 56
A court shall grant summary judgment if a party shows
that there is no genuine dispute as to any material fact and
the party is entitled to judgment as a matter of law. Fed.
R. Civ. P. 56(a). The judge is not to weigh the evidence,
but rather to determine if there is a genuine issue of fact.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249
(1986). If no material factual disputes remain, then
summary judgment should be granted against a party who
fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and
on which the party bears the burden of proof. *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence
should be viewed in the light most favorable to the
non-moving party. *See Perini Corp. v. Perini Constr.,
Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

In her Report, the Magistrate Judge first explained
Plaintiff's employment history and the alleged
employment infractions. Next, the Magistrate Judge
outlined the proper way to analyze Plaintiff's employment

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3369453

discrimination claims. As the Magistrate Judge explained, a Plaintiff may establish a discrimination claim either by direct evidence or pursuant to the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Cassity v. Green*, 749 F. Supp. 2d 380, 402 (D.S.C. 2010) (citing *Taylor v. Va. Union. Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc), abrogated on other grounds, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)). In the absence of direct evidence of discrimination, a plaintiff may establish a claim using the *McDonnell Douglas* burden-shifting scheme, which requires a plaintiff to first demonstrate a prima facie case of discrimination. If a plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Hux v. City of Newport News*, 451 F.3d 311, 314-15 (4th Cir. 2006). If the defendant does so, then the ultimate burden falls on the plaintiff to establish "that the legitimate reasons offered by the defendant were not its reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 142. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* (quoting *Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

*2 Here, the Magistrate Judge noted that Defendant Honeywell does not dispute that Plaintiff is a member of a protected class or that he suffered an adverse employment action. Accordingly, the Magistrate Judge next considered whether Plaintiff showed that he was satisfactorily performing his job duties and meeting his employer's legitimate expectations. The Magistrate Judge outlined the evidence related to complaints that Defendant received about Plaintiff's alleged violations of company policy, and the Magistrate Judge also considered Plaintiff's adamant denial of the allegations against him. However, because Plaintiff offered nothing more than conclusory assertions to dispute the allegations and the evidence offered by Defendant, the Magistrate Judge found that "there is no evidence from which a jury could conclude that Defendant did not honestly believe Plaintiff had violated the Company's books and records policy." (ECF No. 27 at 12 (citation omitted).) Accordingly, the Magistrate Judge found that Plaintiff failed to show that he was performing his job duties at a level that met his employer's legitimate expectations at the time of the

adverse employment action.

In his objections to the Magistrate Judge's Report, Plaintiff asserts that he has provided sufficient evidence to create a genuine issue of material fact as to whether he was meeting his employer's job expectations, and Plaintiff again points to the fact that he received satisfactory performance reviews and promotions. Importantly, however, nowhere does Plaintiff point to any evidence that creates a genuine issue of material fact as to Defendant's belief that Plaintiff violated the company's books and records policies. Plaintiff summarily asserts that "[t]he fact that Defendant chose [to] pursue allegations from an unknown source and unilaterally determined the Plaintiff (an employee with a history of exemplary performance) was "lying" is certainly evidence of bad faith." (ECF No. 28 at 3.) However, the Court is not convinced by Plaintiff's argument and finds this objection wholly without merit.

Next, the Magistrate Judge determined that even if Plaintiff could create a genuine issue of material fact as to his job performance, he still failed to produce evidence that other employees outside of his protected class were retained under similar circumstances.

Plaintiff objects to this conclusion and asserts that "Plaintiff has set forth multiple instances wherein Caucasian employees were treated more favorably," and asserts that Caucasian employees were mentored more than he was and were not written up for using terms like "stupid" or "idiot." The Magistrate Judge considered Plaintiff's allegation that white employees were treated more favorably but found that there was no evidence indicating that white employees were retained under circumstances similar to those surrounding Plaintiff's termination. As the Magistrate Judge noted, Plaintiff even testified at his deposition that he was not aware of any other employees who were alleged to have violated the company's books and records policy and were more favorably treated. After review, the Court agrees with the Magistrate Judge that Plaintiff has failed to show that employees outside his protected class were treated more favorably under similar circumstances, and the Court overrules Plaintiff's objection on this point.

Finally, the Magistrate Judge concluded that, even assuming for the sake of argument that Plaintiff could establish a *prima facie* case of race discrimination, Defendant had met its burden of showing a legitimate, non-discriminatory reason for its actions–namely, that Plaintiff was fired because Defendant determined that he violated the company's books and records policy–and that Plaintiff failed to show that the reason was a pretext for

Kunda v. Honeywell International, Inc., Not Reported in Fed. Supp. (2019)

2019 WL 3369453

discrimination.

Plaintiff objects to these findings and contends that Defendant failed to establish a legitimate reason for Plaintiff's termination and that Plaintiff offered evidence of pretext, but the Court finds Plaintiff's objections wholly without merit. Plaintiff argues that the evidence that Defendant relied on for terminating him was not credible, but he points to no other evidence indicating that Defendant's stated reason for his termination was a mere pretext for discrimination, and the Court finds absolutely no merit to Plaintiff's entirely unsubstantiated claim that his "appearance is what creates the incentive to unfairly rest upon anonymous, untrustworthy allegations of misconduct." (ECF No. 28 at 4.) Plaintiff's objections are overruled.

## CONCLUSION

**\*3** In all, the Court finds that the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law, and the Court finds no reason to otherwise disturb the Magistrate Judge's well-reasoned findings. Accordingly, the Court adopts and incorporates the Magistrate Judge's Report (ECF No. 27); the Court overrules Plaintiff's objections (ECF No. 28); and the Court grants Defendant's motion for summary judgment (ECF No. 25).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3369453

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

2020 WL 6219421
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Greenville Division.

Dillon STEINHILBER, Plaintiff,
v.
YANFENG US AUTOMOTIVE INTERIORS I,
LLC, Defendant.

Civil Action No. 6:18-cv-2966-TMC-KFM
|
Signed 05/11/2020

**REPORT OF MAGISTRATE JUDGE**

Kevin F. McDonald, United States Magistrate Judge

**\*1** This matter is before the court on the defendant's motion for summary judgment (doc. 44). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

The plaintiff filed this action in state court on October 1, 2018, alleging claims under Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act ("ADA") against his former employer, Yanfeng US Automotive Interiors I, LLC (doc. 1-1). The action was removed by the defendant to this court on November 2, 2018, based on federal question jurisdiction (doc. 1).

**FACTS PRESENTED**

The plaintiff is a transgender male (doc. 1-1, compl. ¶ 9). The plaintiff's transition from female to male included years of hormone therapy, counseling, surgery, and other steps in the process (doc. 50-1, pl. dep. 94, 149-51). The plaintiff previously worked for Faurecia as a production supervisor on the door panel line in their manufacturing plant in Fountain Inn, South Carolina (doc. 1-1, compl. ¶ 9). Upon hiring at Faurecia, the plaintiff was still legally a female with the name of "Jamie Steinhilber" (doc. 50-1, pl. dep. 89-90). While the plaintiff began identifying as male earlier during this transition process, after beginning employment with Faurecia, he legally changed his name and gender in or around March 2016 (id. 86, 89-90, 149-51). The plaintiff changed his name to "Dillon Jamie Steinhilber" (id. 5). While at Faurecia, the plaintiff reported to the company that he had no "physical or mental impairment that substantially limits one or more major life activities" (doc. 44-1).

On or about July 1, 2016, the defendant acquired Faurecia's Fountain Inn plant (doc. 1-1, compl. ¶ 10; doc. 13, answer ¶ 10). The plaintiff continued to work as a production supervisor in the same plant but as an employee of the defendant. He was directly supervised by Production Manager Jeremy Hill (doc. 50-2, Hill dep. 18; doc. 50-1, pl. dep. 50). Around August 2016, the plaintiff was transferred from the day shift to the night shift where he continued to report to Hill (doc. 50-1, pl. dep. 41-42). In his new employee paperwork with the defendant, which is dated May 4, 2016, the plaintiff identified as "Dillon J. Steinhilber," a male, and he indicated that he did not have any disabilities for which he needed accommodation (docs. 44-2, 44-3).

Hill suggested that the plaintiff get tested for attention deficit/hyperactivity disorder ("ADHD"), because he felt the plaintiff had some issues at work, including getting upset when someone interrupted him, inattentiveness, and being easily distracted (doc. 50-1, pl. dep. 102-05, 146-47, 155). The plaintiff's counselor referred him to Dr. Marc Harari, a licensed clinical psychologist, for evaluation of possible ADHD (id. 95). The plaintiff was tested on July 14, 2016, and, in a report issued July 15, 2016, Dr. Harari noted that the plaintiff endorsed moderate ADHD symptoms but concluded that the plaintiff did not have ADHD and suggested the symptoms were related to other issues (id. 112, 157). The plaintiff informed Hill that he had undergone testing and that he did not have ADHD but instead had something else and was going to have further testing (id. 157).

**\*2** On September 15, 2016, the plaintiff met with Dr. Michelle Peterson, a licensed clinical psychologist in the same practice as Dr. Harari, for testing to evaluate a possible diagnosis for autism spectrum disorder ("ASD") (doc. 50-1, pl. dep. 113-16). Dr. Peterson issued a report on September 22, 2016, finding that the plaintiff had moderate ADHD symptoms and diagnosing the plaintiff with ASD; Dr. Peterson recommended that the plaintiff

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

undergo further testing to better evaluate his ASD (*id.* 123-26, 138). The plaintiff continued to update Hill regarding the testing and informed Hill of his ASD diagnosis in September 2016 after the report from Dr. Peterson (*id.* 158-59).

In or about October 2016, the defendant's human resources department began investigating the plaintiff after a temporary employee who had been terminated from employment reported that "she was terminated because she had not ... yielded to [the plaintiff's] advances" (doc. 44-4, Gorie dep. 46; doc. 50-1, pl. dep. 158). The plaintiff testified that he was told by a temporary employee that he was being investigated. The plaintiff went to Human Resource Manager Joe Shubert and asked why he was being investigated, and Shubert told the plaintiff not to worry if he did not do anything wrong (doc. 50-1, pl. dep. 56-58, 175-77). The plaintiff told Shubert that he felt humiliated and that he was being harassed because he was followed to the restroom and people were making comments (*id.*). He testified that he "did not give [Shubert] specifics about what statements were said" (*id.*). The plaintiff testified that the person who followed him to the restroom was a female group lead on the day shift who did so to see whether he would use the men's or the women's restroom (*id.* 69-71). According to the plaintiff, Shubert "didn't acknowledge [his complaints]" (*id.* 71).[1] Shubert testified that the plaintiff never complained to him about being harassed because of his transgender status (doc. 50-3, Shubert dep. 21).

[1]   The plaintiff states in the response to the motion for summary judgment that the complaint to Shubert was "on or about October 16, 2016" (doc. 50 at 16). However, the cited excerpts from the plaintiff's deposition do not provide a date for the plaintiff's complaint (*see* doc. 50-1, pl. dep. 57-58, 68-71, 176-77).

The plaintiff's counselor, Palmyra Powell at Life in Balance Counseling Center, wrote a letter to Shubert that is dated October 18, 2016, and stated as follows:

I am writing a letter on behalf of Dillon Steinhilber. I have been seeing Mr. Steinhilber for the last four years for individual counseling. Recently, Mr. Steinhilber was recently diagnosed with Autism Spectrum Disorder by psychologist Dr. Michelle Peterson. Due to Mr. Steinhilber's disability, he may have difficulty with social interactions and staying focused on task. Mr. Steinhilber works best in a structured environment with supportive feedback.

Please do not hesitate to call should you have questions or concerns.

(Doc. 44-10; *see* doc. 50-1, pl. dep. 93-95)). The plaintiff testified that he placed the letter on Shubert's desk on or about October 19, 2016, in front of another human resources representative, Lisa Harrison (doc. 50-1, pl. dep. 97, 146, 170). In his deposition, Shubert acknowledged that he received the letter from the plaintiff and that he "reviewed it with him and asked if there was anything further," but he testified that he did not recall anything else about it (doc. 50-3, Shubert dep. 17-19, 35). He did not recall the plaintiff making any request for accommodations, other than the letter (*id.*). The plaintiff testified that no one at the defendant discussed with him ways to provide a structured environment or supportive feedback in response to this letter (doc. 50-1, pl. dep. 170-71).

**\*3** As a result of the investigation by the human resources department, the plaintiff was issued a final written warning dated November 2, 2016, for "[v]iolation of No Harassment Policy" (doc. 44-7). The defendant's No Harassment Policy stated in pertinent part:

> Yanfeng Global Automotive Interiors is committed to providing a workplace free of sexual harassment based on race, color, religion, national origin, ancestry, age, disability, sexual orientation, ... or any other characteristics protected from discrimination by law. Yanfeng Global Automotive Interiors disapproves of and will not tolerate harassment of its employees. All employees should be aware of the following: 1. Sexual harassment is strictly prohibited. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, unwelcome or offensive touching, verbal conduct such as sexual jokes or suggestive or obscene comments, written or graphic materials, ... as well as any other conduct of a sexual nature, whether written, verbal or physical....

(Doc. 44-15). The plaintiff acknowledged this policy on

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

May 4 and November 8, 2016 (*id.*).

The final written warning stated that, during the investigation, the discharged temporary employee "brought to our attention that [the plaintiff] made an inappropriate comment related to her body, specifically her rear-end" (doc. 44-7). The warning further stated that the complaint was substantiated by another employee (*id.*). In addition, the warning stated that the investigation uncovered that the plaintiff had "made other employees feel uncomfortable with conversations and actions related to [his] gender transition," including giving details regarding his surgery and remaining surgery, discussing costs associated with the transition process, raising his shirt to reveal scarring, and giving details about romantic relationships (*id.*).

On November 3, 2016, Hill and Senior Human Resources Manager Jasmine Gorie met with the plaintiff to inform him of the final written warning, which included a two-day suspension (doc. 44-7; doc. 50-1, pl. dep. 54-55). The plaintiff testified that, during the meeting, he told Gorie and Hill that he did not understand why he was being disciplined, and he told Hill and Gorie that they should have talked to him first to get his side of the story before making a decision (doc. 50-1, pl. dep. 58, 60, 64-65). The plaintiff also testified that he discussed having difficulties on the job, that he was tested for ADHD upon Hill's advice, and that he had been diagnosed with adult autism (*id.* 59). The plaintiff testified that Gorie told him that she would need a diagnosis, and the plaintiff told her that he "had a letter of disability on file" (*id.* 59-61). Gorie told the plaintiff that she did not have any knowledge of such letter and would need a diagnosis, but she would look for the letter and call the number provided by his counselor (*id.* 58-61, 160-61). The plaintiff testified that he suggested accommodations such as putting him "in accounting or someplace that dealt with numbers," because he needed "to be in an area that doesn't have such large groups of people" (*id.* 61-62). The plaintiff testified that the defendant never asked him for additional medical documentation, and the defendant had no additional discussions with him regarding possible accommodations (*id.* 161-63).

**\*4** Gorie testified that she understood from the conversation on November 3rd that the plaintiff was undergoing testing at that time, and she told the plaintiff that she needed a confirmation of the diagnosis once the testing was done and that the plaintiff should follow up directly with her (doc. 50-4, Gorie dep. 81-82, 92-96). According to Gorie, the plaintiff told her that his doctor would be willing to provide a letter and would be willing to speak to her, and she reinforced that she needed a

diagnosis from a medical professional "to start the interactive process" (*id.* 82-83). Gorie testified that when the plaintiff returned from suspension, he talked to her and told her that his physician thought he might work best in a quiet environment away from people and mentioned accounting or IT, but she never looked into this further (*id.* 83-84). She further testified that she never received any confirmation of a diagnosis and that, prior to her deposition, she had never seen the letter from the plaintiff's counselor that is quoted above (*id.* 79, 93).

The defendant submitted Gorie's notes from the November 3rd meeting as an exhibit to the motion for summary judgment (doc. 44-9). In that document, Gorie noted that the plaintiff stated he had "brought in a letter to Lisa & Joe," and she told the plaintiff that she did not have the letter and asked if it "spelled out what conditions he was explaining." The plaintiff responded that the letter did not do so as he was just beginning testing, and he offered his counselor's telephone number so that Gorie could speak with her. Gorie noted that she told the plaintiff that she would need confirmation following a medical diagnosis and that, once the testing was over, the plaintiff should follow up directly with her. Gorie further noted that she reiterated to the plaintiff that she could not accommodate a condition that allowed the plaintiff to disrespect employees or violate the No Harassment Policy, and the plaintiff stated that he understood (*id.*). The plaintiff argues in his response to the motion for summary judgment that Gorie's notes "were created" or "manipulated after the fact" (doc. 50 at 6 n.2). Specifically, while the submitted document consists of two pages, the plaintiff testified that Gorie only brought two sheets of paper to the November 3rd meeting, and she gave the plaintiff one sheet and wrote on the back of the other sheet (doc. 50-1, pl. dep. 55-56, 60-61, 161).

The plaintiff acknowledged in his deposition that he did make the comment regarding a female employee's rear end that was referenced in the final written warning;[2] however, he testified that he did not intend it in any sexual way as he was "complimenting everybody to try to make things go smoother," because he understood that the employees on the night shift, where he had recently been transferred, were "very uncomfortable with [his] presence because of being transgendered" (doc. 50-1, pl. dep. 42-43). Immediately upon making the comment, the plaintiff apologized to the employee, noting that it did not come out right and he did not intend it in any inappropriate way (*id.* 43). The plaintiff testified that the employee laughed and told him she was not offended and thought the situation was funny (*id.*). The employee raised the issue about the plaintiff's comment when she was terminated from employment, along with accusations

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

against other employees (*id.* 44-48; doc. 44-5 at 7, Cynthia Wilmore stmt.).

[2]    The plaintiff testified that he told the employee that what she was wearing made her "butt look good" (doc. 50-1, pl. dep. 43).

The plaintiff testified that he never raised his shirt at work to show his chest or scars, as was referenced in the final written warning (doc. 50-1, pl. dep. 66-67, 177; *see* doc. 44-7). The plaintiff acknowledged that he "might have" had conversations with Lawanda Attaway, a temporary employee, and Lisa Harrison, a human resources representative, about details of his gender transition surgery and the remaining surgery he still had to have done, the costs associated with the transition process, and possibly details about his romantic relationships (doc. 50-1, pl. dep. 65-67).

**\*5** On January 3, 2017, the plaintiff complained to Harrison in human resources that he was being harassed by an employee, Tara Cunningham. The plaintiff complained that Cunningham treated him differently than she treated other supervisors and was very argumentative and disrespectful to him. He also complained that Cunningham laughed or coughed sarcastically when she heard someone introduce him as "Mr." (doc. 50-1, pl. dep. 143-45, 154-55; doc. 50-5). In an email to Cynthia Wilmore[3] and Hill on January 3rd, Harrison stated that the plaintiff felt that he was "being harassed based on his sexual orientation by Tara Cunningham" (doc. 50-5 at 3). Harrison stated that she told the plaintiff to reach out to Hill so that they could sit down with Cunningham and address her behavior (*id.*). Harrison also told Hill to talk to Cunningham about her position to "remind her that she is classified as an operator" (*id.*). According to the plaintiff, Hill "had to sit [Cunningham] down and write her up for insubordination" (doc. 50-1, pl. dep. 145). The plaintiff testified that Cunningham believed that she was Hill's employee and "not under us supervisors," but Hill explained to the plaintiff and another supervisor that Cunningham "works under us" (*id.* 145).

[3]    Wilmore was a human resources supervisor who worked on the night shift (doc. 50-3, Shubert dep. 19).

On January 26, 2017, the plaintiff was terminated from employment in a telephone call with Gorie and Hill. In a memorandum regarding "termination" and noting the "attendees" were herself and Hill via telephone, Gorie stated that it was brought to her attention on that date and was later confirmed by the plaintiff that he was directed

by supervisors with MS Company[4] to bring a contract temporary employee to the office so that she could be released, but the plaintiff ignored the directive and revealed to the employee on the production floor that she had failed a drug screen. According to the memorandum, the plaintiff "was aware that his actions were inappropriate." Gorie noted that, based on the plaintiff's final written warning in November, "we decided to terminate [the plaintiff]. We contacted him via phone" (doc. 44-12). Gorie testified that she and Hill made the decision to terminate the plaintiff's employment (doc. 50-4, Gorie dep. 18).

[4]    MS Company is the staffing company that provided temporary employees to the defendant.

The plaintiff testified that the MS Company supervisors told him the employee had failed a drug test and asked him to bring the employee to them. The plaintiff asked if he could speak with the employee first, and neither of the supervisors objected. The plaintiff escorted the employee to the other side of equipment so they were alone without others around. He explained to the employee that she failed her drug test and was to meet with the MS supervisor, but he knew she had medical issues and that she could ask to appeal it (doc. 50-1, pl. dep. 73-80, 165-69; doc. 50-6). After being terminated from employment, the plaintiff asked Shubert if Gorie left a letter for him as to the reasons why he was being terminated from employment, and Shubert stated that he could not find one (doc. 50-1, pl. dep. 166-67). The plaintiff notes in the response to the motion for summary judgment that "one was later produced" (doc. 50 at 7), apparently referencing the termination memorandum signed by Gorie (*see* doc. 44-12).

Following the plaintiff's termination from employment, he applied for various production and shift supervisor level positions with other companies (doc. 50-1, pl. dep. 84-85; doc. 44-14). In the types of positions for which he applied, his job responsibilities would have been similar to the responsibilities he had with the defendant, including working with teams and maintaining production goals (doc. 50-1, pl. dep. 84-85). The plaintiff testified that he was fully qualified for these supervisory and shift-lead positions when he applied for them (*id.* 86). The plaintiff testified that he would describe himself as "people-oriented" (*id.* 9-10). The plaintiff is currently employed by Amazon as a stower, and, in that position, he is "very interactive" with other employees (*id.* 35) When the plaintiff started at Amazon, he notified them of his ASD disability, but he did not request an accommodation based upon his disability (*id.* 35-36, 86). Since working at Amazon, the plaintiff has applied for

2020 WL 6219421

promotions for managerial and supervisory positions (*id.* 30-31). In those positions, the plaintiff would be required to have direct contact with employees and conduct tasks such as leading meetings, and he plans to continue applying for such positions (*id.* 32, 34).

## APPLICABLE LAW AND ANALYSIS

### Standard of Review

**\*6** Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### Title VII Discrimination

Title VII prohibits an employer from failing or refusing to hire, discharging, or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). A plaintiff asserting claims for discriminatory treatment and retaliation "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Haynes v. Waste Connections, Inc.,* 922 F.3d 219, 223 (4th Cir. 2019) (parallel citations omitted). "[T]he elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010). If the plaintiff establishes a prima facie case of discrimination or retaliation, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory justification for its action. *Haynes,* 922 F.3d at 223. If the employer satisfies this burden, then the plaintiff must prove by a preponderance of the evidence that the employer's purportedly neutral reasons were a pretext for discrimination or retaliation. *Id.*[5]

[5]    Both parties have analyzed the plaintiff's causes of action under the *McDonnell Douglas* framework (doc. 44 at 6-19; doc. 50 at 9-25).

The defendant first argues that the plaintiff's transgender status does not qualify as a protected class under Title VII (doc. 44 at 8-9). As acknowledged by the parties, the Court of Appeals for the Fourth Circuit has not specifically addressed this issue, there is a split among the circuit courts that have addressed it, and the question is currently pending before the Supreme Court of the United States. In *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC,* the Supreme Court granted certiorari limited to the following question: "Whether Title VII prohibits discrimination against transgender people based on (1) their status as transgender (2) sex stereotyping under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L.Ed.2 268 (1989)." 139 S. Ct. 1599 (2019) (No. 18-107). The Court heard oral argument in October 2019, and a decision is expected this term.[6]

[6]    Neither party has sought a stay of the case pending the Supreme Court's ruling.

**\*7** The plaintiff argues in response to the defendant's

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

motion that he is able to meet the first element of a prima facie case under a theory of gender stereotyping (doc. 50 at 10). The defendant did not respond to this argument in its reply (see doc. 52). As argued by the plaintiff, the Supreme Court in Price Waterhouse v. Hopkins recognized employment discrimination based on sex stereotyping. 490 U.S. at 250-52 ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " (citation omitted)). Although the Fourth Circuit has yet to apply Price Waterhouse expressly to Title VII claims brought by transgender individuals, several district courts in this circuit have concluded that allegations of gender stereotyping are cognizable Title VII sex discrimination claims and, by extension, Title IX sex discrimination claims. See Kadell v. Folwell, – F. Supp.3d –, 2020 WL 1169271, at *6 (M.D. N. C. Mar. 11, 2020) (Title IX case); Grimm v. Gloucester County Sch. Bd., 302 F. Supp.3d 730, 745–46 (E.D. Va. 2018) (Title IX case); M.A.B. v. Bd. Of Educ. of Talbot Cty., 286 F. Supp.3d 704, 714 (D. Md. 2018) (Title IX case stating, "[T]his Court has concluded that discrimination on the basis of transgender status constitutes gender stereotyping because 'by definition, transgender persons do not conform to gender stereotypes.' As a result, transgender discrimination is per se actionable sex discrimination under Title VII based on Price Waterhouse." (quoting Finkle v. Howard Cty., 12 F. Supp.3d 780, 787–88 (D. Md. 2014))). See also Boyd v. Johnson Food Servs., LLC, C.A. No. 3:17-cv-3414-JMC, 2019 WL 1090725, at *6 (D.S.C. Mar. 8, 2019) (noting that "gender stereotype claims are protected under Title VII" in denying motion to dismiss gender stereotype claim). Based upon the foregoing, the undersigned finds that the plaintiff has met the first element of a prima facie case of discrimination.

The defendant next argues that the plaintiff cannot meet the second element of a prima facie case by showing that he had satisfactory job performance. "Such a showing of satisfactory performance does not require the plaintiff to show that he was a perfect or model employee. Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations." Haynes, 922 F.3d at 225. The defendant specifically argues that the plaintiff did not meet the defendant's legitimate expectations based on his violations of the No Harassment Policy that led to his suspension (making a comment about an employee's rear end, sharing details regarding his gender transition

surgery and remaining surgeries, discussing costs associated with the transition process, raising his shirt to reveal scarring on his chest, and sharing details of romantic relationships) and the incident in January 2017 that led to his termination from employment (telling a temporary employee on the production floor that she failed a drug screen) (doc. 44 at 9-10). In response, the plaintiff argues that where, as here, " 'the defendant's proffered evidence for showing that a plaintiff was not meeting the employer's expectations mirrors the nondiscriminatory reason produced by the employer, courts have assumed a prima facie case and proceeded to the pretext inquiry in the interests of fairness and efficiency' " (doc. 50 at 11) (quoting Jones v. Giant Foods, Inc., C.A. No. JFM-00-3469, 2000 WL 1835393, at *2 (D. Md. Nov. 27, 2000) (citations omitted)). This court agrees and will proceed to the consideration of pretext.

As noted, the defendant states that the plaintiff was given the final written warning and suspension based on his violation of the No Harassment Policy, and he was terminated from employment for telling the temporary employee on the production floor that she failed a drug screen. With regard to the reasons given for his suspension, the plaintiff admits making the comment about the employee's rear end. However, the plaintiff denies that the employee was offended and notes that the employee only raised the issue after being terminated from employment when she made allegations against multiple people. He denies raising his shirt to show scarring on his chest and notes that the only evidence in the record supporting this is an unsworn statement by Harrison. The plaintiff acknowledges talking to Attaway and Harrison about issues with his gender reassignment, but contends there is nothing to show that he did so inappropriately. With regard to the reason given for his termination from employment, the plaintiff admits telling the employee that she failed the drug screen, but denies doing it within earshot of any other employees and points out that, when he asked the MS Company supervisors if he could speak to the employee prior to bringing her in, he was never told he could not do so (doc. 50 at 11-12). "What matters in the Title VII analysis, however, is not whether [the plaintiff actually violated the No Harassment Policy or publicly disclosed confidential information to the employee on the production floor], but whether [the defendant] in good faith believed he did." Jones, 2000 WL 1835393, at *2 (citing Hawkins v. Pepsico, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (the court should not evaluate whether the reason proffered was "wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination" (internal quotations and citation omitted)); Moore v. Sears, Roebuck & Co., 683

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

F.2d 1321, 1323 n. 4 (11th Cir.1982) (the court inquires only into whether "the defendant in good faith believed plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination")).

*8 The plaintiff argues that he has shown sufficient evidence that the defendant's reasons for his suspension and termination are pretext for discrimination. Specifically, the plaintiff argues that much of the conduct in the final written warning was only at issue because he is transgender. However, the plaintiff has failed to present evidence supporting the argument. The plaintiff cites other employees whom he claims engaged in similar conduct but were not suspended or terminated from employment (doc. 50 at 14-15). To establish a valid comparator, the plaintiff must produce evidence that he and the comparator "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haynes, 922 F.3d at 223-24 (quoting Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010)). Specifically, the plaintiff notes that a non-transgender male supervisor raised his shirt to show off his stomach to female employees and was not reprimanded (doc. 50 at 15). However, the plaintiff has presented only hearsay evidence in support (doc. 50-1, pl. dep. 177-78). He additionally claims that another supervisor, Bill Norris, who is non-transgender, was sent an email with an alleged performance improvement plan, was accused of wrongdoing by the same employee who accused the plaintiff of making the comment about her rear end, and was constantly late to work, but Norris was not suspended or terminated from employment (doc. 50-1, pl. dep. 47-48, 50, 179; doc. 50-2, Hill dep. 27). However, the plaintiff has pointed to no evidence that the reasons for Norris' placement on a performance improvement plan or that the allegations made against Norris by the employee were in any way similar to the conduct for which the plaintiff was suspended and later terminated from employment. As for Norris being "constantly late to work," the plaintiff presents only his conclusory, unsubstantiated testimony on this point. The plaintiff also points to Hill as a comparator, arguing that Hill told the plaintiff that he should get tested for ADHD, but Hill was only verbally reprimanded (doc. 50 at 15) (citing doc. 50-2, Hill dep. 17-18). Even assuming that this is sufficiently similar conduct to the plaintiff's, it is undisputed that Hill was the plaintiff's supervisor, and, therefore, he is not a valid comparator. See Haynes, 922 F.3d at 223-24.

As evidence of pretext, the plaintiff further contends that he "had a previous issue with Ms. Gorie related to his transgender status and getting medical coverage" (doc. 50 at 15). The plaintiff testified that when the defendant was taking over the plant from Faurecia, he spoke to the temporary workers who were doing the human resources processing, and he was told he needed to speak to Gorie, but he "could never find her. She was busy." He testified that he emailed Gorie several times asking whether the new health insurance would cover his transgender-related health issues, but Gorie did not respond, and it was only when he happened to see her that she told him the insurance "did not cover transgender" (doc. 50-1, pl. dep. 171-73). However, the plaintiff has presented absolutely no evidence that Gorie's failure to immediately respond to the emails – which the plaintiff himself testified were sent during the defendant's takeover of the plant and a very busy time for the human resources department – was motivated by discriminatory animus and in any way related to his final written warning and termination from employment.

The plaintiff further argues that the defendant's "subjective and incomplete investigation" prior to the issuance of the final written warning is evidence of pretext (doc. 50 at 14). The plaintiff testified that he was not interviewed during the investigation of his alleged violation of the No Harassment Policy for which he received a two-day suspension (doc. 50-1, pl. dep. 58, 64-65, 176-77). As recognized by the Fourth Circuit in Villa v. CavaMezze Grill, LLC, "evidence of an obviously inadequate investigation into the employee's misconduct could tend to show that claimed employee misconduct was actually pretext for prohibited animus." 858 F.3d 896, 905 (4ᵗʰ Cir. 2017) (emphasis added) (citing Smothers v. Solvay Chems., Inc., 740 F.3d 530, 542 (10th Cir. 2014)). Here, however, the plaintiff has failed to show that the investigation was obviously inadequate. As an exhibit to the motion for summary judgment, the defendant has including statements from employees dated in October 2016 that substantiate the conduct set out in the final written warning (docs. 44-5, 44-8). Moreover, there is no indication that the defendant's policy required that an employee be interviewed prior to the employee being punished for misconduct. See Palomino v. Concord Hosp. Enters. Co., 126 F. Supp. 3d 647, 655 (D.S.C. 2015) (rejecting plaintiff's argument that failure to interview her demonstrated pretext; she offered no evidence that company was required to do so). Viewing all evidence in the light most favorable to the plaintiff, the court is convinced that no reasonable jury could find that the quality of the defendant's investigation itself (or in combination with any other fact in the record) can establish pretext.[7]

[7]     With regard to the termination event, the plaintiff

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

argues that while the defendant "did get an email from Plaintiff ..., they still did not properly investigate as they claimed there were others around to hear yet they could produce no such person" (doc. 50 at 14). In his deposition, the plaintiff testified that after the incident on January 26th, Wilmore, a human resources supervisor on the night shift, called him and told hm to send an email with the details of what happened, and he did so (doc. 50-1, pl. dep. 76-77). The plaintiff included as an exhibit to his response to the motion for summary judgment two emails dated January 26, 2017, from himself to Wilmore, in which he explained that he told the employee that she failed her drug test, but they were "in the F16 area alone" (doc. 50-6). Thus, the plaintiff's own evidence demonstrates that he was allowed to give his side of the story, and the plaintiff has failed to show that the investigation into the termination event was inadequate.

**\*9** "[T]o establish that a proffered reason for the challenged action was pretext for discrimination, the plaintiff must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (citation omitted). The plaintiff has failed to present sufficient evidence showing that the reasons given by the defendant for the adverse employment actions were not the actual reasons, and he has likewise failed to raise a reasonable inference that sex discrimination was the real reason for his final written warning and/or termination from employment. The ultimate question in an employment discrimination case is whether the employer intentionally discriminated against the plaintiff on a prohibited basis. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000). Although the court has applied the *McDonnell Douglas* framework to this record, the undersigned has done so while keeping that ultimate question in mind. After careful review of the record and the applicable law, the court concludes the plaintiff has failed to establish a "genuine, triable issue," *Celotex*, 477 U.S. at 327, as to whether the defendant discriminated against him on the basis of sex. Accordingly, summary judgment should be granted to the defendant on this cause of action.

*Title VII Retaliation*
Title VII prohibits retaliation "against an employee

because, in relevant part, she 'has opposed any practice made an unlawful employment practice by this subchapter.' " *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)). "A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) [he] suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018) (citation omitted). In order for the plaintiff to prove that he engaged in a protected activity, he "need 'only ... prove that he opposed an unlawful employment practice [that] he reasonably believed had occurred or was occurring.' " *Coleman v. Loudoun Cty. Sch. Bd.*, 294 F. App'x 778, 781 (4th Cir. 2008) (quoting *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)). "This requires that the plaintiff: (1) have a good faith belief that the employer is engaging in an unlawful employment practice; and (2) that the belief is objectively reasonable in light of the facts." *Id.* (citing *Peters*, 327 F.3d at 321).

The defendant argues that the plaintiff cannot show that he engaged in protected activity or a causal link between any protected activity and his termination from employment (doc. 44 at 13-14). The undersigned disagrees. The plaintiff testified that, prior to his suspension, he went to Shubert and asked why he was being investigated and told Shubert that he felt humiliated and harassed because he was followed to the restroom and people were making comments (doc. 50-1, pl. dep. 56-58, 175-77). The defendant notes that Shubert testified that the plaintiff never complained to him about being harassed because of his transgender status and that it is undisputed that Gorie and Hill, not Shubert, made the decision to terminate the plaintiff's employment. However, the plaintiff made another complaint on January 3, 2017, when he told Harrison in human resources that he was being harassed by an employee. In an email to Wilmore and Hill on January 3rd, Harrison stated that the plaintiff felt that he was "being harassed based on his sexual orientation ..." (doc. 50-5 at 3). Accordingly, at least one of the decisionmakers had notice of the plaintiff's complaint that he was being harassed prior to his termination from employment some three weeks later. As close temporal proximity can demonstrate causation, the undersigned finds that the plaintiff can make out a prima facie case of retaliation under Title VII. *See Waag v. Sotera Defense Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) ("[F]or purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation." (citing *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogated on other*

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

grounds by *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013))).

**\*10** In *Foster v. University of Maryland - Eastern Shore*, 787 F.3d 243, 246 (4ᵗʰ Cir. 2015), the Fourth Circuit considered the effect of the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), on what Title VII retaliation plaintiffs must show to survive a motion for summary judgment. The court in *Foster* clarified that the stringent but-for causation required for Title VII retaliation claims is applied not at the prima facie stage, but during the pretext analysis. 787 F.3d at 252 ("We conclude, therefore, that the *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action. *Nassar* does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim."). Thus, in order to meet his burden at the pretext stage, the plaintiff must show that he would not have been suspended and/or terminated from employment but-for the defendant's retaliatory animus. *Id.*

The plaintiff argues that pretext is shown by the proximity in time between his complaint to Shubert and his suspension (approximately two weeks) and between his complaint to Harrison and his termination from employment (approximately three weeks). However, "temporal proximity, without more, does not support a finding of pretext. *Jones v. UnitedHealth Group, Inc.*, 19-1728, 2020 WL 2116496, at \*2-3 (4th Cir. Apr. 21, 2020) (citing *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (holding that, while proximity can establish a prima facie case of causation, it is insufficient to alone establish pretext)). Moreover, with regard to the plaintiff's suspension, it is undisputed that the investigation into the plaintiff's conduct that led to the final written warning had already begun at the time the plaintiff complained to Shubert. Indeed, the reason the plaintiff went to Shubert in the first place was because he heard he was being investigated. Moreover, there is no evidence that Hill and Gorie, who issued the final written warning, knew that the plaintiff had told Shubert that he felt humiliated and harassed because someone followed him to the restroom and co-workers were making comments. Further, he has presented no evidence that raises an inference that retaliation for his complaint about harassment to Harrison was the reason for his termination from employment. In order to carry his burden at the pretext stage of showing "that retaliation was a but-for cause" of his suspension and/or termination, the plaintiff must present evidence to "establish both that the employer's reason [for the suspension and/or termination] was false and that retaliation was the real reason for the

challenged conduct." *Foster*, 787 F.3d at 252 (citation, internal quotation marks, and brackets omitted). While the plaintiff clearly disagrees with the defendant's proffered reasons, he has failed to produce evidence tending to show that the defendant's non-discriminatory reasons for his suspension and termination were false and that retaliation was the real reason. Based upon the foregoing, summary judgment should be granted to the defendant on the Title VII retaliation cause of action.

### ADA Discrimination

The ADA prohibits a covered employer from discriminating against an individual "on the basis of disability." 42 U.S.C. § 12112(a). The *McDonnell Douglas* burden-shifting framework discussed above applies to both discrimination and retaliation claims under the ADA. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). When bringing a wrongful discharge claim under the ADA, "a plaintiff must prove (1) that [ ]he has a disability, (2) that [ ]he is a 'qualified individual' for the employment in question, and (3) that [his employer] discharged [him] (or took other adverse employment action) because of [his] disability." *Id.* (quoting *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)). *See Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235-36 (4th Cir. 2016) (holding that the ADA requires that a plaintiff's disability be a but-for cause of the adverse employment action).

**\*11** The defendant argues that the plaintiff did not have a disability as a matter of law (doc. 44 at 14-16). The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1). The ADA states that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2). The EEOC has also identified "interacting with others" as a major life activity. 29 C.F.R. § 1630.2(i)(1)(i).

Pursuant to the ADA Amendments Act of 2008 ("ADAAA"), the definition of disability " 'shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms.' " *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting 42 U.S.C. § 12102(4)(A)). The ADAAA was intended to make it "easier for people

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Id.* Accordingly, "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id. See also Jacobs*, 780 F.3d at 572 (citation omitted).

Viewing the evidence in a light most favorable to the plaintiff, the undersigned finds that the plaintiff has presented sufficient evidence that he has a mental impairment that substantially limits him in a major life activity (such as concentrating and interacting with others) or that he was regarded as having such an impairment. It is undisputed that the plaintiff's supervisor, Hill, suggested that the plaintiff get tested for ADHD, because he felt the plaintiff had issues at work, including getting upset when someone interrupted him, inattentiveness, and being easily distracted (doc. 50-1, pl. dep. 102-05, 146-47, 155). Further, the plaintiff has presented evidence that he was tested in September 2016, while he was employed by the defendant, and Dr. Peterson issued a report finding that the plaintiff had moderate ADHD symptoms and diagnosing the plaintiff with ASD. Further, the plaintiff's counselor wrote a letter to the defendant in October 2016 stating that the plaintiff had been diagnosed with ASD and, due to his disability, he "may have difficulty with social interactions and staying focused on task" (doc. 44-10).

Having found that the plaintiff has presented sufficient evidence to show that he has a disability under the ADA, the undersigned will assume for purposes of this motion that the plaintiff can make out each of the remaining elements of a prima facie case of discrimination under the ADA. Accordingly, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the plaintiff's suspension and termination from employment. As discussed above, the defendant has done so by presenting evidence that the plaintiff was suspended for violating the No Harassment Policy, and he was terminated from employment for telling a temporary contract employee on the production floor that she failed a drug screen (docs. 44-7, 44-12). Thus, the burden shifts back to the plaintiff to prove that these asserted justifications are pretextual.

The plaintiff argues that the defendant's "reasoning seems to shift as to why they alleged his actions called for termination, thus giving rise to ... inference of pretext" (doc. 50 at 23). However, the plaintiff does not explain

this statement nor does he cite any evidence in support. Rather, the evidence before the court shows that the reasons given for the plaintiff's final written warning and ultimate discharge have remained consistent.

*12 Further, while the temporal proximity between the plaintiff giving Shubert the letter from his counselor and his suspension is quite short, there is no indication in the record that Gorie knew about the letter prior to giving the plaintiff the final written warning. The plaintiff argues that "testimony trying to disclaim knowledge or receipt of the ... letter from the counselor [and] the false assertions from ... Gorie about what was said at the meeting and her seemingly concocted notes" are probative of pretext. However, Shubert acknowledged receiving the letter from the counselor, but he testified that he did not recall having any discussions with Gorie about the plaintiff's disability or accommodations (doc. 50-3, Shubert dep. 18-19), and Gorie testified that she never saw the letter prior to her deposition, and she did not recall Shubert ever mentioning it to her (doc. 50-4, Gorie dep. 79). Thus, the plaintiff's testimony that Gorie told him at the November 3rd meeting that she did not have any knowledge of the letter and would need a diagnosis (doc. 50-1, pl. dep. 58-61, 160-61) is consistent with Gorie's deposition testimony. The plaintiff's allegation that Gorie "seemingly concocted" her notes from the November 3rd meeting hangs on the plaintiff's threadbare allegation that Gorie had only one piece of paper on which to take notes. Further weighing against any inference of disability discrimination is the undisputed evidence showing that the plaintiff presented the letter from his counselor to Shubert only *after* the human resources department began investigating the plaintiff's conduct. Likewise, the plaintiff has failed to provide evidence sufficient to raise an inference that his termination from employment on January 26, 2017, was in any way motivated by his discussion with Gore and Hill about his disability approximately three months prior in the final written warning meeting on November 3, 2016.

The undersigned finds that a reasonable jury could not conclude that the plaintiff has presented sufficient evidence of pretext to ultimately prevail on this claim. The plaintiff he admits that he engaged in the conduct cited by the defendant for his suspension and termination from employment, while at the same time disputing the details (*see* doc. 50 at 6-7, 12-13, 23). However, the court " 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination....' " *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997)).

2020 WL 6219421

Rather, the court's

> sole concern is "whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."

*Id.* (quoting *Giannopoulos,* 109 F.3d at 410-11). The plaintiff has failed to present sufficient evidence to raise a reasonable inference that the defendant's given reasons for his suspension and termination from employment were not its true reasons, and he has likewise failed to raise a reasonable inference that discrimination based on his disability was the real reason for his suspension and/or termination from employment. Accordingly, summary judgment should be granted to the defendant on the plaintiff's ADA discrimination cause of action.

### ADA Retaliation
Section 503 of the ADA prohibits retaliation against an employee "because [that] individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 12203(a). As noted, the *McDonnell Douglas* burden-shifting framework discussed above applies to both discrimination and retaliation claims under the ADA. *Jacobs,* 780 F.3d at 572. "Importantly, although intermediate evidentiary burdens shift back and forth under this framework, [the plaintiff] retains the ultimate burden of persuading the trier of fact, ... that [his] engagement in the protected activities was a 'but for' cause of [his suspension and/or termination from employment]." *Staley v. Gruenberg,* 575 F. App'x. 153, 155 (4th Cir. 2014) (internal citations and quotation marks omitted).

The undersigned finds that the plaintiff can establish a prima facie case of ADA retaliation. Viewing the evidence in a light most favorable to the plaintiff, he has presented evidence upon which a reasonable jury could determine that he engaged in protected activity by providing Shubert with a letter from his counselor and in discussing his disability with Gorie and Hill and suggesting possible accommodations. With regard to the causation element, the plaintiff has presented evidence that he placed the letter from his counselor on Shubert's

desk on or about October 19th, and he received the final written warning and two-day suspension approximately two weeks later. Further, in the meeting with Hill and Gorie on November 3rd, the plaintiff testified that he mentioned the letter from his counselor and suggested accommodations for his issues, and he was terminated from employment approximately three months later. The undersigned finds that the temporal proximity is sufficient to satisfy prima facie causation. *See Jacobs,* 8780 F.3d at 575 (finding that "[s]uch close temporal proximity [three weeks] weighs heavily in favor of finding a genuine dispute as to causation." (citing *Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 706 (4th Cir.2001) (finding that temporal proximity alone can create a genuine dispute to causation))). However, as with the plaintiff's Title VII retaliation claim, temporal proximity alone is insufficient to satisfy the plaintiff's burden of showing that retaliation for his protected activities was a but-for cause of his suspension and termination from employment. For the reasons discussed above with regard to his Title VII claims and ADA discrimination claim, the plaintiff has failed to meet his burden of showing pretext. Accordingly, the defendant's motion for summary judgment should be granted on the plaintiff's ADA retaliation cause of action.

### ADA Failure to Accommodate
**\*13** In his third cause of action entitled "ADAAA Disability Discrimination," the plaintiff alleges that he sought reasonable accommodations for his disability, but the defendant failed to engage in a legitimate interactive process, ignored his requests, and refused to accommodate his "request to modify his job so as to allow him to work in slightly smaller crowds" (doc. 1-1, compl. ¶¶ 59-60). To establish a prima facie case under the ADA for failure to accommodate, the plaintiff must show: " '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.' " *Wilson v. Dollar Gen. Corp.,* 717 F.3d 337, 345 (4th Cir.2013) (brackets and ellipses omitted) (quoting *Rhoads v. Fed. Deposit Ins. Corp.,* 257 F.3d 373, 387 n.11 (4th Cir.2001)).

In its motion for summary judgment, the defendant does not address the alleged failure to accommodate as an independent claim, but, as part of the argument that summary judgment should be granted on the ADA discrimination claim, the defendant argues that the

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

plaintiff has not shown that he could perform the essential functions of his position with reasonable accommodation (*see* doc. 44 at 16-17). In response to the motion for summary judgment, the plaintiff also conflates the ADA discrimination and failure to accommodate claims (doc. 50 at 19-23). Out of an abundance of cation, the undersigned will address the failure to accommodate claim independently, in the event it is a claim the plaintiff has intended to pursue.

As noted, the plaintiff contends that the defendant failed to engage in an interactive process to identify a reasonable accommodation with which he could perform the essential functions of his job. In defining "reasonable accommodation," the ADA regulations provide:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). "The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson,* 717 F.3d at 346-47 (citations omitted). However, " 'liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions.' " *Id.* at 347 (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91 (1st Cir. 2012)).

Here, the undersigned finds that the plaintiff's failure to accommodate claim fails because the plaintiff has not identified a reasonable accommodation that could have been discovered in the interactive process that would have enabled him to perform the essential functions of his position as a production supervisor. In his deposition, the plaintiff testified that he suggested accommodations to the defendant such as putting him "in accounting or someplace that dealt with numbers," because he needed "to be in an area that doesn't have such large groups of people," and he needed "to work in a smaller environment" (doc. 50-1, pl. dep. 61-62). It appears to be undisputed, however, that the plaintiff's position as a production supervisor required that he interact with large groups of people, and he has failed to show how he could perform the essential functions of that position "in a smaller environment." In support of his contention that the defendant could have reassigned him to "accounting or someplace that dealt with numbers," the plaintiff notes that "[p]roviding a reasonable accommodation to a disabled employee may sometimes involve reassigning that employee to another position" (doc. 50 at 22). The plaintiff cites the federal regulations, which state that "[r]eassignment to a vacant position" is considered a "potential reasonable accommodation." 29 C.F.R. § 1630.2(o)(2)(ii). However, " 'reasonable accommodation' does not require an employer to reassign the qualified individual to a position occupied by another employee or to create a position when none exists." *Mag.-Ward v. Donahoe*, C.A. No. 4:11-CV-02896-RBH, 2013 WL 4056313, at *17 (D.S.C. Aug. 12, 2013) (citing *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 355 (4th Cir. 2001) (finding reassignment not reasonable accommodation when it would require the employer to "bump another employee out of a particular position"); *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002) (finding employer not required to "create a new position as an accommodation to a disabled employee")). The "[p]laintiff has the burden to establish the availability of one or more positions for which the employer could provide reasonable accommodation." *Williams v. United Parcel Services, Inc.*, C.A. No. 2:10-1546-RMG, 2012 WL 601867, at *6 (D.S.C. Feb. 23, 2012). The plaintiff has not done so here. "To simply assert that questions of fact exist regarding whether such positions or duties might exist is insufficient to carry [the plaintiff's] burden." *Mag.-Ward*, 2013 WL 4056313, at *17 (citing *Williams*, 2012 WL 601867).

**\*14** As the plaintiff has failed to identify a reasonable accommodation that could have been discovered in the interactive process that would have enabled him to perform the essential functions of his position, summary judgment should be granted to the defendant on the plaintiff's ADA failure to accommodate cause of action.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the defendant's motion for summary judgment (doc. 44) be granted.

Steinhilber v. Yanfeng US Automotive Interiors I, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 6219421

IT IS SO RECOMMENDED.

*The attention of the parties is directed to the important notice on the following page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and

Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6219421

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

2012 WL 7176826
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Charleston Division.

Jessie TORO, Plaintiff,
v.
SCIENCE APPLICATIONS INTERNATIONAL
CORPORATION, Defendant.

Civil Action No. 2:12–1833–DCN–BM.
|
Dec. 7, 2012.

**Attorneys and Law Firms**

Ashley E. Ameika, Ashley Ameika Law Office, Charleston, SC, Jennifer Munter Stark, Jennifer Munter Stark Law Office, Mt. Pleasant, SC, for Plaintiff.

Lucille L. Nelson, Ashley Prickett Cuttino, Eric C. Schweitzer, Ogletree Deakins Nash Smoak and Stewart, Charleston, SC, for Defendant.

**REPORT AND RECOMMENDATION**

BRISTOW MARCHANT, United States Magistrate Judge.

**\*1** This action has been filed by the Plaintiff, a former employee of the Defendant, asserting various federal and state causes of action arising out of her employment by the Defendant. Defendant has filed a Rule 12 motion to dismiss Plaintiff's Second Cause of Action insofar as it asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as well as Plaintiff's Third Cause of Action under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12117, et seq., and Plaintiff's Fourth Cause of Action for retaliation.

Plaintiff filed a memorandum in opposition to the Defendant's motion on October 18, 2012, following which the Defendant filed a reply memorandum on October 25, 2012. Defendant's motion is now before the Court for disposition.[1]

[1]   This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant has filed a motion to dismiss. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

**Discussion**

When considering a Rule 12 motion to dismiss, the Court is required to accept the allegations in the pleading as true, and draw all reasonable factual inferences in favor of the Plaintiff. The motion can be granted only if the Plaintiff has failed to set forth sufficient factual matters in the Complaint to state a plausible claim for relief "on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**I.**

**(Title VII Retaliation Claims in Second Cause of Action and ADA Claim in Third Cause of Action)**

Defendant initially asserts that, to the extent Plaintiff's retaliation claim in her Second Cause of Action is asserted under Title VII, as well as her entire Third Cause of Action under the ADA, should be dismissed for failure of the Plaintiff to exhaust her administrative remedies. In order to bring a lawsuit in United States District Court under Title VII or the ADA, a plaintiff is first required to properly exhaust his or her administrative remedies. Specifically, these statutes require that a claimant file a charge of discrimination with the EEOC within one hundred and eighty (180) days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state", within three hundred (300) days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency, or within thirty (30) days of the

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

state agency's termination of its proceedings, whichever is earlier. *See* 42 U.S.C. § 2000e–5(e); 42 U.S.C. § 12117(a) [ADA adopts procedures set forth in § 2000e–5(e) ].

Since South Carolina is a deferral state, the South Carolina Human Affairs Commission (SCHAC) is the appropriate state agency for purposes of Defendant's motion, and Plaintiff filed a charge of discrimination with SCHAC on June 16, 2011. *See* Defendant's Exhibit (Court Docket No. 15–1).[2] Defendant argues in its motion that the filing of this administrative charge by the Plaintiff did not exhaust her administrative remedies with respect to any Title VII retaliation claim or an ADA claim, however, because Plaintiff failed to assert any such claims in her administrative charge. *Smith v. First Union Nat'l. Bank,* 202 F.3d 234, 247 (4th Cir.2000) ["Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC [or SCHAC]"]; *Brown v. South Carolina School for Deaf and Blind,* No. 11–1111, 2011 WL 5110133 at * 1 (D.S.C. Oct.26, 2011) ["Claims brought under the ADA must be administratively exhausted in the same manner as those claims brought under Title VII prior to filing of an action in federal court."]. A plain reading of Plaintiff's administrative charge of discrimination confirms that she only asserted a claim for sex discrimination in that document, and did not assert a claim for either retaliation or disability discrimination. *Defendant's Exhibit* (Court Docket No. 15–1). Further, Plaintiff has herself provided as an exhibit a copy of SCHAC's letter to her enclosing her charge of discrimination (which Plaintiff was to sign, notarize and return), which clearly states that Plaintiff is only submitting a claim under Title VII and the corresponding state law, and not referencing any disability claim. *See* Court Docket No. 24–2, p. 1.

[2]     The Court may consider this exhibit in ruling on Defendant's motion to dismiss. *See Williams v. 1199 Seiu United Healthcare Workers East,* No. 12–72, 2012 WL 2923164 at * 1 n. 1 (D.Md. July 17, 2012) ["In the employment context, a court may consider an EEOC charge and other EEOC documentation [when considering a motion to dismiss] because such documents are integral to the complaint as Plaintiff necessarily relies on these documents to satisfy the time limit requirements of the statutory scheme."] (citing *Holowecki v. Fed. Express Corp.,* 440 F.3d 558, 565–566 (2d Cir.2006); *McDougall v. Maryland Transit Auth.,* No. 11–3400, 2012 WL 1554924 at n. 3 (D.Md. Apr.27, 2012) ["a plaintiff's administrative discrimination charge is integral to a subsequent discrimination complaint."] ); *see also,* Complaint, ¶ 8.

**\*2** Plaintiff argues in her response brief, however, that the Initial Inquiry Questionnaire and supporting documentation she provided to SCHAC (apparently back in September of 2010, almost a year earlier), while not using the term "retaliation", "articulates that she was the subject of negative repercussions in the terms and conditions of her employment as a result of complaining about men getting more pay, better schedules, leniency in disciplinary action, and flexibility with leave", while with respect to her ADA claims, she discusses on page 4 of her inquiry documentation that the Defendant was aware that she had been "pre-diagnosed with cervical cancer ....". *See* Plaintiff's Exhibit A (Court Docket No. 24–1).[3] However, Plaintiff's Initial Inquiry Questionnaire and supporting documentation do not save her Title VII retaliation and ADA claims from dismissal.

[3]     *See* n. 2, *supra. See also Ashraf–Hassan v. Embassy of France in U.S.,* —— F.Supp.2d ——, 2012 WL 2948548 at * 4 (D.D.C. July 20, 2012) [Finding that a court may consider intake questionnaire without converting motion to dismiss into a motion for summary judgment]; *Federal Exp. Corp. v. Halowecki,* 552 U.S. 389, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008) [Court considered intake questionnaire when ruling on a motion to dismiss].

Where the administrative agency makes clear that an initial questionnaire does not constitute an administrative charge, any claims raised in the initial questionnaire but not in the actual administrative charge itself (assuming the Court were to otherwise find for purpose of Defendant's motion to dismiss that Plaintiff had actually raised retaliation and/or ADA claims in her initial questionnaire) are not properly exhausted. *Middleton v. Motley Rice,* LLC, No. 08–3256, 2010 WL 3167360, at * 6 (D.S.C. Aug.9, 2010) [Noting that an intake questionnaire is not shared with the employer, while the administrative charge form "serves to define the scope of the [administrative agency's] investigation and to notify the defendant of the charges against it. A Plaintiff cannot be allowed to transfer the allegations mentioned only in the questionnaire to the ... charge itself. Not only would this be circumventing the role of the Commission, but it would be prejudicial to the employer"], citing *Barzanty v. Verizon, PA., Inc.,* 361 Fed.Appx. 411, 415 (3rd Cir.2010); *see also Park v. Howard University,* 71 F.3d 904, 909 (D.C.Cir.1995) ["To treat Intake Questionnaires willy-nilly as charges would be to dispense with the requirement of notification of the perspective defendant",

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

quoting *Early v. Bankers Life and Cas. Co.,* 959 F.2d 75, 80 (7th Cir.1992); *Green v. Walmart Stores, Inc.,* No. 11–2219, 2012 WL 2048207, at * 2 (D.S.C. May 3, 2012)["[T]his District and other jurisdictions have repeatedly concluded that claims raised in the questionnaire but not the actual ... charge are not properly exhausted and that such claims are ripe for dismissal"] (internal citations omitted), *adopted and incorporated into,* 2012 WL 2046124 (D.S.C. June 6, 2012). Here, as was the case in *Green,* the questionnaire itself conspicuously, at the top of the first page, states in bold type that **"COMPLETION AND SUBMISSION OF THIS QUESTIONNAIRE DOES NOT IMPLY OR CONSTITUTE THE FILING OF A CHARGE".** As was noted by the Court in *Green,* "[t]he disclaimer makes it impossible, as an objective matter, to ... construe the questionnaire" as a charge. *Green,* 2012 WL 2048207, at * 3.

**\*3** Therefore, in determining the scope of Plaintiff's exhausted claims, the Court is bound by the scope of Plaintiff's claims as are set forth in her administrative charge, and only those discrimination claims set forth in the administrative charge and reasonably related thereto or were developed by a reasonable investigation of the claims set forth in the original charge may be maintained in a subsequent Title VII lawsuit. *Bryant v. Bell Atlantic MD., Inc.,* 288 F.3d 124, 132 (4th Cir.2002); *Evans v. Techs. Applications & Serv., Co.,* 80 F.3d 954, 963 (4th Cir.1996); *Jones,* 551 F.3d at 300. "Allowing a complaint to encompass allegations outside the ambit of the predicate [administrative] charge would circumscribe [the administrative agency's] investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely ... charge". *Dorsey v. Pinnacle Automation, Co.,* 278 F.3d 830, 838 (8th Cir.2002) (internal quotation marks and citations omitted).

Plaintiff's administrative charge clearly only asserts claims for gender discrimination, and does not set forth any claim for disability discrimination under the ADA or for retaliation under Title VII or any other discrimination statute. *See* Defendant's Exhibit (Court Docket No. 15–1). Therefore, these claims are subject to dismissal. *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995) [Claims that exceed the scope of an administrative charge and any claim that would have naturally arisen from an investigation thereof are procedurally barred); *Iqbal,* 129 S.Ct. at 1949 [To survive a motion to dismiss, Plaintiff must have set forth a claim for relief that is plausible "on its face"] .[4]

[4]     Plaintiff also argues, *inter alia,* that she should be allowed to pursue her ADA and Title VII

retaliation claims because administrative exhaustion of remedies is not a jurisdictional prerequisite to the bringing of a suit in federal court, but is instead a requirement subject to waiver, estoppel, and equitable tolling, citing to *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1983). However, the Defendant clearly has not waived this defense, and Plaintiff has presented no cogent argument for why the Defendant should be estopped from asserting this defense. *Polsby v. Chase,* 970 F.2d 1360, 1363 (4th Cir.1992) [Equitable relief is reserved for only the most deserving complainants, usually where there exists affirmative misconduct], *vacated on other grounds,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993); *Ramirez v. City of San Antonio,* 312 F.3d 178, 183 (5th Cir.2002) ["The party who invokes equitable tolling bears the burden of demonstrating that it applies in his case."]. In any event, Defendant correctly notes in its reply brief that *Zipes* referred to the *untimeliness* of an administrative charge. *Zipes,* 455 U.S. at 393. *See also Davis v. North Carolina Dep't. of Corrections,* 48 F.3d 134, 140 (4th Cir.1995). Defendant's argument here does not rest on the timeliness of the filing of the administrative charge or Plaintiff's federal court Complaint; rather, it rests on the fact that Plaintiff failed to assert in her administrative charge the claims that she is now asserting in federal court, and a "failure by the Plaintiff to exhaust administrative remedies concerning a Title VII [or ADA] claim deprives the federal courts of subject matter jurisdiction over the claim." *Jones v. Calvert Group, Ltd.,* 551 F.3d 297, 300 (4th Cir.2009).

## II.

### (Three Hundred Day Claim Requirement)

Defendant further asserts that, even if Plaintiff did assert claims in her administrative charge for retaliation or under the ADA, Plaintiff's Third Cause of Action under the ADA as well as *all* of Plaintiff's claims asserted under Title VII (not just her retaliation claim) are subject to

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

dismissal for failure of the Plaintiff to file her administrative charge within three hundred (300) days of the alleged discriminatory acts of which Plaintiff complains. After careful review of the arguments and exhibits presented, the undersigned is constrained to agree.

As previously noted, both Title VII and the ADA require that a claimant file a charge of discrimination (in a "deferral state") within three hundred (300) days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency. *See* 42 U.S.C. § 2000e–5(e), 42 U.S.C. § 12117(a). Here, it is undisputed that South Carolina is a deferral state, and that SCHAC is the appropriate state agency for purposes of initiating state proceedings. Therefore, Plaintiff had three hundred (300) days to file her administrative charge with SCHAC following a discriminatory act, and a failure by the Plaintiff to do so bars her from pursuing a Title VII or ADA lawsuit in this Court with respect to any alleged discriminatory act violating these statutes which falls outside of this three hundred (300) day period. *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979); *Mickel v. South Carolina State Employment Serv.,* 377 F.2d 239, 242 (4th Cir.1967); *see National RR Passenger Corp. v. Morgan,* 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

**\*4** The record reflects that Plaintiff's administrative charge was formally filed with SCHAC on June 16, 2011, after having been received by SCHAC on June 3, 2011. *See* Exhibits (Court Docket Nos. 15–1, 24–2, p. 1).[5] Based on Plaintiff's administrative charge filing date of June 16, 2011, any alleged discriminatory conduct asserted in this lawsuit would have to had occurred on or after August 20, 2010. However, Plaintiff specifically alleges in her charge of discrimination that the discriminatory acts of which she complains occurred on or before August 4, 2010. Even assuming the unverified charge (a copy of which the Court has not been provided) apparently received by SCHAC on June 3, 2011 could constitute Plaintiff's administrative charge,[6] the alleged discriminatory acts of which Plaintiff complains must still have occurred on or after August 7, 2010. Therefore, since Plaintiff's claims fall outside of the applicable three hundred (300) day claim period, they may not be considered by this Court.

[5]    Plaintiff's Exhibit (Court Docket No. 24–2, p. 1) indicates that Plaintiff initially provided her charge of employment discrimination to SCHAC on June 3, 2011, but that since what she had provided did not fully comply with the filing requirements, she was instructed to sign, date and notarize an official charge of discrimination and return it to SCHAC, which she did on or about June 16, 2011. *See* Defendant's Exhibit (Court Docket No. 15–1).

[6]    Plaintiff cites to the case of *Edelman v. Linchburg College,* 535 U.S. 106, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002), as support for a finding that her June 3, 2011 filing could satisfy her filing requirement. However, while that case does hold that an unverified filing can count as the filing of an administrative charge where the filing is subsequently verified by another filing, it is still a requirement that the initial filing was treated as the filing of an administrative charge by the claimant and the administrative agency. *Edelman,* 535 U.S. at 107–108. While it is arguable that under *Edelman,* at least for purposes of a Rule 12 motion to dismiss, Plaintiff's submission to SCHAC on June 3, 2011 could satisfy her filing requirement for purposes of this lawsuit, that would still not save her Title VII and ADA claims, as they would still be untimely for the reasons set forth hereinabove, *supra.* Additionally, the *Edelman* decision further underscores the undersigned's previous finding that Plaintiff's initial intake questionnaire is not entitled to be considered a charging document, as the *Edelman* decision noted in dicta that the failure of the administrative agency to comply with the statutory requirement that notice of a charge be served upon the entity being charged within a set period of time provided some support for a finding that an initial inquiry filing was not to be considered an administrative charge. *Id,* at 108.

While this may seem a harsh result, the Fourth Circuit has strictly construed the statutory filing requirements for discrimination cases, holding that "[p]rocedural requirements ... for gaining access to the ... courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Polsby,* 970 F.2d at 1364, *vacated on other grounds,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993) (quoting *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)); *see Poteat v. Mack Trucks Inc.,* No. 96–1437, 1997 WL 33117, ——4 (4th Cir. January 28, 1997); *Chappell v. Emco Machine Works Co.,* 601 F.2d 1295, 1303 (5th Cir.1979); *cf. Watts–Means v. Prince George's Family Crisis Center,* 7 F.3d 40, 42 (4th Cir.1993) [finding a complaint was time barred when filed five days too late]; *Harvey v. New Bern Police*

*Dep't,* 813 F.2d 652, 653–654 (4th Cir.1987) [finding a complaint was time barred when filed one day too late]; *Johnson v. Bryant,* No. 11–537, 2012 WL 2935254 at \*2 (D.S.C. July 19, 2012) [dismissing complaint as untimely where plaintiff filed suit 2 days late based upon her receipt of her right to sue letter].[7] Therefore, since Plaintiff failed to file her administrative charge within three hundred (300) days of the discriminatory conduct alleged, and in light of the applicable caselaw and statutory requirements, the undersigned has no choice but to find that Plaintiff's claims, to the extent they are asserted under Title VII or the ADA, are time barred and subject to dismissal.

[7]     As the filing of a timely charge of discrimination with the administrative agency is not a jurisdictional prerequisite to suit, but a requirement that, like a statute of limitations, is subject to waiver, estoppel or equitable tolling, Plaintiff could argue that she is entitled to equitable tolling. However, "[e]quitable relief is reserved for only the most deserving complainants," usually where there exists affirmative misconduct; *Polsby,* 970 F.2d. at 1363; and Plaintiff has advanced no argument for an awarding of equitable relief in this case. *Ramirez,* 312 F.3d at 183 ["The party who invokes equitable tolling bears the burden of demonstrating that it applies in his case."].

## III.

### (Fourth Cause of Action for Retaliation)

In her Fourth Cause of Action, Plaintiff asserts that she was constructively discharged from her job in retaliation for engaging in protected activity when she complained about the Defendant's treatment of her. Plaintiff purportedly asserts these claims under the ADA, Title VII, the Equal Pay Act (EPA), and the public policy of South Carolina. *See* Complaint (Fourth Cause of Action). However, for the reasons already discussed herein, *supra,* to the extent Plaintiff is asserting Title VII and the ADA as a basis for her claim in her Fourth Cause of Action, those grounds for relief are subject to dismissal.

**\*5** With respect to Plaintiff's "public policy" claim, Defendant argues that this cause of action is subject to

dismissal because Plaintiff has or had existing statutory remedies for her retaliatory discharge claim. The undersigned is again constrained to agree. In *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 337 S.E.2d 213 (S.C.1985), the South Carolina Supreme Court held that a cause of action in tort exists under South Carolina law where a retaliatory discharge of an at-will employee[8] constitutes a violation of a clear mandate of public policy, such as "when an employer requires an at-will employee, as a condition of retaining employment, to violate the law". *Id,* at 216. *See also Culler v. Blue Ridge Electric Cooperative, Inc.,* 309 S.C. 243, 422 S.E.2d 91 (S.C.1992). "This exception is generally applied in a situation in which an employer requires an employee to violate a law, or when the reason for the termination is itself a violation of criminal law"; *Barron v. Labor Finders of South Carolina,* 384 S.C. 21, 682 S.E.2d 271, 273 (S.C.Ct.App.2009), *aff'd as modified by,* 393 S.C. 609, 713 S.E.2d 634 (S.C.2011); although some other limited situations may also apply. *See Barron,* 713 S.E.2d at 637 [noting that there may be cases where a public policy wrongful termination claim could be pursued even where a discharge did not itself violate a criminal law or the employer did not require the employee to violate the law], citing to *Garner v. Morrison Knudsen Corp.,* 318 S.C. 223, 456 S.E.2d 907 (S.C.1995) and *Keiger v. Citgo Coastal Petroleum, Inc.,* 326 S.C. 369, 482 S.E.2d 792 (S.C.Ct.App.1997).

[8]     Neither party disputes that Plaintiff was an "at will" employee.

Plaintiff has failed in the allegations of her Complaint to identify any public policy violation with respect to this claim. There is no indication in the allegations of Plaintiff's complaint, nor does Plaintiff argue in her response brief, that a violation of a criminal law was involved in this matter. Rather, the violations of law cited by the Plaintiff are Defendant's alleged violations of Title VII, the ADA, the EPA, and perhaps some South Carolina statutes such as the South Carolina Human Affairs Law (SCHAL), S.C.Code Annotated § 1–13–90, *et seq.* However, even assuming that the Defendant did deny Plaintiff her rights under one or more of those statutes, that is not the commission of a crime, nor is there any allegation that the Defendant otherwise required Plaintiff to violate a "public policy" as defined by state law. *Lawson v. South Carolina Dept. of Corrections,* 340 S.C. 346, 532 S.E.2d 259, 260–261 (S.C.2000) [Public policy claim arises where "an employer requires an employee to violate the [criminal] law or the reason for the employee's termination was itself a violation of a criminal law"]; *Eady v. Veolia Transp. Services, Inc.,* 609 F.Supp.2d 540, 559 (D.S.C.2009) [Plaintiff failed to show violation of

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

public policy where he claimed that he was terminated for refusing to sign a blank affidavit]; *King v. Charleston County School District,* 664 F.Supp.2d 571, 584–585 (D.S.C. May 21, 2009); *Love v. Cherokee County Veteran's Affairs Office,* No. 09–194, 2009 WL 2394369, at * 3 (D.S.C. Jul. 31, 2009) [Granting Rule 12 motion to dismiss where no inference could be drawn from the facts alleged that the Plaintiff's termination was in violation of a criminal law]; *Barron,* 384 S.C. 21, 682 S.E.2d 271, 2009 WL 1520820, at * 3 [No wrongful discharge action where employee was not asked to violate the law and his termination did not violate the criminal law]; *Merck v. Advanced Drainage System, Inc.,* 921 F.2d 549, 554 (4th Cir.1990) [The "public policy" exception to the at-will doctrine "is to be very narrowly applied."].

**\*6** Even in those limited (and as yet undefined[9]) circumstances where the violation of a criminal statute is not involved, a *Ludwick* claim still cannot be asserted where there are federal or state statutory remedies available to vindicate the public policies allegedly implicated by a plaintiff's termination. The South Carolina Supreme Court has explicitly held that "[w]hen a statute creates a substantive right and provides a remedy for infringement of that right, the Plaintiff is limited to that statutory remedy." *Palmer House of Blues Myrtle Beach Restaurant Corp.,* No. 05–3301, 2006 WL 2708278 at *3 (D.S.C. Sept.20, 2006) (citing *Lawson,* 340 S.C. 346, 532 S.E.2d 259); *see Barron,* 713 S.E.2d at 637 [noting that, even where an at-will employee might otherwise have a public policy wrongful termination claim even when no criminal violation is involved, "[t]he public policy exception does not ... extend to situations where the employee has an existing statutory remedy for wrongful termination"]. Here, Plaintiff has or had statutory remedies for her wrongful termination claim under the EPA, SCHAL, Title VII, and the ADA.[10]

[9]   *See Barron,* 713 S.E.2d at 617–618.

[10]   While the EPA does not itself contain a provision allowing for a claim for retaliatory discharge, claims of retaliation for filing EPA complaints are allowed under 29 U.S.C. § 215(a)(3) [part of the Fair Labor Standards Act]. *See Truckenmiller v. Burgess Health Center,* 814 F.Supp.2d 894, 905 (N.D.Iowa 2011) ["Because the EPA is an amendment to the FLSA and is codified under the same chapter ... retaliation for filing EPA complaints ... is analyzed under § 215(a)(3)"], citing *Lambert v. Ackerly,* 180 F.3d 997, 1014, n. 5 (9th Cir.1999) (internal quotes and citations omitted); *Traver v. Tucson Unified School*

*District,* 376 Fed.Appx. 799, 800 (9th Cir.2010).

While Plaintiff argues that an exception allowing for a public policy claim under the allegations of her Complaint should be approved by the Court here, and it is true that, as a general matter, novel issues should not ordinarily be decided on a Rule 12 motion to dismiss; *see Garner,* 456 S.E.2d at 909; the determination of what constitutes public policy is a question of law for the courts to decide; *Barron,* 713 S.E.2d at 638; and it has already been conclusively held in other cases that violations of federal and state discrimination statutes do not give rise to a public policy claim under South Carolina law. *Heyward v. Monroe,* No. 97–2430, 1998 WL 841494, at * 4 (4th Cir. Dec.7, 1998) ["South Carolina permits an action under the public policy exception when an at-will employee is terminated for refusing to violate the law. It has not been extended to circumstances where there is a statutory remedy for employment discrimination, as in this case"]; *Jefferson v. Chestnut Group, Inc.,* No. 08–3728, 2009 WL 302312 at * 2 (D.S.C. Feb.6, 2009) [Dismissing state public policy claim where Plaintiff clearly had a potential remedy under South Carolina Human Affairs Law and Title VII]; *Washington,* 2009 WL 386926 [Dismissing public policy claim where employer purportedly denied employee's request for FMLA leave, which neither violated a criminal law nor required the employee to do so]; *Epps v. Clarendon County,* 304 S.C. 424, 405 S.E.2d 386, 387 (S.C.1991) [No wrongful discharge claim where employee already had an existing remedy under 42 U.S.C. § 1983]; *see Merck,* 921 F.2d at 554 [The "public policy" exception to the at-will doctrine "is to be very narrowly applied."].

Therefore, as Plaintiff has a statutory remedy for her retaliatory termination claim, she may not pursue a separate state law public policy/wrongful termination cause of action. *Palmer,* 2006 WL 2708278, at —— 3 and 5; *Zeigler v. Guidant Corp.,* No. 07–3448, 2008 WL 2001943 at * 2 (D.S.C. May 6, 2008) ["The *Ludwick* exception to at-will employment is not designed to overlap an employee's statutory rights to challenge a discharge, but rather to provide a remedy for a clear violation of public policy where no other reasonable means of redress exists."] (quoting *Stiles v. American General Life Ins. Co.,* 335 S.C. 222, 516 S.E.2d 449, 452 (S.C.1999)); *Ramsey v. Vanguard Servs., Inc.,* No. 07–265, 2007 WL 904526 at *1 (D.S.C. Mar.22, 2007); *Dockins v. Ingles Markets, Inc.,* 306 S.C. 496, 413 S.E.2d 18, 19 (S.C.1992). The Defendant is entitled to dismissal of Plaintiff's Fourth Cause of Action to the extent Plaintiff asserts in this cause of action a claim for retaliatory constructive discharge in violation of Title VII,

the ADA, or the public policy of South Carolina. *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) ["Complaint must contain facts which state a claim as a matter of law ...."]; *Iqbal,* 129 S.Ct. at 1949–1950["[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"]; *see also Harper v. United States,* 423 F.Supp. 192, 196 (D.S.C.1976)["[W]here the claims in a complaint are insufficiently supported by factual allegations, these claims may be properly dismissed by summary dismissal"].

*7 Based on the foregoing, it is recommended that Plaintiff's asserted grounds for relief under Title VII, the ADA, and the public policy of South Carolina be **dismissed.** If the Court accepts this recommendation, Plaintiff's Third Cause of Action under the ADA will be dismissed, *in toto,* while Plaintiff's Second and Fourth causes of Action will proceed only to the extent the claims asserted therein are asserted under the Equal Pay Act. Plaintiff's remaining causes of action remain unchanged.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7176826

*Conclusion*

2013 WL 652568
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Charleston Division.

Jessi E TORO, Plaintiff,
v.
SCIENCE APPLICATIONS INTERNATIONAL
CORPORATION, Defendant.

No. 2:12–1833–DCN.
|
Feb. 21, 2013.

**Attorneys and Law Firms**

Ashley E. Ameika, Ashley Ameika Law Office,
Charleston, SC, Jennifer Munter Stark, Jennifer Munter
Stark Law Office, Mt. Pleasant, SC, for Plaintiff.

Lucille L. Nelson, Eric C. Schweitzer, Ogletree Deakins
Nash Smoak and Stewart, Charleston, SC, Ashley Prickett
Cuttino, Ogletree Deakins Nash Smoak and Stewart,
Greenville, SC, for Defendant.

**ORDER**

DAVID C. NORTON, District Judge.

**\*1** This matter is before the court on Magistrate Judge
Bristow Marchant's Report and Recommendation (R &
R) regarding defendant Science Applications International
Corporation's (SAIC) motion to dismiss the second, third,
and fourth claims of the complaint. The magistrate judge
recommends that the court dismiss plaintiff Jessie Toro's
third claim, for violation of the Americans with
Disabilities Act (ADA), in its entirety. The magistrate
judge further recommends that Toro's second and fourth
claims be allowed to proceed only to the extent that they
are asserted under the Equal Pay Act. The court has
examined the record and Toro's objections to the R & R.
For the reasons set forth below, the court adopts the R &
R in its entirety and grants in part and denies in part the
motion to dismiss.

*I. BACKGROUND*

Toro is a former employee of SAIC. Toro filed a
complaint in federal court on July 2, 2012, alleging, *inter
alia,* violations of Title VII of the Civil Rights Act of
1964, the Americans with Disabilities Act ("ADA"), and
the Equal Pay Act. She also seeks recovery for retaliation
under the above listed Acts and a public policy theory.

Toro contacted the South Carolina Human Affairs
Commission (SCHAC) based on perceived discrimination
she experienced while working for SAIC. SCHAC
received Toro's Employment Initial Inquiry
Questionnaire in February 2011,[1] and assigned staff to the
case in March 2011. A charge was mailed to Toro and her
attorney on June 3, 2011, and was deferred to the Equal
Employment Opportunity Commission (EEOC) which
eventually issued a right to sue notice, leading to the
filing of this action.

SAIC filed a motion to dismiss plaintiff's Title VII, ADA,
and retaliation claims. The case was referred to the
magistrate judge for pretrial proceedings. On December 7,
2012 the magistrate judge issued an R & R
recommending that the court dismiss Toro's claims as
asserted under Title V II, the ADA, and the public policy
of South Carolina, leaving Toro's second and fourth
causes of action to proceed only to the extent that they are
asserted under the Equal Pay Act. Toro filed written
objections to the R & R on December 27, 2012.

*II. STANDARD OF REVIEW*

This court is charged with conducting a *de novo* review of
any portion of the magistrate judge's R & R to which
specific, written objections are made. 28 U.S.C. §
636(b)(1). The court may adopt the portions of the R & R
to which the plaintiff did not object, as a party's failure to
object is accepted as agreement with the conclusions of
the magistrate judge. *Thomas v. Arn,* 474 U.S. 140,
149–50, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The
recommendation of the magistrate judge carries no
presumptive weight and the responsibility to make a final
determination remains with this court. *Mathews v. Weber,*
423 U.S. 261, 270–71, 96 S.Ct. 549, 46 L.Ed.2d 483
(1976). This court may accept, reject, or modify the report

Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)

of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration. 28 U.S.C. § 636(b)(1).

### III. DISCUSSION

**\*2** SAIC argues that Toro's retaliation claim, as asserted under Title VII, and her ADA claim should be dismissed because Toro failed to exhaust her administrative remedies. SAIC further contends that even if Toro did properly exhaust her administrative remedies for these claims, they nevertheless are subject to dismissal because Toro did not file her administrative charge within three hundred (300) days of the alleged discriminatory acts. SAIC further argues that to the extent Toro's claim of retaliation is asserted under the public policy of South Carolina, the claim should be dismissed as she had existing statutory remedies. The court addresses these arguments in turn.

#### A. Exhaustion of Administrative Remedies

Before an employee may sue her employer in federal court, the employee must first exhaust his or her administrative remedies. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 247 (4th Cir.2000) (Title VII claims); *Brown v. S. Carolina Sch. for Deaf & Blind,* No. 11–cv–1111, 2011 WL 511013, at \*1 (D.S.C. Oct. 26, 2011) (ADA claims). Federal statutes require that a claimant file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act(s), or, if the alleged discrimination occurred in a deferral state, within 300 days from the alleged discriminatory act(s) if claimant institutes proceedings with the appropriate state agency. 42 U.S.C. § 200e–5(e); 42 U.S.C. § 12117(a).

The court agrees with the magistrate judge's finding that the administrative charge asserts only gender discrimination claims, and fails to set forth ADA claims or retaliation claims as asserted under Title VII. Pl.'s Objections to R & R 3, Dec. 27, 2012. Though Toro argues to the contrary, the initial inquiry questionnaire that she completed does not constitute an administrative charge, and the information contained therein is not considered in developing claims outside of those listed in or reasonably related to the administrative charge. *See Green v. Wal–Mart Stores, Inc.,* No. 11–cv–2219, 2012

WL 2048207, at \*3 (D.S.C. May 3, 2012); *Middleton v. Motley Rice,* No. 08–cv–3256, 2010 WL 3167360, at \*6 (D.S.C. Aug.9, 2010).

In *Green,* the magistrate judge pointed to the Supreme Court's holding "that for a questionnaire to be considered as a Charge it 'must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee.' " 2012 WL 2048207, at \*3 (quoting *Fed. Express Corp. v. Holowecki,* 552 U.S. 389, 402, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008)). As is also the case here, the magistrate judge highlighted that the initial inquiry form contained a conspicuous disclaimer at the top of the form, making it impossible to interpret the questionnaire as a request for action. *Id.* at \*3. Therefore, in the present case, as the administrative charge does not contain ADA or retaliation claims, the court finds Toro has not exhausted her administrative remedies for these claims. As a result, Toro's third cause of action—her ADA claim—will be dismissed. Her fourth cause of action, for retaliation, will be dismissed to the extent it is asserted under Title VII and the ADA.

#### B. Three Hundred Day Claim Requirement

**\*3** As previously noted, an employee must file an administrative charge of the alleged discriminatory act within 300 days if in a "deferral state." 42 U.S.C. § 2000e–5(e); 42 U.S.C. § 12117(a). There is no dispute that South Carolina is a deferral state, and that the SCHAC is the appropriate state agency for purposes of initiating proceedings. Thus, Toro had 300 days following a discriminatory act in which to file her administrative charge for relief under Title VII or the ADA. She failed to do so. The charge was issued on June 3, 2011, and on June 16, 2011 was officially filed after being signed by Toro and notarized. As explained in the R & R, using the unverified charge date of June 3, 2011, the discriminatory acts must have occurred prior to August 7, 2010. R & R at 8–9. Toro lists the alleged acts as occurring on and prior to August 4, 2010, beyond the 300 day filing requirement. Toro seems to argue that the 300 day requirement should be based from the completion of her questionnaire. This argument conflates the filing of her initial questionnaire with the filing of an administrative charge. As explained above, an initial questionnaire does not constitute an administrative charge. *See Green,* 2012 WL 2048207, at \*3; *Middleton,* 2010 WL 3167360, at \* 6 ("Simply stated, the EEOC Charge Form and the Intake Questionnaire serve different purposes. An Intake Questionnaire facilitates 'pre-charge filing counseling'

and allows the EEOC to determine whether it has jurisdiction to pursue a charge.") (citations omitted); *see also White v. Andersen Distrib., Inc.,* No. 09–cv–2705, 2011 WL 4435635, at * 5 (D.S.C. Aug.15, 2011) ("The [initial] questionnaire that White filed ... is a preliminary step in the filing of the formal written complaint.)

Toro also contends that the SCHAC did not send the charge in a timely manner, and that if not for the staff's delay, the charge would have been filed within the 300–day period. Therefore, Toro argues, the limitations period should be equitably tolled. Pl.'s Objections to R & R at 7–8. Equitable relief is extended "only sparingly" and "is reserved for the most deserving complainants." *Polsby v. Chase,* 970 F.2d 1360, 1363 (4th Cir.1992), *vacated on other grounds,* 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 646 (1993) (citations omitted). Toro concedes that she has not shown any affirmative misconduct that would lead the court to grant this equitable relief. *See Ramirez v. City of San Antonio,* 312 F.3d 178, 183 (5th Cir.2002) ("The party who invokes equitable tolling bears the burden of demonstrating that it applies in this case.") Additionally, the R & R cites a number of cases within this district and within the Fourth Circuit that support the strict construction of statutory filing requirements for discrimination cases. R & R at 9.

Based on the above, the court finds Toro failed to meet her 300 day filing requirement, and that equitable tolling is not appropriate in this case.

### C. Retaliation Claim under South Carolina Public Policy

*4 Toro asserts her claim for retaliation should proceed under the public policy of South Carolina. Pl.'s Objections to R & R at 8. The South Carolina Supreme Court has created a limited exception to the at-will employment that "[w]here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful

discharge arises." *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 337 S.E.2d 213, 216 (S.C.1985). However, case law provides that where "the employee has a statutory remedy for the wrongful termination itself, South Carolina would refuse to extend the public policy exception to cover that claim." *Washington v. Purdue Farms, Inc.,* No. 07–cv–3552, 2009 WL 386926, at * 12 (D.S.C. Feb.13, 2009); *see also Garner v. Morrison Knudsen Corp.,* 318 S.C. 223, 456 S.E.2d 907, 909 (S.C.1995).

The court agrees with the magistrate judge's conclusion that Toro has failed to identify any violation of public policy that would allow her to proceed with her retaliation claim. As Toro has or had statutory remedies for her retaliation claim, she may not proceed with that claim on the basis that SAIC's action violated South Carolina public policy.

### IV. CONCLUSION

Based on the foregoing discussion, the court **ADOPTS** the magistrate judge's R & R in its entirety and **GRANTS IN PART AND DENIES IN PART** defendant's motion to dismiss. The court **DISMISSES** plaintiff's Third Cause of Action and **DISMISSES** plaintiff's Second and Fourth Causes of Action to the extent that relief is asserted under Title VII, the ADA, or the public policy of South Carolina. Plaintiff's Second and Fourth Causes of Action may proceed only to the extent they are asserted under the Equal Pay Act.

**AND IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 652568

### Footnotes

1    Toro asserts that she completed the initial questionnaire in October 2010. She attaches a copy of her October 2010 questionnaire to her Objections to the R & R; however, nothing on that document indicates that it was ever received by SCHAC. Toro also submits an initial questionnaire, dated February 11, 2011, that her counsel completed on her behalf. SCHAC received the February questionnaire on February 14, 2011, as reflected by a date stamp on the first page of the document. Since SCHAC only has record of the February 2011 questionnaire, the court will use this document when calculating deadlines.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Toro v. Science Applications Intern. Corp., Not Reported in F.Supp.2d (2013)**

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

2022 WL 5434251
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Florence Division.

Dwane HEYWARD, Plaintiff,
v.
CARETEAM PLUS, INC., Defendant.

Civil Action No. 4:21-cv-0754-SAL-TER
|
Signed July 27, 2022

**Attorneys and Law Firms**

Bonnie Travaglio Hunt, Hunt Law, Goose Creek, SC, for Plaintiff.

Cherie Wilson Blackburn, Mary Stuart King, Nexsen Pruet, Charleston, SC, for Defendant.

**REPORT AND RECOMMENDATION**

Thomas E. Rogers, III, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** This action arises out of Plaintiff's employment with Defendant. Plaintiff alleges that she suffered discrimination and retaliation in violation Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. and 42 U.S.C. § 1981.[1] Presently before the Court is Defendant's Motion for Summary Judgment (ECF No. 50). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. 636(b)(1)(A) and (B) and Local Rule 73.02 (B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

[1]  Plaintiff's other causes of action have already been dismissed. See Order (ECF No. 47).

**II. FACTS**

Defendant Careteam is a primary and specialty care provider ensuring access to comprehensive healthcare services regardless of patients' ability to pay. Pl. Dep. 32 (ECF No. 50-2); Haynes Dep. 14, 21 (ECF No. 50-3). Careteam hired Plaintiff on August 9, 2018, as the Prevention Coordinator. Offer Letter (ECF No. 50-1); Pl. Dep. 32. Johanna Haynes, Chief Executive Officer (CEO), interviewed Plaintiff and ultimately made the decision to hire her. Pl. Dep. 32; Haynes Dep. 14, 21. Plaintiff reported to Haynes until Cheryl Johnson was hired as Chief Programs Officer (CPO) in October 2018 and subsequently became Plaintiff's supervisor. Pl. Dep. 34; Johnson Dep. 6 (ECF No. 50-4). Johnson remained Plaintiff's supervisor until September 2019, at which time Haynes became Plaintiff's supervisor again. (Pl. Dep., p. 34, ll. 5–8).

Plaintiff was primarily responsible for coordinating and providing "HIV testing, recruitment and outreach activities for [the] identified population[s] for counseling, treating, and referrals" under the South Carolina Department of Health and Environmental Control (SC DHEC) guidelines. Pl. Dep. 32–33; Prevention Coordinator Job Description (ECF No. 50-5). An essential part of Plaintiff's job was developing and maintaining positive relationships with organization leaders and venue owners that would "ensure access to high[-]risk HIV [positive] population[s]" for purposes of providing sexually transmitted infection ("STI") education and other prevention services. Prevention Coordinator Job Description. Haynes felt that developing a working relationship with the owners of the "gay bars" in the area was of particular importance to Plaintiff's position because the "highest number of new infections to date" occur within the "gay community." Pl. Dep. 224; Haynes Dep. 32. The quality of these relationships determined the extent to which Plaintiff could effectively accomplish her other requisite duties, such as scheduling testing and outreach events; providing HIV prevention and other health related education sessions; and distributing condoms to the gay bars. Pl. Dep. 32–33, 268; Prevention Coordinator Job Description. Plaintiff avers that she had a fundamental problem with this perception that placed a priority on the gay community because gay people are not the only people who contract HIV. Pl. Aff. ¶ 5 (ECF No. 56-2).

**\*2** In connection with a grant that SC DHEC provided to Careteam, SC DHEC implemented a requirement that

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

HIV test results had to be provided to the individual at the time the test was taken. Ms. Haynes and Plaintiff directed Careteam employees in December 2018 to discontinue HIV testing in bars and other venues that did not allow for privacy to give immediate results to individuals who underwent testing. Pl. Email dated December 13, 2018 (ECF No. 50-6); Haynes Email dated December 27, 2018 (ECF No. 50-7) ("I instructed [Careteam employees] not to perform testing at all in any bar setting until a solution that complies with our grants and protects individual privacy can be agreed upon.").

Without the ability to test in the gay bars, Careteam would lose access to a large portion of the high-risk population. Haynes Dep. 32, 61; Haynes Email dated December 27, 2018 ("I am deeply concerned about the 'missed' opportunities that we have in bar settings to test individuals who may not otherwise come in for testing."). Haynes felt that Plaintiff repeatedly failed to engage the gay community in Careteam's prevention efforts though she repeatedly asked Plaintiff to do so.[2] Pl. Dep. 224, 267–268, 270; Haynes Dep. 32, 61. Plaintiff did not directly inform the owners of the gay bars or their patrons about Careteam's testing events scheduled at various other locations. Pl. Dep. 135. However, she utilized social media to spread awareness of testing events. Pl. Aff. ¶ 12. For almost five months, between December 2018 and May 2019, Plaintiff did not make any contact with the owners of the gay bars regarding condom deliveries, an essential duty in her job description. Pl. Dep. 133–135; Haynes Dep., 49–50; Prevention Coordinator Job Description; Haynes Email dated May 2, 2019 (ECF No. 50-8). Plaintiff failed to coordinate Careteam's participation in the June 2019 Pride in the Park event, the largest LGBTQ+ community event that took place outside of the gay bars in the area, and neither Plaintiff nor any other member of the Prevention Department attended. Pl. Dep. 226; Emails dated December 10, 2019 (ECF No. 50-9). Plaintiff asserts that she had personal plans for the day of the Pride in the Park event and she was advised that if the Prevention Department could not participate it would be ok. Pl. Aff. ¶ 13; Emails dated December 10, 2019.

[2]   Haynes discussed the issue with Plaintiff on at least seven occasions, including: May 2, 2019; August 13, 2019; October 10, 2019; October 28, 2019; November 18, 2019; December 9, 2019; and December 16, 2019. Pl. Dep. 138–39, 155–56, 167, 172–73, 195–97, 219–20, 223; Haynes Dep. 60–61; Email from Johanna Haynes dated May 2, 2019 (ECF No. 50-8); Emails dated December 10, 2019 (ECF No. 50-9).

On October 22, 2019, Careteam's administrative staff, executive staff, and the head of each department attended a leadership meeting. Pl. Dep. 162–163. During this meeting, Haynes asked Plaintiff about the new Prevention Specialists, Armondo Alford and Jessica Pittman, and questioned whether they had "settled down" from the stress of preparing for the SC DHEC Prevention Grantee Site Visit scheduled for November 13, 2019. October 22, 2019 Recording, at 21:54 – 22:18 (ECF No. 50-10). Plaintiff responded, "I told them you were crazy." October 22, 2019 Recording; Pl. Dep. 165. When Haynes questioned Plaintiff's response, Plaintiff repeated, "I said she's crazy but she'll temper down and calm down and just do what she asks you to do, keep it moving." October 22, 2019, Recording at 21:54 – 22:18. Plaintiff later clarified herself at the end of the meeting and said that she told her staff that Haynes was crazy due to stress from the upcoming SC DHEC Site Visit. Pl. Dep. 166; October 22, 2019, Recording at 28:03 – 28:13.

**\*3** On October 28, 2019, Haynes met with Plaintiff to discuss Plaintiff's order of three boxes of sex toys, specifically vibrating rings for males, that she paid for with Careteam funds. Pl. Dep. 167–168. Following receipt of the boxes, Plaintiff had walked around the office handing the vibrating rings out to her co-workers, which resulted in Haynes receiving a complaint from Kathleen Gregory, Human Resources Administrator, who was offended by Plaintiff's unprofessional conduct and inappropriate purchase. Pl. Dep. 171; Gregory Notes p. 7 (ECF No. 50-11). Haynes questioned Plaintiff on the order's relevance to preventing the spread of STIs. Pl. Dep. 171; Gregory Notes p. 7. Plaintiff stated that "using them with condoms would make sex fun." Pl. Dep. 168. Plaintiff admits, however, that the vibrating rings she purchased do not serve a purely preventative purpose because they can be used without condoms. Pl. Dep. 171.

During this same conversation, Haynes asked Plaintiff about testing in the gay bars again, but she refused to engage in conversation with Haynes. Pl. Dep. 172–73. Haynes stated to Plaintiff that she was unaware that Plaintiff was the type to follow rules. Pl. Dep. 173. When Plaintiff questioned what she meant, Haynes clarified that Plaintiff always followed the rules during her employment, but that she just did not seem like the type of person to do so. Pl. Dep. 173.

After this conversation with Haynes, Plaintiff called Gregory and told her that she believed Haynes was harassing her by "questioning [her] job performance, ... questioning if [she] needed to do anything over again, calling, making statements about [her], slanderizing [her] name ... Making these type of statements about [she's] not

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

a rule follower." Pl. Dep. 176–77. Plaintiff also told Gregory that she was aware that Haynes had contacted a former employee, Tiffany Joyner, to ask whether she knew that Plaintiff lived with her supervisor, Cheryl Johnson. Pl. Dep. 176. Plaintiff told Gregory that she believed Haynes was "creating and cultivating a toxic and racially charged work environment" and her action of calling Joyner was "in direct relation" to an investigation that occurred in February 2019.[3] Pl. Dep. 180, 183, 185; Timeline Notes (ECF No. 50-12). On October 31, 2019, Gregory met with Plaintiff to follow up on their October 28, 2019, discussion. Pl. Dep. 183. During this conversation, Plaintiff reiterated that she believed Haynes was harassing her and that it related to her race. Pl. Dep. 185.

[3]    The investigation from February 2019 was requested by Johnson after she heard that Careteam employees believed that she, as an African American, treated African American employees, including Plaintiff, more favorably than Caucasian employees. Johnson Dep., 12–13; Gregory Dep. 17–18 (ECF No. 50-13). The allegations of the investigation did not accuse Plaintiff of any wrongdoing; rather she was simply listed as an employee who may have been treated more favorably due to her race, and the outside legal counsel who investigated the claims ultimately concluded that Johnson had not treated Caucasian employees differently than African American employees. Pl. Dep. 146; Report of Investigation by Burnette, Shutt & McDaniel, PA (ECF No. 50-14).

On November 18, 2019, Haynes and Plaintiff met with Plaintiff's new supervisor, Kim Sinkway, Chief Operations Officer (COO). Pl. Dep. 187; Sinkway Dep. 8 (ECF No. 50-15). During this meeting, Haynes asked Plaintiff about the future and development of the Prevention Department to include her plans for educational activities in the area, outreach to the gay community, and scheduling of her two staff members between the Georgetown and Conway offices. Pl. Dep. 187. Haynes also asked Plaintiff if she was facilitating a program to educate the community on HIV prevention by means of using pre-exposure prophylaxis (PrEP) and Plaintiff admitted she had not done so, despite being asked by Haynes on several occasions. November 18, 2019 Recording (ECF No. 50-16) at 30:20 – 31:45. Plaintiff became agitated and either would not answer or would only provide a short and unhelpful response. November 18, 2019, Recording at 35:30 – 36:45. At that point, Haynes asked Plaintiff about her attitude. November 18, 2019, Recording at 36:45 – 39:10. Plaintiff

responded to Haynes that she did not have an attitude. November 18, 2019, Recording at 36:45–39:10.

**\*4** Consequently, Sinkway, who was also present at the October 22, 2019, leadership meeting, reprimanded Plaintiff on her "disrespectful" conduct that she exhibited during the meeting and during the prior meeting where Plaintiff called Haynes crazy. Pl. Dep. 188–91. Plaintiff began expressing instances when she felt like Haynes had disrespected her too, including when Haynes inquired whether Plaintiff lived with her supervisor, Johnson. Pl. Dep. 192–194. Plaintiff then accused Haynes of having an issue with Plaintiff hanging out with Johnson outside of work because they are "black folks." Pl. Dep. 199–200; November 18, 2019, Recording at 1:03:06 – 1:03:45. Plaintiff stated that there was no issue when Haynes spent time outside of work with Mathias Thorpe, an African American former Careteam employee. Pl. Dep. 199–200; November 18, 2019, Recording at 1:07:37 – 1:08:15. Haynes assured Plaintiff that it had nothing to do with race; rather, Haynes was concerned that Plaintiff's relationship with Johnson could be construed as favoritism given that Johnson was her supervisor and in light of the prior complaint that Johnson was favoring African-American employees. November 18, 2019, Recording at 1:04:14 – 1:09:44; Pl. Dep. 146. The meeting between Plaintiff, Haynes, and Sinkway resumed the following day, November 19, 2019, wherein Haynes addressed condom deliveries with Plaintiff. Pl. Dep. 201; Timeline.

On December 9, 2019, Sinkway, Haynes, Plaintiff, and Kiasha Stinson, CPO and Plaintiff's new supervisor, met to discuss the Prevention Department. Pl. Dep. 219–20, 223. During this meeting, Haynes counseled Plaintiff again on her failure to engage and make connections with the gay community in the area, and requested that Plaintiff reach out to specific organizations. Pl. Dep. 220–23. Haynes gave specific directions and detailed guidance to Plaintiff:

> I need a relationship developed with those bar owners. I need your face and presence in the [gay] bars regularly. I need them to know you. When you walk in the door, they need to know who [you] are and that you're there from Careteam.... The [LGBTQ+] community still represents over half the infections of HIV and with absolutely no outreach to that community, and there's so few ins to the

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

community. The bars are certainly it. I know that there were issues with testing at the bar, but just stopping communication and relationship particularly with those two bars.... There need[s] to be some programs there. It would have been a great place to be advertising your referral event this month. Going and passing out flyers for that would have been a really great way to reach that community, talking with the bar owners about doing special events maybe around PrEP. Initiative to get people educated on PrEP. But there has to be an ongoing relationship. Them calling you when they need condoms is not a relationship. So what I'm hearing is that that's pretty much it this year. So y'all want to talk about a plan and some initiatives and what you plan to do with the gay bars this year. I would like to hear about that.

Pl. Dep. 220-23.

When Haynes followed up with Plaintiff about her outreach efforts to the gay community at the next Prevention Department meeting on December 16, 2019, Plaintiff refused to participate in the conversation and began speaking in a disrespectful tone to Ms. Haynes. Pl. Dep. 230–31; December 16, 2019, Recording (ECF No. 50-17). Sinkway counseled Plaintiff again on the inappropriate tone she used when speaking with Haynes and provided guidance to Plaintiff throughout the rest of the meeting. Pl. Dep. 231–32; Sinkway Dep.19–22. During the meeting, Plaintiff began "slouching ... looking uninterested [and] annoyed," then continued to speak to Haynes in a "disrespectful manner," at which point Haynes said: "I'm not going to have any more meetings like this. I'm not going to sit here and have to pull teeth to get information from you or to get your attitude back when I ask you a question." Stinson Dep. 14; December 16, 2019, Recording.

After Haynes exited the room, Plaintiff asked Stinson and Sinkway whether they saw harassment. Pl. Dep. 233; December 16, 2019, Recording. Plaintiff accused Haynes of being a "liar" and questioned why the CEO was even present for the meeting. December 16, 2019, Recording ("But again, why are you in here with this? ... Isn't there

some bill or something else you have to do?"); Stinson Dep. 13–14. Stinson counseled Plaintiff on her behavior and informed her that she had received complaints from employees that Plaintiff was "not being very friendly and some people are uncomfortable." Pl. Dep. 232. Sinkway and Stinson met with Plaintiff for almost an hour talking through how to effectively communicate, as well as resolve any issues, with Haynes. December 16, 2019, Recording; Pl. Dep. 231.

**\*5** Also on December 16, 2019, Plaintiff approached Gregory and requested her personnel file. Pl. Dep. 233-34; Gregory Notes (ECF No. 50-19). Plaintiff told Gregory that she felt she was being harassed, however, she did not give Gregory any details at that time. Pl. Dep. 234; Gregory Notes. Plaintiff avers that she did not receive her personnel file until after this litigation began. Pl. Aff. ¶ 21. Gregory contacted Careteam's external human resources consultant to discuss Plaintiff's complaint. Gregory Notes. The consultant recommended that Gregory provide Plaintiff with a complaint form to complete, then begin an internal investigation. Gregory Notes.

Defendant maintains a Respectful Workplace policy in its Employee Handbook, which provides, in pertinent part:

> In addition to our commitment to equal employment opportunity, Careteam+ strives to foster harmonious, productive working relationships. The provider believes in going beyond what is required by law and expects our employees to treat each other with respect and courtesy.... Careteam+ prohibits any behavior that is discourteous or demeaning toward other individuals....
>
> Appropriate corrective action, up to and including termination, if necessary, will be taken against any employee engaging in disrespectful behavior. Careteam+ reserves the right to determine whether any type of behavior is disrespectful and injurious to the morale of the provider.

Respectful Workplace Policy (ECF No. 50-34).

The day after the meeting, on December 17, 2019, Stinson, Haynes, Sinkway, and Gregory participated in a conference call with Careteam's external human resources consultant. Sinkway Notes dated December 17, 2019 (ECF No. 50-20). Based on Plaintiff's pattern of behavior that was first addressed on November 18, 2019, then again on December 16, 2019, the consultant recommended that Careteam issue Plaintiff a written warning documenting her unacceptable and disrespectful conduct, as well as her insubordination and failure to

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

follow direction. Sinkway Notes dated December 17, 2019.

On December 18, 2019, Plaintiff received a written warning for insubordinate and disrespectful behavior, specifically her behavior towards Haynes in prior meetings on November 18, 2019, and December 16, 2019. Pl. Dep. 235; Sinkway Dep. 13–p. 14; Gregory Dep. 49; Written Warning (ECF No. 50-21); Redlined Notes of Kathleen Gregory (ECF No. 50-22). Sinkway, Stinson and Gregory reviewed the written warning with Plaintiff who stated that she would provide her response by December 20, 2019. Pl. Dep. 235. While reviewing the written warning, Plaintiff asked Gregory if she had informed Sinkway or Stinson about her complaint that Haynes was harassing her, and Gregory responded that she had not informed anyone. Gregory Dep. 52.

On December 19, 2019, Plaintiff informed Sinkway and Gregory that she would like to submit a written complaint regarding the harassment and retaliation she was experiencing at Careteam. Pl. Letter to Gregory dated December 19, 2019. Gregory provided Plaintiff with a form to fill out pursuant to the recommendation of the external human resources consultant, but rather than filling out the form, Plaintiff wrote a letter to Gregory complaining about the form itself. Pl. Letter to Gregory dated December 19, 2019. In this letter, Plaintiff also alleged that she had complained of retaliation and harassment in the past. Pl. Letter to Gregory dated December 19, 2019.

Later that day, Gregory and Sinkway met with Plaintiff to discuss the contents of Plaintiff's letter and address her allegations of harassment and retaliation. Gregory Dep. 26; Emails between Pl. and Gregory dated December 19, 2019 (ECF No. 50-24). Plaintiff informed Gregory and Sinkway that she did not have time to write everything down yet, and provided generalized allegations from months' prior. Gregory Dep. 26. Plaintiff informed Gregory that Haynes was creating a racially charged work environment. Pl. Aff. ¶ 27 (ECF No. 56-2). Gregory sent an e-mail to Plaintiff later that day reminding Plaintiff to provide her response to the written warning and other alleged documentation by the agreed upon date of December 20, 2019. Emails between Pl. and Gregory dated December 19 and 20, 2019 (ECF No. 50-25). Gregory also informed Plaintiff that she had given her the form as a tool so that Careteam could move forward with an investigation into Plaintiff's allegations but Plaintiff was not required to use the form. Emails between Pl. and Gregory dated December 19 and 20, 2019.

*6 Plaintiff went on vacation on December 20, 2019, and

returned January 6, 2020. Pl. Aff. ¶ 23. Plaintiff provided her response to the written warning on January 2, 2020. Pl. Dep. 235, 243; Redlined Notes of Gregory; Response to Written Warning (ECF No. 50-26).

On January 5, 2020, Plaintiff submitted an e-mail and timeline detailing her claims of harassment and retaliation. Timeline; Pl. Letter to Gregory dated January 5, 2020 (ECF No. 56-2 pp. 73-74). She asserted that she has been subjected harassment and continual retaliatory behaviors ever since the February 2019 racial investigation. Pl. Letter to Gregory dated January 5, 2020. Gregory received this e-mail on January 6, 2020, and consequently, Careteam began a preliminary investigation into Plaintiff's allegations and consulted with their outside legal counsel. Gregory Dep. 43; Redlined Notes of Gregory; E-mail from Gregory to Pl. dated January 6, 2020 (ECF No. 50-27). Careteam placed Plaintiff on a paid administrative leave with full benefits beginning January 8, 2020, while the matter was investigated. Pl. Dep. 254; Gregory Dep. 29–30; Administrative Leave Letter (ECF No. 50-28). On January 9, 2020, Plaintiff sent an e-mail to the Careteam Board of Directors, copying Stinson, Gregory, and Haynes, requesting an external investigation into her allegations of harassment. Pl. Dep. 254; Pl. Email to Board of Directors dated January 9, 2020 (ECF No. 50-29). She admitted in the same e-mail, however, that she had already been informed that an investigation into her allegations was in progress. Pl. Email to Board of Directors dated January 9, 2020. Plaintiff also mentioned that she filed with the Equal Employment Opportunity Commission (EEOC). Haynes Dep. 72; Stinson Dep. 19; Pl. Email to Board of Directors dated January 9, 2020.

Based upon Plaintiff's response to the written warning, Plaintiff's supervisors felt she did not take any responsibility for her actions with respect to the performance of her department, indicate any remorse for her disrespectful statements, or show any intention of correcting the insufficiencies in her work performance, and, thus, the decision was made, with input from Haynes, Sinkway, Stinson, Defendant's external human resources consultant, and Defendant's outside legal counsel, to terminate Plaintiff's employment. Sinkway Dep. 22; Gregory Dep. 25; Stinson Dep. 11, 13. Gregory spoke with Plaintiff on the phone on January 29, 2020, to schedule a meeting for purposes of informing Plaintiff of Careteam's decision to terminate her employment. Pl. Email to Gregory and Sinkway dated January 30, 2020 (ECF No. 50-30). Gregory, Plaintiff, and Sinkway scheduled the meeting for 5:00 p.m. on January 30, 2020, however, that morning, Plaintiff informed Sinkway and Gregory via e-mail that she would not be attending. Pl.

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

Email to Gregory and Sinkway dated January 30, 2020. As a result, Careteam sent a termination letter to Plaintiff the next day, January 31, 2020. Pl. Dep. 261; Termination Letter (ECF No. 50-31).

## III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

*7 To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV. DISCUSSION

### A. Discrimination

Plaintiff alleges that her employment was terminated because of her race in violation of Title VII and 42 U.S.C. § 1981. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Section 1981 states, in relevant part, that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C § 1981. The standards applicable to lawsuits under § 1981 are the same as the standards applicable to lawsuits under Title VII, with the same case law being used to evaluate a claim under either statute. See Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) ("In analyzing a claim ... under section 1981, we apply the same standards as in a similar Title VII claim."); Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D. Va. 1995); Kim v. Nash Finch Co., 123 F.3d 1046,1063 (8th Cir. 1997).

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, he may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc). When direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff proceeds under the McDonnell Douglas burden-shifting scheme.

Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination, which "var[ies] depending on the nature of the case." Briggs v. Waters, 484 F. Supp. 2d 466, 477 (E.D. Va. 2007). To establish a prima facie claim for wrongful termination, Plaintiff must present evidence that (1) that she was a member of a protected class; (2) that she was performing at a level that met her employer's legitimate job expectations at the time of the adverse

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

employment action; (3) that she suffered an adverse employment action; and (4) that the position remained open or was filled by a similarly qualified applicant outside the protected class. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). The fourth element can also be established by presenting other evidence raising an inference of discrimination. See EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir. 2001) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

*8 If Plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 336 (4th Cir. 2011); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Hurst v. District of Columbia, 681 Fed.Appx. 186, 190, 2017 WL 908208, at *3 (4th Cir. Mar. 7, 2017) (per curiam).This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendant has met its burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 5 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against her.

Defendant argues that Plaintiff fails to present sufficient evidence to establish a prima facie case of discrimination with respect to her termination because she fails to show that she was performing at a level that met her employer's legitimate job expectations at the time of her termination or that her position remained open or was filled by a similarly qualified applicant outside the protected class.

Plaintiff asserts that she was performing at a level that met Defendant's legitimate expectations based on her October 29, 2018, and April 10, 2019, evaluations. In both evaluations, Plaintiff received a "meets" or "exceeds" rating in each category. Pl. Evaluations (ECF No. 56-2, pp. 40-66). However, the relevant time to evaluate an employee's performance is at the time of the adverse action. See, e.g., Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005). Further, it is clear from the record that Plaintiff and Haynes had a difference of opinion with respect to how Plaintiff should perform her job responsibilities. Though Plaintiff believed that she was properly handling her responsibilities, the record reveals that in Haynes' opinion she was not successfully engaging the gay community in Defendant's prevention efforts through testing and other HIV awareness events as specifically requested by Haynes. Haynes believed the quality of the relationship between the Prevention Coordinator and the gay community determined the extent to which Plaintiff could effectively accomplish essential duties, such as scheduling testing and outreach events; providing HIV prevention and other health related education sessions; and distributing condoms to the gay bars. Plaintiff repeatedly failed to engage the gay community in Careteam's prevention efforts though Haynes asked Plaintiff to do so on numerous occasions as discussed above. It is the perception of the decisionmaker, and not the plaintiff's self-assessment, that is the relevant inquiry when determining whether the plaintiff was meeting her employer's legitimate expectations. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). Further, Plaintiff does not dispute that she exhibited unprofessional behavior, including calling Haynes crazy, and accepted that her statement was disrespectful. Pl. Dep. 189–190. Plaintiff also took responsibility for other inappropriate statements, such as calling Haynes a liar and questioning her authority as CEO to sit in on Plaintiff's department's meetings. Response to Written Warning. Therefore, she fails to present sufficient evidence to meet this prima facie requirement.

*9 Plaintiff only tangentially addresses the fourth required element to establish a prima facie case of wrongful termination based on race. She states that she meets the fourth requirement–that her position was filled with someone outside her protected class–by stating "her position remained open and was fulfilled by Armando and other employee Jessica." However, she fails to point to any evidence in the record to support this assertion or identify whether either of these individuals was outside her protected class. To the contrary, the record reflects that after Plaintiff was terminated, Haynes hired Stephen Batts, who is African-American, as Prevention Coordinator and, thereafter, promoted Brandon Brown, who is also African-American, to the position. Pl. Dep. 265-66; Haynes Dep. 79-80; Alford Dep. 30-31 (ECF No. 50-37). Plaintiff also argues that it is not necessary for her

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

to show that she was replaced by someone outside her
protected class, citing law outside the Fourth Circuit. See
Pl. Resp. p. 31 (citing George v. Leavitt, 407 F.3d 405,
412 (D.C. Cir. 2005)).[4] In EEOC v. Sears Roebuck & Co.,
243 F.3d 846, 851 n. 2 (4th Cir. 2001), the Fourth Circuit
noted that the prima facie formula necessarily will vary at
times based on the facts of each case. Id. (citing
McDonnell Douglas, 411 U.S. at 802, n. 13). "What is
critical with respect to the fourth element is that the
plaintiff demonstrate he was not hired (or fired or not
promoted, etc.) 'under circumstances which give rise to
an inference of unlawful discrimination.' " Id. (citing
Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248,
253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Thus, while
Plaintiff is correct that she does not necessarily have to
show that her position was filled by someone outside her
protected class, she has failed to present any other,
sufficient evidence that would give rise to an inference of
unlawful discrimination. That is, she has failed to present
any evidence to give rise to an inference that she was
terminated because of her race. As such, she fails to
establish a prima facie case of discrimination, and, thus,
summary judgment is appropriate on this claim.

[4]    In George, the District of Columbia Circuit held
that one method of showing unfavorable action
that gives rise to an inference of discrimination is
to show that the adverse action "is not attributable
to the two most common legitimate reasons on
which an employer might rely to reject a job
applicant: an absolute or relative lack of
qualifications or the absence of a vacancy in the
job sought." George, 407 F.3d at 412 (citing
Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir.
2002)) (internal quotations omitted). However, as
set forth above, that is not the law in this Circuit.

Plaintiff also alleges in her complaint that she was
disciplined because of her race. To establish a prima facie
case of disparate treatment on the basis of her race,
Plaintiff must show: "(1) membership in a protected class;
(2) satisfactory job performance; (3) adverse employment
action ...; and (4) that similarly-situated employees
outside the protected class received more favorable
treatment." White v. BFI Waste Servs., LLC, 375 F.3d
288, 295 (4th Cir. 2004). Defendant argues that Plaintiff
fails to present evidence sufficient to meet any of the
required prima facie elements other than membership in a
protected class. Plaintiff was disciplined with a written
warning on December 18, 2019. Written Warning (ECF
No. 50-21). However, this warning does not amount to an
adverse employment action for Title VII purposes.

For the purposes of a Title VII discrimination claim, an

"adverse employment action" is one that "constitutes a
significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a
significant change in benefits." Hoyle v. Freightliner,
LLC, 650 F.3d 321, 337 (4th Cir. 2011) (internal
quotation marks omitted). In other words, Plaintiff must
show that the action "adversely affect[ed] the terms,
conditions, or benefits of the plaintiff's employment."
Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th
Cir. 2007) (internal quotation marks omitted). To qualify
as an adverse employment action, the harm alleged must
"work a 'significant' detriment" on a plaintiff. Adams v.
Ann Arundel Cty. Pub. Sch., 789 F.3d 422, 431 (4th Cir.
2015). A written warning does not constitute an adverse
employment action because it does not affect the terms,
conditions, or benefits of employment. Thompson v.
Potomac Elec. Power Co., 312 F.3d 645, 651–52 (4th Cir.
2002); Jesnsen-Graf v. Chesapeake Emp's' Ins. Co., 616
F. App'x 596, 598 (4th Cir. 2015) (explaining that "[a]n
adverse employment action is an action that constitutes a
significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly
different responsibilities, or a decision causing a
significant change in benefits" and holding that the
plaintiff's complaint failed to state a plausible claim for
discriminatory issuance of a PIP because it did not "allege
that she received lower pay, was demoted, was passed
over for a promotion, failed to receive a bonus, or given
significantly different responsibilities because she was
placed on the PIP"). There is no evidence in the record
that the written warning Plaintiff received caused any
change in the terms, conditions, or benefits of her
employment or that it otherwise worked a "significant
detriment" on her. Therefore, she fails to show that she
suffered an adverse employment action with respect to the
written warning and summary judgment is appropriate as
to that claim.

**B. Retaliation**

**\*10** Plaintiff also alleges that her termination was in
retaliation for her complaints of discrimination based on
her race. Title VII makes it an "unlawful employment
practice for an employer to discriminate against any of his
employees ... because he has opposed any practice made
an unlawful employment practice by this subchapter, or
because he has made a charge, testified, assisted, or
participated in any manner in an investigation,
proceeding, or hearing under this subchapter." 42 U.S.C.
§ 2000e-3(a). To establish a prima facie case of retaliation
under Title VII, a plaintiff must show (1) he engaged in

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir. 1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendants' legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir. 2001).

Protected activity involves opposing an unlawful employment practice which the plaintiff reasonably believed had occurred or was occurring. Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). Title VII protects an employee who opposes "any practice made an unlawful employment practice," 42 U.S.C. § 2000e-3(a), or who "reasonably believes" she is opposing a practice made an unlawful practice by Title VII. E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) (internal quotation marks omitted). Filing an EEOC charge is also a protected activity. 42 U.S.C. § 2000e–3(a).

Defendant argues that Plaintiff's internal complaints regarding Haynes do not amount to protected activity because Plaintiff did not complain that the harassment she was suffering from Haynes was because of her race. However, there is evidence in the record that Plaintiff did make complaints based on race. Plaintiff first complained about Haynes to Gregory on October 28, 2019, following a meeting she had with Haynes. Plaintiff called Gregory and told her that she believed Haynes was harassing her by "questioning [her] job performance, ... questioning if [she] needed to do anything over again, calling, making statements about [her], slandering [her] name ... Making these type of statements about [she's] not a rule follower." Pl. Dep. 176–177. Plaintiff also told Gregory that she was aware that Haynes had contacted a former employee, Tiffany Joyner, to ask whether she knew that Plaintiff lived with her supervisor, Cheryl Johnson. Pl. Dep. 176. Plaintiff told Gregory that she believed Haynes was "creating and cultivating a toxic and racially charged

work environment" and her action of calling Joyner was "in direct relation" to an investigation that occurred in February 2019 regarding race relations in the office.[5] Pl. Dep. 180, 183, 185; Timeline Notes (ECF No. 50-12). On October 31, 2019, Gregory met with Plaintiff to follow up on their October 28, 2019, discussion. Pl. Dep. 183. During this conversation, Plaintiff reiterated that she believed Haynes was harassing her and that it related to her race. Pl. Dep. 185. During a November 18, 2019, meeting, Plaintiff complained that Haynes had an issue with Plaintiff hanging out with Johnson outside of work because they are "black folks." Pl. Dep. 199–200; November 18, 2019, Recording at 1:03:45. Again, in a meeting with Gregory and Sinkway on December 19, 2019, Plaintiff informed Gregory that Haynes was creating a racially charged work environment. Pl. Aff. ¶ 27. In her letter to Gregory dated January 5, 2020, Plaintiff mentioned that she'd been subjected to harassment since her participation in the February 2019 racial investigation. Pl. Letter to Gregory dated January 5,2020. This evidence is sufficient to show that Plaintiff engaged in protected activity under Title VII.

[5]     As stated above, the investigation from February 2019 was requested by Johnson after she heard that Careteam employees believed that she, as an African American, treated African American employees, including Plaintiff, more favorably than Caucasian employees. Johnson Dep., 12–13; Gregory Dep. 17–18 (ECF No. 50-13).

**\*11** Though Defendant does not dispute that Plaintiff's termination was an adverse action, it argues, as it did with respect to Plaintiff's discrimination claim, the written warning Plaintiff received on December 18, 2019, is not an adverse action. However, a less strenuous standard applies with respect to adverse actions in the retaliation context. Strothers v. City of Laurel, Maryland, 895 F.3d 317, 327 (4th Cir. 2018). The adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." Id.; see also Burlington Northern, 548 U.S. at 64, 126 S.Ct. 2405 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); Barnes v. Charles Cty. Pub. Schools, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam) ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.) Thus, "[t]he scope of Title VII's anti-retaliation provision ... is broader than the anti-discrimination provision." Strothers, 895 F.3d at 327. The Fourth Circuit has ruled that "a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

disciplinary actions could result in further discipline, including termination." Barnes, 747 Fed. App'x at 119. Plaintiff's written warning contained a statement that "[f]ailure to improve may result in further disciplinary action up to and including termination." Written Warning. Therefore, it constitutes an adverse action in the retaliation context.

Plaintiff must also present sufficient evidence of a causal connection between her protected activity and the adverse actions. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark County School District. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted). A" 'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action' " often " 'negates any inference that a causal connection exists between the two.' " Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005) (citation omitted). Here, the record reflects that Plaintiff made complaints regarding racial discrimination or retaliation on October 28, 2019, October 31, 2019, November 18, 2019, December 19, 2019, and January 5, 2020. Plaintiff received the written warning on December 18, 2019, and she was notified of her termination on January 30, 2020. While there is no bright line time frame to establish causation for a prima facie case, the Fourth Circuit has held that a one-month period between the protected activity and an adverse employment action is sufficient to create a jury question regarding the causation prong of a prima facie case. See Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 247 (4th Cir. 2015). Here, one month passed between Plaintiff's November 18, 2019, complaint and the written warning she received on December 18, 2019. Less than two months passed between Plaintiff's December 18, 2019, complaint and her termination on January 30, 2020. "[E]stablishing a 'causal connection' at the prima facie stage is not an onerous burden." Strothers, 895 F.3d at 335 (citing Foster, 787 F.3d at 251; Burgess v. Bowen, 466 F. App'x 272, 283 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation.") (citation omitted)). Accordingly, Plaintiff has presented sufficient evidence of a causal connection between her protected activity and her adverse actions to create a prima facie case of retaliation. Therefore, the

burden shifts to Defendant to produce a legitimate, non-retaliatory reason for the adverse actions.

Defendant asserts that Plaintiff was given a written warning for insubordinate and disrespectful behavior, specifically her behavior towards Haynes in meetings on November 18, 2019, and December 16, 2019. Pl. Dep. 235; Sinkway Dep. 13–p. 14; Gregory Dep. 49; Written Warning (ECF No. 50-21); Redlined Notes of Kathleen Gregory (ECF No. 50-22). Further, based on Plaintiff's written response to her warning, Plaintiff's supervisors felt she did not take any responsibility for her actions with respect to the performance of her department, indicate any remorse for her disrespectful statements, or show any intention of correcting the insufficiencies in her work performance, and, thus, the decision was made, with input from Haynes, Sinkway, Stinson, Careteam's external human resources consultant, and Careteam's outside legal counsel, to terminate Plaintiff's employment. Pl. Dep. 235, 243; Redlined Notes of Gregory; Response to Written Warning; Sinkway Dep. 22; Gregory Dep. 25; Stinson Dep. 11, 13; Sinkway Notes dated December 17, 2019. Both of these actions were in accordance with Defendant's Respectful Workplace Policy. These are legitimate, non-retaliatory reasons for the written warning and the termination. See, e.g., Calhoun v. U.S. Dep't of Labor, 576 F.3d 201, 214 (4th Cir. 2009) (holding an employee's "continued failure to follow supervisors' instructions" was a legitimate non-retaliatory reason); Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989) (holding an "insubordinate attitude" and "difficulty in working with fellow employees" were legitimate non-discriminatory reasons). Thus, the burden returns to Plaintiff to present evidence sufficient to show that the reasons given were not the true reasons for the adverse action, but pretext for a retaliatory reason.

**\*12** In her response, Plaintiff does not address how the reasons given for her written warning and termination are pretext for a retaliatory reason. Rather, she rests her retaliation discussion on the temporal proximity between her protected activity and the adverse actions. See Pl. Resp. p. 33. However, "the causation standard Plaintiff must meet at this stage of McDonnell Douglas is a demanding one." Williams v. Fairfax Cnty., No. 121CV598RDAIDD, 2022 WL 2346615, at *12 (E.D. Va. June 29, 2022); Foster, 787 F.3d at 251 (noting the causation standards for establishing a prima facie case of retaliation and proving pretext are not identical, and the prima facie causation burden is "less onerous"). Whereas mere temporal proximity might be enough to sufficiently make a prima facie showing of causation, "temporal proximity alone ... cannot create a sufficient inference of pretext." Nathan v. Takeda Pharms. Am, Inc., 890 F.

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 5434251

Supp. 2d 629, 648 (E.D. Va. 2012) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)); Waag v. Sotera Def. Sols., Inc., 857 F.3d 179, 192 (4th Cir. 2017) (agreeing that "for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation," but noting the plaintiff "still 'bears the burden of establishing that the employer's proffered explanation is pretext for ... retaliation.' "). Plaintiff admitted to her unprofessional conduct, including calling Haynes crazy, and even accepted that her statement was disrespectful. Pl. Dep. 189–90. Plaintiff also took responsibility for other inappropriate statements, such as calling Haynes a liar and questioning her authority as CEO to sit in on Plaintiff's department's meetings. Response to Written Warning. She was aware of Careteam's Respectful Workplace policy and understood that any conduct in violation of this policy could lead to disciplinary action including termination. Pl. Dep. 95–96. She fails to present sufficient evidence to show that these reasons were not the true reasons for her written warning and subsequent termination but were pretext for a retaliatory reason.

In sum, it is clear from the record, and Plaintiff explicitly states in her affidavit, that she had a "fundamental problem" with Haynes' perception of the Prevention Coordinator position and her focus on maintaining a connection with the gay community. Pl. Aff. ¶ 5. While she disagrees with Haynes' assessment of whether she was adequately performing her job duties, Plaintiff does not disagree that she was disrespectful towards Haynes

during her communications with her about her job responsibilities and performance. The Court's assessment of pretext depends upon the "perception of the decisionmaker." See Holland, 487 F.3d at 217; see also Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct ... so long as it truly was the reason for the plaintiff's termination.") Plaintiff fails to present sufficient evidence that would call Defendant's stated reasons for its decision to issue a written warning and terminate her position into doubt or that would create a genuine issue of material fact as to whether Defendant's decision was worthy of credence. Accordingly, summary judgment is appropriate.

## V. CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (ECF No. 50) be granted and this case be dismissed in its entirety.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 5434251

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4103121
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Florence Division.

Dwane HEYWARD, Plaintiff,
v.
CARETEAM PLUS, INC., Defendant.

Case No.: 4:21-cv-0754-JD-TER
|
Signed September 8, 2022

**Attorneys and Law Firms**

Bonnie Travaglio Hunt, Hunt Law, Goose Creek, SC, for
Plaintiff.

Cherie Wilson Blackburn, Mary Stuart King, Nexsen
Pruet, Charleston, SC, for Defendant.

**ORDER AND OPINION**

Joseph Dawson, III, United States District Judge

**\*1** This matter is before the Court with the Report and
Recommendation ("Report and Recommendation" or
"Report") of United States Magistrate Judge Thomas E.
Rogers, III, made in accordance with 28 U.S.C. §
636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) of the
District of South Carolina.[1] (DE 70.) Plaintiff Dwane
Heyward ("Plaintiff" or "Heyward") brought this action
against her employer, Defendant Careteam Plus, Inc.
("Defendant" or "Careteam"), alleging race
discrimination and retaliation under Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et
seq. ("Title VII"). (DE 1-1.) On February 28, 2022,
Careteam filed a Motion for Summary Judgment seeking
to dismiss Heyward's claims. (DE 50.) On March 28,
2022, Heyward filed a response Memorandum in
Opposition to Careteam's Motion for Summary
Judgment. (DE 56.) On April 4, 2022, Careteam filed a
reply. (DE 64.)

[1]     The recommendation has no presumptive weight,
        and the responsibility for making a final

determination remains with the United States
District Court. See Mathews v. Weber, 423 U.S.
261, 270-71 (1976). The court is charged with
making a de novo determination of those portions
of the Report and Recommendation to which
specific objection is made. The court may accept,
reject, or modify, in whole or in part, the
recommendation made by the magistrate judge or
recommit the matter with instructions. 28 U.S.C.
§ 636(b)(1).

On July 27, 2022, the magistrate judge issued the Report,
recommending that Careteam's Motion for Summary
Judgment be granted and the case be dismissed in its
entirety. (DE 70.) For the reasons stated below, the Court
adopts the Report and Recommendation and incorporates
it herein and grants Careteam's Motion for Summary
Judgment. (DE 50.)

**BACKGROUND**

The Report and Recommendation sets forth the relevant
facts and legal standards, which this Court incorporates
herein without a full recitation. However, as a brief
background relating to the objections raised by Plaintiff,
the Court provides this summary.

Careteam[2] hired Heyward on August 9, 2018, as the
Prevention Coordinator, and Heyward's primary duties
were to coordinate and provide "HIV testing, recruitment
and outreach activities for [the] identified population[s]
for counseling, treating, and referrals" under the South
Carolina Department of Health and Environmental
Control ("SC DHEC") guidelines. (DE 50-1, 50-5.) An
essential part of Heyward's job was developing and
maintaining positive relationships with organization
leaders and venue owners that would "ensure access to
high[-]risk HIV [positive] population[s]" for purposes of
providing sexually transmitted infection ("STI")
education and other prevention services. (DE 5-5.)
Heyward reported to Johanna Haynes ("Haynes"), Chief
Executive Officer (CEO), until Cheryl Johnson
("Johnson") was hired as Chief Programs Officer (CPO)
in October 2018 and subsequently became Plaintiff's
supervisor. (DE 50-4.) Johnson remained Plaintiff's
supervisor until September 2019; thereafter, Haynes
returned to being Plaintiff's supervisor. In October 29,
2018, and April 10, 2019, evaluations, Plaintiff received a
"meets" or "exceeds" rating in each category of the

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 4103121

evaluations. (DE 56-2, pp. 40-66.)

[2]    Careteam is a primary and specialty care provider ensuring access to comprehensive healthcare services regardless of patients' ability to pay.

**\*2** Haynes advocated for developing a working relationship with the owners of the "gay bars" in the area which was of particular importance to Plaintiff's position because the "highest number of new infections to date" occur within the "gay community." (DE 56-2.)

The quality of these relationships determined the extent to which Plaintiff could effectively accomplish her other requisite duties, such as scheduling testing and outreach events; providing HIV prevention and other health related education sessions; and distributing condoms to the gay bars. Plaintiff avers that she had a fundamental problem with this perception that placed a priority on the gay community because gay people are not the only people who contract HIV. (DE 56-2.)

On October 28, 2019, Heyward called Kathleen Gregory ("Gregory"), Human Resources Administrator, and told her that she believed Haynes was harassing her by "questioning [her] job performance, ... questioning if [she] needed to do anything over again, calling, making statements about [her], slanderizing [her] name ... Making these type of statements about [she's] not a rule follower." (DE 50-12.) Haynes told Gregory that she believed Haynes was "creating and cultivating a toxic and racially charged work environment," and her action of calling Tiffany Joyner ("Joyner"), a former employee of Defendant, to inquire about Joyner's knowledge of Plaintiff residing with Johnson was "in direct relation" to an investigation that occurred in February 2019. (DE 50-12.)

On October 31, 2019, Gregory met with Heyward to follow up on their October 28, 2019, discussion. During this conversation, Plaintiff reiterated that she believed Haynes was harassing her and that it related to her race. On November 18, 2019, Haynes and Plaintiff met with Plaintiff's new supervisor, Kim Sinkway ("Sinkway"), Chief Operations Officer (COO). (DE 50-15.) During this meeting, Haynes asked Plaintiff if she was facilitating a program to educate the community on HIV prevention by means of using pre-exposure prophylaxis (PrEP), and Plaintiff admitted she had not done so, despite being asked by Haynes on several occasions to do so. (DE 50-16.) During the meeting, Plaintiff became agitated and either would not answer or would only provide a short and unhelpful response. (DE 70, p. 6.)

Consequently, Sinkway reprimanded Plaintiff on her "disrespectful" conduct that she exhibited during the meeting and during a prior meeting where Plaintiff called Haynes crazy. Plaintiff began expressing instances when she felt like Haynes had disrespected her too, including when Haynes inquired whether Plaintiff lived with her supervisor, Johnson. (DE 50-15.)

On December 9, 2019, Sinkway, Haynes, Plaintiff, and Kiasha Stinson, CPO and Plaintiff's new supervisor, met to discuss the Prevention Department. During this meeting, Haynes counseled Plaintiff again on her failure to engage and make connections with the gay community in the area, and requested that Plaintiff reach out to specific organizations. (DE 50-17.) Haynes gave specific directions and detailed guidance to Plaintiff. (Id.) Sinkway counseled Plaintiff again on the inappropriate tone she used when speaking with Haynes and provided guidance to Plaintiff throughout the rest of the meeting. (Id.)

**\*3** On December 18, 2019, Plaintiff received a written warning for insubordinate and disrespectful behavior, specifically her behavior towards Haynes in prior meetings on November 18, 2019, and December 16, 2019. (DE 50-21; 50-22.) Sinkway, Stinson, and Gregory reviewed the written warning with Plaintiff. On January 5, 2020, Plaintiff submitted an e-mail and timeline detailing her claims of harassment and retaliation. (DE 56-2, pp. 73-74.) Plaintiff asserted that she had been subjected to harassment and continual retaliatory behaviors ever since a February 2019 racial investigation.[3] (Id.) Gregory received this e-mail on January 6, 2020, and Careteam began a preliminary investigation into Plaintiff's allegations and consulted with their outside legal counsel. (DE 50-27.) Careteam placed Plaintiff on a paid administrative leave with full benefits beginning January 8, 2020, while the matter was investigated. (DE 50-28.) On January 9, 2020, Plaintiff sent an e-mail to the Careteam Board of Directors, copying Stinson, Gregory, and Haynes, requesting an external investigation into her allegations of harassment. (DE 50-29.) She admitted in the same e-mail, however, that she had already been informed that an investigation into her allegations was in progress. (Id.) Plaintiff also mentioned that she filed a complaint with the Equal Employment Opportunity Commission (EEOC). (DE 70, p. 11.)

[3]    Johnson requested an investigation after she heard that Careteam employees believed that she, as an African American, treated African American employees, including Plaintiff, more favorably than Caucasian employees. (DE 50-13.)

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 4103121

Based upon Plaintiff's response to the written warning, Plaintiff's supervisors felt she did not take any responsibility for her actions with respect to the performance of her department, indicate any remorse for her disrespectful statements, or show any intention of correcting the insufficiencies in her work performance, and, thus, the decision was made, with input from Haynes, Sinkway, Stinson, Defendant's external human resources consultant, and Defendant's outside legal counsel, to terminate Plaintiff's employment. (DE 50-30.) A termination letter was sent to Heyward on January 31, 2020. (DE 50-31.)

### DISCUSSION

On August 10, 2022, Heyward filed an objection to the Report. (DE 71.) However, to be actionable, objections to a report and recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute.' " Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985)). "A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object." Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003). "Likewise, a mere restatement of the arguments raised in the summary judgment filings does not constitute an 'objection' for the purposes of district court review." Nichols v. Colvin, 100 F. Supp. 3d 487 (E.D. Va. 2015). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, the Court finds that Heyward raises the following objections to the Report: 1) lack of consideration of Plaintiff's exemplary performance reviews and that Plaintiff's only employment issues arose with Haynes, a white supervisor while Plaintiff is African-American, among other specific facts; and 2) regarding Plaintiff's retaliation claim, a lack of consideration for Plaintiff's complaints prior to Plaintiff's first disciplinary infraction. (DE 71.) The Court addresses both objections seriatim.

First, as to the Report's lack of consideration for specific facts regarding Heyward's satisfactory job performance and Haynes's discriminatory actions towards Heyward, the Report ably and comprehensively addresses how Heyward's claims do not meet the test for a discrimination claim. A plaintiff asserting a claim for unlawful employment discrimination may proceed through two avenues of proof. First, he may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir.2005); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). When direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination, which "var[ies] depending on the nature of the case." Briggs v. Waters, 484 F. Supp. 2d 466, 477 (E.D. Va. 2007).

**\*4** To establish a prima facie claim for wrongful termination, Plaintiff must present evidence (1) that she was a member of a protected class; (2) that she was performing at a level that met her employer's legitimate job expectations at the time of the adverse employment action; (3) that she suffered an adverse employment action; and (4) that the position remained open or was filled by a similarly qualified applicant outside the protected class.[4] See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). There is no dispute that Plaintiff is a member of a protected class. However, the parties dispute whether or not Heyward was performing at a level that met her employer's legitimate job expectations at the time of the adverse employment action. Plaintiff contends that she was performing at a level that met Defendant's legitimate expectations based on her October 29, 2018, and April 10, 2019 performance reviews. In both evaluations, Plaintiff received a "meets" or "exceeds" rating in each category. (DE 56-2, pp. 40-66) Heyward also points to isolated statements made by Haynes, first, on December 2, 2019 when Haynes told Heyward that she was doing a good job, and second, on November 18, 2019 when Haynes said she has a lot of confidence in Heyward and Heyward represents the company well. (DE 50-12.)

[4]     Since the second element of a prima facie discrimination claim is dispositive in this case, there is no need to get to the fourth element; however, the Record reflects that after Plaintiff was terminated, Haynes hired Stephen Batts, who is African-American, as Prevention Coordinator and, thereafter, promoted Brandon Brown, who is

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 4103121

also African-American, to the position. (DE 50-37.)

However, the relevant time to evaluate an employee's performance is at the time of the adverse action. See, e.g., Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005). Heyward was terminated in January 2020, based on Plaintiff's supervisors' perception that Heyward did not take any responsibility for her actions with respect to the performance of her department, indicate any remorse for her disrespectful statements to and regarding Heyward, or show any intention of correcting the insufficiencies in her work performance. (DE 50-30.) Moreover, it is clear from the record that Plaintiff and Haynes had a difference of opinion with respect to how Plaintiff should perform her job responsibilities. Though Plaintiff believed that she was properly handling her responsibilities, the record reveals that, in Haynes' opinion, she was not successfully engaging the gay community in Defendant's prevention efforts as specifically requested by Haynes. Plaintiff repeatedly failed to engage the gay community in Careteam's prevention efforts even though Haynes asked Plaintiff to do so on numerous occasions.

It is the perception of the decisionmaker, and not the plaintiff's self-assessment, that is the relevant inquiry when determining whether the plaintiff was meeting her employer's legitimate expectations. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.2003). Therefore, Heyward fails to present sufficient evidence to meet this prima facie requirement. Heyward simply disagrees with the Report but fails to point to evidence in the record to contradict its finding therefore, the Court overrules Heyward's objections as they relate to her discrimination claim.

As to Heyward's retaliation claim, Heyward contends the Report fails to consider that Heyward "made complaints on at least 4 occasions before her very first discipline on December 16, 2019." (DE 71, p. 10.) Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. See Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th

Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998).

*5 Protected activity involves opposing an unlawful employment practice which the plaintiff reasonably believed had occurred or was occurring. See Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003). Title VII protects an employee who opposes "any practice made an unlawful employment practice by [Title VII]," 42 U.S.C. § 2000e-3(a), or who "reasonably believes" she is opposing a practice made an unlawful practice by Title VII. E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001). At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendants' legitimate, non-retaliatory reason is pretextual. Id.

Here, the Report found that Plaintiff had presented sufficient evidence of a causal connection between her protected activity and her adverse actions to create a prima facie case of retaliation. (DE 70, p. 23.) Therefore, the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for the adverse actions. Defendant articulates legitimate, non-retaliatory reasons for the written warning and Heyward's termination: Heyward was given a written warning for insubordinate and disrespectful behavior, specifically her behavior towards Haynes in meetings on November 18, 2019, and December 16, 2019. (DE 50-21; 50-22.) Further, based on Plaintiff's written response to her warning, Plaintiff's supervisors felt she did not take any responsibility for her actions with respect to the performance of her department, indicate any remorse for her disrespectful statements, or show any intention of correcting the insufficiencies in her work performance, and, thus, the decision was made to terminate Plaintiff's employment. (DE 50-30.) Given these non-retaliatory reasons, the burden returns to Plaintiff to present evidence sufficient to show that the reasons given were not the true reasons for the adverse action, but pretext for a retaliatory reason. See Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 217-18 (4th Cir. 2016) ("To survive summary judgment, however, [an employee] need not squarely rebut his employer's explanation. Instead, [the employee] must cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").

In her objection to the Report, Plaintiff does not address

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 4103121

how the reasons given for her written warning and termination are pretext for a retaliatory reason. Rather, she again rests her retaliation discussion on the number of complaints (4) and temporal proximity between her protected activity and the adverse actions. Although temporal proximity is sufficient to establish a prima facie causal connection between an employee's protected conduct and an employer's adverse action, under the McDonnell Douglas burden shifting framework, temporal proximity alone will not rebut a defendant's' legitimate and uncontested ground of termination. See Yancey v. Nat'l Ctr. on Insts. & Alts., 986 F. Supp. 945, 956 (D. Md. 1997) (granting summary judgment where plaintiff did not present any evidence of pretext "beyond temporal proximity"), aff'd, 141 F.3d 1162 (4th Cir. 1998); see also Guessous, 828 F.3d at 218 ("[I]n retaliation cases, courts must determine 'what made [the employer] fire [the employee] when it did.' "). The objection fails to present sufficient evidence to show that the employer's reasons were not the true reasons for her written warning and subsequent termination but were pretext for a retaliatory reason.

**\*6** Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report (DE 70) and incorporates it by reference.

It is, therefore, **ORDERED** that Defendant's Motion for Summary Judgment (DE 50) is granted and this action is dismissed.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4103121

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Heyward v. Careteam Plus, Inc., Not Reported in Fed. Rptr. (2023)

2023 WL 3581693

2023 WL 3581693
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

Dwane D. HEYWARD, Plaintiff - Appellant,
v.
CARETEAM PLUS, INC., Defendant - Appellee,
and
Johanna Haynes, Defendant.

No. 22-2031
|
Submitted: May 18, 2023
|
Decided: May 22, 2023

Appeal from the United States District Court for the
District of South Carolina, at Florence. Joseph Dawson,
III, District Judge. (4:21-cv-00754-JD)

**Attorneys and Law Firms**

Dwane D. Heyward, Appellant Pro Se. Cherie Wilson
Blackburn, Mary Stuart King, MAYNARD NEXSEN,
PC, Charleston, South Carolina, for Appellee.

Before NIEMEYER, RICHARDSON, and RUSHING,
Circuit Judges.

**Opinion**

Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

**\*1** Dwane D. Heyward appeals the district court's order
adopting the magistrate judge's recommendation and
granting Careteam Plus, Inc., summary judgment on
Heyward's discriminatory discharge and retaliation
claims, brought pursuant to Title VII of the Civil Rights
Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. We have
reviewed the record and find no reversible error.
Accordingly, we affirm for the reasons stated by the
district court. *Heyward v. Careteam Plus, Inc.*, No.
4:21-cv-00754-JD (D.S.C. Sept. 8, 2022). We dispense
with oral argument because the facts and legal contentions
are adequately presented in the materials before this court
and argument would not aid the decisional process.

*AFFIRMED*

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 3581693

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

2025 WL 27827
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Dr. Joann CREDLE, Plaintiff,
v.
VIRGINIA COMMUNITY COLLEGE SYSTEM,
Defendant.

Civil No. 3:24cv233 (DJN)
|
Signed January 3, 2025

**Attorneys and Law Firms**

Samantha Vanterpool, Jessica Greer, Pro Hac Vice, The
Spiggle Law Firm, PC, Alexandria, VA, Jordan David
Howlette, JD Howlette Law, Washington, DC, Valerie A.
Teachout, The Teachout Law Firm, PLLC, Williamsburg,
VA, for Plaintiff.

Ronald Nicholas Regnery, Office of the Attorney
General, Richmond, VA, Brittany Ashley McGill,
Defense Commissary Agency, Fort Gregg-Adams, VA,
for Defendant.

**MEMORANDUM OPINION**

David J. Novak, United States District Judge

**\*1** This matter comes before the Court on Virginia
Community College System's ("Defendant") Motion to
Dismiss (ECF No. 21) and Motion to Strike (ECF No.
22). In its Motion to Dismiss, Defendant moves to
partially dismiss Count I and to dismiss Count II in its
entirety for lack of subject matter jurisdiction under
Federal Rule of Civil Procedure 12(b)(1). Further,
Defendant moves to dismiss Counts I, II and III for failure
to state a claim upon which relief can be granted under
Federal Rule of Civil Procedure 12(b)(6). Finally,
Defendant moves to strike portions of Plaintiff's
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(f). Because a plaintiff's mere supposition of
racial animus in the context of a simple employment
dispute does not warrant relief for racial discrimination,

Plaintiff's claims must be dismissed. As such, the Court
will GRANT Defendant's Motion to Dismiss (ECF No.
21) and DENY AS MOOT Defendant's Motion to Strike
(ECF No. 22).

**I. BACKGROUND**

The facts recited by Defendant's First Amended
Complaint ("FAC") (ECF No. 16), which the Court must
accept as true for present purposes, reveal the following
factual narrative.

Defendant is a statewide system of publicly supported
community colleges established and administered by the
Virginia State Board of Community Colleges. (ECF No.
23 ("Mem.") at 2.) Northern Virginia Community
College's ("NOVA") Annandale campus is one of
Defendant's locations. (FAC ¶ 16.) Plaintiff began
working for Defendant at NOVA in 1982. (*Id.*) Plaintiff
now serves as the Coordinator of Specialized Programs.
(*Id.* ¶ 17.) In this position, Plaintiff works with students
and stakeholders to administer special programs. (*Id.* 9.)
Plaintiff is also a member of the Provost's office and
reports directly to the Annandale Provost, Dr. Diane
Mucci ("Dr. Mucci"). (*Id.* ¶ 18.)

Plaintiff served as a member of the Conference for
Hispanic Students project ("Conference" or "project").
(*Id.* ¶ 19.) As part of the project, Plaintiff arranged for
children to be at the Conference in a separate room, but in
close proximity to their parents attending the Conference.
(*Id.* ¶ 20.) Plaintiff alleges that she obtained prior verbal
approval from Dr. Mucci for the children to attend. (*Id.*)
Despite receiving approval, the Director of College
Government Affairs and Community Relations, Thomas
"Dana" Kauffman ("Mr. Kauffman"), notified Plaintiff on
or about June 8, 2022, that she did not follow protocol
when she allowed children to be present at the
Conference, and would therefore be removed from the
project's planning team. (*Id.* ¶ 19.)

Plaintiff was the only African American staff member
assigned to plan the Conference. (*Id.* ¶ 23.) Additionally,
Plaintiff alleges that while "other staff members on the
Conference Project were not performing satisfactorily,
[Plaintiff] was the only individual removed from the
project." (*Id.* ¶ 22.) Plaintiff contends that planning team
members' continued requests for her assistance after her
removal from the project demonstrates her satisfactory
performance. (*Id.*)

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

**\*2** Plaintiff was displeased with her removal from the project. As a result, on June 8, 2022, Plaintiff "emailed NOVA President, Dr. Anne Kress ("Dr. Kress"), expressing her concerns about being removed from the Conference project and requesting to be returned to the project." (*Id.* ¶ 24.) Plaintiff alleges that her removal sparked rumors that she was unable to perform her duties satisfactorily. (*Id.* ¶ 25.) On June 9, 2022, Plaintiff emailed Dr. Mucci and Mr. Kauffman regarding these rumors. (*Id* ¶ 26.) In the email, Plaintiff informed her superiors that "she would be submitting medical documentation in support of her need to take a few weeks working away from campus," and that she "cannot take the people talking behind my back." (*Id*)

By the next day, June 10, 2022, Plaintiff had not received a reply to her email. (*Id.* ¶ 28.) As a result, Plaintiff went to Mr. Kaufman's office to address the issue in person. (*Id.*) Plaintiff alleges that Mr. Kaufman refused to speak with her, falsely claimed that Plaintiff threatened him and demanded that Plaintiff leave his office. (*Id.*) After leaving Mr. Kaufman's office, Plaintiff went to Dr. Mucci's office to discuss the rumors that Plaintiff could not perform her job duties. (*Id.* ¶ 29.) As this point, Plaintiff proved "distraught about being removed from the program and Mr. [ ] Kauffman's hostile response." (*Id.* ¶ 30.) Plaintiff then contacted NOVA's Director of Human Resources ("HR"), Tammy Currie ("Ms. Currie"), and Associate Vice-President of HR, Charlotte Calobrisi ("Ms. Calobrisi"), detailing what had happened. (*Id.* ¶¶ 30, 31.) Later that day, Plaintiff also spoke with a former student about her removal from the project. (*Id.* ¶ 32.) Plaintiff expressed that "she felt her removal from the Conference project was because she is African American, particularly given that [Plaintiff] was the only African American NOVA employee on the Conference Committee and the only committee member reprimanded for doing something she had been given express permission by Provost Mucci to do." (*Id.*) Plaintiff alleges that Dean Rahman's assistant overheard this conversation and reported it to Dean Rahman. (*Id.*)

During the evening of June 10, 2022, Ms. Currie emailed Plaintiff notifying her that she was "suspended until further notice because she was 'a threat.' " (*Id.* ¶ 33.) Defendant did not give Plaintiff an immediate opportunity to respond to this allegation. (*Id.*) On June 15, 2022, Mr. Kauffman emailed Plaintiff to say that human resources was investigating unprofessional conduct that she allegedly demonstrated on June 10, 2022. (*Id.* ¶ 35.) Mr. Kauffman also informed Plaintiff that she was barred from the NOVA premises during her administrative leave period. (*Id*)

On July 6, 2022, Plaintiff met with Mr. Kauffman, Ms. Currie, and Ms. Calobrisi to discuss the June 10, 2022 incident. (*Id.* ¶ 36.) At the end of the meeting, Mr. Kauffman, Ms. Currie and Ms. Calobrisi informed Plaintiff that she could return to work on July 11, 2022. When Plaintiff returned to work on July 11, 2022, Dr. Mucci issued a "Letter of Reprimand" to Plaintiff. (*Id.* ¶ 48.) The letter alleged that Plaintiff " 'had several interactions with colleagues and co-workers on the Annandale Campus that were unprofessional and discourteous' in connection with her removal from a project on June 8, 2022." (*Id.*) The letter detailed that Plaintiff's interactions on June 10, 2022 included her "raising her voice and making inappropriate comments to coworkers and a community partner." (*Id*) Further, the letter said that Plaintiff's conduct violated various workplace policies. (*Id.* ¶ 49.) Plaintiff alleges that Defendant has failed to discipline non-African American colleagues who engaged in "misconduct that is similar to the misconduct which [Defendant] claims [Plaintiff] engaged in." (*Id.* ¶ 53.) Plaintiff cites an example of a colleague who was reported for numerous rude interactions but was not suspended like Plaintiff was. (*Id.* ¶ 54–58.)

**\*3** After Plaintiff returned to work, she began to experience "debilitating panic attacks due to the discrimination and harassment that she had been subjected to." (*Id.* ¶ 59.) Plaintiff alleges that "[h]er work conditions had become so hostile that [she] would experience frequent anxiety attacks." (*Id.* ¶ 60.) Plaintiff informed Dr. Mucci that she was experiencing panic attacks at work due to the conditions. (*Id.* ¶ 61.)

On July 20, 2022, Dr. Mucci emailed Plaintiff with a list of "discussion items," one of which was a new requirement that Plaintiff was required to work at the NOVA campus 8:00 a.m. to 4:30 p.m. Monday through Friday due to "business needs.... changing." (*Id.* ¶ 63.) But for the past "ten to fifteen years, [Plaintiff] had only been required to work on campus four days per week. (*Id.* ¶ 64.) And despite Dr. Mucci's reasoning that the NOVA campus' "business needs are changing," Plaintiff asserts that Dr. Mucci did not similarly require any of Plaintiff's colleagues, who are not African American, to adhere to the new in-office requirement. (*Id.*) A further discussion item in Dr. Mucci's email was notifying Plaintiff that she would have additional responsibilities taken away and given to non-African American colleagues. (*Id.* ¶ 65.) This included a program with the Arlington County Sheriff's Office, despite Plaintiff already completing tasks on this program. (*Id.*) And finally, Dr. Mucci informed Plaintiff that she now had to teach an SDV course, a task that Plaintiff had never previously been required to do.

(*Id.* ¶¶ 71, 72.)

On July 21, 2022, Plaintiff heard from a colleague that Dr. Kress "did not want [Plaintiff] to go out and set up programs." (*Id.* ¶ 68.) After hearing this, Plaintiff emailed Dr. Kress, Ms. Calobrisi and Ms. Currie expressing concern about not being allowed to set up programs and additional duties being taken away from her. (*Id.*) Dr. Kress responded only to tell Plaintiff that "all matters regarding her duties should only be discussed with [Dr.] Mucci." (*Id.* ¶ 69.)

Due to Plaintiff's panic attacks at work, she informed Dr. Mucci that she would be unable to teach the SDV course. (*Id.* ¶ 73.) In response, Dr. Mucci suggested that Plaintiff retire. (*Id.* ¶ 74.) Later that day, Dr. Mucci emailed Plaintiff that "she would need to request an accommodation in order to be relieved from teaching the SDV courses." (*Id.* ¶ 75.) But Dr. Mucci further elaborated that "excessive absenteeism is not permitted under VCCS or DHRM policy. Similarly, misrepresenting the reason for requesting sick leave is an abuse of sick time and is not acceptable. Any action that is a violation of policy or is not permitted may result in sanctions up to and including dismissal." (*Id.* ¶ 76.) Plaintiff interpreted these statements as a threat to her job security. (*Id.*)

Plaintiff then applied for medical accommodations at work. (*Id.* ¶ 77.) But, despite providing "ample medical documentation," Defendant denied her request because "the SDV was included as part of her performance plan." (*Id.*) Plaintiff continued to experience panic attacks, and as a result arranged to move her SDV students to other instructors to relieve her of the obligation. (*Id.* ¶ 79.) Plaintiff alleges that Defendant continued to not address Plaintiff's medical concerns. Then, in the fall of 2022, Defendant issued Plaintiff her Employee Work Plan (EWP), which reflected duties usually performed by a Specialized Program Coach, rather than a Coordinator. (*Id.* ¶ 81.) Plaintiff asserts that, as a result, Defendant "effectively demoted" her. (*Id.*)

**\*4** On February 24, 2023, Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 23-1.) On January 2, 2024, the EEOC issued a Notice of Right to Sue to Plaintiff. (FAC ¶ 14.) Plaintiff timely filed this case on March 29, 2024. (ECF No. 1.) The Amended Complaint raises three counts against Defendant for race discrimination, retaliation and hostile work environment, all in violation of Title VII. (*Id.* ¶ 82-134.)

On June 27, 2024, Defendant filed the instant Motions,

(ECF Nos. 21, 22), arguing that the Court lacks subject matter jurisdiction and Plaintiff fails to state a claim upon which relief can be granted. (ECF No. 21.) Defendant further seeks to strike certain portions of Plaintiff's Amended Complaint. (ECF No. 22.) On August 2, 2024, Plaintiff filed her Opposition, (ECF No. 34), and on August 15, 2024, Defendant filed its Reply, (ECF No. 36). Accordingly, the Motions now stand ripe for judicial determination.

## II. STANDARD OF REVIEW

At this stage, the Court accepts as true the facts set forth in the Amended Complaint (ECF No. 16). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, the Court views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Although the law does not require "detailed factual allegations... [f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the claim "plausible on its face" rather than merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At this juncture, Rule 8 of the Federal Rules of Civil Procedure requires only that Plaintiff proffers a short and plain statement showing that Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000, *et seq*, entitles her to relief. Moreover, in the employment discrimination context, Plaintiff does not need to plead facts demonstrating that a non-discriminatory reason for terminating her employment was pretextual, as that determination is to be made at the summary judgment stage. *Ray v. Amelia County Sheriff's Office*, 302 F. App'x 209, 211 (4th Cir. 2008); *Moore v. Mukasey*, 305 F. App'x 111, 114 (4th Cir. 2008).

## III. DISCUSSION

"Where a party has made both a Rule 12(b)(1) motion and a Rule 12(b)(6) motion, a court should address the 12(b)(1) issue first." *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 2019 WL 4564564, at *6 (E.D. Va. Sept. 9, 2019). As such, the Court will resolve Defendant's 12(b)(1) challenge first.

### A. Subject Matter Jurisdiction

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

Plaintiff has the burden of proving that subject matter jurisdiction exists. *Richmond, F. & P.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A federal court properly has jurisdiction over a Title VII claim only after the plaintiff exhausts the administrative procedures set forth in 42 U.S.C. § 2000e–5. *Davis v. N. Carolina Dep't of Correction*, 48 F.3d 134, 137 (4th Cir. 1995). Section 2000e–5(f)(1) requires an individual to obtain a Notice of Right to Sue from the EEOC before bringing suit in a federal court on a Title VII claim. This requirement "ensures that the employer is put on notice of the alleged violations," thereby giving it a chance to address the alleged discrimination before litigation. *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005). That said, an "administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.; see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) (finding that the touchstone for exhaustion is whether plaintiffs administrative and judicial claims are "reasonably related."); *Sydnor v. Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012) (explaining that the "reasonably related" standard ensures that the employer receives adequate notice of claims that may not have been explicitly included in the initial EEOC complaint).

*5 Here, Defendant asserts that the Court lacks subject matter jurisdiction over Plaintiff's claims arising out of an alleged amendment to her Employee Work Profile ("EWP") and over her retaliation claim for failing to raise — and therefore exhaust — these assertions with the EEOC. (ECF No. 23 ("Mem. Supp.") at 1.) The Court will address both claims in turn.

### 1. Employee Work Profile ("EWP") Claim

Defendant argues that "[n]othing alleged in the [EEOC] Charge suggests that a charge of discrimination regarding the alleged realignment of her duties to match those performed by a 'Specialized Program Coach' in Fall 2022 would have naturally arisen from an investigation" of the claims alleged in Plaintiff's EEOC Charge. (*Id.* at 9.) Plaintiff responds that while her "EEOC Charge did not mention anything about a formal change to her EWP, she alleged that she was being stripped of additional duties/responsibilities." (ECF No. 36 ("Opp.") at 2.) Therefore, the question becomes whether Plaintiff's claims in her EEOC Charge and her judicial claims before this Court are "reasonably related." *Sydnor*, 681 F.3d at 594.

Plaintiff's EEOC Charge alleges that a colleague relayed to her that "Dr. Kress does not want [Plaintiff] to go out and set up programs." (ECF No. 23-1 at 10–11.) After confronting Dr. Kress about this, Dr. Kress responded that "all matters regarding her job description and assigned duties should be discussed with Provost Mucci." (*Id.*) Plaintiff responded that being barred from setting up programs "was not in my letter [of reprimand] that was issued to me when I was allowed to come back to work." (*Id.* at 11.) Plaintiff's EEOC Charge further stated that "it seem[s] to me that if I can[not] set up programs, I am useless." (*Id.*) Plaintiff does not explicitly mention a change in her EWP in her EEOC Charge. But in her Amended Complaint, Plaintiff claims that "NOVA effectively demoted [Plaintiff] when she was issued her Employee Work Plan (EWP) in or around Fall 2022, and it reflected duties that were usually performed by a Specialized Program Coach, rather than a Coordinator." (FAC ¶ 81.)

Despite failing to mention a change in EWP in her EEOC Charge, Plaintiff's EEOC Charge asserted sufficient facts such that a change in her EWP is "reasonably related" to not being allowed to "go out and set up programs." (ECF No. 23-1 at 10–11.) Specifically, Plaintiff's EEOC Charge demonstrates that she proved concerned about the state of her role and responsibilities such that an investigation into changes in her EWP would reasonably follow her EEOC charge. Thus, Plaintiff sufficiently exhausted assertions regarding a change in her EWP. As a result, the Court will not dismiss Plaintiff's claim on this ground. (ECF No. 21.)

### 2. Retaliation Claim

Next, Defendant argues that Plaintiff did not "assert a retaliation claim in her EEOC Charge" and does not even "allege that such a claim was ever before the EEOC." (Mem. Supp. at 9.) Plaintiff responds that although she "did not formally raise a retaliation claim in her EEOC Charge, she clearly alleged that she believed that [Defendant] was taking adverse actions against her because of opposition to her discriminatory removal from the Conference Project." (Opp. at 3.) As a result, Plaintiff argues that "[a] retaliation claim would have reasonably arisen from an investigation of her allegations that the adverse actions taken against her resulted from her opposition to discriminatory activity." (*Id.*)

*6 In *Miles v. Dell*, the Fourth Circuit addressed whether the plaintiff's retaliation claim was reasonably related to

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

her EEOC Charge. *Miles v. Dell, Inc.*, 429 F.3d 480, 491–92 (4th Cir. 2005). The *Miles* court found that the plaintiff did not sufficiently exhaust her retaliation claim, because she "did not check the retaliation box on her charge form, and the narrative explaining her charge made no mention of retaliation." *Id.* Further, regarding plaintiff's insufficient narrative, the court explained that "[a]lthough [plaintiff's EEOC Charge] narrative states that she complained to [the alleged discriminator's] supervisor, it does not state that she complained to him *about discrimination.*" *Id.* Instead, plaintiff only stated in her EEOC Charge that she discussed the alleged discriminator's "hostile attitude" with his supervisor, and never stated whether the alleged discriminator was aware that plaintiff had complained to his supervisor. *Id.* Therefore, these statements failed to show that the alleged discriminator "was motivated by a retaliatory impulse." *Id.* Summarizing its conclusion, the court explained that the plaintiff's "charge does not remotely allege that [the alleged discriminator] retaliated against [plaintiff] because he had complained of his discriminatory conduct to his supervisor, and it does not otherwise allege facts that would have put [defendant] or the EEOC on notice that she was charging [defendant] with retaliation." *Id.*

Here, Plaintiff similarly did not check the retaliation box on her EEOC Charge form:



(ECF No. 23-1 at 2.) Further, Plaintiff's narrative in her EEOC Charge does not mention the word retaliation, nor does it allege facts that amount to a retaliation allegation.[1] (ECF No. 23-1 at 3–13.) Plaintiff alleges in her EEOC Charge that a colleague overheard — and later reported to their supervisor — Plaintiff telling a former student that she felt her removal from the project "was because she is African American." (*Id.* at 3.) Plaintiff did not subsequently allege that any of the disciplinary actions taken against her were connected to this allegation or "motivated by a retaliatory impulse." *Miles*, 429 F.3d at 491-92. Instead, Plaintiff alleges only discrimination and hostile work environment. (ECF No. 23-1 at 3–13.) But like *Miles*, alleging discrimination alone is insufficient to adequately exhaust a retaliation claim. *Miles*, 429 F.3d at 491-92. As a result, the Court finds that Plaintiff's retaliation claim does not reasonably relate to her EEOC Charge such that it would have reasonably followed from an investigation of Plaintiff's sex discrimination and hostile work environment claims. As a result, the Court

lacks subject matter jurisdiction over Plaintiff's retaliation claim. Therefore, the Court DISMISSES Count II of Plaintiff's Amended Complaint (ECF No. 16).

[1]    The Court notes that Plaintiff had the assistance of counsel when filing her EEOC Charge. (ECF No. 23-1 at 2.) As a result, the Court need not "liberally" construe Plaintiff's Charge, as it would have had Plaintiff lacked representation. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

### B. Failure to State a Claim

#### 1. Count I — Title VII Disparate Treatment

Title VII protects those in a protected class from overt discrimination, known as disparate treatment discrimination. Plaintiffs have two available avenues to establish liability under Title VII for this type of claim: (1) "demonstrate through direct or circumstantial evidence that [race] was a motivating factor in the employer's adverse employment action"; or (2) use the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017). Here, Plaintiff omits argument related to the direct and circumstantial evidence approach; therefore, the Court proceeds by assuming that Plaintiff cannot demonstrate disparate treatment through that approach.[2]

[2]    Even still, the Court finds that Plaintiff failed to plead sufficiently direct or circumstantial evidence to support an inference that race served as a motivating factor in the adverse employment actions that she pleads. Plaintiff's only mention of race as it relates to her alleged adverse employment actions is that she "mentioned to a former student when she was informed of her removal, [that] she was being removed because she is African American." (FAC ¶ 87.) Further, Plaintiff asserts that when a colleague called her behavior threatening, he "perpetuat[ed] a stereotyped belief that African American women who raise their voices are 'Angry Black Women' and are acting in a threatening manner." (*Id.* ¶ 88.) These do not constitute direct or circumstantial evidence that Defendant discriminated against Plaintiff on the basis of her

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

race. Instead, these simply amount to Plaintiff's own characterizations of a workplace decision and interaction.

**\*7** To establish a claim under *McDonnell Douglas*, a plaintiff must put forth a prima facie case of discrimination by establishing: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Adams v. Trs. of the Univ. of N. C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). The fourth element is met if "similarly-situated employees outside the protected class received more favorable treatment." *Swain*, 698 F. App'x at 747 (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). And while a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint remains subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*. *Id.*

Under Count I, the parties omitted briefing on prong one (membership in a protected class). Thus, the Court reviews only prongs two, three and four. For prong two, Plaintiff asserts that she performed her duties satisfactorily. (FAC ¶ 127.) As for prongs three and four, Plaintiff alleges that Defendant's discrimination (prong four) resulted in five adverse employment actions against her (prong three). The Court will begin by addressing the alleged adverse employment actions (prong three) before turning to prongs two and four.

### a. Adverse Employment Actions Under Title VII

A Title VII claim requires that a plaintiff experience an adverse employment action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Termination constitutes the typical adverse employment action predicating a Title VII claim. However, actions short of termination can constitute an adverse employment action in a Title VII claim for disparate treatment, the type of claim that Plaintiff brings in Count I, under certain circumstances. To rise to the level of an adverse employment action absent termination, the misconduct must be more than something that offends the employee, and instead must materially alter "the terms, conditions, or benefits" of the plaintiff's employment. *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001). But the Supreme Court recently held in *Muldrow*

*v. City of St. Louis, Missouri* that a plaintiff alleging workplace discrimination need not establish that she suffered a "*significant* employment disadvantage." 144 S. Ct. at 976–77. Instead, a plaintiff need only show that she suffered "some injury." *Id.*

Plaintiff alleges that she suffered the following adverse employment actions: (1) placement on administrative leave; (2) a Letter of Reprimand; (3) the amendment to her Employee Work Profile ("EWP"); (4) losing her "responsibilities relating to projects she had been successfully working on;" and (5) having "to take on additional responsibilities by teaching the SDV course." (FAC ¶¶ 94–95.) The Court will address each in turn.

#### i. Administrative Leave

Plaintiff alleges that when Defendant placed her on administrative leave, it denied her "the benefits that other staff members received during this time period, including a bonus." (FAC ¶ 47.) As a result, Plaintiff argues that her placement on administrative leave constituted an adverse employment action. (Opp. at 6.) Defendant disagrees, arguing that "paid administrative leave does not constitute an adverse employment action in the discrimination context." (ECF No. 36 ("Rep.") at 5.)

Courts in the Fourth Circuit have held that placement on administrative leave with pay does not constitute an adverse employment action. *See Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (finding that administrative leave with pay for a short time to allow investigation of the matter did not constitute an adverse employment action); *Sturdivant v. Geren*, 2009 WL 4030738, at \*6 (E.D. Va. Nov. 19, 2009), *aff'd sub nom. Sturdivant v. McHugh*, 450 F. App'x 235 (4th Cir. 2010) (holding a 90-day paid administrative leave did not constitute an adverse employment action as required for a claim of discrimination or retaliation); *Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 632 (W.D. Va. 2023) (finding that paid administrative leave did not constitute an adverse employment action); *Williams v. Newport News Sch. Bd*, 2021 WL 3674983, at \*10 (E.D. Va. Aug. 19, 2021) (finding that because it remained unclear on the facts whether plaintiff's administrative leave was paid, plaintiff's administrative leave "plausibly implicate[d] a significant detrimental effect so as to constitute an adverse employment action").

**\*8** Plaintiff seeks to skirt this precedent by alleging that

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

that her placement on paid administrative leave deprived her of a bonus that other employees received while she was out, and therefore constitutes an adverse employment action as a "decrease in ... benefits." (FAC ¶ 47; Opp. at 7.) However, courts in the Fourth Circuit have held that the denial of a discretionary bonus does not constitute an adverse employment action. *See Smith v. Virginia Hous. Dev. Auth.*, 437 F. Supp. 3d 486, 510 (E.D. Va. 2020) (finding that the denial of a discretionary bonus was not an adverse employment action); *Harris v. The Vanguard Group, Inc.*, 2015 WL 9685565, at *3 (W.D.N.C. Nov. 6, 2015), *report & recommendation adopted at 2016 WL 110600*; *aff'd 667 F. App'x 815 (4th Cir. 2016)* (holding same); *Nasis-Parsons v. Wayne*, 2006 WL 1555913, at *5 (E.D. Va. June 1, 2006), *aff'd sub nom. Parsons v. Wynne*, 221 F. App'x 197 (4th Cir. 2007) (holding that "the loss of a discretionary or gratuitous bonus does not have a tangible effect on the terms or conditions of employment when the employee is not automatically entitled to her bonus.")

As a result, the Court finds that Defendant placing Plaintiff on paid administrative leave — causing Plaintiff to miss out on a potential, discretionary bonus — does not constitute an adverse employment action for purposes of a Title VII discrimination claim.

### ii. Letter of Reprimand

Next, Plaintiff contends that the July 11, 2022 Letter of Reprimand that she received from Dr. Mucci constituted an adverse employment action, because it "resulted in not only her emotional distress, but in the loss of career path opportunities." (FAC ¶¶ 112-13; Opp. at 7.) Defendant disagrees, arguing that the Letter of Reprimand "was not an adverse employment action because [Plaintiff] does not allege to have suffered any adverse effect from it." (Mem. Supp. at 13.)

Courts in the Fourth Circuit have held that a letter of reprimand does not constitute an adverse employment action for purposes of a discrimination claim unless the reprimand was tethered to an adverse impact on the terms and conditions of the plaintiff's employment. *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 819–20 (E.D. Va. 2016) (holding that "neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action"); *Lee v. Virginia Beach Sheriff's Off.*, 2014 WL 1493560, at *7 (E.D. Va. Apr. 14, 2014) (citing

*Plateau v. South Carolina Comm'n for the Blind*, 50 Fed. Appx. 653, 655 (4th Cir. 2002)) (holding that "[e]ven if Plaintiff had received a written reprimand, such a written reprimand is not an adverse employment action within the scope of Title VII, unless it was 'used as a basis to detrimentally alter the terms and conditions of the recipient's employment' ").

While Plaintiff alleges that the Letter of Reprimand caused her "emotional distress" and "the loss of career path opportunities," neither of these allegations show that the Letter or Reprimand detrimentally altered the terms and conditions of Plaintiff's employment. (FAC ¶¶ 112-13; Opp. at 7.) First, emotional distress does not plausibly impact the terms and conditions of one's employment. Second, Plaintiff alleges that the Letter of Reprimand caused her to lose "career path opportunities." However, she cites no specific opportunities that she lost as a result of the letter that detrimentally altered the terms of her employment.[3] As a result, because Plaintiff's Amended Complaint offers no factual basis for this allegation, the allegation is conclusory and the Court affords it no weight in the motion-to-dismiss analysis under *Iqbal.* 129 S. Ct. at 1949. As such, the Letter or Reprimand did not constitute an adverse employment action for purposes of a Title VII discrimination claim.

[3]    Further, *Muldrow* does not save Plaintiff's allegation. While *Muldrow* expanded the scope of what qualifies as an adverse employment action such that a plaintiff need not prove their adverse employment action was "significant," a plaintiff must still plead particular facts to support their allegations. *Muldrow*, 601 U.S. at 354–55.

### iii. Amendment to Plaintiff's Employee Work Profile

**\*9** Plaintiff alleges that Defendant "effectively demoted [her] when she was issued her Employee Work Plan (EWP) in or around Fall 2022, and it reflected duties that were usually performed by a Specialized Program Coach, rather than a Coordinator." (FAC ¶ 81.) As a result, Plaintiff asserts that the amendment to her EWP constituted an adverse employment action. (*Id.* ¶ 95.) Defendant disagrees, arguing that Plaintiff "states no facts to explain how being required to perform duties usually performed by a Specialized Program Coach – without any resulting change in job title, pay, supervisory authority, or promotional opportunity – constitutes a 'demotion.' " (Mem. Supp. at 14.)

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

The Fourth Circuit has held that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256– 57 (4th Cir. 1999); *see also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (holding that "[t]he mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action"); *Von Gunten v. Maryland*, 243 F.3d 858, 868 (4th Cir. 2001) (holding same).

But the Supreme Court's recent decision in *Muldrow* abrogated Fourth Circuit decisions on the issue of what constitutes a sufficient change in employment terms or conditions. 601 U.S. at 355. Expanding the scope of what qualifies, Justice Kagan wrote that in the context of a discrimination claim "[an employee] must show *some* harm respecting an identifiable term or condition of employment." *Id.* at 354-55 (emphasis added). However, she does "not have to show ... that the harm incurred was significant. Or serious, or substantial or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355. Moreover, "[t]he terms or conditions phrase ... is not used in the narrow contractual sense; it covers more than the economic or tangible." *Id.* While the full impact of *Muldrow* on Fourth Circuit precedent remains uncertain, the Supreme Court definitively lowered the bar as to what qualifies as an adverse employment action for purposes of a Title VII claim.

In considering whether Plaintiff meets this standard, the Court looks to the facts of *Muldrow*, where plaintiff's rank and pay remained the same, but the Supreme Court found, based on the allegations below, that she had sufficiently pleaded injury:

> [Plaintiff] was moved from a plainclothes job in a prestigious specialized division giving her substantial responsibility over priority investigations and frequent opportunity to work with police commanders. She was moved to a uniformed job supervising one district's patrol officers, in which she was less involved in high-visibility matters and primarily performed administrative work. Her schedule became less

regular, often requiring her to work weekends; and she lost her take-home car.

*Id.* at 359. While the *Muldrow* Court concluded that the plaintiff met the "some injury" requirement "with room to spare," *Muldrow's* lower standard does not relieve a plaintiff of the responsibility to plead particularized facts with respect to an injury. And here, Plaintiff fails to plead any concrete harm that she suffered from Defendant amending her EWP, let alone a remotely comparable injury to that pled in *Muldrow*. 601 U.S. at 359.

Plaintiff alleges that she proved "effectively demoted" when issued a new EWP that "reflected duties that were usually performed by a Specialized Program Coach, rather than a Coordinator." (FAC ¶ 81.) Plaintiff further alleges that a colleague informed her that her managers "did not want [her] to go out and set up programs," something that is "the core responsibility of her position as Coordinator of Specialized Programs." (*Id.* ¶ 68; Opp. at 2.) But it is entirely unclear to the Court the extent to which a Coordinator and Coach differ, let alone any injury Plaintiff suffered as a result. This is unlike *Muldrow*, where the plaintiff pleaded that the injuries that she suffered after being transferred to a new position included, among other things, losing her take-home police car, working on weekends, performing primarily administrative work, and decreased supervisory responsibility. 601 U.S. at 359. Plaintiff, on the other hand, does not allege that she was transferred to a new role, just that she believed she was "effectively demoted." This allegation, based entirely off Plaintiff's own characterizations, is conclusory, and therefore afforded no weight at the motion-to-dismiss stage. As a result, Plaintiff failed to plead that she suffered harm respecting an identifiable term or condition of her employment when Defendant amended her EWP. Thus, Defendant's amendment of Plaintiff's EWP does not constitute an adverse employment action under Title VII.

### iv. "Stripping" Plaintiff of Responsibilities

**\*10** Plaintiff alleges that Defendant "stripp[ed] [Plaintiff] of responsibilities relating to projects she had been successfully working on." (FAC ¶ 105.) These responsibilities include serving on the Conference for Hispanic Students planning team and attending meetings with the Arlington County Sheriff's Office. (*Id.* ¶¶ 19, 65.) Plaintiff argues that this "stripping [ ] of

2025 WL 27827

responsibilities ... constitute[s] [an] adverse employment action." (*Id.* ¶ 105.) Defendant presumably disagrees but offers no argument as to why removing Plaintiff from the Conference for Hispanic Students planning team and from meetings with the Arlington County Sheriff's Office do not constitute adverse employment actions. As a result, the Court considers this issue conceded.

### v. Additional Responsibilities

Plaintiff alleges that when Defendant permitted her to return to work, it "subjected her to additional requirements," which included teaching a "Student Development (SDV)" and be present on NOVA's campus five days per week. (*Id.* ¶¶ 93, 100.) Plaintiff had never been required to teach an SDV course as a Specialized Programs Coordinator. (*Id.* ¶ 104.) Further, "for the past ten to fifteen years, [plaintiff] had only been required to work on campus four days per week." (*Id.* ¶ 101.) Defendant disagrees that these additional requirements constitute an adverse employment action, arguing that Plaintiff never actually taught the SDV course and that Plaintiff failed to adequately allege that working five days per week in office was an adverse employment action. (Mem. Supp. at 11, 16.)

First, the Court agrees with Defendant that Plaintiff's Amended Complaint asserts that she did not, in fact, teach the SDV course. Instead, Plaintiff "under[took] her own efforts to ensure that students were assigned to other SDV courses." (FAC ¶ 80.) As a result, no adverse employment action occurred. Second, the Court finds that Plaintiff adequately pleaded facts to assert that being required to work in-office five days a week, as opposed to four, was an adverse employment action. Dictating where one can work is a condition of employment. And because Defendant changed Plaintiff's in-office work requirement, this qualifies as an adverse employment condition.[4]

[4]     Defendant notes in their Motion to Dismiss that Plaintiff "mischaracterize[d]" the directive that Plaintiff work in-office five days per week. (Mem. Opp. at 5.) Instead, they argue that Dr. Mucci's new requirement was that Plaintiff work five days a week *anywhere*, because at the time, Plaintiff was only working four days per week. (*Id.*) At this stage, the Court will resolve all factual disputes in the Plaintiff's favor.

### b. Inference of Unlawful Discrimination

"A plaintiff is not required to identify a similarly situated white comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through other means." *Swaso*, 698 F. App'x at 748 (citation omitted). Instead, the Court "may infer discriminatory intent from evidence of a general pattern of racial discrimination in the practices of a defendant." *Id.* (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017)). Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, however, "[t]he similarity between comparators ... must be clearly established in order to be meaningful." *Swaso*, 698 F. App'x at 748 (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)).

Because the Court determined above that placement on paid administrative leave, the Letter of Reprimand, amending Plaintiff's EWP and teaching an SDV course do not qualify as adverse employment actions, the Court will only examine whether the remaining adverse employment actions are tethered to an inference of unlawful discrimination, as required under prong four of a disparate treatment allegation under Title VII. The remaining adverse employment actions are: (1) "stripping" Plaintiff of responsibilities and (2) requiring that Plaintiff work in-office five days per week.

### ii. Inference of Discrimination in Removing Responsibilities

**\*11** Plaintiff alleges comparator evidence to support an inference of discrimination when Defendant removed Plaintiff from the Conference project and from a meeting with the Arlington County Sheriff's Office. Specifically, Plaintiff asserts that "on information and belief, [Defendant] has not removed job assignments from non-African American faculty members who have been similarly successfully performing [their] assignments." (*Id.* ¶ 67.) Further, Plaintiff alleges that she "was the only African American on the Conference Committee and the only committee member removed from the Conference project for doing something she was expressly permitted to do by [Dr.] Mucci." (*Id.* ¶¶ 32, 86.) Defendant argues that Plaintiff's allegations lack the necessary facts to adequately establish a reliable comparator and therefore fail to satisfy the fourth prong of a prima facie case. (Mem. Supp. at 15.)

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

When a plaintiff chooses to rely on comparator evidence to satisfy prong four, such evidence must be "clearly established in order to be meaningful." *Swaso*, 698 F. App'x at 748 (citation omitted). "Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* (citing *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)). In *Swaso*, the plaintiff "alleged that, unlike her, some white teachers were permitted to return to work with more severe restrictions or medical conditions, and that some white employees were permitted to return with similar standing restrictions." *Id.* But the Fourth Circuit agreed with the district court that these "bare allegations" failed to suffice. *Id.* Specifically, plaintiff "failed to provide any factual enhancement regarding the alleged comparators—such as the medical conditions or restrictions of the white teachers who were allowed to return, or the positions or job requirements of those employees allowed to return with standing restrictions—that would permit the court to reasonably infer their similarity." *Id.* at 749. As a result, the court found that "[a]bsent further factual development, [plaintiff] falls short of alleging facts from which to reasonably infer that their difference in treatment was attributable to racial discrimination." *Id.*

Here, Plaintiff encounters the same problem. While she alleges that she "was the only African American staff member assigned to the Conference Project," (FAC ¶¶ 23, 32), and that "[n]one of the non-African American committee members suffered any adverse employment action for doing something they had been given permission to do," (FAC ¶ 32), Plaintiff assertions amount to nothing more than "bare allegations." *Swaso*, 698 F. App'x at 748. Like *Swaso*, Plaintiff failed to provide "factual enhancements" regarding her alleged comparators (i.e., the tasks that they were given permission to do, the parameters planning committee members were given and the like) that would permit the Court to infer their similarity. *Id.* at 749. Further, Plaintiff's allegation that Defendant removed her from the project "because she is African American" is conclusory and does not salvage her comparator evidence. As a result, Plaintiff failed to adequately plead non-conclusory facts that support an inference of discrimination when Defendant removed her from the Conference project and meeting with the Arlington County Sheriff's Office.

### iii. Inference of Discrimination in 5-Days In-Office

### Policy

Finally, Plaintiff alleges that the circumstances surrounding Defendant's requirement that she work five days in the office supports an inference of discrimination because "[Dr.] Mucci did not similarly require any of [Plaintiff's] colleagues who are not African American to adhere to the five-day-per-week on-campus requirement." (FAC ¶¶ 64, 104.) Defendant argues that Plaintiff again fails to adequately plead facts that support an inference of racial discrimination when Defendant required that she work five days per week. (Mem. Supp. at 11–12.)

**\*12** As described above, a plaintiff utilizing comparator evidence to establish the fourth prong of a prima facie case must plead "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Swaso*, 698 F. App'x at 748 (citation omitted). But here, Plaintiff fails to plead any facts past the conclusory statement that no other non-African American employees had to work five days per week in the office. (FAC ¶¶ 64, 104.) Plaintiff failed to even name a single similarly-situated colleague who was not required to work in office five days per week. Further, under the "general pattern of racial discrimination" standard, Plaintiff would again fail, because she pleads no such pattern. *Swaso*, 698 F. App'x at 748 (citation omitted). As a result, Plaintiff failed to plead non-conclusory facts to support an inference of discrimination as it relates to the requirement that she work in the office five days per week.

### c. Satisfactory Job Performance

Because the Court determined above that Plaintiff's adverse employment actions do not give rise to an inference of discrimination, Plaintiff's discrimination claims fail. As a result, the Court need not analyze the satisfactory job performance prong of Plaintiff's claim.

### d. Conclusion on Count I

In conclusion, Plaintiff failed to plead that any of her adverse employment actions give rise to an inference of discrimination. Instead, Plaintiff simply disagrees with how she was managed. But "mere disagreement 'with the management style or decisions of [supervisors] ... is not

Credle v. Virginia Community College System, Slip Copy (2025)

2025 WL 27827

actionable under Title VII.' " *Thorn v. Sebelius*, 766 F.Supp. 2d 585, 601 (D. Md. 2011), *aff'd*, 465 Fed.Appx. 274 (4th Cir. 2012) (citing *Webster v. Johnson*, 126 Fed. Appx. 583, 588 (4th Cir. 2005) (noting that sten supervision does not evidence actionable harassment)). As a result, Plaintiff's disparate treatment allegations fail to state a plausible claim upon which the Court could grant relief. Thus, the Court DISMISSES Count I of Plaintiff's Amended Complaint (ECF No. 16).

**2. Count III — Hostile Work Environment in Violation of Title VII**

"A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Thus, to prevail on a Title VII claim that a workplace is racially hostile, 'a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's ... race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)).

The Fourth Circuit elaborated on what satisfies the hostile work environment test, noting that "[w]hile this standard surely prohibits an employment atmosphere that is 'permeated with discriminatory intimidation, ridicule, and insult," ' (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), "it is equally clear that Title VII does not establish a 'general civility code for the American workplace.' " *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "This is because, in order to be actionable, the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.' " *E.E.O.C.*, 521 F.3d at 315 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Instead, " 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *E.E.O.C.*, 521 F.3d at 315 (quoting *Faragher*, 524 U.S. at 788).

*13 Plaintiff alleges that Defendant harassed her through the following: "(1)remov[ing] [her] from the Conference Project; (2) false accusations of threatening behavior; (3) an unwarranted suspension that did not comply with [Defendant's] policy; (4) a letter of reprimand that similarly did not comply with [Defendant's] policy; (5) removal of duties that she had been satisfactorily performing; (6) requir[ing] [her] to work on campus five days a week, which had never been a prior requirement and was not required of other[ ] non-African American employees; (7) assign[ing] [her] to teach an SDV course, despite her medical conditions limiting her ability to perform this duty, which forced [Plaintiff] to undertake her own efforts to ensure that students were assigned to other SDV courses; [and] (8) effectively demoting her via her EWP and revising her duties to reflect a lesser role." (FAC ¶ 127.) Plaintiff further alleges more generally that her "supervisors engaged in demeaning and hostile conduct towards [her] during the course of her employment with Defendant." (*Id.* ¶ 128.) Defendant disagrees, arguing that Plaintiff failed to "allege[ ] [ ] racially offensive or insulting remarks, comments, or other actions" to satisfy a hostile work environment claim. (Mem. Opp. at 21.) Defendant further contends that what Plaintiff calls harassment constitutes mere disagreement with her supervisors. (*Id.*)

With this "high bar" in mind, the Court finds that Plaintiff failed to plead conduct that could even conceivably rise to the level of harassment. *E.E.O.C.*, 521 F.3d at 315. Plaintiff clearly takes issue with the decisions that her superiors made to remove her from projects and assign additional responsibilities. But "a routine difference of opinion and personality conflict with [one's] supervisor [is] not actionable under Title VII." *E.E.O.C.*, 521 F.3d at 315-16 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)). Further, none of Plaintiff's harassment allegations connect to her race. Instead, Plaintiff offers only the conclusory allegation that she was "subjected to hostile work environment harassment on the basis of her race." (FAC ¶ 130.) But this alone will not satisfy the standard that a workplace "environment [be] reasonably [ ] perceived ... as hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

Plaintiff injects her race into these workplace disagreements by arguing that Defendant's "false accusations of [Plaintiff's] threatening behavior" perpetuated the "Angry Black Woman" stereotype. (FAC ¶¶ 3, 127.) But this constitutes Plaintiff's evaluation of an altercation, and not a statement that Defendant's employee made. As such, this allegation is conclusory and therefore given no weight at the motion-to-dismiss stage. Plaintiff further disagrees with how she was managed. But neither rude treatment nor callous behavior by a supervisor will satisfy the Title VII workplace harassment

**Credle v. Virginia Community College System, Slip Copy (2025)**

2025 WL 27827

standard. *See Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006) (holding that "complaints premised on nothing more than 'rude treatment by [coworkers]' are not actionable under Title VII); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (holding that "callous behavior by [one's] superiors" is not actionable under Title VII). As a result, the Court finds that Plaintiff's hostile workplace allegations are entirely conclusory and do not rise to the requisite level of hostility. Thus, the Court DISMISSES Count III of Plaintiff's Amended Complaint (ECF No. 16).

**C. Motion to Strike**

Finally, Defendant moves to strike portions of Plaintiff's Amended Complaint as "immaterial, impertinent and scandalous allegations." (Mem. Supp. at 22.) Though because the Court granted Defendant's Motion to Dismiss and subsequently dismissed all Counts, the Court need not consider Defendant's Motion to Strike. Thus, the Court DENIES AS MOOT Defendant's Motion to Strike. (ECF No. 22.)

**IV. CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendant's Motion to Dismiss. (ECF No. 21.) Further, the Court DENIES AS MOOT Defendant's Motion to Strike. (ECF No. 22.) As a result, Counts I, II and III of Plaintiff's Amended Complaint (ECF No. 16) are hereby DISMISSED.

An appropriate Order shall issue.

**All Citations**

Slip Copy, 2025 WL 27827

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

2025 WL 1000666
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Kenneth Duronn WILSON, Plaintiff,
v.
Kristi NOEM, Defendant.[1]

[1]     Secretary of Homeland Security Kristi Noem
        is substituted as Defendant pursuant to Rule
        25(d) of the Federal Rules of Civil Procedure.

Case No. 20-cv-100 (GMH)
|
Signed April 3, 2025

**Attorneys and Law Firms**

George A. Rose, Tully Rinckey PLLC, Washington, DC, for Plaintiff.

Kenneth Duronn Wilson, Austin, TX, Pro Se.

**MEMORANDUM OPINION AND ORDER**

G. MICHAEL HARVEY, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Kenneth Duronn Wilson alleges that he was discriminated against on the basis of race and gender and retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., and other federal statutes during his approximately ten-year tenure at the Federal Emergency Management Agency ("FEMA"), a component of the Department of Homeland Security.[2] Defendant[3] has filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which Plaintiff largely opposes (although he concedes some points as discussed below).[4] For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART.

[2]     As discussed below in Section I.B.2, many of the
        claims included in the Complaint have already
        been dismissed. See Wilson v. Wolf, No.
        20-cv-100, 2021 WL 230136, at \*8 (D.D.C. Jan.
        22, 2021).

[3]     Because "[a]n official-capacity suit against an
        agency or agent of the federal government is the
        equivalent of a suit against the United States of
        America[,]" Davis v. Mukasey, 669 F. Supp. 2d
        45, 49 (D.D.C. 2009), the Court sometimes refers
        to Defendant as "the government."

[4]     The following docket entries are relevant to this
        Memorandum Opinion: (1) Defendant's Motion
        for Summary Judgment, including its Statement
        of Material Facts not in Genuine Dispute
        ("Defendant's Statement of Undisputed Facts")
        and other exhibits, ECF Nos. 45 through 45-49;
        (2) Plaintiff's Opposition, including his Statement
        of Material Facts and other exhibits, ECF Nos. 49
        through 49-21; (3) Defendant's Reply, including
        its Response to Plaintiff's Statement of Material
        Facts and other exhibits, ECF Nos. 59 through
        59-6. Page numbers cited herein are those
        assigned by the Court's CM/ECF system.
        Plaintiff was represented by counsel from the
        inception of this case through the briefing on the
        motion for summary judgment. Approximately
        two months after that briefing was completed, the
        Court granted Plaintiff's counsel's motion to
        withdraw, and Plaintiff now proceeds pro se. See
        ECF No. 60; Minute Order (June 28, 2024).

**I. BACKGROUND**

Plaintiff's claims of discrimination and retaliation focus on thirteen allegedly adverse employment actions. Four of those occurred between October 2011 and May 2014, when he was working as a Reservist at FEMA: (1) on October 7, 2011, Plaintiff was transferred from the Hewlett, New York Operations Field Office ("Hewlett Field Office") on Long Island, New York, to the Kirkwood, New York Operations Field Office ("Kirkwood Field Office") in Binghamton, New York; (2) on January 3, 2012, Plaintiff was designated a Trainee for the position of Logistics System Specialist, allegedly a demotion from his prior position as Logistics Manager; (3) on February 17, 2012, Plaintiff was demobilized from

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

the Kirkwood Field Office; and (4) on May 5, 2014, FEMA rescinded a job offer to Plaintiff for the position of Logistics Management Specialist. The remaining ten actions occurred between March 2015 and May 2016, when Plaintiff was employed as a Support Branch Director as part of FEMA's Cadre On-Call Response/Recovery ("CORE") program: (5) in March 2015, Plaintiff's supervisor twice denied his requests to telework; (6) on June 11, 2015, Plaintiff's supervisor issued Plaintiff a letter of reprimand; (7) in September and October 2015, Plaintiff's supervisors twice disallowed Plaintiff from using a FEMA-issued credit card he had been issued to make work-related purchases; (8) in September 2015 and March 2016, supervisors denied Plaintiff's request to become a "Disaster Alternative Approving Official,"[5] although Plaintiff had completed the required training for that position; (9) supervisors did not delegate authority for Plaintiff to sign his staff's time cards and travel vouchers; (10) supervisors denied Plaintiff the opportunity to sign off on his staff's Position Task Books;[6] (11) on February 19, 2016, Plaintiff received an unfair performance rating;(12) in 2015 through2016, on a deployment to Jefferson City, Missouri, supervisors denied Plaintiff access to a coach evaluator who could sign off on his Position Task Book; and (13) on May 20, 2016, Plaintiff was terminated from his position.[7]

[5]    It appears from the record that a Disaster Alternative Approving Official "authorize[s] the acquisition, receipt, and payment for goods and services during a disaster response." ECF No. 45-43 at 3.

[6]    Position Task Books are issued to FEMA trainees and include tasks related to a trainee's job qualifications. See ECF No. 45-2, ¶¶ 65, 67.

[7]    Plaintiff's Complaint includes allegations that Plaintiff's supervisor ordered Plaintiff alone to lift equipment that required two people to lift and refused to approve Plaintiff's request to attend a FEMA training course. See ECF No. 1, ¶¶ 56–57. The record also includes allegations that Plaintiff was improperly ordered by his supervisor to bring in equipment that was assigned to his office for inventory and inspection, see ECF No. 45-6 at 15, and to demobilize from a deployment in Jefferson City, Missouri, and return to Kansas City, Missouri, on April 1, 2016, see ECF No. 45-17 at 14. Defendant's opening brief argues that the

order to lift equipment, the order to bring in equipment, and the denial of training were not adverse employment actions (and indeed that Plaintiff's request to attend the training was not denied, but approved); that any claim based on the order to lift equipment is unexhausted; and that Plaintiff cannot establish that discrimination or retaliation motivated any of the alleged conduct. See ECF No. 45-1 at 36–41, 43–44, 49–51. Plaintiff's opposition does not counter any of those arguments. See generally ECF No. 49-1; see also ECF No. 59 at 13–14, 34 (noting that Plaintiff does not address Defendant's arguments as to those actions). "It is well understood in this Circuit that when a plaintiff files an opposition ... addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997)); *see also, e.g.*, *Saleh v. Mayorkas*, No. 23-cv-409, 2024 WL 3400261, at *3 (D.D.C. July 12, 2024) (treating an argument raised in the defendant's dispositive motion as conceded where the plaintiff "opted not to respond to [the] argument"); *Williams v. Savage*, 569 F. Supp. 2d 99, 107 (D.D.C. 2008) (finding that, where plaintiffs "demonstrate[d] that they knew of their right to respond to the defendants' arguments" by filing an opposition to a dispositive motion but "chose not to" address those arguments, "[i]t is a concession of the point"). Such a rule is consistent with the "principle of party presentation," by which courts "rely on the parties to frame the issues for decision" and assume that "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)). The Court therefore deems Defendant's arguments that it is entitled to summary judgment as to those four actions conceded and does not address them further here.

**\*2** Plaintiff filed a complaint with FEMA's Office of Equal Rights[8] on January 18, 2012, which was amended on March 23, 2012 (the "First EEO Complaint"). *See generally* ECF No. 59-3. He filed another complaint with the Office of Equal Rights on September 18, 2015, which was amended multiple times (the "Second EEO

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Complaint"). *See generally* ECF No. 45-6.

[8]  An affidavit from that office's director identifies it as the "Office of Equal Rights" or "OER." ECF No. 45-3 at 1. Defendant, on the other hand, refers to an "Equal Rights Office" or "ERO." *See, e.g.*, ECF No. 59-1 at 9. The Court assumes the offices are the same.

## A. Factual Background[9]

[9]  The requirements for summary judgment briefing are set out in Rule 56, this district's Local Civil Rule 7(h), and this Court's Procedures and Scheduling Order filed at ECF No. 22. Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support the assertion" either by citing "particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may "consider the fact undisputed for the purposes of the motion" and "grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e). This district's Local Civil Rule 7(h)(1) provides that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h)(1). Oppositions are to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." *Id.* Further, "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* The undersigned's Procedures and Scheduling Order cautions that this Court "strictly adheres to the dictates of Local Civil Rule 7(h)" and additionally requires the party opposing summary judgment to "file a separate document" responding to each paragraph of the movant's statement of undisputed material facts "with a correspondingly-numbered paragraph indicating whether that paragraph is admitted or denied." ECF No. 22 at 3. That order also provides, like Local Civil Rule 7(h)(1), "[t]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such facts are controverted in the statement filed in opposition to the motion." *Id.*

The government filed a Statement of Undisputed Facts that complies with Rule 56(c), Local Civil Rule 7(h), and this Court's Scheduling and Procedures Order. *See* ECF No. 45-2. Plaintiff, however, did not respond to that filing as required by those rules and that Order. Instead, he filed a document entitled "Plaintiff's Statement of Material Facts" that purports to set forth "material facts as to which there is a genuine dispute" but also includes some facts that are undisputed. *See generally* ECF No. 49-2. That document fails to address the facts that Defendant asserts are undisputed. *See id.* In accordance with the Federal Rules of Civil Procedure, the Local Civil Rules, the Scheduling and Procedures Order, and prior precedent, the Court deems the properly supported assertions of fact contained in Defendant's Statement of Undisputed Facts to be admitted. *See, e.g.*, *Booker v. D.C. Gov't*, No. 19-cv-2639, 2023 WL 4156684, at *1 n.3 (D.D.C. June 23, 2023); *Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (noting that, if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court should treat the movant's "factual assertions [that] are properly supported by the record ... as admitted").

As to Plaintiff's Statement of Material Facts, in many cases it attempts to support its assertions with citations to pages in exhibits—most often to Exhibit 1 to his Opposition, which is an affidavit by Plaintiff created on December 3, 2023, after the Motion for Summary Judgment was filed, *see* ECF No. 49-3 (the "December 2023 Wilson Affidavit")—that do not support the facts alleged. Defendant often responds by stating, "This statement is unsupported by the record cited. Thus, the Court need not consider it for purposes of determining whether Defendant's Statements are contested"—without controverting or otherwise challenging the fact alleged. *E.g.*, ECF

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

No. 59-1 at 6 (emphasis omitted). Although the
D.C. Circuit acknowledges that when a party fails
to properly support a fact at the summary
judgment stage, "the district court is under no
obligation to sift through the record" to find such
support, *Jimenez v. Mayorkas*, No. 21-5193, 2023
WL 2607385, at *2 n.2 (D.C. Cir. Mar. 23, 2023)
(quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602,
616 (D.C. Cir. 2000)), in some instances support
for the fact alleged by Plaintiff is readily
discernable from a quick review of some other
page in the thirteen-page affidavit. In those cases,
provided the fact alleged by Plaintiff is not
directly contradicted by the facts deemed
admitted in Defendant's Statement of Undisputed
Facts and is either material to the issues to be
decided or provides useful context, the Court has
included those assertions this section and cites the
record supporting them. The Court declines
Defendant's invitation to strike Plaintiff's
Statement of Material Facts for failure to comply
with the Local Civil Rules. *See* ECF No. 59 at 10.
For an exploration of the difficulties presented by
the citations in Plaintiff's opposition brief, see
note 52, *infra*.

1. Plaintiffs' Tenure as a Reservist—September 2006 to
June 2014

**\*3** Plaintiff is an African American[10] male who worked at
FEMA as a Reservist assigned to the Logistics Cadre
from September 27, 2006, to June 24, 2014. ECF No.
45-2, ¶ 13. Reservists are hired for appointments of up to
24 months to work "as required in support of disaster
operations," although a Reservist's appointment can be
terminated "at any time prior to the not-to-exceed date[ ]
based on performance, conduct, or mission-related
needs." *Id.*, ¶¶ 1–3, 5. Reservists are paid only when they
are "activated, called-up, deployed, or mobilized to an
appointment"; Plaintiff's deployments as a Reservist
"typically lasted from two to seven months." *Id.*, ¶¶ 4, 6.

[10]    Throughout the briefing, the parties use the
        descriptors "African American" and "Caucasian."
        The Court therefore adopts that usage.

*a. Deployment in Region 2*[11]*—August 2011 to February
2012*

[11]    FEMA "consists of ten regions in the continental
        United States and territories." *Regions, States and
        Territories*,    FEMA    (Aug.    29,    2022),
        https://www.fema.gov/about/organization/regions
        [https://perma.cc/8Z48-9ZAP]. Region 2, which is
        headquartered in New York City, includes New
        Jersey, New York, Puerto Rico, and the U.S.
        Virgin Islands. *Region 2*, FEMA (Jan. 23, 2025),
        https://www.fema.gov/about/organization/region-
        2 [https://perma.cc/2QD4-QBBV].

At the end of August 2011, Plaintiff was deployed to the
Hewlett Field Office on Long Island as a Logistics
Manager to assist with the response to Hurricane Irene.
*Id.*, ¶ 33. His first-line supervisor was Logistics Group
Supervisor Timothy Henggeler, a Caucasian male; his
second-line supervisor was Logistics Chief John Alonso,
a Hispanic and African American male. *Id.*, ¶ 34; *see also*
ECF No. 59-1 at 5. Plaintiff asserts that, on October 6,
2011, when he was part of a team ordered to break down
three disaster recovery centers in different boroughs of
New York City, "discrepancies arose pertaining to
communications, delays, and lack of coordination among
the crews"; Alonso then convened a telephone call during
which he blamed Plaintiff for the discrepancies and, later,
would not credit Plaintiff's denial of responsibility until a
Caucasian team member corroborated it during an
investigation. ECF No. 49-2 at 2–3; *see also* ECF No.
49-3, ¶¶ 5–6.

At some point Alonso decided to move Plaintiff to the
Kirkwood Field Office near Binghamton, New York, and
have Logistics Manager Paul Swindells of the Kirkwood
Field Office move to the Hewlett Field Office, which was
closer to Swindells' home.[12,13] ECF No. 45-2, ¶ 36. Alonso
explained that moving Swindells to the Hewlett Field
Office would allow him to work without charging the
government a *per diem* allowance or lodging charges. *Id.*,
¶ 37. On October 6, 2011, after the call during which
Alonso blamed Plaintiff for the delays and lack of
coordination during the breakdown of the disaster
recovery centers, Plaintiff was instructed to switch places
with Swindells and Plaintiff reported to the Kirkwood
Field Office shortly thereafter. *Id.*, ¶¶ 38–39; *see also*
ECF No. 59-3 at 17. A subsequent investigation based on
Plaintiff's whistleblower allegations of travel violations
found that Swindells, Alonso, and other FEMA personnel
provided misleading information about the distance from
Swindells' home to the Hewlett Field Office, which
allowed Swindells to wrongfully receive over $31,000 in

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

hotel, car rental, and *per diem* payments from the government.[14] ECF No. 45-2, ¶¶ 41–44; *see also* ECF No. 45-1 at 10–11.

[12]    Defendant mistakenly states that the Kirkwood Field Office was in "Birmingham, New York," rather than Binghamton, New York. ECF No. 45-2, ¶ 36; *see* ECF No. 45-18 at 4 (noting that Swindells was working at "the Binghamton office"). Defendant also asserts that the decision to transfer Plaintiff was made "*prior to* October 6, 2011." ECF No. 45-2, ¶ 36 (emphasis added). However, the evidence it cites says nothing about when the decision was made—it could have been made on October 6 itself, the day it was communicated to Plaintiff. *See* ECF No. 45-5 at 15, 17; ECF No. 45-33 at 5; ECF No. 45-18 at 4; ECF No. 45-8 at 11–12. The Court therefore does not credit the statement about the timing of the transfer decision. *See, e.g., Ladd,* 603 F. Supp. 2d at 105 (noting that, even if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court need not treat the fact as admitted where the court's independent review shows that the fact is not properly supported).

[13]    In the December 2023 Wilson Affidavit, Plaintiff asserts that his second-line supervisors also included External Support Branch Director Tom Szmyr and Deputy Logistics Section Chiefs Dan Paton, Pete Connelly, and Laura Swedlow, all of whom are Caucasian. ECF No. 49-3, ¶ 4. Defendant contends that, "[t]o the extent that Plaintiff relies on th[e] new affidavit to create an inference that someone other than [ ] Alonso made the decision to transfer him," the Court should disregard the statements expanding the universe of supervisors under the sham affidavit doctrine. ECF No. 59 at 11. Under that doctrine, a party may not "creat[e] an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony.' " *Galvin v. Eli Lilly & Co.,* 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C. Cir. 1991)). The doctrine does not apply, however, "[i]f the supplemental affidavit does not contradict but instead clarifies the prior sworn statement." *Id.* Here, Defendant points to Plaintiff's deposition testimony that Alonso was his second-line supervisor at the time of the transfer and that Alonso made the decision to transfer him. *See* ECF No. 45-8 at 10–12. More, Plaintiff did not attempt to controvert Defendant's assertion that Alonso made the transfer decision, *see* ECF No. 45-2, ¶ 36, and Plaintiff's Opposition does not assert that someone other than Alonso did so. Therefore, to the extent that Plaintiff's identification of other second-line supervisors is a subtle attempt to undermine his sworn testimony that Alonso ordered the transfer, the Court will disregard it.

[14]    In his Statement of Material Facts, Plaintiff (apparently relying on the December 2023 Wilson Affidavit, *see* ECF No. 49-3, ¶ 9) asserts that Swindells revealed to Plaintiff in an October 7, 2011, phone call that Logistics Chief Alonso and Deputy Logistics Chief Swedlow cooked up the scheme to allow Swindells to move back to his home and still collect benefits provided to those in "travel status." *See* ECF No. 59-1 at 8–9. The government contends that the statement from Swindells to Plaintiff is hearsay. *See id.* at 9. The Court agrees. Although the statement could be considered a statement against interest—after all, the investigation of the incident resulted in referral to various FEMA and DHS components to recommend disciplinary actions against the participants, as well as a basis "for consideration as to whether to refer to the Attorney General for civil and/or criminal prosecution," ECF No. 45-34 at 4–5—that exception to the hearsay rule applies only when the proponent of the statement establishes that the witness is unavailable, *see* 9A Charles Alan Wright *et al.*, Federal Practice and Procedure § 6963 (2024 ed.), a task neither party has taken up here. And so, to the extent it is offered for its truth, it is inadmissible and "counts for nothing on summary judgment." *Gilmore v. Palestinian Interim Self-Gov't Auth.,* 843 F.3d 958, 969 (D.C. Cir. 2016) (quoting *Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007)).

**\*4** On January 3, 2012, Plaintiff received notice that that a panel of subject matter experts from Plaintiff's disaster cadre had reviewed Plaintiff's FEMA employee records to determine his status under the FEMA Qualification System, which set performance and training standards for positions within FEMA and was to be implemented in Spring 2012. *See* ECF No. 45-2, ¶¶ 63, 69; *see also* ECF

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

No. 45-35 at 2. Under that system, an employee is certified as either "Qualified" or as a "Trainee" in a particular position. ECF No. 45-2, ¶ 64. An employee identified as a Trainee for a position is issued a Position Task Book, which outlines trainings and tasks associated with that job; Trainees are nonetheless eligible for deployment in that job. *See id.*, ¶¶ 65–66. To become fully qualified, a Trainee must engage in the required training and must—while deployed to a specific incident—perform the required tasks in the Position Task Book to the satisfaction of a coach evaluator assigned to the Trainee. *See id.*, ¶¶ 66–68. Plaintiff was designated a Trainee Logistics System Specialist; his prior title had been Logistics Manager. *See id.*, ¶¶ 33, 46, 69. Plaintiff's salary was not reduced because of this designation. *Id.*, ¶ 71.

Also in January 2012, the Federal Coordinating Officer[15] for the disaster recovery center to which Plaintiff was deployed announced a twenty percent downsizing of personnel to reduce costs. *Id.*, ¶ 48. On February 10, 2012, Plaintiff's first-line supervisor at the Kirkwood Field Office, Logistics Group Supervisor Jeffrey Cole, a Caucasian, notified Plaintiff that he would be part of a group scheduled to demobilize on February 24, 2012.[16] *Id.*, ¶ 49; *see also* ECF No. 59-1 at 5. The group to be demobilized included out-of-region employees being paid a *per diem*, like Plaintiff,[17] and included at least one Caucasian. *See* ECF No. 45-2, ¶¶ 51, 54, 56. Plaintiff then called Operations Director Mark Bezou, an individual outside of Plaintiff's chain-of-command, who confirmed that out-of-region employees were being demobilized. *See id.*, ¶¶ 52–54. Plaintiff also spoke to his second-line supervisor, Logistics Chief Gary Butkus, also a Caucasian, who also asserted that out-of-region employees were being demobilized to save FEMA money. *See id.*, ¶ 56; *see also* ECF No. 59-1 at 5. Butkus decided to release Plaintiff early for breaking his chain of command and confirmed his decision with FEMA employee relations staff. *See* ECF No. 45-2, ¶¶ 58–59. Plaintiff asserts that he complained to a representative from FEMA's Office of Equal Rights, who told him that "Mr. Butkus' actions appeared to be in retaliation" for Plaintiff's protected activity "and that the claim about saving money for FEMA was an excuse."[18] ECF No. 49-3, ¶ 17. Plaintiff was demobilized on February 17, 2012. ECF No. 45-2, ¶ 60. Swindells, who was not out-of-region, was not demobilized. *See* ECF No. 59-1 at 14–15.

[15]   The Federal Coordinating Officer, or FCO, is appointed by the President "[i]mmediately upon [the] declaration of a major disaster or emergency" to "appraise the situation, establish field offices, and coordinate the administration of

relief. 42 U.S.C. § 5143(a)–(b). The parties occasionally refer to a "Field Coordinating Officer (FCO)." *See, e.g.*, ECF No. 59-1 at 16–17, 22. The Court assumes that the positions are the same.

[16]   Defendant mistakenly states that the demobilization date was February 24, 2018. *See* ECF No. 45-2, ¶ 49. The context and the supporting documents make clear that the proper year is 2012. *See, e.g.*, ECF No. 45-16 at 4.

[17]   Plaintiff's home region as a FEMA Reservist was Region 9, headquartered in Oakland, California. *See* ECF No. 45-17 at 2; *Region 9*, FEMA (Jan. 23, 2025), https://www.fema.gov/about/organization/region-9 [https://perma.cc/8TVJ-FTDT]. It is undisputed that Plaintiff was an out-of-region Reservist being paid a *per diem* at the time of his demobilization from the Kirkwood Field Office.

[18]   Defendant contends that the statement of the representative from Office of Equal Rights is hearsay. *See* ECF No. 59-1 at 17. However, under Rule 801(d)(2)(D) of the Federal Rules of Evidence, a "statement made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay when "offered against [the] opposing party." Fed. R. Evid. 801(d)(2)(D). The statement at issue appears to fall into that category. *See, e.g.*, *Ritchie v. Napolitano*, 196 F. Supp. 3d 54, 64–65 (D.D.C. 2016) (admitting, in a Title VII case, statements by an EEO counselor offered against the defendant under Rule 801(d)(2)(D)); *Nair v. Columbus State Cmty. College*, No. 02-cv-595, 2008 WL 483333, at *2, *2 n.4 (S.D. Ohio Feb. 19, 2008) (same).

**\*5** On March 23, 2012, Plaintiff amended the First EEO Complaint to add allegations that Butkus discriminated against him based on race and prior EEO activity when Plaintiff was ordered to demobilize on February 24, 2012, a date that was later accelerated to February 17, 2012.[19] *See* ECF No. 45-2, ¶¶ 17–19.

19  Plaintiff asserts that his March 23, 2012, amendment to the First EEO Complaint alleged that the scheme by which Swindells wrongfully collected hotel, car rental, and *per diem* payments was "done with the knowledge and approval" of, among others, Deputy Logistics Chief Paton. There is no indication in the record before the Court that the First EEO Complaint accused Paton of participation, approval, or even knowledge of that scheme, including in the records related to that complaint Plaintiff has submitted in support of his Opposition. *See* ECF No. 49-4. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court therefore does not credit the allegation that Paton was involved in or had knowledge of the scheme.

b. Post-New York Deployments and Events—February 2012 to May 2014

After being demobilized from the Kirkwood Field Office on February 17, 2012, Plaintiff was deployed to Denton, Texas, on August 27, 2012, and then to Baton Rouge, Louisiana, for a period of approximately nine months, ending in May 2013. *Id.*, ¶ 62; ECF No. 45-33 at 4–5.

Thereafter, Plaintiff applied and was interviewed for a four-year, full-time position as a "Logistics Management Specialist (Service Branch Director)" for FEMA's Office of Response and Recovery, Response Directorate. ECF 45-36 at 2; *see also* ECF No. 45-2, ¶ 72. The record establishes that on May 5, 2014, FEMA sent a letter "tentatively offer[ing]" him the position "contingent upon a favorable suitability rating which is determined through a fingerprint check with the FBI and the completion of the Declaration for Federal Employment." ECF No. 45-36 at 2; *see also* ECF No. 45-2, ¶ 72. Later that day, he was informed that "management decided to rescind [the] offer."[20] ECF No. 45-36 at 4; *see also* ECF No. 45-2, ¶ 72. As detailed below in Section I.B, Plaintiff attempted unsuccessfully to add a claim of retaliation to the First EEO Complaint based on the rescission of the tentative job offer. *See* ECF No. 45-2, ¶¶ 73–80.

20  Plaintiff asserts that Logistics Branch Chief Bryon Grable (Defendant spells the name "Grabel," but that appears to be an error, *see, e.g.*, ECF No. 59-5 at 2 (email from "Bryon D. Grable")), whom Plaintiff "knew from past disaster deployments[,]" told Plaintiff that Justo Hernandez, the hiring authority for the position that Plaintiff had been tentatively offered, told Grable that Paton, who had recently been selected as Logistics Section Chief for the relevant Incident Management Assistance Team, "did not want to work with [Plaintiff][ ] and interfered to have the position offered to [him] and subsequent[ly] resci[nded]." ECF No. 49-3, ¶¶ 23–24; *see also* ECF No. 49-8 at 13. There are three potential levels of hearsay in this statement: the statement of Paton to Hernandez, the statement of Hernandez to Grable, and the statement of Grable to Plaintiff. Even if the statement from Grable to Plaintiff could be considered non-hearsay under Rule 801(d)(2)(D)—which is unlikely, because there is no indication that inquiries about hiring were "within [Grable's] general duties and responsibilities," 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6776 (2024 ed.)—there does not appear to be any exception that would apply to the communication between Paton and Hernandez or between Hernandez and Grable. *See* Fed. R. Evid. 805 (providing that hearsay within hearsay is "not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule"). The Court therefore does not consider these assertions as evidence that Paton interfered with Plaintiff's hiring.

2. Tenure as a CORE Employee in Region 7[21]—June 2014 to May 2016

21  Region 7 comprises Iowa, Kansa, Missouri, and Nebraska and is headquartered in Kansas City, Missouri. *Region 7*, FEMA (Jan. 23, 2025), https://www.fema.gov/about/organization/region-7 [https://perma.cc/643K-TVM5].

**\*6** On June 29, 2014, Plaintiff began working as a Support Branch Director in the Cadre of On-Call

Response/Recovery Employees—or CORE—with the Region 7 Incident Management Assistance Team ("IMAT"),[22] headquartered in Kansas City, Missouri. *Id.*, ¶ 83. Plaintiff was appointed for a renewable four-year term of employment. *See id.*, ¶¶ 8–9, 84. As Logistics Support Branch Director, Plaintiff was responsible for supervising and overseeing tasks such as receiving, storing, processing, and distributing supplies; ensuring accountability for equipment and materials in accordance with federal law; and ordering and ensuring that funds were available for procurement. *See id.*, ¶¶ 86–87. He was still "in training status" for that position while with the Region 7 IMAT.[23] *See id.*, ¶ 137. Plaintiff's first-line supervisor was Logistics Section Chief Ralph B. Meyers, and his second-line supervisor was Team Lead DuWayne W. Tewes, both of whom are Caucasian. *See id.*, ¶ 85; ECF No. 45-23 at 2; ECF No. 45-24 at 2. Until September 2015, Meyers supervised only Plaintiff and one other employee, Edwin Maldonado, a Hispanic male. *See* ECF No. 45-2, ¶ 90; ECF No. 45-25 at 4.

22   IMATs comprise "full-time and pre-identified collateral duty personnel[,]" who "are always on standby to deploy before and after an incident occurs and will remain deployed until the response phase is complete, until they are redeployed to another incident, or until they are demobilized to home station." ECF No. 45-2, ¶¶ 10–11.

23   The precise title for which Plaintiff was in training was "Support Branch Director II." ECF No. 45-47 at 2. Plaintiff was deemed "Qualified" for the apparently lower position of Logistics Section Chief III. *See id.* FEMA classifies incidents into levels based on complexity, with Type 1 being the most complex, Type 2 being less complex, etc. *Incident Types*, https://emilms.fema.gov/is_0200c/groups/518.html [https://perma.cc/HUQ4-NB9W]. The record reflects that the numeral after a job title corresponds to the level of incident for which the employee is (or will be) qualified. *See* ECF No. 45-13 at 16. Thus, a Support Branch Director II could be deployed to a level 2 incident.

In July 2014, Plaintiff attended a training course that included Paton and Hernandez (whom Plaintiff believed were involved in the rescission of his tentative job offer, *see* note 20, *supra*); because of the anxiety caused by interactions with those individuals, Plaintiff informed Meyers and Tewes about his prior EEO activity and about

the May 2014 job rescission and later—in March 2015—updated Meyers about those events. ECF No. 49-3, ¶¶ 27–28.

*a. Telework Requests*

Beginning in March 2015, Plaintiff began asking if he and Maldonado could telework. ECF No. 45-2, ¶ 91. To do so, he had to get permission from Meyers. *Id.*, ¶ 89. Meyers initially denied the request, explaining that he could not ensure that Plaintiff and Maldonado had enough work that could be performed virtually to occupy an eight-hour day. *Id.*, ¶ 91. Plaintiff alleges that Caucasian members of the Region 7 IMAT were allowed to telework, but it is undisputed that they had supervisors other than Meyers. *See* ECF No. 49-3, ¶ 29; ECF No. 45-2, ¶ 90. At the end of April 2015, when it became clear that Plaintiff could perform a full day of work on telework days, Meyers gave permission for him to telework every other Monday.[24] ECF No. 45-2, ¶ 92. On July 6, 2015, Meyers approved Plaintiff's request to telework every Wednesday. *See id.*, ¶ 93; ECF No. 45-39.

24   Plaintiff asserts that he complained to Meyers again in May 2015 "about the request to telework and the bias in denying only [Plaintiff] and another minority employee telework" and thereafter "report[ed] the denial of telework to ... Tewes [ ] and up the chain of command." ECF No. 49-3, ¶ 32. He does not say, however, that he was denied the opportunity to telework in May 2015 and it is undisputed that by May 2015 he was allowed to telework every other Monday. *See* ECF No. 45-2, ¶ 92; ECF No. 45-7 at 8.

*b. Letter of Reprimand*

On May 20 and 21, 2015, Meyers communicated with employee relations staff about four work-related incidents involving Plaintiff that had occurred earlier that month and asked that a letter of reprimand be issued to Plaintiff. *See* ECF No. 45-2 at 15, ¶ 94; ECF No. 45-7 at 9–10; ECF No. 49-3, ¶ 33; ECF No. 59-1 at 29. A FEMA human resources specialist agreed that three of the four incidents merited such a letter. ECF No. 45-2, ¶ 95. On June 11, 2015, Meyers issued Plaintiff a letter of reprimand for failure to follow instructions and lack of candor outlining those three incidents: Plaintiff (1) had

failed to register for a training class that Meyers had sought funding for and directed Plaintiff to attend, (2) had failed to provide proof of pending purchases and proof of required training completion as directed by Meyers, and (3) was dishonest to Meyers regarding a request Plaintiff made to have a Reservist deployed to the Region VII offices. *See id.*, ¶¶ 97–98; *see also* ECF No. 45-7 at 11–13. The letter was placed in Plaintiff's personnel file.[25] ECF No. 45-2, ¶ 98.

> [25] Defendant asserts that "no further action [was] taken" regarding the reprimand, ECF No. 45-1 at 42; however, its evidence for a lack of further action is merely the reprimand itself, which is not evidence that no consequences followed from the reprimand. Indeed, the letter of reprimand itself states that it could "be used as evidence that [Plaintiff was] on notice about the conduct in question" and that "any future acts of misconduct may result in more severe disciplinary action being taken against [Plaintiff], up to and including ... removal from the Federal service." ECF No. 45-7 at 12. And, as discussed below in Section III.B.1.a.v, it appears to have been used in precisely that manner. The Court does not, therefore, credit Defendant's unsupported statement that "no further action was taken" because of the reprimand.

### c. *Jefferson City Deployment—August 30, 2015, to April 12, 2016*

**\*7** From August 30, 2015, to April 12, 2016, Plaintiff was deployed to Jefferson City, Missouri, in connection with a flood, which FEMA classified as a "Type 3" incident.[26] *See* ECF No. 45-2, ¶¶ 99, 147; ECF No. 45-33 at 2. During that deployment, Plaintiff's direct supervisors included Logistics Section Chief Meyers and Deputy Logistics Section Chief Sheila Turnis. ECF No. 45-2, ¶ 99. And as noted, Team Lead Tewes was Plaintiff's second-line supervisor during his employment in Region 7. *See id.*, ¶ 85. Plaintiff claims that he was discriminated against during this deployment when supervisors twice denied him the ability to use his purchase card, twice denied his requests to become a Disaster Alternative Approving Official, denied his request for authority to sign off on timecards and travel vouchers, did not provide him a coach evaluator to sign off on tasks in his Position Task Book, gave him an unsatisfactory performance evaluation, and ordered him demobilized to Region 7's Kansas City headquarters in April 2016 with little notice.

Plaintiff also alleges that during the deployment, he became involved in the investigation of a discrimination complaint against Meyers made by one of Plaintiff's subordinates.

> [26] As noted, FEMA classifies incidents into levels based on complexity. *See* note 23, *supra*. A Type 3 incident is less severe than a Type 2 incident, which is less severe than a Type 1 incident.

### i. Purchase Card

In May 2015, Plaintiff became authorized to use a government credit card to make purchases for official government business; in connection with that authorization, he agreed, among other things, to ensure written approval was obtained and sufficient funds were available prior to making any purchase, to screen the requirements for required sources of supply prior to making a purchase and document the results, to maintain a purchase card ordering log, and to retain copies of receipts and similar documents for six years and three months. *Id.*, ¶ 103; *see also* ECF No. 45-40 at 2–3. He further acknowledged that such authority could be revoked "for cause or no cause." ECF No. 45-2, ¶ 104 (quoting ECF No 45-40 at 4). While deployed to Jefferson City, Meyers and Turnis refused to sign off on paperwork allowing Plaintiff to make a purchase with his government credit card on September 21, 2015, and October 21, 2015.[27] *See id.*, ¶¶ 100–101. Plaintiff asserts (and Defendant does not dispute) that Tewes was involved in the denial.[28] ECF No. 49-3, ¶ 37. Meyers explained that permission was denied because Plaintiff had not demonstrated that he understood the ordering and receiving process, failed to maintain copies of transaction information, and failed to ensure that receiving reports for all shipments were completed. ECF No. 45-2, ¶ 102.

> [27] Plaintiff asserts that the ability to make purchases with the government credit card was "integral to the efficient execution" of his duties as Support Branch Director. *See* ECF No. 59-1 at 31. As support, he points merely to the letter appointing him as a cardholder, a document that says nothing about his duties as Support Branch Director. *See id.* (citing ECF No. 49-13 at 2). The Court therefore does not credit this statement.

> [28] The government states that Plaintiff's assertion in

his Statement of Material Facts that Meyers and Tewes denied him the ability to use the card is undisputed, pointing to the assertion in Defendant's Statement of Undisputed Facts that Meyers and *Turnis* were involved in the denial. *See id.* (citing ECF No. 45-2, ¶ 100). Because the government has not disputed that Tewes was involved, the Court credits Plaintiff's statement despite the apparent typo.

### ii. Disaster Alternative Approving Official

At some point prior to his deployment to Jefferson City, Plaintiff completed training to become a Disaster Alternative Approving Official at the direction of Meyers. *Id.*, ¶ 106. Then, at the beginning of the Jefferson City deployment, Plaintiff asked Meyers to approve his request to become a Disaster Alternative Approving Official; Meyers stated that he denied the request for the same reasons he denied Plaintiff's request to use his government credit card—because Plaintiff lacked understanding of the ordering and receiving processes and failed to maintain proper records. *See id.*, ¶¶ 107–08. Then, on March 30, 2016, Plaintiff asked Turnis to approve his request to become a Disaster Alternative Approving Official. *Id.*, ¶¶ 109–110. She denied Plaintiff's request, asserting that he lacked judgment and did not follow directions. *Id.*, ¶ 110. Separately, Tewes explained to Plaintiff in March 2015 that there were already sufficient Disaster Alternative Approving Officials for the Jefferson City deployment. *Id.*, ¶ 111.

***8** Later, acting on a tip from Plaintiff, the Department of Homeland Security investigated alleged wrongdoing "in the requisition of supplies, equipment, and services" during the Jefferson City deployment. ECF No. 45-43 at 3. The investigation found that three FEMA officials authorized 67 payments totaling more than $450,000 prior to completing the training required to become a Disaster Alternative Approving Official. ECF No. 45-2, ¶ 112. However, the investigation concluded that those officials did not knowingly or intentionally violate FEMA procedures; rather, they were unaware of newly implemented requirements for Disaster Alternative Approving Officials because an HR representative detailed to the disaster response office failed to inform them and because the procurement documents used were ambiguous about whether Disaster Alternative Approving Official certification was necessary. *See* ECF No. 45-43 at 3–4; *see also* ECF No. 45-2, ¶ 113. The agency found that

"no improper debt obligations occurred." ECF No. 45-43 at 4.

### iii. Timecards and Travel Vouchers

Because of the small contingent of personnel deployed to the Logistics Section during the Jefferson City response, Logistics Chief Meyers and Deputy Logistics Chief Turnis had the authority to approve timecards and travel vouchers for that section. *See* ECF No. 45-2, ¶¶ 114–15, 117. When Meyers was demobilized in February 2016, Turnis retained that authority. *Id.*, ¶ 118. Thereafter, Plaintiff asked Turnis for authority to sign timecards and travel vouchers. *Id.*, ¶ 119. Turnis denied the request because those tasks were already being handled by others. *Id.*, ¶ 120.

### iv. Coach Evaluator

Coach evaluators are FEMA personnel authorized to observe Trainees demonstrate performance of tasks in the Trainee's Position Task Book during deployments. *See id.*, ¶¶ 67–68. Coach evaluators are not deployed solely to perform evaluations; rather, a coach evaluator can observe a Trainee's performance only when deployed in the coach evaluator's regular employment capacity to the same disaster as the Trainee. *See id.*, ¶¶ 140, 144. Satisfactory completion of those tasks allows a Trainee for a position become Qualified for that position. *Id.*, ¶ 67. At the beginning of the Jefferson City deployment, Logistics Branch Chief Grable was assigned as Plaintiff's coach evaluator; IT Branch Chief Kevin Fitts was assigned as coach evaluator for Maldonado. *Id.*, ¶ 139. Neither Grable nor Fitts were able to be deployed immediately to Jefferson City, however, so Meyers asked for other coach evaluators to be deployed to observe Plaintiff and Maldonado. *Id.*, ¶¶ 141–42. None were available, due, in part, to the fact that fewer than one percent of FEMA staff are coach evaluators. *Id.*, ¶¶ 142–43. Because Plaintiff lacked a coach evaluator to sign off on tasks in his Position Task Book, his lack of progress on that front was not held against him in his evaluation. *Id.*, ¶ 145. At some point, Turnis served as coach evaluator working with Plaintiff. *Id.*, ¶ 146. However, because Plaintiff's Position Task Book was for Type 2 events, which are more complex than Type 3 events like the Jefferson City disaster; tasks falling under Type 2 events could not have been observed or signed off on during the Jefferson City deployment.[29] *See id.*, ¶¶ 147–48.

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

29    The record reflects that Plaintiff had been issued a Position Task Book for the position of Support Branch Director II. ECF No. 45-47. As noted, the "II" represents level of incident for which the employee is (or will be) qualified. *See* note 23, *supra.*

v. February 2016 Performance Evaluation

Plaintiff asserts that, on February 19, 2016, Meyers gave him an unsatisfactory performance evaluation, presumably for the year 2015. ECF No. 49-3, ¶ 43; *see also* ECF No. 45-23 at 6. It is undisputed, however, that Plaintiff ultimately received a rating of "Achieved Expectations" on his 2015 annual performance evaluation.[30] ECF No. 45-2, ¶ 121; *see also* ECF No. 45-7 at 16–17. Meyers asserted that Plaintiff received a low score—within the "unacceptable" range—on his " 'deployed' performance evaluation," which is factored into the annual performance rating. *See* ECF No. 45-23 at 6 (Meyers asserting that Plaintiff "received a rating of 1.7 on his 'deployed' performance evaluation"); ECF No. 45-7 at 17 (identifying a score of less than 2.5 as in the unacceptable range). Meyers' supervisors instructed him to "zero out" the deployment rating, which resulted in an adjusted rating of "Achieved Expectations." *See* ECF No. 45-23 at 6; ECF No. 45-7 at 16 (reflecting that the deployment rating was given a weight of zero percent). Meyers asserted that to achieve a higher rating, Plaintiff needed to complete assigned tasks, adhere to deadlines, and demonstrate professionalism.[31] ECF No. 45-2, ¶ 124. Maldonado also received an "Achieved Expectations" rating on his 2015 annual performance evaluation. *Id.*, ¶ 123.

30    The scale reflected on the evaluation form established four ratings: unacceptable, achieved expectations, exceeded expectations, and achieved excellence. *See* ECF No. 45-7 at 17.

31    Plaintiff asserts that in April 2015, he received a rating of "Exceeded Expectations" from his supervisors. ECF No. 59-1 at 28. However, the document Plaintiff cites does not support that assertion. It is a document titled "Employee Performance Plan and Appraisal Form," it states that it is a performance plan for the period between April 1, 2015, and December 31, 2015, it

does not reflect a particular performance rating, and it was signed by Meyers on July 24, 2015. *See generally* ECF No. 49-10; *see also* ECF No. 59-1 at 28. Accordingly, the Court does not credit Plaintiff's assertion that he received a rating of "Exceeded Expectations" in 2015.

vi. EEO Official Jacquelyn Seymour, Ph.D.

**\*9** In January 2016, Jacquelyn Seymour, Ph.D., an official from FEMA's Office of Equal Rights, was deployed to Jefferson City. *See* ECF No. 59-1 at 35. At some point during the deployment, Tewes also told Seymour that Plaintiff was "lazy." ECF No. 49-17 at 2–3. In her sworn affidavit, Seymour asserts that she interpreted that comment as "a racial reference as historically black men have been called lazy and other negative adjectives."[32] *Id.* at 3.

32    Defendant asserts that Tewes' comment that Plaintiff was lazy is hearsay to the extent that it is intended to prove the assertion that the comment was racially derogatory. *See* ECF No. 59-1 at 36. It is not. Defendant could (but does not) argue that the statement is hearsay to the extent that it is offered as evidence that *Tewes said Plaintiff was lazy.* Such an argument might or might not succeed. But Seymour's sworn testimony that she interpreted the comment as racially derogatory does not implicate the rule against hearsay.

     Plaintiff includes details about allegations of discrimination against supervisors by two of his subordinates—Rosa Thomas and Carrie Cedeno. ECF No. 49-3, ¶¶ 39, 42. Plaintiff asserts that he advocated on their behalf. *See id.* There is no indication how any EEO complaints regarding these individuals were resolved. *See id.* Plaintiff does allege that Seymour was told by Tewes that an advisor from the Office of Equal Rights had counseled Meyers and Turnis "regarding their treatment of their African American logistics staff," including Thomas and Cedeno. *Id.*, ¶ 40. Seymour includes in her affidavit an assertion that "[a]s I understand it," that advisor had counseled Meyers and Turnis on their treatment of Cedeno and another "black female who is around 70 years old," ECF No. 49-17 at 2, but there is no indication of how she came to "understand" that such counseling had occurred. Assuming that an advisor told Tewes of the counseling, Tewes told

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Seymour, and Seymour told Plaintiff, it is possible that each of those statements—advisor to Tewes; Tewes to Seymour; Seymour to Plaintiff—would be non-hearsay under Rule 801(d)(2)(D), but there are insufficient facts for the Court to make that determination. The Court therefore does not credit those statements. *See, e.g., United States v. Fuller*, —— F. Supp. 3d ——, ——, 2025 WL 511112, at *2 (D.D.C. 2025) (noting that the proponent of potential hearsay must establish that it falls into an exception by a preponderance of the evidence).

### d. Subordinates' Position Task Books

Plaintiff was in Trainee status during his tenure in Region VII; as such, he was not authorized to sign off on his subordinates' Position Task Books.[33] ECF No. 45-2, ¶ 137.

[33]   Plaintiff conceded at his deposition that he was not permitted to sign off on his subordinates' Position Task Books and asserted that he never requested permission to do so. *See* ECF No. 45-8 at 28–29. Nevertheless, Plaintiff presses this claim in his Opposition. *See* ECF No. 49-1 at 21, 28–29.

### e. Termination on May 20, 2016

On May 20, 2016, FEMA terminated Plaintiff for failure to follow instructions and negligent performance of duties. *Id.*, ¶ 157. The termination letter provided six instances of failure to follow directions and three instances of negligent performance:

(1) On November 3, 2015, Meyers instructed Plaintiff to put missing FEMA form 143s in the Common Drive by the end of the week and failed to do so.

(2) On December 3, 2015, Meyers instructed Plaintiff to generate paperwork associated with the lease of specific office space by December 4, 2015, and Plaintiff failed to do so.

**\*10** (3) On December 7, 2015, Meyers instructed

Plaintiff to provide an electronic copy of his completed deployed evaluation report by close of business on December 11, 2015, and Plaintiff failed to do so.

(4) On December 8, 2015, Meyers instructed Plaintiff to send a current listing of all IMAT site code items by close of business that day, and Plaintiff failed to do so.

(5) On December 8, 2015, Meyers instructed Plaintiff to establish procedures and directives regarding contacting vendors, contracted service providers, and property management by January 7, 2016, and Plaintiff failed to do so.

(6) On January 23, 2016, Meyers instructed Plaintiff to correct his hours in WebTA and Plaintiff failed to do so.

(7) On February 2, 2016, Plaintiff issued an iPhone to a Public Assistant Specialist without a barcode or serial number, which broke with Agency Policy.

(8) On February 25, 2016, Plaintiff initiated a Mission Assignment despite lacking authority to do so.

(9) On April 11, 2016, Plaintiff failed to return IMAT equipment to the Region VII Office in Kansas City.

*Id.*, ¶¶ 158–59. On June 10, 2016, Plaintiff submitted a rebuttal to that termination that responds to each of the specifications. *See* ECF No. 49-9 at 75–81.

### B. Procedural History

This case has a long and complicated procedural history, particularly during administrative proceedings at FEMA and the Equal Employment Opportunity Commission ("EEOC").

### 1. Administrative Proceedings

Plaintiff initiated EEO counseling with FEMA's Office of Equal Rights on November 18, 2011, after his transfer to the Kirkwood Field Office. ECF No. 45-2, ¶ 15–16. He filed the First EEO Complaint on January 18, 2012, and amended it on March 23, 2012. *Id.*, ¶¶ 15, 17. In its final

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

form, the First EEO Complaint alleged that

> (1) Plaintiff was discriminated against on the basis of
> race when Henggeler and Alonso reassigned him to
> the Kirkwood Field Office on October 7, 2011;
>
> (2) Plaintiff was discriminated against based on race
> and prior EEO activity when Butkus ordered him
> demobilized from the Kirkwood Field Office on
> February 24, 2012; and
>
> (3) Plaintiff was discriminated against based on race
> and prior EEO activity when Butkus demobilized
> him on February 17, 2012, rather than February 24,
> 2012.

See id., ¶¶ 16, 18–19. FEMA sent its report of the
investigation to Plaintiff in November 2013 and Plaintiff
requested a hearing before an EEOC administrative judge.
See id., ¶¶ 20–21; see also ECF No. 45-27.[34]

[34]    Defendant's Statement of Undisputed Facts
        contains a typographical error as to the date
        FEMA's report was sent to Plaintiff: it asserts that
        occurred in 2023; it is clear from the record,
        however, that it occurred in 2013. See ECF No.
        45-27.

Although Defendant asserts that FEMA's Office of Equal
Rights "has no record of receiving [a] request by Plaintiff
to [again] amend his First EEO Complaint to add a
retaliation claim related to the rescission of [his] tentative
job offer in [May] 2014," it nonetheless admits that he
sent such a request on June 16, 2014. ECF No. 45-2, ¶¶
73–74. However, at that time, the agency's investigation
was complete, so it no longer had the authority to accept
an amendment. See id., ¶ 75; see also 29 C.F.R. §
1614.106(d) (providing that a complainant may seek
permission from the agency to amend a complaint "to
include issues or claims like or related to" the claims
already raised "at any time prior to the conclusion of the
investigation" but that after a hearing has been requested,
the complainant must file a motion to amend with the
administrative judge). Defendant also admits that the next
day Plaintiff sought to amend his complaint with the
EEOC to add the claim related to the May 5, 2014,
rescission. See ECF No. 45-2, ¶ 77. As discussed below,
that attempt was ultimately unsuccessful.

*11 On July 17, 2015, Plaintiff initiated EEO counseling
regarding the letter of reprimand, which he asserted was
discriminatory based on race and sex. Id., ¶ 23; see also
ECF No. 45-6 at 8. He filed the Second EEO Complaint
on September 18, 2015, alleging that he was

discriminated against based on race when his request to
telework was denied and when he was issued the letter of
reprimand. ECF No. 45-2, ¶ 23; see also ECF No. 45-6 at
3. That complaint was amended multiple times (the sixth
and last time on June 24, 2016, after Plaintiff's
termination, see ECF No. 45-6 at 14) and ultimately
charged that Plaintiff was subjected to discrimination
based on race, sex, and reprisal when (1) Plaintiff's and
Maldonado's requests to telework were denied, (2)
Plaintiff was issued the letter of reprimand, (3) Plaintiff
was twice denied permission to use his purchase card, (4)
Plaintiff was not permitted to become a Disaster
Alternative Approving Official, (5) Plaintiff was not
given signature authority for timecards and travel
authorizations, (6) Plaintiff received an unfair
performance evaluation in February 2016, (7) Plaintiff
was directed to demobilize from the Jefferson City
deployment on April 1, 2016, (8) Plaintiff and a Hispanic
co-worker were instructed to physically bring in
equipment assigned to the office for inspection, (9)
Plaintiff was denied permission in April 2016 to attend a
training session, (10) Plaintiff was denied a coach
evaluator, and (11) Plaintiff's appointment was
terminated in May 2016.[35] ECF No. 45-2, ¶ 26.

[35]    As noted, see supra note 7, by failing to respond
        to Defendant's arguments that any claims based
        on Plaintiff's allegations related to (7) the order to
        demobilize on April 1, 2016, (8) the order to bring
        equipment in for inspection, and (9) the denial of
        approval to attend a training session, Plaintiff has
        conceded those arguments before this Court.
        Defendant is therefore entitled to summary
        judgment on those claims.

On October 18, 2017, the Office of Equal Rights sent
Plaintiff a letter informing him that "the investigation of
[his] complaint"—that is, the Second EEO
Complaint—"may not be completed within the 180-day
time frame" and, if it were not, he could either request a
hearing before an EEOC administrative judge or file a
civil action "in an appropriate U.S. District Court." ECF
No. 45-7 at 4; see also ECF No. 45-2, ¶ 27. Plaintiff
requested a hearing. ECF No. 45-2, ¶ 28. The
administrative judge dismissed Plaintiff's Second EEO
Complaint without prejudice on August 14, 2018, to allow
the agency to complete its investigation. Id., ¶ 29. FEMA
completed the investigation on October 28, 2018. ECF
No. 45-3, ¶ 21.

Meanwhile, on August 23, 2017, Plaintiff filed a motion
with the EEOC to amend the First EEO Complaint "to
add a retaliation claim based on allegations that he
received a job offer from the agency on May 15, 2014[,]

2025 WL 1000666

and that it was rescinded 30 minutes later." ECF No. 45-29 at 2. The EEOC administrative judge denied the motion initially in August 2018 and on reconsideration in October of that same year. *See id.* As to the timing of the amendment, he explained that Plaintiff had "repeatedly raised a potential motion to amend the complaint dating years back," that "there were various delays in the process which were not attributable to [Plaintiff]," and that the previously assigned judge had granted Plaintiff permission "to file the motion in 2017 when he did." *Id.* at 3. On the merits, however, the administrative judge found that the proposed claim based on rescission of the May 2014 job offer was not "like or related to the original complaint" as is required for claim to be added to an earlier EEO complaint. *Id.*; *see also, e.g.,* 29 C.F.R. § 1614.106(d) ("After requesting a hearing, a complainant may file a motion with the administrative judge to amend a complaint to include issues or claims like or related to those raised in the complaint."). He therefore denied the motion to amend. ECF No. 45-29 at 4.

At some point, the First EEO Complaint and the Second EEO Complaint were consolidated for the purposes of the EEOC's consideration. *See, e.g.,* ECF No. 45-30 at 2 (EEOC order with both case numbers). On March 8, 2019, they were dismissed without prejudice "based on [Plaintiff's] inability to proceed ... due to valid personal reasons." *Id.* Plaintiff was allowed the opportunity to resubmit a request for a hearing by mid-June 2019.[36] *Id.* When he did not, the administrative judge found that Plaintiff's "hearing request must be dismissed ... based on [Plaintiff's] failure to prosecute the case." ECF No. 45-31 at 2. On November 1, 2019, the Department of Homeland Security's Office of Civil Rights and Civil Liberties issued its final order "implement[ing] the [administrative judge's] decision" and issued notice of Plaintiff's right to appeal or to sue on federal court. *See generally* ECF No. 45-32. FEMA had no record of Plaintiff initiating any further EEO counseling or of filing a complaint alleging discrimination based on the May 2014 job offer rescission. *See* ECF No. 45-2, ¶¶ 32, 78.

[36]     The order has a typographical error. It asserts that Plaintiff must file the request by "June 14, 2018," but from the context—not least that the order was issued in March 2019—it is clear that the year should be 2019. ECF No. 45-30 at 2.

2. Federal Court Proceedings

**\*12** Plaintiff, through counsel, filed the Complaint in this district against the then-Acting Secretary of the Department of Homeland Security on January 14, 2020. *See* ECF No. 1. He alleged racial discrimination in employment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count One); sex and gender discrimination in employment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Two); retaliation in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Three); retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count Four); a hostile work environment in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Count Five); and conspiracy in violation of 42 U.S.C. § 1985(3) (Count Six). *See id.,* ¶¶ 66–103.

In May 2020, the government sought dismissal for failure to state a claim of (1) the claim under 42 U.S.C. § 1981 based on gender discrimination, (2) all claims under 42 U.S.C. § 1983, (3) the False Claims Act retaliation claim, (4) the hostile work environment claims, and (5) the conspiracy claim. *See* ECF No. 10 at 1, 3; *see also id.* at 7 (arguing that "Plaintiff's section 1983 claim should be dismissed from each of the counts in which it has been asserted" because, among other things, the provision "does not create a cause of action against federal officials"). Judge Amy Berman Jackson interpreted the motion as seeking dismissal of

> those portions of the race discrimination claim in Count One and the retaliation claim in Count Three that are predicated on section 1983; that portion of the gender discrimination claim in Count Two that is predicated on section 1981; and Counts Four (retaliation in violation of the False Claims Act); Five (hostile work environment), and Six (section 1985 conspiracy).

*Wilson,* 2021 WL 230136, at \*1. Judge Jackson granted the motion. *See id.* As to the claims under Section 1981 and 1983, Judge Jackson reasoned that "it is clear from the plain language of the statute that section 1983 does not apply to federal officials" and found "[t]he invocation of section 1981 [was] problematical" because "it too is ... a section of the Civil Rights Act aimed at the conduct of state officials." *Id.* at \*4–5. She therefore dismissed "the portions of Counts One and Three based on section 1983[,] the portion of Count Two based on section 1981," and the hostile work environment claim under both provisions. *See id.* at \*6, \*8. She also dismissed the

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

remainder of the hostile work environment claim (Count Three) brought under Title VII and Counts Four (False Claims Act retaliation) and Five (conspiracy). *Id.* at *8. That is, although the government sought dismissal of *all* claims under Section 1983 (it is not clear why it limited its motion to the gender discrimination claims based on Section 1981, but it did) and the reasoning in Judge Jackson's opinion would apply to *all* claims under *both* Section 1983 and Section 1981, the ruling on the motion to dismiss preserved the following claims: Count One to the extent that it claims racial discrimination under Title VII and Section 1981 (but not Section 1983), Count Two to the extent it claims gender discrimination under Title VII and Section 1983 (but not Section 1981), and Count Three to the extent it claims retaliation in violation of Title VII and Section 1981 (but not Section 1983).

Thereafter, the parties consented to the jurisdiction of a magistrate judge. ECF No. 21. Defendant filed its motion for summary judgment on October 13, 2023, and the motion was fully briefed on April 26, 2024. *See* ECF Nos. 45, 49, 59. That briefing narrows the pending claims further. As noted above in notes 7 and 35, by failing to address Defendant's arguments in favor of summary judgment, Plaintiff has conceded that dismissal is appropriate for any claims arising from alleged orders that (1) Plaintiff alone lift equipment that required two people to lift, (2) he bring in equipment for inventory and inspection, (3) he demobilize from a deployment in Jefferson City, Missouri, and (4) from a supervisor's alleged refusal to approve Plaintiff's request to attend a FEMA training course.

**\*13** Similarly, Plaintiff has conceded that the remaining claims under 42 U.S.C. §§ 1981 and 1983 must be dismissed. Defendant argues that such claims cannot survive because (1) the statutes apply only " 'to persons acting under color of "any State or Territory, or ... District of Columbia" law' and there is no evidence in the record to establish that federal officials in this matter were acting under color of state law" and (2) the Court lacks subject matter jurisdiction because federal government has not waived its sovereign immunity for suits under those statutory provisions. ECF No. 45-1 at 23–24 (alterations in original) (quoting *Bai v. Graves*, No. 21-cv-390, 2022 WL 123880, at *1 (D.D.C. Jan. 13, 2022)). Plaintiff does not respond to those arguments and asserts—admittedly erroneously, as shown above—that any claims under those statutes were already dismissed by Judge Jackson. *See* ECF No. 49-1 at 48. The Court finds that he has conceded that subject matter jurisdiction is lacking for those claims by failing to respond to Defendant's arguments that the United States has not waived sovereign immunity. *See, e.g., Jean-Baptiste v. U.S. Dep't of Just.,*

No. 23-cv-432, 2024 WL 1253858, at *4 (D.D.C. Mar. 25, 2024) ("There is nothing in the text of Sections 1981 [or] 1983 ... that suggests the United States has waived its immunity to suit under these statutes. In fact, courts have expressly held the opposite."), *aff'd*, Order, *Jean-Baptiste v. U.S. Dep't of Just.*, No. 24-5070. 2024 WL 5495581 (D.C. Cir. Oct. 29, 2024).

Finally, Plaintiff explicitly concedes in the briefing that "the evidence is insufficient to support disparate treatment gender discrimination." ECF No. 49-1 at 16. Accordingly, Court will also dismiss Plaintiff's gender discrimination claims. *See, e.g., Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 786 F. Supp. 2d 359, 366 (D.D.C. 2011) (dismissing a claim based on the plaintiff's "explicit concession" that it should be dismissed). That leaves only the claims under Title VII for racial discrimination and retaliation in Counts I and III of the Complaint.

On June 28, 2024, the Court granted Plaintiff's counsel's motion to withdraw; Plaintiff now proceeds *pro se. See* ECF No. 60; Minute Order (June 28, 2024).

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.' " *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

upon by the opposing party do not actually establish the absence or presence of a genuine dispute. *Fed. R. Civ. P. 56(c)(1)*. While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party " 'may not rest upon mere allegation or denials of his pleading' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

*14 It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604) Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff ... to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence. *Id.* Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.*

**B. Discrimination and Retaliation Based on Discrete Acts**

The federal sector provision of Title VII provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." *42 U.S.C. §§ 2000e-16(a)*. The government is also prohibited from retaliating against an employee or applicant for engaging in protected activities such as filing an EEO complaint alleging employment discrimination. *See Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

When a Title VII plaintiff does not offer direct evidence of discrimination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Holcomb v. Powell*, 433 F.3d 889,895 (D.C. Cir. 2006). Under that framework, the plaintiff must initially establish a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly situated employees outside the protected class. *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013). Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act. *Rochon*, 438 F.3d at 1219–20. Once the plaintiff succeeds in making her *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In employment discrimination and retaliation cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory or non-retaliatory reasons for its actions. Where an employer has done so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (italics in original). Even in *Brady*, however, the D.C. Circuit implicitly recognized

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

that the plaintiff must "suffe[r] an adverse employment action" before the reasons for that action, benign or discriminatory, can be evaluated. *Id.* Both the courts of this District and subsequent panels of the D.C. Circuit have recognized that proceeding to the *Brady* analysis may be premature when the defendant contests whether an adverse employment action occurred at all. *See, e.g.,* *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146 (D.D.C. 2010); *cf. Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("*Brady*'s suggested preference for merits resolution on the third prong [of the *McDonnell Douglas* framework] is just that—a suggestion, which the District Court should follow only when feasible.").

**\*15** If an adverse employment action occurred, the "central question" on summary judgment then becomes whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). The Court of Appeals has clarified that, in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff ... or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka*, 156 F.3d at 1289); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

A plaintiff may carry his rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts" that formed the predicate for the employment action, *Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,' " *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, ... there ordinarily is no basis for permitting

a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. A plaintiff may also come forward with comparative evidence that persons who are similarly situated to the plaintiff but are of a different race, sex, or age have been treated more favorably by the employer. *Id.*

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.' " *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.' " *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

### III. DISCUSSION

Omitting claims Plaintiff has conceded (or has been deemed to have conceded) must be dismissed, Plaintiff continues to press claims that he was subject to racial discrimination and/or retaliation in violation of Title VII based on the following conduct: (1) his October 7, 2011, transfer from the Hewlett Field Office to the Kirkwood Feld Office; (2) his January 3, 2012, designation as a Trainee for the position of Logistics System Specialist; (3) his February 17, 2012, demobilization from the Kirkwood Field Office; (4) the May 5, 2014, job offer rescission; (5) the March 2015 denial of his requests to telework; (6) the June 11, 2015, letter of reprimand; (7) the September and October 2015 restrictions on his use of a FEMA purchase card; (8) the September 2015 and March 2016 denials of his requests to become a Disaster Alternative Approving Official; (9) his supervisors' refusal to delegate authority for him to sign his staff's time cards and travel vouchers; (10) his supervisors' refusal to permit him to sign off on his subordinates' Position Task Books; (11) the February 19, 2016, performance rating; (12) his supervisors' failure to allow him access to a coach evaluator during his 2015–2016 Jefferson City deployment; and (13) his May 20, 2016, termination.

**\*16** As discussed below, Defendant will be granted summary judgment in its favor on most of Plaintiff's remaining claims either because they are unexhausted, the event to which Plaintiff objects is not actionable, or Plaintiff has failed to provide sufficient evidence to allow a reasonable jury to find that Defendant's explanation for

the action was a pretext concealing discrimination or retaliation. However, Plaintiff's racial discrimination claim based on his October 2012 transfer from the Hewlett Field Office to the Kirkwood Field Office survives, as does his retaliation claim based on the February 2012 demobilization.

**A. Exhaustion**
Defendant contends that Plaintiff's discrimination and retaliation claims based on the January 3, 2012, designation as a Trainee Logistics System Specialist and the rescinded 2014 job offer must be dismissed because they are not administratively exhausted.

"A plaintiff may file a Title VII ... action in federal court only after exhausting ... administrative remedies before the relevant federal agency for each allegedly discriminatory act." *Smith v. Lynch*, 106 F. Supp. 3d 20, 41 (D.D.C. 2015). The first step of the process for a federal employee who believes that he has been subject to discrimination by his employer requires him to "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 10–11 (D.D.C. 2019) (alteration in original) (quoting 29 C.F.R. § 1614.105(a)(1)). If the issue is not resolved informally in counseling, the complainant must file a formal complaint with "with the agency that allegedly discriminated against the complainant." 29 C.F.R. § 1614.106(a); *see also, e.g.,* *Blue v. Jackson*, 860 F. Supp. 2d 67, 73 (D.D.C. 2012) ("In order to exhaust administrative remedies, a complainant must file [ ] a formal complaint[.]"). "After filing a written complaint, the employee may file a civil action after the agency issues an adverse final decision or 180 days elapse without a decision, whichever happens first." *Blue*, 860 F. Supp. 2d at 73 (citing 42 U.S.C. § 2000e-16(c)). Where the agency issues a decision, the complaint must be filed within 90 days of that decision. 29 C.F.R. § 1614.407(a).

"The primary purpose of the exhaustion requirement is to provide the agency with sufficient notice to begin the investigative process." *Hernández v. Mao*, 235 F. Supp. 3d 172, 177 (D.D.C. 2017). Although the rules of exhaustion "should not be construed to place a heavy, technical burden" on employee-plaintiffs, *Fennell v. AARP*, 770 F. Supp. 2d 118, 126 (D.D.C. 2011) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)), a failure to exhaust administrative remedies "will ordinarily bar a judicial remedy," *Bowe–Connor v. Shinseki*, 923 F. Supp. 2d 1, 5 (D.D.C. 2013).

In *Park*, the D.C. Circuit endorsed a "continuing violation" theory, which held that claims "like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations" can proceed even if not included in an EEO complaint. 71 F.3d at 906–07 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). "Under that standard, claims must 'arise from the administrative investigation that can [be] reasonably expected to follow the charge of discrimination.' " *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 373 F. Supp. 3d 174, 185 (D.D.C. 2019) (alteration in original) (quoting *Park*, 71 F.3d at 911). After *Park*, courts construed its already-expansive exhaustion standard broadly and "permitted a plaintiff to bring suit and recover for all related incidents, even those that were not specifically exhausted" in an EEOC charge. *Mount v. Johnson*, 36 F. Supp. 3d 74, 83 (D.D.C. 2014).

**\*17** Seven years after the D.C. Circuit decided *Park*, the Supreme Court substantially undermined its core rationale in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In that case, the Court "rejected the application of the continuing violation doctrine to discrete acts of discrimination or retaliation," *Klotzbach-Piper*, 373 F. Supp. 3d at 186, making clear that "claims based on discriminatory or retaliatory acts that occurred more than 180 or 300 days before the filing of [an] administrative charge are time-barred, regardless of whether they are 'like or reasonably related to' allegations contained in the administrative charge," *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 136 (D.D.C. 2009) (quoting *Morgan*, 536 U.S. at 113). Importantly, *Morgan* held that "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges.*" 536 U.S. at 113 (emphasis added). And although *Morgan* "dealt with timeliness rather than exhaustion," its rejection of the "like or reasonably related to" and continuing violation theories leaves *Park* on uncertain ground, as other courts in this Circuit have observed. *See, e.g., Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 45 (D.D.C. 2022) ("For the reasons explained at greater length in [an earlier case], the Court concludes (once again) that 'the reasonably related rule no longer reflects the state of the law.' " (quoting *Hargrove v. AARP*, 205 F. Supp. 3d 96, 119 (D.D.C. 2016))); *Coleman–Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 137 (D.D.C. 2004) (noting that "*Park* no longer reflects the state of the law" on administrative exhaustion), *amended on reconsideration in part on other grounds*, 400 F. Supp. 2d 257 (D.D.C. 2005). Indeed, although some courts continue to apply the reasonably related rule, *see Mount*, 36 F. Supp. 3d at 83 (explaining the post-*Morgan* divergence between the majority and

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

minority approaches in this Circuit), "[m]ost judges in this district have held that plaintiffs alleging discrete acts of discrimination or retaliation 'must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others.' " *Rashad v. Washington Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (quoting *Coleman–Adebayo*, 326 F. Supp. 2d at 137–38); *see also Hartzler v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *8–9 (D.D.C. Oct. 27, 2022) (applying the majority approach as "more concordant" with Supreme Court precedent), *aff'd*, No. 22-5310, 2024 WL 321989 (D.C. Cir. June 28, 2024) (per curiam); *Harris v. Mayorkas*, No. 21-cv-1083, 2022 WL 3452316, at *13 (D.D.C. Aug. 18, 2022) ("[T]he majority of courts in this jurisdiction now require plaintiffs to exhaust each discrete claim of retaliation." (quoting *Jones v. Granholm*, No. 20-cv-472, 2021 WL 2530677, at *7 (D.D.C. June 21, 2021))); *Moran v. Barr*, No. 18-cv-1986, 2020 WL 4286825, at *10 (D.D.C. July 27, 2020) (similar and collecting cases); *Klotzbach-Piper*, 373 F. Supp. 3d at 186 (similar).

Although the D.C. Circuit has on several occasions declined to expressly weigh-in on this issue or reconsider *Park*,[37] the Court finds the majority view more consistent with *Morgan*, which emphasized the severable nature of adverse employment decisions. *See, e.g.*, *Morgan*, 536 U.S. at 114 (explaining that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice' "); *see also Harris*, 2022 WL 3452316, at *13. Other circuits have reached the same conclusion and held that, following *Morgan*, each distinct instance of retaliatory or discriminatory conduct must be exhausted irrespective of their relationship to one another. *See Richter v. Advance Auto Parts*, 686 F.3d 847, 851–52 (8th Cir. 2012); *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003) ("*Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted."); *see also Shaw v. Aramark Mgmt. Servs. Ltd. P'ship*, 903 F. Supp. 2d 413, 421 n.7 (E.D. Va. 2012) (noting that "*Martinez* is a persuasive argument for applying *Morgan*" to the exhaustion analysis), *aff'd*, 516 F. App'x 269 (4th Cir. 2013). More, "[r]equiring a plaintiff to exhaust each discrete claim of discrimination or retaliation" makes sense, as it " 'comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.' " *Romero–Ostolaza*

*v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (second alteration in original) (quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 (D.D.C. 2004)). As the D.C. Circuit has emphasized more generally concerning exhaustion, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). And although the exhaustion requirement "should not be construed to place a heavy technical burden" on would-be plaintiffs, neither is it "a 'mere technicality,' " and courts "cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the ... administrative process." *Park*, 71 F.3d at 907 (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992)). After all, "the employing agency [has] a 'crucial administrative role' in addressing alleged violations," which "rigorous exhaustion requirements" aid in preserving. *Webster*, 49 F.4th at 566 (quoting *Brown v. GSA*, 425 U.S. 820, 833 (1976)).

[37]    *See, e.g.*, *Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022) (noting that the Circuit has "twice reserved the question whether *Park* survives *Morgan*" and doing so again); *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526 n.1 (D.C. Cir. 2019); *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (explaining that the court "need not decide whether *Morgan*" now requires individualized exhaustion of discrete claims); *Weber v. Battista*, 494 F.3d 179, 183–84 (D.C. Cir. 2007); *see also Hazel v. Washington Metro. Area Transit Auth.*, No. 02-cv-1375, 2006 WL 3623693, at *7 (D.D.C. Dec. 4, 2006) ("[T]he D.C. Circuit has not weighed in expressly on the precise reach of *Morgan*.").

**\*18** For these reasons, the Court will apply the majority approach articulated above to Defendant's exhaustion arguments. Such application simplifies the analysis here. Plaintiff does not contest that he did not initiate EEO counseling regarding the January 3, 2012, Trainee designation and admits that he "did not include [the January 2012 Trainee designation] claim in the First EEO Complaint."[38] ECF No. 49-1 at 45; *see* ECF No. 45-2, ¶ 32 ("FEMA has no record of Plaintiff initiating EEO counseling on any other dates beside November 18, 2011, the day when Plaintiff initiated EEO counseling for claims included in his First EEO Complaint, and on July 17, 2015, the day when Plaintiff initiated his EEO counseling for claims included in his Second EEO

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Complaint."); *Davis v. Mnuchin*, No. 08-cv-447, 2018 WL 8584035, at *19 (D.D.C. Nov. 13, 2018) (stating that "[w]here a defendant has presented evidence that a claim was not exhausted, such as a declaration by a person with personal knowledge that the relevant files do not contain records of a grievance or complaint" a genuine issue of fact is not created by "vague assertions without supporting details that the plaintiff exhausted [the] claim"), *report and recommendation adopted sub nom. Davis v. Yellen*, 2021 WL 2566763 (D.D.C. Jan. 22, 2021).

[38]   Confusingly, Plaintiff asserts that "this claim occurred after Plaintiff was reassigned [to the Kirkwood Field Office] in October 2011 and filed his EEO Complaint in November 2011." ECF No. 49-1 at 45. Some courts have suggested that "[w]hether the *Morgan* test applies ... may depend on whether the unexhausted discriminatory [or retaliatory] events took place ... after [the plaintiff] filed [an] administrative complaint." *McCallum v. Mayorkas*, No. 21-cv-1911, 2023 WL 3203011, at *8 (D.D.C. May 2, 2023). But that would not help Plaintiff here because the record is clear that he did *not* file an EEO complaint in November 2011; rather, it is undisputed that he filed the First EEO Complaint on January 18, 2012, which post-dates the designation, which occurred on January 3, 2012. *See* ECF No. 45-2, ¶ 15 (Defendant stating that the First EEO Complaint was filed on January 18, 2012); ECF No. 49-3, ¶ 13 (Plaintiff stating that "[o]n or about January 20, 2012, [he] filed an Individual Complaint of Employment Discrimination" with FEMA's Office of Equal Rights); ECF No. 59-3 at 2 (Plaintiff's First EEO Complaint dated January 18, 2012). And, although Plaintiff did initiate EEO *counseling* in November 2011, it is undisputed that he did not assert a claim related to his designation as a Trainee—he could not have, because it had not yet occurred.

Similarly, Plaintiff does not allege that he successfully amended the First EEO Complaint to include the 2014 rescission of the job offer; he argues, rather, that the "act[ ] of retaliation in 2014" was "like or reasonably related to the claims" in the First EEO Complaint and that FEMA had notice of the claim, "and by inference opportunity to resolve [it], which served the substantial purpose of administrative exhaustion." ECF No. 49-1 at 45–46. Under the *Morgan* regime, a showing that an unexhausted claim is similar to an exhausted one is insufficient.[39] *See, e.g., Richter*, 686 F.3d at 852 ("Here, as in *Morgan*, 'our

most salient source for guidance is the statutory text.' We recognize that *Morgan* concerned discrete acts of an employer that occurred *prior* to the filing of an EEOC charge, rather than discrete acts of an employer that occurred thereafter, but the meaning of the phrase 'unlawful employment practice' does not vary based on the timing of the alleged unlawful acts. The term 'practice' no more subsumes multiple discrete acts when one of those acts occurs after the filing of an EEOC charge than it does when all acts occur before the charge is filed."); *see also, e.g., Martinez*, 347 F.3d at 1210–11 (similar).

[39]   Even if the Court applied the "like or reasonably related to" standard, this claim would still be unexhausted. For an unexhausted claim to be like or reasonably related to an exhausted one, it "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.' " *Park*, 71 F.3d at 907 (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)). Courts have held that unexhausted alleged acts of discrimination or retaliation that occur significantly later than the allegations investigated by the agency cannot be like or reasonably related to that earlier conduct because "the investigation could not have reasonably been expected to uncover" the subsequent conduct. *Redding v. Mattis*, 327 F. Supp. 3d 136, 141 (D.D.C. 2018). Thus, an alleged act of retaliation that occurred "almost a year" after the conduct the agency investigated was not exhausted under the like or reasonably related standard. *Id.* Here, the May 2014 job offer rescission occurred more than two years after the latest allegedly retaliatory act in the First EEO Complaint—the February 2012 demobilization from the Kirkwood Field Office. FEMA's "investigation could not [therefore] have been reasonably expected to uncover [it], because of the temporal distance between [it] and the allegations in [the] EEO charge that were actually investigated." *Id.*

**\*19** As to Plaintiff's "notice" argument, the D.C. Circuit indicated 40 years ago that "notice may be adequate where a claim is brought to the agency's attention 'during the course of the administrative proceeding' and 'before it issued its final decision' even if the argument or claim is not clearly set out in the [administrative] complaint." *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985) (quoting *President v. Vance*, 627 F.2d 353, 361 (D.C. Cir. 1980)). However, "[t]he vitality" of that decision "is questionable in light of the Supreme Court's subsequent decision in

*Morgan*." *Wright v. Barr*, No. 17-cv-1081, 2020 WL 13598000, at *15 (D.D.C. June 8, 2020), *report and recommendation adopted sub nom. Wright v. Garland*, 2022 WL 17584011 (D.D.C. Dec. 12, 2022). And, in any case, there is no support for Plaintiff's hypothesis that FEMA or the EEOC had the "opportunity to resolve" the claim. As discussed above, the May 2014 termination so postdated the conduct included in the First EEO Charge that the investigation cannot reasonably have been expected to uncover it. And, "as the District of Columbia Circuit has emphasized, '[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role ...' " *Lee v. McDonough*, No. 22-cv-319, 2024 WL 3858820, at *5 (D.D.C. Aug. 19, 2024) (first alteration in original) (quoting *Marshall*, 130 F.3d at 1098). Indeed, in *Redding* the court found claims unexhausted where the plaintiff had—as did Plaintiff here—"attempted to exhaust" them by unsuccessfully seeking permission from the EEOC administrative judge to amend her administrative complaint. 327 F. Supp. 3d at 141. Similarly, in *Lee*, the court found a claim unexhausted where the EEOC rebuffed plaintiff's attempts to raise it, finding that "the EEOC was not given 'an opportunity to handle [the] matter[ ] internally.' " 2024 WL 3858820, at *5. (alterations in original) (quoting *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017)). So it is here.

Accordingly, the Court finds that Plaintiff's claims based on his January 2012 designation as a Trainee Logistics System Specialist and the rescinded May 2014 job offer are unexhausted.

**B. The Merits**

This case has now been whittled down to claims that the following conduct violated Title VII's prohibition on racial discrimination and/or retaliation in federal employment: (1) Plaintiff's October 7, 2011, transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) his February 17, 2012, demobilization from the Kirkwood Field Office; (3) the March 2015 denial of his requests to telework; (4) the June 11, 2015, letter of reprimand; (5) the September and October 2015 restrictions on his use of a FEMA purchase card; (6) the September 2015 and March 2016 denials of his requests to become a Disaster Alternative Approving Official; (7) his supervisors' refusal to delegate authority for him to sign his staff's time cards and travel vouchers; (8) his supervisors' refusal to permit him to sign off on his staff's Position Task Books; (9) the February 19, 2016,

performance rating; (10) his supervisors' failure to allow him access to a coach evaluator during his 2015–2016 Jefferson City deployment; and (11) his May 20, 2016, termination. The government argues that much of that conduct does not constitute adverse employment action sufficient to sustain a discrimination or retaliation claim. It further contends that Plaintiff has not adduced evidence sufficient for a reasonable jury to find that any of the conduct at issue was motivated by discriminatory animus or retaliation.

1. Adverse Employment Action

As noted above, notwithstanding *Brady*'s exhortation that where the employer has provided a non-discriminatory reason for the conduct that allegedly violates Title VII, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case," 520 F.3d at 494, courts have nevertheless addressed the preliminary question of whether an adverse employment action has occurred before proceeding to the essential question of whether the employee produced enough evidence to for a reasonable jury to find that the employer's reason was mere pretext for intentional discrimination or retaliation. *See, e.g., Wright*, 2020 WL 13598000, at *9 (collecting cases). Defendant maintains that many of the actions at issue is insufficient to constitute adverse employment actions under Title VII. Specifically, it asserts that the denial of Plaintiff's requests to telework; the June 2015 letter of reprimand; the restrictions on Plaintiff's use of his purchase card; the refusal to permit Plaintiff to sign the timecards, travel vouchers, or Position Task Books, and the February 2016 performance rating do not qualify under the standards applicable to either claims of discrimination or claims of retaliation. *See* ECF No. 45-1 at 39–43. Plaintiff disagrees and argues that those actions are sufficiently adverse to meet the requirements of both a discrimination and retaliation claim under Title VII. *See* ECF No. 49-1 at 19–21, 38.

**\*20** This analysis is complicated by two factors. First, the standard by which a court measures whether an employment action is adverse differs depending on whether the claim is one for intentional discrimination or for retaliation. Second, although the parties agree on the standard for retaliation claims, they disagree on the standard applicable to intentional discrimination claims. The Court tackles the latter—and more complicated—question first.

*a. Intentional Discrimination*

Title VII uses different language when describing the types of employment actions that are prohibited in federal-sector employment and in non-federal-sector employment. The provision applicable to non-federal employers makes it an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The provision applicable to the federal government, on the other hand, requires that "[a]ll *personnel actions* affecting employees or applicants for employment ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a). Notwithstanding this difference in language, D.C. Circuit precedent has long held that "the two [provisions] contain identical prohibitions." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *see also, e.g.*, *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) ("Despite the difference in language between these two sections, we have held that Title VII places the same restrictions on federal ... agencies as it does on private employers ...."); *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977) ("[I]t is beyond cavil that Congress legislated for federal employees essentially the same guarantees against ... discrimination that previously it had afforded private employees.").

The government contends that the Supreme Court abrogated that precedent in 2020 when it decided *Babb v. Wilkie*, 589 U.S. 399 (2020). In that case, the Court addressed whether the federal-sector provision of the Age Discrimination in Employment Act ("ADEA")—which "provides (with just a few exceptions) that 'personnel actions' affecting individuals aged 40 and older 'shall be made free from any discrimination based on age'"—"imposes liability only when age is a 'but-for cause' of the personnel action in question." *Babb*, 589 U.S. at 402 (quoting 29 U.S.C. § 633a(a)). In holding that, under that provision of the ADEA, "age must be a but-for cause of discrimination—that is, of differential treatment—but not necessarily a but-for cause of a personnel action itself," the Supreme Court observed that

Section 633a(a) concerns "personnel actions," and while the ADEA does not define this term, its meaning is easy to understand. The Civil Service Reform Act of 1978,

which governs federal employment, broadly defines a "personnel action" to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews. That interpretation is consistent with the term's meaning in general usage, and we assume that it has the same meaning under the ADEA.

*Babb*, 589 U.S. at 405–06 (internal citation omitted) (citing 5 U.S.C. § 2302(a)(2)(A)). From this, the government argues that because the federal-sector provision of Title VII also uses the term "personnel actions," *see* 42 U.S.C. § 2000e-16(a), only adverse personnel actions as defined by the Civil Service Reform Act are actionable under that provision. *See* ECF No. 45-1 at 36. That is important because the Civil Service Reform Act includes in its definition of personnel actions "other, unenumerated 'change[s] in duties, responsibilities, or working conditions' only if they are 'significant.' " *Id.* (alteration in original) (quoting 5 U.S.C. § 2302(a)(2)(A)(xii)); *see also* ECF No. 59 at 28 (maintaining that "for an event to be actionable under the federal sector provisions of Title VII ... the identified event must either be an enumerated 'personnel action' under the Civil Service Reform Act or fall into that term's catch-all—i.e., 'any other *significant* change in duties, responsibilities, or working conditions' " (citations omitted) (quoting 5 U.S.C. § 2302(a)(2)(A)(xii))). The requirement that changes in duties, responsibilities, or working conditions be "significant" to be actionable is a higher standard than that applied under 42 U.S.C. § 2000e-2 (the non-federal-sector provision of Title VII) as recently interpreted by the D.C. Circuit and the Supreme Court.[40]

[40]    Interestingly, some courts have found that, if *Babb* were applied to Title VII claims, it would *expand* the universe of prohibited adverse employment actions. *See* *Fentress-Bussey v. Austin*, No. 23-cv-1080, 2024 WL 3823784, at *4 (E.D. Va. Aug. 14, 2024) (stating that judges in the Eastern District of Virginia have interpreted "the phrase 'personnel action' ... [to be] a broader, more inclusive term than the ordinarily used 'adverse employment action.' " (quoting *Abdelhamid v. Sec'y of the Navy*, 525 F. Supp. 3d 671, 684 (E.D. Va. 2021))); *Pembleton v. USAF*, No. 22-cv-3989, 2023 WL 9521898, at *9 n.12 (D.S.C. Sept. 15, 2023) (stating that, in *Babb*, the

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Supreme Court "signaled that the federal-sector term 'personnel action' should be interpreted more broadly than its private-sector counterpart 'employment action' " because the Civil Service Reform Act defines the term without regard "to the impact [such actions] have on the employee's job responsibilities"). That may be true for actions like "appointment, promotion, transfer, reassignment, and performance evaluations," *id.*, but, as noted, the statute mandates that "other ... changes in duties, responsibilities, or working conditions" must be "significant," 5 U.S.C. § 2302(a)(2)(A)(xii).

**\*21** In *Chambers v. District of Columbia*—a case alleging violations of the non-federal-sector provision of Title VII—the D.C. Circuit overruled its 1999 decision in *Brown v. Brody*—a case brought under the federal-sector provision of Title VII—and held that a plaintiff alleging intentional discrimination under Title VII need not show that an adverse employment decision caused "objectively tangible harm." *Chambers v. District of Columbia*, 35 F.4th 870, 875, 882 (D.C. Cir. 2022) (en banc) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). Two years later, in *Muldrow v. City of St. Louis*—a non-federal-sector case—the Supreme Court clarified that to support a discrimination claim under Title VII, a plaintiff need not show that an adverse employment action caused harm that was " 'significant' ...[,] [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." 601 U.S. 346, 355 (2024) (quoting *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022)). Rather, the plaintiff must show only "some harm respecting an identifiable term or condition of employment."[41] *Id.* at 354–55.

[41]      There is some disagreement over whether the "some harm" standard set in *Muldrow* conflicts with the en banc decision in *Chambers*. Justice Kavanaugh thought that it did, reasoning that the teaching of Chambers is that "[t]he discrimination is the harm" and "disagree[ing] with the Court's new some-harm requirement." *Muldrow*, 601 U.S. at 364–65 (Kavanaugh, J., concurring in the judgment). Still, he pointed out that the some-harm requirement is a "low bar" and opined that "the Court's approach and [his] preferred approach will land in the same place and lead to the same result in 99 out of 100 discriminatory-transfer cases, if not in all 100." *Id.* at 365. Courts in this district have similarly found that *Muldrow* and *Chambers* can

comfortably co-exist. *See, e.g., Dixon v. Blinken,* No. 22-cv-2357, 2024 WL 4144105, at \*2 (D.D.C. Sept. 11, 2024) ("*Muldrow* is consistent with the D.C. Circuit's decision in *Chambers* ...."); *see also, e.g., Stewart v. U.S. Dep't of Agric.*, No. 23-cv-1194, 2024 WL 4332618, at \*5 (D.D.C. Sept. 27, 2024) (applying *Chambers* post-*Muldrow*).

This Court, like several before it, rejects the government's argument that *Babb* requires federal-sector Title VII plaintiffs to make a different showing than non-federal-sector Title VII plaintiffs to establish an adverse employment action. As Judge Contreras explained:

> *Babb* is nothing new. When the D.C. Circuit decided *Chambers*, it was certainly aware of the "usual rule ... 'when the legislature uses certain language in one part of the statute and different language in another,' " courts should "assume[ ] different meanings were intended. But that general principle is not absolute, the D.C. Circuit has consistently interpreted Title VII's federal-sector and private-sector language in parallel, and there is no sign that *Chambers* wedged those provisions apart.
>
> The Court also gives little weight to the Supreme Court's assumption that the Civil Service Reform Act's definition of "personnel actions" applied to the ADEA: the *Babb* Court did not hold that this definition was controlling, but merely commented that it was consistent with standard usage and moved on from the issue. That observation has no effect on whether that definition must govern Title VII federal-sector claims. Moreover, Defendant does not grapple with the fact that their argument would hold the federal government to a *lower* standard than the private-sector, which would be the opposite of *Babb*. Defendant has not provided the compelling textual, structural, and historical evidence that would be necessary to convince this Court that Title VII's federal-sector provision should be a less-protective departure from the private-sector provision. And regardless, because D.C. Circuit precedent binds this Court to construe the provisions together, *Chambers* applies to this action.

**\*22** *Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at \*10 (D.D.C. Feb. 29, 2024) (alterations in original) (footnote omitted) (citations omitted) (quoting *DePierre v. United States*, 564 U.S. 70, 83 (2011)); *see, e.g., Turner v. Buttigieg*, No. 23-cv-1665, 2024 WL 4346332, at \*8 (D.D.C. Sept. 30, 2024) (rejecting the defendant's

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

argument that "a federal-employee [Title VII] plaintiff may only bring a claim based on an adverse 'personnel action' as defined by the Civil Service Reform Act"); *Stewart*, 2024 WL 4332618, at *4 (following *Doe v. Austin* on this point); *Bain*, 648 F. Supp. 3d at 53–55 (continuing to interpret the federal-sector and non-federal sector provisions of Title VII congruently notwithstanding the difference in language); *see also McCray v. McDonough*, No. 22-cv-2154, 2023 WL 171927, at *7 n.8 (D. Kan. Jan. 12, 2023) ("*Babb* addressed a different act—the Age Discrimination in Employment Act of 1967. And, as defendant concedes, this definition was proposed as dicta in *Babb*. Our Circuit hasn't applied the list of 'adverse personnel actions' in Title VII cases since the Supreme Court decided *Babb*. Instead, post-*Babb*, our Circuit has continued to apply the 'adverse employment action' standard to federal sector Title VII claims."); *cf. Fentress-Bussey*, 2024 WL 3823784, at *4 ("Although neither this District Judge nor the Fourth Circuit ha[s] addressed the impact of the *Babb* dicta, other district judges within this District have recognized that it is unclear whether the 'personnel action' definition would apply to Title VII ..."). Thus, the following discussion applies the *Muldrow/Chambers* regime to determine whether the conduct Defendant challenges constitutes adverse employment actions.[42]

[42]    The government appears to contend, at one point in its briefing, that the *Chambers/Muldrow* standard is congruent with the standard it advocates derived from *Babb*: "Objectively, if an event had no significant effect on Plaintiff's duties and responsibilities, or working conditions, then the same event cannot be construed as having any [e]ffect on Plaintiff's 'terms, conditions, or privileges of employment,' either." ECF No. 45-1 at 41. First, if that were the case, Defendant would not have needed to spill so much ink trying to convince the Court to apply a standard derived from *Babb*, because it would make no difference to the analysis. More fundamentally, the government's statement is simply wrong. That an event does not have a *significant* effect on a job's duties and responsibilities does not mean it has *no* effect on the terms, conditions, or privileges of employment.

### i. Denial of Requests to Telework

*Muldrow* requires that, to establish an adverse

employment action for the purposes of a Title VII discrimination claim, the plaintiff must show "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 347. Although rescinding or suspending an employee's approved telework schedule or refusing to permit an employee to engage in telework to which he is otherwise entitled may well be an adverse employment action under that standard, merely refusing an employee's request to telework is not, because there is no "identifiable term or condition of employment" that has been harmed by the denial. *Id.* Recent caselaw[43] bears that out. For example, in *Black v. Guzman*, the court found that the "suspension of plaintiff's telework benefits" was an adverse employment action because it was "an adverse change to plaintiff's 'terms, conditions, or privileges of employment,' " noting that being "forced ... to work in person instead of remotely" was a "major change[ ]" to the plaintiff's conditions of employment. No. 22-cv-1873, 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023) (citations omitted) (first quoting *Chambers*, 35 F.4th at 876; and then quoting *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022)). The court contrasted the suspension of the ability to telework with the "denial of a request for changes in work schedule"—such as a request to begin teleworking—because such a denial was "not an effective change in [the] plaintiff's existing work schedule." *Id.* at *8 n.8; *see also Kelso v. Vilsack*, No. 19-cv-3864, 2024 WL 5159101, at *3, *6 n.7 (D.D.C. Dec. 18, 2024) (finding that a supervisor's denial of three requests to telework on specific days from an employee who did not have a telework agreement did not constitute an adverse employment action); *cf. Dixon v. Blinken*, No. 22-cv-2357, 2024 WL 4144105, at *3 (D.D.C. Sept. 11, 2024) (finding that the denial of the plaintiff's "request to change his telework day on one occasion" was an adverse employment action because his " 'approved telework schedule' was plainly a term, condition, or privilege of his position"); *Imhof v. N.Y.C. Hous. Auth.*, No. 23 Civ. 1880, 2024 WL 3376084, at *10 (S.D.N.Y. July 11, 2024) (finding that allegations that the plaintiff was prohibited from working remotely three days per week "in contravention of [the employer's] policy ... plausibly pleaded an adverse employment action"); *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2023 WL 6276635, at *9 (D.D.C. Sept. 26, 2023) (finding, on a motion to dismiss, that "it is plausible that revocation of that [telework] arrangement forced Keith to work in-person rather than remotely, and thus amounted to an adverse change to the terms, conditions, or privileges of her employment"). As a court in the Northern District of Illinois explained, because employees who telework rely on that arrangement, the "loss of telework" is an adverse "change[ ] [in] the structure of an employee's workday."

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

*Miller v. O'Malley*, No. 20 C 2118, 2024 WL 4240443, at *4 (N.D. Ill. Sept. 19, 2024). Here, Plaintiff did not have an approved telework schedule and there is no evidence that he had a vested right to telework. He has therefore not shown "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 347.

43    The caselaw from this district cited here all post-dates *Chambers*, which was issued on June 6, 2022; the caselaw from outside this district cited here all post-dates *Muldrow*, which was issued on April 17, 2024.

**ii. Signature Authority for Position Task Books**

**\*23** Plaintiff has also not shown that any denial of the authority to sign off on subordinates' Position Task Books was an adverse employment action. To the contrary, he admitted in his deposition that such authority was not part of his job, that he never asked for such authority, and that he was not alleging that the denial of such authority was discriminatory or retaliatory. *See* ECF No. 45-8 at 28–29. Notwithstanding those admissions, Plaintiff's opposition brief inexplicably continues to press discrimination and retaliation claims based on the denial of the opportunity to "sign off on Plaintiff's staff Position Task Books." ECF No. 49-1 at 13; *see also id.* at 21, 28, 41. The Court finds that Plaintiff has not shown "some harm respecting an identifiable term or condition of employment" by being denied an opportunity that he has admitted he was not qualified to perform. *Muldrow*, 601 U.S. at 347.

**iii. Signature Authority for Timecards and Travel Vouchers**

It is a closer call whether supervisors' refusal to grant Plaintiff the authority to sign his subordinates' timecards and travel vouchers constitutes an adverse employment action. Plaintiff asserts that signing timecards and travel vouchers was among the duties and responsibilities of his position and a "necessary action in [his] job description." ECF No. 45-17 at 13; *see also* ECF No. 49-3, ¶ 44 (identifying signing off on timecards and travel vouchers as a "job duty"). Defendant acknowledges a slightly different point: that "ensur[ing] that all personnel time records [were] complete, accurate, and submitted within established timeframes was a common responsibility shared by all individuals with a supervisory position."

ECF No. 45-2, ¶ 116. But Defendant points to *Baloch*, in which the plaintiff maintained (among other things) that he suffered an adverse employment action when his substantive duties changed upon the hiring of another employee with his job title. *See* 550 F.3d at 1196; ECF No. 45-1 at 40. The D.C. Circuit disagreed. It found that, although after the new hire "some of [the plaintiff's] previous responsibilities were no longer his," the change "did not constitute qualitatively inferior work requiring less skill or knowledge" and emphasized that the court was "hesitan[t] to engage in 'judicial micromanagement of business practices' by second-guessing employers' decisions about 'which of several qualified employees will work on a particular assignment.' " *Baloch*, 550 F.3d. at 1197 (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997)). Defendant cites the case to show that the removal of the "shared duty or responsibility between [Plaintiff] and the Logistics Section Chief" to "sign for staffs' timecards and travel vouchers ... cannot be deemed adverse." ECF No. 45-1 at 40.

*Baloch*, of course, predates the change wrought by *Chambers* and *Muldrow*. More recent cases have suggested that a "stripping [an employee] of an organization of the duties normally associated with [his] post" will "clear[ ] the adverse-employment-action hurdle." *Yazzie v. Nat'l Org. for Women*, 712 F. Supp 3d 56, 79 (D.D.C. 2024); *Stewart*, 2024 WL 4332618, at *5 (quoting *Yazzie*). To be sure, Plaintiff never enjoyed the authority to sign off timecards or travel vouchers, so nothing was "stripp[ed]" from him, but he does assert that signing such documents was one of the duties associated with his job. *Cf. Imhof*, 2024 WL 3376084, at *10 (finding that prohibiting the plaintiff from enjoying one of the privileges of his job constituted an adverse employment action).

The government, however, asserts that that "nothing in the record can establish that this had a non-*de minimis*, let alone significant, effect on Plaintiff's duties and responsibilities or working conditions." ECF No. 45-1 at 40. But *Muldrow* did away with any requirement that an employment action have a "significant" deleterious effect to be considered adverse for the purposes of an intentional discrimination claim. *See* 601 U.S. at 355. And it is not clear whether an exception for de minimis harms survived *Chambers*—the en banc court declined to decide that question, *see* 35 F.4th at 875 ("[W]e need not decide today whether Title VII includes a de minimis exception ....")—or *Muldrow*. Indeed, the court in *Dixon*, while noting that *Muldrow* requires a showing of "some harm," also explained that "nothing in Title VII 'says anything about how much worse' or otherwise distinguishes

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

between 'significant disadvantages and ... not-so-significant ones.' " *Dixon*, 2024 WL 4144105, at *3 (alteration in original) (quoting *Muldrow*, 601 U.S. at 355). More, Defendant has not explained *why* the refusal to allow Plaintiff to perform a duty that he avers was among his job duties should be considered a de minimis harm—it simply asserts that it is. *See* ECF No. 45-1 at 40. The Court will therefore assume that Plaintiff has shown enough to defeat summary judgment as to whether the denial of signature authority was an adverse employment action for the purposes of an intentional discrimination claim. *See Dixon*, 2024 WL 4144105, at *3 ("Here, [the plaintiff] alleges that he was treated 'worse' than his female co-worker .... That is all Title VII requires ....").

### iv. Use of Purchase Card

**\*24** This is also a close call. It is undisputed that Plaintiff was provided a government credit card on May 26, 2015. *See* ECF No. 45-40 at 2–4. The memorandum accompanying the card asserts that Plaintiff was "appointed as a Cardholder with the authority to execute purchases in support" of FEMA's mission. *Id.* at 2. That is, it appears from the record in this case that Plaintiff was granted authority to make purchases with the card, as long as he obtained "written approval" and ensured there were sufficient funds available. *Id.* But Plaintiff testified at his deposition that Meyers refused to allow Plaintiff even to activate his card and thereafter denied two of Plaintiff's requests to make purchases. *See* ECF No. 45-8 at 21–22. Defendant does not counter that testimony. It appears from the record that those were the only two requests Plaintiff made. That is, although Plaintiff had been authorized to be a cardholder and make purchases (with approval), Meyers refused to allow him to activate his card and denied each of Plaintiff's later requests to make a purchase.

Defendant again supports its argument with caselaw that pre-dates *Chambers* and *Muldrow* and contends that the denial "on only two occasions[ ] could not have had a non-*de minimis*, let alone significant, effect on Plaintiff's duties and responsibilities or working conditions." ECF No. 45-1 at 40. That bare-bones argument is no more successful here than it is in connection with the denial of signature authority discussed above.

There is little precedent on point, although in a recent case, the government withdrew an argument that the suspension of a government credit card was "not sufficiently adverse to sustain an employment discrimination claim" in the wake of *Chambers*. *Cobb v. Del Toro*, No. 20-cv-3015, 2023 WL 6215037, at *7 (D.D.C. Sept. 25, 2023). Because there is evidence in the record that indicates that Plaintiff had "authority" to make purchases with the government credit card and that he was denied that ability every time he asked to exercise it and—crucially—because Defendant's argument that the denials were not sufficiently adverse is wanting, the Court will not grant summary judgment for Defendant on that basis.

### v. July 2015 Letter of Reprimand

Even post-*Chambers* (and post-*Muldrow*), courts have found that to be considered an adverse employment action, a letter of reprimand must lead to some deleterious change in the terms, conditions, or privileges of employment. *See, e.g.*, *Holmes v. Washington Metro. Area Transit Auth.*, 723 F. Supp. 3d 1, 17 (D.D.C. 2024) ("[T]he D.C. Circuit 'has held that formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.' A formal reprimand can be an adverse action, however, if it serves as 'a building block' that justifies an adverse action down the road." (citations omitted) (first quoting *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002)); and then quoting *Robb v. Vilsack*, No. 20-cv-929, 2021 WL 3036796, at *13 (D.D.C. July 19, 2021)); *Rupard v. Mayorkas*, No. 22-cv-1806, 2023 WL 5650083, at *5 (D.D.C. Aug. 31, 2023) (" 'Run-of the mine letters of reprimand are generally not adverse employment actions,' at least when they are not 'abusive and do not lead to disciplinary action.' " (quoting *Bell v. Fudge*, No. 20-cv-2209, 2022 WL 4534603, at *6 (D.D.C. Sept. 28, 2022))); *Mitchell v. Planned Parenthood of Greater New York, Inc.*, No. 23-cv-01932, 2024 WL 3849192, at *10 (S.D.N.Y. Aug. 16, 2024) ("[A] 'mere admonition by a supervisor without any formal consequences is not an adverse employment action because it does not represent any disadvantageous change in the terms or conditions of the plaintiff's employment.' " (quoting *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024))).

Here, Defendant asserts that "nothing in the record ... establishes that Plaintiff's ... letter of reprimand had any effect on Plaintiff's terms, conditions, or privileges of employment such that it could appropriately be considered to be an [a]dverse action."[44] ECF No. 45-1 at 42. However, Plaintiff's notice of termination explicitly states that the June 11, 2015, reprimand "for similar misconduct" was "taken into consideration" when "determining the appropriate penalty to impose." ECF

No. 49-21 at 7. As such, it appears to have "serve[d] as 'a building block' " to "justif[y] an adverse action"—Plaintiff's termination—"down the road." *Holmes*, 723 F. Supp. 3d at 17 (quoting *Robb*, 2021 WL 3036796, at *13); *see also Robb*, 2021 WL 3036796, at *13 (finding a letter of reprimand can constitute an adverse employment action where it is used as a reason to justify a later dismissal and the causal connection between the reprimand and the dismissal is not "too tenuous"). Defendant does not address that connection. On this record, a reasonable jury could find that the letter of reprimand caused "some harm respecting an identifiable term or condition of employment," which is all *Muldrow* requires for the purposes of an intentional discrimination claim.[45] 601 U.S. at 354–55.

[44]   The only letter of reprimand in the record is from 2015. *See* ECF No. 45-7 at 11. The Court assumes that Defendant's identification of a "2016 letter of reprimand" is a typographical error, especially since the record cite it provides leads back to a copy of the June 11, 2015, letter of reprimand. *See* ECF No. 45-1 at 42 (Defendant citing, as support for its description of the content of the letter of reprimand, paragraph 97 of Defendant's Statement of Undisputed Facts, ECF No. 45-2, ¶ 97, which in turn cites ECF No. 45-7 at 11, which is the June 11, 2015, letter of reprimand)

[45]   In *Bain*, the court dismissed the plaintiff's *retaliation* claim based on a letter of reprimand that the plaintiff alleged led to her dismissal years later, finding the letter did not "create a predictable and direct prospect of [tangible job] consequences," but allowed a discrimination claim based on the letter to go forward, at least until summary judgment. 648 F. Supp. 3d at 57. The case is discussed more fully in Section III.B.1.b.v.

#### vi. February 2016 Performance Evaluation

**\*25** This analysis mirrors the prior one but—as happens with mirrors—comes out the other way. As above, post-*Chambers* caselaw from this district and post-*Muldrow* caselaw from other districts require a performance review to have some identifiable negative effect on the terms, conditions, or privileges of employment before it will be considered an adverse

employment action for the purposes of an intentional discrimination claim. *See, e.g.*, *Johnson v. Hartogensis*, No. 19-cv-1998, 2023 WL 6479495, at *4 (D.D.C. Oct. 5, 2023), *aff'd*, No. 23-cv-5279, 2024 WL 3076788 (D.C. Cir. June 20, 2024) ("A lowered performance appraisal that is tied to lost compensation can constitute an adverse action."); *Keith*, 2023 WL 6276635, at *7 (finding that an allegation that a negative performance review with no supporting facts "suggesting the precise manner in which" it had an adverse impact on a term, condition, or privilege of employment did not make out an adverse employment action for an intentional discrimination claim); *Heavans*, 648 F. Supp. 3d at 14 (finding that poor performance reviews "[fell] into the category of a supervisor's ordinary workplace exercise of authority that did not adversely affect the conditions of [the] plaintiff's employment, though these actions undoubtedly caused tribulations, eroded [the] plaintiff's morale, and likely undermined his supervisory position ...."); *see also, e.g.*, *Knispel v. Haaland*, No. 21-cv-3015, 2025 WL 306426, at *14 (D.S.D. Jan. 27, 2025) ("An unfavorable evaluation alone is not an adverse employment action but may be actionable 'where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.' " (quoting *Spears v. Mo. Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 854 (8th Cir. 2000))); *Aly v. Yellen*, No. 23-cv-01699, 2024 WL 2053492, at *5 (D. Md. May 8, 2024) ("[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (alteration in original) (quoting *Dortch v. Cellco P'ship*, 770 F. App'x 643, 647 (4th Cir. 2019))).[46]

[46]   The court in *Turner* found that an allegation that the plaintiff received "a performance rating of 'exceeds expectations,' rather than her usual rating of 'outstanding,' due to her race and sex" sufficiently pleaded an adverse employment action because, if the evaluation was lowered "due to discriminatory animus, it is actionable." 2024 WL 4346332, at *7–8. As support, the court turned to "[t]he following hypothetical from *Chambers* ...: imagine 'an employer that provides doughnuts every week for employees but hangs a "whites only" sign over the doughnuts.' " Being subjected to such a blatantly discriminatory workplace policy (even if the policy is doughnut distribution) is itself a harmful condition of employment." *Id.* (citation omitted) (quoting *Chambers*, 35 F.4th at 878). But it is not clear whether that hypothetical still has vitality after *Muldrow*, which requires a showing of "some harm respecting *an identifiable term or condition*

*of employment.*" 601 U.S. at 354–55 (emphasis added). Justice Kavanaugh read the "some harm" requirement to mean some harm in addition to the discrimination itself: "I disagree with the Court's new some-harm requirement. No court has adopted a some-harm requirement, and no party or *amicus* advocated that requirement to this Court. More to the point, the text of Title VII does not require a separate showing of some harm. The discrimination is harm." *Id.* at 364–65 (Kavanaugh, J., concurring in the judgment). He also recognized that the statute requires another showing: "whether the relevant employment action changes the compensation, terms, conditions, or privileges of employment." *Id.* at 365. Leaving aside the doughnut hypothetical, it is not clear how a performance review that has no identifiable adverse consequences can be said to "change the compensation, terms, conditions, or privileges of employment." *Id.* at 354–55.

Defendant contends that "Plaintiff can point to nothing in the record that establishes that his 2016 performance evaluation had any effect on his terms, conditions, or privileges of employment." ECF No. 45-1 at 42. In this instance, it is correct. Plaintiff does not suggest that the evaluation—in which he received a satisfactory, if not stellar, rating—caused any adverse change in the terms, conditions, or privileges of his employment, *see, e.g.*, ECF No. 49-1 at 22, and the Court's review of the record has not revealed any such consequences. In short, Plaintiff has not shown "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 347.

### b. Retaliation

**\*26** Although "the retaliation standard historically 'encompass[ed] a broader sweep of actions' than the discrimination standard did, the opposite is true after the D.C. Circuit's landmark decision in *Chambers*[,]" *Flores v. Crown Bldg. Maint., Co.*, No. 23-cv-275, 2024 WL 1795974, at \*5 (D.D.C. Apr. 25, 2024) (alteration in original) (citation omitted) (quoting *Baloch*, 550 F.3d at 1198 n.4), which "limited its holding to discrimination claims and left the existing 'materially adverse action' standard in place for retaliation claims," *Leach v. Yellen*, No. 18-cv-3075, 2023 WL 2496840, at \*6 (D.D.C. Mar. 14, 2023), *aff'd*, No. 23-5100, 2024 WL 4274378 (D.C. Cir. Sept. 24, 2024); *see also Heavans*, 648 F. Supp. 3d at 16(noting that post-*Chambers*, "courts still look for

'objective' materiality [when addressing retaliation claims] in much the same way that they used to require 'objectively tangible harm' in discrimination claims"). "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. In *Muldrow*, the Supreme Court reaffirmed that "Title VII's anti-retaliation provision ... applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." 601 U.S. at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Court explained that "[t]he test was meant to capture those ... employer actions serious enough to 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.' An action causing less serious harm will not deter Title VII enforcement and so falls outside the purposes of the ban on retaliation." *Id.* (quoting *White*, 548 U.S. at 68). The standard is "objective and captures only 'significant,' rather than 'trivial,' harms," which " '[t]ypically ... involve[ ] "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." ' " *Watkins v. Dep't of Just.*, No. 23-cv-766, 2024 WL 4362156, at \*9 (D.D.C. Sept. 30, 2024) (first and second alterations in original) (first quoting *White*, 548 U.S. at 68; and then quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).

The Court now applies that standard to the six allegedly materially adverse actions addressed above.

### i. Denial of Requests to Telework

As above, although the revocation of an existing telework arrangement may constitute a materially adverse employment action and support a retaliation claim, the denial of an "initial telework request" does not. *Saunders v. Mills*, 172 F. Supp. 3d 74, 101 (D.D.C. 2016); *see also, e.g.*, *Kirton v. Mayorkas*, No. 18-cv-1580, 2021 WL 981241, at \*7 (D.D.C. Mar. 16, 2021) ("An employer's decision to not grant the permission to telework, on its own, simply does not entail the type of harm that is actionable under [the anti-retaliation provisions of] Title VII."); *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 41 (D.D.C. 2013) ("[T]he denial of an employee's request to work from home on a few occasions, without more, does not constitute an adverse employment action under Title VII ... under the ... standard applicable to retaliation claims."). That is especially true where, as here, the request was

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

ultimately granted. *See Pauling v. District of Columbia,* 286 F. Supp. 3d 179, 207 (D.D.C. 2017) (finding no materially adverse action where "although there was a delay in providing the plaintiff with ... telecommuting privileges, it is undisputed that she eventually received those benefits, even after filing an OHR complaint and initiating this lawsuit").

#### ii. Signature Authority for Position Task Books

As noted above, *see* Section III.B.1.a.ii, *supra,* Plaintiff admits that he was not qualified to sign off on subordinates' Position Task Books, so the fact that he was not allowed to do so did not cause even "some harm," let alone the significant harm necessary to support a retaliation claim. *Muldrow,* 601 U.S. at 348, 350.

#### iii. Signature Authority for Timecards and Travel Vouchers

As discussed above, Plaintiff asserts, without contradiction from Defendant, that signing timecards and travel vouchers was a duty and responsibility of his position that was withheld from him. *See* Section III.B.1.a.iii, *supra.* But the D.C. Circuit has held that "inconveniences" like " 'alteration of job responsibilities [does] not rise to the level of adverse action' necessary to support a [retaliation] claim." *Taylor v. Solis,* 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Stewart v. Evans,* 275 F.3d 1126, 1135 (D.C. Cir. 2002)).

#### iv. Use of Purchase Card

This analysis is like the one above. It is undisputed that Plaintiff had the authority to make purchases with a government credit card with written approval from a supervisor and approval was withheld. Nevertheless, that is precisely the kind of minor inconvenience that will not support a retaliation claim. *See Searcy v. Locke,* No. 09-cv-1142, 2010 WL 3522967, at *8 (E.D. Va. Sept. 7, 2010) (finding that removing the plaintiff's responsibilities as a purchase card coordinator for the U.S. Patent and Trademark Office was "not a materially adverse action within the meaning of *Burlington Northern*").

#### v. June 2015 Letter of Reprimand

**\*27** Generally, "letters of reprimand setting forth allegations of deficient work performance ... are not materially adverse action[s]." *Stewart v. United States Dep't of Agric.,* No. 23-cv-1194, 2024 WL 4332618, at *6 (D.D.C. Sept. 27, 2024); *see also Flores,* 2024 WL 1795974, at *6 ("As our Circuit has held time and again, '[F]ormal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.' " (alteration in original) (quoting *Stewart v. Evans,* 275 F.3d 1126, 1136 (D.C. Cir. 2002))). Here, of course, the reprimand was considered in the decision to terminate Plaintiff almost one year later. *See* ECF No. 49-21 at 7. That does not cause the reprimand to rise to the level of a materially adverse employment action for the purposes of a retaliation claim, however. In *Bain,* the plaintiff—a former immigration judge with the Department of Justice—made a retaliation claim alleging that counseling letters and "somewhat less positive [performance] review[s]" were materially adverse actions because "DOJ relied on them when taking more tangible actions against her, most notably terminating her." 648 F. Supp. 3d at 57–58. Judge Moss disagreed. He reasoned:

> [W]hether tangible job consequences eventually occurred is not the question. The question is whether these consequences were foreseeable at the time the challenged actions occurred. If the rule were otherwise, each instance of retaliation that fell short of an adverse action on its own would linger like some kind of Schrödinger's cat, either actionable or unactionable based on some future event that may or may not transpire. Here, at the time Bain received the evaluations and counseling letters at issue, there was no reason to believe that these actions would provide support for her later dismissal.... Even when it happened, Bain's removal was predicated on her conduct in certain immigration hearings with no connection to her evaluations and counseling letters. The letters and evaluations came into play only when DOJ considered Bain's record to identify aggravating and mitigating factors—including whether she was on notice "regarding the expectations of professional behavior"—for purposes of imposing a sanction. The connection between the events is thus apparent only in hindsight and would have been entirely speculative at the time Bain received the letters and evaluations. That does not suffice.

> There are further reasons, doctrinal and practical, to reject the rearview-mirror understanding of adverse actions that Bain advances. For one thing, the notion that retaliatory acts that do not lead predictably and

directly to tangible job consequences persist indefinitely as inchoate adverse actions pending some future conduct cannot be reconciled with *Morgan*'s admonition that discrete retaliation claims are just that: discrete. They therefore "occur" at a definite and knowable time, and the merits of those discrete claims do not turn on whether they may be "related to" any future acts. Nor is any such theory necessary to provide relief to plaintiffs. A retaliatory act that is not cognizable when it occurs provides an employee no entitlement to relief at that time. If, at a later date, an adverse action occurs that was caused by the prior retaliatory act, the employee can challenge that latter action.... And no matter what, a prior, non-cognizable retaliatory act can still provide evidence to support later claims based on acts that *are* sufficiently adverse. Here, Bain is free to use her counseling letters and performance evaluations as evidence in support of her claim related to her termination, among others.

*Id.* at 58–59 (internal citations omitted) (emphasis in original). Here, as in *Bain*, Plaintiff had no reason to believe at the time the reprimand was issued it would provide support for his dismissal months later, a dismissal predicated not on the behavior at issue in the June 2015 reprimand, but rather on actions between November 2015 and April 2016. *See* ECF No. 49-21 at 2–3. And here, as in *Bain*, the June 2015 reprimand was considered only in relation to the choice of sanction. *See id.* at 7. And so "[t]he connection between the events is ... apparent only in hindsight and would have been entirely speculative at the time [Plaintiff] received the letter[ ] .... That does not suffice."[47] *Bain*, 648 F. Supp. 3d at 58.

[47]   Also like in *Bain*, here the Court has found that the same reprimand could be an adverse employment action for the purposes of an intentional discrimination claim. *See Bain*, 648 F. Supp. 3d at 57 (allowing an intentional discrimination claim based on counseling letters to proceed to summary judgment).

### vi. February 2016 Performance Evaluation

**\*28** A performance evaluation—even one "that is not negative or 'adverse in an absolute sense' "—can be materially adverse to support a retaliation claim if the plaintiff "present[s] evidence that the evaluation[ ] '[was] attached to' specific and tangible 'financial harms.' " *Bridgeforth v. Salazar*, 831 F. Supp. 2d 132, 143–44 (D.D.C. 2011) (first quoting *Weber v. Battista*, 494 F.3d

179, 185 (D.C. Cir. 2007)); and then quoting *Taylor*, 571 F.3d at 1321, *aff'd in relevant part*, No. 12-5015, 2012 WL 2371601 (D.C. Cir. June 15, 2012) (per curiam), *and aff'd sub nom. Bridge-forth v. Jewell*, 721 F.3d 661 (D.C. Cir. 2013). As noted above, Plaintiff has failed to present evidence linking his February 2016 performance rating to any tangible adverse consequence. *See* Section III.B.1.a.vi, *supra*. The performance rating cannot, therefore, support a retaliation claim.

### 2. Pretext

To recap, any claims related to Plaintiff's designation as Trainee in January 2012 are unexhausted, as are any claims related to the rescinded May 2014 job offer. The denials of Plaintiff's requests to telework, refusal to allow Plaintiff to sign off on subordinates' Position Task Books, and February 2016 performance evaluation are not adverse employment actions for the purposes of either an intentional discrimination claim or retaliation claim. The refusal to allow Plaintiff to sign off on timecards and travel vouchers, failure to approve his use of a government credit card, and July 2015 reprimand can support an intentional discrimination claim but not a retaliation claim. Accordingly, intentional discrimination claims remain based on the following actions: (1) the October 2011 transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) the February 17, 2012, demobilization from the Kirkwood Field Office; (3) the June 2015 letter of reprimand; (4) the September and October 2015 failure to approve Plaintiff's use of a government credit card; (5) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (6) the failure to delegate to Plaintiff the authority to sign off on subordinates' timecards and travel vouchers; (7) the denial of access to a coach evaluator; and (8) his May 2016 termination. Retaliation claims remain based on the following actions: (1) the October 2011 transfer from the Hewlett Field Office to the Kirkwood Field Office; (2) the February 17, 2012, demobilization from the Kirkwood Field Office; (3) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (4) the denial of access to a coach evaluator; and (5) his May 2016 termination. Defendant has proffered a non-discriminatory and/or non-retaliatory reason for each of those actions except for the October 2011 transfer. As to that action, Defendant admits that the reason proffered by Alonso for the transfer (which was to save FEMA money) was false but asserts that Plaintiff has nevertheless failed to show that discrimination or retaliation was the true reason for the

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

transfer. Plaintiff contends that all reasons are pretextual. The Court addresses those arguments below.

*a. Intentional Discrimination*

i. 2011 Transfer

As noted, Plaintiff was transferred to the Kirkwood Field Office from the Hewlett Field Office while Swindells, a Caucasian employee of the same rank as Plaintiff, was transferred to the Hewlett Field Office from the Kirkwood Field Office. ECF No. 45-2, ¶ 36. The reason given for the transfer was budgetary: Alonso asserted that, because Swindells lived close to the Hewlett Field Office, transferring him there would save the government hotel charges and *per diem* payments that he received when in "travel status" working more than 50 miles from his home. *See id.*, ¶¶ 36–37; ECF No. 49-7 at 3 (explaining eligibility for *per diem* payments). It is undisputed that that explanation was false, and, in fact, Alonso and his deputy Swedlow provided misleading information that allowed Swindells to continue receiving such payments. *See* ECF No. 45-2, ¶¶ 42–44; *see also* ECF No. 45-34.

**\*29** In *Aka v. Washington Hospital Center*, the D.C. Circuit addressed what more, if anything, is required of a plaintiff resisting summary judgment who has already shown that the employer's stated reason for an adverse employment action is false. *See* 156 F.3d 1284, 1289–94 (D.C. Cir. 1998) (en banc). The court held that a plaintiff who "discredit[s] ... an employer's stated reason for its employment decision" will not "*always* be deemed to have presented enough evidence to survive summary judgment"; rather, "the court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination and accordingly summary judgment is inappropriate." *Id.* at 1290. The court provided examples of when showing the stated reason is pretextual would not be sufficient to survive summary judgment, including "a case in which the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation." *Id.* at 1291. Defendant fastens on that illustration and argues that a reasonable jury could not find that Alonso's reason for the transfer was racially discriminatory: "[E]ven if the real reason for Plaintiff's transfer in October 2011 was to defraud FEMA of money,

Plaintiff's discrimination and retaliation claims still fail where the actual motivation for the transfer is not discrimination or retaliation." ECF No. 45-1 at 33. In its reply, the government asserts that "the undisputed record shows that ... Swindells was transferred because he lived in Long Island and therefore appeared like he would not have to be paid travel expenses, even though an investigation revealed that he and his supervisors continued to process and pay such travel expenses after the transfer." ECF No. 59 at 21. The government's problem is that the admissible evidence in the record does not "*conclusively demonstrate[ ]*" that the real explanation" for the transfer was a plan to defraud the government. *Aka*, 156 F.3d at 1291 (emphasis added). Indeed, the Office of Special Counsel's report of its investigation found that the fraud was planned "in the span of 33 minutes on *October 7, 2011*," ECF No. 45-34 at 3 (emphasis added), which is *after* Plaintiff was informed of the transfer on October 6, 2011, *see* ECF No. 45-2, ¶ 38; *see also* ECF No. 59-3 at 17. That evidence squarely contradicts Defendant's current theory that the non-discriminatory reason for the transfer was to facilitate the fraud. Accordingly, it would not be inconsistent with the record for a reasonable jury to find that the reason for the transfer was discrimination.

The government does not argue that the circumstances of the transfer, in which a Caucasian colleague was allegedly treated more favorably than Plaintiff was, are insufficient to raise an *inference* of discrimination. *See Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) ("A plaintiff can raise an inference of discrimination by showing 'that [he] was treated differently from similarly situated employees who are not part of the protected class' " (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005))). Rather, it faults Plaintiff for failing to "point[ ] to evidence of intentional discrimination to survive summary judgment" or to cite "support for the claim that the mere fact that he switched positions with someone who was not part of his protected class, alone, mean[s] that the transfer was intentionally discriminatory." ECF No. 59 at 21. Those points misunderstand the law. *Aka* indicates that, here, Plaintiff need not point to additional evidence of intentional discrimination to create a genuine issue of material fact as to whether the transfer was intentionally discriminatory. In *Aka*, the en banc court refused to endorse a rule that "plaintiffs are presumptively required to submit evidence over and above ... a rebuttal [of the defendant's non-discriminatory reason for the employment action] in order to avoid summary judgment." 156 F.3d at 1292. To be sure, a plaintiff "cannot always avoid summary judgment by showing the employer's explanation to be false" but "such a showing does have considerable

evidentiary significance." *Id.*

> First, when the plaintiff rebuts the employer's own explanation of its challenged acts, this eliminates the principal nondiscriminatory explanation for the employer's actions. Events have causes; if the only explanations set forth in the record have been rebutted, the jury is permitted to search for others, and may in appropriate circumstances draw an inference of discrimination.

*Id.* Second, "[i]f the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination" because "according to ordinary evidentiary principles ..., a lie is evidence of consciousness of guilt. The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent." *Id.* at 1293; *see also id.* at 1294 ("In an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination.... If 'disbelief is accompanied by a suspicion of mendacity,' the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more readily." (alteration in original) (citations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993))). That is, *Aka* teaches that "in an appropriate case," a jury faced with evidence that the employer's non-discriminatory reason for an adverse employment action is "a lie" might reasonably conclude that the real reason is discrimination. *Id.* at 1293–94. This case, where there is not merely "a suspicion of mendacity," but *undisputed proof* that the reason Alonso gave for the transfer—saving FEMA money—was false, coupled with evidence contradicting the government's newly-minted theory that the actual motive was to commit fraud, fits the bill.[48] Accordingly—although it is perhaps a close call—Defendant is not entitled to summary judgment on this claim.

[48]      This case is thus different from the cases Defendant cites. In *Hendricks v. Geithner*, the court found that the plaintiff's evidence was insufficient to allow a reasonable jury to conclude that the employer's asserted reason for selecting a

male to promote rather than her was pretext. 568 F.3d 1008, 1013–14 (D.C. Cir. 2009). In *Brady*, somewhat similarly, the plaintiff alleged the employer's asserted non-discriminatory reason for demoting him—that he had previously engaged in sexual harassment—was falsified but failed to show that the employer did not honestly and reasonably believe that the incident occurred; he therefore failed to show pretext. 520 F.3d at 495–96. Here, however, there is no question that the explanation Alonso offered was a fiction.

### ii. February 2012 Demobilization

**\*30** For this claim, recall that, in a nutshell, Plaintiff's first-line supervisor Cole at the Kirkwood Field Office informed Plaintiff that he would be demobilized on February 24, 2012, pursuant to a directive from the Federal Coordinating Official to reduce personnel by twenty percent to save money. ECF No. 45-2, ¶¶ 48–49. Plaintiff was among those to be demobilized because he was an out-of-region employee being paid a *per diem. Id.*, ¶¶ 51, 54, 56. Plaintiff called Operations Director Bezou, who was outside Plaintiff's chain of command, to express concerns about the demobilization. *Id.*, ¶¶ 52–53. Logistics Chief Butkus decided to demobilize Plaintiff earlier on the basis that Plaintiff had breached the chain of command. *Id.*, ¶¶ 58–59. Plaintiff was demobilized on February 17, 2012. *Id.*, ¶ 60. Swindells, who was not out-of-region, was not demobilized from the Hewlett Field Office. *See* ECF No. 59-1 at 14–15. At that time, however, Swindells was nevertheless receiving travel expenses, including a *per diem,* pursuant to the scheme discussed previously. ECF No. 45-2, ¶¶ 42–43.

"A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race ... more favorably in the same factual circumstances." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (alteration in original) (quoting *Brady*, 520 F.3d at 495). "At the summary judgment stage, the Court 'must rely on evidence substantiated by the record' to conclude that the plaintiff and an asserted comparator are similarly situated." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (quoting *Anyaso v. U.S. Capitol Police*, 39 F. Supp. 3d 34, 43 (D.D.C. 2014), *aff'd sub nom. Nelson v. District of Columbia*, 689 F. App'x 642 (D.C. Cir. 2017)). "[I]f a reasonable jury would be unable to find that the plaintiff

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated." *Id.* "A plaintiff must ... demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee." *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995)). " '[T]he similarly situated inquiry is not a mechanical comparison,' but 'requires enough common factors to determine if intentional discrimination was at play' by 'eliminating confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.' " *Burton,* 153 F. Supp. 3d at 67 (quoting *Hnin v. TOA (USA), LLC,* 751 F.3d 499, 504–505 (7th Cir. 2014)).

Plaintiff identifies Swindells as his comparator. ECF No. 49-1 at 24. But Plaintiff has not shown that "all of the relevant aspects" of Swindells' employment situation were "nearly identical" to Plaintiff's at the time of the demobilization.[49] *Holbrook,* 196 F.3d at 261 (quoting *Neuren,* 43 F.3d at 1514). Plaintiff has not, for example, shown that the decision to demobilize Plaintiff and the decision to keep Swindells on were made by the same decisionmaker. *Ragsdale v. Holder,* 668 F. Supp. 2d 7, 25 (D.D.C. 2009) ("In order to show that [ ]he was similarly situated to a fellow employee, [the] plaintiff must 'demonstrate that all of the relevant aspects of their employment situation are nearly identical,' including working under the same supervisor." (second alteration in original) (quoting *Childs-Pierce v. Utility Workers of Am,* 383 F. Supp. 2d 60, 70 (D.D.C. 2005))). More, even if Plaintiff did show that, he has not pointed to any evidence that such a decisionmaker believed that Swindells and Plaintiff were similarly situated and yet treated Plaintiff more harshly. It is undisputed that out-of-region employees, who were being paid a *per diem,* were to be demobilized first. ECF No. 45-2, ¶¶ 56–57. Plaintiff was an out-of-region employee; Swindells was not. To be sure, at the time, Swindells, like Plaintiff, was receiving *per diem* payments. But Plaintiff has not pointed to any evidence that any supervisor responsible for Plaintiff's demobilization knew that Swindells, too, was receiving *per diem* payments (whether fraudulent or otherwise).[50] "[I]n assessing the pretextual nature of the proffered reason" for an adverse employment action—here, Plaintiff's demobilization for budgetary reasons—the court's task "is limited to determining whether the employer 'believe[d] in the accuracy of the reason given.' " *Cocuzzo v. Trader Joe's E. Inc.,* 121 F.4th 924, 932 (1st Cir. 2024) (second alteration in original) (quoting *Espinal v. Nat'l Grid NE Holdings 2, LLC,* 693 F.3d 31, 35 (1st

Cir. 2012)). Thus, "[a]n employer who makes a distinction between employees because that employer believes the employees are not similarly situated does not discriminate on an impermissible basis." *Pennington v. City of Huntsville,* 93 F. Supp. 2d 1201, 1216 (N.D. Ala. 2000), *aff'd,* 261 F.3d 1262 (11th Cir. 2001). So, to establish that Defendant's proffered reason for treating Plaintiff differently than Swindells was pretextual, Plaintiff would have to show not only that the decisionmaker "acted on an incorrect perception" of the facts (which he has done), but also that the decisionmaker "did not think the proffered interpretation [of those facts] was correct." *Cocuzzo,* 121 F.4th at 933. This, Plaintiff has not done.

[49]  Defendant does not argue that Swindells is an inappropriate comparator with regard to the October 2011 transfer.

[50]  It is undisputed that Logistics Chief Alonso knew Swindells continued to receive such payments; Alonso, however, was no longer Logistics Chief in February 2012, having been demobilized on or before December 19, 2011. *See* ECF No. 45-2, ¶ 35. Swedlow, too, was no longer in the Logistics Section. *See* ECF No. 59-3 at 18 (Logistics Section Organization Chart dated December 19, 2011).

**\*31** Plaintiff has also failed to raise a genuine issue of fact as to whether his early demobilization on February 17, 2012, rather than February 24, 2012, was based on discriminatory animus. Logistics Chief Butkus stated that he accelerated Plaintiff's demobilization because Plaintiff broke the chain of command when he complained to Operations Director Bezou about the demobilization. *See* ECF No. 45-2, ¶¶ 52–53, 58. "Ultimately, it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.' " *Hartzler,* 2022 WL 15419995, at \*19 (quoting *Crockett v. Richardson,* 127 F. Supp. 2d 40, 47 (D.D.C. 2001)). Here, "the core inquiry" on summary judgment is "whether [Plaintiff] has produced sufficient evidence for a reason to find that FEMA did not 'honestly believe in the reasons it offer[ed]' " for demobilizing Plaintiff on February 17, 2012. *Id.* (second alteration in original) (quoting *Fischbach,* 86 F.3d at 1183). Plaintiff has, again, not done so. His only attempt is a repeated assertion that Butkus "made clear that the acceleration of demobili[z]ation was motivated by [Plaintiff's] complaint to the [Office of Equal Rights]." ECF No. 49-1 at 43; *see*

*also id.* at 23, 32, 47. Not only would that not support an inference that the demobilization was based on racially discriminatory animus, but Plaintiff provides no evidence in support of it.[51] The Court therefore disregards it.

[51]    The only record citations Plaintiff offers to support this allegation appear to reference paragraphs 15 and 17 of the December 2023 Wilson Affidavit or perhaps paragraphs 15 and 17 of Plaintiff's Statement of Material Facts—it is unclear, because the bulk of the citations in Plaintiff's briefs are "*id.*," but they often do not refer back to the immediately preceding citation. *See* ECF No. 49-1 at 43, 47. None those paragraphs nor any other paragraph in the affidavit or Statement of Material Facts makes an assertion—whether in admissible form or not—that Butkus made such a statement.

Because Plaintiff has failed to raise a genuine issue of material fact as to whether the demobilization was discriminatory, Defendant is entitled to summary judgment on this claim.

### iii. June 2015 Letter of Reprimand

Regarding the June 2015 reprimand, Plaintiff asserts (1) of the ten members of the IMAT team, he, the only African American, was the sole employee reprimanded, ECF No. 49-1 at 25; (2) the reprimand's allegations "were disputed and shown to be weak and inconsistent," *id.* at 28; and (3) the reprimand was "issued without warning or counselling as required by Defendant's policies," *id.* at 47. None of those arguments defeats Defendant's motion for summary judgment.

First, as to the proposed comparators, the nine other members of the IMAT, Plaintiff has made no attempt to show that " 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee[s]," including that "they were charged with offenses of comparable seriousness." *Burley*, 801 F.3d at 301 (first two alterations in original) (quoting *Holbrook*, 196 F.3d at 261). Indeed, his sole argument as to comparators is the following paragraph:

> The IMAT Team consisted of a list of ten (10) individual with Mr. Wilson as the only African

American. *See Id.* ¶ 47. All the others were Caucasian Americans, except Mr. Maldanado who identified as of Hispanic background. *Id.* None of the other members on the IMAT Team were reprimanded, denied Purchase Card Use, DAAO, Signature Authority for PTB and Concur WebTA, Coach and Evaluator for Disaster and fired from the IMAT Team. Mr. Wilson was the only one on the IMAT Team who had prior EEO activity at the time.

ECF No. 49-1 at 25.[52] The record contains two charts that appear to identify other employees on the IMAT, one including position title and the other including race and ethnicity, but neither include more detailed information. *See* ECF No. 49-9 at 19–20. Thus, there is no information about facts like the other employees' "experience, seniority, or expertise," *Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013), or their "supervisors, responsibilities, or employment situations," *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 125 (D.D.C. 2014), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016). And the job-related information provided—position title—shows that each of the putative comparators had a different title than Plaintiff. *See* ECF No. 49-9 at 19. His attempt to show pretext with comparator evidence therefore fails. *See, e.g.*, *Moreno-Livini v. AFL-CIO Housing Inv. Tr.*, No. 24-cv-1392, 2024 WL 4144112, at *3 (D.D.C. Sept. 11, 2024) (noting that differences in job titles and duties are indications that two employees are not similarly situated).

[52]    "DAAO" stands for Disaster Alternative Authorizing Official; "PTB" stands for Position Task Book; Concur and WebTA are timecard and travel voucher programs.
    It is unclear what Plaintiff cites here as support in his opposition brief. Tracing back from the "*Id.*" to the immediately prior non-"*id.*" citation suggests that Plaintiff is referencing *Tennant v. District of Columbia*, No. 19-cv-2949, 2023 WL 5094916, at *21 (D.D.C. Aug. 9, 2023), but that cannot be right. The immediately prior non-"*id.*" citation to the record—coming thirteen pages before the citation at issue—is ECF No. 45-1 at 14, a page from Defendant's opening brief cited as support for the statement that Plaintiff's "2015 performance evaluation was issued in February 2016," ECF No. 49-1 at 12, so that cannot be right either. The next previous non-"*id.*" citation to the

record is four pages before that (on the second substantive page of Plaintiff's brief) and identifies Plaintiff's Statement of Material Facts as its source. *See* ECF No. 49-1 at 8. Paragraph 47 of that document reads, "On April 25, 2016, Mr. Meyers and or Mr. Tewes denied Mr. Wilson training for the E/L 06011-FEMA Incident Workforce Academy (FIWA), Tier II for Command and General Staff at the Emergency Management Institute (EMI) scheduled for September 12-16, 2016." ECF No. 49-2, ¶ 47. The Court will not root through the hundreds of pages of records filed in connection with this summary judgment motion to find factual support to fill in this evidentiary gap. *Jones v. Kirchner,* 835 F.3d 74, 83 (D.C. Cir. 2016) ("We apply forfeiture to unarticulated [legal and] evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." (quoting *Estate of Parsons v. Palestinian Auth.,* 651 F.3d 118, 137 (D.C. Cir. 2011))).

**\*32** Second, Plaintiff's contention that the evidence supporting the reprimand was "weak" and "disputed" appears to be an argument that the performance issues enumerated in the reprimand were false. For such an argument to succeed in showing pretext, "the plaintiff must establish a basis to conclude that the employer has lied about the reason or, more directly, that the reason was discriminatory." *Desmond v. Mukasey,* 530 F.3d 944, 963–64 (D.C. Cir. 2008). "And a plaintiff's subjective assessment of his own performance is not sufficient evidence of pretext." *Bruder v. Moniz,* 51 F. Supp. 3d 177, 188 (D.D.C. 2014). The record contains Plaintiff's rebuttal to the three charges in the reprimand. As to the charge that Plaintiff failed to attend a training course as instructed, *see* ECF No. 45-7 at 11, Plaintiff's rebuttal admits he "cancel[ed] and pull[ed] out of attendance," ECF No. 45-6 at 6; as to the charge that Plaintiff failed to provide requested information by the end of the May 14, 2015, workday, ECF No. 45-7 at 11, Plaintiff's rebuttal does not contradict that charge, but rather explains that his day was consumed with dealing with other important issues, *see* ECF No. 45-6 at 7; as to the charge that Plaintiff "lacked candor in continuing to pursue" permission for a FEMA Reservist to deploy to the regional office after the request had already been denied by higher-ups, ECF No. 45-7 at 11, Plaintiff does not contradict the representations but merely states that he kept his supervisor "informed both verbally and through emails," ECF No. 45-6 at 7. As noted, "it 'is not this

Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.' " *Hartzler,* 2022 WL 15419995, at *19 (quoting *Crockett,* 127 F. Supp. 2d at 47). Plaintiff has not presented a sufficient factual basis for a reasonable jury to find otherwise.

Finally, "[a] plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing ... its deviation from established procedures or criteria." *Walker,* 798 F.3d at 1092. Plaintiff asserts that he was not counseled or warned prior to the reprimand as required by FEMA's policies. ECF No. 49-1 at 47. However, there is no evidence in the record regarding FEMA's policies on letters of reprimand—just a bald statement by Plaintiff that some unidentified policy required either counseling or warning or, perhaps, both, prior to issuance of such a letter. "But 'a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to genuine issues of material fact in the record' ...." *SaintPreux v. Mayorkas,* No. 19-cv-01364, 2021 WL 3912180, at *4 (D.D.C. Sept. 1, 2021) (quoting *Accurso v. FBI,* No. 19-cv-2540, 2021 WL 411152, at *8 (D.D.C. Feb. 5, 2021)), *aff'd* No. 21-5221, 2022 WL 1177328 (D.C. Cir. Apr. 14, 2022). More fundamentally, the record contains a letter entitled "Formal Counseling Regarding Your Failure to Follow Specific Instructions" dated May 20, 2015, that includes a discussion of each of the incidents included in the reprimand. *See* ECF No. 49-9 at 82–83.

Defendant is entitled to summary judgment on this claim.

iv. Use of Purchase Card

Defendant asserts that Plaintiff was denied the ability to use his government credit card because he had not demonstrated that he understood the ordering and receiving process, failed to maintain copies of transaction information, and failed to ensure that receiving reports for all shipments were received. ECF No. 45-2, ¶ 102. Logistics Section Chief Meyers explained that, considering this failure to "understand the basic procedures for procurement and receiving," Plaintiff would not be "allowed to make things worse by making additional purchases without maintaining copies of his requests for equipment and supplies, as well as corresponding funding documents, receipts, and purchase card transaction documentation." ECF No. 45-23 at 9.

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Plaintiff again asserts that none of the other nine members of the IMAT were denied use of a purchase card. ECF No. 49-1 at 25. And again, he does not even attempt to show that " 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee[s]." *Burley*, 801 F.3d at 301 (first two alterations in original) (quoting *Holbrook*, 196 F.3d at 261). He also asserts that the denials were contrary to FEMA policy but cites nothing in the record reflecting a policy related to the use of a government credit card or supporting the claim that the denials violated such a policy. *See* ECF No. 49-1 at 29. Indeed, the closest thing to a policy in the record is the purchase card agreement, which provides that his appointment as a cardholder could be revoked at any time "for cause or no cause," indicating that supervisors had wide discretion as to the card's use. ECF No. 45-40 at 4.

**\*33** Plaintiff indicates that IMAT Team Lead Tewes was involved in this denial (as well as many other adverse employment actions discussed here). *See* ECF No. 49-2, ¶¶ 37 (use of purchase card), 38 (Disaster Alternative Approving Official), 44 (signature authority for timecards and travel vouchers), 49 (coach evaluator), 50 (termination). He also contends that, "[o]n one occasion" prior to Plaintiff's termination, Tewes reported to Seymour—the Office of Equal Rights official deployed to Jefferson City in January 2016—that Plaintiff was lazy, which Seymour understood to be a racially derogatory comment. *Id.*, ¶ 41. Even assuming Seymour's interpretation of Tewes' comment was correct, the D.C. Circuit has found that "an isolated race-based remark unrelated to the relevant employment decision [cannot], without more, permit a jury to infer discrimination." *Morris v. McCarthy*, 825 F.3d 658, 669–70 (D.C. Cir. 2016); *see also Hendricks*, 568 F.3d at 1014 (finding evidence that a decision-making manager had a history of making misogynist comments was insufficient for a jury to conclude that the non-discriminatory reason offered by the defendant for the adverse employment action was pretext, "much less that [the plaintiff] was not selected because of her sex"); *McDaniel v. Vilsack*, No. 12-cv-723, 2016 WL 5349198, at \*5–6 (D.D.C. Sept. 23, 2016) (finding that an isolated statement by the decision-making supervisor that the plaintiff should "stop acting white" was neither direct nor circumstantial evidence of discrimination when it was not explicitly linked to the adverse employment action alleged), *aff'd sub nom. McDaniel v. Perdue*, 717 F. App'x 5 (D.C. Cir. 2017). That is what Plaintiff's evidence amounts to—a single (and somewhat oblique) race-based remark that Plaintiff has failed to link to the denial of use of the purchase card or to any of the other adverse employment actions at issue.

Defendant is entitled to summary judgment on Plaintiff's intentional discrimination claim related to the purchase card.

v. Denial of Requests to Become Disaster Alternative Approving Official

Defendant offers three reasons for the denial of Plaintiff's requests to become a Disaster Alternative Approving Official. Plaintiff's first request (in September 2015) was denied by Logistics Section Chief Meyers because Plaintiff lacked an understanding of the ordering and receiving process; his second request (in March 2016) was denied by Deputy Logistics Section Chief Turnis because Plaintiff lacked judgment and failed to follow directions; Team Lead Tewes also explained that there were a sufficient number of officials with approval authority on the Jefferson City Deployment. *See* ECF No. 45-2, ¶¶ 107–111. Plaintiff's arguments are identical to those above: only he out of the ten IMAT members was denied the opportunity to become a Disaster Alternative Approving Official and the denial violated FEMA policy. *See* ECF No. 49-1 at 25, 29. They again fail because Plaintiff has not shown that any of the other IMAT members are appropriate comparators and has pointed to no policy that would require supervisors to appoint him a Disaster Alternative Approving Official. True, it is undisputed that Meyers asked Plaintiff to complete training for the position. *See* ECF No. 45-2, ¶ 106–07. But there is nothing in the record indicating that completion of that training entitled him to be appointed to the position and nothing to show that the supervisors who denied that appointment "did not 'honestly believe in the reasons [they] offer[ed]' " for the denial. *Hartzler*, 2022 WL 15419995, at \*25 (second alteration in original) (quoting *Fischbach*, 86 F.3d at 1183).

The fact that an investigation determined that some payments were approved by individuals who had not received training to be Disaster Alternative Approving Officials, *see* ECF No. 45-2, ¶¶ 112–113, does not create a genuine issue of material fact as to whether the non-discriminatory reasons provided for denial of Plaintiff's requests to become a DAAO were pretextual—and Plaintiff makes no argument that it does. In any case, the investigation says nothing about whether Meyers and Turnis reasonably believed the performance-related reasons given for denying Plaintiff's requests. On the other hand, the investigation *supports* Tewes' assertion that there were sufficient officials with signature authority on that deployment. It found that

2025 WL 1000666

"approval authority was vested in several different agency representatives" and that "proper procedures were followed." ECF No. 45-43 at 4. Defendant shall be granted summary judgment on this ground.

### vi. Signature Authority for Timecards and Travel Vouchers

**\*34** Defendant explains that Plaintiff was denied the authority to sign off on subordinates' time-cards and travel vouchers because it was unnecessary for him to have that authority: Logistics Chief Meyers had authority to sign those records for the small number of people deployed to the Logistics Section in Jefferson City and when he left that deployment in February 2016, Deputy Logistics Chief Turnis took over. *See* ECF No. 45-2, ¶¶ 114, 118–120. Again, Plaintiff asserts that only he was denied such signature authority without establishing that any of the other nine individuals on the team are appropriate comparators and that the denial violated FEMA policy without providing any evidence of such a policy. He has not shown that Defendant's explanation was a pretext concealing discrimination.

### vii. Coach Evaluator

According to Defendant's Statement of Undisputed Facts, Plaintiff was assigned a coach evaluator when deployed to Jefferson City, but the official could not himself deploy immediately to that location. ECF No. 45-2, ¶¶ 139, 141. Logistics Section Chief Meyers therefore asked to have other coach evaluators deployed to Jefferson City but was told that none were available. *Id.*, ¶ 142. Indeed, at the time of the deployment, fewer than one percent of staff were designated coach evaluators. *Id.*, ¶ 143. More, coach evaluators were not deployed merely to serve in that capacity; they had to be working on the same disaster as their assigned trainee to perform that function. *Id.*, ¶¶ 140, 144.

Plaintiff's arguments that his denial of a coach evaluator was discriminatory are the same as those made above, *see* ECF No. 49-1 at 25 (asserting that none of the other IMAT team members were denied a coach evaluator with no further detail), 29 (asserting that the denial was inconsistent with FEMA policy with no further detail), and fail for the same reasons.

### viii. Termination

Plaintiff was terminated on May 20, 2016, with a letter outlining two charges—failure to follow instructions and negligent performance of duties—with a total of nine specifications. *See* ECF No. 49-21. To the extent he seeks to rely on comparator evidence, that strategy, too, fails for the reasons already discussed. Plaintiff also points to a rebuttal he submitted, *see* ECF No. 49-1 at 30–31, but that document makes clear that he admitted all the charges (while offering explanations). *See* ECF No. 49-9 at 75–81. Specifically, he admitted that (1) on November 3, 2015, he failed to timely provide "missing receipts and/or receiving reports" requested by Logistics Chief Meyers, explaining that "improper procedures related to" the requested files made the task "impossible to accomplish"; (2) on December 4, 2015, he failed to generate documents related to the extension of an occupancy agreement requested by Meyers, explaining that he was out sick prior to and after that date and had other duties that consumed his time, but nevertheless completed the task on December 11, 2015; (3) on December 7, 2015, he failed to provide a copy of a performance appraisal requested by Meyers because it was not his responsibility to do so, but he nevertheless completed the task on December 14, 2015; (4) on December 8, 2015, he failed to provide a copy of an inventory requested by Meyers because, although "a valid request" it was "very low on the priority list" and was completed on December 18, 2015; (5) he failed to follow established procedures for contacting vendors as instructed by Meyers on December 8, 2015, explaining that he had permission from a different official to contact the vendor directly and that he "did not alter, amend or obligate ... any financial commitment" of the federal government "for goods and services with th[at] vendor"; (6) on January 23, 2016, he failed to correct his timesheets as instructed by Meyers because Plaintiff had left for the weekend before Meyers emailed those instructions and he did not check his emails until the following Monday; (7) on February 2, 2016, he issued an iPhone without a barcode or serial number as required by agency policy, explaining that it was "an honest mistake"; (8) on February 25, 2016, he initiated a mission assignment without authority, explaining that he was asked to do so by a supervisor and had not been "briefed or counseled ... regarding th[e] [proper] procedure"; and (9) on April 11, 2016, he failed to return equipment to its proper location, explaining that he was "in travel status" and could not fit all the equipment (which he had accumulated over his seven-month deployment) in his "compact vehicle" but that all equipment was returned by May 31, 2016. *Id.* at 75–80. Where a plaintiff "[does] not contravene—and in fact admit[s]—... the deficiencies the defendants cite[ ] concerning [the plaintiff's] performance, [he] fail[s] to establish" pretext. *Waterhouse*

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

v. District of Columbia, 298 F.3d 989, 995 (D.C. Cir. 2002); see also id. at 994 (plaintiff did not establish pretext where she "admitted that she missed the deadlines" and "[h]er only defense was that ... she should have received greater support from outside contractors"); McGrath v. Clinton, 666 F.3d 1377, 1384–85 (D.C. Cir. 2012) (finding that where the plaintiff did not dispute that he "failed to heed [ ] instruction[s]" given to him and "failed to perform his assigned tasks," but argued that "there were extenuating circumstances and there were some positive attributes to [his] performance," the responses did not demonstrate that his termination was retaliatory (third alteration in original) (quoting Waterhouse, 298 F.3d at 995)). Additionally, Plaintiff has once again failed to show that a reasonable jury could find that FEMA did not 'honestly believe in the reasons it offer[ed]' " for terminating him. Hartzler, 2022 WL 15419995, at *25 (alteration in original) (quoting Fischbach, 86 F.3d at 1183); see also id. at *19 ("Ultimately, it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed these reasons and acted in good faith upon those beliefs.' " (quoting Crockett, 127 F. Supp. 2d at 47)). Rather, the bulk of his explanations amount to his subjective assessment that, in spite of the admitted deficiencies, he was adequately performing his duties. See, e.g., ECF No. 49-9 at 76 (contending that he generated the documents related to the extension of the occupancy agreement prior to their due date on December 11, 2015, prior to their due date on December 15, 2015), 77 (contending that "nothing was impacted by [his] delay" in providing the inventory to Meyers), 78 (asserting that his failure to follow protocols regarding contacting vendors had no financial impact on the federal government and that his failure to issue an iPhone with a bar code was "an honest mistake" that was corrected the next day). However, Plaintiff's "own personal opinion [of his performance] is inadequate by itself to create an issue for the jury." Walker, 798 F.3d at 1094; see also, e.g., Congress v. Gruenberg, 643 F. Supp. 3d 203, 236 (D.D.C. 2022) ("[A]n employee's personal opinion as to an employer's assessment of [her] does not matter.").

### b. Retaliation

**\*35** Generally, the methods a plaintiff can use to undermine an employer's asserted non-retaliatory reason for an adverse employment action are the same as the methods for showing a non-discriminatory reason was pretext. See, e.g., Walker, 798 F.3d at 1092 ("A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." (emphasis added)). The analyses from the section above also apply to three of the five remaining allegedly retaliatory actions—(1) the September 2015 and March 2016 denial of Plaintiff's requests to become a Disaster Alternative Approving Official; (2) the denial of access to a coach evaluator; and (3) the May 2016 termination—and will not be repeated here. For the reasons stated above, Plaintiff's retaliation claims based on that same conduct fail. However, the October 2011 transfer and the February 2012 demobilization require additional discussion.

### i. October 2011 Transfer

Plaintiff alleges that the October 2011 transfer occurred "after [his] complaint about ... his supervisor's treatment of an incident." ECF No. 49-1 at 22. He does not explain what "incident" he is referring to nor whether the "complaint" constituted protected activity. The only "incident" in the record that predates the October 7, 2011, transfer is the contretemps on October 6, 2011, involving the breaking down of three disaster recovery centers in New York City, which culminated in a conference call with Alonso, apparently also on October 6, 2011, in which he blamed Plaintiff for delays and failing to assist other crew members. See ECF No. 49-3, ¶¶ 5–6. As for Plaintiff's "complaint," in order "to constitute 'protected activity,' the employee 'must in some way allege unlawful discrimination.' " Payne v. Salazar, 899 F. Supp. 2d 42, 52 (D.D.C. 2012) (quoting Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006)); see also, e.g., Arias v. Marriott Int'l, Inc., 217 F. Supp. 3d 189, 195–96 (D.D.C. 2016) ("Protected activity includes having 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' on the basis of discrimination ...." (emphasis added) (quoting Jones v. Billington, 12 F.Supp.2d 1, 13 (D.D.C. 1997))). Plaintiff points to no evidence to meet his burden to show that he did so on the October 6, 2011, call. See, e.g., Holbrook, 196 F.3d at 263 (noting that the plaintiff has the burden to show that he engaged in protected activity). Indeed, there is no indication that Plaintiff made any complaint of discrimination until he contacted the

Wilson v. Noem, Slip Copy (2025)

2025 WL 1000666

Office of Equal Rights on November 18, 2011. *See* ECF No. 49-3, ¶ 10; *see also* ECF No. 49-1 at 34 (Plaintiff identifying his November 18, 2011, contact with the Office of Equal Rights as the first "protected activity" in which he engaged). Because the October 7, 2011, transfer pre-dates Plaintiff's first protected activity, it cannot serve as the basis for a retaliation claim—there was nothing to retaliate against at that time. *See, e.g.*, *Harris*, 2022 WL 3452316, at *14 (collecting cases). Therefore, Plaintiff cannot show that retaliation was the true reason for the transfer.

### ii. February 2012 Demobilization

Plaintiff is more successful here. He filed the First EEO Complaint on January 18, 2012. ECF No. 45-2, ¶ 15. Less than one month later, on February 10, 2012, he received the initial order from Logistics Group Supervisor Cole requiring his February 24, 2012, demobilization (pursuant to a directive from the Federal Coordinating Officer) and, on approximately February 14, 2012, he received the subsequent order from Logistics Chief Butkus requiring his February 17, 2012, demobilization. *See id.*, ¶ 49; ECF No. 49-3, ¶ 17. Such temporal proximity is sufficient to permit an inference of causation for the purposes of a *prima facie* case, *see, e.g.*, *Mitchell v. Powell*, No. 17-cv-182, 2017 WL 6735800, at *7–8 (D.D.C. Dec. 24, 2018), but Defendant contends that "while mere proximity may be enough at the motion to dismiss stage, more is required to survive summary judgment," ECF No. 59 at 24 (quoting *Harris v. Trs. of Univ. of D.C.*, 567 F. Supp. 3d 131, 160 (D.D.C. 2021)). Plaintiff has provided more here. Specifically, he has asserted that he reported the demobilization order to an official from the Office of Equal Rights—Florence Nelson—who stated that the demobilization order "appeared to be in retaliation" for the First EEO Complaint "and that the claim about saving money for FEMA was an excuse." ECF No. 49-3, ¶ 17. As discussed in note 18, *supra*, that statement is non-hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. More, similar statements from EEO officials have been held sufficient to defeat a motion for summary judgment on a discrimination or retaliation claim. *See, e.g.*, *Ritchie*, 196 F. Supp. 3d at 64–65 (finding evidence that an EEO counselor stated that the employer had taken the race and gender of the plaintiff into account when failing to offer him a position to which he applied sufficed to overcome a motion for summary judgment on a discrimination claim); *Klein v. Derwinski*, 869 F. Supp. 4, 9 (D.D.C. 1994) (finding evidence that an EEO counselor believed that a supervisor's "hostile reaction" upon finding out that the plaintiff had visited the EEO office

"was a breach of EEO principles" sufficient to overcome a motion for summary judgment on a retaliation claim). That is, Plaintiff does have positive evidence of retaliation—thin as it may be—sufficient to defeat Defendant's motion for summary judgment on this claim.

**\*36** In its reply, Defendant asserts that Plaintiff has not shown that either the Federal Coordinating Official or Butkus knew of Plaintiff's prior protected activity. *See* ECF No. 59 at 23. Its opening brief made no such argument. That submission mentions only once whether the decisionmakers had knowledge of Plaintiff's protected activity:

> Plaintiff may point to the fact that his demobilization was retaliatory because he had just filed his First EEO Complaint on January 18, 2012, a month before he was instructed to demobilize. *But even if Plaintiff claims that Cole and Butkus knew about this Complaint*, the undisputed record cannot establish that any retaliatory animus Plaintiff alleges, no matter how thinly supported, was the but-for reason for Plaintiff's instruction to demobilize alongside twenty percent of the workforce.

ECF No. 45-1 at 34 (emphasis added) (internal citations omitted). That italicized clause is not sufficient to present the issue of the decisionmakers' knowledge of Plaintiff's protected activity to the Court for analysis, *see Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))), and arguments raised first in a reply brief are generally considered forfeited, *see, e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider this argument because plaintiffs have forfeited it on appeal, having raised it for the first time in their reply brief."). In any event, Defendant's argument in its reply is sparse, at best: it asserts that Plaintiff fails to "point to ... evidence that the Field Coordinating Officer, who made the decision to reduce staff by twenty percent in February 2012, and Plaintiff's supervisor, Mr. Butkus, knew of Plaintiff's prior protected activity to support any

retaliation claim," quoting *Celotex* for the proposition that "[t]he moving party is 'entitled to judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which [it] has the burden of proof." ECF No. 59 at 23 (second alteration in original) (quoting *Celotex*, 477 U.S. at 322). But it is hardly surprising that Plaintiff did not marshal evidence or make argument on the issue in its opposition, as it was not squarely raised in the government's opening brief; indeed, the statement in Defendant's opening brief regarding knowledge, directs attention *away* from the issue of knowledge and toward the question of retaliation *vel non.*[53] *See* ECF No. 45-1 at 34 ("[E]ven if Plaintiff claims that Cole and Butkus knew about this Complaint, the undisputed record cannot establish that any retaliatory animus Plaintiff alleges ... was the but-for reason for Plaintiff's instruction to demobilize alongside twenty percent of the workforce."). Therefore, the Court deems that, for the purposes of this motion for summary judgment, Defendant has forfeited any argument that it is entitled to judgment as a matter of law on this claim because Plaintiff failed to establish that the decisionmakers had knowledge of his protected activity.

[53]    It is worth noting, too, that "[t]o survive summary judgment, ... [a plaintiff] needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones*, 557 F.3d at 679.

**\*37** Accordingly, Defendant is not entitled to summary judgment on Plaintiff's claim that his February 2012 demobilization was retaliatory.

\* \* \* \* \*

Summing up, the government is entitled to summary judgment on all but two of Plaintiff's Title VII claims. The claims that survive are his discrimination claim based on the October 2011 transfer to the Kirkwood Field Office and his retaliation claim based on the February 2012 demobilization from that office.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are **DISMISSED** for lack of jurisdiction. It is further

**ORDERED** that Defendant's motion for summary judgment, ECF No. 45, is **GRANTED IN PART AND DENIED IN PART** as discussed above. It is further

**ORDERED** that the parties shall confer and on or before May 5, 2025, file a joint status report addressing (1) the parties' preference for alternative dispute resolution, such as private mediation or a referral to a Magistrate Judge, Judge Teel, or the Circuit Mediator for settlement; and (2) a proposal for further proceedings in this case. At the request of Plaintiff, the Court may appoint an attorney to represent Plaintiff *pro bono* for the purposes of mediation.

**SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 1000666

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

2022 WL 2500341
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Columbia Division.

Shontera BOYD, Plaintiff,
v.
NEPHRON PHARMACEUTICALS
CORPORATION, Defendant.

C/A No. 3:20-4385-MGL-PJG
|
Signed May 19, 2022

**Attorneys and Law Firms**

James Paul Porter, Cromer Babb Porter and Hicks, Columbia, SC, for Plaintiff.

Elizabeth Ashley Robertson Parr, Nexsen Pruet, Greenville, SC, Nikole Setzler Mergo, Nexsen Pruet Jacobs and Pollard, Columbia, SC, for Defendant.

**REPORT AND RECOMMENDATION**

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Shontera Boyd filed this employment action in the Lexington County Court of Common Pleas, raising claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; and the South Carolina Payment of Wages Act ("SCPWA"), S.C. Code Ann. §§ 41-10-10 et seq. Defendant Nephron Pharmaceuticals Corporation ("Nephron") removed the case to this court. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Boyd's motion for partial summary judgment as to the SCPWA claim (ECF No. 19), and Nephron's motion for summary judgment (ECF No. 22). The motions are fully briefed and ready for the court's consideration. (ECF Nos. 23, 31, 32, & 38.) Having reviewed the record presented and the applicable law, the court concludes that Boyd's motion should be denied and

Nephron's motion should be granted.

**BACKGROUND**

The following facts are either undisputed or are taken in the light most favorable to the plaintiff, to the extent they find support in the record. Boyd started working for Nephron, a pharmaceutical manufacturer, on December 7, 2018 as a Quality Assurance Syringe Visual Inspector On-line. Boyd made $19 per hour in that role. On May 12, 2019, Boyd moved into a Clean Room Quality Assurance position where she made $21 per hour. The Clean Room is a controlled, aseptic space that filters out unwanted microorganisms to prevent their entry into Nephron's products, and as such, requires employees to wear special clothing and to take other precautions. Thus, employees who work in the Clean Room earn premium pay of $1 per hour.

On August 13, 2019, Boyd requested that she be assigned temporary alternative work outside of the Clean Room. Boyd presented a note from her primary care physician explaining that Boyd appeared to be having allergic symptoms from working in the Clean Room and recommended an alternative work environment while Boyd underwent allergy testing. Nephron attempted to move Boyd to a similar position—Visual Inspection—but Boyd informed Nephron that those duties caused her to experience headaches. Three days later, Nephron temporarily assigned Boyd to work in a Secondary Packing Quality Assurance position, for which Boyd was trained and had previously applied. Boyd's wage was reduced by $1 per hour because she was not working in the Clean Room, but Nephron continued to pay Boyd an extra $1 per hour due to her cross training as a visual inspector. Boyd complained to Nephron's Vice President of Human Resources Kathy Griffin and CEO Lou Kennedy about her pay being reduced. Boyd told Griffin in an email that "I find the decrease in pay to be extremely inconsiderate to my health." (Pl.'s Resp. Ex. 14, ECF No. 32-14 at 2.) Griffin responded that she hoped Boyd's condition improved so that she could be reassigned to the Clean Room with the extra $1 per hour pay.

**\*2** Also on August 13, 2019, an employee who sends daily emails with various announcements included a meme at the end of the email. The meme depicts Lucille Ball of "I Love Lucy" with the words, "That awful moment when you realize this IS your circus and those ARE your monkeys." (Pls.' Resp. Ex. 12, ECF No. 32-12

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

at 2.) Boyd and other employees responded to the email to say they found the meme offensive.

On September 23, 2019, Boyd informed Nephron that her doctor cleared her to work in the Clean Room again but on a "limited basis." (Boyd Dep. at 99-100, ECF No. 22-2 at 19.) Nephron requested that Boyd obtain further clarification from her doctor about how limited her work in the Clean Room should be, but Boyd never provided Nephron with a clarification. Regardless, Nephron assigned Boyd to work part-time in the Clean Room and part-time in Secondary Packaging. Nephron also provided Boyd with the $1 per hour premium pay for the hours she worked in the Clean Room.

On September 30, 2019, Boyd completed an intake questionnaire in the South Carolina Human Affairs Commission. The questionnaire included allegations about the offensive email, Boyd's pay, and Boyd's work assignments in light of her medical condition. On October 2, 2019, Boyd emailed her supervisors to complain that despite her doctor only clearing her to work in the Clean Room on a limited basis, she was assigned to work there for twelve-hour days and non-stop. Boyd told another supervisor that her medical condition restricts her ability to work in the Clean Room and that she felt her pay was reduced for retaliation. Griffin reinstated Boyd's pay when she heard about Boyd's complaints about her wages.

Between October 13-15, 2019, Boyd emailed her supervisors to complain that she was having allergy problems from working in the Clean Room. Vice President of Quality Systems Jamie Shuster directed that a supervisor meet with Boyd to determine precisely how much time Boyd could work in the Clean Room. Shuster noted in an email that not everyone was in agreement about Boyd's medical restrictions and work assignments.

On the morning of October 16, 2019, Boyd was instructed to report to Secondary Packing but upon her arrival she found there was no work for her. Boyd was then sent to the Clean Room where she was told, again, there was no work for her. Emails between Boyd's supervisors showed a miscommunication about Boyd's work assignment in light of the confusion about Boyd's doctor's instructions about her work restrictions. Boyd emailed Human Resources to complain about not having any work and asked if she could be considered for another position. Shuster forwarded the email to Griffin and admitted that Shuster's office was partially at fault and that Boyd should have been told that morning that she could not work in the Clean Room until they had a clear understanding of her medical restrictions.

Later that day, one of Boyd's supervisors and Senior Manager of Quality—Megan Hunter—sent Boyd to work with the syringe labeling equipment inside Secondary Packing (also known as the "Accraply" Department). In Accraply, Boyd perceived that a co-worker harassed her by recording Boyd with a cellphone. Boyd accused the employee of recording her, but the other employee denied that she had used her cellphone to record Boyd. Boyd went to the main office suite to report to Human Resources that she had been harassed by an employee in Accraply. After she made the report, she was told to wait to receive her next work assignment.

**\*3** While waiting in the main office suite, Boyd could overhear a meeting between several managers, including Megan Hunter. Boyd overheard Hunter say, "I just sent Shontera's ass down to [A]ccraply!" (Boyd Dep. at 161-62, ECF No. 32-31 at 4-5.) Another manager told Hunter that Boyd was right outside of the room, to which Hunter replied, "Okay." (Id. at 162.) Boyd entered the room and confronted Hunter, who remained seated. Boyd yelled at Hunter and used profanity, repeatedly asking Hunter "what was her problem with me" and "where's the professionalism?" Boyd hit a file cabinet in frustration, causing the cabinet to shake back and forth. At one point a manager stepped in between Hunter and Boyd, though Hunter remained seated. During the incident Griffin walked into the room and observed Boyd's behavior. Griffin testified that she felt nervous about the level of Boyd's anger, profanity, and emotion and believed that Boyd was a threat to her and other employees. One of the managers called security and Boyd was escorted to Griffin's office. Griffin immediately suspended Boyd.

Griffin recommended to CEO Lou Kennedy and Executive Director of Human Resources Karen Wilson that Boyd be terminated. Griffin based her recommendation on her own observation of Boyd's behavior toward Hunter. The following day, October 17, Nephron terminated Boyd's employment based on the use of "profane and inappropriate language" and "disorderly conduct in a threatening and intimidating manner." Boyd filed a charge of discrimination in the Equal Employment Opportunity Commission on November 19, 2019, alleging race and disability discrimination and retaliation.

Boyd brings this employment action claiming race discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.; race discrimination pursuant to 42 U.S.C. § 1981; retaliation pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; and a statutory claim under the South Carolina Payment

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

of Wages Act ("SCPWA"), S.C. Code Ann. §§ 41-10-10 et seq. Nephron moves for summary judgment as to all of Boyd's claim, whereas Boyd seeks summary judgment only as to the SCPWA claim.

## DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact.*" Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

### B. Methods of Proof in Employment Cases

*4 A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, she may attempt directly to prove discrimination with direct or circumstantial evidence. Alternatively, when direct proof is lacking, a plaintiff may proceed under the McDonnell Douglas burden-shifting framework. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (stating that the McDonnell Douglas burden-shifting framework, developed for Title VII, has been applied to § 1981 claims); Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000) (holding that the McDonnell Douglas framework applies to retaliation claims under Title VII); Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) (holding that the McDonnell Douglas framework applies to claims brought under the ADA). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non.*" Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext for discrimination." Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of ... whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

**C. Race Discrimination Claims**
Title VII makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Ocheltree v. Scollon Prods, Inc., 335 F.3d 325, 331 (4th Cir. 2003). To establish a *prima facie* case of Title VII discrimination with regard to a disciplinary discharge, a plaintiff must show: (1) that she is a member of a protected class; (2) that she was qualified for the job and that her job performance was satisfactory; (3) that she was discharged; and (4) that other employees outside the protected class were retained under similar circumstances. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995).

**\*5** Nephron argues that, even assuming Boyd could show a *prima facie* race discrimination claim under Title VII, it had a legitimate, non-discriminatory reason for terminating Boyd—the October 16 outburst to Hunter—and Boyd cannot put forth evidence that Nephron's reason was pretext for race discrimination.[1]

The court agrees. Disruptive and unprofessional workplace behavior is a legitimate, non-discriminatory reason to terminate employment. See, e.g., Pearlman v. Pritzker, 564 F. App'x 716, 719 (4th Cir. 2014); Sadeghi v. Inova Health Sys., 251 F. Supp. 3d 978, 993-94 (E.D. Va. 2017), aff'd, 711 F. App'x 174 (4th Cir. 2018).

1    Nephron also argues that Boyd cannot establish that race was a but-for cause of her termination, and therefore, Nephron is entitled to judgment as a matter of law on Boyd's § 1981 claim. See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020) (providing that to prevail on a claim of race discrimination pursuant to § 1981, a plaintiff must initially plead and ultimately prove that, but for race, she would not have suffered the loss of a legally protected right). Boyd does not respond to Nephron's argument, and accordingly, the court considers this claim abandoned. See Eady v. Veolia Transp. Servs., Inc., 609 F. Supp. 2d 540, 560-61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action."); Sawyers v. United Parcel Serv., Inc., C/A No. 1:18CV1037, 2019 WL 4305771, at *3 (M.D.N.C. Sept. 11, 2019) (collecting cases showing that "[t]his district and others within the Fourth Circuit agree that failing to respond to an argument constitutes an abandonment of a claim").

Boyd argues that the record is disputed as to whether her behavior was profane, threatening, and intimidating as her termination letter asserted, and therefore, sufficient evidence of pretext exists to survive summary judgment. Even assuming the record is inconclusive on those points, Boyd fails to point to any evidence that the decision-makers, namely Griffin, did not actually believe the reasons they gave for terminating Boyd, or that the decision was actually motivated by race. See Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006) ("Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."). In other words, Boyd fails to forecast evidence that Griffin did not actually believe that Boyd's behavior was profane, threatening, and intimidating, or that her decision was motivated by race. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (finding summary judgment to the employer was appropriate where the plaintiff failed to put forth evidence that the

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

decision-maker's decision was retaliatory as opposed to being based on the decision-maker's belief that the plaintiff threatened a co-employee); Carson v. Giant Food, Inc., 187 F. Supp. 2d 462, 485 (D. Md. 2002) (finding that the plaintiff could not establish pretext even though the plaintiff disagreed with the employer's perception of the confrontation because the employee put forth no evidence that the decision-maker did not actually have that perception). Boyd may not agree with the degree and severity of the termination letter's characterization of her behavior, but absent evidence that Griffin did not actually believe Boyd's behavior was profane, threatening, or intimidating, no reasonable jury could conclude that Boyd's termination was based on race.

**D. Retaliation Pursuant to Title VII**

**\*6** Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute. See 42 U.S.C. § 2000e-3(a). The requisite elements for a *prima facie* case of retaliation typically include: (1) the employee engaged in a protected activity; (2) the employer acted adversely against him or her; and (3) there was a causal connection between the protected activity and the asserted adverse action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).

Nephron argues that Boyd cannot produce evidence that she engaged in a protected activity or that there was a causal connection between her termination and purportedly protected activities. Specifically, Nephron argues that Boyd never told anyone at Nephron that she believed she had been treated differently based on her race. On the other hand, Boyd argues that "there is a reasonable implication" that Griffin was aware of Boyd's complaint about the Lucille Ball meme. (Pl.'s Resp., ECF No. 32 at 31.) Also, Boyd argues that Griffin and "other top-level staff" were on notice that Boyd had filed the September 30, 2019 questionnaire with the South Carolina Human Affairs Commission, which mentioned the Lucille Ball meme. (Id.)

On this record, no reasonable jury could conclude that Boyd's termination was in retaliation for Boyd's complaints about racial discrimination. Boyd puts forth no evidence that Griffin actually knew that Boyd had made complaints about race discrimination, and her assertion that she "should have known" is insufficient to meet the causation element. See generally Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 125 (4th Cir. 2021) (stating that the plaintiff in a retaliation claim must show that the decision-maker had actual knowledge of a protected activity, rather than just constructive knowledge). To the extent Boyd relies on Griffin's purported knowledge about her September 30, 2019 questionnaire filed in the South Carolina Human Affairs Commission, she only points to an email thread where Hunter informed Griffin that Boyd "has a complaint against Nephron with the State" in regard to Boyd's wage dispute. Thus, the email itself makes no mention of the questionnaire or complaints about race discrimination. Consequently, Boyd has failed to forecast any evidence that her termination was caused by her complaints about race discrimination.

**E. Retaliation Pursuant to the ADA**

The ADA prohibits retaliation against any individual who makes a charge of discrimination pursuant to the ADA. 42 U.S.C. § 12203(a). To establish a *prima facie* retaliation claim under the ADA, the plaintiff must allege that (1) she engaged in an activity protected by the ADA; (2) she suffered an adverse employment action; and (3) that a causal link exists between the protected activity and the adverse action. See Reynolds, 701 F.3d at 154; A Soc'y Without A Name v. Virginia, 655 F.3d 342, 350 (4th Cir. 2011).

Nephron argues that even assuming Boyd can establish a *prima facie* case of retaliation under the ADA, Boyd cannot put forth any evidence that Nephron's stated reason for terminating Boyd was pretext for retaliation. The court agrees. As previously established, Nephron provided a legitimate, non-discriminatory reason for terminating Boyd—the October 16 outburst to Hunter that was described as profane, threatening, and intimidating—and Boyd fails to put forth evidence to show that Griffin did not actually believe that Boyd's behavior was profane, threatening, and intimidating. See Hux, 451 F.3d at 315.

**\*7** Boyd argues that "management was frustrated [ ] and arguing amongst themselves [ ] about the process of accommodating [Boyd]," and that the close proximity in time to her termination after that frustration shows that she was actually fired in retaliation for complaining about

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2500341

a lack of accommodation. (Pl.'s Resp., ECF No. 32 at 33.) Boyd attempts to show that management was frustrated with Boyd's situation by pointing to emails between Boyd's supervisors that discuss some of the issues they had accommodating Boyd. (See, e.g., Pl.'s Resp. Exs. 8, 19-28, ECF Nos. 32-8 & 32-19 through 32-28.) However, those emails have nothing to do with Griffin's decision to terminate Boyd; the emails are all dated before Boyd's outburst and show only that the supervisors at times struggled to effectively or efficiently accommodate Boyd. None of the emails provides any insight into Griffin's state of mind. Boyd is speculating both that the emails show that Griffin was frustrated and that Griffin's purported frustration caused her to decide to fire Boyd for a pretextual reason. Boyd fails to forecast any evidence from which a reasonable jury could conclude that the reason Nephron terminated Boyd was actually a pretext to terminate her in retaliation for seeking accommodations.

**F. SCPWA Claim**
Nephron argues that the SCPWA does not provide a private cause of action for Boyd's claim that Nephron failed to provide her with advance notice of the pay cut she took when stopped working in the Clean Room. The court agrees.

The SCPWA provides:

> Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs. The employer has the option of giving written notification by posting the terms conspicuously at or near the place of work. Any changes in these terms must be made in writing at least seven calendar days before they become effective. This section does not apply to wage increases.

S.C. Code Ann. § 41-10-30(A). This statute does not create a private right of action for an employer's failure to

notify an employee of a change in their hours or wages. See Tarry v. Captain George's of S.C., LP, C/A No. 4:19-cv-00800-SAL, 2020 WL 12787708, at *3 (D.S.C. Sept. 21, 2020); see also Sawyer v. Tidelands Health ASC, LLC, C.A. No. 2:19-cv-1612-SAL-MHC, 2021 WL 4596919, at *14 (D.S.C. July 26, 2021), report and recommendation adopted, 2021 WL 4272594 (D.S.C. Sept. 21, 2021).

Boyd attempts to circumvent the lack of a legal remedy for a subsection 30(A) violation by arguing that Nephron's failure to give Boyd notice of the pay cut actually violates a different section of the statute—subsection 40(C). Subsection 40(C) states, "An employer shall not withhold or divert any portion of an employee's wages unless it is required or permitted to do so by state or federal law or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of Section 41-10-30." S.C. Code Ann. § 41-10-40(C). However, subsection 40(C) applies only to deductions and withholdings, not changes in an hourly rate of pay. See Mathis v. Brown & Brown of S.C., Inc., 698 S.E.2d 773, 782 (S.C. 2010) (distinguishing between a "reduction" in salary and a " 'deduction' within the terms of the statute, [which] is the act of taking away from a salary in order to fund some benefit"). Consequently, Boyd's SCPWA claim fails as a matter of law.

**RECOMMENDATION**

Based on the foregoing, the court recommends that Boyd's motion for partial summary judgment (ECF No. 19), be denied and Nephron's motion for summary judgment (ECF No. 22), be granted.

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district

2022 WL 2500341

court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

**\*8** Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street

Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2500341

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2302199

2022 WL 2302199
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Columbia Division.

Shontera BOYD, Plaintiff,
v.
NEPHRON PHARMACEUTICALS
CORPORATION, Defendant.

CIVIL ACTION NO. 3:20-4385-MGL
|
Signed June 27, 2022

**Attorneys and Law Firms**

James Paul Porter, Cromer Babb Porter and Hicks, Columbia, SC, for Plaintiff.

Elizabeth Ashley Robertson Parr, Nexsen Pruet, Greenville, SC, Nikole Setzler Mergo, Nexsen Pruet Jacobs and Pollard, Columbia, SC, for Defendant.

## ORDER ADOPTING THE REPORT AND RECOMMENDATION AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FEDERAL CLAIMS

MARY GEIGER LEWIS, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Shontera Boyd (Boyd) filed this lawsuit in the Lexington County Court of Common Pleas against her former employer, Defendant Nephron Pharmaceuticals Corporation (Nephron). Boyd alleges claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq.; and the South Carolina Payment of Wages Act (SCPWA), S.C. Code Ann. §§ 41-10-10 et seq.

Nephron subsequently removed the case to this Court and filed a motion for summary judgment. The Court has federal question jurisdiction over Boyd's federal Title VII, Section 1981, and ADA claims in accordance with 28 U.S.C. § 1331, and supplemental jurisdiction over her SCPWA state claim under 28 U.S.C. § 1367.

The matter is before the Court for consideration of the Magistrate Judge's Report and Recommendation (Report) suggesting Boyd's motion for partial summary judgment be denied and Nephron's motion for summary judgment be granted. The Magistrate Judge submits the Report in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the Court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

The Magistrate Judge filed the Report on May 19, 2022, and Boyd filed her objections on June 9, 2022.

Boyd lodges seven objections to the Magistrate Judge's Report. First, she complains that the Magistrate Judge erred in disregarding issues of fact underlying the reason Nephron gave for firing Boyd.

The Magistrate Judge recounts Boyd's termination, and the facts leading up to it as follows:

[On October 16, 2019,] [w]hile waiting in the main office suite, Boyd could overhear a meeting between several managers, including Megan Hunter [(Hunter) [the Senior Manager of Quality]. Boyd overheard Hunter say, "I just sent [Boyd's] ass down to [A]ccraply!" Another manager told Hunter that Boyd was right outside of the room, to which Hunter replied, "Okay." Boyd entered the room and confronted Hunter, who remained seated. Boyd yelled at Hunter and used profanity, repeatedly asking Hunter "what was her problem with me" and "where's the professionalism?" Boyd hit a file cabinet in frustration, causing the cabinet to shake back and forth. At one point a manager stepped in between Hunter and Boyd, though Hunter remained seated. During the incident [Kathleen Griffin, (Griffin) Nephron's Vice President of Human Resources] walked into the room and observed Boyd's behavior. Griffin testified that she felt nervous about the level of Boyd's anger, profanity, and emotion and

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2302199

believed that Boyd was a threat to her and other employees. One of the managers called security and Boyd was escorted to Griffin's office. Griffin immediately suspended Boyd.

**\*2** Griffin recommended to CEO Lou Kennedy and Executive Director of Human Resources Karen Wilson that Boyd be terminated. Griffin based her recommendation on her own observation of Boyd's behavior toward Hunter. The following day, October 17, [2019,] Nephron terminated Boyd's employment based on the use of "profane and inappropriate language" and "disorderly conduct in a threatening and intimidating manner."

Report at 4-5.

According to Boyd, however, several witnesses's "description of [her] conduct pales in comparison to the severity described by Griffin; yet they witnessed more of the incident than Griffin [d]id." Boyd's Objections at 5.

But, these witnesses cast a shadow over her claim as to the degree of her misbehavior. For instance, one witness, Emily Duncan states that she "didn't think [Boyd] should have taken things to the level they got to[.]" Emily Duncan's Statement.

Another witness, Erica Callum, said that Boyd's "screaming continued to happen along with banging on the filing cabinet[.]" Erica Callum's Statement. Further, Daralyn Sossamon stated that Boyd "began screaming that there was no respect and kept yelling at [Hunter.]" Daralyn Sossamon's Statement.

In addition, according to Kisha Wright, Boyd "proceeded to yell and curse lots of profane words to [Hunter]. [Hunter] never said anything out of the way back to [Boyd]. [Griffin] ... called security and I stepped out of the office.... The door was shut behind me, and I could still hear [Boyd] screaming and beating on the file cabinet in the office. [Boyd] was uncontrollable [and] was escorted out of the office and building at that time." Kisha Wright's Statement.

And, even Boyd admits that she "raised her voice and may have slammed her hand into file cabinet[.]" Boyd's Objections at 2.

That said, as the Magistrate Judge explained, even if there is contrary evidences as to the severity of Boyd's misbehavior, which there arguably is not, "Boyd fails to point to any evidence that the decision-makers, namely Griffin, did not actually believe the reasons they gave for terminating Boyd, or that the decision[,] was actually

motivated by race." Report at 10. Accordingly, the Court will overrule Boyd's first objection.

In Boyd's second objection, she contends the Magistrate Judge erred in disregarding evidence of differential discipline between she and Hunter to show racial bias. Boyd is a black woman and Hunter is a white woman, who Boyd states is similarly situated to her.

A "variety of factors are considered when determining whether a comparator is similarly situated[.]" *Spencer v. Virginia State University*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted) (internal quotation marks omitted). Although "there is no bright-line rule for what makes two jobs 'similar' under Title VII, courts consider whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id.* (citation omitted) (internal quotation marks omitted).

A cursory review of the law above shows Boyd and Hunter are not similarly situated. For instance, from the Court's review of the record, it concludes they did not have the same job description nor did they have the same supervisor. Therefore, the Court will also overrule this objection.

**\*3** Boyd's third, fourth and fifth objection essentially make the same argument: that the Magistrate Judge substituted her judgment for matters that ought to be instead decided by a jury.

In her third objection, she insists the Magistrate Judge mistakenly assumed the credibility of Griffin. In light of the other contested evidence, Griffin's credibility, according to Boyd, is a question for a jury to decide. Boyd's fourth objection is that the Magistrate Judge erred because, by improperly assuming Griffin's credibility, she wrongfully decided questions of motive and intent, which are also jury questions. And, her fifth objection is that, by assuming Griffin's credibility, she eliminated Boyd's ability to prove her case by circumstantial evidence.

"Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). "The former would not create a 'genuine' dispute, [and] the latter would fail to be 'material[.]' " *Id.*

Boyd v. Nephron Pharmaceuticals Corporation, Not Reported in Fed. Supp. (2022)

2022 WL 2302199

As the Magistrate Judge stated, "Boyd fails to forecast evidence that Griffin did not actually believe that Boyd's behavior was profane, threatening, and intimidating, or that her decision was motivated by race." Report at 13. And, although Boyd takes issue with this statement in her objections, she still proffers no evidence of discrimination or retaliation. As such, she is unable to prove either of these claims. To put it another way, given the evidence in this case, the Court is unable to say a reasonable jury would be able to find any discrimination or retaliation in Nephron's decision to terminate Boyd's employment. Thus, the Court will overrule these objections, as well.

Boyd's sixth and seventh objection are also related. In her sixth objection, she states the Magistrate Judge erred by accepting Nephron's characterization of her SCPWA claim as a notice-only claim and overlooked its failure to give proper notice resulted in a failure to pay all wages due to Boyd. And, in her seventh objection, she contends the Magistrate Judge erred in failing to consider whether to recommend declining to exercise supplemental jurisdiction over Boyd's SCPWA claim.

The Court may decline to exercise supplemental jurisdiction over a plaintiff's state law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367. And, the Court has "wide discretion" to do so. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 553 n.4 (4th Cir. 2006).

When determining whether to decline to exercise supplemental jurisdiction, the Court considers "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

Here, the Court is unable to fathom how its declining to exercise its supplemental jurisdiction over the remaining SCPWA state law claim would inconvenience or unfairly prejudice either of the parties. Nor does it appear there are any underlying issues of federal policy or comity involved in Boyd's SCPWA claim. Additionally, the principles of judicial economy and efficiency suggest this state claim, which was originally filed in state court, should be decided there.

**\*4** Therefore, the Court will decline to exercise supplemental jurisdiction over Boyd's SCPWA state claim and remand it to the Lexington County Court of Common Pleas for adjudication.

After a thorough review of the Report and the record in this case pursuant to the standard set forth above, the Court overrules objection numbers one through five, adopts the Report to the extent it does not contradict this Order, and incorporates it herein. Accordingly, it is the judgment of this Court Boyd's motion for partial summary judgment is **DENIED** and Nephron's motion for summary judgment is **GRANTED** as to Boyd's federal claims, which are **DISMISSED WITH PREJUDICE**.

Further, Boyd's SCPWA state law claim is **REMANDED** to the Lexington County Court of Common Pleas for adjudication there.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2302199

---

End of Document          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Barnhill v. Bondi, --- F.4th ---- (2025)

2025 WL 1408890

2025 WL 1408890
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

Lisa BARNHILL Plaintiff – Appellant,
v.
Pamela Jo BONDI, U.S. Attorney General,
Defendant – Appellee.

No. 23-1901
|
Argued: December 11, 2024
|
Decided: May 15, 2025

**Synopsis**
**Background:** Former Drug Enforcement Administration (DEA) supervisor brought action against United States Attorney General under Title VII alleging racial and gender discrimination, retaliation, and hostile work environment. The United States District Court for the Eastern District of Virginia, Anthony J. Trenga, J., dismissed several claims, 636 F.Supp.3d 592, and granted summary judgment in Attorney General's favor on remaining claims, 2023 WL 4873641. Supervisor appealed.

**Holdings:** The Court of Appeals, Benjamin, Circuit Judge, held that:

DEA's denials of supervisor's applications for promotion and imposition of five-day suspension were not in retaliation for her initiation of Equal Employment Opportunity (EEO) proceeding;

management review of supervisor was not in retaliation for her initiation of EEO proceeding;

decision to temporarily reassign supervisor was not in retaliation for EEO proceeding; and

any unwelcomed conduct that supervisor suffered was not sufficiently severe or pervasive to support her hostile work environment claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss

for Failure to State a Claim; Motion for Summary Judgment.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony John Trenga, Senior District Judge. (1:21-cv-01377-AJT-WEF)

**Attorneys and Law Firms**

ARGUED: Richard Randolph Renner, NOBLE LAW FIRM, PLLC, Raleigh, North Carolina, for Appellant. Yuri S. Fuchs, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. ON BRIEF: Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

Before NIEMEYER, KING, and BENJAMIN, Circuit Judges.

**Opinion**

Affirmed by published opinion. Judge Benjamin wrote the opinion, in which Judge Niemeyer and Judge King joined.

DEANDREA GIST BENJAMIN, Circuit Judge:

**\*1** Lisa Barnhill, a white woman, sued the United States Attorney General for discrimination she claims she suffered at the hands of, among others, her African American supervisor while she was employed by the Department of Justice Drug Enforcement Administration ("DEA"). Barnhill brought claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for racial and gender discrimination, retaliation, and a hostile work environment. Some claims were dismissed pursuant to Fed. R. Civ. P. 12(b)(6), while the others were disposed of on summary judgment under Fed. R. Civ. P. 56(a). Because Barnhill's attempt to spotlight her supervisor's misconduct illuminated only her own, we affirm.

I.

A.

Barnhill v. Bondi, --- F.4th ---- (2025)

2025 WL 1408890

i.

Lisa Barnhill was a longtime employee of the DEA.[1] She began her career with the DEA as a diversion investigator and held this role until April 2010, when she became a diversion program group supervisor. As a group supervisor, Barnhill oversaw diversion investigators assigned to the DEA's Little Rock, Arkansas, District Office within the DEA's New Orleans Field Division.

[1]     We begin by addressing the motion to dismiss. The facts stated in this section were alleged in Barnhill's first amended complaint, and we presume they are true for purposes of this section and our analysis of Barnhill's dismissed claims. *See Wilcox v. Lyons*, 970 F.3d 452, 455 n.1 (4th Cir. 2020) (citing *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam)). Facts that were revealed during discovery will be addressed in section II of the opinion, as they are relevant to our analysis of the claims that were discarded on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Initially, Barnhill reported to Joseph Shepherd, an African American man, who was the assistant special agent in charge at the New Orleans Field Division. Barnhill's second-level supervisor was Keith Brown, the special agent in charge at the New Orleans Field Division.[2] David Downing, another African American man, served as the assistant special agent in charge at the Little Rock District Office.[3]

[2]     The record shows that Brown is a man, but his race is unspecified. *See* J.A. 42.

[3]     Each district office has its own assistant special agent in charge, but the diversion program group supervisor reports to the assistant special agent in charge in the division office, not the assistant special agent in charge in the district office. *See* J.A. 82. Therefore, Barnhill reported only to Shepherd and Brown, not Downing. *See id.*

ii.

In January 2013, Shepherd assigned Barnhill to be the acting group supervisor of the Jackson, Mississippi, District Office while maintaining her regular duties as group supervisor in Little Rock. One year later, in January 2014, Shepherd relieved Barnhill of her duties in Jackson following complaints from two African American employees, as well as ongoing performance issues with one of her subordinates.

**\*2** In June 2014, Barnhill complained to Shepherd about the performance of one of her subordinates, Diversion Investigator Pamela Lee, an African American woman. Lee was subsequently placed on a preliminary performance improvement plan and denied a promotion until her performance improved. However, just a few months later, Shepherd told Barnhill that Lee was being taken off the preliminary performance improvement plan. When explaining the rationale behind his decision, Shepherd told Barnhill that "these people need their jobs," which Barnhill construed as a directive to show preferential treatment to African American employees. J.A. 84. Shepherd informed Barnhill that it was her responsibility, as Lee's supervisor, to provide Lee with the support necessary to meet DEA performance standards.

Around the same time, Diversion Investigator Samantha Rogers also contacted Shepherd to lodge a complaint about Barnhill. Shepherd did not discuss the complaint with Barnhill, but Barnhill alleges that Shepherd told her that he believed "she lacked the 'tools' to handle her subordinates because she was not a mother" and warned her not to continue acting as "the hammer" or she would risk becoming "the nail." J.A. 85.

In June 2015, Barnhill's relationship with Downing became strained. Shepherd therefore ordered Barnhill to cease communication with Downing, and Downing stopped inviting Barnhill to supervisors' meetings. Barnhill never understood Downing's problems with her, but requested that Shepherd and Downing have an "in-person discussion [with her] to hash out any differences." J.A. 85. Both declined her request.

At the same time, Barnhill continued to complain about Lee. Barnhill claims she did so to "ma[k]e clear... that she would refuse to give [ ] Lee preferential treatment because of her race," despite never alleging that she was ever affirmatively asked to give anyone preferential treatment at all. J.A. 87.

Later that month, Shepherd informed Barnhill that her group would undergo a "Management Review" to investigate whether she was creating a coercive or hostile work environment. *Id.* However, the review did not occur

because Shepherd neglected to get final approval before notifying Barnhill of the supervisors' plans and failed to initiate the review in a timely manner according to DEA policy.

On September 22, 2015, Barnhill initiated an Equal Employment Opportunity (EEO) proceeding for alleged race and gender discrimination by contacting the DEA's EEO office to request informal counseling regarding her concerns.

On October 27, Shepherd downgraded Barnhill's overall performance rating as part of the Agency's annual performance rating. Shepherd's superior, however, ordered him to upgrade the performance ratings because they were dissatisfied with the amount of documentation and the meetings Shepherd had held with Barnhill throughout the year to inform her of her deficient performance.

On November 6, Brown received written notice that Barnhill had filed her EEO proceeding. On November 17, Brown launched a management review of Barnhill and her group. Three days later, on November 20, Brown relieved Barnhill of her supervisory duties and issued her a "Temporary Duty Reassignment" to the New Orleans Division Office. J.A. 90. The reassignment required weekly travel and overnight stays in New Orleans. Brown stated that he implemented the reassignment to "allow the time for the completion of the recent management review, and ... time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review." J.A. 90. Barnhill was reimbursed for all her travel expenses. She claimed that the reassignment remained in place until March 2016.

On December 16, 2015, Brown encouraged three of the diversion investigators Barnhill supervised, John Conner, Marcia Hawthorne, and Pamela Lee, to file EEO complaints against Barnhill. Lee later went through with filing a complaint in June 2016.

**\*3** Additionally, beginning in December 2015, while the management review was still pending, Barnhill applied for several promotions at the DEA.[4] The job applications required Barnhill's supervisors to assess her fitness for the roles. Barnhill alleges that her supervisors' "ratings and comments detracted from" her application. J.A. 91.

4    Barnhill continued to apply for promotions after the management review was complete.

The DEA uses a Career Board ("Board") to select candidates for management positions. Barnhill alleges

that the DEA's EEO officer is a non-voting member of the Board and knew about her EEO proceeding, and that the DEA's deputy administrator is a voting member of the Board and is informed of any EEO proceedings. Barnhill further alleges that other Board members knew of her EEO proceeding and discussed it amongst each other. She claims that Brown spoke with Board members and discouraged them from selecting Barnhill. Ultimately, Barnhill was not selected for the promotions she applied for, despite being "significantly more qualified" than those who were selected. J.A. 100.

The management review of Barnhill and her group was completed on January 12, 2016. The review had twenty-one attachments supporting its findings and asserted that Barnhill had "engaged in vindictive, intimidating, and/or unprofessional conduct." J.A. 93. It maintained that Barnhill colluded with subordinates to get others fired, held up promotions, prevented subordinates from gaining work experience, targeted particular subordinates, and called them unprofessional nicknames.

In March 2016, the Board informed Barnhill that she would be reassigned to a position working at the DEA's headquarters. But when Barnhill requested that the transfer be rescinded, the Board obliged. Barnhill was instead assigned to work at a state agency's office for six months and then transferred to another DEA office in Salt Lake City, Utah.

In July 2018, after an investigation, the DEA issued a final agency decision ("FAD") in response to Lee's June 2016 EEO complaint against Barnhill. The FAD relied heavily on the findings of the management review and concluded that Barnhill discriminated against Lee. Based on the FAD, DEA deciding official Matthew Germanowski imposed a five-day suspension on Barnhill and required her to take supplemental training on discrimination.[5]

5    The record in this matter is voluminous, and additional facts will be addressed as they become pertinent to the issues discussed in this opinion.

### B.

#### i.

On December 10, 2021, Barnhill filed a complaint in the

Barnhill v. Bondi, --- F.4th ---- (2025)

2025 WL 1408890

United States District Court for the Eastern District of Virginia, bringing claims for race and gender discrimination, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Government moved to dismiss for failure to state a claim, which the district court granted in part and denied in part pursuant to Fed. R. Civ. P. 12(b)(6) (first dismissal order). *See generally Barnhill v. Garland*, 636 F. Supp. 3d 592 (E.D. Va. 2022).

The district court first determined that many of the employment actions that Barnhill complained of were not adverse and therefore did not engender valid claims under Title VII. *See id.* at 603–07. The court determined that the only actions that could serve as the basis for her various claims were the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD.[6] *See id.* In any event, the court concluded that Barnhill failed to plead that any of the adverse actions she described stemmed from discriminatory animus related to her race or gender. *See id.* Accordingly, the race and gender discrimination claims were dismissed. *Id.* at 607.

[6]    In *Muldrow v. City of St. Louis, Missouri*, the Supreme Court held that an adverse action for purposes of a Title VII discrimination claim is merely one that causes "some harm respecting an identifiable term or condition of employment." 601 U.S. 346, 354–55, 144 S.Ct. 967, 218 L.Ed.2d 322 (2024). An employee need not show that the harm was significant, serious, substantial, "or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355, 144 S.Ct. 967. However, Barnhill did not preserve the argument that any actions aside from the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD, were adverse. Although Barnhill told the court that *Muldrow* could alter the standard for Title VII claims in her reply brief (and in a supplemental letter that *Muldrow* ultimately did alter the standard), on appeal, she never affirmatively argued what else in her complaint constituted an adverse action, *and why.* Because the Government was never afforded the opportunity to respond, Barnhill has waived the argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue.") (quoting *Brown v. Nucor Corp.*,

785 F.3d 895, 923 (4th Cir. 2015) (internal quotation marks omitted)).

**\*4** As to the retaliation claim related to her promotion denials, the court determined that Barnhill engaged in a protected activity when she initiated her EEO proceeding in September 2015, but at no time before that. *See id.* at 607–08. The court also recognized that Barnhill did not plead facts supporting the plausible inference that the members of the Board who declined to promote her knew of her EEO proceeding or possessed any discriminatory animus toward her. *See id.* at 609 n.9. The court therefore dismissed Barnhill's retaliation claim related to her promotion denials. *See id.*

The court also dismissed Barnhill's retaliation claim related to the five-day suspension. *See id.* at 606. The court reasoned that because Barnhill did not specify who made the decision to suspend her, the court could not infer that someone possessing discriminatory animus toward her made the decision. *See id.* The court also found that the suspension could not have come as a result of discrimination because Barnhill's complaint conceded that the suspension was only imposed after the FAD found merit in Lee's claim that Barnhill discriminated against her. *See id.*

The court was persuaded, however, to allow the retaliation claims rooted in the management review and the temporary duty reassignment to proceed. *See id.* at 609. The court reasoned that the temporal proximity between the initiation of Barnhill's EEO proceeding and the management review and temporary duty reassignment, along with the fact that the temporary duty reassignment continued after the management review was complete, were probative of retaliation. *See id.* For the same reasons, the court also allowed Barnhill's hostile work environment claim to proceed. *See id.* at 609–10.

ii.

Discovery began and Barnhill moved for leave to file a first amended complaint (hereinafter "complaint"), which was granted. The complaint added allegations that included Barnhill's speculation that Board members would have discussed her EEO proceeding amongst each other, and Germanowski's reliance on the FAD, which in turn relied on the management review, when imposing the five-day suspension.

While discovery was ongoing, the Government filed a second motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), seeking to dismiss all claims aside from those explicitly preserved by the first dismissal order. The district court granted the motion in full under Fed. R. Civ. P. 12(b)(6) (second dismissal order). The court dismissed the discrimination claims for the same reasons it did in the first dismissal order—none of the adverse actions Barnhill alleged stemmed from any discriminatory animus. It also dismissed the retaliation claims rooted in the promotion denials and the five-day suspension on the grounds that Barnhill failed to plead that any relevant decisionmaker possessed discriminatory animus toward her.

Barnhill timely filed a notice of appeal as to the second dismissal order and the later-issued summary judgment order.[7] The court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

[7]    To the extent that Barnhill seeks to appeal the district court's determination in its first dismissal order that she did not engage in a protected activity until her EEO proceeding, this argument was abandoned when Barnhill failed to include that order in her notice of appeal. See Jackson v. Lightsey, 775 F.3d 170, 176–77 (4th Cir. 2014) ("Given [the appellant's] express designation of one particular order, the fairest inference is that [the appellant] did not intend to appeal the other.").

### C.

**\*5** We first address Barnhill's appeal of the second dismissal order. This court "review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6)." Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing Sucampo Pharm., Inc. v. Astellas Pharma, Inc., 471 F.3d 544, 550 (4th Cir. 2006)). Under this standard, we assess the adequacy of the complaint by drawing all reasonable inferences in the plaintiff's favor. Evans v. United States, 105 F.4th 606, 616 (4th Cir. 2024).

However, "we need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quotations omitted)). The complaint can

only survive a motion to dismiss where its factual allegations, not conclusions, "raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible." Evans, 105 F.4th at 616 (quoting Bazemore v. Best Buy, 957 F.3d 195, 200 (4th Cir. 2020) (internal quotations and citations omitted)). Barnhill's complaint fails to meet this burden.

### i.

We first consider Barnhill's dismissed Title VII race and gender discrimination claims related to the management review, the temporary duty reassignment, the promotion denials, and the five-day suspension imposed after the FAD. Because Barnhill fails to plausibly allege that any of these adverse actions were because of her race or gender, her claims must be dismissed.

To state a Title VII discrimination claim, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." Coleman, 626 F.3d at 190 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In pertinent part, Title VII prohibits an employer from "refus[ing] to hire ... or otherwise ... discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex." 42 U.S.C. § 2000e-2(a)(1). As in the district court, Barnhill makes no effort on appeal to demonstrate that the complaint plausibly alleges that any relevant decisionmaker was motivated by her race or gender. Rather, Barnhill merely contends in her opening brief that the complaint's conclusory allegations of race and gender discrimination should be sufficient. See Br. of Appellant 29–30 (arguing that it is enough that she "claims that her race, sex and prior protected activity were each—and together—causes of the adverse actions alleged in the complaint," and that nothing in Title VII "requires her to prove any one of the bases separately, or to parse out what action was caused specifically by sex discrimination and what specifically by race discrimination").

Barnhill's theory is patently contrary to binding precedent. See Coleman, 626 F.3d at 190–91. Therefore, her Title VII race and gender discrimination claims fail.

### ii.

Barnhill v. Bondi, --- F.4th ---- (2025)

2025 WL 1408890

Next, we address Barnhill's dismissed Title VII retaliation claims related to the promotion denials and the five-day suspension imposed after the FAD. Because Barnhill fails to allege a connection between her EEO proceeding and these adverse actions beyond mere "speculation," her claims must be dismissed. *See id.* at 191.

**\*6** To support a claim for retaliation under Title VII, a plaintiff must show "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Id.* at 190 (citing *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)). The first element is satisfied by Barnhill's initiation of her EEO proceeding in September 2015. *See Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (protected activities "include[ ] complain[ts] to superiors about suspected violations of Title VII." (internal quotation marks omitted)); *see also Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 718–21 (4th Cir. 2024) (explaining that a complaint constitutes protected activity when it is based on allegations of discrimination based on race, gender, and other categories falling within the scope of Title VII). The second element is not in dispute as the parties agree that the promotion denials and the five-day suspension imposed after the FAD constitute adverse actions under Title VII. *See supra* n.6. Therefore, all that is left to decide is whether Barnhill's complaint fell short of establishing a causal connection between her protected activity and the adverse actions she alleged. For the reasons outlined below, it did.

While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021). In any event, the plaintiff must show that a relevant decisionmaker was actually aware of the protected activity before making their decision. *See id.* at 124 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). With respect to the promotion denials and the five-day suspension, temporal proximity does not weigh in Barnhill's favor. The complaint alleges that the first promotion denial did not occur until March 2016—almost six months after Barnhill's EEO proceeding was initiated. And the five-day suspension was not imposed until July 2018, almost three years after Barnhill's EEO proceeding was initiated. Therefore, the temporal proximity between the EEO proceeding's initiation and the adverse employment actions at issue does not satisfy the causation element of Barnhill's retaliation claims.

However, even in the absence of temporal proximity, causation can be established through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity. *See e.g., Barbour v. Garland*, 105 F.4th 579, 593–94 (4th Cir. 2024); *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (causation established where supervisor told plaintiff that they "would be involved" in their EEO complaint); *Lettieri v. Equant Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007) (causation established where plaintiff was stripped of multiple job responsibilities before ultimately being fired for an illegitimate reason).

In *Barbour*, a plaintiff alleged that the DEA retaliated against her by denying her employment as a special agent after discovering her participation in a class action lawsuit against the FBI. *See* 105 F.4th at 593–94. The court determined that the plaintiff's allegations regarding the period between when the DEA learned of her lawsuit and when the plaintiff finally discovered that she had not been hired plausibly established causation. *See id.* at 593–94, 597. The court found that DEA agents' incessant questioning of Barbour about the FBI lawsuit and the difference in how her application was handled after the DEA learned of the lawsuit were highly suggestive of "retaliatory animus." *See id.* Barbour's application was suddenly stalled despite previously being expedited, her background check was reopened, she received varying information about her application from DEA agents, previously helpful agents ceased communicating with her, and she was not notified when she was not selected for the role. *See id.* at 593–94. This sequence of events suggested that there was a causal connection between the lawsuit and the DEA's denial of Barbour's application. *See id.* at 597–98. The court therefore found it "plausible" that the DEA retaliated against Barbour for filing the lawsuit despite the "six-to eight-month lapse" in time. *Id.* at 591, 596–97.

**\*7** *Barbour*'s principles are inapplicable here. First, unlike *Barbour*, Barnhill does not allege that she was treated favorably before the DEA gained knowledge that she had initiated an EEO proceeding. *See also Lettieri*, 478 F.3d at 650 (discriminatory acts began after filing of complaint). Instead, Barnhill alleges that she repeatedly suffered discrimination *before* the initiation of her EEO proceeding. Therefore, Barnhill cannot meritoriously argue that the initiation of the EEO proceeding caused her to be treated differently. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("The actions that led to [the plaintiff's] probation and termination began *before* her protected activity, belying the conclusion that a reasonable factfinder might find that

[the employer's] activity was motivated by [her] USERRA complaints."); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) (holding that a reasonable factfinder could find that a protected activity brought about adverse actions where adverse actions were not "gradual" and did not begin "well before" the protected activity).

Second, unlike in *Barbour*, where the plaintiff was "repeated[ly] and obsessive[ly] question[ed]" about her lawsuit, Barnhill never alleges that anyone at the DEA ever asked her about the EEO proceeding or that she was ever coerced into discussing it with anyone at the DEA. *Cf. Barbour*, 105 F.4th at 593.

Nor is this case like *Holloway.* There, the plaintiff's employer "exclaimed" that they were aware of the plaintiff's EEO complaint and implied they would interfere with the proceedings by stating they "would be involved." *See Holloway*, 32 F.4th at 300. Here, Barnhill never alleges that anyone at the DEA told her that they would be tampering with her EEO proceeding. *Cf. id.*

Third, unlike the plaintiff in *Barbour*, Barnhill's complaint is riddled with allegations of discrimination and misconduct on her part that caused contemporaneous responses from the DEA, both before and after the initiation of her EEO proceeding. Therefore, to the extent that there were any suggestive events that occurred between her protected activity and alleged adverse employment actions, Barnhill can hardly establish more than a remote and tenuous connection between them, if any. For these reasons, *Barbour* and its affiliated cases cannot help Barnhill.

Barnhill nevertheless argues that she can establish causation, including through the "cat's paw" theory. She cannot.

In *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277 (4th Cir. 2004), the court explained that, in certain rare instances, the discriminatory animus of an employee can be imputed onto the employer to establish causation—known as the "cat's paw" theory. *See* 354 F.3d at 290–91 (en banc). To satisfy the cat's paw theory at the motion to dismiss stage, a plaintiff must plead that a coworker harboring discriminatory animus toward her exercised authority over an adverse employment action that the plaintiff suffered such that the colleague should be viewed as the "actual decisionmaker" principally responsible for the adverse action. *See id; see also e.g., Roberts v. Gestamp W. Virginia, LLC*, 45 F.4th 726, 739 (4th Cir. 2022) (theory unsatisfied where a subordinate employee harboring discriminatory animus lacked

decision-making authority, irrespective of them substantially influencing the decisionmaker); *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410–11 (4th Cir. 2013) (theory unsatisfied where a discriminating employee substantially influenced the actual decisionmaker, but was not principally responsible for the decision); *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 356 (4th Cir. 2013) (theory unsatisfied where a problematic supervisor had no role in the adverse action the plaintiff suffered); *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 343 (4th Cir. 2008) (theory unsatisfied where the complained of employee was not even involved in discussions pertaining to the adverse action the plaintiff suffered, let alone in charge of making the decision).

**\*8** In *Bandy v. City of Salem, Virginia*, 59 F.4th 705 (4th Cir. 2023), the court provided guidance regarding a plaintiff's burden when she attempts to satisfy *Hill's* standard through a decision-making committee, as opposed to an individual. *See Bandy*, 59 F.4th at 705. The court recognized that a plaintiff could satisfy *Hill's* standard where committee members exercising authority over an adverse action the plaintiff suffered acted together in making the decision. *See id.* at 708, 710–11. Nevertheless, the court still required the plaintiff to show that the committee members harbored discriminatory animus toward them, as opposed to merely implementing an action adverse toward the plaintiff. *See id.* at 711–12.

Regarding the promotion denials, Barnhill cannot make use of the cat's paw theory because she failed to plausibly allege that Brown or any Board member possessing discriminatory animus toward her was the "actual decisionmaker" over the adverse employment actions she suffered. *See Hill*, 354 F.3d at 290–91. Nor did Barnhill plausibly allege that the Board members collectively harbored discriminatory animus toward her. *See Bandy*, 59 F.4th at 711–12.

Barnhill did allege that the DEA's EEO officer is a non-voting member of the Board and knew about her EEO proceeding, and that the DEA's deputy administrator is a voting member of the Board and is informed of all EEO proceedings. She also alleged that Brown possessed discriminatory animus toward her, told Board members about her EEO proceeding, and encouraged them to vote against her. She further alleged that Board members spoke amongst each other about the EEO proceeding.

However, ruling in Barnhill's favor would require *assuming* that someone with both principal authority and discriminatory animus decided not to select Barnhill for the promotions, without the complaint leading to such an inference. As a result, Barnhill's allegations do not "rise

Barnhill v. Bondi, --- F.4th ---- (2025)
2025 WL 1408890

above" mere "speculation," *Coleman*, 626 F.3d at 191, and her Title VII retaliation claims based on her promotion denials fail.

As to the five-day suspension, Barnhill never alleged that the relevant decisionmaker possessed any discriminatory animus. *See Hill*, 354 F.3d at 290–91. The suspension was imposed by Germanowski, the DEA's deciding official, after the FAD revealed that Barnhill had discriminated against Lee. Nowhere in Barnhill's complaint did she allege that Germanowski possessed discriminatory animus toward her or that he discriminated against her in any way. Thus, while Germanowski was the sole decisionmaker over the suspension, Barnhill's failure to allege discrimination on his part eliminates any pathway for establishing causation as to this adverse action. Therefore, Barnhill's Title VII retaliation claim related to her five-day suspension also fails.[8]

[8]    Barnhill also argues that the suspension was the DEA's first opportunity to retaliate against her. *See Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("[T]he employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case."). First, this argument is contradicted by Barnhill's own assertion that the management review, temporary duty assignment, and promotion denials—which all predated the five-day suspension—were retaliatory acts as well. This differs from *Barbour*, where the plaintiff pled that the denial of her application was the first time the defendants could have retaliated against her, and the defendants asked the court to infer that they could have retaliated against the plaintiff sooner had they been inclined to do so. *See Barbour*, 105 F.4th at 594–97. Second, the fact that Barnhill never alleged that Germanowski—the individual who imposed the suspension—knew of her EEO proceeding or harbored any discriminatory animus toward her further renders this argument unviable. Third, this court has already held that the first opportunity doctrine is "specific to the failure-to-hire context"; therefore, it cannot apply to Barnhill's five-day suspension. *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 657 (4th Cir. 2017).

**\*9** For these reasons, we affirm the dismissal of Barnhill's Title VII race and gender discrimination claims, as well as her Title VII retaliation claims related to the promotion denials and the five-day suspension imposed after the FAD.

## II.

The district court resolved the remaining claims on summary judgment under Fed. R. Civ. P. 56(a), including the retaliation claims related to the management review and temporary duty reassignment, as well as the hostile work environment claim. We now address these claims and, likewise, affirm.

### A.

During discovery, the factual record was developed.[9] Discovery revealed that complaints about Barnhill's discriminatory conduct and harsh managerial style began trickling in less than two years into Barnhill's tenure as group supervisor. In February 2012, Diversion Investigator Kelli Geary sent Shepherd a detailed letter explaining how Barnhill "targeted" her with "constant criticism" such that she was "afraid" to do her job. J.A. 204. Lee, whom Barnhill had complained about to Shepherd, also alleged that Barnhill "scolded" her incessantly, J.A. 208, scrutinized her work harder than others, denied her a promotion, and told other employees that she wanted her to quit. J.A. 207–08. Furthermore, Barnhill's own affidavit revealed that Downing's issues with her did not arise out of thin air, as her complaint suggests. Rather, Barnhill herself stated that Downing took issue with her mishandling of a diversion case and that he believed she could not be trusted.

[9]    Unless otherwise stated, the facts alleged in the complaint were corroborated during discovery.

Discovery also revealed that on October 12, 2015, Shepherd emailed a draft of Barnhill's annual performance review to his assistant. But this draft was incomplete, lacking an overall rating, official rating comments, or a signature. As stated in the complaint, on October 27, Shepherd sent Barnhill a revised performance rating, which was much more critical of her performance. Shepherd explained that the initial version was merely a "shell" containing information from previous years. J.A. 778. The initial draft was thus an unfinalized document, immaterial to Shepherd's assessment of Barnhill's performance throughout 2015. *Id.*

Separately, around this time, Anthony Lemons began

serving as acting assistant special agent in charge in place of Shepherd.[10] Upon assuming this role, Lemons, too, was bombarded with complaints about Barnhill from Conner, Hawthorne, and Lee. On different occasions, Barnhill's subordinates complained to Lemons about her "targeting and harassment." J.A. 330. They said they were "distraught" and "contemplating leaving their positions" if things did not change. *Id.*

[10]    The record does not provide the precise date on which Lemons entered this role.

On October 7, 2015, Lemons reported these complaints to Brown and requested that a management review be conducted "as soon as possible" to address the "major morale issues" in Barnhill's group. *Id.* On November 17, in accordance with Lemons' request, Brown launched a management review of Barnhill and her group.

In light of the management review, Brown relieved Barnhill of her supervisory duties and issued her a "Temporary Duty Reassignment" to the New Orleans Division Office just three days later, on November 20. J.A. 90, 496. Brown's letter to Barnhill confirmed that the reassignment required weekly travel and overnight stays in New Orleans. Brown did, however, make clear that the reassignment was not intended to be punitive; rather, it was implemented to "allow the time for the completion of the recent management review, and ... time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review." J.A. 496. Barnhill was reimbursed for all her travel expenses. The reassignment remained in place until February 2016, a month prior to what Barnhill's complaint suggests.

**\*10** The management review was finalized on January 12, 2016, and it elaborated on Barnhill's discriminatory conduct and behavior in great detail. Specifically, it summarized the thirteen interviews the DEA conducted and the twenty-one documents it discovered during the investigative process. The review confirmed that Barnhill had created a "caustic, repressive, and obstructionist work environment," and that "[e]very single person interviewed" who was supervised by Barnhill stated that she "engaged in vindictive, intimidating, and/or unprofessional conduct." J.A. 352. It also unveiled Barnhill's specific targeting of female subordinates and her refusal to provide adequate training for new employees. The review recommended, among other things, that Barnhill be removed from her supervisory position in Little Rock and undergo extensive professional training.

The FAD itself also provided additional context beyond what Barnhill had stated in her complaint. The FAD exposed that Barnhill had discriminated against Lee on the basis of her race and sex for years. It concluded that Barnhill engaged in "pervasive harassment" and subjected Lee to a "hostile and abusive" work environment. J.A. 610. The FAD relied in part on the management review, which found that Barnhill "targeted new Diversion Group employees and bullied and intimidated them to maintain control." J.A. 602. And based on the FAD, Germanowski did impose a five-day suspension on Barnhill and required her to participate in supplemental training on discrimination.

B.

Based on the factual development during discovery, the district court disposed of the remaining claims on summary judgment under Fed. R. Civ. P. 56(a)—the retaliation claims based on the management review and temporary duty reassignment, and the hostile work environment claim. *See generally Barnhill v. Garland,* No. 1:21-cv-1377-AJT-WEF, 2023 WL 4873641 (E.D. Va. July 31, 2023). As to the management review, the court determined that record evidence confirmed that the review was initiated by Lemons, whom Barnhill never alleged discriminated against her. *See id.* at *3–4.

As for the temporary duty reassignment, the court ruled that even if it assumed that Brown, who imposed the reassignment, possessed discriminatory animus toward Barnhill, it could not conclude that the reassignment was implemented for illegitimate reasons. *See id.* at *4–6. Considering the large number of complaints made against Barnhill, the initiation of the management review, and Brown's detailed letter explaining why the reassignment was imposed, the court found that no genuine issue of material fact existed regarding the purpose of the reassignment. *See id.* at *4–6. The court concluded that the reassignment was clearly imposed "to limit any potential conflicts that might arise if Barnhill were in the office while the management review was underway." *Id.* at *4.

As to the hostile work environment claim, the court determined that Barnhill's failure to show that any relevant decisionmaker possessed discriminatory animus toward her, or a connection between her EEO proceeding and the adverse actions, belied her claim. *See id.* at *4. The court concluded that the allegations on which the hostile work environment claim were based were "simply too trivial or generalized to constitute either an adverse action or severe and pervasive harassment." *Id.* at *4 n.4.

C.

This court reviews a district court's grant of summary judgment under Fed. R. Civ. P. 56(a) de novo. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 259 (4th Cir. 2005). Summary judgment is appropriate when the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the nonmoving party is entitled to all reasonable, non-speculative inferences drawn in her favor, such inferences must be justifiable from the evidence, and the nonmoving party must present "significantly probative"—not "merely colorable"—evidence in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Like Barnhill's dismissed Title VII retaliation claims, her failure to prove causation defeats her Title VII retaliation claims rooted in her management review and temporary duty reassignment.

i.

**\*11** Barnhill's claim based on the management review fails because discovery revealed that the management review was initiated by Lemons. On the one hand, temporal proximity weighs in Barnhill's favor because the management review was initiated less than a month after the EEO proceeding was initiated. *See Roberts*, 998 F.3d at 127 (explaining that the inference of causation does not begin to weaken until two months have passed between the protected activity and adverse action). But the lack of evidence that Lemons knew of the EEO proceeding before initiating the management review forecloses temporal proximity as a pathway to establishing causation. *See id.* at 124–27 (explaining that irrespective of temporal proximity, a plaintiff must show that a relevant decisionmaker knew of their protected activity at the time of the adverse action to establish causation).

Secondly, *Barbour*'s principles cannot help Barnhill because neither the complaint nor the record contains any suggestive intervening events between the initiation of the EEO proceeding and when Lemons called for the management review. *See Barbour*, 105 F.4th at 593–94, 597 (explaining that suggestive intervening events can bridge a prohibitively long temporal gap and establish causation). Lastly, like Germanowski, there is no

indication that Lemons ever possessed any discriminatory animus toward Barnhill.

Barnhill contends that we can reach a different conclusion if we find that Brown initiated the management review. She argues that if we view the record this way, causation could be established via temporal proximity because Brown began the management review within two months of learning of the EEO proceeding. *See Roberts*, 998 F.3d at 127. But the record unambiguously reveals otherwise. The management review, as well as both Brown and Lemons, assert that the review only came about because of Lemons' directive to initiate it. Indeed, when he ordered the review, Lemons was Barnhill's direct supervisor and therefore responsible for overseeing her leadership of the group she managed in Little Rock. And after receiving complaints from three of Barnhill's subordinates, Lemons did what most responsible supervisors would under the circumstances: he requested that an investigation into the allegations take place. We therefore decline Barnhill's invitation to construe the record in an erroneous fashion and affirm the district court's grant of summary judgment as to Barnhill's Title VII retaliation claim based on the management review.

ii.

The temporary duty reassignment is more complicated. Under the burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), once a plaintiff makes a prima facie showing of a retaliation claim, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for their adverse action. *See Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023) (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)); *Decoster v. Becerra*, 119 F.4th 332, 342–43 (4th Cir. 2024). If the employer meets this burden, "the burden then shifts back to the ... [employee] to prove by a preponderance of the evidence" that the employer's purported reason is pretext for intentional retaliation. *See Palmer*, 72 F.4th at 63.

The record indicates that Brown instituted Barnhill's reassignment to the New Orleans office on November 20, 2015, just two weeks after learning of the EEO proceeding on November 6, 2015. Thus, Barnhill has made out a prima facie case of retaliation under Title VII because temporal proximity satisfies the causation prong of the analysis. *See Roberts*, 998 F.3d at 124–27 (explaining that close temporal proximity between the protected activity and the adverse action coupled with a

relevant decisionmaker's knowledge of the protected activity at the time of the adverse action establishes causation.

**\*12** However, the record shows that Brown had a legitimate reason for instituting the reassignment, and so the retaliation claim grounded in the reassignment also fails. The record reveals that Barnhill was given the reassignment in response to the management review, which had begun three days prior. The objective behind the reassignment was to remove Barnhill from her group in Little Rock while it was being investigated to prevent any intermeddling or unnecessary hostility.

Barnhill cannot prove that Brown's reason for instituting the reassignment is pretext for intentional retaliation. Barnhill points out that a management review was not initiated when Shepherd requested it in June 2015, but was a couple of months after she commenced her EEO proceeding. She further contends that the record does not show any misconduct on her part between June 2015 and October 2015 that would justify the management review. She also claims that there is a lack of evidence as to Lemons' request for the management review and that the review was mishandled in several ways, which indicates that it was initiated on baseless grounds. Lastly, she argues that the temporary duty reassignment lasting beyond the completion of the management review is evidence of pretext.

Simply put, these contentions fall short of genuinely disputing the record's attestation that the DEA had legitimate, nonretaliatory reasons for instituting the reassignment. *See Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 794 (4th Cir. 2023) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) ("[W]hen an employer gives a legitimate, nondiscriminatory reason for terminating an employee, it is not our province to decide whether the reason was wise, fair, *or even correct*, so long as it was *the genuine reason* for the employment decision." (internal quotation marks omitted)). The problem with all but one of Barnhill's arguments is that they are directed at the validity of the management review, not the temporary duty reassignment. But the two are separate from one another. While it is true that the temporary duty reassignment came in response to the management review, it would have been imposed irrespective of whether the management review found Barnhill guilty or innocent of the allegations against her. This is because the temporary duty reassignment was not intended to punish Barnhill, but to prevent her from having contact with members of her group while the management review was taking place. And the need to keep Barnhill away from her group would have been

apparent whether the allegations against her were meritless or meritorious.

Barnhill's other argument—that the temporary duty reassignment being extended beyond the completion of the management review is evidence of pretext—is specious. If there was ever any doubt as to whether Barnhill should have been separated from her group when the management review was initiated, any such doubt was certainly removed once the review was complete.

As previously stated, the management review detailed a "caustic, repressive, and obstructionist work environment" in Barnhill's group. J.A. 352. It revealed that each of Barnhill's subordinates were suffering from low morale, and that Barnhill engaged in "vindictive, intimidating, and/or unprofessional conduct." *Id.* It also exposed that she specifically targeted female subordinates and refused to provide adequate training for new employees. Therefore, after the management review was complete, the DEA had an even greater reason for keeping Barnhill out of the Little Rock office and far away from her group.

**\*13** Furthermore, the reassignment lasting beyond the completion of the management review aligns with what Brown told Barnhill when he issued the reassignment. Brown informed Barnhill that the reassignment was not only in place to allow time for the management review to be completed, but also to give the DEA time to figure out the best course of action once the results of the management review were released. *See* J.A. 90, 496 (articulating that the reassignment was implemented to "allow the time for the completion of the recent management review, and ... time to determine what, if any, actions [the DEA] w[ould] be taking as a result of the review."). It should therefore have come as no surprise that the reassignment lasted until February 2016, as that was the same month that the DEA decided where it wanted to transfer Barnhill after the results of the management review were released. Because Barnhill cannot show that Brown's reason for implementing the temporary duty reassignment was pretextual, her retaliation claim related to the reassignment fails.

### iii.

Barnhill's hostile work environment claim under Title VII was also disposed of on summary judgment under Fed. R. Civ. P. 56(a). To succeed on such a claim a plaintiff must show " '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently

severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.' " *Strothers*, 895 F.3d at 328 (quoting *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). To satisfy the third element of the claim, a plaintiff must show that they were placed in a "retaliatory hostile work environment ... *so severe or pervasive* that it would dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022) (emphasis added). This high burden cannot be satisfied by claims based on "petty slights or minor annoyances." *Id.* at 218 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

In *Laurent-Workman*, the court held that the plaintiff had adequately pled the third element of her hostile work environment claim by alleging that one of her supervisors became even more hostile towards her after she complained to her supervisors about a coworker's blatantly racist comments. *See id.* at 207–09, 218. The supervisor's acts of hostility involved "a series of unpredictable management decisions and acts of sabotage." *Id.* at 218. They "ranged from erroneous reprimands to bogus denials of professional training opportunities to the alteration of work product in a manner damaging to Laurent-Workman's reputation, on top of additional meddling." *Id.* The court held that any one of these actions may not have been enough to satisfy the third element of the claim "when considered in isolation," but together, "the allegations t[old] a multi-act story of undermining, gaslighting, and disruption[,]" which satisfied the element. *Id.*

Because any unwelcomed conduct that Barnhill suffered was limited and far from abusive, she cannot satisfy the third element of the claim. The fundamental difference between *Laurent-Workman* and this case is that here,

every adverse action that Barnhill complains about came in response to her own bad behavior—not her complaints about others. Whether it be the exclusion from supervisor meetings, management review, temporary duty reassignment, promotion denials, the five-day suspension, or the complaints filed against her, Barnhill cannot point to a single action that did not stem from her own behavior.

In sum, the record demonstrates that Barnhill's supervisors never instigated strife between themselves and Barnhill but merely responded to Barnhill's own behavior toward her subordinates. Therefore, the acts were no different than ones "all employees experience" when they are alleged to have engaged in misconduct as egregious as that which Barnhill is linked to in this case. *Id.* at 218 (quoting *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405).

III.

**\*14** Barnhill sued for discrimination she claims she suffered while working at the DEA. As to the claims that were dismissed, Barnhill failed to plead the necessary elements of her claims. As for the remaining claims, the record shows that it was Barnhill's own behavior that gave rise to the adverse actions she experienced. For the foregoing reasons, the decision of the district court is

*AFFIRMED.*

**All Citations**

--- F.4th ----, 2025 WL 1408890

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Drotleff v. Michelin Tire Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 32332183

2002 WL 32332183
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina,
Greenville Division.
Jean DROTLEFF, Plaintiff,
v.
MICHELIN TIRE COMPANY, INC., Michelin
North America, Inc., and Michelin Corp.,
Defendants.
Jean DROTLEFF, Plaintiff,
v.
MICHELIN NORTH AMERICA, INC.,[1] Defendant.

[1]     The plaintiff originally brought this action against Michelin Tire Company, Inc., and Michelin Corporation. However, on August 3, 2001, the parties filed a stipulation of dismissal designating Michelin North America, Inc., as the only proper defendant.

No. C.A. 6:01–2496–25AK.
|
April 1, 2002.

**Attorneys and Law Firms**

Thomas Bailey Smith, Smith Law Firm, Easley, SC, for Plaintiff.

Andreas Neal Satterfield, Jr., Ellison Ford McCoy, Haynsworth, Baldwin, Johnson and Greaves, Greenville, SC, for Defendants.

*ORDER*

WOOTEN, J.

**\*1** In this employment discrimination case, the plaintiff alleges that the defendants unlawfully retaliated against her, because she complained of sexual harassment. In particular, the plaintiff alleges, in part, that the defendants unlawfully denied her a transfer and counseling services, delayed/denied her computer training, terminated a female custodian who had befriended the plaintiff, and interviewed the plaintiff in the presence of her alleged

harassers. The defendants have filed a motion for summary judgment.

This matter is now before the undersigned for review of the Report and Recommendation ("the Report") filed by United States Magistrate Judge William M Catoe, to whom this case had previously been assigned pursuant to 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2) (D.S.C.). In his Report, Magistrate Judge Catoe recommends that the defendants' motion for summary judgment be granted. Plaintiff has filed objections to the Report.

In conducting this review, the Court applies the following standard:

> The magistrate judge makes only a recommendation to the Court, to which any party may file written objections.... The Court is not bound by the recommendation of the magistrate judge but, instead, retains responsibility for the final determination. The Court is required to make a de novo determination of those portions of the report or specified findings or recommendation as to which an objection is made. However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the Report and Recommendation to which no objections are addressed. While the level of scrutiny entailed by the Court's review of the Report thus depends on whether or not objections have been filed, in either case, the Court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations.

*Wallace v. Housing Auth. of the City of Columbia,* 791 F.Supp. 137, 138 (D.S.C.1992) (citations omitted). In light of this standard, the Court has reviewed, *de novo,* the Report and the objections thereto. The Court accepts the Report in its entirety and concludes that the plaintiff's objections thereto are without adequate legal justification.

Drotleff v. Michelin Tire Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 32332183

In particular, as the summary judgment record reflects, the plaintiff has not sufficiently established that she experienced any adverse employment action(s), either singly or in combination with one another. Rather, as properly concluded by Magistrate Judge Catoe in this case:

> Viewing the evidence in the light most favorable to the plaintiff, the alleged actions taken by Michelin do not rise to the level of adverse employment actions and, thus, the plaintiff has failed to establish a prima facie case of retaliation.

Likewise, plaintiff's assertion that the Magistrate Judge applied the wrong legal standard in determining the existence of adverse employment action is without merit.

**\*2** IT IS THEREFORE ORDERED on this the *29th* day of March, 2002, at Florence, South Carolina, that the Report be ACCEPTED, plaintiff's objections be OVERRULED, and the defendants' motion for summary judgment be GRANTED.

*REPORT OF MAGISTRATE JUDGE*

CATOE, Magistrate J.

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff alleges retaliation under Title 42, United States Code, Section 2000e (Title VII).[2]

    [2]     Originally, the plaintiff had alleged claims for sexual discrimination and sexual harassment. However, on November 14, 2001, the parties entered into a consent order for partial dismissal with prejudice. Currently, the retaliation claim is the only remaining claim.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

*FACTS PRESENTED*

The plaintiff, Jean Drotleff, was hired by the defendant Michelin North America, Inc. ("Michelin"), as a computer operator in March 1997. On July 30, 1999, the plaintiff was promoted to the position of lead operator. In February 2000, Michelin instituted a career advancement program, Job Advertisement System, under which employees could nominate themselves for salaried exempt positions in the Information Technology Department. Under the program, an employee must have been in her current position for at least two years[3] and obtain a "release date" from her immediate supervisor. The supervisor had discretion over whether to issue a release date.

    [3]     The two-year requirement was eliminated in April 2001. Sartini dep. 21.

On March 7, 2000, Joy Cruz, a Michelin employee, submitted a complaint of sexual harassment to Michelin. As part of the investigation into the complaint, the plaintiff was interviewed on March 22, 2000. During the interview, the plaintiff alleged she had been subjected to inappropriate sexual comments by some male Michelin employees. Three male employees were ultimately disciplined and Cruz was transferred.

In March 2000, the plaintiff approached her immediate supervisor, Andy Philip, about a self-nomination for a position of MLT Liason. Philip told the plaintiff she had to be in her current position for two years prior to being eligible for a self-nomination and he refused to give the plaintiff a release date. In April 2000, the plaintiff approached Philip about another position and he again refused to give her a release date, stating the plaintiff had not been in her current position for the required two years.

On May 1, 2000, the plaintiff received an annual pay raise of 6%. In August 2000, after the plaintiff had been in her position for one year, Philip recommended she receive a pay grade promotion. She received a pay grade promotion to level 34 and a pay increase of approximately 5% on September 1, 2000.

On January 31, 2001, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity

2002 WL 32332183

Commission ("EEOC") alleging sexual harassment and retaliation. On March 14, 2001, the plaintiff was issued a notice of right to sue. On March 19, 2001, the plaintiff filed a written complaint with Michelin alleging a male employee, Tony Martin, made inappropriate sexual comments to her. After an investigation, Michelin stated it was unable to determine if the comments had been made.

**\*3** On May 1, 2001, the plaintiff again received her annual pay increase of approximately 5%. In September 2001, the plaintiff again approached Philip about a release date for an Information Technology Administrator position. Philip gave the plaintiff a release date. The plaintiff, however, was not selected for the position. The plaintiff then asked Philip for a release date for another position, Level One Help Desk. Philip gave the plaintiff a release date and she was selected for this position. The plaintiff began working in this position on October 17, 2001. The plaintiff's pay grade, salary, and benefits did not change with her transfer to this position.

*APPLICABLE LAW*

Rule 56(c) of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that she is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in her pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

*ANALYSIS*

**\*4** To prove a *prima facie* case for retaliation requires that (1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the plaintiff; and (3) a causal connection existed between the protected activity and the adverse action. *Williams v. Cerberonics,* 871 F.2d 452, 457 (4th Cir.1989)(applying *McDonell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).[4] Here, for the purposes of this motion, Michelin does not dispute that the plaintiff has established the first element of a *prima facie* case (Def.mem.10–11). Michelin contends, however, there has been no adverse employment action taken against the plaintiff.

Drotleff v. Michelin Tire Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 32332183

[4]    The plaintiff contends the burden-shifting *McDonnell Douglas* framework does not apply because she has presented direct evidence of discrimination. (Pl.Mem.15). The court agrees that "the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1984). However, whether the plaintiff offers direct or indirect evidence, the plaintiff must initially establish a *prima facie* case of retaliation. Since the court concludes the plaintiff has not established a *prima facie* case, any further analysis is unnecessary.

Absent unusual circumstances, a job transfer with no decrease in title, pay or benefits does not constitute an adverse employment action. In other words, a purely lateral transfer, or the denial of the same, cannot be relied upon to establish a *prima facie* case of race discrimination or retaliation under Title VII. *See Burger v. Central Apartment Management, Inc.,* 168 F.3d 875, 879 (5th Cir.1999). Furthermore, a plaintiff's subjective impression concerning the desirability of one position over another does not control with respect to the existence of an adverse employment action. *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 886 (6th Cir.1996). An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment. *See Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997). "[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir.1999). A transfer without any change in pay, or benefits is not an adverse employment action to satisfy the *prima facie* case for retaliation. *Id.* Here, the plaintiff's denial of a transfer does not rise to the level of an adverse employment action.

Second, the plaintiff alleges that she was denied the right to company-paid counseling. After the plaintiff filed her complaint with the EEOC alleged upon the advice of her counselor, Michelin decided to transfer the plaintiff to another Employment Assistance Program ("EAP") counselor or an outside counselor (Manker dep. 19, 21; Pl. dep. 205). The only evidence in the record shows that the plaintiff refused counseling from another EAP counselor. As the plaintiff has not offered any evidence that she was denied EAP counseling, this allegation is unsupported by the record.

Third, the plaintiff contends she was denied the right to

train on new computer systems. The plaintiff received INEX training March 7–16, 2000, so her complaint is actually that Michelin delayed this training (Pl.dep.170). Furthermore, the plaintiff's first protected activity occurred March 22, 2000, during the investigation of the allegations made by Cruz. (Def. dem. Ex. B—Investigation Report 29). Thus, the plaintiff's protected activity did not occur until after the alleged retaliation. Further evidence that the alleged retaliation preceded the protected activity is the plaintiff's own statement that she was offered false excuses, "such as 'we're waiting for Y2K,' " which obviously occurred prior to January 2000 (Pl.mem.26). As for the ACCESS and web-design training, the plaintiff testified she never asked to attend (Pl.dep.168–169). Accordingly, this allegation is without merit.

**\*5** Fourth, the plaintiff contends she was subjected to averse employment action when she was interviewed by Michelin in front of her alleged harassers in March 2001. The plaintiff has not cited any case law which holds such conduct is adverse employment action. Although this conduct may not be the most desirable manner in which to handle an employee's harassment allegations, it does not equate to an adverse employment action. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286 (3rd.Cir.1997)(allegations that employees was subjected to "unsubstantiated oral reprimands" and "unnecessary derogatory comments" following her complaint do not rise to the level of adverse employment action).

The plaintiff also contends the termination of a female custodial staff member who had allegedly complained about sexual harassment supports her allegation of retaliation because she contends similar treatment of other females who reported sexual harassment is evidence of retaliation. First, the custodial staff member was not an employee of Michelin. Michelin occupies a floor in the AT & T building and the custodial services are contracted outside to a custodial services company. Second, Michelin did not fire the custodial worker. Michelin asked that another custodian employee be assigned to clean its floor of the AT & T building (Cuyar dep. 8; 11–12; Philip dep. 23). The custodial worker continues to be employed by the custodial company (Cuyar dep. 7). Thus, the treatment of the custodial staff member is not similar to the plaintiff's situation.[5] Lastly, the plaintiff alleges Michelin failed to effectively end the harassment. She does not specifically allege this was done in retaliation for her protected activity. If anything, this allegation supports a claim for harassment, not retaliation.

[5]    Additionally, the custodial staff member did not complain about any sexual misconduct to Michelin until she had been informed she would

2002 WL 32332183

not longer be cleaning Michelin's offices (Cuyar dep. 20).

Viewing the evidence in a light most favorable to the plaintiff, the alleged actions taken by Michelin do not rise to the level of not adverse employment actions and, thus, the plaintiff has failed to establish a *prima facie* case of retaliation. Therefore, Michelin's motion for summary judgment should be granted.

*CONCLUSIONS AND RECOMMENDATION*

Accordingly, it is recommended that the defendant's motion for summary judgment be granted.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 32332183

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

1999 WL 94655

173 F.3d 424
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals, Fourth Circuit.

Roy L. COGGINS, *Plaintiff-Appellee,*
v.
GOVERNMENT OF DISTRICT OF COLUMBIA,
*Defendant-Appellant.*

No. 97-2263.
|
Feb. 19, 1999.

Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria. T.S. Ellis, III,
District Judge. (CA-96-1696-A).

**Attorneys and Law Firms**

Louis Edward Dolan, Jr., Peabody & Brown, Washington,
D.C., for Appellant.

John Edwards Harrison, Harrison & Hughes, P.C.,
Alexandria, Virginia, for Appellee.

ON BRIEF: William F. Causey, Gina S. Love, Peabody &
Brown, Washington, D.C.; Charles L. Reischel, Appellate
Division, Office of Corporation Counsel, Washington,
D.C., for Appellant.

Before ERVIN and NIEMEYER, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

**OPINION**

ERVIN.

**\*1** This is an appeal of a jury verdict in a Title VII
wrongful discharge action. Roy L. Coggins ("Coggins"), a
Chief Steward at the District of Columbia ("the District")
Department of Corrections prison in Lorton, Virginia

("Lorton Facility"), was allegedly fired because he
refused to complete required annual evaluations of his
subordinates despite repeated requests from his immediate
supervisor, Francis Henderson ("Henderson"). Coggins, a
Caucasian, sued the District for conspiring to create a
pretext to fire him and to replace him with a less-qualified
African-American. A jury awarded Coggins $50,000 for
pain and suffering. The district court denied the District's
motion for judgment as a matter of law and awarded
Coggins $11,053.40 in back pay and $48,375 in legal
fees. On review of the trial record, we find no evidence
that the decision makers who terminated Coggins were
motivated by racial animus. Accordingly, because no
reasonable jury could find that the District terminated
Coggins because of his race, we reverse the judgment of
the district court and remand the case with instructions to
enter judgment for the defendant.

I.

Roy L. Coggins was fired because he allegedly refused to
complete required annual personnel evaluations of his
subordinate staff. Both sides agree that Coggins never
completed the evaluations.

In early May of 1995, Henderson, an African American,
gave Coggins a direct order to complete performance
evaluations of Coggins' culinary staff by May 22, 1995.
On May 18, 1995, Coggins wrote a memorandum to
Henderson and his superiors "requesting to be relieved of
the duty of evaluations until all is resolved" in the *Bessye
Neal* case because "I continue to have a cease and desist
order on me" and "I do not want to be accused of
tampering with witnesses."

Coggins was one of several named defendants in a
class-action sexual harassment lawsuit. *See, e.g., Bessye
Neal v. Director, District of Columbia Department of
Corrections,* No. CIV.A.93-2420 (RCL, 24), 1994 U.S.
Dist. LEXIS 21338 (D.D.C. Aug. 25, 1994). One of
Coggins' subordinates, Denise Hessing, had filed charges
of sexual harassment against Coggins. Two other
subordinates were witnesses in the case. In spite of the
ongoing lawsuit, Hessing and the two witnesses were
never transferred from Coggins' staff. Coggins continued
to maintain supervisory responsibility over them until his
termination.

On May 24, 1995, Henderson met with Coggins about the

Coggins v. Goverment of Dist. of Columbia, 173 F.3d 424 (1999)

1999 WL 94655

evaluations. During this meeting, Coggins asked Henderson if Henderson had forwarded Coggins' May 18th memorandum up the chain-of-command. Henderson responded that he had refused to send the memorandum up the chain-of-command because the memorandum had coffee stains on it and he believed that his superiors would think less of him if he sent them a stained document. At this meeting, Henderson gave Coggins a memorandum dated the same day that relieved Coggins of his responsibility to evaluate Hessing, the plaintiff in *Bessye Neal,* but still ordered Coggins to rate the remaining staff members, including the two witnesses in the harassment case, by the close of business on June 1, 1995. Henderson then ordered Coggins to accompany him to the office of Henderson's boss, Vincent Gibbons ("Gibbons"), a Caucasian and the Warden of the Central Facility.

At this second meeting, Coggins repeated his concerns to Gibbons. Since no other member of Coggins' staff was a member of the protected class and since Henderson was already rating Hessing, Gibbons ordered Coggins to complete the rest of the evaluations because in so doing Coggins would not be violating any court order. Coggins still refused to complete the evaluations.

During either this or a later meeting that day, Gibbons contacted Mark Leavitt, another Caucasian, who was the Deputy Director of Administration for the Department of Corrections and the liaison between the Office of Corporation Counsel and the Department of Corrections for the *Bessye Neal* case. Leavitt confirmed that neither Hessing nor the two witnesses were members of the protected class and that Coggins could rate all of them. Coggins still refused to comply.

*2 Later on May 24th, Coggins, accompanied by his wife Becky and a union representative, returned to Gibbons' office for yet another meeting with Gibbons. Although Coggins claims that he then agreed to rate all of his subordinates, but would do so under "duress," Gibbons does not remember Coggins making this concession. Henderson was not present at this meeting.

At or about the same time Coggins was meeting with Gibbons, Henderson was in his own office writing a Request for Advance Notice of Proposed Action, in which he recommended that Coggins be fired for insubordination. Although this is the harshest penalty available, it was well within Henderson's discretion to fire Coggins under the District's personnel policy. *See* D.C. Personnel Regs. pt. I, ch. 16, tbl. 1618.1(5) (1990). Henderson made this recommendation on May 24th despite the fact that in his last memorandum to Coggins,

Henderson had given Coggins until June 1st, eight days later, to complete the evaluations. Henderson also forwarded Coggins' May 18th memorandum up the chain-of-command, coffee stains notwithstanding.

Coggins claims that he suffered severe health problems as a result of these meetings and the pressure placed upon him by Henderson. On May 24th he sought medical treatment while on his way home from work and was prescribed valium. He took the valium and became ill. Coggins apparently experienced a harmful interaction between the valium and other medication he was taking at the time. He was subsequently hospitalized from May 24 through August 1995. Coggins claims that this hospitalization prevented him from completing the evaluations by the June 1st deadline because by the time he was released from the hospital, he had already been fired.

While Coggins was hospitalized, Henderson prepared and sent to Coggins an Advance Notice of Proposed Action, in which Henderson formally charged Coggins with insubordination. This Notice also advised Coggins: (1) that Coggins had the right to respond to the charge with any defenses available; (2) that any response should be forwarded to the Disinterested Designee assigned to this action, Regina Gilmore (an African-American); (3) that Gilmore would make a recommendation to Bernard Braxton, the Deputy Director for Institutions and the Deciding Official assigned to this action; and (4) that Coggins could obtain copies of the evidence upon which this charge was based. Although Coggins received two copies of this Notice, he did not file a written response.

In early August, the Disinterested Designee, an independent official designated by regulation as an internal check on the disciplinary process, agreed that, based upon the information made available to her, Coggins was insubordinate. The Designee then recommended that Coggins be punished with a reduction in rank and a 45-day suspension without pay.

On August 14, 1995, the Deciding Official Braxton wrote a letter informing Coggins that he would be fired for insubordination. Gibbons recused himself from these proceedings because of his personal involvement in the two meetings. Although Braxton drafted the termination letter, it was ultimately reviewed and signed by another Caucasian Warden Paul Krull ("Krull"). Later, the District reversed its termination decision and reinstated Coggins, placing him on suspension.

Coggins v. Goverment of Dist. of Columbia, 173 F.3d 424 (1999)

1999 WL 94655

II.

**\*3** This Court reviews the district court's denial of a motion for judgment as a matter of law under Rule 50(b) *de novo. See* Fed. R. Civ.P. 50(b). If there is evidence upon which a jury could reasonably find in favor of Coggins, this Court must affirm the final verdict. Further, in reviewing the record, this Court is "not free to weigh the evidence or to pass on the credibility of the witnesses" but instead must "view the evidence most favorably to [Coggins] and give [Coggins] the benefits of all reasonable inferences from the evidence." *United States v. Tobias,* 899 F.2d 1375, 1378 (4th Cir.1990) (citations omitted).

The parties do not dispute that before the disagreement that ultimately led to his termination, Roy L. Coggins was an exemplary employee. By all accounts, Chief Steward Coggins was responsible for quickly transforming his dining hall, the largest in Lorton Facility, from a substandard liability into an exemplary operation. His immediate supervisor, Acting Deputy Warden for Support Services Francis J. Henderson, volunteered during cross-examination that Coggins' previous job performance had been "outstanding." Examining the record in the light most favorable to Coggins, there was enough evidence for a reasonable jury to conclude that Henderson harbored racial animus against Coggins. It is undisputed that Henderson made the initial recommendation on May 24, 1995 which eventually resulted in Coggins' termination on August 14, 1995.

The central issue in this appeal is the relationship between Henderson's alleged racial animus and the ultimate decision to terminate Coggins. The key question is whether there was a nexus between (1) the racial animus that allegedly motivated Henderson's initial recommendation for termination; and (2) the ultimate rationale relied upon by Henderson's superiors in actually terminating Coggins. Coggins argues that because Henderson's superiors blindly accepted Henderson's racially-motivated recommendation, their ultimate decision was motivated by racial bias. The District argues that regardless of whether Henderson's initial recommendation was racially motivated, the ultimate decision was made by independent, unbiased decision makers who relied upon the legitimate, nondiscriminatory rationale that the District's personnel policies authorize termination for insubordination.

This Court has long recognized two methods of proving employment discrimination: the conventional approach and the judicially-created, shifting burden-of-production scheme. *See generally, O'Connor v. Consolidated Coin Caterers, Corp.,* 56 F.3d 542, 545-46 (4th Cir.1995)

(stating two schemes of proof), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992) (stating that discrimination may be proven "under ordinary standards of proof, by direct or indirect evidence relevant to and sufficiently probative of the issue"); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800-06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (holding that because employment discrimination is often difficult to prove, plaintiffs are alternatively allowed to prove their case through a judicially-created scheme); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, 252-56 (1981) (same). Under either scheme of proof, there is no evidence in the record that proves that the ultimate decision makers who terminated Coggins were motivated by racial animus.

A.

**\*4** First, under the conventional approach, while there is ample direct and circumstantial evidence that Henderson may have been motivated by racial animus, there is simply no direct or circumstantial evidence that the ultimate decision makers harbored racial animus against Coggins. The fact that both Krull and Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely.

Although one of the documents relied upon by these decision makers was Henderson's Request for Advance Notice of Proposed Action, there is nothing discriminatory about the document. The facts alleged therein are undisputed by both sides. All Henderson states in the Request is that in his two meetings with Coggins on May 24, 1995 Coggins refused to rate his subordinates.

Even if we accept Coggins' claim that he later agreed to complete the evaluations, Coggins appears to have waived this defense. Despite receiving written notice twice of his right to present any applicable defenses, Coggins did not raise this fact before his termination. His Notice clearly stated, "If you do not wish to reply, a decision will be made based on all of the available information of record."

Moreover, the District independently investigated and verified Henderson's allegations and thereby purged any preexisting discriminatory taint from the final decision. Unrebutted testimony refutes Coggins' claim that the individuals who ultimately terminated him merely "rubber

Coggins v. Goverment of Dist. of Columbia, 173 F.3d 424 (1999)

1999 WL 94655

stamped" Henderson's recommendation.

When questioned on cross-examination about Braxton's draft letter, Krull stated that he carefully read over the draft letter, Henderson's two letters, the Disinterested Designee's report, and the Notice previously mailed to Coggins before he personally decided to terminate Coggins. Krull testified that if he had disagreed with the draft let-ter, he would have held the letter and told Braxton that termination was inappropriate.

Since Coggins did not offer any evidence to contradict Krull's testimony or credibility, we accept that Krull fairly and impartially ascertained the merit of Henderson's complaint. This inference is supported by the District's own personnel regulations. Although Coggins was not charged with violating this specific provision of the District's personnel code, there is a regulation in the District's personnel code that appears to require Coggins' termination. Henderson wrote in his first letter to Coggins that he had previously counseled Coggins that "D.C. Personnel Regulation 1400.3, District Personnel Manual (DPM) Chapter 14 ... in part, assigns all heads of departments and agencies the responsibility for assuring impartial, objective evaluations of work performances of employees under their jurisdiction." Accordingly, since Coggins was the head of food service for the Central Facility, his evaluations were an assigned duty and responsibility. The District's regulations give no discretion for "[r]efusal to carry out assigned duties and responsibilities." Even if it is a first offense, the only available punishment is "[r]emoval." *See* D.C. Personnel Regs. pt. I, ch. 16, tbl. 1618.1(5)(c) (1990).

B.

**\*5** Second, under the judicially created scheme of proof, although Coggins may have been able to establish a prima facie case of discrimination, he was unable to rebut the District's legitimate, nondiscriminatory reason for his termination, namely that Coggins was insubordinate and such insubordination cannot be tolerated in the tense, paramilitary environment of a prison.

Warden Krull testified that even though the Disinterested Designee did not recommend termination, Krull decided to disregard the Designee's recommendation and to terminate Coggins because the special circumstances of a prison made insubordination more dangerous than in other employment contexts. Lorton Facility is run as a

paramilitary organization where subordinates must follow the lawful orders of superiors without question. As Krull stated, "You can't run a prison when people don't do what they're told to do."

Since the trial proceeded to completion, we need not reexamine the entire prima facie case but rather may focus upon the "specific proofs and rebuttals of discriminatory motivation the parties have introduced." *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.,* No. 97-2044, 1998 WL 786693, at \*2, 1998 U.S.App. LEXIS 28389, at \*5 (4th Cir. Nov. 12, 1998), *quoting St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

When denying the District's motion for judgment as a matter of law, the district court erred in ruling that a jury could have reasonably found the District's preferred rationale for termination was pretextual. The district court believed the District's insubordination rationale could be considered pretextual in two ways: (1) that the District erroneously relied upon both Henderson's biased, misleading factual recounting of events and Henderson's unfounded initial charge of insubordination to terminate Coggins and (2) that the jury could have found that "fairly construed, the situation really didn't amount as much to insubordination as to an employee who didn't want to do something that he thought was contrary to law, and officials who were too impatient to deal with him and to deal with his concerns, however valid or invalid they were." Transcript, Volume # 7, at 26, *Coggins v. District of Columbia,* No. CIVA.96-1966-A (D.D.C. July 25, 1997).

Both reasons fail to demonstrate that the District's insubordination charge was pretextual. First, as discussed above, none of the facts related in Henderson's two letters are disputed and any discriminatory taint was subsequently purged by the District's independent inquiry. The second reason at best appears to dispute the sound judgment or fair business practices of the District. Since the District subsequently reinstated Coggins, this argument may have some merit to it. Nevertheless, this Court is not concerned with judging the District's business or administrative acumen. The sole issue before us is whether Coggins' termination was motivated by racial animus and we have found no evidence to support that premise.

III.

**Coggins v. Goverment of Dist. of Columbia, 173 F.3d 424 (1999)**

1999 WL 94655

**\*6** The right to a jury trial is a fundamental right and no action affects this right more than the reversal of a jury verdict. *See Neely v. MartinK. Eby Constr. Co., Inc.,* 386 U.S. 317, 322, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967) (there is "nogreater restriction on the province of the jury"). In certain cases, however, reversal is warranted. On these facts, there simply was no nexus between Henderson's allegedly discriminatory conduct and Coggins' termination. Finding no evidence of racial animus in the actions of the ultimate decision makers, we reverse the jury verdict and remand to the district court for the entry of judgment as a matter of law for the District.

REVERSED AND REMANDED

**All Citations**

173 F.3d 424 (Table), 1999 WL 94655

End of Document                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5311256
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina, Rock
Hill Division.

Joe L. ADAMS, Jr., Plaintiff,
v.
3D SYSTEMS, INC., Defendant.

Case No. 0:19-cv-00663-JMC-KDW
|
Signed 06/24/2021

**Attorneys and Law Firms**

Joe L. Adams, Jr., Rock Hill, SC, Pro Se

Elizabeth Ashley Robertson Parr, Nexsen Pruet,
Greenville, SC, Jennifer S. Cluverius, Nikole Setzler
Mergo, Nexsen Pruet Jacobs and Pollard, Columbia, SC,
for Defendant.

Report and Recommendation

(Motions for Summary Judgment, ECF Nos. 189, 192)

Kaymani D. West, United States Magistrate Judge

**\*1** This matter is before the court[1] on Motions for
Summary Judgment filed by Defendant 3D Systems Inc.
("3D Systems" or "Defendant"), ECF No. 189, and pro se
Plaintiff Joe L. Adams, Jr. ("Adams" or "Plaintiff"), ECF
No. 192. Having considered the Motions and the various
responses,[2] the undersigned recommends Defendant's
Motion for Summary Judgment (ECF No. 189) be
*granted*, and Plaintiff's Motion for Summary Judgment,
ECF No. 192, be *denied* as detailed herein.

[1] All pretrial proceedings in this case were referred
to the undersigned pursuant to the provisions of
28 U.S.C. § 636(b)(1)(B) and Local Civil Rule
73.02(B)(2)(g) (D.S.C.). Because these motions
are dispositive, this report and recommendation
("R&R") is entered for the district judge's
consideration.

[2] Plaintiff filed a memorandum and surreply in
opposition to Defendant's Motion, ECF Nos. 213,
224, to which Defendant filed a reply and
sur-surreply, ECF Nos. 221, 230. Defendant filed
a memorandum in opposition to Plaintiff's
Motion, ECF No. 203, to which Plaintiff filed a
Reply, ECF No. 225. Because of the voluminous
briefing considered herein, the memoranda will be
referred to by ECF numbers.

**I. Procedural history**
On March 6, 2019, Plaintiff filed his Complaint against
Defendant, his former employer. Compl., ECF No. 1.
Plaintiff's Complaint, prepared on the court's "Complaint
for Employment Discrimination" form used by pro se
litigants, included claims of discrimination, harassment,
and retaliation based on his race in violation of Title VII
of the Civil Rights Act of 1964, as amended ("Title VII").
Plaintiff also alleged color and national origin
discrimination in violation of Title VII, and age
discrimination in violation of the Age Discrimination in
Employment Act of 1967 (the "ADEA"), as well as
state-law claims for assault, negligent supervision, and
wrongful termination. Compl., ECF No. 1. The court
granted Defendant's Motion for Partial Dismissal as to
Plaintiff's claims of color and national origin
discrimination, age-based discrimination claims, and all
claims arising before June 14, 2017. ECF No. 122.[3]
Plaintiff's post-June 14, 2017 claims of race-based
discrimination, harassment and retaliation and his
state-law-based claim of assault remain before the court[4]
and are the subject of Defendant's Motion for Summary
Judgment. Plaintiff's Motion for Summary Judgment
seeks judgment as a matter of law as to these same
claims.[5]

[3] As the order was silent as to whether the dismissal
was with or without prejudice, and because
amendment would have been futile, those claims
were dismissed with prejudice. *See generally
Carter v. Norfolk Cmty. Hosp. Ass'n, Inc.*, 761
F.2d 970, 974 (4th Cir. 1985) ("A district court's
dismissal under Rule 12(b)(6) is, of course, with
prejudice unless it specifically orders dismissal
without prejudice. That determination is within
the district court's discretion."). *See* ECF No. 68
at 22 (R&R recommending that the dismissal be

2021 WL 5311256

with prejudice). The court should decline Plaintiff's passing request that the state-law claims of negligent supervision and wrongful termination (or other dismissed claims) be "reexamined." ECF No. 213 at 2.

[4]    To the extent Plaintiff's briefing is construed to include a belated request to add other claims at this late date, such request should be denied.

[5]    Defendant's Amended Answer and Counterclaims includes three counterclaims against Plaintiff: one for violation of Federal Trade Secrets Act; one for violation of the South Carolina Trade Secrets Act; and one alleging breach of contract. ECF No. 70. Plaintiff's prior Motion to Dismiss the Counterclaims was denied. *See* ECF Nos. 95, 116. *Plaintiff has not moved for summary judgment as to the Counterclaims.*

II. Factual overview

*2 Unless otherwise stated, the facts set out herein are undisputed. Where disputes arise, to the extent the disputes are supported by the record, the court considers the evidence in the light most favorable to the nonmoving party, separately considering the cross-motions as appropriate. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). That noted, the issues raised in both motions are virtually identical—both Plaintiff and Defendant seek judgment as a matter of law as to Plaintiff's post-June 14, 2017 claims of race-based discrimination, harassment, and retaliation, as well as his claim for assault. This factual overview is not intended to exhaustively catalog every anecdote or argument made by the parties.[6] The undersigned has reviewed all argument and evidence presented. To the extent necessary, additional facts are set out in the context of the specific causes of action.

[6]    Plaintiff has set out the text of Defendant's Memorandum in Support of Summary Judgment section-by-section, listing various points of "object[ion]" to each section. While the undersigned has reviewed Plaintiff's various points of objection, many of those points are

unsupported arguments that do not require discussion herein.

A. 3D Systems and Plaintiff's employment background there

3D Systems is a global provider of content-to-print solutions including personal, professional, and production 3D printers, integrated print materials, and on-demand custom parts services for professionals and consumers. Declaration of Andrew Johnson, Executive Vice President, Chief Legal Officer, and Secretary, "Johnson Decl." ¶ 3, ECF No. 189-2. 3D Systems has a Plastics unit that contains both a Product Development Division and a Process Development Division. Declaration of Vice President of Operations, Plastic Printer Hardware Michael Maul "Maul Decl." ¶ 3, ECF No. 189-3. The Product Development Division focuses on the electrical and mechanical designs of 3D Systems' printers, whereas the Process Development Division focuses on the actual materials selected for use in the printing process. *Id.* The Product Development Division, including its SLA and SLS Development Departments,[7] were, at all times relevant to the instant lawsuit, overseen by Maul. *Id.*

[7]    3D printing is a process by which three-dimensional solid objects of any shape are created through a process called additive manufacturing. Both stereolithography ("SLA") and laser sintering ("SLS") are additive manufacturing processes used in three-dimensional printing. Maul Decl. ¶ 3.

Plaintiff began his employment at 3D Systems on December 5, 2012 as a Production Repair Technician, and became a Technical Support Engineer effective December 16, 2013. Maul Decl. ¶ 4.[8] In March 2016, 3D Systems transferred Plaintiff to an Engineering/Electrical Technician position (the "ET Position"). *Id.* ¶ 5.[9] In this role, Plaintiff performed repairs on 3D printers by conducting electrical work, calibrating lab equipment, and other machine maintenance. *Id.* In the ET Position, Plaintiff worked in the Company's Product Development Division. *Id.* According to Maul, Plaintiff worked in the SLS Development Department until September 2017, at which time 3D Systems physically moved a portion of that department due to business needs, and transferred Plaintiff to its SLA Development Division. *Id.* ¶ 6.[10] Nothing about Plaintiff's terms or conditions of

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

employment changed with that transfer. *Id.* With the transfer, Plaintiff remained in an ET Position; however, his supervisor then became Darshan Pandya, the then-manager of the SLA Development Department. Declaration of Director of Material Commercialization for SLA & SLS, Darshan Pandya ("Pandya Decl.") ¶ 2, ECF No. 189-5. Pandya reported directly to Maul. *Id.* ¶ 2. Post-transfer, Plaintiff worked primarily in the SLA Lab, where Plaintiff's responsibilities included technical maintenance of machines. *Id.* ¶ 3.

[8]    When Plaintiff began employment with 3D Systems, he signed documents acknowledging various policies, including the Equal Employment Opportunity, Anti-Discrimination and Anti-Harassment Policy and Code of Conduct. Declaration of Senior Vice President, People & Culture, Allen Latty "Latty Decl." ¶ 4 & exs. thereto, ECF No. 4.

[9]    As explained by Plaintiff, his supervisor in 2016 until August 2017 was Debbie Beebe. *See* ECF No. 213-2 at 83 (Dec. 16, 2016 email to Beebe indicating a "Resource Issue" and noting Plaintiff reported to Beebe at that time); ECF No. 213-2 at 78-81 (Pl. "Annual Performance 2016," listing dates of "Jan. 1 to Apr. 1, 2017," completed by Deborah Defrancesco (presumably a/k/a Debbie Beebe)).

[10]    Plaintiff objects to the characterization that he previously worked in the SLS Division. Rather, Plaintiff submits that he "worked for the Electrical department and transferred to the SLA department." ECF No. 213 at 4. Further, in commentary included on the cover sheet of Plaintiff's "Exhibit XIX," he indicates he was not transferred into the SLA department until February 2018. ECF No. 213-3 at 6. These distinctions are not material to disposing of the pending motions.

**B. Plaintiff's work performance and interactions with coworkers**

**\*3** Defendant has submitted evidence of several issues management and coworkers had with Plaintiff's work and

interactions while at 3D Systems. *E.g.*, Pandya Decl. ¶¶ 4, 6 (indicating Plaintiff "struggle[ed] to work with the context of a team," demonstrated "poor judgment," and "create[ed] unnecessary conflict in the workplace," bypassed chain of command, and was "regularly involved in workplace conflict"); Maul Decl. ¶¶ 7, 8 (indicating Plaintiff "regularly caused conflict with co-workers," including a specific unfounded conflict with coworker Scott McClain; indicating Plaintiff "regularly failed to finish his work in a timely manner"); Declaration of Principal Systems Engineer (former SLS Senior Systems Engineer and SLS Program Manager) Rafael Hidalgo ("Hidalgo Decl.") ¶¶ 3-5, ECF No. 189-6 (relating Plaintiff's complaints about Senior Electrical Engineer David Holland, whom Plaintiff had been assigned to assist). In June 2017, Holland discovered that Plaintiff was recording their conversations, and complained to Human Resources about the same. Holland Decl. ¶ 2, ECF No. 189-7. Plaintiff asserted that Holland made comments that he perceived as racist. *Id.* ¶ 3; Latty Decl., ex. 6, ECF No. 189-4 at 25 (also submitted by Plaintiff as ex. XXII, ECF No. 213-3 at 56). Defendant investigated those allegations but found them to be unsubstantiated. *See* ECF No. 189-4 at 25 (Notes from Human Resources ("HR") Generalist Alexandra Norris regarding issues between Plaintiff and Holland and that claims of allegedly racist comments were unsubstantiated).[11]    Hidalgo indicated that, after Plaintiff was reassigned to the SLA Development Department in September 2017, Hidalgo had to become involved when Plaintiff had refused to turn over work he had performed on an SLS project to another SLS Electrical Technician. Plaintiff indicated he did not want others taking credit for his work. Hidalgo Decl. ¶¶ 7–8.

[11]    In "objecting" to Defendant's statement of the facts Plaintiff contends Alexandra Norris "participated in the collusive effort to discredit the plaintiff in retaliation from filing a racial discrimination complaint with the South Carolina Human Affairs Commission." ECF No. 213 at 6. Plaintiff provides no evidence to substantiate this contention/objection. Plaintiff's retaliation claim is discussed below.

Pandya verbally counseled Plaintiff in October 2017 regarding Plaintiff's need to "demonstrate that he was fully capable of performing his job duties, which he had not done to date." Pandya Decl. ¶ 5. Pandya also coached Plaintiff regarding the need for professional behavior and avoiding unnecessary confrontations. *Id.* ¶ 6. These coachings were verbal. As noted by Plaintiff, he had not been "written up" for these performance issues. *See* ECF No. 213 at 6.

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

C. Plaintiff's desire for promotion and increased lab duties

On October 2, 2017, Plaintiff emailed Maul and expressed interest in becoming an Associate Engineer, which is a position within the Product Development Division. Maul Decl. ¶ 12 & ex. 3 thereto (Pl. email exchange with Maul). Maul advised Plaintiff that, because he did not have an engineering degree, he was not qualified for an Associate Engineer position. Id.[12] Maul advised Plaintiff there were opportunities for obtaining Engineering Technician promotions. Id. However, Maul advised certain factors would impact Plaintiff's potential for promotion. In particular, Maul expressed concerns to Plaintiff about his (a) avoiding conversations with and regularly bypassing his direct supervisor (Pandya), thereby unnecessarily escalating issues to Maul; (b) struggling to work within the context of a team and viewing his work as "his own" rather than as an asset of 3D Systems; and (c) not following supervisory guidance and instruction. Id.

[12]   Plaintiff does not dispute that he does not possess a four-year engineering degree. He does, however, assert that some individuals without four-year engineering degrees obtained "engineer" positions. These claims are discussed in detail below.

At some time in 2017 Plaintiff also advised Pandya that he desired an engineer position in the Product Development Division. Pandya Decl. ¶ 9. Pandya also advised Plaintiff that he would be required to obtain an engineering degree before he could qualify for an engineer position in the Product Development Division. Id. Pandya further emphasized that, to the extent he was otherwise qualified for a promotion, Plaintiff had to demonstrate that he was capable of performing his then-current job duties, which included repairing printers and having a full understanding of the printers in the SLA Lab. Id.

Plaintiff indicates he then expressed to Maul an interest in the "lab manager position in the SLA Lab." ECF No. 213 at 9. Pandya testified in his declaration that, while, from time-to-time, 3D Systems assigns duties within its various labs to individuals who then serve as contact points on specific issues (i.e., maintaining the lab's badge reader or responsibility for chemicals within the lab), such designations are not separate positions or promotions and

do not include a pay increase. Pandya Decl. ¶ 12. Rather, these simply are duties assigned in addition to an employee's regular job duties. Id. 3D Systems does not post job openings for the duties, nor does it permit employees to apply for the duties. Id. In or around March 2018, Pandya selected an employee to be responsible for the SLA Lab chemicals. Id. ¶ 13. Pandya assigned the duties to Arjun Plakkat, a Chemical Engineer who worked on the Process Development Team within the Process Development Division. Id. As explained by Pandya, Plakkat had significant experience working with resins and chemicals (which are hazardous and present in large quantities in the lab) as well as a thorough knowledge of the printers in the lab. Id.

*4 After Plakkat had been assigned these duties, Plaintiff asked Pandya to "reconsider" this decision and assign responsibility for the chemicals to him. Id. Pandya explained to Plaintiff that Plakkat had extensive experience with chemicals and resins, and that assigning the duties to a member of the Process Development Team made sense given that team's frequent use of the lab. Id.[13]

[13]   In his "objections" Plaintiff submits the position at issue was called "lab manager," and makes the unsupported argument that Plakkat was made "lab manager" because he was of Indian descent and the "company had adapted an Indian CEO and was effectively hiring Indian employees by the boat load." ECF No. 213 at 12. While the court acknowledges Plaintiff's argument, Plaintiff has proffered no evidence that "lab manager" is a position for which employees "apply" or that Plakkat was chosen to take on certain lab duties based on his ethnicity.

D. Plaintiff complains to HR regarding promotions

On March 28, 2018, Plaintiff complained to Markia Pressley, 3D Systems' then-Employee Relations and Compliance Manager, that he was denied promotions into engineering roles while other employees without engineering degrees were promoted into engineering roles. Pressley Dec. ¶ 2, ECF No. 189-8. Plaintiff acknowledged, however, that he had never actually applied for a promotion. Id. Pressley testified that Plaintiff never claimed at this time that his promotion-related complaint had anything to do with his race. Id. Pressley's handwritten notes from the meeting do not reference any claim of race-based discrimination. ECF No. 192-2 at 8-9. Plaintiff indicates, however, that he did tell Pressley that

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

he was being racially discriminated against, referencing the Tuskegee Airmen. ECF No. 213 at 13; *see also* Compl. 5.

Upon investigation, Pressley determined that those employees without engineering degrees whom Plaintiff believed were promoted to engineering positions either did not hold true engineering positions or were in a different business group wherein engineering degrees were not an absolute prerequisite to qualify for a position with the word "engineering" in the job title. *Id.* Pressley confirmed with Maul that he did not promote employees in the Product Development Division who did not have an engineering degree into engineering positions. *Id.*

E. Plaintiff's April 4, 2018 email to Holmes resulted in counseling

On April 4, 2018, in response to an email chain regarding a technical issue, Plaintiff sent an email addressed specifically to Christopher Holmes, a Process Development Division Engineering Technician who worked in the SLA Lab. The email was sent as a "Reply All" to the email chain on which 13 other 3D Systems employees were copied.[14] Pandya Decl. ¶ 14; Apr. 4, 2018 email ex. 2 to Pandya Decl., ECF No. 189-5 at 16-23. In the email Plaintiff asked Holmes to "stop being mad about the lab jobs and not being able to fix things"; "stop spreading rumors and gossip hurting our team moral"; and indicating Holmes "may be somewhat bitter." *Id.* Plaintiff suggested that Holmes apply for a different position within the SLA team. *Id.* Others copied on this email included Holmes' direct supervisor and various managers throughout the Company. *Id.*

[14]     Plaintiff takes the position that characterizing the email as copying 13 people is a "lie" because he "did not copy the people in on the email but replied to an email that a host of people were assembled...." ECF No. 213 at 15. The court notes that Plaintiff did not himself initiate the original email that included numerous people; rather, he replied to all on that email chain. That reply to the email group, then, had the effect of sending the email addressed to Holmes to numerous other employees.

*5 Pandya verbally counseled Plaintiff about the email on April 5, 2018, reminding Plaintiff that he had previously been advised he should not get involved in arguments or confrontations with other employees but should advise

Pandya instead. Pandya Decl. ¶ 15. Plaintiff was advised that his failure to do so and his sending the inappropriate email constituted unacceptable behavior. *Id.* Pandya reminded Plaintiff that his position required him to get along with the SLA group team members and that his behavior did not reflect well on Plaintiff's ability to work well as part of a team. *Id.* Pandya testified that Plaintiff did not find the email to have been inappropriate and argued that Holmes, not the email, was the problem. *Id.*

After HR investigated the circumstances surrounding Plaintiff's email to Holmes, Defendant determined that Plaintiff should receive a Performance Written Warning Memorandum ("Written Warning") for his misconduct. The Written Warning is dated April 13, 2018. Pressley Decl. ¶ 3; Pandya Decl. ¶ 16 & ex. 3 thereto, ECF No. 189-5 at 25-26. Pandya worked with HR to prepare the Written Warning. Pandya Decl. ¶ 16.

F. April 9, 2018 email regarding editing Plaintiff's 2017 performance evaluation

Plaintiff's 2017 performance evaluation itself is not part of the record. The record includes an email chain regarding a request by HR that Pandya be permitted to have the 2017 evaluation moved into "edit" mode so that he could edit the review to reflect feedback Pandya wished to convey to Plaintiff. Apr. 9, 2018 email chain, ECF No. 192-2 at 19-20. In the email HR Generalist Norris indicated Adams "has performance issues, and the review that [Pandya] wrote is too positive/not consistent with the feedback he wants to give." *Id.* at 19. As explained by Senior Vice President, People and Culture Allen Latty, managers had until April 26, 2018 to complete employees' evaluation documents and reviews, including the 2017 performance review. Decl. of Latty in Opp'n to Pl. Mot. Summ. J. ("Latty Opp'n Decl.") ¶ 3, ECF No. 203-1.

G. Events of April 10-12, 2018

On April 10, 2018, Plaintiff filed a charge with the EEOC alleging race and age[15] discrimination. Apr. 10 Charge, ECF No. 14-3.[16] Plaintiff called in sick for work on both April 11 and 12, 2018, indicating he had food poisoning. Pressley Decl. ¶ 4.

[15]     The age discrimination claim has been dismissed. *See* ECF No. 122.

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

[16]  Pressley testifies that no one at 3D Systems was aware of the April 10, 2018 Charge while Plaintiff was still employed. Pressley Decl. ¶ 9. Defendant has submitted documentary evidence indicating it did not receive notice of the April 10, 2018 Charge until April 19, 2018. *Id.* & ex. 1 thereto, ECF No. 189-8 at 8-11. Although Plaintiff submits Defendant was aware of the April 10, 2018 Charge by the time of his April 16, 2018 termination, ECF No. 213 at 24, ECF No. 224 at 11 (baldly stating Defendant had been notified by fax regarding the EEOC charge but not indicating when or providing evidence thereof), he offers no competent evidence to support this statement. Plaintiff also indicates he had filed a claim with SCHAC in 2017 regarding "the continued efforts from the defendant to steal the plaintiff's invention." ECF No. 213 at 24. However, he provides no evidence to support this claim or to explain how it is relevant here.

H. Events of April 13, 2018

When Plaintiff returned to work on April 13, 2018, he reported to Pressley that he felt Pandya was treating him differently than other employees "because he was black." Pressley Decl. ¶ 5. Pressley immediately investigated Plaintiff's allegations. *Id.* After discussing Plaintiff's spoken allegations with Pandya and after reviewing applicable documents, Pressley deemed Plaintiff's allegations unfounded and directed Pandya to proceed with issuing the Written Warning. *Id.*

**\*6** On the afternoon of April 13, 2018, Pandya met with Plaintiff and issued him the Written Warning. Pandya Decl. ¶ 17. Plaintiff indicates that he requested that an HR representative be present at the meeting but Pandya did not permit it. ECF No. 213 at 17. The Written Warning addressed the inappropriateness of Plaintiff's email to Holmes and his continued inability to accept responsibility for his unprofessional behavior, and reminded Plaintiff that his inability to work well with others was a continuing problem. ECF No. 189-5 at 25-26. The Written Warning conveyed that Plaintiff's behavior violated the Company's Code of Conduct, including because he had failed to treat his teammates with "dignity and respect," and to "extend trust and show

respect and care in every interaction." *Id.* Finally, it warned Plaintiff that if he did not improve his judgment and professionalism, "additional corrective actions, up to and including immediate termination, may be in order." *Id.*

Upon issuance of the Written Warning, Plaintiff continued to deny any wrongdoing on his part. Pandya Decl. ¶ 18. Plaintiff accused Pandya of discriminating against him by issuing a warning without also issuing one to Holmes. *Id.* Pandya advised that the Written Warning was not discriminatory and that it was Plaintiff who had engaged in misconduct. *Id.*

Pandya instructed Plaintiff to sign the Written Warning, and Plaintiff requested to read it first. Pandya Decl. ¶ 19. Pandya agreed to let Plaintiff read it first. Rather than read it, Plaintiff took out his cell phone so that he could take a photograph of the document. *Id.* Pandya informed Plaintiff that he could obtain a copy of the Written Warning from HR, but that he was not to take a photograph. *Id.* As relayed by Pandya, Plaintiff ignored that instruction, grabbed the Written Warning, turned his back to Pandya, and proceeded to attempt to photograph the document. *Id.* At this point, Pandya stood up, reached over Plaintiff, and took the document from him before ending the meeting. *Id.* Plaintiff's description of what took place after he tried to take a photograph of the Written Warning includes additional details. Plaintiff submits Pandya "ran around the table," which was a "3-4 ft. wide and 10-12 ft. long conference table," and "grabbed [Plaintiff] from the back." ECF No. 213 at 19-20. Plaintiff also indicates that, in the statement to Travelers Insurance, Pandya indicated he "grabbed the plaintiff on the bicep," which is consistent with Plaintiff's version of what took place. *Id.* at 20.[17]

[17]  As noted within, the undersigned has reviewed the audio recording of the statement Pandya provided to Travelers Insurance. Rather than indicating he "grabbed" Plaintiff on the bicep, Pandya explained that he may have had "incidental contact" with Plaintiff's bicep when reaching for the Written Warning. Apr. 23, 2018 Recorded Stmt., available at ex. XVIV to ECF No. 213 ("Master Audio Video Disc").

After leaving the meeting with Pandya, Plaintiff went to the HR office and met with Pressley. Pressley Decl. ¶ 6. Plaintiff complained that the Written Warning was "unfair," although he acknowledged that his email "wasn't a nice email." Plaintiff alleged that the issuance of the Written Warning was discriminatory and retaliatory. *Id.* Plaintiff then began describing the meeting

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

with Pandya, telling Pressley that Pandya had grabbed him from behind and taken the document out of his hands but not indicating he [Plaintiff] was in any pain. *Id.* Plaintiff then began demonstrating Pandya's behavior on Pressley. *Id.*[18] Pressley indicates Plaintiff demonstrated Pandya's actions "in a manner that caused [her] unnecessary pain and which was wholly inappropriate." At that time, Pressley asked Sally Branham, 3D Systems' then-Director and HR Business Partner, to join her in the meeting with Plaintiff. *Id.*; Branham Decl. ¶ 2, ECF No. 189-9. Plaintiff also demonstrated the actions on Branham. Branham Decl. ¶ 2, Pressley Decl. ¶ 6.[19]

[18]    Plaintiff indicates Pressley had "invited [him] to demonstrate how Darshan Pandya had assaulted him." ECF No. 213 at 20.

[19]    Plaintiff does not deny that he demonstrated Pandya's purported actions on Pressley and Branham. Rather, he "contends that he did not demonstrate abusively but was very gentle just to show the jist (sic) of what happened but contends that if he had assaulted [ ] either of the women why didn't they tell the police when the officer called the company during the same afternoon when the plaintiff made the police report." ECF No. 213 at 21.

I. Defendant's investigation and Plaintiff's April 16, 2018 termination

**\*7** HR investigated Plaintiff's allegations regarding Pandya's conduct during the April 13, 2018 meeting and found no evidence to substantiate Plaintiff's claims that Pandya had touched Plaintiff or that Plaintiff had suffered any discrimination or retaliation. Pressley Decl. ¶ 7; Branham Decl. ¶ 3.[20]

[20]    In moving for summary judgment Defendant takes the position that it "could have terminated [Plaintiff's] employment immediately given his unacceptable behavior toward Ms. Pressley and Ms. Branham[.]" ECF No. 189-1 at 10. Plaintiff disagrees with this characterization of his behavior toward Pressley and Branham. ECF No. 213 at 22.

Following this investigation, Pressley made the

recommendation, on behalf of HR and in collaboration with Branham and Latty, that Defendant terminate Plaintiff's employment, a recommendation with which 3D Systems' legal and management teams, including Maul, agreed. Pressley Decl. ¶ 8; Johnson Decl. ¶ 5; Maul Decl. ¶ 18. Defendant terminated Plaintiff's employment on April 16, 2018, due to his insubordination toward Pandya during the April 13, 2018 meeting, Plaintiff's recording that meeting without Pandya's knowledge or consent,[21] inappropriate physical contact with Pressley and Branham, and chronic inability to get along with others in the workplace. *Id.* Maul conveyed the termination decision to Plaintiff via telephone the same day. Pressley Decl. ¶ 8. Defendant offered Plaintiff a severance package in an attempt to help him transition into another position with a new employer. Johnson Decl. ¶ 6.[22]

[21]    Defendant's briefing does not focus on the nonconsensual nature of the recording. Plaintiff has submitted the recording as evidence in support of his version of events. ECF No. 43. Without passing on its admissibility, the court notes that it has listened to the recording of the April 13, 2018 meeting between Plaintiff and Pandya, and it does not shed light on the physical actions of either individual.

[22]    Plaintiff contends Defendant offered him a severance package "because they already were under the understanding that complaints were submitted to both the South Carolina Human Affairs Commission in February and the Equal Employment Opportunity [C]ommission on April 10, 2018 that were both pending." ECF No. 213 at 24. Plaintiff has provided no evidence of a February 2017 Charge or evidence that Defendant was aware of the April 10, 2018 Charge as of April 16, 2018.

J. Plaintiff's workers compensation and unemployment claims

Defendant, through Sally Branham, submitted a claim to Travelers Insurance Company, Defendant's workers compensation carrier, on Plaintiff's behalf. ECF No. 192-2 at 1-5. The claim paperwork indicates the incident was reported to the employer on April 13, 2018, and briefly describes the incident as follows:

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

> Employee alleges that his manager physically grabbed him causing harm to his shoulder. Manager denies having touched the employee. Employee did not tell us of the alleged injury until Monday morning via email.

*Id.* at 4.

Plaintiff's initial claim for unemployment benefits was denied based on the claim adjudicator's finding that Plaintiff had been discharged for misconduct. S.C. Dep't of Employment and Workforce ("SCDEW") Decision of Appeal Tribunal 1, ECF No. 192-1 at 26-35. Plaintiff appealed that finding, and after a hearing at which Defendant did not appear, the Appeal Tribunal found Plaintiff was eligible for benefits. *Id.* at 27-28.[23]

[23]   This information is provided as background. "The information in the SCDEW decision has no precedential value." *Koszarsky v. A.O. Smith Corp.*, No. 4:12-CV-00939-RBH, 2014 WL 108320, at *6 (D.S.C. Jan. 9, 2014).

### K. Plaintiff's relevant EEOC claims and the instant litigation

**\*8** As set out in more detail in the undersigned's November 26, 2019 R&R, Plaintiff filed three Charges that are the subject of this litigation: the April 10, 2018 Charge as well as Charges dated April 20, 2018 and June 4, 2018. *See* R&R, ECF No. 68 (adopted by Order found at ECF No. 122). Plaintiff initiated the instant civil action in March 2019.

### III. Standard of review

#### A. Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not

disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Id.* at 248. An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 248. A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). In considering cross-motions for summary judgment, "[t]he Court must deny both motions if it finds there is a genuine issue of material fact, 'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.' " *Wallace v. Poulos*, No. CIV.A DKC 2008-0251, 2009 WL 3216622, at *4 (D. Md. Sept. 29, 2009) (citation omitted).

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

Further, although the court is to liberally construe a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g.*, *Erickson v. Pardus*, 551 U.S. 89 (2007), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

Cir. 1990).

B. Methods of proof in employment cases

*9 A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, he may attempt directly to prove discrimination with direct or circumstantial evidence. Alternatively, when direct proof is lacking, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000) (holding the *McDonnell Douglas* framework applies to retaliation claims under Title VII). Here, both parties analyze the Title VII claims under the *McDonnell Douglas* framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). The defendant's burden "is a burden of production, not persuasion." *Reeves*, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Id.* (internal quotation marks and citations omitted). Stated differently, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext for discrimination." *Merritt*, 601 F.3d at 294 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Merritt*, 601 F.3d at 294 (quoting *Burdine*, 450 U.S. at 256) (alterations in original). To meet this "merged" burden, the plaintiff/employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of ... whether the plaintiff was the victim of intentional discrimination." *Merritt*, 601 F.3d at 294–95.

IV. Analysis

A. Title VII discrimination claims

1. Failure to promote

Plaintiff's racial-discrimination claim focuses in large measure on Defendant's purported failure to promote him because of his race. To establish a prima facie case of race discrimination based on 3D Systems' alleged failure to promote Plaintiff, he must demonstrate that: (1) he is a member of a protected class; (2) 3D Systems had an open position for which he applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996) (citations omitted); *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). Plaintiff is a member of a protected class. Defendant challenges the remaining prongs of the prima facie case.

Defendant first asserts it is entitled to summary judgment because there were no open positions for which Plaintiff applied or sought to apply during the relevant timeframe. The Fourth Circuit has explained that, when an employer "has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a prima facie case of discriminat[ion]." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (internal citation omitted). The *Williams* court noted, though, that "the application requirement may be relaxed and the employee treated as if [ ]he had actually applied for a specific position" if an employer "fails to make its employees aware of vacancies[.]" *Id.* at 431.

In his Complaint and deposition, Plaintiff indicates he was discriminated against because Defendant failed to promote him to "Process Engineer, Failure Analysis Engineer, Sr. Technician, and Lab Manager," ECF No. 1 at 11, and an "Associate Engineer" or "Entry Level Engineer," *see* Pl. Dep. 95, ECF No. 189-10. In summary judgment briefing Plaintiff alleges he "tried on multiple occasions to apply for a job as Engineer I, Process Engineer, and a Failure Analysis Engineer[.]" ECF No.

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

213 at 27.

Defendant submits Plaintiff cannot show that he applied for any open positions. Latty explained that, since 2015, Defendant has used a system called Taleo for job posting and applications but that Plaintiff never applied for a position with 3D Systems through Taleo while he was employed by 3D Systems or afterward. Latty Decl. ¶ 7. Defendant also offers evidence that, during the time at issue (from June 2017 through April 2018), there never was an opening for a Failure Analysis Engineer, Associate Engineer, or Entry Level Engineer position. Latty Decl. ¶ 6, Maul Decl. ¶ 11. Regarding any senior technician position, Defendant explains that Plaintiff could not have applied for such a position because, rather than a move to a different position, it would involve a merit-based change in the "career level." The "senior" designation relates to 3D Systems' terminology concerning merit-based linear career progression. Maul Decl. ¶ 16 & ex. 4 thereto. Regarding the "lab manager" position referenced by Plaintiff, Defendant explains that 3D Systems does not have a position with that title. Pandya Decl. ¶ 13. Rather, Pandya's assignment of certain lab duties to Plakkat was not a promotion for Plakkat—he did not receive a pay raise, title change, or similar benefit. *Id.* ¶ 12. Further, Plaintiff admitted in deposition that neither he, nor anyone else, applied to be lab manager. Pl. Dep. 89. Plaintiff also indicated he never applied for an open position other than expressing interest to Pandya and Maul of his desire for a promotion. Pl. Dep. 82-83; *see* Pl. Oct. 2, 2017 email to Maul expressing interest in becoming an associate engineer, Maul Decl. ¶ 12 & ex. 3 thereto (Pl. email exchange with Maul), ECF No. 189-3; Pandya Decl. ¶ 9 (indicating Plaintiff expressed interest in an engineer position in the Product Development Division).[24]

[24]    Both Maul and Pandya advised Plaintiff that engineer positions required four-year engineering degrees.

**\*10** Citing no case law or record evidence to support his argument, Plaintiff submits he did not submit formal applications because there "was not a formal application process that was adhered [to] but the positions were secretly given and awarded to different people in secret." ECF No. 213 at 27. Plaintiff indicates that at a time when he was "promoted from the Repair Department to the position of Technical Support Engineer there was no application process that was done prior to the interview and receiving the job[,]" but that he was contacted by another employee and by "supervisor Paul Tullar" who offered the position to the plaintiff without paperwork and without application by others. *Id.*[25] Plaintiff also

"contends that he did indeed apply several times for various Engineering Positions and due to being transferred after Debbie Beebe [left] that all of his [prospective] promotions, training, and overtime were all cut and [he] was removed from all training programs as well." ECF No. 213 at 28 (citing Exhibit XIII). Plaintiff's Exhibit XIII is an email from Pandya advising Plaintiff to keep overtime to a minimum. The email does not include any evidence of Plaintiff's application for a particular position.

[25]    Plaintiff also submits that he approached HR and Pandya several times about "the Engineering Title" but was told he " 'could not' apply for the position because he did not have a completed 4 year degree[.]" ECF No. 213 at 27. This point refers more to another prong of the prima facie case—being qualified for the positions at issue.

Plaintiff has provided no competent evidence that he applied for the positions on which he bases his failure-to-promote claim. Regarding Plaintiff's claim that he was not "promoted" to the position of "lab manager," the claim is subject to summary judgment for Defendant because Plaintiff has provided no evidence that the position would be a "promotion." *See Sare v. Elec. Data Sys., LLC*, No. RWT 08CV1567, 2009 WL 3347251, at *2 (D. Md. Oct. 13, 2009) (recognizing that a failure-to-promote claim cannot exist where there is no evidence that reassignment would have constituted a "promotion"). Relatedly, the "Senior Technician" position would be a merit-based progression, not an actual promotion.

Regarding the promotion to other positions—that of Process Engineer, Failure Analysis Engineer, associate engineer, or entry level engineer—the undersigned is of the opinion that Plaintiff has not provided evidence sufficient to establish a prima facie case. Certainly, Plaintiff's indication to Pandya and Maul that he generally desired a promotion is insufficient to satisfy his prima facie case for his failure-to-promote claim. *See Nichols v. Caroline Cty. Bd. of Educ.*, 123 F. Supp. 2d 320, 328 (D. Md. 2000), *aff'd*, 15 F. App'x 156 (4th Cir. 2001) (granting an employer summary judgment on a failure to promote claim because there was no evidence that plaintiff applied for any particular promotion). The closer question is presented by Plaintiff's generalized argument that he did not apply because there "was not a formal application process" and positions were awarded "secretly." When an employee presents evidence to this effect, the prong of applying to an open position may be excused. *See Williams*, 370 F.3d at 431. Here, though, it does not seem that Plaintiff's general musing about how a

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

former supervisor at one time suggested he apply for a prior job, without any actual record evidence to support his claim, is insufficient to provide such an excuse.[26] In *Williams*, the plaintiff's failure-to-promote claim focused on *specific* position openings of which she indicated she had been unaware at the time they were open. *See generally Williams*, 370 F.3d at 431–32 (discussing specific April 1998 and November 1998 promotion opportunities at issue). Here, though, Plaintiff has provided no evidence of actual openings for particular positions for process engineer, failure analysis engineer, associate engineer, or entry level engineer. Because Plaintiff has not established that there were particular position openings for which he applied (or even actual open positions), he cannot establish the first prong of the prima facie case, and summary judgment is appropriate as to his failure-to-promote claim.

[26]    Plaintiff also briefly "contends that there was no job board that announced all positions in the Engineering Department." ECF No. 213 at 28. The lack of a "job board" does not equate to the lack of a system for advising employees of openings. Plaintiff does not address Defendant's evidence that since 2015 it has used the Taleo system for all job postings and applications. *See* Latty Decl. ¶ 7.

**\*11** In any event, even assuming, *arguendo*, Plaintiff had applied for a promotion to an open position, he has not demonstrated that he was qualified for any of the positions or duties at issue. Accordingly, he cannot establish the second prong of his prima facie case.

As explained to Plaintiff by Maul and Pandya, he was required to have a four-year engineering degree for an actual "engineer" position at 3D Systems. Maul Decl. ¶¶ 10, 12 and Oct. 2, 2017 email to Adams. Regarding a "process engineer" position, Maul indicated that 3D Systems only hires individuals for Process Engineer positions who have: (a) an engineering degree (either bachelors, masters or Ph.D.); (b) an equivalent advanced scientific degree (at the bachelors level or above); or (c) extensive work experience (i.e. six to eight years) in the field of process engineering. Maul Decl. ¶ 14. Plaintiff indisputably did not have a four-year engineering degree, nor did he have six-to-eight years' experience in the process-engineering field. Regarding Plaintiff's quest to progress to the level of Senior Engineering Technician, Pandya advised Plaintiff that he needed to demonstrate that he was not only capable of performing his then-current role at the Intermediate level in a satisfactory manner, but that he could also perform at a higher level. Pandya Decl. ¶ 9. Maul advised Plaintiff that, to progress,

he would have to improve in certain areas. Maul Decl. ¶ 12. Plaintiff never demonstrated that he was qualified to work as an Engineering Technician at the Senior level. *Id.* ¶ 16. Regarding Plaintiff's quest to become "lab manager," Pandya explained that Plaintiff was not qualified to take responsibility for the chemicals in the SLA Lab. Pandya Dec. ¶ 13.

Plaintiff does not dispute that he does not have a four-year engineering degree. This lack of qualification is sufficient for non-selection. *See, e.g., Holland v. Flowserve US, Inc.*, No. 6:12-CV-00020, 2013 WL 2237775, at \*4 (W.D. Va. May 21, 2013) (dismissing plaintiff's failure-to-promote claim based upon his non-selection for several positions, including a position requiring an engineering degree, which plaintiff did not have).[27]

[27]    Plaintiff's contention that others were "engineers" without four year degrees or specific experience is discussed below.

Further, Plaintiff submits he was qualified to hold the positions he claims he should have received. *See generally* ECF No. 213 at 30-31. However, Plaintiff's subjective belief that he was qualified for any of the positions or duties at issue is insufficient to establish a prima facie case of discrimination. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (noting employee's own testimony regarding his performance is insufficient; rather, it is the perception of the employer that is relevant); *see also Bryant v. Yorktowne Cabinetry, Inc.*, 548 F. Supp. 2d 239, 244–45 (W.D. Va. 2008) ("[O]ne of the most common and obviously nondiscriminatory reasons for declining to promote an individual is the employer's judgment that she is not objectively qualified for the position she seeks by the employer's own standards."). Defendant has provided evidence that it found Plaintiff did not satisfy the qualifications for the positions Plaintiff says he was wrongly denied. Because Plaintiff has not shown he was qualified, summary judgment is appropriate for Defendant on this prong, as well.

**\*12** The undersigned also considers the final prong of Plaintiff's prima facie failure-to-promote claim: whether Defendant failed to promote Plaintiff under circumstances giving rise to an inference of unlawful discrimination. Generally, to raise an inference of discrimination in the failure-to-promote context, a plaintiff must establish that he was not only qualified, but he must "make a strong showing that h[is] qualifications [we]re superior to those who actually received the promotion." *McLaughlin v. CSX Transportation, Inc.*, 211 F. Supp. 770, 782-83 (D.S.C. 2016) (citation omitted). More generally, when a

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

plaintiff uses comparators to demonstrate discrimination, he must "include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and ... [in the context of disparate discipline or treatment] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Although the issue of whether an employee has presented a valid comparator may often be a question of fact, the Fourth Circuit recently noted, "this does not preclude a court from deciding as a matter of law that there is an insufficient basis for comparison to submit the question to the fact-finder." *Tinsley v. City of Charlotte*, No. 19-1871, 2021 WL 1783226, at *6 (4th Cir. May 5, 2021) (overturning jury verdict in sex-discrimination case because plaintiff had not presented a valid comparator).

Plaintiff generally attempts to demonstrate an inference of discrimination by identifying several purported comparators—those he claims were outside of his protected class but otherwise similarly situated and held the positions for which he brings suit.[28] Defendant argues Plaintiff has not set forth evidence of a valid comparator. Construing Plaintiff's arguments liberally, he presents several employees as comparators.[29] Based on the various filings of Plaintiff and Defendant, following is a list of 3D Systems employees whom Plaintiff suggests are comparators, as well as relevant information regarding each of these individuals:

• David Fosdick (Process Engineer): Plaintiff indicates Fosdick was promoted to position of Process Engineer without a four-year degree, noting Fosdick "was a prior employee from Wendy's." ECF No. 213 at 35. Defendant never indicated a process engineer was required to have a four-year degree. Rather, Maul explained that the engineering-degree requirement applied only to positions in the Product Development Division. Maul Decl. ¶ 14. Unlike Plaintiff, Fosdick had significant experience working in 3D Systems' Process Development Division. *Id*. ¶ 15. Further, Plaintiff did not apply for the position of process engineer.

• Chad Houck (Senior Engineering Technician): Houck had extensive experience in a product development role, some of it at 3D Systems. Pandya Decl. ¶ 11. Pandya indicated Houck demonstrated the capability of managing and completing projects independently, and generally completed work at a higher level of complexity and quality than Plaintiff. *Id*.

• Steven Goransson (Senior Process Technician in the SLS Lab), Ed Berberich (Senior SLS Engineering Technician II), Scott McClain (Senior Process Technician in the SLS Lab): Unlike Plaintiff, these individuals worked in the SLS Lab. Additionally, as noted above, the progression to "senior" is a career-level advancement rather than an actual promotion.

• Paul Hoskinson (Software QA Engineer): Plaintiff has not made any allegation regarding a software engineer position—which position falls within a totally different department than Plaintiff ever worked. Maul Decl. ¶ 10.

• John Clay (Product Management Engineering): Clay has a four-year degree, a bachelor's of technology ("BT") degree in mechanical engineering. *See* ECF No. 192 at 14.

• Christopher Holmes (Chemistry Lab Technician): Holmes did not hold a position with the term "engineer" or "engineering" in the title.

• Sean Leighty (Field Service Department), Josh Heiber (Software Engineering Department), Benjamin Dibble (Print Services Department), Terry Wilkes (Print Process Department), and Clinton Vilim (Electrical Engineer): These individuals worked in departments other than the Development Engineering Department, where Plaintiff worked. Latty Opp'n Decl., ECF No. 203-1.

**\*13** • Zeke Quinn (Senior Tech Support Engineering) and William "Greg" Booth[30] (Senior Technician Support Engineer): Suppl. Latty Decl. ¶¶ 5,6, ECF No. 230-1. Quinn and Booth both held a position once held by Plaintiff. As discussed above, promotion to the "senior" level is a career-advancement move rather than a promotion for which one applies. None of the positions Quinn or Booth has held require a four-year degree. *Id*.

Compl. 11, ECF No. 189-1 at 17-18, ECF No. 192 at 6, ECF No. 203 at 5-8, ECF No. 213 at 35-37, ECF No. 224 at 13-15, ECF No. 230 at 2-5.

[28]    As noted above, Plaintiff's failure to show he applied for particular "engineer" positions during the relevant time frame is fatal to his prima facie failure-to-promote claim. This failure makes it difficult to analyze his purported comparators with clarity. In any event, given Plaintiff's pro se status and in the interest of examining his arguments, the undersigned has attempted to

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

summarize Plaintiff's various comparator arguments herein.

29  Plaintiff's general, broad arguments that there was an "array of other white employees that were hired or promoted to Engineer titles with less than a 2 year degree," ECF No. 213 at 32, and his generalized claim that Defendant "has no history of ever hiring or promoting any Black employees to Engineer status[,]" particularly at the Wilsonville, OR plant, *id.* at 28, lack specific evidence and require no further analysis.

30  Plaintiff alleges that 3D Systems "replaced" Plaintiff by promoting Booth into Plaintiff's prior position. ECF No. 224 at 13. However, Booth was hired into an Inter Engineering Technician position which was posted prior to termination of Plaintiff's employment, and which was a different position than Plaintiff's final position. ECF No. 203 at 12 n.24; Suppl. Latty Decl. ¶ 5.

None of these individuals is an appropriate comparator to Plaintiff because their roles and supervisors, among other things, were different. Although comparators need not be identical, a plaintiff is required to show that his comparators are "similar in all relevant respects[.]" *Haywood*, 387 F. App'x at 359. These similarities include showing that the employees "dealt with the same supervisor, [were] subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances ...." In addition, as discussed above, Plaintiff did not apply to any of the positions held by these individuals.

Plaintiff has not set out appropriate comparators and cannot establish an inference of discrimination in that way. Defendant is entitled to summary judgment on the failure-to-promote claim.[31]

31  The undersigned is of the opinion the failure-to-promote claim need not proceed to the pretext stage. In any event, the reasons presented by Defendant for Plaintiff's lack of advancement to certain engineering positions, the reason he had not been made "senior," and the reason he was not assigned additional lab duties are legitimate, nondiscriminatory reasons. Nothing presented by Plaintiff demonstrates pretext in this regard. It is

not for the court to micro-manage decisions of this nature. *See Williams v. Horry-Georgetown Tech. Coll.*, 26 F. Supp. 3d 519, 537 (D.S.C. 2014) (finding no pretext and finding summary judgment for employer appropriate, noting, "[I]t is not within our authority to dictate the factors that employers must weigh in making a promotion, and we see nothing in Title VII to indicate that Congress wished to require companies to disregard the successful personal interactions that make for a productive workplace." (citation omitted)).

2. Other discrimination allegations

**\*14**  Plaintiff also alleges he was subjected to race discrimination as a result of the April 13, 2018 alleged "assault" and issuance of the Written Warning; and based on 3D Systems' not acknowledging Plaintiff for "inventing" the Versa II Module. Construing Plaintiff's claims liberally, the court also considers Plaintiff to have alleged that his termination was race-based, as well.[32]

32  Plaintiff's claim that coworkers subjected him to derogatory statements is addressed in connection with his claim of a hostile work environment below.

In order for Plaintiff to establish a prima facie case of race-based discrimination, he must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was meeting 3D Systems' legitimate performance expectations at the time of the alleged adverse action; and (4) the adverse action occurred "under circumstances which give rise to an inference of unlawful discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 484–87 (4th Cir. 2005). If Plaintiff establishes a prima facie case, the burden of production shifts to Defendant to set out legitimate, nondiscriminatory reasons for the adverse employment action. Then, the burden shifts back to Plaintiff to prove that the legitimate, nondiscriminatory reason is mere pretext for illegal discrimination. *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004).

Title VII prohibits discrimination solely with respect to the compensation, terms, conditions, or privileges of employment. *See* 42 U.S.C. § 2000e–2(a)(1); 29 U.S.C. § 623(a)(1). To state a prima facie case of discrimination,

2021 WL 5311256

any alleged "adverse employment action" must be "a discriminatory act which adversely affects the terms, conditions, or benefits of employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).

Defendant concedes that termination is an adverse action. ECF No. 189-1 at 22.[33] Defendant argues, however, that neither the alleged assault, the Written Warning, nor 3D Systems' response to the Versa II Module constitutes an adverse employment action that affected the terms, conditions, or benefits of his employment. The undersigned agrees. Plaintiff has not provided evidence that, prior to the termination, Defendant took actions that amounted to an adverse employment action. *E.g.*, *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651–52 (4th Cir. 2002) (finding written warning does not constitute an adverse employment action because it does not affect the terms, conditions, or benefits of employment). Again, although Plaintiff has an opinion that 3D Systems' response to his work on the VERSA II was improper, he has not shown that it was an adverse employment action.[34] The undersigned continues the analysis of Plaintiff's non-failure-to-promote discrimination claims as to his April 26, 2018 termination only.

[33]    Plaintiff's apparent misunderstanding of Defendant's argument notwithstanding, *see* ECF No. 213 at 44, Defendant does *not* concede that the termination was discriminatory. Rather, Defendant concedes only that termination is generally considered an "adverse employment action" for purposes of a prima facie discrimination case.

[34]    In opposing Defendant's motion for summary judgment Plaintiff asserts for the first time that he was "demoted from Technical Support Engineer to Electrical Technician when he was moved to the Electrical Engineering department[.]" ECF No. 213 at 45. Plaintiff cannot raise new allegations at this juncture. In any event, he has not provided evidence that the transfer to the Electrical Engineering department was a "demotion" that adversely impacted the terms and conditions of his employment.

**\*15** To raise an inference of race-based discrimination, Plaintiff must establish that he was performing at a level meeting 3D Systems' legitimate performance expectations at the time of any alleged adverse employment action. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515–16 (4th Cir. 2006). Defendant submits Plaintiff was not meeting 3D Systems' legitimate performance expectations at the time he received the Written Warning or his subsequent termination from employment. *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 992 (E.D. Va. 2017), *aff'd*, 711 F. App'x 174 (4th Cir. 2018) ("[P]oor job behavior, by itself, is a sufficient reason to conclude that plaintiff failed to meet defendant's legitimate expectations."). Defendant points to Plaintiff's problems working as a teammate, his lack of respect, and his unwillingness to change behaviors when coached. *See id.* ("As the Fourth Circuit has stated, the 'anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.' " (citation omitted)). The April 13, 2018 Written Warning specifically addressed Plaintiff's inappropriate email addressed to Holmes but copied on numerous others and expressly informed Plaintiff that his behavior violated the Company's Code of Conduct. *See Combs-Burge v. Rumsfeld*, 170 F. App'x 856, 863 (4th Cir. 2006) (employee's job performance did not meet employer's legitimate job performance where employer had written documentation establishing same).

Plaintiff takes the position that his work performance was meeting expectations, pointing to the email sent by Norris requesting that Pandya be permitted to update Plaintiff's performance evaluation. Plaintiff's issues with that process aside, considering all facts in the light most favorable to him, the performance evaluation at issue predated the April 13, 2018 Written Warning. Further, it is Defendant's perception of Plaintiff's job performance, not Plaintiff's, that is considered. *King*, 328 F.3d at 149. In addition, the undersigned notes Plaintiff's reliance on the "Thank You" brochure issued upon Plaintiff's five-year anniversary of employment with 3D Systems. Again, that brochure was issued before the Written Warning and termination and does not speak to whether Plaintiff was meeting legitimate expectations at the time of termination. *See Warch*, 435 F.3d at 518 (holding that evidence of past work performance did not alter the "abundant evidence" showing that the plaintiff was not otherwise meeting the employer's legitimate job expectations at the time of discharge).

Because Plaintiff was not satisfying 3D Systems' legitimate performance expectations at the time of his termination, his discrimination claims should fail as a matter of law. *See, e.g., Sanders v. McLeod Health Clarendon*, No. 2:18-CV-01344-DCN-MGB, 2020 WL 4588471, at \*9 (D.S.C. Apr. 8, 2020) (recommending summary judgment for failure to satisfy prima facie claim of discrimination when employee was terminated for

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

"unprofessional behavior"), *report and recommendation adopted*, No. 2:18-CV-01344-DCN-MGB, 2020 WL 3467886 (D.S.C. June 25, 2020), *appeal dismissed sub nom. Sanders v. Clarendon*, No. 20-1812, 2020 WL 8261641 (4th Cir. Dec. 1, 2020). As Plaintiff cannot establish this prong of his prima facie case, summary judgment as to Plaintiff's non-failure-to-promote discrimination claims is appropriate without further analysis.

Further, Plaintiff's race-based discrimination claim is subject to summary judgment because the circumstances surrounding the termination do not give rise to an inference of unlawful discrimination. *See Miles*, 429 F.3d at 484–87. In order to raise an inference of unlawful discrimination, Plaintiff generally must allege that his position remained open or was filled by a similarly situated qualified employee outside of his protected class. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). However, Plaintiff's specific position neither remained open, nor was it filled by an employee outside of his protected class. Rather, following Plaintiff's separation, 3D Systems eliminated his specific position altogether. Pandya Decl. ¶ 22. Latty explained that, on March 15, 2018 (before Plaintiff's Written Warning or termination), 3D Systems posted a new position for "Inter Engineering Technician." Latty Opp'n Decl. ¶ 4. William Greg Booth applied for the position through Taleo, the job-postings-and-applications system; Booth was hired for the position. *Id.*

**\*16** Plaintiff may also raise an inference of unlawful discrimination by presenting evidence demonstrating that similarly situated employees outside of his protected class were treated more favorably under apparently similar circumstances. *See Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). Beyond the context of his failure-to-promote claim, Plaintiff makes no real attempt to identify similarly situated comparators outside of his protected class who were treated more favorably, nor does he identify any other facts suggesting that adverse action was motivated by race-based discrimination. To the extent he is claiming that Pandya was a comparator who was treated differently in that Pandya was involved in the April 13, 2018 "assault" but was not terminated, such contention is unavailing. By definition, Pandya, who supervised Plaintiff, did not have the same supervisor as Plaintiff. Further, there is no evidence of any written warnings directed toward Pandya at the time of the April 13, 2018 meeting at which the assault allegedly took place. As a matter of law, Pandya cannot be Plaintiff's comparator in connection with the discriminatory-termination claim.

Further, 3D Systems has presented evidence that it has terminated multiple white males for insubordination. Latty Decl. ¶ 8. Additionally, Pressley, who was a relevant decision maker with respect to the Written Warning and Plaintiff's termination, is a member of Plaintiff's protected class under Title VII. Pressley Decl. ¶ 11. This belies Plaintiff's allegation that he suffered discrimination based on his race. *See Hightower v. Savannah River Remediation, LLC*, No. CV 1:13-3558-JMC-PJG, 2015 WL 13732192, at *5, n.4 (D.S.C. Nov. 24, 2015) (noting decision makers of same race as plaintiff created inference of non-discrimination in race context), *report and recommendation adopted,* No. 1:13-CV-03558-JMC, 2016 WL 1128022 (D.S.C. Mar. 23, 2016), *aff'd,* 702 F. App'x 173 (4th Cir. 2017); *Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class [as the plaintiff] suggests no discriminatory motivation."), *aff'd per curiam*, 208 F.3d 208 (4th Cir. 2000).

Regarding Plaintiff's claim that he was physically assaulted by Pandya during the April 13, 2018 meeting regarding the Written Warning, Plaintiff has offered no evidence of any potential nexus with a claim of race discrimination. Similarly, Plaintiff's claim concerning the Versa II Module is not tied in any manner to a claim of race discrimination. When asked in deposition what evidence he had that he was denied recognition for an invention because of his race, he responded, "That's the way I felt about it because they wouldn't even talk to me about it." Pl. Dep. 55. However, when asked for details, he indicated "other white engineers" had been recognized, but he then clarified he was referring to those whom he believed had been promoted. *Id.* at 56; *see also Id.* at 219–20 (Plaintiff indicating he believed he was denied recognition for a patent because "they just dropped it" and ignored him). In Plaintiff's brief, he indicates other engineers "such as Hernado Angulo, David Holland, and Paul Marygold all had patents[,]" and had not been denied patents. ECF No. 213 at 53. However, Plaintiff provides no evidence to support this claim. Even assuming these other individuals have been awarded patents, such information, without more, is not evidence or inference of race-based discrimination. Further, Plaintiff provided an email exchange between himself and Defendant's Intellectual Property and Technology Counsel, Keith Roberson, in which Roberson indicated he had reviewed Plaintiff's materials regarding his "design for patent consideration," met with Plaintiff, and sent the information to Defendant's patent agent for review. Emails between Roberson and Plaintiff, ECF No. 213-3 at 8-11.[35] Chief Legal Officer Johnson also indicates he received an email from Plaintiff about the Versa II and,

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

"on behalf of the Company, [ ] thanked him for his work." Johnson Decl. ¶ 4.

35    Plaintiff submits Defendant "sought to sen[d] engineers to copy the plaintiff's invention and again exploit the plaintiff and take his invention as history dictates has been done to African American inventors for decades." ECF No. 213 at 53 (citing Roberson email). However, the email does not support that Defendant sought to "copy" the Versa II or "exploit" Plaintiff. Plaintiff's general reference to "decades" of history is not evidence of discrimination directed toward Plaintiff.

**\*17** Finally, 3D Systems' offer of severance benefits does not, in and of itself, give rise to an inference of unlawful discrimination. Here, Plaintiff has presented no evidence demonstrating the severance offer was discriminatory. *See Sneed v. Strayer Univ.*, No. 1:15-CV-0004-GBL-IDD, 2016 WL 1023311, at \*11 (E.D. Va. Mar. 8, 2016) (noting for severance package to support a discrimination claim the employee must demonstrate discriminatory conduct has occurred). Plaintiff's characterization of the severance offer as a "bribe" does not demonstrate race-based discrimination of any sort. To establish an inference of discrimination Plaintiff must tie the severance offer to an intent to discriminate. *See Hopkins v. Sam's W., Inc.*, 216 F. Supp. 3d 1322, 1339 (N.D. Ala. 2016) (finding employer's offer of a severance package did not reflect an intent to discriminate against employee).

Because Plaintiff has not established a prima facie case of race-based discrimination, Defendant's Motion for Summary Judgment should be granted as to all of Plaintiff's Title VII race discrimination claims. Conversely, Plaintiff's Motion for Summary Judgment as to his Title VII discrimination claims should be denied.

Alternatively, should the District Judge proceed beyond the prima-facie stage of the race-discrimination claim, summary judgment for Defendant remains appropriate because Plaintiff cannot establish pretext.

Even if Plaintiff were able to establish a prima facie case of discrimination on the basis of his race, his discrimination claim would fail because there are no facts to cast doubt on 3D Systems' legitimate, non-discriminatory reasons for terminating[36] Plaintiff. Defendant terminated Plaintiff's employment on April 16, 2018, due to his admitted insubordination toward Pandya during the April 13, 2018 meeting, recording that meeting without Pandya's knowledge or consent, inappropriate physical contact with Pressley and Branham, and chronic

inability to get along with others in the workplace. Pressley Decl. ¶ 8; Johnson Decl. ¶ 18; Maul Decl. ¶ 18. These reasons satisfy Defendant's burden of production. *See Evans*, 80 F.3d at 960 (noting poor job performance "is widely recognized as [a] valid, non-discriminatory [basis] for any adverse employment decision.").

36    As noted above, termination is the only adverse employment action considered (in addition to the already-discussed failure-to-promote claims).

The burden shifts to Plaintiff to show that the reasons given for termination are pretextual. This is so even if Defendant honestly believed termination was appropriate—even if there were some mistaken understanding about the facts. *See generally Wooten v. Commonwealth of Va.*, 154 F. Supp. 3d 322, 336–37 (W.D. Va. 2016). ("If the record shows Defendants 'honestly believed' Plaintiff deserved to be discharged, then pretext is absent, even if Defendants were wrong or mistaken about the underlying facts.") (citing *Holland*, 487 F.3d at 217–18). In other words, in considering pretext, courts are not called upon to judge "whether the reason was wise, fair, or even correct, ultimately." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002).

Here, Plaintiff does not agree with Defendant's reasons for terminating him and takes issue with Defendant's characterization of the physical contact and of his work performance. However, this is insufficient to demonstrate pretext. *See, e.g.*, *Jones v. Eaton Corp.*, No. 3:15-CV-04236-JMC, 2017 WL 1190873, at \*9 (D.S.C. Mar. 31, 2017). Indeed, " '[t]he focus of a pretext inquiry is whether the employer's stated reason was honest,' " but " '[t]he ultimate question is whether the employer intentionally discriminated[.]' " *Id.* (quoting *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004); *Anderson v. Ziehm Imaging, Inc.*, No. 7:09-CV-02574-JMC, 2011 WL 1374794, at \*5 (D.S.C. Apr. 12, 2011)). In other words, " 'proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that plaintiff's proffered reason is correct[.]' " *Id.* (quoting *Love-Lane*, 355 F.3d at 788). " '[I]t is not enough to disbelieve the employer[;]' [r]ather, Plaintiff must demonstrate that a reasonable jury could believe him." *Id.* (quoting *Love-Lane*, 355 F.3d at 788). Plaintiff has not established pretext. Defendant's Motion for Summary Judgment should be granted, and Plaintiff's Motion denied, as to all of Plaintiff's Title VII discrimination claims.

2021 WL 5311256

B. Title VII claim of hostile work environment (harassment)

**\*18** Next, the court considers Plaintiff's race-based hostile work environment (harassment) claim. Plaintiff's Complaint alleges "harassment[,] humiliation[,] and intimidation based on Race." ECF No. 1 at 8, ¶ 3.

A hostile work environment claim requires conduct that (1) was unwelcome, (2) was based on a protected status (such as gender, race, or national origin), (3) was sufficiently severe or pervasive, and (4) can be attributed to the employer. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). It is not disputed that Plaintiff experienced interactions that were unwelcome to him. However, Defendant argues Plaintiff cannot establish the other elements of the harassment claim.

To establish that harassment creating a hostile work environment was "based on race," Plaintiff must show that but for his race, he would not have been the victim of the alleged harassment. *See Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). A plaintiff alleging harassment "can succeed only by showing that [ ]he is the individual target of open hostility because of h[is] [protected status]," not simply alleging that "[ ]he was the target of open hostility." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) (internal quotation and citations omitted). Plaintiff must show that the alleged harassment was motivated by actual racial animus. *Gilliam v. S.C. Dep't Of Juv. Just.*, 474 F.3d 134, 142–43 (4th Cir. 2007). A plaintiff must also establish that any racially offensive conduct was directed at him. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190–91 (4th Cir. 2004).

Plaintiff's claims of harassment in his Complaint and briefing focus principally on conduct by coworker Holland. *See* Compl. 8-9, ECF No. 213 at 58, ECF No. 192 at 10. Plaintiff includes as an exhibit the witness statement that SCHAC obtained from coworker Chatney Merrill. ECF No. 192-2 at 24-28. The court first notes that Merrill may be referencing events that Plaintiff indicates took place "around April 2017," Compl. 8, which is prior to the June 14, 2017-and-later timeframe being considered in this litigation. Plaintiff's Complaint also relays an event of "around October of 2016" that took place and was witnessed by Merrill. Compl. 12. This episode is also outside the timeframe being considered. In any event, Merrill's statement, while describing insulting and rude behavior, does not in any way tie the behavior to race. ECF No. 192-2 at 24-25. Accordingly, the evidence from Merrill, if considered, does not advance Plaintiff's harassment claim.

Further, with the exception of two statements discussed in more detail below, Plaintiff's allegations regarding Holland's behavior toward him suggest animosity, perhaps, but not race-related harassment. For example, in Plaintiff's deposition, he described the allegedly discriminatory conduct by Holland as follows:

> [Holland] would constantly go and belittle my skills to several other people within the company. He would embarrass me in front of my coworkers and say very derogatory – make derogatory statements and defame my skills in front of my coworkers. And even when I made a substantial invention ... I was given no recognition for any of that and David Holland so many times assaulted me verbally with different things that he would say.

**\*19** Pl. Dep. 215. These claims are not tied to race and are not actionable. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281–82 (4th Cir. 2000) (affirming summary judgment for employer on hostile work environment claim where the alleged harasser publicly criticized or laughed at plaintiff's suggestions, failed to acknowledge the plaintiff's input, among other things, and the court found that she was a "tough, demanding supervisor" whose criticism may have been "blunt and even at times unfair").

Two instances of alleged harassment require further consideration because they do involve statements at least generally related to race. In the Complaint, Plaintiff avers the following:

> e. Mr. Holland regularly told Mr. Adams about his conquest of Black Women that he would meet in the area not 500 yards from Mr. Adams['] home. Mr. Holland said he would pick up the women and have conversations with them that may or may not have amounted to anything. Mr. Adams felt as though Mr. Holland wanted him to know he had Black Women as a way of disrespecting Black women as drunks and prostitutes.

> f. There was a Riot in Charlotte NC in 2017 when a police officer shot an unarmed Black man and a huge public outcry ensued. Mr. Adams decided to go after work to the protest in support of stopping the violence and bringing unity to Charlotte. When [ ] Holland heard

2021 WL 5311256

what I was planning he said "So why you going to the march in charlotte? Why Black people always got to tear up everything every time one of them gets killed? Why do Black people always feel so emotional about things like that? .. Mr. Adams stated that he did not want to reply. But Mr. Holland insisted in front of the group that Mr. Adams say something. So Mr. Adams stated that "Mr. Holland would not understand. Mr. Adams said as soon as you can tell me how long you have been Black then I will take time to address those question[s]. Otherwise I'm going to the march[.]"

Compl. 13.

These alleged statements,[37] while referencing race, arguably are not directed toward Plaintiff personally and may prevent him from establishing the "because of race" prong of his prima facie case. *See Honor*, 383 F.3d at 190–91.

[37]    Holland indicates he did not make these statements. Holland Decl. ¶ 4. For purposes of considering Defendant's Motion, however, the court construes the evidence in the light most favorable to Plaintiff.

In any event, Plaintiff's hostile work environment claim fails because he has not set out evidence that any harassment directed toward him because of his race would be considered "severe or pervasive." This prong contains both a subjective and an objective component. *See Strothers v. City of Laurel*, 895 F.3d 317, 331 (4th Cir. 2018) (stating that the third prima facie element of a hostile work environment claim consists of "both a subjective and objective component, i.e., the employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment"). Here, the court accepts that the complained-of behavior was, to Plaintiff's way of thinking (that is, *subjectively*) "severe or pervasive." However, the evidence presented by Plaintiff simply does not rise to the level of being *objectively* severe or pervasive. The court arrives at such conclusion after examining "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Strothers*, 895 F.3d at 331 (internal quotation marks omitted). Whether an environment is hostile or abusive may be determined only by weighing all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably

interferes with the plaintiff's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). To be sufficiently severe or pervasive, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21.

**\*20** The undersigned is of the opinion that the conduct of which Plaintiff complains falls short of meeting this element. Even if the alleged "harassment" was race-related, it would not constitute a hostile work environment because there is no genuine dispute that it was not frequent, severe, physically threatening, or disruptive of Plaintiff's ability to work. Summary judgment in favor of Defendant is appropriate as to the hostile work environment claim.

Based on this recommendation, consideration of the fourth prong—a basis for holding employer liable—is unnecessary.

C. Title VII retaliation claim

Plaintiff claims Defendant retaliated against him based on complaints of discrimination made to Pressley and those made in the April 10 Charge. *See* Compl. 4.[38] In addition to terminating him, Plaintiff claims Defendant retaliated against him by contesting his unemployment claim.

[38]    In Plaintiff's briefing he "contends that the defendant received a report from the SCHAC regarding the racism and harassment issues in February or early March of 2018 and [Defendant was] well aware of the allegations made by the plaintiff and sought to get rid of the plaintiff." ECF No. 213 at 65. Plaintiff has offered no documentary or testamentary evidence to support his claim that Defendant became aware of claims of racism based on a SCHAC report issued "in February or early March of 2018." His own unsupported contention is not evidence. Accordingly, Plaintiff has not provided evidence of any protected activity of which Defendant had knowledge as of "February or early March 2018."

Under *McDonnell Douglas*, to establish a prima facie case of retaliation, a plaintiff is required to "show (1) that [ ]he engaged in protected activity; (2) that h[is] employer took an adverse action against h[im]; and (3) that a causal connection existed between the adverse activity and the protected action." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 578 (4th Cir. 2015) (internal quotation

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

marks omitted). If the plaintiff "establish[es] a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). The burden then shifts back to the plaintiff to "demonstrate that the [employer's] proffered reason is pretextual." *Id.*

Here, Plaintiff's April 10 Charge is unquestionably a protected activity. In addition, the court also considers Plaintiff's March 28, 2018 complaint to Pressley as protected activity based on Plaintiff's claim in his Complaint and his briefing that he raised issues of race-based discrimination at that time.[39]

[39]    The court notes that Pressley has indicated the March 28, 2018 meeting focused on issues related to promotions but did not include discussion of race-based discrimination. However, for the purposes of Defendant's Motion the court considers facts in the light most favorable to Plaintiff.

Plaintiff's termination unquestionably is an adverse action and is considered further below. Defendant argues, however, that its contesting Plaintiff's claim for unemployment benefits following termination is not an adverse action in the Title VII retaliation sense. ECF No. 34-35 (citing several cases). *See Mitchell v. N.C. Div. of Employment Sec.*, 76 F. Supp. 3d 620, 625 (E.D.N.C. 2014), *aff'd*, 599 F. App'x 517 (4th Cir. 2015) (dismissing pro se plaintiff's Title VII retaliation claim because his former employer's participation in his unemployment case did not constitute a materially adverse action); *Griffin v. S. Piedmont Cmty. Coll.*, No. 3:10CV412, 2011 WL 3841562, at *7 (W.D.N.C. Aug. 30, 2011) ("[A]s a matter of sound policy, an employer's lawful participation in an employee's unemployment benefit proceedings cannot be an "adverse employment action" within the meaning of a Title VII retaliation claim."). Plaintiff does not respond to this legal argument. Rather, he submits that the allegations Defendant initially made to the unemployment commission were untrue and that, had they been true, Defendant would have appeared before the unemployment tribunal in support of its position. ECF No. 213 at 63. Aware of no controlling authority on this point of law, the undersigned agrees with the North Carolina District Court's reasoning and recommends a finding that Defendant's action in the unemployment proceeding ought not be considered an adverse action.

**\*21** Accordingly, the court now considers whether Plaintiff has established a causal connection between his

protected activities (the March 28, 2018 conference with HR representative Pressley and the April 10, 2018 Charge) and his April 16, 2018 termination. While Defendant urges the court to apply a "but-for causation" standard at the prima facie stage, the burden for establishing causation is actually "less onerous" than the but-for burden for establishing causation at the pretext stage. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015). Although the Supreme Court held in *University of Texas Southwestern Medical Center v. Nassar* that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," 570 U.S. 338, 360 (2013), the Fourth Circuit has since held that an employee need not show "that [his] protected activities were but-for causes of the adverse action" at the prima facie stage. *Strothers*, 895 F.3d at 335 (citing *Foster*, 787 F.3d at 251) (holding that, even after *Nassar*, but-for causation in a Title VII retaliation case must be shown only at the pretext stage of the *McDonnell Douglas* burden-shifting framework).

Under this less-onerous standard, Plaintiff can make out a prima facie causal link when the alleged adverse action takes place soon after the employer becomes aware of the protected activity. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (noting that "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close" to raise an inference of causation); *see Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding causation where employee's demotion occurred fewer than six months after he filed complaint of racial discrimination). Conversely, a "lengthy time lapse ... negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (holding that three years is too long to show causation). Here, in considering Defendant's Motion for Summary Judgment, the court considers Plaintiff's protected activities to have taken place on March 28 and April 10. Plaintiff has provided no competent evidence that Defendant was aware of the April 10 Charge until April 19, 2018—after his termination. Considering the March 28, 2018 communication with HR and the April 16, 2018 termination, though, the undersigned is of the opinion that prima-facie causation has been shown.

This does not end the analysis, however. The court must consider the pretext portion of the analysis. As discussed above, Defendant has set out legitimate, nondiscriminatory reasons for terminating Plaintiff—his insubordination during the April 13, 2018 meeting with Pandya, his inappropriate physical contact with Pressley and Branham, and his continued inability to get along

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

with others in the workplace.

The burden then shifts back to Plaintiff to demonstrate the justification was pretextual and that retaliation was the "real reason" for the adverse action. *Foster*, 787 F.3d at 252. In order to proceed to a jury on the retaliation claim Plaintiff is required to demonstrate a but-for causal link between his complaints of race-based discrimination and Defendant's decision to terminate him on April 16, 2018. In other words, Plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

The undersigned finds Plaintiff has provided no such proof. Construing Plaintiff's arguments liberally, he seeks to establish pretext and but-for causation based on his assertion that Defendant's HR department "sought to get rid of" him in retaliation for his "complaints submitted to [SCHAC] and EEOC" by allegedly editing Plaintiff's 2017 performance review to "downplay or recharacterize" Plaintiff's performance. ECF No. 192 at 22. In particular, Plaintiff relies on an April 9, 2018 email from Alexandra Norris, 3D Systems' then-HR Generalist, to the manager of Defendant's HRIS (computerized evaluation system), alleging Defendant improperly reopened Plaintiff's 2017 performance review to "[e]nsure [P]laintiff's work history was tarnished" and to allow Pandya to "secretly replace the original comments" in the review. *Id.* at 9, 22, ECF No. 192-2 at 19-20 (Apr. 9, 2018 email). However, the email relied on by Plaintiff does not provide the evidence he needs. Plaintiff's supposition that there was a "secret" conspiracy to change the results of his review is supported by no evidence. In fact, the record does not include a copy of any version of Plaintiff's 2017 review. Further, the undisputed evidence is that the 2017 reviews did not have to be finalized until the end of April 2018. Latty Opp'n Decl. ¶ 3. Plaintiff's 2017 performance review had not yet been finalized when Norris requested that 3D Systems' HRIS Manager make Plaintiff's review editable for Pandya. As demonstrated by Norris's emails, Pandya planned to revise language in the 2017 performance review to ensure that it reflected Plaintiff's existing performance problems. ECF No. 192-2 at 19-20.

**\*22** Plaintiff has not presented evidence from which a reasonable factfinder could conclude that he was terminated for an impermissible reason. The undersigned recommends granting summary judgment in Defendant's favor (and denying it for Plaintiff) as to the Title VII retaliation claim.

### D. State-law-based assault claim

Finally, the court considers Plaintiff's assault claim in which Plaintiff avers that, after issuing Plaintiff the Written Warning during the April 13 Meeting, and after Plaintiff had attempted to take a picture of the Written Warning, Pandya "ran around the table behind [Plaintiff] and assaulted [Plaintiff] and pulled both his arms back behind his back trying to wrestle with [Plaintiff] and get the letter out of [Plaintiff's] Hands before he could take the picture .. [Plaintiff] said, 'No No No Darshan' but Mr. Pandya's arm were too long and he was too strong and took the letter from [Plaintiff's] Hands after hyper extending them behind his back causing injuries to [Plaintiff's] shoulders." Compl. 5.

Pandya indicates that, when Plaintiff attempted to photograph the document, Pandya "reached over" and "took the document" from Plaintiff. Pandya Decl. ¶ 19. Pandya indicates he "did not intentionally touch" Plaintiff, nor did he "apply any force" to his arms, nor did he "pull [Plaintiff's] arms behind his back, wrestle with him or cause injuries to [Plaintiff's] shoulders." *Id.* Pandya further indicates he did not threaten Plaintiff or engage in conduct or make statements to the effect that he intended to do bodily harm or physical violence. *Id.* ¶ 20.

In responding to Defendant's briefing and Pandya's Declaration, Plaintiff has proffered his own recording of the April 13, 2018 meeting between Pandya and himself. Plaintiff submits that the audio recording supports his claim that Pandya assaulted him. Plaintiff also submits a recorded statement of Pandya taken by a representative of Travelers Insurance Company concerning Plaintiff's workers' compensation claim. The court has reviewed both of these audio recordings, but notes that Defendant addressed the recordings although objecting to their admissibility. Nothing in the audio recording of the April 13, 2018 meeting definitively supports Plaintiff's version of the facts—that he was "assaulted" by Pandya's hyperextending his shoulders—or Pandya's version—that he did not intentionally touch Plaintiff, apply force to him, or cause shoulder injury. Referring to the Travelers' recording, Plaintiff submits that it supports his version of events because of the "Freudian slip" by Pandya when he indicated he may have had "incidental contact" with Plaintiff and touched the back of his bicep when reaching over to take the Written Warning from Plaintiff.

Having reviewed the accounts of the April 13, 2018 meeting between Pandya and Plaintiff, the court considers Defendant's legal argument that it is entitled to summary judgment as to the assault claim because the South Carolina Workers' Compensation Act (the "Act") provides the exclusive remedy for the claim. ECF No.

Adams v. 3D Systems, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 5311256

189-1 at 37-38. That provision provides in relevant part as follows:

> [t]he rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury ..., shall exclude all other rights and remedies of such employee ... at common law or otherwise, on account of such injury....

**\*23** S.C. Code Ann. § 42-1-540. The South Carolina Supreme Court has looked to the statutory intent of this exclusivity provision and determined the Act is to be liberally construed in favor of finding matters to be covered by the Act. *See Peay v. U.S. Silica Co.,* 437 S.E.2d 64, 65-66 (S.C. 1993). South Carolina courts have opined that an employee's injury that was intentionally caused by a co-employee who is the "alter ego" of the employer falls outside of Act, so that the exclusivity provision does not apply. *Dickert v. Metro. Life Ins. Co.,* 428 S.E.2d 700, 701 (S.C. 1993). Importantly, however, South Carolina courts have held that, for this purpose, "alter ego" does not generally extend to "supervisory employees such as [an] office manager," but rather, includes only " 'dominant corporate owners and officers.' " *Id.* Accordingly, when a plaintiff seeks to recover in tort for a workplace injury, the intentional nature of the injury can take the injury outside the scope of the Act only if the plaintiff has alleged that the tortfeasor was a dominant corporate owner or officer of the employer. *Williams v. GlaxoSmithKline LLC,* No. 1:18-CV-01346-JMC, 2019 WL 211087, at \*7 (D.S.C. Jan. 16, 2019).

Plaintiff offers no real counter to this legal argument, other than to argue that Defendant is treating this like a workplace injury rather than a "criminal act that was done by [Defendant's] agent Darshan Pandya and should be reviewed and treated as an assault case not overshadowed by workers compensation laws." ECF No. 213 at 67.

Even if considered an intentional act, as claimed by Plaintiff, South Carolina law supports Defendant's argument that the assault claim brought concerning the actions of Pandya—who was a supervisor but not the actual employer or its "alter ego"—is barred by the Act's exclusivity clause. *See Loges v. Mack Trucks, Inc.,* 417 S.E.2d 538, 540 (S.C. 1992). Accordingly, summary judgment for the employer is appropriate on an assault claim arising from a work-related personal injury, even where the employee alleges that the assault occurred due to the employer's failure to provide adequate protection. *Id.* at 139, 541; *see also Ellis v. Harrelson Nissan of S.C., Inc.,* C/A No. 0:15-3322-MBS-KDW, *Ellis v. Harrelson Nissan of S.C., LLC,* No. CV 0:15-3322-MBS-KDW, 2016 WL 1084292, at \*2 (D.S.C. Mar. 21, 2016) ("[T]he exclusivity provision dictates that claims of assault by one employee against another must be resolved under the Workers' Compensation Act."); *Pauling v. Greenville Transit Auth.,* No. C.A.6:05 1372 HMH BH, 2006 WL 3354512, at \*4 (D.S.C. Nov. 16, 2006) employee's assault claim against manager as barred by the Act).

It is recommended that summary judgment be awarded to Defendant as to Plaintiff's assault cause of action. Conversely, Plaintiff's motion for summary judgment as to that claim should be denied.

V. Conclusion and Recommendation

It is recommended that Defendant's Motion for Summary Judgment, ECF No. 189, be *granted,* and Plaintiff's Motion for Summary Judgment, ECF No. 192, be *denied.* If the R&R is adopted, summary judgment will be granted to Defendant as to all of Plaintiff's claims, leaving only Defendant's counterclaims for trial.

IT IS SO RECOMMENDED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5311256

© 2025 Thomson Reuters. No claim to original U.S. Government Works.