# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# AIKEN DIVISION

| | |
|---|---|
| Alisha Johnson,<br><br>    Plaintiff,<br><br>v.<br><br>Savannah River Nuclear Solutions, LLC,<br><br>    Defendant. | C/A No.: 1:24-cv-02612-JDA-PJG<br><br>**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

  Plaintiff opposes Defendant's Motion for Summary Judgment filed on June 12, 2025. (ECF 38). For the reasons set forth below, Plaintiff respectfully asks this Court to deny Defendant's Motion.

## **INTRODUCTION**

  Plaintiff initiated this action against Defendant in the Aiken County Court of Common Pleas on March 25, 2024, following the Equal Employment Opportunity Commission's (EEOC) issuance of a right to sue notice on December 26, 2023. (ECF 1-1). Plaintiff brought the following causes of action: (1) race discrimination, (2) gender discrimination, and (3) retaliation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq) following her termination from employment by Defendant on March 1, 2023.

  Defendant removed this case to this Court on April 26, 2024. (ECF 1). Defendant then filed its Answer on May 3, 2024. (ECF 5). Following the conclusion of discovery, Defendant filed a Motion for Summary Judgment on June 12, 2025. (ECF 38).

1

**STATEMENT OF THE FACTS**

Plaintiff, an African American female, was employed by Defendant from 1998 to 2023 after her discharge from the United States Navy. (Compl. ¶¶7-9). During her tenure, she held several positions, culminating in her work in the maintenance department of H Area as an Engineering Specialist, otherwise known as a Work Window Manager (WWM) in 2016. (Compl. ¶10). Plaintiff's position involved coordinating the complex structure of maintenance needed for Defendant's operations and she continuously received high praise, excellent performance reviews for her work, and was given a significant raise in 2022. (Exhibit A: Plaintiff Dep. 33:19-22; Exhibit B: FY20 & FY 21 Performance Reviews).

Within the maintenance department, two positions existed which carried added responsibility and provided opportunities to advance to more lucrative and higher positions in the department: Single Point of Contact (SPOC) and Lead Planner. (Ex. A, 61: 3-25, 62: 1-2). While these positions did not provide any increase in pay while serving in them, several individuals who served in these positions went on to serve as overall managers of the maintenance department. (Ex. A, 61: 3-25, 62: 1-2). Plaintiff and other department employees, Calvin Litt and Michael Garrett, recalled that the most senior WWM was promoted to SPOC or Lead Planner without a formal application. (Ex. A, 58: 17-24, 59: 5-25, 60:1-15, 65:14-17; Exhibit C-Calvin Litt Decleration ¶12; Exhibit D-Michael Garrett Decleration ¶ 13).

In June 2022, both the SPOC and Lead Planner positions became available. (Compl. ¶ 13). Plaintiff was the most senior WWM at that time and was supervised by Porter Youngblood, a white male. (Compl. ¶14). Youngblood himself had recently been promoted to Manager after serving as both SPOC and Lead Planner. (Ex. A, 62: 7-11). Despite Plaintiff's seniority, two white males—Russell Overton and William Owensby—were promoted to the positions of SPOC and Lead

2

Planner by Youngblood. (Compl. ¶¶ 16-17.) At the time of his promotion, Overton had only been employed as a WWM for approximately two years. (Compl. ¶ 18). Owensby, who was a recent transfer from another department, had never worked as a WWM and as a result, Youngblood directed Plaintiff to train Owensby. (Exhibit E- Porter Youngblood Dep. 31: 13-25, 32:1).

Shocked and upset by the promotions, Plaintiff approached Youngblood to discuss the matter in August 2022. (Ex. A, 66: 23-25, 67:1-19; Exhibit F- Youngblood Timeline). As the only African-American female WWM and one of only three African-American WWMs in June 2022, she told Youngblood she believed she was passed over due to her race and sex. (Ex. C ¶ 6-8; Ex. D ¶¶7-9; Ex. A, 67: 20-24). The maintenance department had previously been described by Plaintiff and the other African American employees as a "good ole boys club" that was dominated by solely white management. (Ex. A, 52:21-24). As a result of Plaintiff's questioning, Youngblood responded that he could staff and run the department as he saw fit. (Ex. A, 17-19).

Plaintiff then raised her concerns with Youngblood's manager, Eddie Bodie, a white male who had also advanced through the maintenance department. (Ex. A, 70: 19-25). She again cited her race and sex as factors in being passed over for the SPOC and Lead Planner designations. (Ex. A, 71: 1-6). Bodie acknowledged that Youngblood had deviated from standard promotion practices in elevating Overton and Owensby. (Def. Ex. 6 at 8). Still concerned, Plaintiff raised the issue again with Bodie and Youngblood after training Owensby, who remained unqualified for the Lead Planner role. (Ex. A, 72: 18-25). When Plaintiff again referenced her race and sex, Bodie and Youngblood escalated the matter to Bodie's manager, David Hart, a white male, and Human Resources (HR) Representative Tamara Blankenship, a Black female in November 2022. (Ex. A, 71:24-25, 72:1-25, 73: 1-25.).

3

In that first meeting with Bodie, Youngblood, Hart, and Blankenship, it was acknowledged that the promotions of Overton and Owensby were a poor management decision. (Exhibit G- Tamara Blankenship Dep. 34:25, 35:1). In response, the maintenance department was going to institute a rotation system for each eligible employee to be placed in the SPOC and Lead Planner position. (Ex. G, 35: 2-8). However, this rotation system was never actually instituted. (Exhibit H- John Litchfield Dep., 22:12-13; Ex. E, 37: 16-23). Plaintiff, tired of the treatment she was facing, requested a transfer from the department. (Ex. A. 74: 18-15, 75:1-8). Plaintiff brought up that she believed the department was operating under a "good ole boy system" to Hart, Bodie, Blankenship, and Youngblood, but her concerns were dismissed. (Ex. A 73: 7-25).

In late November 2022, Plaintiff was involved in an incident with Terry Stoudemire, a white male, who was also employed in the department. (Ex. A, 138-141:6). Stoudemire approached Plaintiff and began to ask about a bar/restaurant that Plaintiff had previously owned in the area. (Ex. D ¶21). Plaintiff was wary as she had previously reported several employees in the past for using racial slurs and other derogatory racial language. (Ex. A, 81:4-14, 84:14-25; Ex. D ¶ 26). Stoudemire asked about the location of the restaurant and after Plaintiff told him, he asked if there was a lot of "killings" there. (Ex. A, 139: 5-9). Plaintiff perceived this comment to be racial as the business she had previously owned was located in a majority African-American section of the area. (Ex. D ¶¶ 22-23). Plaintiff informed Stoudemire that his comments were racist and then she and Stoudemire began arguing. (Exhibit I-Terry Stoudemire Statement, Nov. 22, 2022). Other employees ended up breaking up the argument and escorted Stoudemire back to his side of the department. (Ex. A, 140: 7-10, Ex. D ¶ 24). Plaintiff reported the incident and after HR reviewed the incident and acknowledged that Stoudemire's language could be "perceived as derogatory"

both Plaintiff and Stoudemire were issued Informative Contacts, a form of written documentation. (Ex. G, 47: 12-18.).

Following this incident, in January 2023, Plaintiff again approached Blankenship about a transfer, which Blankenship could not provide an update for. (Ex. G, 50:18-25). Shortly after, in February 2023, Plaintiff was contacted by the Office of Inspector General (OIG) regarding supposed improper use of her government owned work computer. (Ex. A, 197: 7-25, 198: 1-6). Plaintiff was told by an OIG representative that they had received an anonymous tip stating Plaintiff had fraudulently applied for a Paycheck Protection Loan (PPP) from the Small Business Administration. (Ex. A, 197: 7-12). Plaintiff stated she had never applied for a PPP loan, but an investigation began into Plaintiff's computer use began by Defendant. (Ex. A, 198: 2-6). Plaintiff had previously received a Corrective Contact in 2021 regarding her use of the government computer and printing of personal documents which she candidly admitted to and accepted the contact. (Ex. J -2021 Forensic Examination).

Plaintiff was then informed that she was being subject to a Disciplinary Review Board (DRB) by Defendant following a report that alleged Plaintiff had lied to investigators and continued personal use of her computer for her business, which had been sold at this time. (Ex. A, 163: 7-9, Exhibit K: DRB Notice). Plaintiff admitted to sending a tax form using her work computer but was adamant she had not been dishonest. (Ex. A, 235: 21). She also stated that she accessed YouTube videos—with permission from Talent Management—so she could train herself on Microsoft Excel, which the maintenance center was implementing. (Ex. A, 205:1-23). However, the DRB recommended termination, and Plaintiff was terminated on March 1, 2023. (Exhibit L-Termination Memorandum dated Mar. 31, 2023).

## **STANDARD OF REVIEW**

"Summary judgment is appropriate only if the moving party 'shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to a judgment as a matter of law.'" *Webb v. Cty. of Allendale*, C/A No. 1:15-2766-JMC-PJG, 2017 WL 8794893 at *3 (D.S.C. Aug. 25, 2017), *report and recommendation adopted*, C/A No. 1:15-cv-02766-JMC, 2018 WL 661462 (D.S.C. Jan. 31, 2018) (quoting Fed. R. Civ. P. 56(a)). "A party may support or refute that a material fact is not disputed by 'citing to particular parts of materials in the record' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Id*. (quoting Fed. R. Civ. P. 56(c)(1)).

In deciding if summary judgment is appropriate, "a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10 A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure §2728 *569 (3d ed. 1998)). "[T]he drawing of legitimate inference from the facts are jury functions, not those of [the court] …" and therefore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Overall, "[t]he moving party has the burden of proving that summary judgment is appropriate." *Webb*, 2017 WL 8794893 at *3.

6

# ARGUMENT

I. **Title VII Retaliation**

   a. **Plaintiff has sufficiently pled a prima facie case of retaliation under Title VII and Defendant's proffered legitimate, non-discriminatory reason for her termination is pretextual.**

Plaintiff's Title VII claim concerns her termination after she engaged in protected activities and then was subjected to an investigation and ultimately termination. Plaintiff employs the burden-shifting indirect method of proof scheme from *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1972) for this claim.

Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment…because he has opposed any practice made an unlawful practice by this subchapter…".

42 U.S.C. §2000e-3(a). Courts "[i]nterpret the antiretaliation provision to provide broad protection from retaliation." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). *See also Grover v. SLED*, 170 F.3d 411, 414 (4th Cir. 1999) (noting that Title VII's parallel provision provides "'exceptionally broad protection,'" and finding that it provides "a clear signal that the provision is meant to sweep broadly"…) (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998,1006 n. 18 (5th Cir. 1969)); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015).

A prima facie retaliation case requires that a plaintiff (1) engage in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection exists between the protected activity and the adverse employment action. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). Under the applicable burden-shifting framework established in *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation.

7

*Id*. at 802.; *see also Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 246 (4th Cir. 2015). Once a plaintiff has carried this burden, the defendant must show that its alleged retaliatory action was in fact the result of a legitimate, non-retaliatory reason. *Foster*, 787 F.2d at 250. If the defendant makes this showing, the burden shifts back to the plaintiff to show that legitimate reasons offered by the defendant are pre-textual. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001).[1]

Defendant mischaracterizes the basis for Plaintiff's retaliation claim. Defendant seems to consider Plaintiff's failure to promote as the sole adverse action on which the prima facie case relies on and therefore her complaints of race discrimination after cannot be used to prove a prima facie case. This is incorrect.

Plaintiff's claim rests on the fact that after the promotion of unqualified, white males over her in June 2022, she raised numerous concerns to management regarding her belief that she felt this was racially motivated. Then, after she raised these concerns, she was subjected to an investigation and then a termination. As described below, Plaintiff has sufficiently established a prima facie case of Title VII retaliation.

First, Plaintiff engaged in protected activity through numerous instances of her speaking to management and HR regarding the promotions and other discriminatory behavior. Courts have described what constitutes protected activity in fairly broad manner owing to Title VII's broad anti-retaliation section. *See Strothers v. City of Laurel*, 895 F.3d 317, 372 (4th Cir. 2018). Employees may be shielded from retaliation under two categories of protected activity—

---

[1] This framework is a flexible one as "[t]he facts necessarily will vary in Title VII cases, and the specification [ ] of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13 (1973). Given this flexibility, the prima facie case "should not be transposed into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

8

participation and opposition. *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). Opposition applies in the case of Plaintiff. "Section 704(a)…bars retaliation for 'oppos[ition] [to] any practice made an unlawful practice by this subchapter'. This clause provides qualified protection for a wide range of conduct." *Id*. (citing *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 277-78 (2009), which held that protected opposition activity does not have to be active or consistent). "[F]or an employee's activity to constitute protected opposition, she must show that (1) that she reasonably believed that the employment action constituted a Title VII violation…and (2) that her conduct in opposition was reasonable." *Id*. at 937-38 (citing *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (*en banc*) and *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259-60 (4th Cir. 1998)) (internal citations and quotation marks omitted).

Plaintiff clearly opposed the promotions of Overton and Owensby and believed it constituted a Title VII violation as she maintained she was passed over for her race and sex. Plaintiff's conduct was also reasonable. She went to her superiors to voice her concerns and engaged with Human Resources when they were brought in.

Second, Plaintiff obviously suffered an adverse employment action in the termination of her employment. Unlike what Defendant contends, the informative contact given to Plaintiff after the Stoudemire incident was not sole the adverse action Plaintiff bases her retaliation claim on. (ECF No. 38-1 at 27). It is Defendant's subjugation of Plaintiff to an investigation, DRB, and ultimately termination. *See Von Guten v. Maryland*, 243 F.3d 858, 864-65 (4th Cir. 2001).

Third, Plaintiff can show a causal connection. Although Defendant cites a six-month gap between her last complaint and termination, adverse actions began sooner. (ECF No. 38-1 at 27). An investigation into her computer activity, prompted by an alleged tip about a fraudulent PPP

9

loan, began in January 2023—less than two months after her complaint—and her DRB notice followed in February. Plaintiff also spoke with HR that January about the situation and her desire to transfer. As Defendant admits, "there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation…", as such, "the burden for establishing causation at the prima facie stage is 'less onerous.'" *Foster*, 787 F.2d at 251 (quoting *Williams v. Cerebronics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).

Finally, Defendant attempts to hamstring Plaintiff's retaliation claim by claiming that the decisionmakers into her termination—i.e. the DRB panel members—were unaware of her protected activity. However, the DRB panel members were not the only decision makers. Hart and Youngblood who also recommended termination were well aware of her protected activity and presented their views to the DRB. (Exhibit M- Disciplinary Review Boad Report). In fact Hart and Youngblood, made the first presentation to the independent panel members and therefore, their views of the situation colored the rest of the proceeding. (Ex. M, pg. 2). If management's views were irrelevant as Defendant claims, the DRB panel would not have heard their presentation or recommendations. Simply put, the DRB could not have acted without management's involvement. *See Barnhill v. Bondi*, 138 F.4th 123, 131 (4th Cir. 2021) (holding that a Plaintiff must show or allege that any relevant decision maker—not the ultimate decision maker—had discriminatory animus.)

As Plaintiff has established a prima facie case of retaliation, *McDonnell Douglas* instructs that a Defendant must then proffer legitimate, non-retaliatory reason for the adverse employment action. As expected, Defendant offers the investigation and subsequent termination of Plaintiff following charges she misused her government work computer and lied to investigators from the Office of Inspector General. (ECF 38-1 at 28-29). Defendant's proffered reason in pre-textual.

"In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based. On mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). "Once the plaintiff offers such circumstantial evidence the case must be decided by a trier of fact and cannot be resolved on summary judgement." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643,652 (U.S. 4th Cir. 2021) (internal quotations omitted). Plaintiffs may show pretext through evidence of "trumped-up" termination reasons or biased employer investigations. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 296 (4th Cir. 2010) ("[W]e note that when 'facts, if believed, would allow a trier of fact to think [the employer] was simply looking for a reason to get rid of [the employee],' the employer's proffered explanation may not be worthy of credence."); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (quoting *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 296 (4th Cir. 2010)); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855-56, 371 U.S. App. D.C. 68 (D.C. Cir. 2006) (the issue of whether the investigation carried out by the employer was "fair and impartial" was a question for a jury)).

There is no question that Plaintiff was previously issued a Corrective Contact for misuse of a government computer in 2021. She admitted she used her computer to print documents related to her business which was against Defendant policy and was disciplined for it. However, in the case of the 2023 investigation, initiated mere weeks after Plaintiff's last allegation of discrimination, Plaintiff was clearly subject to a fishing expedition by Defendant.

Defendant's own policies permit personal use of government computers when such use is "de minimis (insignificant)." (Exhibit N- Defendant Human Resources Program Procedure Section 5.23.3). This includes, for example, personal purchases, emails, and checking bank accounts. (Ex. N). While Defendant claims the 2023 forensic report of Plaintiff's computer shows Plaintiff used

11

her computer for personal gain through her businesses, those businesses—addressed in a 2021 report—were sold in May 2022. (Exhibit O- 2023 Forensic Exam). Thus, she could not have personally profited from them at the time. Additionally, as Plaintiff admitted, downloading forms even related to a past business would qualify as de minimis under Defendant's policies. The 2023 report also cites YouTube videos on bookkeeping and Excel as improper use, but Plaintiff testified she watched them with permission to improve her Excel skills for work. (Ex. A, 205:1-23). Plaintiff additionally testified that her reason for accessing a site called Clover on a particular occasion was to check her account as she received an email indicating her account may have been hacked. (Ex. A, 243: 7-13). This also qualified as de minimis use and did not indicate she was accessing the site for any personal gain. Defendant has not rebutted this testimony in any significant way.

There is a significant question as to how the investigation into Plaintiff began. Plaintiff testified she was told the investigation stemmed from an anonymous tip about a fraudulent PPP loan. (Ex: A, 197: 7-12). Yet, the PPP loan is never mentioned in the forensic reports or DRB hearing, and Plaintiff was never charged or disciplined for it. (Exhibit P- Summary of Investigation excerpt dated Sept. 11, 2023). While Defendant now disclaims knowledge of any PPP investigation, its own records show an OIG Special Agent contacted them about a fraudulent loan application and misuse of government resources. (Ex. P). Defendant later stated the PPP issue was unrelated to Plaintiff's discipline and noted that under Defendant's Rules of Conduct, Defendant was obligated to investigate that information they claim was not relevant. (Ex. A, 229: 19-22; Ex. P).

Defendant also accused Plaintiff of being dishonest with investigators regarding her computer use. They asked Plaintiff if she had accessed Clover or the South Carolina Department of Revenue site. (Ex. A, 235: 1-9). Plaintiff told him that she had, but only for the purpose of

checking if her account was hacked and sending a document. (Ex. A, 235: 10-24.). Defendant's investigator, with little justification, accused her of lying and used the forensic report showing minimal use as a "gotcha" moment.

These inconsistencies, shifting justifications, and questionable investigative practices create a genuine dispute as to whether Defendant's stated reason was a pretext for retaliation—an issue that must be decided by a jury.

## II.     Title VII Failure to Promote

### a. Because Defendant did not raise a timeliness defense regarding the failure to promote claim in their Answer, this defense is waived.

Defendant argues Plaintiff's failure-to-promote claim is time-barred based on the EEOC filing date. (ECF 38-1 at 16-17). However, because Defendant did not specifically raise this defense in its Answer, it is waived. (ECF 5).

While Defendant made the generic defense of, "Plaintiff's claims are barred by the applicable statue of limitations", they raised no specific objection to any untimeliness regarding Plaintiff's obligations under the 300-day EEOC deadline. (ECF 5, ¶ 8). "Generally, under Rule 8(c) [FRCP], if a party fails to raise an affirmative defense in its answer, the defense is waived." *Ritchie v. Aker Kvaerner Songer*, 2009 U.S. Dist. LEXIS 154555 at *44 (S.D.W.Va. Nov. 13, 2009). Specifically in Title VII charge filing cases, the "charge-filing instruction is not jurisdictional" and must "be timely raised to come into play." *Fort Bend Cnty., Tx. v. David*, 587 U.S. 541, 543-44 (2019). "Defendants, after all, have good reason promptly to raise an objection that may rid them of the lawsuit filed against them." *Id*. at 552.

Because Plaintiff filed her EEOC charge before initiating this lawsuit, Defendants were fully aware of any potential timeliness argument but chose not to raise it. Accordingly, the defense is waived, and Plaintiff's failure-to-promote claim should proceed.

13

> **b. Plaintiff has sufficiently pled a prima facie case regarding her failure to promote claim and Defendant's proffered legitimate, non-discriminatory reason for the failure to promote is pretextual.**

Plaintiff's failure to promote claim is viewed in the lens of the *McDonnell Douglas* framework. To prove a prima facie case of discriminatory failure to promote, a plaintiff must show that "'(1) plaintiff is member of a protected group; (2) plaintiff applies for the position in question; (3) plaintiff was qualified for the positions; and (4) plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.'" *Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994) (quoting *McNairn v. Sullivan*, 929 F.3d 974, 977 (4th Cir. 1991)). "To satisfy the fourth prong, [a plaintiff] need only show that the position was filed by a white applicant." *Id*.

Defendant asserts that the Plaintiff cannot establish a prima facie case because she did not apply to the SPOC and Lead Planner positions. (ECF 38-1 at 18-19). Plaintiff testified that while Defendant had an internal job postings site called Brass Ring, these positions were not posted and traditionally had never been posted. (Ex. A, 29:1-11). Therefore, Plaintiff had no opportunity to apply. According to Plaintiff and other employees, it was common practice for the most senior Work Window Manager to be placed into the position and normal formal application practice existed. (Ex. A, 58: 17-24, 59: 5-25, 60:1-15, 65:14-17; Exhibit C ¶12; Exhibit D ¶ 13). This was confirmed by Youngblood's placement of Owensby and Overton—two inexperienced and Owensby's case totally unqualified, white males—into each position. Evidence of the unequal way an employer conducted the promotional process can be highly probative for a jury to consider. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002).

Additionally, Defendant's stated reasons underscore pretext rather than provide a valid rebuttal. Defendant claims the Lead Planner and SPOC positions did not exist, yet all employees— including Youngblood, who placed Owensby and Overton in those roles—knew of them. (ECF

38-1 at 20). Defendant also admitted Youngblood deviated in filling these positions and was counseled for poor management, which it now cites as its non-discriminatory reason. (ECF 38-1 at 20). Such an argument does not make sense and Defendant's offer of "inconsistent post-hoc explanations for its employment decisions is probative of pretext…". *Dennis,* 290 F.3d at 647.

The same-actor inference further does not save Defendant's argument against pretext. (ECF 38-1 at 21-22). While the same-actor inference can lead to a presumption of nondiscriminatory conduct, that presumption exists when the hirer and firer (or promoter) engages in conduct "*within a relatively short time span following the hiring.*" *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (emphasis added). *See also Sempowich*, 19 F.4th 643 at 653.[2] Therefore, as time grows, that inference is less strong. Youngblood and Bodie hired Plaintiff into the maintenance department in 2016. The failure to promote occurred in 2022, six years later, and is therefore too tenuous.

### III. Discriminatory Termination

#### a. Plaintiff has sufficiently pled a prima facie case of discriminatory termination.

"Absent direct evidence, the elements of a prima face case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). As with any indirect evidence case, the *McDonnell-Douglas* burden shifting framework guides evaluation.

Defendant asserts that Plaintiff's prima facie case fails as she cannot establish a non-protected class comparator who was treated more favorably. (ECF 38 at 11). The identification of a

---

[2] The *Sempowich* court found that a period of eight years between hiring and an adverse employment action cannot "support a grant of summary judgement" using the same-actor inference. *Sempowich*, 19 F.4th at 653.

comparator is not a rigid process as "a comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'" *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)). "[A] meaningful comparison can be made without precise equivalence between the two employees." *Gary v. Facebook, Inc.*, 822 F. Appx. 175, 180 (4th Cir. 2020) (internal quotation marks omitted).

Defendant's DRB report lists comparators by offense and outcome. (Ex. M, pg. 3 ). While Plaintiff was terminated, one employee who ran a personal business on a government computer received only corrective action and 12 months' probation, with no details on offense severity. (Ex. M, pg. 3). Another employee who viewed sexually explicit material was also terminated, implying Defendant viewed Plaintiff's act of downloading a form for a closed business as equally serious. (Ex. M, pg. 3) The report also fails to show Plaintiff gained any benefit from the alleged personal business activity. Overall, the record shows Plaintiff was treated more harshly than these comparators. Therefore, Plaintiff has satisfied this prong of the prima face case.

Defendant again offers up the biased investigation into Plaintiff as a legitimate reason for her termination. As discussed in Section (I), this reason is pre-textual and indicative of discriminatory conduct.

IV. **Discriminatory Discipline**

    a. **While Plaintiff concedes she was treated the same as a white male employee following a racially charged incident, the surrounding facts remain relevant in providing context for her other claims.**

As Defendant notes regarding the discriminatory discipline claim, Plaintiff and Stoudemire were both issued Informative Contacts following the racially charged incident instigated by Stoudemire. (ECF 38-1 at 22-23). However, as Plaintiff and other African-American employees

16

have stated, derogatory racial slurs and comments were commonplace in the department. (Ex. D ¶26). Plaintiff reported several of these comments to her management. (Ex.A, 81:4-14, 84:14-25).

Courts in our district have noted:

> By nature, circumstantial evidence must be considered as a whole. While individual facts may not be sufficient to cast doubt on an employer's offered justifications, taken as a whole, the totality of the circumstances surround the employer's actions may carry the plaintiff's burden in a jury's eyes."

*Edwards v. BCDR, LLC*, C/A No. 3:19-cv-02671-JMC, 2022 U.S. Dist. LEXIS 59900 at *6 (D.S.C. Mar. 31, 2022).

Circumstantial evidence has a cumulative effect in Title VII cases and can be used in a variety of ways including to establish pretext as described above. *See DeMasters v. Carillion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (describing the "panoramic lens" a jury must look at evidence through). While Plaintiff did receive the same discipline as Stoudemire in this instance, he was the inappropriate aggressor in the situation, the occurrence of it can still be viewed in light of her other claims and is instructive regarding Defendant's actions. (Ex. D ¶¶ 19-22).

## V.    Conclusion

Jury issues preclude granting summary judgment to the Defendant on Plaintiff's claims. Plaintiff respectfully requests that this Court recommend Defendant's Motion be denied.

BY: s/Jillian M. Lesley
Julius W. Babb, IV (#10500)
Jillian M. Lesley (#14090)
CROMER BABB & PORTER, LLC
1418 Laurel Street, Suite A (29201)
Post Office Box 11675
Columbia, South Carolina 29211
Phone: 803-799-9530
Fax:    803-799-9533
jay@cromerbabb.com
jill@cromerbabb.com

**Attorneys for Plaintiff**

Columbia, SC
July 28, 2025