IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

CASE NO.:  3:22-cv-03898-MGL

Alisha Johnson,                    )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )
                                   )
Savannah River Nuclear             )
Solutions,                         )
                                   )
        Defendant.                 )

DEPOSITION OF

ALISHA JOHNSON

********

Wednesday, January 8, 2025

10:00 a.m. - 6:40 p.m.


The deposition of ALISHA JOHNSON was
taken on behalf of the Defendant at the law
offices of Fisher & Phillips, LLP, 1320 Main
Street, Suite 750, Columbia, South Carolina,
on the 8th day of January, 2025, before
Cassandra E. Vance, Court Reporter and Notary
Public in and for the State of South
Carolina, pursuant to Notice of Deposition.

1/8/2025                    ALISHA JOHNSON

```
 1                      APPEARANCES:

 2   Julius W. "Jay" Babb IV, Esquire
     Cromer, Babb & Porter, LLC
 3   1418 Laurel Street
     Columbia, South Carolina  29201
 4   Counsel for the Plaintiff

 5   Phillips L. McWilliams, Esquire
     Fisher & Phillips, LLP
 6   1320 Main Street, Suite 750
     Columbia, South Carolina  29201
 7   Counsel for the Defendant

 8                        INDEX
                                              PAGE
 9   Direct Examination by Mr. McWilliams..............4
     Cross-Examination by Mr. Babb.....................270
10   Redirect Examination by Mr. McWilliams............275
     Recross-Examination by Mr. Babb...................281
11   Further Redirect Examination by Mr. McWilliams....282
     Certificate.......................................285
12   Verification of Deponent..........................286
     Errata Page.......................................287
13
                       EXHIBITS
14                                            PAGE

15   Defendant's Exhibit 1, (2 pages).............22
        - 01AA000088-89
16   Defendant's Exhibit 2, (1 page)..............24
        - 01AA000101
17   Defendant's Exhibit 3, (4 pages).............26
        - 01AA000045-46, 40, 36
18   Defendant's Exhibit 4, (33 pages)............36
        - 01AQ000001-33
19   Defendant's Exhibit 5, (8 pages).............46
        - 01AR000001-8
20   Defendant's Exhibit 6, (8 pages).............53
        - 01AW000001-8
21   Defendant's Exhibit 7, (8 pages).............56
        - Summons and Complaint
22   Defendant's Exhibit 8, (6 pages)............105
        - 01AG000032-37
23   Defendant's Exhibit 9, (6 pages)............111
        - 01AG000038-43
24   Defendant's Exhibit 11, (12 pages)..........113
        - Plaintiff's Responses to Defendant's First Set of
25   Discovery Requests
```

1/8/2025                        ALISHA JOHNSON

1                    EXHIBITS (Continued)
                                                 PAGE
2
     Defendant's Exhibit 12, (5 pages)...........119
3        - Plaintiff's First Supplemental Responses to
     Defendant's First Set of Discovery Requests
4    Defendant's Exhibit 13, (6 pages)...........123
         - Johnson, A. 1010-1015
5    Defendant's Exhibit 14, (3 pages)...........134
         - Johnson, A. 1018, 1017, 1016
6    Defendant's Exhibit 15, (1 page).............145
         - 01AN000004
7    Defendant's Exhibit 16, (1 page).............149
         - 01AN000005
8    Defendant's Exhibit 17, (1 page).............154
         - 01AC000001
9    Defendant's Exhibit 18, (3 pages)...........156
         - 01AK000004-6
10   Defendant's Exhibit 19, (3 pages)...........160
         - 01AK000001-3
11   Defendant's Exhibit 20, (31 pages)..........164
         - 01AL000001-31
12   Defendant's Exhibit 21, (5 pages)...........186
         - 01AF000001-5
13   Defendant's Exhibit 22, (2 pages)...........190
         - 01AB000030-31
14   Defendant's Exhibit 23, (18 pages)..........202
         - 01AM000001-18
15   Defendant's Exhibit 24, (9 pages)...........227
         - 01AF000006-15
16   Defendant's Exhibit 25, (1 page).............237
         - 01AB000025
17   Defendant's Exhibit 26, (7 pages)...........239
         - 01AB000003-9
18   Defendant's Exhibit 27, (2 pages)...........252
         - 01AB000027-28
19
                        STIPULATIONS
20

21           It is stipulated and agreed that this
         deposition is being taken pursuant to the
22       South Carolina Rules of Civil Procedure.

23           It is stipulated by and between counsel
         and the witness that the reading and signing
24       of the following deposition be, and the same
         are, hereby reserved.

25

1/8/2025                    ALISHA JOHNSON

```
 1            (On the record at 10:16 a.m.)
 2        ALISHA JOHNSON, having been duly sworn,
 3    deposes and testifies as follows:
 4                 DIRECT EXAMINATION
 5    BY MR. MCWILLIAMS:
 6    Q    Ms. Johnson, my name is Phillips McWilliams.
 7    I'm an attorney with the law firm of Fisher
 8    Phillips.  I represent your former employer, SRNS,
 9    in this matter.
10        And today I'm taking your deposition.  This
11    is just my chance to ask you questions about the
12    case that you've brought or the lawsuit that
13    you've brought against SRNS.  Have you ever been
14    deposed before?
15    A    No.
16    Q    Okay.  So, just going to go over some rules
17    that, even if you've been deposed before, I have
18    to go over.  I'm required to.
19        Just as the court reporter just told you,
20    she's taking down all our answers that we have
21    today, and so to help her and to make sure that we
22    get a clean record, she -- I'm going to ask, you
23    know, you wait till I finish asking the question
24    to answer it, even if you think that you might
25    know where I'm -- what I'm going to ask or where
```

1/8/2025                                ALISHA JOHNSON

```
1   I'm going, and I will try to wait until you finish
2   answering to ask another question so we're not
3   talking over each other.  Does that make sense?
4   A    It does.
5   Q    Okay.  And you're doing a good job of this
6   right now, but you need to respond verbally to all
7   my questions.
8        It's really hard when you're reading a
9   transcript later to hear "uh-uh" and "huh-uh" and
10  distinguish what you meant.  So, if I'm asking
11  you, "Is that a 'yes' or is that a 'no,'" I'm not
12  trying to be a smart aleck.  I'm trying to get a
13  clean record for us, okay?
14  A    Understand.
15  Q    All right.  And if you don't understand a
16  question, please tell me.  Otherwise, I'm going to
17  assume that you understand the question that I've
18  asked; is that fair?
19  A    That's fair.
20  Q    Okay.  And so I'm required to tell you that
21  if you have any questions or anything, you have to
22  ask me those questions.  You can't ask your
23  attorney any questions during this for
24  clarifications or help.
25       So, if you need any clarifications,
```

1/8/2025                    ALISHA JOHNSON

1    definitions, explanations about the documents sent
2    to you, you need to ask those to me, not to your
3    attorney, okay?
4    A    Understand.
5    Q    All right.  And so I'm going to be asking you
6    specific questions, and I'm going to ask that you
7    give specific answers or get -- answer the
8    specific question that I'm asking.
9         If I don't think you're answering my
10   question, I might stop you -- that might be the
11   one time I try to talk over you and stop you --
12   and direct you to answer the question that I'm
13   asking.
14        Because the point of this deposition is for
15   you to answer the questions that I'm going to ask
16   of you.  And after I'm done asking questions, your
17   attorney will have a chance to ask any questions
18   if he wants to.  Does that make sense?
19   A    That makes sense.
20   Q    Okay.  All right.  So, while you're
21   testifying, your attorney may object to some of
22   the questions I ask.  He'll probably say something
23   like, "Object to the form."
24        However, unless he specifically directs you
25   not to answer a question, you still have to answer

1/8/2025                    ALISHA JOHNSON

```
 1    my question after he objects.  Does that make
 2    sense?
 3    A    That makes sense.
 4    Q    Okay.  All right.  If you need to take a
 5    break for any reason, let me know.  This is not a
 6    hostage situation.  You know, if you got to go to
 7    the bathroom, you need some water or something,
 8    just let me know.
 9         All that I'm going to ask is, if I've posed a
10    question, I'd ask that you answer that question
11    before we take that break, okay?
12    A    Understand.
13    Q    All right.  You understand that you're under
14    oath today and that you're giving testimony just
15    like we were in a courtroom and there was a jury
16    and a judge there, correct?
17    A    Correct.
18    Q    Okay.  All right.  And you understand the
19    penalties of perjury apply here, just as they
20    would if we were in that courtroom in front of a
21    jury with a judge there?
22    A    I understand.
23    Q    Okay.  All right.  And don't get offended.  I
24    have to ask everyone these questions.  Is there
25    any reason that you cannot truthfully answer my
```

1/8/2025                    ALISHA JOHNSON

```
 1    questions today?
 2    A    There's no reason that I cannot answer your
 3    questions truthfully today.
 4    Q    Okay.  Are you currently under the influence
 5    of drugs or alcohol?
 6    A    No, I'm not.
 7    Q    Are you taking any medication that would
 8    affect your ability to answer my questions
 9    truthfully today?
10    A    No, I'm not.
11    Q    Okay.  Have you taken any medication in the
12    past 24 hours?
13    A    Yes.
14    Q    What kind of medication?
15    A    Amlodipine for my blood pressure.
16    Q    Okay.  And that medication doesn't impact
17    your ability to give truthful answers today?
18    A    It does not.
19    Q    Okay.  All right.  So, while I'm -- during
20    this deposition, I might refer to SRNS.  You
21    understand that stands for your former employer,
22    Savannah River Nuclear Solutions, correct?
23    A    Yes.
24    Q    All right.  And I might say the company.  I'm
25    also referring to your former employer, Savannah
```

1/8/2025                              ALISHA JOHNSON

```
 1      River Nuclear Solutions.
 2      A     I understand.
 3      Q     Okay.  Other than discussions with your
 4      attorney -- I don't want to know anything that
 5      you've discussed with your attorney and he doesn't
 6      want you to tell me anything that you did.  But
 7      other than that, did you do anything to prepare
 8      for today's deposition?
 9      A     Tried to get a good night's rest.
10      Q     Okay.  You didn't review any documents?
11      A     I looked over some emails.
12      Q     What emails did you review?
13      A     Just emails from my attorney and maybe the
14      paralegal.
15      Q     Okay.
16            MR. BABB:  And don't disclose --
17            MR. MCWILLIAMS:  Yeah, and I don't
18      want -- I don't want to know what's in the
19      content of those.
20      BY MR. MCWILLIAMS:
21      Q     All right.  Those are the only documents you
22      reviewed, then?
23      A     That's correct.
24      Q     Okay.  All right.  Can you please spell your
25      full name for the record?
```

1/8/2025                ALISHA JOHNSON

```
 1      A    A-L-I-S-H-A, S-H-E-M-E-K-A,

 2      D-E-M-E-T-R-I-S-E, J-O-H-N-S-O-N.

 3      Q    All right.  Do you have any other names or

 4      aliases you go by?

 5      A    Barnes and Walker.

 6      Q    Are those former...

 7      A    Walker, maiden name; Barnes, former married

 8      name.

 9      Q    Okay.  What's your current address?

10      A    342 Bedford Place, Aiken, South Carolina

11      29803.

12      Q    And how long have you lived there?

13      A    Almost 20 years.

14      Q    All right.  And where were you born?

15      A    Augusta, Georgia.

16      Q    And were you raised in Augusta?

17      A    No, I wasn't.

18      Q    Where were you raised?

19      A    In Trenton, South Carolina.

20      Q    Forgive my ignorance of the geography of

21      South Carolina.  Where's Trenton?

22      A    Edgefield County.

23      Q    Okay.  And what's your social security

24      number?

25      A    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.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    All right.  What's your date of birth?
 2      A    September 26, 1972.
 3      Q    Do you have any children?
 4      A    I do.
 5      Q    How many?
 6      A    Three.
 7      Q    And what are their names?
 8      A    Dehavelyn Barnes, Fredericka Tucker, and
 9   Frelicia Tucker.
10      Q    And, I'm sorry, what was the first child's
11   name again?
12      A    Dehavelyn, D-E-H-A-V-E-L-Y-N.
13      Q    Dehavelyn.  And that was with your first
14   husband?
15      A    That's correct.
16      Q    Okay.  And how old is Dehavelyn?
17      A    Thirty-two.
18      Q    And how old's Fredericka?
19      A    Twenty-six.
20      Q    And how old's Felicia [sic]?
21      A    Twenty-six.
22      Q    And where does Dehavelyn live?
23      A    In Maryland.
24      Q    Okay.  And Fredericka?
25      A    Tallahassee.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    And Felicia?

 2      A    Maryland.

 3      Q    All right.  Are you currently married?

 4      A    Yes.

 5      Q    What's your spouse's name?

 6      A    Marvin Johnson.

 7      Q    And you said you were married once before?

 8      A    That's correct.

 9      Q    And what's your former husband's name?

10      A    Broderick Barnes.

11      Q    When did you get married to Marvin?

12      A    October 13, 2013 -- October 19th, I'm sorry,

13      2013.

14      Q    That's good.  I have to take my ring off to

15      look at my date on the inside of it, so.

16           What about Broderick, when did you marry him?

17      A    April of 1992.

18      Q    When did you get divorced from Broderick?

19      A    Two -- the year 2013.  I don't know the exact

20      date.

21      Q    Obviously before October.

22      A    Ah, yes.

23      Q    All right.  Do you have any other relatives

24      in South Carolina?

25      A    Yes.
```

1/8/2025                          ALISHA JOHNSON

```
 1        Q    And who are they?

 2        A    I have an aunt.  Her name is Regina Adams.

 3        Q    Where does Regina live?

 4        A    In Aiken.

 5        Q    How old is Regina?

 6        A    In her 60s.

 7        Q    Any other family in South Carolina?

 8        A    Like cousins.

 9        Q    And who are they?

10        A    George Doby, he lives in Greenville; Arthur

11   Doby, he lives in Trenton; and Jackie Doby, she

12   lives in Columbia; Dale Robertson, he lives in

13   Jackson; Ronald Adams, he lives in North Augusta.

14             And I don't know -- I'm trying to think.  I

15   don't have a whole lot of cousins.

16        Q    Uh-huh (affirmative response).

17        A    Those are my first cousins.

18        Q    Okay.  So these are the first cousins that

19   live in South Carolina?

20        A    That's correct.

21        Q    Okay.

22        A    Those are the cousins that I know of.

23        Q    All right.  Ones that can talk to you?  Where

24   did you go to high school?

25        A    Strom Thurmond.
```

1/8/2025                    ALISHA JOHNSON

1    Q    And what year did you graduate from Strom
2    Thurmond High School?
3    A    1990.
4    Q    Did you go to college?
5    A    When I was in the Navy and -- so, yes.
6    Q    Okay.  Where'd you go to college?
7    A    Tidewater Community College and Norfolk
8    State.
9    Q    Did you say and Norfolk?
10   A    Norfolk State.  And American Intercontinental
11   College.
12   Q    Did you graduate from any of those?
13   A    Yes.
14   Q    Okay.  Which one?
15   A    American Intercontinental.
16   Q    All right.  What year?
17   A    2012 or '13.
18   Q    What did you study?
19   A    Business Management; Concentration, Project
20   Management.
21   Q    Any other education, like postgraduate or
22   anything?
23   A    No.
24   Q    What about any professional training?  Any
25   licenses or certifications?

1/8/2025                    ALISHA JOHNSON

1    A    No.

2    Q    Okay.  Were you in the military?

3    A    Yes.

4    Q    What branch?

5    A    United States Navy.

6    Q    And how -- when were you in the Navy?  What

7    years?

8    A    1990 through 1997.

9    Q    So, did you go in the Navy right after high

10   school?

11   A    That's correct, three days.

12   Q    I spent four years in the Army myself.

13   A    Thank you for your service.

14   Q    Thank you for yours.  What was the highest

15   rank you obtained?

16   A    E-4.

17   Q    So, an E-4 is a Sergeant in the Army.

18   A    Petty Officer Third Class.

19   Q    Okay.  And where all did you serve?

20   A    Boot camp was in Orlando.  A-school was in

21   Great Lake, Illinois.  My first command was in

22   Virginia on the USS Yellowstone.  Shore duty in

23   Virginia.

24       Then I went to another ship in Kings Bay,

25   Georgia, and then another ship in Mayport,

1/8/2025                    ALISHA JOHNSON

1    Florida.  So, mostly East Coast.

2    Q    Okay.  Why did you decide to get out?

3    A    I got out -- my dad was hurt really bad,

4    became a quadriplegic, and I needed to help him.

5    Q    I'm sorry to hear that.  Have you ever been

6    involved in another lawsuit before?

7    A    Not that I know of.

8    Q    Okay.  Have you ever been arrested?

9    A    I have.

10   Q    When were you arrested?

11   A    I was arrested for criminal domestic violence

12   with my live-in boyfriend at the time.  I want to

13   say it was around 2001.

14   Q    Who was your live-in boyfriend?

15   A    His name was Alexander Moore.

16   Q    And can you describe the circumstances that

17   led to your arrest?

18   A    I was on shift work, and I was on night

19   shift -- no.  Yeah, I was -- I was on mornings,

20   and had to be to work super early.  So, he stayed

21   out all night.

22        I'm getting ready to go to work the next

23   morning.  He's coming in the house.  We get into

24   it, and it got physical.  Police were called.  We

25   were both arrested, and we were given PR bonds,

*Cola City Reporting*
803-530-6703/colacityreporting@gmail.com

1/8/2025                      ALISHA JOHNSON

```
 1      and mine was expunged whenever we went to court.
 2      It was -- the charges were dropped.
 3      Q    Okay.  So, not convicted?
 4      A    That's correct.
 5      Q    Was he convicted of anything?
 6      A    No, he wasn't.
 7      Q    Okay.  Have you ever been arrested beyond
 8      that one time?
 9      A    Yes, I had a bounced check.  It was for $34
10      and some change to afford dry cleaners, and that
11      was in the '90s.
12      Q    And they arrested you for that?
13      A    Yes.  I went to do a background check, and it
14      was a warrant out, so I was detained.
15      Q    And what came of that?
16      A    I paid the check, and that was expunged.
17      Q    So, not convicted of anything?
18      A    Not convicted.
19      Q    Any other arrests?
20      A    Not that I know of.
21      Q    Okay.  So, you've never been convicted or
22      pled guilty to a crime?
23      A    No, I haven't.
24      Q    Okay.  Have you ever filed a worker's
25      compensation claim against an employer?
```

1/8/2025                    ALISHA JOHNSON

```
 1    A    No, I haven't.
 2    Q    All right.  Other than the Charge of
 3    Discrimination you filed with the EEOC for this
 4    lawsuit that you filed against SRNS, have you ever
 5    filed an administrative complaint against an
 6    employer before?
 7    A    I don't understand.
 8    Q    So, do you recall before you filed this
 9    lawsuit, you filed a Charge of Discrimination with
10    the Equal Employment Opportunity Commission?
11    A    Can you just repeat that?  I'm sorry.
12    Q    Yeah.  So, have you ever filed -- besides
13    with this case, not in connection with this case
14    that we're talking about right now, have you ever
15    filed a complaint against an employer with a state
16    administrative agency?
17    A    Oh, no.
18    Q    Okay.
19    A    No, sir.
20    Q    All right.  All right.  So, I want to go a
21    little bit -- oh, sorry, one more thing.  Have you
22    ever filed for bankruptcy before?
23    A    No, I haven't.
24    Q    Okay.  So, I'm going to go through your work
25    history.  You went to the Navy immediately after
```

1/8/2025                    ALISHA JOHNSON

```
1    high school from 1990 to 1997.  Where did you work
2    after you got out of the Navy?
3    A    For the South Carolina State Prison.
4    Q    And what years did you work for the South
5    Carolina State Prison?
6    A    1997 to 1998.
7    Q    What did you do for them?
8    A    I was a correctional officer.
9    Q    What were your general job duties as a
10   correctional officer?
11   A    To basically look after the inmates or do
12   visitation, but mainly I was there for my GI Bill.
13   I wanted to become an attorney.  So, I had a grant
14   from the government, and I had to write papers on
15   a weekly basis about my experiences as a
16   correctional officer.
17   Q    Okay.  Why did you leave your job with the
18   South Carolina State Prison?
19   A    I became pregnant with twins and I had to go
20   on -- I had to be in something less stressful.
21   Q    Where did you go after working with the South
22   Carolina State Prison?
23   A    Savannah River Site.
24   Q    Okay.  So, that's the job that you had
25   until --
```

1/8/2025                    ALISHA JOHNSON

```
 1    A     That's correct.
 2    Q     -- you were terminated from -- okay.  And
 3    we'll get into that.
 4          Outside of your job with SRNS or its prior
 5    companies at the Savannah River Site, have you
 6    ever been disciplined at work?
 7    A     No, I haven't.
 8    Q     Okay.
 9    A     Let me go back.  Have I been disciplined from
10    any other job?
11    Q     Yes, any other job, not --
12    A     No, I haven't.
13    Q     Okay.  Besides SRNS, have you ever been
14    terminated from a job?
15    A     No, I haven't.
16    Q     Okay.  Why did you first apply to work at
17    SRNS?
18    A     Because back then it was called DuPont and
19    because of my job in the Navy, I was an
20    electrician, and there was a lot of Navy nukes
21    that worked out at DuPont back then.  And my
22    chances of starting a career and still being able
23    to serve my country in a way, that's why I
24    applied.
25    Q     Okay.  How did you find out about the job at
```

1/8/2025                    ALISHA JOHNSON

```
 1        DuPont, which eventually became SRNS?
 2        A    It was the biggest job in the area.  And some
 3        of my Navy counterparts, you know, that was Navy
 4        nukes, so, you know, it was a discussion.
 5        Q    So, did you work on nuclear ships when you
 6        were in the Navy?
 7        A    I did.
 8        Q    Okay.  And since SRNS deals with nuclear
 9        stuff, you thought that would be a good fit?
10        A    That's correct.
11        Q    Okay.  Did someone refer you to the job or...
12        A    No.
13        Q    Okay.  Do you remember if you applied for a
14        specific position or you submitted an application
15        generally?
16        A    I submitted an application generally for an
17        operator position.
18             MR. MCWILLIAMS:  Okay.  Jay, this is for
19        you and this is for you.
20        BY MR. MCWILLIAMS:
21        Q    And so you'll see there's tabs on each one of
22        these, and I'll tell you which tab to go to.
23        These are the exhibits that we have.
24             If you could open to tab one, please.
25        A    (Witness complies.)
```

1/8/2025                    ALISHA JOHNSON

```
 1          (DEFENDANT'S EXHIBIT 1 WAS MARKED FOR
 2     IDENTIFICATION PURPOSES (2 pages) - 01AA000088-89)
 3     Q    All right.  So this has been marked as
 4     Defendant's Exhibit 1.  Do you recognize this
 5     document?
 6     A    It's my handwriting.
 7     Q    So that's your handwriting on it?
 8     A    Yes.
 9     Q    Is this your initial application to work at
10     SRNS, which at that time was called DuPont?
11     A    That's correct.
12     Q    Okay.  It looks like it's dated July 7, 1998.
13     Does that sound correct?
14     A    That's correct.
15     Q    All right.  And it says you were in the Navy
16     from June 1990 to March 1998.
17     A    1997.  It should be 1997.
18     Q    Okay.  So you just made a little mistake
19     there?
20     A    That's correct.
21     Q    Okay.  But that's the period of service we
22     discussed earlier?
23     A    That's correct.
24     Q    And it asks, "Do you have special training?"
25     I don't know if you see it halfway.  You say
```

1/8/2025                    ALISHA JOHNSON

```
 1        "Electricians Mate A School"?
 2   A    That's correct.
 3   Q    And that's through the Navy?
 4   A    That's correct.
 5   Q    And it says "Motor Rewind School Code"?
 6   A    That's correct.
 7   Q    That's also through the Navy?
 8   A    That's correct.
 9   Q    And then "Electronic Control Devices Code"?
10   A    That's correct.
11   Q    And that's also through the Navy?
12   A    Yes.
13   Q    And so did you use any of that training out
14   at SRNS or...
15   A    Of course.
16   Q    Was any of it just relevant to the jobs you
17   held when you were out there at the site?
18   A    At some point, you know, all of the training,
19   the military training, incorporates into everyday
20   life.  So I would say at some point with some of
21   the -- some of the things that I did out there,
22   yes.
23   Q    Okay.  All right.  So the next page under
24   Work History, it lists Trenton Correctional
25   Institution.  Do you see that?
```

1/8/2025                          ALISHA JOHNSON

```
 1        A    That's correct.
 2        Q    And that's the job that we talked about
 3   earlier at the South Carolina State Prison?
 4        A    That's correct.
 5        Q    And here it says you left voluntarily because
 6   of the difficult pregnancy, correct?
 7        A    That's correct.
 8        Q    All right.  And those are the only two work
 9   experiences you had after high school before going
10   to work on the Savannah River Site?
11        A    That's correct.
12             (DEFENDANT'S EXHIBIT 2 WAS MARKED FOR
13   IDENTIFICATION PURPOSES (1 page) - 01AA000101)
14        Q    All right.  So, if you could flip to
15   Exhibit 2, what's been marked as Defendant's
16   Exhibit 2.  Have you ever seen this document
17   before?
18        A    Yes.
19        Q    What is it?
20        A    It was the offer letter for the position at
21   Savannah River Site.
22        Q    Okay.  At the time, it says you were employed
23   by Westinghouse Savannah River Company; is that
24   correct?
25        A    That's correct.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    All right.  And then at some point,
 2      Westinghouse Savannah River Company became SRNS,
 3      correct?
 4      A    That's correct.
 5      Q    All right.  But you didn't have to reapply.
 6      You just stayed employed the whole time?
 7      A    Yes.
 8      Q    Okay.  It says your start date was about
 9      August 18, 1998; is that correct?
10      A    That's correct.
11      Q    That's when you started?
12      A    Yes.
13      Q    All right.  And you started as a Production
14      Operator Trainee, correct?
15      A    Yes.
16      Q    All right.  What were your duties and
17      responsibilities generally as a Production
18      Operator Trainee?
19      A    Basically, I took rounds in the facility.  I
20      worked in the Tritium facility, which it was
21      classified.  I held a Q clearance.  So, a lot of
22      the things I did, it's like a need-to-know.  But
23      to sum it up, I took rounds and did
24      troubleshooting and...
25      Q    When you say take rounds, what do you mean?
```

1/8/2025                    ALISHA JOHNSON

1    A     I take readings off of critical equipment to

2    make sure that it's operating within the

3    parameters.

4    Q     Okay.  And so you go around to different

5    equipment and do that?

6    A     That's correct.

7    Q     Okay.  And if there was a problem, you'd

8    troubleshoot it?

9    A     I would report it first.

10   Q     And then either you or someone else would fix

11   it?

12   A     That's correct.

13   Q     Okay.  And you were continually employed by

14   SRNS since 1998 until you're terminated on

15   March 1st, 2023, correct?

16   A     That's correct.

17   Q     All right.  So, you held several different

18   positions during that time period with SRNS,

19   correct?

20   A     That's correct.

21   Q     All right.  We'll go through some of your

22   more recent positions.  Can you turn to what's

23   been marked as Defendant's Exhibit 3?

24         (DEFENDANT'S EXHIBIT 3 WAS MARKED FOR

25   IDENTIFICATION PURPOSES (4 pages) - 01AA000045-46,

1/8/2025                    ALISHA JOHNSON

1    01AA000040, 01AA000036)

2    A    Yes.

3    Q    All right.  Have you seen this document

4    before?

5    A    Is there something else to it?

6    Q    There's a second page to it.

7    A    I can't recall to say that I saw this

8    particular document.

9    Q    Okay.  Well, I'll represent to you, this is a

10   Change of Status form that SRNS maintains in the

11   regular course of business and that we produced to

12   your attorney during discovery.

13         And can you see this particular one, it looks

14   like -- if you look under the kind of like second

15   group of stuff on the right-hand side under

16   Effective Date, it looks like this change was

17   effective February 1st, 2017.  Do you see that?

18   A    I see it.

19   Q    All right.  And it says that at the time,

20   your current job up top looks like Lead Ops

21   Specialist C.

22   A    Where is that?

23   Q    Up in the blue thing, you see current job

24   title?

25   A    I see it.

1/8/2025                    ALISHA JOHNSON

1  Q    And was that a job that you held?

2  A    Okay.  So that Lead Ops Specialist C,

3  that's -- I was Shift Operations Manager, so

4  maybe -- that's correct.

5  Q    Okay.  So that's correct?  And your grade at

6  that time, you can see right next to it, was 33?

7  A    Yes.

8  Q    All right.  And then we go down under -- it

9  says like Promotion.  It looks like that you were

10  promoted to looks like Print [sic] Engineer and

11  Tech Support Specialist; is that correct?

12  A    A Principal Engineer.

13  Q    Principal Engineer?  Okay.

14  A    That's correct.

15  Q    All right.  And above that, it looks like you

16  got that promotion through the posting system; is

17  that correct?

18  A    That's correct.

19  Q    So does that mean that this job was posted

20  somewhere on SRNS like intranet and you applied

21  for it?

22  A    That's correct.  Yes.

23  Q    Okay.  And how did you know about this

24  posting?

25  A    It came out on Brass Ring.

1/8/2025                    ALISHA JOHNSON

1    Q    And tell us what Brass Ring is.

2    A    It's where the jobs appear, the open jobs

3    appear and you can -- anybody can apply for them.

4    Q    So that's like an internal system that SRNS

5    has?

6    A    That's correct.

7    Q    Okay.  So if you see a job on there, you can,

8    I don't know, click a link and then apply?

9    A    That's correct.  It's not just internal.

10   It's external, too.

11   Q    Okay.

12   A    Meaning that if you don't work there, you can

13   also -- you also have access to the Brass Ring.

14   Q    Okay.  All right.  Thank you.  What were your

15   job duties and responsibilities as the Principal

16   Engineer and Tech Support Specialist?

17   A    To scope and -- scope, lock in, and execute

18   the day-to-day activities in the facility.

19   Q    What do you mean by "scope and execute"?

20   A    So you work on a eight -- a rolling

21   eight-week schedule.  And my task was to

22   communicate with Operations, RADCON, Maintenance,

23   Construction, and any type -- any outside work

24   facilities to coordinate any work that was

25   scheduled during that week.

1/8/2025                         ALISHA JOHNSON

```
1        So, in order to work the job, you had to
2    scope it to make sure that -- what we say is, we
3    have our three P's out, People, Parts and Paper;
4    meaning that the job is ready to work.
5        We had to have a package for the job.  We had
6    to have the people to work the job, and any
7    permits that were needed for the job.  So in order
8    to get all that to get together, I had to
9    coordinate with the different work groups.
10        So, actually, it's kind of like a three-week
11    process.  You get the schedule, work with the
12    scheduler, and the work populate that comes up.
13        Now, if it's any emergencies or emergent work
14    that comes up, you have to kind of coordinate that
15    in, also.  So it was a lot of moving pieces and
16    parts to it.
17        So, one week you would scope the work, then
18    you would lock a little work in, and then it's
19    time to execute to actually do the job.
20        And during the execution week, it's different
21    jobs going on with the different departments.  So
22    it was my job to kind of oversee all of those
23    tasks at the same time to make sure that everybody
24    had what they needed to get the jobs completed in
25    a safe and timely manner.
```

1/8/2025                          ALISHA JOHNSON

```
 1        Q    So, if I understand correctly, you're kind of
 2     coordinating all the stuff that needs to happen
 3     for a job to be completed.
 4        A    And multiple jobs at the same time.
 5        Q    Okay.
 6        A    But that's correct.
 7        Q    Okay.  And it looks like here, if we look
 8     down in this Pay Rate Change, you went up to a
 9     grade 34 from 33 with this promotion; is that
10     correct?
11        A    That's correct.
12        Q    Okay.  So, if you could flip to the third
13     page.  I'll represent to you this is another
14     Change of Status form that SRNS maintains in the
15     ordinary course of business and that we produced
16     to your attorney during discovery.
17            And it looks like -- is this -- it says your
18     name and user ID at the top?
19        A    That's correct.
20        Q    All right.  And it looks like this change was
21     effective on December 1st, 2022; is that correct?
22        A    (No response.)
23        Q    Do you see the Effective Date under Job
24     Reclassification?
25        A    I see the date.  Yes, I see it.
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    Okay.  And it looks like your job title was
2    changed to Work Window Coordinator?
3    A    I see it there, but this was never discussed
4    with me about this Change of Status.
5    Q    This Change of Status wasn't?  I mean, your
6    job was Work Window Coordinator, correct?
7    A    When I initially -- that's the name of the
8    job.
9    Q    Uh-huh (affirmative response).
10   A    But when I went into it, I was an Engineer
11   Specialist.
12   Q    Okay.  So this is just kind of they changed
13   the name to Work Window Coordinator?
14   A    I wasn't aware that it was changed, but I see
15   what you have here.
16   Q    So you weren't a Work Window Coordinator when
17   you were terminated from SRNS?
18   A    I was an Engineering Specialist, so I
19   thought.
20   Q    Okay.  So -- but here, this document says the
21   new job title is Work Window Coordinator?
22   A    That's what that says.
23   Q    Okay.  And up at the top, it says that your
24   grade is still grade 34?
25   A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    And that's what your grade was when you were
2    terminated from SRNS?
3    A    Yes.
4    Q    Okay.  And so your job duties and
5    responsibilities didn't change at all with this
6    Change of Status form?
7    A    And, again, it's my first time seeing this,
8    but no, my job -- my job duties did not change.
9    Q    Okay.  Did your pay change at all?
10   A    Yes.
11   Q    How did --
12   A    Not with this.
13   Q    Well, when did your pay change?
14   A    Okay.  So, an assessment was held at the
15   entire SRNS, and what was going on is, they were
16   looking -- a team came in -- and I'm just speaking
17   from kind of like hearsay.  And they reassessed a
18   lot of different people's salaries.
19        So, sometime in 2022, maybe -- 2021 or 2022,
20   I'm not for sure -- but I was given a significant
21   raise of about -- it was about 12,000 -- over
22   $12,000.
23        And when I was given that raise, Porter
24   Youngblood, who was my supervisor at the time, he
25   called me into the office and he told me that,
```

1/8/2025                          ALISHA JOHNSON

1    "Hey, you know, you're being given this raise.  I

2    don't know why you're being -- you're receiving

3    this.  Me, nor Eddie, approved this, and it's kind

4    of like a 17 percent raise and -- or whatever."

5         So, what I did is, I inquired further.  And

6    what I was told whenever I sought out -- and I

7    can't remember exactly who it was in Human

8    Resources.

9         But what I was told was, whenever my pay was

10   evaluated, I was not getting the same amount, or I

11   wasn't getting the same pay as some of my

12   counterparts; that I was being underpaid. That's

13   why I received the raise.

14   Q    And you don't remember who told you that in

15   HR?

16   A    I cannot remember who told me that.

17   Q    And that was in 2022 that you received --

18   A    2021, 2022.  I'm not sure of the exact date.

19   Q    So the Compensation Rate here on -- looking

20   at Exhibit 3 says $8,924.34 a month.  Is that how

21   much you were making at the end of your

22   employment?

23   A    Yes.

24   Q    Okay.  So this reflects either the change in

25   pay or the change of pay had already occurred at

1/8/2025                    ALISHA JOHNSON

1    the time this happened?

2    A    That's correct.  Because initially I was

3    getting about 81.

4    Q    Okay.  And so you don't know who made the

5    decision to up your pay?

6    A    Like I said, the -- an assessment team came

7    in and they were looking at people, you know, just

8    looking at the different salaries.

9         Because, evidently, complaints were out about

10   people not getting adequate pay or not being paid

11   what some of the counterparts that were doing the

12   same positions were being paid.  And from that

13   assessment, thus, I received the raise.

14   Q    Okay.  If you could look at what's been

15   marked as -- sorry, never mind, excuse me.

16   A    Okay.

17   Q    There's one more page on this exhibit, the

18   final page.  And this, I'll represent to you, is

19   another Change of Status form that SRNS maintained

20   in the ordinary course of business that we

21   produced to your attorney.

22        And this one just lists your termination

23   date.  It says it's effective 3/1/2023, was

24   your -- was your last day of work; is that

25   correct?

1/8/2025                    ALISHA JOHNSON

1    A    That's correct.

2    Q    And that was your last day of work?

3    A    To the best of my knowledge, what happened

4    is, they sent me home and -- after my Disciplinary

5    Review Board for about a week, and I was called in

6    to meet them at the badge office, you know, on or

7    about March 1st or February the 28th, one of those

8    days, somewhere close.  And that's when I signed

9    the -- well, that's when they told me I was

10   terminated.

11   Q    Okay.  So it's around about the date that's

12   listed on here.

13   A    That's correct.

14   Q    Okay.  All right.  Do you know, did SRNS have

15   an employee handbook?

16   A    Yes.

17   Q    Okay.  Did you review the employee handbook?

18   A    Yes.

19   Q    Okay.  And you could look at it whenever you

20   wanted electronically?

21   A    Yes.

22        (DEFENDANT'S EXHIBIT 4 WAS MARKED FOR

23   IDENTIFICATION PURPOSES (33 pages) -

24   01AQ000001-33)

25   Q    Okay.  I'm going to show you what's marked

1/8/2025                 ALISHA JOHNSON

```
 1        Exhibit 4.
 2        A    Okay.
 3        Q    And I'm going to direct you to section 4.1,
 4        which is on page four of this document.  Or,
 5        sorry, have you seen -- have you seen this before?
 6        A    Yes.
 7        Q    And what is this?
 8        A    The 5B.  It's is the -- the policy for SRNS.
 9        Q    Okay.  So this is part of the SRNS handbook?
10        A    That's correct.
11        Q    Okay.  All right.  And so section 4.1, do you
12        see where it states, "All managers, Personnel, and
13        Organizations"?  And then underneath it, it says,
14        "All managers, personnel, and organizations are
15        responsible for..."  Do you see that?
16        A    I see it.
17        Q    All right.  So the first bullet point says,
18        "Notifying their immediate manager and the
19        SRNS-M&O or SRNS" -- or, excuse me -- "or SRNL-M&O
20        Office of General Counsel of any Office of
21        Inspector General or General Accounting Office
22        requests for information, reports, interviews, et
23        cetera -- et cetera, pertaining to audits,
24        reviews, inspections, and investiagions."  Did I
25        read that correctly?
```

1/8/2025                          ALISHA JOHNSON

```
 1    A    The best -- from what I heard.

 2    Q    Is that a "yes"?

 3    A    Yes.

 4    Q    Okay.  So, is it your understanding from this

 5    bullet point that we just looked at, that if SRNS

 6    receives a request from the OIG, the Office of

 7    Inspector General, to investigate a matter, they

 8    are required to investigate that issue?

 9         MR. BABB:  Object to the form.

10    A    Can you repeat that?

11    Q    So if -- per this policy that we just read,

12    if SRNS receives a request to investigate from the

13    Office of Attorney -- Office of Inspector General,

14    they're required to cooperate with that?

15    A    Yes.

16    Q    Okay.  All right.  So the second bullet point

17    underneath 4.1 states, "Complying with the OIG or

18    GAO requests for interviews and briefings and

19    providing affidavits, sworn statements, if so,

20    requested by designated personnel of the OIG and

21    GAO who are authorized to administer oaths or

22    affirmative [sic] or take affidavits."  Is that --

23    did I read that correctly?

24    A    Yes, you read it correctly.

25    Q    Okay.  So does this second bullet point state
```

1/8/2025                      ALISHA JOHNSON

```
 1     that SRNS employees are required to comply with
 2     the OIG if they request to interview an SRNS
 3     employee?
 4     A    Can you repeat that again?
 5     Q    So, looking at the second bullet point, does
 6     this say that SRNS employees are required to
 7     comply with an OIG request to interview that
 8     employee?
 9     A    Yes.
10     Q    Okay.  All right.  So then the third bullet
11     point says, "Giving full and prompt attention to
12     providing pertinent documentation, other
13     information to the OIG and GAO under the direction
14     of appropriate M&O management."  Did I read that
15     correctly?
16     A    Yes.
17     Q    All right.  And so, basically, based on these
18     three bullet points that we've just looked over,
19     SRNS is required to investigate a matter brought
20     to them by the OIG, correct?
21          MR. BABB:  Object to the form.  You can
22     answer.
23     A    Yes.
24     Q    Okay.  All right.  So if we turn to page six.
25     All right.  You see section 5.1, Rules of Conduct?
```

1/8/2025                    ALISHA JOHNSON

```
 1     A     I do.

 2     Q     And have you reviewed these rules before?

 3     A     I have.

 4     Q     Okay.  So if you look at number four under

 5     5.1, it says, "These rules are published for the

 6     individual's information and protection.

 7     Ignorance of work rules is not an acceptable

 8     excuse for violation."  Did I read that correctly?

 9     A     Yes.

10     Q     Does that mean that not knowing about a rule

11     doesn't excuse your violation of the rule?

12     A     Yes.

13     Q     Okay.  All right.  So then right under four,

14     number five, it gives a list of Rules of Conduct

15     that may warrant disciplinary action up to and

16     including termination; is that correct?

17     A     Yes.

18     Q     All right.  And so there's a bunch of

19     examples under five, and if you turn onto the next

20     page, page seven, and you look at the example

21     that's labeled J, do you see that?

22     A     Yes.

23     Q     And so J says that, basically, SRNS doesn't

24     tolerate people taking any action based on

25     someone's protective characteristics to include
```

1/8/2025                ALISHA JOHNSON

```
 1     their race or their gender; is that correct?
 2     A    That's what that says.
 3     Q    Okay.  And then do you see O?
 4     A    I do.
 5     Q    And so is it your understanding that this O
 6     under 5.1 means that an SRNS employee could be
 7     fired if they don't fully provide the information
 8     requested of them during an investigation?
 9     A    I understand that.
10     Q    Okay.  All right.  So then on the next page,
11     still under 5.1, there's an example that's labeled
12     AA.  Do you see that?
13     A    I see it.
14     Q    All right.  So is it your understanding that
15     this means an SRNS employee could be fired if they
16     use a government computer for something unrelated
17     to their job at SRNS?
18     A    Can I see section 5.24?
19     Q    We're going to -- we're going to look at
20     that.  But so this one says, "Unauthorized use or
21     abuse of government property, including computers,
22     telephones, et cetera."
23          So if you use a government property,
24     including computers, in an unauthorized manner,
25     that means you'd be subject to discipline up to
```

1/8/2025                          ALISHA JOHNSON

1    and including termination, correct?

2    A    You need to clarify what "unauthorized" is in

3    here.

4    Q    If SRNS deems that you have used government

5    property, including a computer, in an unauthorized

6    manner, then you can be terminated for that,

7    correct?

8    A    Yes, that's what that says.

9    Q    Okay.  Thank you.  And so you're right, it

10   does say -- it says look at section 5.24, correct?

11   A    That's correct.

12   Q    All right.  So let's go to page 25 of this

13   exhibit.  And there's numbers at the bottom.

14   It'll help you find it.  All right.  Page 25 has

15   section 5.24, correct?

16   A    That's correct.

17   Q    And that's the section you were just saying

18   was referenced in that AA section under 5.1 we

19   looked at?

20   A    That's correct.

21   Q    All right.  And this is called -- section

22   5.24 is titled Use of Unclassified Information

23   Technology Resources, correct?

24   A    That's correct.

25   Q    All right.  So section 5.24.1 talks about the

1/8/2025                         ALISHA JOHNSON

```
 1    control and monitoring that SRNS does of its
 2    computer systems; is that correct?
 3    A    That's correct.
 4    Q    All right.  And looking at the bullet points
 5    under 5 -- or the numbered paragraphs under
 6    5.24.1, they tell you that SRNS has processes in
 7    place to monitor the use of its computers and
 8    phones and other equipment, correct?
 9    A    That's correct.
10    Q    All right.  And it also tells you that SRNS
11    can and does check its employees computers and
12    equipment randomly to determine if there's been
13    unauthorized use and abuse of those systems,
14    correct?
15    A    Correct.
16         MR. BABB:  Object to the form.
17    Q    All right.  So let's go to page 27.  So this
18    is section 5.24.3, Incidental Personal Use of
19    Government Information Technology Resources,
20    correct?
21    A    Correct.
22    Q    All right.  And so if we go down to the
23    bottom of the page, there's section number 2 and
24    it's Limitations; is that correct?
25    A    That's correct.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    And then A says, "All users of government
 2   computers and network resources for incidental
 3   personal use are --
 4          THE COURT REPORTER:  I'm sorry, can you
 5   slow down just a little bit?  People talk
 6   faster when they read.
 7          MR. MCWILLIAMS:  Sorry.
 8          THE COURT REPORTER:  Thank you.
 9   BY MR. MCWILLIAMS:
10      Q    All right.  So under section 2, Limitations,
11   section A, it provides a list of actions that any
12   user of government computers and network resources
13   for incidental personal use are strictly forbidden
14   to do; is that correct?
15      A    That's correct.
16      Q    All right.  And then if you turn to the next
17   page, in that list of things that individuals are
18   strictly forbidden to use government resources --
19   or government computers or network resources for,
20   number 3 states anything that involves personal
21   gain beyond SIP, banking, or credit union account
22   management; is that correct?
23      A    That's correct.
24      Q    So that -- that point 3 right there means
25   that SRS [sic] employees can't use government
```

1/8/2025                    ALISHA JOHNSON

```
 1    computers to do anything that involves personal
 2    gain outside of checking their personal banking
 3    accounts, correct?
 4         MR. BABB:  Object to the form.
 5    A    That's what that says.
 6    Q    Okay.  And number 4 says that they can't use
 7    government computers or the network in any way --
 8    or, excuse me, to any -- to in any way facilitate
 9    the individual's outside personal business; is
10    that correct?
11    A    That's correct.
12    Q    So do you understand that to mean SRS
13    employees cannot use their government computers to
14    do anything related to an outside personal
15    business?
16    A    I understand that.
17    Q    Okay.  And this isn't limit -- it says "in
18    any way."  You can't do it in any way; is that
19    correct?
20         MR. BABB:  Object to the form.
21    A    That says "in any way."
22    Q    Uh-huh (affirmative response).  So it's not
23    limited to, you can't visit a couple of websites.
24         MR. BABB:  Object to the form.
25    A    I'm not sure what you're asking.
```

1/8/2025                          ALISHA JOHNSON

1    Q    Okay.  So it doesn't say, "Hey, you can't use
2    our networks or government computers to visit
3    these particular websites," correct?
4    A    It says "in any way."
5    Q    Yeah.  So, any sort of way that facilitates
6    your personal business, you cannot use a
7    government computer or the government network.
8    A    So if you own a personal business, you cannot
9    in any way facilitate it, if you own a business.
10   Q    Yeah, using your government computer.
11   A    I understand that.
12        (DEFENDANT'S EXHIBIT 5 WAS MARKED FOR
13   IDENTIFICATION PURPOSES (8 pages) - 01AR000001-8)
14   Q    Okay.  All right.  Will you turn to what's
15   been marked as Defendant's Exhibit 5?  It's the
16   next tab.
17   A    Oh, okay.
18   Q    Have you seen this document before?
19   A    I have.  Yes, I've seen the document before.
20   Q    What is this?
21   A    It's the disciplinary process.
22   Q    And it's part of the handbook that you've
23   reviewed before?
24   A    That's correct, yes.
25   Q    All right.  And it's SRNS' disciplinary

1/8/2025                          ALISHA JOHNSON

```
 1     process, correct?
 2     A    Yes.
 3     Q    All right.  Are you generally familiar with
 4     what the discipline process used by SRNS is?
 5     A    I am.
 6     Q    Okay.  So, there are occasions when a manager
 7     can institute discipline, correct?
 8     A    That's correct.
 9     Q    But there's other times where a Disciplinary
10     Panel has to be convened to issue any sort of
11     discipline; is that correct?
12     A    That's correct.
13     Q    All right.  And before your termination with
14     SRNS, you were heard by a Disciplinary Panel?
15     A    I was.
16     Q    Okay.  So let's look at page four of this
17     exhibit.  And you see section 4.4?  That talks
18     about what the Disciplinary Panel is responsible
19     for; is that correct?
20     A    That's correct.
21     Q    All right.  And the second bullet point under
22     4.4 says, "The Disciplinary Panel is responsible
23     for determining appropriate disposition of the
24     case."  Did I read that correctly?
25     A    Yes, you read that correctly.
```

1/8/2025                         ALISHA JOHNSON

```
 1     Q    So is it your understanding that if a
 2     Disciplinary Panel is convened, the Disciplinary
 3     Panel members are the ones who determine that what
 4     discipline, if any, should be imposed?
 5          MR. BABB:  Object to the form.  And what
 6     page?  You're on page four?
 7          MR. MCWILLIAMS:  Yes, page four.
 8          THE WITNESS:  Okay.  Can you repeat
 9     that?
10     BY MR. MCWILLIAMS:
11     Q    Sure.  So, if a Disciplinary Panel is held,
12     the panel members are the ones who determine what
13     discipline is instituted.
14     A    That's what this says.
15     Q    Is that your understanding of what the
16     process is?
17     A    No, that's not my understanding.
18     Q    What do you have to show that this policy is
19     not followed by SRNS?
20     A    At this time, I don't have anything concrete,
21     other than just from working out there for 25
22     years in several different areas, seeing people go
23     through disciplinary -- different disciplinary
24     processes and seeing the outcomes for different
25     people.
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    Okay.  So nothing concrete, just --
2    A    I don't have anything concrete.
3    Q    Okay.  So, if we can go to the next page,
4    page five, we've got section 5.1.  Do you see
5    that?
6    A    I see it.
7    Q    All right.  And so when you go down, there's
8    number 3 under 5.1.  Do you see that?
9    A    I see that.
10   Q    And does paragraph 3 state that the
11   Disciplinary Panel is going to consist of three
12   members, and those members are HR policy
13   facilitator, personnel security, and management,
14   unbiased and independent of the case?
15   A    I see that.  That's what that says.
16   Q    Okay.  So, the immediate manager or
17   supervisor of the person who's being disciplined
18   is not part of the Disciplinary Panel, correct?
19   A    That's what's listed here.
20   Q    Have you ever personally seen a Disciplinary
21   Review Panel where the immediate management is
22   part of the panel?
23   A    With my board, I've only seen my Disciplinary
24   Review Board, and it consisted of much more than
25   those three people.  And my management, they were
```

1/8/2025                          ALISHA JOHNSON

```
 1    not in my particular room, but they did talk to my

 2    management before and after that same Disciplinary

 3    Review Board.

 4    Q    So they talked to your management, but was

 5    your management part of the three-member panel?

 6    A    Again, I'm not sure what you're asking,

 7    because the panel I had was about 13 people in a

 8    row.

 9    Q    So I understand a lot of people participate

10    in a Disciplinary Review Panel, but there are

11    three members of the panel.  Or do you have

12    anything to dispute that there are just three

13    members of the panel?

14    A    I'm not sure.

15    Q    So you're not sure that you have anything to

16    dispute it?

17    A    I'm not sure that those are the only three

18    people.

19    Q    Okay.  But this policy says there's only

20    three people.

21    A    That's what this policy says.

22    Q    Okay.  And you don't know for a fact whether

23    there are more or less people on the panel?

24        MR. BABB:  Object to the form.

25    A    I don't -- I don't know.
```

1/8/2025                           ALISHA JOHNSON

```
1    Q    Okay.  You didn't participate in the
2    deliberations with the panel, did you?
3    A    What -- I don't understand what you mean by
4    that.
5    Q    So when the panel meets to talk about, "Hey,
6    what sort of discipline are we going to issue,"
7    have you ever participated with the panel on that?
8    A    I did not.
9    Q    Okay.  All right.  So then we're going to go
10   to the next page, which is page six.  All right.
11   Section 5.4, do you see that?
12   A    I see it.
13   Q    Okay.  And this section states that if the
14   discipline issued is greater than 40 hours of time
15   off without pay or termination, that the CEO or
16   the COO or their designee has to be briefed about
17   it, and then the CEO or the COO has to make the
18   final determination.  Is that what this policy
19   states?
20   A    It says, "When greater than 40 hours of time
21   off without pay or termination is recommended, HR
22   Policy with the Line Management in attendance will
23   brief the CEO and/or COO or their designee.  The
24   CEO or COO will make the final determination."
25   That's what I understand.
```

1/8/2025                    ALISHA JOHNSON

1    Q    Okay.  So if someone's to be terminated, the

2    CEO or the COO has to make the final determination

3    about termination?

4    A    With the HR Policy person and the Line

5    Management of the person they're terminating in

6    attendance, that's what I understand.

7    Q    Okay.  So the final decision, though, is up

8    to the CEO or the COO?

9    A    Per this policy.

10   Q    Do you have anything to dispute or to prove

11   that SRNS does not follow this policy when

12   terminating employees?

13   A    At this time, I don't have anything in

14   concrete at this time.

15   Q    Are you actively looking for something to

16   disprove it?

17   A    Let's just say there are things going on and

18   that have been going on at SRNS that are beyond

19   the policies that are listed here.

20   Q    What are those things?

21   A    It's just different practices and -- that are

22   carried out by different people out there.

23   Q    What practices?

24   A    The "good old boy" system is one of the ones.

25   Q    So there's a "good old boy" system where

1/8/2025                          ALISHA JOHNSON

```
 1    people are not terminated?
 2    A     The "good old boy" system -- and it goes
 3    beyond people not being terminated.  The "good old
 4    boy" system goes to people getting different
 5    positions just because --
 6    Q     Can you give me --
 7    A     -- of who they are.
 8    Q     -- a specific example of where the "good old
 9    boy" system resulted in someone who should have
10    been terminated not being terminated?
11    A     I can't give you anything concrete at this
12    time, because disciplinary actions are including
13    and up to -- including different other things up
14    to termination.  So I cannot give you anything
15    concrete in saying that the "good old boy" system
16    was used in not terminating someone.  So, no, I
17    can't give you anything in concrete --
18    Q     Okay.
19    A     -- at this time.
20    Q     What would make you be able to give me
21    something concrete?
22    A     I don't have an answer for you at this time.
23          (DEFENDANT'S EXHIBIT 6 WAS MARKED FOR
24    IDENTIFICATION PURPOSES (8 pages) - 01AW000001-8)
25    Q     Okay.  Would you turn to paragraph 6 -- or,
```

1/8/2025                    ALISHA JOHNSON

1     excuse me, not paragraph 6, Defendant's Exhibit 6?

2     Do you recognize this document?

3     A     I do.

4     Q     Is this the Charge of Discrimination you

5     filed in connection with this lawsuit?

6     A     Yes.

7     Q     Is that your signature at the bottom?

8     A     That's my signature at the bottom.

9     Q     And it looks like you submitted it on

10    May 19th, 2023?

11    A     That's correct.

12    Q     All right.  And in your charge, you allege

13    you were passed over for promotion in June 2022

14    because of your race and sex; is that correct?

15    A     That's correct.

16    Q     All right.  And you also allege you were

17    terminated in March 2023 in retaliation for

18    raising concerns about race and gender

19    discrimination; is that correct?

20    A     That's correct.

21    Q     Okay.  So look at the fourth page of this

22    exhibit.  Have you seen this document before?

23    A     And what document are you on?

24    Q     The one you're looking at.

25    A     I've seen this before.

1/8/2025                    ALISHA JOHNSON

```
 1      Q    Is this the Dismissal and Notice of Rights to
 2   sue that you received from the EEOC?
 3      A    Yes.
 4      Q    Okay.  And under Dismissal of Charge, it
 5   states, "The EEOC has granted your request for a
 6   Notice of Right to Sue, and more than 180 days
 7   have passed since the filing of this charge."  Did
 8   I read that correctly?
 9      A    Yes.
10      Q    So, did your attorney or you ask the EEOC for
11   you to send you a Notice of Right to Sue?
12      A    I'm not sure what you're asking.
13      Q    So the EEOC didn't make a determination on
14   your charge, did they?
15      A    I'd have to ask my lawyer.
16      Q    So you're not sure what happened?
17      A    EEOC gave me the right to sue.  That's what I
18   understand.
19      Q    Okay.  But they didn't like say, "Yeah,
20   you're correct"?
21      A    They didn't say I was incorrect.
22      Q    Okay.  They just didn't make a determination
23   either way?
24      A    They gave me the right to sue.
25      Q    So did they make a determination at all?
```

1/8/2025                ALISHA JOHNSON

1   A    They determined that I had the right to sue.

2   Q    Okay.  But they didn't say, "You're right,

3   that we conclude your allegations in this charge

4   are correct"?

5   A    I didn't -- they gave me the right to sue.

6   That's all that I'm aware of.

7        (DEFENDANT'S EXHIBIT 7 WAS MARKED FOR

8   IDENTIFICATION PURPOSES (8 pages) - Summons and

9   Complaint)

10   Q    Okay.  So if you could turn to, excuse me,

11   what's been marked as Defendant's Exhibit 7.  And

12   there's a lot of pages to it, but do you recognize

13   this document?

14   A    Yes, I recognize this document.

15   Q    Is this and the following pages, is this the

16   Summons and Complaint that you filed in this

17   action?

18   A    Do I have permission to turn the page?

19   Q    Yeah, yeah, yeah, go ahead.

20        MR. BABB:  Can we take a quick break?

21        MR. MCWILLIAMS:  Yeah.

22   (Off the record from 11:24 a.m. to 11:30 a.m.)

23   BY MR. MCWILLIAMS:

24   Q    All right.  So, Ms. Johnson, before we took a

25   break, we were looking at Exhibit 7.  And is that

1/8/2025      ALISHA JOHNSON

1    the Summons and the Complaint that your attorney

2    filed on your behalf in this action?

3    A    Yes.

4    Q    Did you review it before it was filed?

5    A    I looked at it with my attorney before it was

6    filed.

7    Q    And were -- are all the allegations in this

8    Complaint accurate?

9    A    They're accurate as to the best of what my

10   recollection was at the time.

11   Q    Okay.  So, if you look at page six and seven

12   of the Complaint, they're numbered, it looks like

13   you've asserted three causes of action; is that

14   correct?

15   A    That's correct.

16   Q    And the first one is Race Discrimination in

17   violation of Title VII, correct?

18   A    That's correct.

19   Q    The second is Sex Discrimination in violation

20   of Title VII?

21   A    That's correct.

22   Q    And the third is Retaliation in violation of

23   Title VII?

24   A    That's correct.

25   Q    And those are the only three causes of action

1/8/2025                          ALISHA JOHNSON

```
 1      you've asserted in this Complaint?
 2           MR. BABB:  Object to the form of the
 3      question.  Answer, if you can.
 4      A    Those are the three that are listed here.
 5      Q    Are you aware of any other causes of action
 6      that you've brought against the company?
 7      A    Not at this time.
 8      Q    Okay.  And are you making any other claims in
 9      this lawsuit against SRNS?
10      A    Not at this time.
11      Q    Okay.  So, if you look at paragraph 11 of the
12      Complaint...
13      A    So go back another page?
14      Q    Yeah, you'll go back to page two of the
15      Complaint.  It's where paragraph 11 is.
16      A    (Witness complies.)
17      Q    So, paragraph 11, you allege, "Upon
18      information and belief, it is the practice within
19      the maintenance department in which Plaintiff
20      worked for the most senior Work Window Manager to
21      be promoted to spot manager in the same department
22      when the position became available."  Did I read
23      that correctly?
24      A    Yes.
25      Q    And when you say "spot manager," did you mean
```

1/8/2025                    ALISHA JOHNSON

```
1     SPOC, S-P-O-C, Single Point of Contact manager?
2     A    That's correct.
3     Q    Okay, just wanted to make sure.  What's your
4     basis for the allegation in paragraph 11?
5     A    My basis for the -- for that allegation in
6     paragraph 11, whenever I started training back in
7     initially 2016, James Barnes was a Work Window
8     Manager at the time, and he was the one that
9     trained me.
10          And during the training process, as he was
11    describing my roles and responsibilities, he also
12    told me that the common practice was, the most
13    senior Work Window Manager would -- if a lead
14    planning position opened up, or if the SPOC
15    position opened up, the most senior Work Window
16    Manager at the time would take that position.
17          To further defend this allegation, Porter
18    Youngblood was the Lead Planner whenever I took
19    this position, and whenever the SPOC manager left,
20    Porter took the SPOC position, because he was the
21    most senior, and Scott Brown, Michael Brown, took
22    the Lead Planner position, because at that time,
23    he was the most senior Work Window Manager.
24          Well, when Porter was promoted to -- let me
25    go back.  So when Porter was the SPOC, somebody
```

1/8/2025                    ALISHA JOHNSON

```
 1    left that position.  I forget that guy's name.
 2    Porter got that position because he was the -- he
 3    was the most senior.  Mike Brown was next in line,
 4    so he took the Lead Planner position.  So that
 5    left James Barnes as the most senior Work Window
 6    Manager, and I was next in line behind James
 7    Barnes.
 8         So whenever Scott Brown was moved to an
 9    Outage Coordinator, the Lead Planner position came
10    open, and James Barnes was moved to the Lead
11    Planner position.
12         When James Barnes was moved to the Lead
13    Planner position, at that time that left me as the
14    most senior Work Window Manager.
15         After a while...
16    Q    So hold up for a second.  All these changes
17    that you've just discussed, of people move to the
18    SPOC or the Lead Planner position, were you privy
19    to any of the discussions on, "Hey, this is why
20    we're deciding to move these people there"?
21    A    No, other than the discussion that was had
22    with me with other Work Window Managers, as well
23    as even Porter, the most senior Work Window
24    Manager would move up.
25    Q    But when the decision was made, did they say,
```

1/8/2025                    ALISHA JOHNSON

```
 1        "We're moving this person because he's the most
 2    senior"?
 3    A    I believe that it wasn't in context as just
 4    as you're putting it.  But what was relayed to me
 5    by Porter Youngblood was, that the most senior
 6    Work Window Manager would be moved to these
 7    positions to put them in the spotlight so that
 8    they would have more responsibility and work in
 9    that job capacity, so when the position became
10    open for a Work Center Manager position, the
11    person that was put in that spot would already
12    have the capabilities and the knowledge to be able
13    to succeed as a Work Center Manager.
14    Q    And Work Center Manager is the step above
15    where you were as a Work Window Manager?
16    A    That's correct.
17    Q    Okay.  And when Porter told you this, what
18    was his position?
19    A    He said this several times.  So maybe he was
20    the SPOC at the time or maybe he was the Lead
21    Planner at the time, but he said this on -- at
22    different points.
23    Q    And does the SPOC position, does it have more
24    pay than a Work Window Manager position?
25    A    I'm not sure that it has more pay at the
```

1/8/2025                     ALISHA JOHNSON

```
 1    time.  But, again, being put in that position will
 2    get you to where you can get more pay.
 3    Q    Okay.  Does the Lead Planner position come
 4    with more pay than --
 5    A    I'm not sure, but it will put you in a
 6    position that you can get more pay.
 7    Q    Did Porter tell you that he was told that,
 8    "Hey, I got the SPOC position or the Lead Planner
 9    position," because he was the most senior Work
10    Window Manager?
11    A    Yes, he did.
12    Q    When did he tell you that?
13    A    Back whenever he got it -- whenever -- again,
14    whenever I started working over there between 2016
15    and '17.
16    Q    So he told you that in 2016 or '17?
17    A    Whenever I started working in 2016 and '17, I
18    was told that the most senior Work Window Manager
19    moves up when those positions become open, by
20    James Barnes, by Michael Brown, by Porter
21    Youngblood on different occasions.
22    Q    But it was all when you first started?
23    A    When I first started and throughout my tenure
24    over there.
25    Q    How many times throughout your tenure?
```

1/8/2025                    ALISHA JOHNSON

1    A    More than ten times.

2    Q    So you worked there seven years.

3    A    That's correct.

4    Q    So more than once a year you were told this?

5    A    That's correct.

6    Q    Do you remember specifically when they told

7    you this?

8    A    Just in general conversations.  I don't

9    remember anything specifically, but in general

10   conversations that we would have, that came up

11   often about how it worked.

12   Q    So you said -- sorry, who are the three

13   people?  Porter Youngblood, James...

14   A    Barnes.

15   Q    And Michael Brown?

16   A    That's correct.

17   Q    To your knowledge, did any of those three

18   have decision-making authority at the time they

19   told you this of who was going to become the SPOC

20   manager or the Lead Planner?

21   A    When you say decision-making authority, I

22   don't understand what you mean by that.

23   Q    Were they the ones who were able to say,

24   "We're putting this person -- making this person

25   the SPOC manager.  We're making this person the

1/8/2025                    ALISHA JOHNSON

```
 1    Lead Planner"?
 2    A    I'm not sure if they did or not.
 3    Q    Okay.  And so paragraph 12, we've already
 4    talked about that.  You're saying that's the same
 5    practice as when the Lead Planner position became
 6    available, correct?
 7    A    That's correct.
 8    Q    Okay.  So on paragraph 13, you say that the
 9    spot -- SPOC manager and the Lead Planner
10    positions became available in June of 2022.  How
11    did you become aware of these vacancies?
12    A    It was around that time, and I became aware
13    of those vacancies whenever -- it was a rumor
14    mill, but when I became aware of them is when an
15    email was sent out saying that Michael Brown had
16    received -- he was going to take a Work Center in
17    one area, and James Brown was going to take a Work
18    Center in another area, which means they were
19    leaving the area that we were in, and that Porter
20    Youngblood was going to assume command of the Work
21    Center that I currently worked in.  And Russell
22    Overton would become the SPOC, and William Owensby
23    would become the Lead Planner.
24         I think it was through an email or maybe a
25    meeting, one of our morning meetings, that all of
```

1/8/2025                                    ALISHA JOHNSON

```
 1      this came out.
 2      Q    So it was either an email or at the meeting?
 3      A    That's correct.
 4      Q    Okay.  You're just not sure which.  Do you
 5      know if either of those positions were posted as
 6      open requisitions?
 7      A    I'm sure that the Lead Planner position
 8      wasn't posted or the SPOC position wasn't posted.
 9      Q    So you think they were not posted?
10      A    Right, those two were not posted.  I'm not
11      sure about the other Work Centers where everybody
12      else went.  I'm not sure if they were posted or
13      not.
14      Q    Did you apply for either of those positions?
15      A    There was nothing to apply for at the time of
16      these moves as far as the SPOC and the Lead
17      Planner.
18      Q    Did you speak to anyone about getting the
19      SPOC or the Lead Planner position before Russell
20      Overton and William Owensby were placed in those
21      positions?
22      A    Not before, because I didn't know, but I did
23      speak to someone about it after I found out.
24      Q    So if we go the next page to the Complaint,
25      paragraph 22, it says you spoke to Porter
```

1/8/2025            ALISHA JOHNSON

```
1     Youngblood about Overton and Owensby being
2     promoted to those positions.  Is that the
3     conversation you're talking about speaking to
4     someone afterwards?
5     A    That's correct.
6     Q    All right.  Do you remember when you had that
7     conversation with Porter?
8     A    I don't remember exactly when, but it was
9     sometime after -- after the announcements were
10    made.  I don't know the exact.
11    Q    Was it in July 2022?
12    A    Again, I'm not going to tell you that I know
13    exactly when.  I know that before I spoke to him
14    about it, I -- it took some time to get myself
15    together so that I could approach the situation in
16    a manner that would not come across as being
17    derogatory, but that could come across as -- so it
18    was sometime after that.  I just -- I had to get
19    myself together.
20    Q    How did the -- did you ask to speak to him?
21    A    I did.
22    Q    Okay.  And what did you say to him?
23    A    So, initially, I asked to speak to him, you
24    know, just the two of us.  So I was like --
25    started the conversation off by, "So have I
```

1/8/2025                    ALISHA JOHNSON

```
 1    been -- you know, am I doing something that I need
 2    to do better?  Is there, you know, something that
 3    I'm not doing the way that you think I should be
 4    doing it?"  And he's like, "No, you're -- you
 5    know, you're my top performer.  You -- I mean, you
 6    surpassed every -- you know, for the last year,
 7    you have met and/or surpassed all expectations.
 8    So, no, you know, you're -- you know, you're my
 9    number one, you know, working person."
10        So with that being said, I was like, "Well, I
11    have a question.  Why wasn't I given the
12    opportunity to take the SPOC position?"  He was
13    like, "Why are you asking me that?"  I said,
14    "Because I am the most senior Work Window Manager
15    and, you know, you never -- you never had a
16    discussion with me."
17        And he says, along the lines, "This is my
18    Work Center, and I can run my Work Center how I
19    want to run my Work Center."
20        So I told him then, I said, "Well, if that's
21    your answer, I feel like I wasn't chosen by you
22    because of the way I look."  He said, "What do you
23    mean by that?"  I said, "Because I'm a black
24    woman."
25        And I told him, I said, "From my
```

1/8/2025                          ALISHA JOHNSON

```
 1    understanding, I am not sure that another black
 2    woman has held this position and has been the most
 3    senior Work Window Manager."  I told him before
 4    me, I said, "I saw you move to the SPOC role when
 5    you were the most senior.  I saw Scott Brown and
 6    James Barnes get moved up when they were the most
 7    senior."  I said, "The only difference now, I'm
 8    the most senior and I'm a black woman.  So running
 9    your Work Center, how you see fit, are you biased
10    because I'm a black woman?"
11         I said, "You told me that I am your top
12    performer.  You never discussed with me of
13    anything that I wasn't doing right or things that
14    I could do better."
15         And I told him at that time, I said, "I
16    respect what you're saying, but I would like to
17    speak to the next person in the line of command,"
18    because I did not agree with what he was doing.
19         At that time, Eddie Bodie was the next in
20    line.  He said I --
21    Q    Hang on, we're going to get there.
22         THE COURT REPORTER:  What was his last
23    name?
24         THE WITNESS:  Bodie.
25         THE COURT REPORTER:  Bodie.
```

1/8/2025                          ALISHA JOHNSON

```
1     BY MR. MCWILLIAMS:
2     Q    So what did Porter say -- Porter Youngblood
3     say back to you when he said, "You didn't promote
4     me because I'm a black woman"?
5     A    He said, again, that he runs his Work Center
6     how he wants to run his Work Center.
7     Q    That's all he said?
8     A    To the best of my knowledge.  To the best of
9     my memories.
10    Q    All right.  So then, I guess, these next two
11    paragraphs, Paragraphs 24 and 25, that's talking
12    about what you're about to go into.  You spoke to
13    the next manager up, who was Eddie Bodie?
14    A    That's correct.
15    Q    All right.  Tell me, how did you -- did
16    you -- did Porter facilitate that or you went to
17    Eddie by yourself?
18    A    So this is what happened.  When I talked to
19    Porter, he told me that he would get in touch with
20    Eddie.  Three weeks passed and I had not heard
21    from Eddie and Porter hadn't said anything else to
22    me about it.
23         So I called Eddie on his office phone, as
24    well as I emailed him, as far as I can remember.
25    And I know when I spoke to Eddie, I said, "Eddie,
```

1/8/2025                    ALISHA JOHNSON

```
 1    when are you going to have a few minutes for me?"
 2    He said, "What do you mean?"  I said, "Porter was
 3    supposed to, you know, get with you so that, you
 4    know, we can have a conversation."
 5         At that time, it appeared that Porter had
 6    never spoken to Eddie.  I -- because -- and I say
 7    that because he didn't seem to know what I was
 8    talking about.
 9         So, we hung up and I guess he called Porter.
10    Don't know what took place, but Eddie called me
11    back that same day and we set something up so that
12    I could talk to Eddie.
13    Q    And approximately -- how many -- you said it
14    was about three weeks later that you had this call
15    with Eddie.
16    A    Uh-huh (affirmative response).
17    Q    How many weeks after that call did y'all have
18    your, I guess, face-to-face meeting?
19    A    Promptly.  You know, we had our
20    face-to-face -- after I called him and he
21    called -- I guess he talked with Porter and he
22    called me back.  And I say he talked with Porter
23    because when he called me back, he said, "I spoke
24    with Porter.  So, you know, basically giving me
25    your synopsis for five minutes of what's going
```

1/8/2025                        ALISHA JOHNSON

```
 1    on."
 2            And when I told him that I thought that I
 3    didn't get the position because of my skin color
 4    and because I'm a woman, he immediately set up a
 5    meeting with David Hart who was his supervisor,
 6    Tamara, who is HR, Porter, and myself.
 7    Q    And Tamara, is that Blankenship or...
 8    A    That's correct.  It's Blankenship.
 9    Q    And who else was the person you met with?
10    A    David Hart.
11    Q    And that's Eddie Bodie's supervisor?
12    A    That's correct.
13    Q    And do you remember when the meeting with
14    Tamara Blankenship, David Hart, Eddie Bodie, and
15    Porter Youngblood occurred?
16    A    Sometime after that.  It may be September.
17    I'm not sure exactly when it was, but it was
18    sometime after that.
19    Q    So you think like early fall of 2023 sounds
20    about right?
21    A    I think it would be 2022.
22    Q    2022, excuse me, yes.
23    A    Somewhere.
24    Q    Okay.  All right.  So tell me about the
25    meeting -- well, let's see.  Tell me about the
```

1/8/2025                    ALISHA JOHNSON

1    meeting with Tamara Blankenship, David Hart, Eddie

2    Bodie, and Porter Youngblood.

3    A    So that meeting was in a different area.  I

4    think, I want to say, N Area.

5         THE COURT REPORTER:  I'm sorry, what

6    area?

7         THE WITNESS:  N.

8         THE COURT REPORTER:  N Area?

9         THE WITNESS:  N as in November.

10        THE COURT REPORTER:  Thank you.

11   A    So, in that meeting, everything that I just

12   discussed with you about the conversation I had

13   with Porter was the exact same conversation I had

14   with all of the people I just mentioned.

15   Q    Okay.  So how did they respond to your

16   statement that, "Hey, the only reason I didn't get

17   this is because I'm a black woman"?

18   A    So, of course, they denied that that was the

19   case.  Eddie at the time said that Porter effed up

20   because he didn't follow practice as it happened.

21        He also said that he did not sign off for

22   Porter's actions as far as the way he chose the

23   SPOC and the Lead Planner.  However, it was some

24   changes that they had discussed, but that was just

25   a discussion.

1/8/2025                          ALISHA JOHNSON

```
1          So the meeting kind of perpetuated.  When I
2    say perpetuated, it's just like David Hart was
3    saying different things.  Eddie was saying
4    different things, you know, like -- Porter was
5    saying different things.  I can't remember
6    everything that everybody was saying.
7          And during that meeting, also what came out
8    is the fact that, you know, they was like, why am
9    I feeling the way that I feel?  I was like, "Well,
10   those are white males.  They fit the 'good old
11   boy' system."  And they was like, "What do you
12   mean by the 'good old boy' system?"
13         And I explained that, basically, if you're
14   not in a certain clique, you know, you don't get
15   the same opportunities as the people that are in
16   that clique.
17         So, again, they asked me, "Do I feel like I
18   was discriminated against?"  And I full-heartedly
19   told them that, "Yes, I feel the only reason why I
20   got looked over is because I'm a black woman."
21         And they was like, "I don't believe that was
22   the case.  I don't think that Porter would do
23   that."
24   Q    Who said they don't believe that's the case?
25   A    Eddie Bodie and David Hart.
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                    ALISHA JOHNSON

1    Q    Was Porter there?

2    A    Porter was there.  Yes, he was.

3    Q    When you say "when you're in a certain

4    clique," what do you mean?

5    A    White male, hunting and golfing, things along

6    those lines.

7    Q    So they did things out of work together --

8    outside of work together or...

9    A    I can't account for what they did outside of

10   work together.  I can only go by what I heard them

11   talking about at work, and golfing, hunting,

12   things along those lines.

13   Q    Did they say at work that like, "Hey, I went

14   golfing with Eddie this weekend," or, "I went

15   hunting," or anything like that?

16   A    I'm not sure.

17   Q    Okay.

18   A    And also, during that meeting, they asked me,

19   "What would it take" -- or what did I need for

20   myself.  At that point, what I told them was this,

21   "Just give me a lateral transfer out of the area."

22        Because it -- I felt pressured.  I felt

23   inadequate because my coworkers, people from

24   different departments were coming to me, "Who did

25   you piss off?  What did you do to not get that

1/8/2025                          ALISHA JOHNSON

1     position?"  Even the other Work Window Managers
2     that I worked with, they were like, "Well, why
3     didn't you get the job?"  I mean, it was just
4     something negative every day.
5            So, I just asked for a lateral, in which they
6     told me -- Eddie told me that they would look into
7     it and try to get me moved.  That was all during
8     that meeting that day.
9     Q    Okay.  And so one of the things you said in
10    there was that Eddie had said that they had spoken
11    about making changes to, I guess, how the SPOC and
12    Lead Planner positions were selected.
13    A    That's correct.
14    Q    Did he specify what those changes they were
15    thinking of making were?
16    A    He was like -- yes, he did.
17    Q    And what were those changes?
18    A    He said something about a rotational
19    assignment, where each Work Window Manager would
20    get to work that role for a certain amount of
21    time.
22    Q    And is that what eventually happened?
23    A    No.  Russell Overton stayed in that spot,
24    just Russell.
25    Q    So you weren't offered a chance to rotate

1/8/2025                          ALISHA JOHNSON

```
 1        into the position?
 2        A     No, I was not offered a chance to rotate in
 3        the position.  What happened, they -- they
 4        authorized me -- or not -- they ordered me to
 5        train Owensby as a Work Window Manager.  That's
 6        what happened.
 7        Q     Have you trained other Work Window Managers?
 8        A     I have.
 9        Q     So that was a normal part of your job?
10        A     Yeah, training was a normal part of my job.
11        But training the person who I felt was given a job
12        over me because I was discriminated upon was a
13        hindrance or it was more of an attack on my
14        mentals.
15        Q     So, when you say "they" ordered you, who
16        ordered you to train?
17        A     Porter.  As a result of the outcome of the
18        meeting, now, all of a sudden, Owensby had to
19        qualify as a Work Window Manager in order to
20        fulfill that Lead Planner position that he was
21        given.  So, I was given the task to train him.
22        Q     Are these the only meetings, the ones that
23        we've just discussed --
24        A     No.
25        Q     -- that you had?  So what's -- so right now,
```

1/8/2025                    ALISHA JOHNSON

```
1    we're talking that -- I'm hearing three sort of
2    meetings.  You had the original one with Porter,
3    you had a call with Eddie Bodie, and then he --
4    with that call, he set up this third meeting,
5    which was with Tamara Blankenship, Eddie Bodie,
6    David Hart, and Porter Youngblood, correct?
7    That's what we've discussed so far?
8    A    That's correct.
9    Q    Okay.  So that's three meetings and you had a
10   fourth meeting.  Is that what you're telling me?
11   A    I did.
12   Q    Okay.  So tell me what's the fourth meeting
13   you had?
14   A    The fourth meeting was just with Tamara
15   Blankenship, just the two of us.
16   Q    And, sorry to interrupt, can you tell me when
17   about this occurred?
18   A    That meeting occurred sometime after the
19   meeting with all of them.  I contacted her as my
20   HR representative because when I was given the
21   task to train Owensby, I felt dilapidated, I felt
22   dehydrated, but I needed to be able to know what
23   my rights were.
24        So I had to train him because that was part
25   of my job, but at the same time, I went to her to
```

1/8/2025                    ALISHA JOHNSON

```
1     discuss all of this.
2           And in the discussions, I also told her of
3     different circumstances, being in that
4     environment, things that had took place racially,
5     that I had told Porter about previously.  Such as,
6     some of my coworkers, they didn't know that I was
7     still at work, and it was about 5:30 whenever they
8     had the Insurrection at the State House.
9           And I told her what the racial slurs they
10    were making, and I told her that I called Porter,
11    because Porter wasn't at work, he was gone
12    already, and I told him exactly what was said, and
13    I told him the people that were over there.
14          And I said that I was offended, they were
15    using the N-word.  They were saying how blacks --
16    you know, they were just -- it was difficult to
17    listen to because these were my coworkers.
18    Q    So, you're talking about this was the -- on
19    January 6th?
20    A    This was something that -- this happened
21    on -- sometime January the 6th or afterwards.  But
22    this is whenever I talked to Tamara, I was telling
23    her that other things that happened --
24    Q    Yeah, I understand.  So I want to talk about
25    this thing that you just told -- you said you told
```

1/8/2025                          ALISHA JOHNSON

```
 1     Tamara about.
 2     A    Okay.
 3     Q    Okay?  So, the thing that you told Tamara
 4     about, that happened about 5:30 in the evening --
 5     A    Uh-huh (affirmative response).
 6     Q    -- that happened on January 6th, 2016?
 7     A    It was --
 8     Q    Or '17, whatever it would have been?
 9     A    No, it was -- no, it was -- it wasn't -- it
10     was -- no, it was -- it had to be '21, maybe.  I
11     think it was '21.  It was not '16 or '17.
12     Q    So it's in 2021.  Do you know the month?
13     A    January.  It was in January, whenever the
14     Insurrection was.  It was -- it was like along
15     there, so I -- let me -- let me go back.  So what
16     happened was --
17     Q    Hang on one sec.  So, this is about
18     January 6th, 2021, when they had the -- they
19     stormed the Capitol in Washington, D.C.  Is that
20     what you're talking about?
21     A    Yes.
22     Q    Okay.
23     A    Somewhere around there.
24     Q    All right.  And you said -- who specifically
25     made --
```

1/8/2025                    ALISHA JOHNSON

1    A    Okay.

2    Q    -- said the N-word?

3    A    It was a group of guys.  It was a group of

4    the Planners.  I know -- I can't -- it was Boan?

5    I can't remember all of their names anymore, but I

6    know specifically I called Porter on his cell

7    phone and I told Porter what I had just heard and

8    witnessed, and I told Porter that -- how it

9    affected me.

10        I said, "These are my coworkers.  I never

11   thought that, you know, I would have to, you know,

12   run into something like this in my place of work."

13        So, from my understanding, Porter discussed

14   this.  I'm not sure what was said, but I think I

15   was told something along the lines that everybody

16   was told not to discuss personal matters of

17   anybody.  You know, nobody should be using any

18   type of racial talk.

19        That's on one occasion.  And I told her --

20   Q    Hang on one sec on that.  So, someone, you

21   don't know who --

22   A    I can't remember exactly who it was at this

23   time, but I --

24   Q    Okay.

25   A    -- knew then when I told Porter.

1/8/2025                    ALISHA JOHNSON

1    Q    And did they say anything else?

2    A    Yeah, they was -- I mean...

3    Q    What specifically did they say?

4    A    Okay.  So, with the Insurrection -- I went to

5    the bathroom.  It was -- I can't recall the exact

6    words, but the racial undertone.  And I did hear

7    the N-word, specifically.  That's what made me

8    stop.  It was just a lot of things, the racial

9    undertone.  It was absurd.

10   Q    And so Porter spoke -- when you said Porter

11   discussed this, you mean that he went and talked

12   to the people who were there and told them, "This

13   is" -- it's your understanding that he told

14   them --

15   A    It was unacceptable.

16   Q    -- it was unacceptable.  "You cannot behave

17   this way in the workplace"?

18   A    That's -- that's to my understanding.

19   Q    Did they ever behave like that again, those

20   specific individuals?

21   A    Yes.

22   Q    Well, how do you know if you don't know who

23   the specific individuals were?

24   A    Because I'm telling you, I don't --

25        MR. BABB:  Object to the form.  You can

1/8/2025                     ALISHA JOHNSON

```
 1    answer.
 2    A    Okay.  So, it was the Planners.  I just
 3    cannot remember all of their names at this time.
 4    Q    Do you remember any one of their names?
 5    A    I know Boan.
 6    Q    Boan?  Does he have a last name?
 7    A    That is his last name.
 8    Q    What's his first name?
 9    A    I can't -- at this time, I cannot remember
10    all of the names.  Let me take a minute and take a
11    breath.  So, Terry Stoudemire was in one of the
12    occasions.
13    Q    Was he in this occasion we're specifically
14    talking about right now, the January 6, 2021
15    occasion?
16    A    I cannot -- I don't know the exact names of
17    everyone that was involved at this time, but I
18    could possibly remember.
19         And your question, was Terry Stoudemire at
20    this specific one?  I'm not sure if he was at this
21    specific one or not.
22    Q    Okay.  So, for this specific one, the one
23    person you can remember is someone with the last
24    name Boan.
25    A    That's correct.
```

1/8/2025                    ALISHA JOHNSON

1   Q    Okay.  And did Boan ever again make a racial
2   comment to you?
3   A    And, again, the comment was not directly to
4   me.  Again, I was going to the bathroom.  It was
5   like 5:30, after hours.
6   Q    Okay.  I understand that you over -- did Boan
7   ever make another racial comment that you
8   overheard again after this?
9   A    Yes.
10  Q    When did Boan make another racial comment?
11  A    It's when it was some riots going on, and it
12  was the same -- it was a group of Planners, again,
13  on that other -- on the other side.
14       And they were having loud discussions about
15  how blacks do things, how blacks do this, they --
16  blacks are hurting -- you know, blacks always act
17  the victim, or blacks -- and they always hurting
18  each other, blacks.  And I told Porter about --
19  Q    Hang on one sec.  So, for this other thing of
20  the Planners, Boan was the only person you can
21  specifically remember being there?
22  A    It was -- it was more than three of them,
23  less than six.  And the reason why I can remember
24  Boan so much is because I worked with Boan a lot
25  as far as he was the PM coordinator.  So, I had to

1/8/2025     **ALISHA JOHNSON**

1 work with him a lot.  So, that's how I remember

2 Boan, specifically.

3   Q But you don't remember anyone else

4 specifically, this -- talking about the second

5 incident here, beyond Boan being there?

6   A I know -- no, Terry Stoudemire was a part of

7 that conversation.

8   Q Okay.  All right.  So Terry Stoudemire.

9 Anyone else?

10   A I know that two of the guys, they left, and I

11 cannot remember their names.

12   Q Okay.

13   A They weren't there long.

14   Q And the specific comments you can remember

15 them saying is, "Blacks always" -- I think you

16 said --

17   A "Blacks always act the victim.  Blacks" -- it

18 was just centered around negativity and they --

19 the way that they said "Blacks," it didn't sit

20 right with me.

21   Q So, with the specific comments you can

22 remember them saying is, "Blacks always act the

23 victims," and I think you said, "Blacks always

24 hurt one another"?

25   A "Hurt one -- that Blacks always hurt one

1/8/2025                    ALISHA JOHNSON

```
1    another."  And I -- it was --
2    Q    Any other statements that you can
3    specifically remember?
4    A    Not that I can specifically remember.
5    Q    Okay.  And was Boan -- and you said that was
6    after the January 6th, 2021...
7    A    I said -- what I said was, whenever the
8    riots -- so riots -- some type of riots broke out,
9    and they were looking at the riots on the
10   computer.  So, that's what I -- that's what I
11   know.
12   Q    Well, didn't the -- I mean, there were a lot
13   of riots while Donald Trump was still president
14   and January 6th, 2021 happened when he was at the
15   end of his presidency.  What -- which riots are
16   you referring to?
17   A    I'm not sure which riots, but it -- it was
18   two for instances that I specifically told Porter
19   what was going on.
20   Q    Okay.  And so the second incident with the
21   riots and you talked to Porter about it.  Do you
22   know if he spoke to people about what they were
23   doing?
24   A    I don't know if he spoke to them or not.
25   Because by then, I didn't follow up with Porter
```

1/8/2025                    ALISHA JOHNSON

```
 1   again about it.  I just decided to just stay in my
 2   cubicle and not go around those people anymore.
 3   Q    Okay.  And did you tell that incident to
 4   Tamara Blankenship during your conversation with
 5   her, as well?
 6   A    I did.
 7   Q    Okay.  And are there any other incidents that
 8   you told Tamara about?
 9   A    During that time, I talked about a lot, but I
10   told her about how I felt.  You know, I had told
11   her I felt like I was being discriminated against,
12   regardless of what Porter or Eddie or David were
13   saying.
14        I told her that having to train Owensby was
15   just a hit in the gut.  I told her how I had to
16   sit in my car and before going into work for 30 to
17   45 minutes and listen to gospel music to get my
18   mind right.
19        I told her about the time when I went to
20   Porter and I told him that I would need time off
21   during some days to take my daughter to see her
22   psychiatrist and therapist.
23        And I shared with him that my daughter was
24   sexually assaulted in her dorm room at FAMU
25   University by three males.  This was her sophomore
```

1/8/2025                    ALISHA JOHNSON

```
 1    year.
 2          I shared with Porter that my daughter went
 3    into a brief psychotic break because she had
 4    suppressed the rape and ran into one of the guys
 5    on campus and started running and didn't stop.
 6          I got the call on a Sunday night that -- not
 7    about the rape.  I got the call that my daughter
 8    was acting different and that I needed to, you
 9    know, get there.
10          Monday -- it was late Sunday night.  I still
11    went to work Monday morning because it was my
12    execution week, and I did my duties and I gave a
13    good turnover to someone before I flew down to
14    Tallahassee.
15          And when I got there, again, I don't know
16    about the rape.  All I know is that my daughter
17    has had something to happen.  Long story short, I
18    brought her back home and --
19    Q    So, Ms. Johnson, I'm -- I hate to interrupt
20    you and I'm terribly sorry that this happened to
21    your daughter and that she -- that you had to go
22    through that and it's a tragic event, but I do
23    want to focus us on kind of the -- this lawsuit,
24    because that's what we're talking about.
25    A    Okay.  And --
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    So I understand -- let me -- please let me
2    finish.  I'm terribly sorry that happened to you
3    and happened your daughter, but -- so you -- she
4    had a psychotic breakdown because of this terrible
5    event that happened and you asked Porter for time
6    off and you were telling Tamara about that.  How
7    does this relate back to what you're saying?
8    A    It relates back because what Porter tried to
9    do is pull me out of -- I did not like need weeks
10   off.  I just needed a couple hours here and there.
11         So what Porter tried to do is, pull me out of
12   the rotation, meaning take my position away from
13   me.  And what he told me at the time is,
14   basically -- and he said it just like this, I
15   quote, "I'll take you out of the rotation and you
16   can be the other guy's bitch."
17         "What do you mean by that?"  "You do" -- I'm
18   asking, "What do you mean by I can be their
19   bitch?"  He says that, "You can do things that
20   maybe they don't have time to do or maybe that
21   they don't want to do."
22         At that time, I reached outside of my
23   organization and I went to my mentor, Annatia
24   Wittenberg, and told -- gave her this information.
25   This is what I'm -- I told Tamara all of this to
```

1/8/2025                          ALISHA JOHNSON

```
 1      try to establish that I had reasonable cause to
 2      feel the way that I was feeling.
 3      Q    And real quick, when did -- when did this
 4      happen with your daughter and Porter made that
 5      comment to you?
 6      A    2019, 2020.
 7      Q    Are you saying he made that comment to you
 8      because of your race?
 9      A    And gender.
10      Q    What made you believe he said that because of
11      your race and gender?
12      A    The way he said it, a bitch, gender.
13      Q    What did that have to do with your race?
14      A    And I was the only black female in there.
15      Q    And Annatia Wittenberg?
16      A    She was my mentor.  Annatia [ANAYSHA].
17      Q    Annatia?  And is she an SRNS employee?
18      A    She was at the time.  I'm not sure.  I think
19      she retired and maybe she's back as a contractor.
20      Q    What advice did she give you?
21      A    She actually told me that she would reach out
22      to Porter, tell him that she didn't think, you
23      know, that what I needed warranted me to be taken
24      out of the rotation and some more, you know, just
25      things along that line.  And needless to say, I
```

1/8/2025                    ALISHA JOHNSON

```
 1    was not taken out of the rotation and I still
 2    performed my job.
 3    Q    So you weren't taken out of the rotation?
 4    A    No, I wasn't.
 5    Q    Okay.  So this call with Tamara, anything
 6    else that you went over with her about?
 7    A    I told her that I was seeing EAP, which was
 8    Employment Assistance Program, and talking to them
 9    about just things.
10    Q    What -- what's the EAP?
11    A    Employee Assistance Program, where the things
12    that I was going through with my daughter, they
13    were able to help reach out, you know, to get me
14    some help, too.
15    Q    Is that like a mental health thing or...
16    A    It's just not mental.  It's for -- Employee
17    Assistance Program, whatever needs.  Like, just if
18    you're an alcoholic, if you're a drug addict --
19    Q    It's an SRNS program?
20    A    It's an SRNS program.
21    Q    Okay.  All right.  So they try to help people
22    that are struggling?
23    A    That's correct.
24    Q    Okay.  And did EAP help you?
25    A    They did.
```

1/8/2025                          ALISHA JOHNSON

```
 1    Q    Okay.  All right.  So how did Tamara respond
 2    to all this?
 3    A    She just told me that, you know, her door is
 4    open, that if I feel like I'm not being treated
 5    fairly, it was her job to help me.
 6         And I told her, I said, "At this point, all I
 7    want is just to be transferred out of H-area and
 8    just do the rest of my time until I can retire."
 9    I -- I'm just -- I was tired.  I was exhausted.
10    Q    Okay.  Did any other -- did you have any
11    other meetings with people about not getting the
12    SPOC or the Lead Planner position after you met
13    with Tamara?
14    A    I didn't have any formal meetings with
15    anyone.  But I did speak with the head of EAP at
16    the time kind of off the record about it.
17    Q    Who's the head of the EFP [sic]?
18    A    I forget her name, but I know she was on my
19    Disciplinary Review Board also.
20    Q    Natalie Johnson?
21    A    Not Natalie Johnson.
22    Q    Adryan Henderson?
23    A    No, not Adryan.
24    Q    Okay.  What'd you say to the head of EAP
25    about not getting the SPOC or the Lead Planner
```

1/8/2025                    ALISHA JOHNSON

```
1    position?
2    A    I gave her the whole rundown of everything
3    that I've talked about with you guys.  We were
4    actually offsite at an AMP, that's A-M-P, event.
5    And we were sitting -- happened to be sitting at
6    the same table.  And I shared my story with her
7    and how I felt.
8         Basically, she just kind of sympathized and
9    kind of like, "Well, you know, sometimes it's
10   better to just, you know, try to just deal with
11   things."  Just basically kind of like, you know --
12   I'm not going to say she blew it off, but it's
13   like she could understand but, you know, sometimes
14   it's just the way things are.
15   Q    So in your Complaint, you don't mention
16   anything about this meeting with the EAP manager.
17   Why is that?
18   A    Again, it was not a meeting.  I talked with
19   her at an offsite event, an AMP event.  We were
20   sitting at the same table.
21   Q    All right.  Any other formal meetings with
22   management at SRNS that you spoke to about the
23   SPOC or the Lead Planner position?
24   A    I spoke with Velice.  She was an HR
25   consultant that was brought into H-area.  What's
```

1/8/2025                              ALISHA JOHNSON

```
 1    her last name?
 2    Q    When did you speak with Velice?
 3    A    Okay.  So some -- she asked to speak to me.
 4    Evidently, one of my coworkers had gone to her and
 5    had expressed concerns about the situation that I
 6    was in, and she wanted to -- she wanted me to tell
 7    her about it.  And that's all I did is told her
 8    the same thing that I'm telling you guys.
 9    Q    What did Velice say?
10    A    I can't remember exactly what she was saying,
11    but I know that maybe she alluded to maybe having
12    conversations with Tamara.  That's about it.
13    Q    And do you remember the time frame of this
14    conversation?
15    A    September, October-ish.
16    Q    Okay.  That'd be 2022?
17    A    That's correct.
18    Q    Any other meetings?
19    A    No more meetings that I'm -- that I can
20    remember at this time.
21    Q    All right.  And besides the meetings with
22    Tamara and the off-site meeting kind of
23    informal -- or off-site conversation with the head
24    of EAP -- or, excuse me, let me rephrase that.
25         Besides speaking with Velice, last name
```

1/8/2025                    ALISHA JOHNSON

```
1    unknown.
2    A    Cummings, maybe.  I don't -- I don't know her
3    last name.
4    Q    Okay.  So besides speaking with Velice and --
5    never mind, that's a bad question.  Don't worry
6    about it.  I want to go back to the -- let me
7    think.
8         MR. MCWILLIAMS:  Actually, it's 12:30.
9    You want to break for lunch and we can...
10        MR. BABB:  I imagine you have a good
11   ways to go?
12        MR. MCWILLIAMS:  I do.
13        MR. BABB:  Okay.  Then, yeah, whatever
14   is a good breaking point for you.
15     (Lunch Break from 12:28 p.m. to 1:32 p.m.)
16   BY MR. MCWILLIAMS:
17   Q    So, ms. Johnson, while we were on our break,
18   did you discuss your testimony with anyone here
19   today?
20   A    No, I didn't.
21   Q    Okay.  So, before we left, you had talked
22   about -- and I believe this is -- if you're
23   looking at Exhibit 7, which is your Complaint,
24   paragraph 34, you talk about people using racial
25   slurs in your presence; is that correct?
```

1/8/2025                          ALISHA JOHNSON

```
1      A     That's correct.
2      Q     And we've talked about two of those
3   incidents.  The first would be, I think you said
4   happened on January 6, 2021, where a group of
5   individuals were using racially derogatory
6   language.  The only language you could identify
7   was the N-word; is that correct?
8      A     I didn't say the only language --
9      Q     Okay.  What else --
10     A     -- that I could identify.
11     Q     -- did they say in the January 6th one?
12     A     The racial -- the undertone or the tone and
13   the words that they were using.  Let me see.
14           Okay.  They were cheering on the people that
15   were trying to take over the State building.  I
16   cannot tell you verbatim at this time exactly what
17   they were saying.
18     Q     Can you remember any of the specific
19   statements that they made?
20     A     I cannot remember the specific statements --
21     Q     Okay.
22     A     -- at this time.
23     Q     But you do remember they said -- someone said
24   the N-word?
25     A     That's correct.
```

1/8/2025                                    ALISHA JOHNSON

1     Q     Was it said repeatedly?

2     A     It wasn't said repeatedly.  But after it was

3     said, just conversation that followed kind of --

4     Q     So was this --

5     A     -- related back to it.

6     Q     Was this said once?

7     A     Again, I cannot remember the exact verbiage

8     that was used, so --

9     Q     Okay.

10    A     -- it could have been said more than once.

11    Q     But you're not sure?

12    A     I'm not sure.

13    Q     Okay.  And it wasn't said directed at you?

14    A     No, it wasn't directed at me.

15    Q     And the only person that you can identify

16    that was part of this group of people was someone

17    with the last name Boan; is that correct?

18    A     That's correct.

19    Q     Okay.  And were there any other witnesses?

20    Anyone else hear this conversation?

21    A     Just the people that were having it, as far

22    as I know.

23    Q     Okay.  And then you --

24    A     I called Porter immediately.

25    Q     Uh-huh (affirmative response).  So, yeah.  So

1/8/2025                          ALISHA JOHNSON

1     then the next incident of racial slurs is the one

2     you said when some riots were happening.

3     A    That's correct.

4     Q    And -- all right.  And they said something,

5     "Blacks are always hurting one another.  Blacks

6     are always acting the victim."  Those are the two

7     specific statements you can remember?

8     A    Those are specific statements.

9     Q    Any other specific statements you can

10    remember?

11    A    They were -- not -- I cannot quote verbatim,

12    but it was along the lines of, I think, "Black

13    Lives Matter.  White Lives Matter.  Black lives

14    don't matter to Blacks."  That was the undertone.

15    Q    Okay.  And you said Boan was present with

16    that group, as well, and Terry Stoudemire?

17    A    Terry Stoudemire.

18    Q    Stoudemire?  Anyone else?

19    A    It's two guys that left.  I don't know their

20    names.

21    Q    Okay.  Did anyone else -- were -- so, first

22    of all, were these comments directed at you or did

23    you just overhear them?

24    A    I overheard them.

25    Q    Okay.  And any other witnesses to this?

1/8/2025                    ALISHA JOHNSON

1    A     Not that I know of.

2    Q     Did you report this to Porter Youngblood, as

3    well?

4    A     I did.

5    Q     Okay.  But you didn't follow up to see what

6    he did?

7    A     I just did not follow up.

8    Q     Okay.  So you don't know what he did?

9    A     I don't know.  And I just decided just to

10   stay away from all of them, only interacted on a

11   need-to-interact basis.

12   Q     Yeah.  And so I know you had an incident with

13   Terry -- another incident with Terry Stoudemire,

14   and we'll talk about that in a bit.  But besides

15   that incident, were there any other incidents

16   where you heard discriminatory comments or racial

17   slurs, excuse me?

18   A     It wasn't a racial slur, but it was with

19   another coworker.  We called him "Captain."

20   Captain -- his name was John...

21         But what happened was, the scheduler, who was

22   a white female, had messed up my schedule, so to

23   speak.  Meaning that I guess it was two-sided and

24   she only made one side -- she only made the

25   schedule changes for one side.

1/8/2025                    ALISHA JOHNSON

1    So I was upset about it and I called her.

2    The conversation was between she and I.  And I

3    went over to -- okay.  His name is John Patrick.

4    I went over to speak to John about it.  And when I

5    walked in his cubicle, unexpectedly, I saw him

6    having a chat with the scheduler.

7         And at that time, just, you know, walking in

8    and just glancing, not trying to be nosy, I saw

9    where he had texted, or the transaction back and

10   forth between him and the scheduler.

11        He said I have -- "Alisha is the perfect

12   definition of a mad black woman," or angry black

13   woman, something along those lines.

14        And I asked him -- I let him know that I saw

15   that directly to John because he was my

16   counterpart.  And, you know, I told him that I was

17   very disappointed for him to have that type of

18   conversation about me, and I didn't realize that

19   he was racist.

20   Q    So you called him racist?

21   A    No, I said I didn't realize that -- I did not

22   call him racist.  I said I did not realize that

23   basically he would take a racial undertone when it

24   came to me.

25   Q    How did he respond?

1/8/2025                          ALISHA JOHNSON

1   A    He didn't say anything.

2   Q    What -- when did this happen?

3   A    Sometime maybe in 2022.  It was early on

4   2022.

5   Q    Okay.  And who's the scheduler?  What's her

6   name, the white female?

7   A    I forgot her name.

8   Q    She's still there?  Or was she when you left?

9   A    She was there when I left.

10  Q    Excuse me.  John Patrick, is he a white male?

11  A    Yes.

12  Q    Okay.  Any other racial slurs or incidents?

13  And I'm not talking about Terry Stoudemire.  We'll

14  talk about that in a little bit.

15  A    No.  And I didn't report that.  I just talked

16  to him about it.

17  Q    Okay.  Did management give you any reasons --

18  you know, you talked about in all these meetings

19  that you had about the SPOC and Lead Planner

20  position, what you wanted was a transfer to

21  another area, correct?

22  A    That's correct.

23  Q    Did they give you reasons why you couldn't be

24  transferred?

25  A    No, other -- they were going to transfer me,

1/8/2025                          ALISHA JOHNSON

1   but the reasons they gave was, basically, you had
2   to be a lateral and, you know, they were working
3   on it.  That's pretty much -- and there's email
4   footage out there, because I would email Eddie
5   from time to time to ask him what was the status
6   of my transfer.
7   Q    Okay.  Are you claiming they didn't transfer
8   you because of your race and gender?
9   A    I'm not -- I'm not claiming they didn't
10  transfer me because of my race and gender.
11  Q    Okay.  All right.  So, still looking at
12  Exhibit 7, your Complaint, it says in
13  paragraph 45, you appeared before a review board
14  for the use -- regarding the use of your work
15  computer; is that correct?
16  A    That's correct.
17  Q    That's the Disciplinary Panel?
18  A    Yes.
19  Q    Okay.  And then in paragraph 46, it says,
20  "During the hearing, Plaintiff acknowledged that
21  she had violated a policy per the review board
22  hearing, but did not know that using her
23  government-issued computer to send that paperwork
24  was a violation."  Is that factually correct?  Did
25  you admit that you had violated the policy?

1/8/2025                          ALISHA JOHNSON

```
 1    A     What I admitted to was that I sent the email,
 2    I sent the document.
 3          At the time I sent the document, I did not
 4    think that what I was doing was in violation of
 5    the policy, because I did not own the business at
 6    that time.  I was simply just sending a document
 7    to clear up -- to make -- to give them
 8    clarification on how to move forward.
 9          And what I admitted to during the review
10    board was that, if I violated the rule, if that
11    was -- if they're saying that was in violation of
12    the rule, then I agree to it that I violated.
13    Because if they're saying that I violated, then
14    I'm agreeing with what they're saying.  Although,
15    I didn't feel like I violated, because I was
16    begging them to basically keep my job.
17          So what I told them, if I violated the
18    policy, I -- if they think I violated the
19    policy -- if they're saying -- what did I say?  If
20    they're saying I violated the policy, I agree, and
21    I would never do anything like that again.
22    Q     Okay.
23    A     That's what I said during the review board.
24    Q     Okay.  But you sent the email that they're
25    talking about?
```

1/8/2025                    ALISHA JOHNSON

```
1    A     That's correct.
2    Q     Okay.  So paragraph 54, this is your Race
3    Discrimination claim.  At the end it says that the
4    Defendant took an adverse action against you.
5    It's basically saying they did something wrong to
6    you.  What are you claiming here that SRNS did
7    wrong?
8    A     (Reading.)
9    Q     Is this your termination?
10    MR. BABB:  Object to the form of the
11    question.
12    A     Okay.  I don't understand what I'm supposed
13    to be answering.
14    Q     So let me see if I can rephrase it for you,
15    then.  You're claiming that SRNS did something
16    wrong, they discriminated you because of your
17    race.  I'm asking, what is it they did wrong
18    because of your race?
19    A     Okay.  That goes back to the situation
20    between Terry Stoudemire and me.
21    Q     So the -- sorry.  Is that where you received
22    a Corrective Contact, so that's what you're
23    claiming about on this?
24    A     It was an Informative Contact.
25    Q     Sorry, Informative Contact.  So that's what
```

1/8/2025                    ALISHA JOHNSON

```
 1    they did wrong here?
 2    A     That's correct.
 3    Q     Okay.  So paragraph 62 is the next page,
 4    page seven.  Same thing, they say -- you talk
 5    about -- this is your Sex Discrimination claim.
 6    You're saying they took an adverse action against
 7    you.  So what -- what did SRNS do wrong that
 8    they -- something they did to you because of your
 9    sex?
10    A     They told --
11          MR. BABB:  Object to the form.  You can
12    answer.
13    A     Okay.  I feel -- I feel like they totally
14    disregarded the matter from my standpoint with
15    Stoudemire because I was a black woman.
16    Q     Okay.  So the Terry Stoudemire's incident
17    again.
18    A     Right.  I told them specifically, had that
19    been a white female that he approached in that
20    manner, they would have took matters more
21    differently.
22    Q     Okay.  All right.  So you applied for several
23    open positions during your tenure of employment
24    with SRNS, correct?
25    A     Yes, I did.
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    Okay.  And you would figured out about when
2    they were open because you could look on Brass
3    Ring, correct?
4    A    Yes.
5         (DEFENDANT'S EXHIBIT 8 WAS MARKED FOR
6    IDENTIFICATION PURPOSES (6 pages) - 01AG000032-37)
7    Q    Okay.  All right.  Can you turn to Exhibit 8
8    in your notebook, what's been marked as
9    Defendant's Exhibit 8?
10   A    (Witness complies.)
11   Q    Okay.  So I'm going to represent to you that
12   this is the job posting for the job that you
13   allege you were passed over for that Russell
14   Overton applied for and received.  We produced
15   this document to your attorney during discovery.
16        At the top, this says that it's for
17   requisition number 6785BR, Work -- a Work Center
18   Manager; is that correct?
19   A    That's what that says.
20   Q    Okay.  And if you look at the second page of
21   this requisition, you've got the Functional Org
22   Code and Name.  It says it's in H Area Planning,
23   correct?
24   A    That's correct.
25   Q    And H Area Planning was the -- H Area
```

1/8/2025                          ALISHA JOHNSON

```
1    Planning was the area you were in, correct?
2    A    That's correct.
3    Q    Okay.  And towards the top of the page -- the
4    same page you're on, sorry.
5    A    Oh, okay.
6    Q    So this is about four lines down.  It says
7    number of positions, three.  Do you see that?
8    A    I do.
9    Q    But you didn't apply for this position, did
10   you?
11   A    So, here's the thing.  Before this position
12   was posted, Porter had already handpicked Russell
13   Overton to do this job.  He was already in the
14   SPOC position.
15   Q    How do you know he had already picked Russell
16   Overton for the job?
17   A    Because this posting didn't come out until at
18   least six to nine weeks after he had put Russell
19   in that position, and after he had placed Owensby
20   into the position of Lead Planner.
21   Q    So you're saying that Russell had to apply
22   for a job he already had, and they went through a
23   whole application process for a position he
24   already had obtained?
25   A    That's correct.
```

1/8/2025                    ALISHA JOHNSON

```
 1    Q    Okay.  So, if you turn to the third page.
 2    Can you look about four or five lines down?  It
 3    says the date needed was July 1st, 2022, right?
 4    A    That's correct.
 5    Q    That's about when Russell Overton started
 6    working in H Area?
 7    A     No, he had been working in H Area before July
 8    of 2022.
 9    Q    So is that about when he became the -- I
10    can't remember which one he was -- the SPOC or the
11    Lead Planner?
12    A     He became that sometime around June before --
13    Q    So you're saying -- so this -- this all was
14    just a sham application process that they went
15    through?
16    A    That's not what I'm saying.  What I'm saying
17    is this:  Whenever that position became open, when
18    Porter was made Work Center Manager, Scott Brown
19    left and went to one area, James Barnes left and
20    went to another area.
21         Porter handpicked Russell Overton and William
22    Owensby for the Lead Planner position and for the
23    SPOC position.
24    Q    So --
25    A    I wasn't finished.  So, just to let you know,
```

1/8/2025                          ALISHA JOHNSON

```
1    I had a conversation with Owensby.  Owensby -- the
2    conversation went just like this:  He said he was
3    approached by Scott Brown saying that he was
4    leaving, would he like to do the job that he was
5    doing.  He said, "You know, that would be cool."
6         He said later that same day, he was
7    approached by Porter, and Porter asked if he would
8    like to do the Lead Planner position.  Owensby
9    told Porter, "I would like to do that job, but I
10   know how things work.  I don't want to do -- I
11   don't want to be moved or have to do anything else
12   other than the Lead Planner job." Porter told
13   Owensby, "You won't have to do anything else and
14   you will stay in that position."
15        Owensby moved into that Lead Planner position
16   at that time.  It was weeks later when Porter came
17   to Owensby and said, "Hey, these positions are
18   open.  I need you to go apply for the position."
19        And Owensby told Porter at that time, "Oh,
20   that's not what I signed up for.  I didn't sign up
21   for one of those positions.  I signed up to be
22   the -- you know, the Lead Planner."
23        Porter at that time, per Owensby, told
24   Owensby, "You will not have to do another job.
25   You will only do the Lead Planning job."
```

1/8/2025                    ALISHA JOHNSON

1     So Owensby put in for the position.  Whenever
2     he interviewed for the position, he ended up being
3     the top candidate.  And because it was multiple
4     positions -- another area actually wanted him.
5     Porter had to go to the other person in the other
6     area and plead to keep Owensby in H Area.
7          So what I am saying is this:  Owensby and
8     Overton were handpicked for these positions by
9     Porter before the positions were ever posted.
10         When the positions were posted, to answer
11    your question, I did not apply for them because he
12    had already put these people in a position.  And
13    by that time, Porter and I were already talking
14    about how I felt that things were -- that things
15    were going on.
16    Q    So when did you have this conversation with
17    Owensby?
18    A    I had that conversation with Owensby more
19    than once, because I was trying to figure out
20    exactly what was going on, how he got the
21    position.
22    Q    So, all the stuff you just talked about,
23    Owensby is the one who told you that?
24    A    That's correct.
25    Q    Okay.  Did you have this conversation before

1/8/2025                          ALISHA JOHNSON

1    he applied for this position?

2    A    I didn't have the conversation -- I don't

3    know if I had it before he applied for it, because

4    I don't know when he actually applied for it.

5    Q    Okay.  Did you have it before the decision

6    was made on this position where they went through

7    the hiring process?

8        MR. BABB:  Object to the form of the

9    question, but you can answer.

10   A    I -- again, I can't answer that because I

11   wasn't privy to exactly how all of that worked.

12   Q    So, do you see the panel members kind of

13   three-fourths of the way down on that page?

14   A    I do.

15   Q    Can you tell me who they are?

16   A    Robert Williamson, Eddie Bodie, Danny

17   Auvenshire.

18   Q    In your experience in SRNS, do the

19   three-member panel, are they the ones who select

20   who gets a position?

21   A    I don't know, but I would believe so.

22   Q    Is --

23   A    I'm not --

24   Q    -- Porter Youngblood one of the panel

25   members?

1/8/2025                          ALISHA JOHNSON

```
 1    A    He -- no.
 2    Q    So he didn't make a decision on who to hire
 3    for this?
 4         MR. BABB:  Object to the form of the
 5    question.
 6    A    That's not what I'm saying.  I don't know
 7    if -- he's not one of the panel members, but,
 8    again, he handpicked Russell and Owensby for those
 9    jobs.
10         (DEFENDANT'S EXHIBIT 9 WAS MARKED FOR
11    IDENTIFICATION PURPOSES (6 pages) - 01AG000038-43)
12    Q    Okay.  So can you turn to Exhibit 9, please?
13    A    Yes.
14    Q    So I'm going to tell you, this is documents
15    kept in the ordinary course of business by SRNS.
16    We produced it in discovery to your attorney.  And
17    I'll represent to you, this is the job posting --
18    A    Uh-huh (affirmative response).
19    Q    -- for the job that you allege you were
20    passed over for that William Owensby applied for
21    and received.
22         And at the top, it says requisition number
23    6786BR, Work Window Coordinator; is that correct?
24    A    That's correct.
25    Q    All right.  So this is the posting for the
```

1/8/2025                    ALISHA JOHNSON

```
 1      same job you already held?
 2      A    Yes, it is.
 3      Q    Okay.  Did you apply for this job?
 4      A    I didn't apply for this particular job.
 5      Q    Okay.  And if you look at the third page of
 6      this exhibit, who are the panel members?
 7      A    Robert Williamson, Jim Peters, Doug Gregory,
 8      and Danny Auvenshire.
 9      Q    So Porter Youngblood is not one of the
10      members of the panel?
11      A    He's not on the panel.  But, again, he had
12      already handpicked both of these guys, and they
13      were already in the position.
14      Q    So he was able to override the panel and get
15      who he wanted?
16      A    Again, before this convened, he had already
17      put both gentlemen in those positions.
18      Q    I understand that you're saying someone
19      worked there potentially temporarily or not.  I
20      mean, I don't -- I don't know.  But I'm saying how
21      did -- if these people are the panel members --
22      A    Uh-huh (affirmative response).
23      Q    -- what is your evidence that Porter
24      Youngblood was just able to override them and
25      place who he wanted in the position?
```

1/8/2025                          ALISHA JOHNSON

```
 1    A    My --

 2         MR. BABB:  Hold on.  Object to the form

 3    of the question.  Now you can answer.

 4    A    Okay.  So my evidence is this:  From the time

 5    before I ever came over to H Area Work Center, the

 6    practice was for the senior Work Window Manager to

 7    be placed in any open Lead Planner position and/or

 8    SPOC position.

 9         Placing the most senior Work Window Manager

10    in these positions would give them the ability to

11    perform the job, to get on-the-job training, so

12    that when these positions became open, they would

13    get the positions.  They would have already been

14    in the spotlight, and they would get those

15    positions.

16    Q    You mean get a position above Work Window

17    Manager?

18    A    That's correct.

19    Q    Okay.  Not the SPOC or Lead Planner position.

20    That's --

21    A    The SPOC and Lead Planner position were

22    stepping stones that were not posted, but it was

23    the common practice.

24         (DEFENDANT'S EXHIBIT 11 WAS MARKED FOR

25    IDENTIFICATION PURPOSES (12 pages) - Plaintiff's
```

1/8/2025                    ALISHA JOHNSON

```
 1      Responses to Defendant's First Set of Discovery
 2      Requests)
 3      Q    Okay.  So can you turn to Exhibit 11, what's
 4      been marked Exhibit 11?
 5      A    (Witness complies.)
 6      Q    And this is your initial interrogatory
 7      responses to responses that -- or to
 8      interrogatories that we sent to your attorney; is
 9      that correct?
10      A    That's correct.
11      Q    Have you seen these before?
12      A    I have.
13      Q    Did you review them before they were sent to
14      us?
15      A    What do you mean by...
16      Q    So your attorney sent us these documents
17      during discovery.  Did you review them --
18      A    I looked --
19      Q    -- through your attorney and say, "Yes, these
20      are correct"?
21      A    I looked them over, and to the best of my
22      knowledge at the time.
23      Q    Okay.  So the first one asks you to name
24      people who have personal knowledge of the facts of
25      the case, and I just want to kind of figure out
```

1/8/2025                          ALISHA JOHNSON

1  who some of these people are.  Calvin Litt.  Who

2  is Calvin Litt?

3  A    He was a fellow Work Window Coordinator.

4  Q    In H Area?

5  A    That's correct.  He's actually the one that

6  went to HR on my behalf, and I didn't know about

7  it.

8  Q    Okay.  What does he know about the complaint

9  or the claims that you've asserted against SRNS?

10  What does he know?

11  A    He knows that I was treated unfairly when it

12  came to Porter giving the positions of Lead

13  Planner and SPOC to Russell and William Owensby.

14  He knows how the practice worked as far as the

15  most senior Work Window Manager moving up.

16  Q    Okay.  Michael Garrett, who's that?

17  A    Work Window Manager.

18  Q    In H Area?

19  A    That's correct.

20  Q    What does he know about the -- your claims

21  against SRNS?

22  A    The same thing as Calvin, but he also was

23  there, the situation with Terry Stoudemire.

24  Q    He witnessed it?

25  A    That's correct.

1/8/2025                          ALISHA JOHNSON

```
 1      Q    Okay.  John Litchfield?
 2      A    Same, Work Window Manager, and he knows the
 3   protocol, how it worked.
 4      Q    That's that the most senior person would get
 5   promoted to Lead Planner and SPOC?
 6      A    That's correct.
 7      Q    Okay.  John Patrick?
 8      A    He was a Work Window Manager at the time.
 9      Q    What does he know about your claims against
10   SRNS?
11      A    The same.
12      Q    Tamara Blankenship?
13      A    Oh, and -- sorry, John Patrick, he's also the
14   one --
15      Q    Oh, sorry.
16      A    -- that I saw saying that I was a angry black
17   woman syndrome.
18      Q    Tamara Blankenship?  She's...
19      A    HR?
20      Q    Yeah, we've talked about her.  Velice
21   Cummings, is this the HR person you said that came
22   to you?
23      A    That's correct.
24      Q    So that's her last name?  So --
25      A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
 1    Q    -- does she know anything else about your
 2    claims against SRNS that we haven't already
 3    discussed?
 4    A    Not that I know of.
 5    Q    And the last one you mentioned, Anita
 6    Wittenberg?
 7    A    It's Annatia.
 8    Q    Annatia [ANAYSHA], that's how you pronounce
 9    it?
10    A    That's correct.
11    Q    Okay.  Annatia Wittenberg, does she know
12    anything else about your claims against SRNS that
13    we haven't already discussed?
14    A    She was my mentor and she's the one that I
15    went to with the concerns about Porter asking me
16    to be the bitch.  She doesn't know anything
17    about -- anything else other than that.
18    Q    And when Porter asked you to be the bitch,
19    was anyone else present?
20    A    Just the two of us.
21    Q    Okay.  And that happened around the time your
22    daughter had that horrible thing happen to her?
23    A    That's correct.
24    Q    Okay.  Okay.  So, if you can turn to page
25    three, and your response to interrogatory number
```

1/8/2025                    ALISHA JOHNSON

```
 1      five, in the last sentence you say you were
 2      subject to an ongoing hostile work environment
 3      based on race; is that correct?
 4      A    (No response.)
 5      Q    Last sentence of your response, sorry.
 6      A    Yes, that's correct.
 7      Q    And the incidents you're talking about, the
 8      hostile work environment, would that be the
 9      incident that happened on January 6, 2021, the
10      other one that happened during the riots, and then
11      the thing with John Patrick?  Are those the
12      three -- and then the Terry Stoudemire incident.
13      Would those be the three things that you're
14      talking about with that -- or four, excuse me, or
15      is there more?
16      A    Those four are for certain.  And as far as
17      right now, that's all that I can think of at this
18      time.
19      Q    Okay.  So you can't think of any other
20      specific incident at the -- right now?
21      A    Not right now.
22      Q    Okay.
23      A    Well, if you go -- can we go back to that
24      question?  Having to train Owensby, that was...
25           I stand corrected.  I -- that was just
```

1/8/2025                          ALISHA JOHNSON

```
 1        totally -- I can't specifically say if that was
 2        racial or not, so I stand corrected there.
 3        Q    Okay.  So those four things we talked about?
 4        A    As of right now.
 5        Q    Okay.  All right.  Sorry.  Do you know who
 6        made the decision to promote Michael Scott Brown
 7        to Lead Planner?
 8        A    No, I don't.  But at the time, Eddie Bodie
 9        was the Work Center Manager, so.
10        Q    Okay.  And the -- James Barnes, when he was
11        promoted to -- to Lead Planner, who made that
12        decision?
13        A    Again, I don't know for certain.
14        Q    Okay.
15        A    Eddie Bodie was the Work Center Manager.
16        Q    And who made the decision to promote Porter
17        Youngblood to SPOC?
18        A    I don't know.  Again, Eddie Bodie was the
19        Work Center Manager.
20             (DEFENDANT'S EXHIBIT 12 WAS MARKED FOR
21        IDENTIFICATION PURPOSES (5 pages) - Plaintiff's
22        First Supplemental Responses to Defendant's
23        Requests)
24        Q    All right.  Can you turn to what's been
25        marked as Defendant's Exhibit 12?
```

1/8/2025                    ALISHA JOHNSON

```
 1      A    Yes.
 2      Q    All right.  These are your supplemental
 3   responses to our interrogatory requests; is that
 4   correct?
 5      A    That's correct.
 6      Q    Okay.
 7      A    Excuse me, that's correct.
 8      Q    Did you review these before your attorney
 9   sent them to us?
10      A    I looked them over, yes.
11      Q    Were they accurate?
12      A    To the best of my knowledge, at the time I
13   looked them over, they were.
14      Q    Okay.  All right.  In your response to
15   interrogatory number five, you talk about people
16   making -- that you saw made racially derogatory
17   comments, and then you say, see your calendar
18   entries for your notes at the time these comments
19   occurred; is that correct?
20           MR. BABB:  Are you looking at 12 --
21   Exhibit 11?
22           MR. MCWILLIAMS:  Yes, it's Exhibit 12.
23           MR. BABB:  All right.  Sorry.
24      A    So I used to make notes on my daily planner,
25   on my calendar, and I also had a log journal that
```

1/8/2025                              ALISHA JOHNSON

1      I kept at my desk.
2            However, when I was sent home, I wasn't
3      allowed to get anything that was at my desk.
4      Porter had to escort me out, and I never
5      received -- I didn't -- I didn't receive my
6      things, all of -- I didn't receive all of my
7      things.
8      Q    Okay.  But do you have some calendar entries?
9      A    I don't -- I did not receive my calendars,
10     and I did not receive my logbook.
11     Q    Okay.
12     A    And the calendar entries that I had, I did
13     send -- we provided a copy.
14     Q    So how did you have those entries and not the
15     other -- like, how did you get those ones?
16     A    Because I had a personal calendar of my own,
17     and that was from -- like, I think it -- that's
18     the only -- that's the calendar that I had --
19     that's the only calendar that was sent in my box.
20     Again, I didn't receive all of my things.  I did
21     receive some things, but I did not receive all of
22     them.
23     Q    So you received that one calendar?
24     A    I received -- along with some shoes and other
25     things.

1/8/2025                    ALISHA JOHNSON

1    Q    Okay.  And then here you said, talking about
2    the people that were saying -- we have Terry
3    Stoudemire, we've already talked about; Stephen
4    Boan, who we've talked about.  Who is this first
5    name unknown Reese?
6    A    Reese.  Okay, Reese, he's one of the people
7    that left.  He quit.
8    Q    So this would be for the second thing we
9    talked about where they were --
10   A    The first and second, he was there for both
11   of those, Reese was.
12   Q    Okay.  So the -- we're talking about the
13   January 6th, 2021 --
14   A    Uh-huh (affirmative response).
15   Q    -- and the thing where some riots were
16   happening --
17   A    Uh-huh (affirmative response).
18   Q    -- and they made some -- okay.  But he was a
19   Planner?
20   A    That's correct.
21   Q    And he was in H Area?
22   A    At that time, yes.
23   Q    Okay.  All right.  So, going back to the
24   first page, your response to interrogatory number
25   four, it asks about posts you made on social

1/8/2025                          ALISHA JOHNSON

```
 1    media.  In your response, you reference some
 2    documents you produced and state that the name was
 3    changed on your Facebook account about nine months
 4    ago to promote your business; is that correct?
 5    A    Not -- well, it was changed to promote -- it
 6    was not my business, but it's a business, yes.
 7    Q    Okay.  Well, it says to promote her business
 8    in your response; does it not?
 9    A    That's what it says, but it's not -- I don't
10    own a business at this time.
11    Q    Okay.  So, around January 2024, you changed
12    your Facebook account from Alisha Johnson to the
13    name that appears on the documents you produced to
14    us.
15    A    That's correct.
16         (DEFENDANT'S EXHIBIT 13 WAS MARKED FOR
17    IDENTIFICATION PURPOSES (6 pages) - Johnson, A.
18    1010-1015)
19    Q    Okay.  So let's look at those Facebook posts.
20    Can you look at Exhibit 13?
21    A    Yes.
22    Q    All right.  Have you seen these documents
23    before?
24    A    Yes.
25    Q    Are these Facebook posts that you made?
```

1/8/2025                          ALISHA JOHNSON

```
 1      A     Yes.
 2      Q     And at the time you made these Facebook
 3      posts, the name wasn't "Threeosix Onyork."  It was
 4      your name?
 5      A     That's correct.
 6      Q     Okay.  So what is "Threeosix Onyork"?
 7      A     That's a bar that my husband owns.
 8      Q     Did it used to be called Bea's Place?
 9      A     It was when I owned it.
10      Q     Do you use this Facebook account now to
11      promote Threeosix Onyork?
12      A     Yes.
13      Q     And do you post on it doing the promotions?
14      A     Yes.
15      Q     Okay.  So, looking at the first page of
16      Exhibit 13, it looks like you posted this on
17      June 6, 2017; is that correct?
18      A     That's correct.
19      Q     All right.  How does this post here, this
20      first page, relate to your employment with SRNS or
21      your claims in this lawsuit?
22      A     So, again, it was coworkers that were talking
23      about -- my -- one of my daughters was
24      Valedictorian of her high school.  And my
25      coworkers -- some of my coworkers were basically
```

1    like -- how can I put this?

2         Some -- I forget exactly who it was, but

3    evidently they had a grandson or a granddaughter

4    that graduated from the same high school, and they

5    were just making light of the fact that, you know,

6    they didn't make such a big deal -- they, the

7    faculty, didn't make a big deal about the

8    Valedictorian and that they let everybody, you

9    know, feel the same.

10        And, you know, in my point, from the

11   undertone of the conversation -- something else

12   was said about the Salutatorian.  It was

13   somebody's son that they knew, and he was a white

14   son.

15        And the fact that, you know, he was able to

16   do whatever he did at graduation and wasn't

17   overshadowed by the black female Valedictorian,

18   you know, they -- you know, it was -- that was

19   different.  And, basically, you know, they treated

20   everyone the same, so.

21   Q    So they just said --

22   A    My thing --

23   Q    -- that they treated everyone the same?

24   A    Yeah, they treated -- you know, they didn't

25   treat the Valedictorian like she was above the

1/8/2025                    ALISHA JOHNSON

```
1    Salutatorian and, you know, the Salutatorian was a
2    white male versus the Valedictorian being a black
3    female and, you know, they were all treated the
4    same.
5         And in the course of the conversation, it was
6    another high school where it was kind of -- it was
7    vice versa and the Valedictorian received all
8    these accolades.  This was the conversation that I
9    was listening to.
10        And the thing about this post, I was like,
11   none of these people that were talking looked like
12   what my daughter looked like.  I said, "With that
13   being said, you know, an African-American young
14   lady who has worked her butt off in the classroom
15   and on the track field, as well as in her
16   community, doesn't deserve such a prestigious
17   recognition."
18        Because they were making light of the fact
19   that, "Oh, it's just a -- you know, a black girl
20   that's the Valedictorian."  That was the undertone
21   of this conversation.
22   Q    Do you remember specifically who engaged in
23   this conversation?
24   A    It was a -- gosh, she's gone.  She was gone a
25   long time.  It was an older white lady.  Her
```

1/8/2025                    ALISHA JOHNSON

1    husband actually worked there, too.  And their

2    grandson was one of the ones that graduated from

3    Aiken High.

4         And then they were talking to these other

5    people that had somebody graduate from the other

6    high school that they were talking about.  And

7    this was, like, in the lunchroom, you know, like

8    during lunch.

9    Q    Were they talking to you or they were just

10   talking?

11   A    They were just talking.  I was in the

12   lunchroom eating, too.

13   Q    Okay.  But you don't remember their names?

14   A    No, I don't.

15   Q    Okay.

16   A    It was an older white lady and her husband

17   worked there, too, and --

18   Q    Did you report this conversation to anyone?

19   A    No, I didn't.

20   Q    Okay.  So can you go to page two, please?

21   A    (Witness complies.)

22   Q    All right.  This looks like this is another

23   Facebook post you made, correct?

24   A    Uh-huh (affirmative response).  That's

25   correct.

1/8/2025                    ALISHA JOHNSON

1    Q    And you made it on August 30th, 2020?

2    A    That's correct.

3    Q    All right.  And here, I mean, how does this

4    relate to your workplace or your claims in the

5    lawsuit?

6    A    Most -- the majority of my coworkers were

7    always talking about Trump.  They were -- almost

8    on a daily basis, somebody's having some type of

9    discussion about just, you know, how -- about

10   Trump and how good he is or -- all -- I mean, just

11   all kinds of discussions.

12         And when I say, "Coworkers for me," it's

13   because, I mean, all the time, it was just always

14   something.  It's going to be contrasted where

15   "Trump is so much better than your President

16   Obama."  And, again, that was said to me a few

17   times, that Obama was my President by my

18   coworkers.  So that's why I said, "Coworkers for

19   me."

20   Q    Who told you that Obama was your President?

21   A    It's more than one person.

22   Q    Can you remember any specific names?

23   A    At this time, I can't recall specific names.

24   Q    Did that happen on this day?  Did that prompt

25   this post or...

1/8/2025                          ALISHA JOHNSON

```
1    A    Again, I don't know what specifically
2    happened that day, but what I -- my frame of mind
3    was, again, almost on a daily basis, I had to
4    listen to different conversations.
5    Q    Okay.  Did you report to anyone that people
6    would say that Obama's your President?
7    A    No.
8    Q    Okay.  Turn to the next page.  And is this
9    another Facebook post that you made?
10   A    That's correct.
11   Q    And you made it on March 25th, 2021?
12   A    That's correct.
13   Q    All right.  And if you look kind of the --
14   you have a big long paragraph and then you start a
15   new one, and it says, "I have personally
16   experienced personal bias from police officers,
17   coworkers, the press, servers, even folk who look
18   like me."  Did I read that correctly?
19   A    That's correct.
20   Q    Is personal bias the same as discrimination?
21   A    That's what I mean by...
22   Q    Okay.  So that's what you meant there?
23   A    That's correct.
24   Q    And you mention a lot of other people -- that
25   you're experiencing personal bias, or as you say
```

1/8/2025                    ALISHA JOHNSON

```
1    now is discrimination, from --
2    A     Uh-huh (affirmative response).
3    Q     -- lots of different people.  Is there
4    anything specific that happened at work that
5    caused you to post this?
6    A     That's -- if I'm not mistaken, and I'm not
7    clear on it, but that could have been around the
8    time when my coworkers were saying, Blacks this
9    and Blacks that.
10   Q     You mean the Black -- the one with the riots?
11   A     Yeah, with the -- yes.
12   Q     Okay.
13   A     And like Black Lives Matter, White Lives
14   Matters, too, that stuff.  So, again, I'm not 100
15   percent certain, but...
16   Q     Gotcha.  All right.  Go to the fourth page,
17   please.  And is this a Facebook post that you
18   made?
19   A     That's correct.
20   Q     And it says, "Communicated to my coworker
21   that I wasn't mad, just disappointed in his racist
22   actions."  Is that a Facebook post you made?
23   A     Yes.
24   Q     On December 29th, 2021?
25   A     Yes.
```

1/8/2025                           ALISHA JOHNSON

```
 1      Q     Who is this about?
 2      A     John Patrick.
 3      Q     So the one we talked about where you saw his,
 4      like, instant message --
 5      A     Yes.
 6      Q     -- comment?  Okay.  And you didn't report
 7      that to anyone, right?
 8      A     No, I didn't.
 9      Q     You just took care of it yourself or spoke to
10      him yourself?
11      A     Yes, I did.
12      Q     And has he ever done anything since then that
13      you deem racial?
14      A     No, we just stopped speaking.
15      Q     Okay.  And it looks like you got one more
16      post here.  It's page five.  Is this a Facebook
17      post that you made?
18      A     That's correct.
19      Q     On June 14th, 2022?
20      A     That's correct.
21      Q     How does this relate to your...
22      A     Despite everything that I was going through
23      with them, I still tried my best to be a team
24      player.
25      Q     So you brought this food to work or is
```

1/8/2025                    ALISHA JOHNSON

1    that...

2    A    I brought that food and cooked it for them.

3    Q    Were they appreciative?

4    A    They cleaned their plates.

5    Q    Did they thank you?

6    A    They did.

7    Q    But there's nothing like -- nothing racial

8    happened in this that made this post or sexist or

9    anything?

10   A    No.

11   Q    Okay.

12   A    I'm sorry.

13   Q    Okay.  All right.  Can you turn to

14   Exhibit 14, please?

15   A    What...

16   Q    There's one more, sorry, excuse me.  Go back.

17   I was wrong.  There's another one.  Page six of

18   Exhibit 13.  Is this a Facebook post that you

19   made?

20   A    Yes.

21   Q    And you made it on November 15th, 2022?

22   A    That's correct.

23   Q    So here it says that you face a lot of BS on

24   a daily basis from family, friends, coworkers,

25   management, employees, customers, SBO, randoms; is

1/8/2025                     ALISHA JOHNSON

```
 1    that correct?
 2    A    That's correct.
 3    Q    Is there any specific BS at work that
 4    prompted this post?
 5    A    Yes.
 6    Q    All right.  What was that?
 7    A    At that time, I was still -- I was having to
 8    train Owensby during this time.  I was going
 9    through people, coworkers, other employees, just
10    coming up to me, "What did you do?  Who did you
11    piss off?"  It was the work -- my work conditions
12    were mentally draining.
13    Q    Okay.  So that's what at work prompted this?
14    A    That's correct.
15    Q    Okay.  And you said people were coming up to
16    you saying, "What did you do?  Who did you piss
17    off," because you didn't get the SPOC or Lead
18    Planner position.  Do you remember who
19    specifically came up and said that to you?
20    A    Yeah.  These were people, not in my
21    department, but in the area.  Mark Chase, he's the
22    First Line in Maintenance.  Timmy Moody was a
23    First Line in Maintenance.
24    Q    Anyone else?
25    A    It was several people.  Scott Self was an
```

1/8/2025                          ALISHA JOHNSON

```
1    outside -- he was an elevator STR.  He didn't work
2    in the area.  He was from outside.  I mean, it was
3    just when -- it was several people.  Those are
4    just --
5    Q    You can remember --
6    A    -- a few I can remember.
7    Q    So you remember three specifically, Mark
8    Chase, Timmy Moody, and Scott Self?
9    A    Yep.
10        (DEFENDANT'S EXHIBIT 14 WAS MARKED FOR
11   IDENTIFICATION PURPOSES (3 pages) - Johnson, A.
12   1018, 1017, 1016)
13   Q    Okay.  Now let's go to Exhibit 14, please.
14   All right.  Do you recognize these documents?
15   A    That's -- that's the -- from one of the
16   calendars.
17   Q    Okay.  So these are your calendar entries
18   that you referred to in that interrogatory
19   response number five we looked at?
20   A    That's -- that's one of the ones, yes, sir.
21   Q    Okay.  Are these the only calendar entries
22   you have from what you've sent us?
23   A    Let me see.  And, again, these were from
24   my -- just my personal...
25   Q    Uh-huh (affirmative response).
```

1/8/2025                    ALISHA JOHNSON

1    A    That's the only one that they gave me, but I
2    used to make -- every day I used to write
3    something in my journal or in --
4    Q    But these are the only ones you still have?
5    A    That's it.
6    Q    Okay.  These three entries?
7    A    That's it.
8    Q    Okay.  And this doesn't have a year on it.
9    Do you know what year these entries were made?
10    A    This was 2022.
11    Q    Okay.  So page one was 2022?
12    A    Yes.
13    Q    What about page two?
14    A    Same.  All of these are the same.
15    Q    All of them are 2022?
16    A    That's correct.
17    Q    Okay.  So do you see the -- first of all, is
18    the only note on this page, page one, that has to
19    do with the -- your claims against SRNS the one on
20    November 22nd?
21    A    What is the question?
22    Q    So you've written something on November 21st,
23    you've written a lot of stuff on November 22nd,
24    and you've written something on November 23rd.
25    I'm asking is the stuff on November 22nd what's

1/8/2025                    ALISHA JOHNSON

```
 1    relevant to your -- the claims you've asserted
 2    against SRNS?
 3    A     The 22nd is when the situation transpired
 4    between Stoudemire and myself.
 5    Q     Okay.  But the 21st, that little entry
 6    doesn't have anything to do with your lawsuit
 7    against SRNS?
 8    A     It's just -- it says "holiday week."
 9    Q     Okay.  And then the 23rd is just noting that
10    it's a holiday, correct?
11    A     That's correct.
12    Q     Okay.  November 22nd, will you read that
13    aloud for me, please, just so I make sure I can
14    read it here -- understand your writing?
15    A     Okay.  I will read it aloud but, again,
16    remember, I wrote this for my personal self.
17    Q     Okay.
18    A     "Pissed.  Today I felt so dehumanized.  I am
19    using all of my coping mechanisms, but this is too
20    much.  I feel like screaming."
21          "Called Porter, no help.  Emailed Tamara.
22    She will probably not help.  Texted Velice.  I
23    feel like MG" -- that's Mike Garrett -- "could
24    have spoken up.  He was definitely" -- he, meaning
25    Stoudemire -- "was definitely back here on his
```

1/8/2025                         ALISHA JOHNSON

1      racist shit."
2      Q    Okay.  So that's the Terry Stoudemire
3      incident?
4      A    That's correct.
5      Q    Okay.  And so you noted you called Porter and
6      said he was no help.  What did you call Porter and
7      tell him?
8      A    I told him what happened.
9      Q    What did he respond with?
10     A    He really didn't say too much.  I can't
11     remember exactly.  I was extremely upset.  I can't
12     remember.
13     Q    Okay.  What did you email Ms. Baldwin,
14     Tamara?
15     A    I -- as far as I can recollect, I remember
16     emailing her what was going on.
17     Q    Do you remember specifically what you said?
18     A    I don't remember specifically what I said.
19     Q    Okay.  And then Velice, is that Velice
20     Cummings who you texted?
21     A    I did.
22     Q    Do you still have that text message?
23     A    It was in my work phone and I don't -- no, I
24     don't have it.
25     Q    Okay.  Do you remember what you texted her?

1/8/2025                        ALISHA JOHNSON

1    A    I can't -- I don't remember verbatim.

2    Q    All right.  And you said MG was who?

3    A    Michael Garrett.  He was a fellow co-worker

4    and he was back there, and I just felt like maybe

5    he should have said something.

6    Q    What's Michael Garrett's race?

7    A    He's a black male.

8    Q    Okay.  So tell me what happened with Terry

9    Stoudemire.

10   A    So he was -- he was on the side of the

11   building that my cubicle was on.  He was talking

12   with someone over there.  I was in my cubicle.  I

13   didn't say anything to him or anybody else, just

14   they're doing whatever I was doing, and he came

15   over into my cubicle and basically started

16   badgering me about, "Do you own this business?"

17        What happened, I did a community event that

18   was featured in the Aiken newspaper.  We were

19   feeding the less fortunate and homeless and they

20   did a huge article on it.  And, evidently, he read

21   the article.

22        So, when he came into my cubicle, he -- I

23   didn't invite him in and, again, he's one of the

24   guys that I wasn't talking to because of the

25   previous racial things that had been going on.

1/8/2025                          ALISHA JOHNSON

```
 1        So he came in there with the tone of, you
 2   know, "Where is this place?  I hear it's on the
 3   rough side of town," and it's just the way that he
 4   was speaking.
 5        So I took a few deep breaths and I tried to
 6   answer his question and, basically, what he was
 7   going for is, he said, "Well, if that's on the
 8   rough side of town, have you ever had any
 9   killings?"
10        And I said, "What do you mean have I had any
11   killings?"  And he kept going, "Well, who could
12   come there?"  You know, and I mean it just got to
13   the point where what I said was, "Anybody that can
14   fit in the door can come." I'm trying to at that
15   time just -- you know, just even it out.
16        Well then he's like, "Well, can I come?"  I
17   said, "Meaning what can" -- you know, I said
18   again, "Anybody that can fit in the door."
19        He said, "No, but can I come?"  I said,
20   "Indian people, black people, white people, Asian
21   people, anybody can come.  It's a diverse place."
22        So he kept going on and I was like, "You
23   know, can you please just leave?  You know, I'm
24   done with trying -- just please leave."  I asked
25   him several times to just leave.
```

1/8/2025                    ALISHA JOHNSON

```
 1          And it just kept going, he kept getting worse
 2    and worse, just the way that he was talking.  I
 3    told him I felt like he was coming from an
 4    inappropriate space.  I felt like he was being
 5    racial, "Please just leave," and I said that
 6    several times.
 7          And it wasn't until a guy named Tim Sears,
 8    who was a white male, that said, "Just -- just
 9    leave her alone," or something that he finally
10    left.
11          By this time, I was so upset, so I called
12    Porter and I told him what was going on, told him
13    how I felt, like I was, you know, being harassed
14    by Stoudemire.
15          Again, I emailed -- I think I called him or
16    maybe she was gone already, so I emailed her.  I
17    don't remember talking to her.
18          I guess I tried to call Velice and I don't
19    think I could get her, so maybe that's why I
20    texted her.  I don't remember all of the events
21    verbatim.  I just know that I was a mess.
22    Q    Okay.  And you said, "Anyone who can fit
23    through the door can come."  Is Terry Stoudemire a
24    big man?
25    A    That's the thing.  I don't think so.  That's
```

1/8/2025                          ALISHA JOHNSON

```
 1    what they tried to make it seem like.  That's why
 2    I got wrote up because they --
 3    Q     You called him fat?
 4    A     And I didn't.  I did not.  I was trying to
 5    keep the conversation -- I was -- I was trying not
 6    to say anything that was indifferent.
 7    Q     Uh-huh (affirmative response).  Okay.  So the
 8    next page of Exhibit 14, this is November 28th
 9    through 30th, 2022, your calendar; is that
10    correct?
11    A     That's correct.
12    Q     So November 28th, you have an entry.  Can you
13    read that to me?
14    A     "Ugh.  Let's see how this day goes," dot,
15    dot, dot.  "Stayed in the car 45 minutes before I
16    walked in here."  Then I got three upside down
17    faces.
18    Q     So sad faces?
19    A     That's correct.
20    Q     Okay.  Did anything specific happen on
21    November 28th or is it just the first day of work?
22    The Terry Stoudemire incident was last week.  I
23    mean, what prompted that?
24    A     Is what -- okay.  What prompted...
25    Q     The entry.  I mean, you wrote that and
```

1/8/2025                          ALISHA JOHNSON

1    everything.  Was there something that happened

2    before?  I mean, obviously, that's before you went

3    into work, it sounds like.  Or is it just, "Hey,

4    last week I had this bad incident with Terry

5    Stoudemire and now I got to come to work on

6    Monday"?

7    A    Just journaling, trying to get a good train

8    of thought.  Right now, something that's -- it

9    helps.

10   Q    So it's just how you're feeling.  There's not

11   like a specific incident that occurred that --

12   A    No.

13                 (Off the Record)

14   Q    All right.  So November 29th, can you read

15   what you wrote there?

16   A    "Got to apply for positions anywhere else."

17   Q    Okay.  Do you recall if you applied for any

18   other positions?

19   A    No, that's because I was still waiting for

20   them to transfer me and, evidently, maybe I had a

21   conversation with Eddie that day, because I

22   thought I was getting transferred right after the

23   Thanksgiving holidays, and something came up where

24   the transfer didn't go through where I wasn't

25   moved.  So it's like that was going on for weeks

1/8/2025                    ALISHA JOHNSON

```
1    with them telling me that they were going to, you
2    know, get me transferred out and it wasn't
3    happening.  So in my mind now, I just need to
4    start looking for jobs in other areas.
5    Q    Okay.  So what prompted that was, it turned
6    out that whatever they were trying to do to
7    transfer you wasn't happening?
8    A    It wasn't happening --
9    Q    Okay.
10   A    -- as they said it would.
11   Q    Okay.  All right.  So November 30th, can you
12   read that entry to me?
13   A    "Wow.  Wow.  David Hart, Eddie Bodie, Porter
14   Youngblood, and Tamara all full of it.  I know
15   what discrimination feels like.  This is it.  If I
16   had blonde hair and blue eyes, this shit wouldn't
17   be happening to me."
18   Q    Okay.  What -- what prompted this?
19   A    So now that's the -- that's more than likely
20   the day I received the write-up.  And with that,
21   it was another gathering with Tamara, David Hart,
22   Eddie Bodie, Porter, and me about the Terry
23   Stoudemire incident, because I didn't feel like I
24   was being heard or being listened to.
25        The fact that Terry Stoudemire came into my
```

1/8/2025                    ALISHA JOHNSON

```
 1    space unannounced or not invited, and the fact
 2    that I asked him to leave several times -- I never
 3    cursed at him.  I never -- you know, I tried to
 4    keep an indifferent undertone, but I was still
 5    being held at fault.
 6    Q    Why do you think -- why did you write that if
 7    you had blonde hair and blue eyes you wouldn't --
 8    it wouldn't happen to you?
 9    A    Because I feel like if he had approached a
10    white female in the same manner that he approached
11    me, it would have been a different story.
12    Q    Are you aware of any incident similar to
13    yours that -- where it was a white female and it
14    was handled differently?
15    A    Throughout my career at SRNS?
16    Q    Yes.
17    A    There have been a few incidents where I've
18    seen white females handled more gingerly than --
19    in the same situations or in similar situations as
20    with black females.
21    Q    Is it the same situation you had here or no?
22    A    (No response.)
23    Q    Let me phrase it this way for you.  Can you
24    name a specific incident that you're talking
25    about?
```

1/8/2025                          ALISHA JOHNSON

1    A    At this time, I can't name a specific

2    incident.

3    Q    Okay.  Can you turn to the third page of your

4    calendar entries?  So for any of these -- well,

5    what can you read what it's on December 1st?

6    A    There's an appointment with somebody and I

7    guess I had to be off and I worked that next day

8    for makeup time, but --

9    Q    That's what it says on the 2nd?

10   A    Yeah.

11   Q    Does that have anything to do with your

12   lawsuit against SRNS?

13   A    No.  Again, this was just my

14   day-to-day activities.

15   Q    Okay.  And these are the only calendar

16   entries you have that are relevant to your lawsuit

17   against SRNS?

18   A    That's correct.

19        (DEFENDANT'S EXHIBIT 15 WAS MARKED FOR

20   IDENTIFICATION PURPOSES (1 page) - 01AN000004)

21   Q    Okay.  Can you turn to Exhibit 15?  Have you

22   seen this document before?

23   A    I have.

24   Q    What is it?

25   A    That is my personal statement of what

1/8/2025                      ALISHA JOHNSON

```
 1    happened with Stoudemire and myself to the best of
 2    my recollection.
 3    Q    Okay.  And is that your signature at the
 4    bottom?
 5    A    That's correct.
 6    Q    And did you fill this out on November 22nd,
 7    2022?
 8    A    That's correct.
 9    Q    And that's the day the Terry Stoudemire
10    incident occurred?
11    A    That's correct.
12    Q    So your recollection would have been the very
13    best when you filled this out?
14    A    Again, I was really upset, so to the best of
15    my ability.
16    Q    Yeah.  So, I mean, you wrote at the bottom,
17    "This statement is true to the best of my
18    recollection;" is that right?
19    A    That's correct.
20    Q    And that's true?
21    A    That's true.
22    Q    Okay.  Looking at the sentence that starts on
23    the fourth line down -- one, two, three, four.
24    It's the very -- one word's on there, it says
25    "Stoudemire," is how it starts.  Do you see that
```

1/8/2025                          ALISHA JOHNSON

```
 1    sentence?
 2    A    I do.
 3    Q    All right.  So it says, "Stoudemire continued
 4    to pick at me, asking me at least five times if he
 5    could come to my bar. I personally felt as if he
 6    was trying to push the white-black issue, so I
 7    finally answered, 'If you can fit in the door, you
 8    can come here.'"  Did I read that correctly?
 9    A    That -- yes, you did.
10    Q    Does that accurately summarize the beginning
11    part of your conversation?
12    A    That's correct.  It does.
13    Q    Okay.  So your -- your response wasn't,
14    "Anyone's welcome," immediately.  It was, "If you
15    can fit in the door, you can come here."
16    A    Again, it was paraphrased.
17    Q    Okay.  So next -- continuing on right there,
18    your statement reads, "He immediately replied,
19    'Have you had any killings?'  I took this as an
20    offensive statement and replied, "White people;"
21    is that correct?
22    A    Again, when I wrote that, I was really upset
23    and, again, everything was paraphrased.  It was to
24    the best of my ability.  I was writing what I
25    thought was said.
```

1/8/2025                    ALISHA JOHNSON

1    Q    Okay.  But did you respond to his question,
2    "Have you had any killings," by stating, "White
3    people"?
4    A    Again, to the best of my recollection, it was
5    more than just "white people" that I said.  But
6    writing it down, I was trying to just get it out.
7    Q    Okay.  So, I understand that you feel that
8    Stoudemire was implying something racial about
9    your bar, correct?
10   A    That's correct.
11   Q    Okay.  Would you agree that responding to the
12   question, "Have you had any killings," with "white
13   people" is also racial?
14        MR. BABB:  Object to the form of the
15   question.
16   A    No, I was not being racial.  It was more than
17   that said, and I was asking about white people,
18   you know, what was he saying.  And, again, I
19   didn't put in every single thing that was said in
20   this statement.
21   Q    Do you think that someone who asked you that
22   question or overheard your response to that
23   question and you saying "white people" could
24   interpret it as you saying white people had been
25   killed at your bar?

1/8/2025                    ALISHA JOHNSON

```
1    A     No, I don't.
2          (DEFENDANT'S EXHIBIT 16 WAS MARKED FOR
3    IDENTIFICATION PURPOSES (1 page) - 01AN000005)
4    Q     Okay.  Can you look at Exhibit 16?  Oh, nope,
5    you went one too far.
6          So I'll represent to you, this is an email
7    from Terry Stoudemire to Porter Youngblood that
8    happened on November 22nd, 2022.  It's kept in the
9    ordinary course of business by SRNS and we
10   produced it to your attorney during discovery.
11         Have you ever seen this before?
12   A     I may have seen it during the -- looking
13   at -- over the documents...
14   Q     Okay.  All right.  So his statement, can you
15   read me what he said happened?
16   A     Yeah.  "I went to Mike Garrett's office to
17   tell him Happy Thanksgiving and just go speak and
18   Alisha walked through the hall into her cubicle.
19   I asked Mike what the name of her club was and she
20   said the name but don't even remember, other than
21   it was on York Street."
22         "So I asked if there were any fights or
23   killings.  She got offended and said, 'Yeah, white
24   people.'  Then she said I was being racist, which
25   I was not, just asking a general question.  Then I
```

1/8/2025                          ALISHA JOHNSON

1    told her I was sorry if I offended her and I did

2    not mean it in that way."

3        "Then Tim Sears said I need to go back to my

4    desk and I told him something and I went back to

5    my desk upset that she would even think that."

6    Q    Okay.  So he filled this out the same day the

7    incident occurred, too, correct?

8    A    That's correct.

9    Q    Okay.  And he also has you responding to his

10   question if there are any fights or killings by

11   saying "white people;" is that correct?

12   A    What he said is she got offended and said,

13   "Yeah, white people."  I never said that in that

14   context.  "She got offended and said, 'Yeah, white

15   people.'"  I never said white people were killed

16   at my establishment.

17   Q    Did you respond with "white people" to his

18   question?

19   A    Again, I said, "Anybody can come to the

20   establishment:  Indians, Asians, white people,"

21   somebody else, something else.

22   Q    So you didn't -- in your statement, going

23   back to 15, you have your response of "white

24   people" to his question of, "Have you had any

25   killings," correct?

1/8/2025                    ALISHA JOHNSON

1    A    And replied "white people."

2    Q    You don't have it that anybody could come,

3    white people, Asians, et cetera, correct?

4    A    That's correct.  Again, I paraphrased.

5    Q    Well, in his statement, Exhibit 16 has the

6    same -- it's consistent with yours, that you

7    responded to that with "white people," correct?

8    A    He says, "Yeah, white people."  I never said,

9    "Yeah, white people," to him.

10   Q    Okay.  But the two statements are consistent

11   in that your response to the question about fights

12   or killings was the term "white people," correct?

13       MR. BABB:  Object to the form of the

14   question.

15   A    I don't agree with that.

16   Q    You don't agree those statements are

17   consistent?

18   A    Because his is saying I said, "Yeah, white

19   people."

20   Q    Uh-huh (affirmative response).

21   A    I did not say, "Yeah, white people."  Mine

22   say, "White people."  But, again, what I'm saying

23   is, I paraphrased.

24   Q    Okay.

25   A    So I left some things out.  I did not like

1/8/2025                              ALISHA JOHNSON

```
1    write verbatim.
2    Q    Okay.  But you're saying your response of
3    "white people" was not to the question, "Have you
4    had any killings?"
5    A    "Have you" -- he said, "Can anybody come
6    there?  Have you" -- I mean, it was just a lot.
7    And what I was answering to was, "Can anybody come
8    there?"  Not from killings, "white people."
9    Nobody's ever -- no white person's ever been
10   killed there --
11   Q    Uh-huh (affirmative response).
12   A    -- or whatever.  That -- that doesn't make
13   sense to me.
14   Q    Okay.  But you would agree that your
15   response -- your personal statement here,
16   Exhibit 15 --
17   A    Uh-huh (affirmative response).
18   Q    -- doesn't contain all these details you're
19   giving us now, correct?
20   A    That's correct.  It does not contain
21   everything.
22   Q    Okay.  So still looking at your statement,
23   Exhibit 15, if you look at the second paragraph
24   that you have there.  And you wrote here, "I've
25   personally tried to avoid Stoudemire and a few
```

1/8/2025                    ALISHA JOHNSON

1    other coworkers due to the fact that I've
2    overheard them talking in an inappropriate manner
3    a while ago.  At the time, I went to my management
4    with the concern and he addressed it."  Did I read
5    that correctly?
6    A    That's correct.
7    Q    Okay.  And is that talking about the time you
8    went to Porter about -- well, which time is that
9    talking about that you went to Porter?  I'm
10   assuming that's when you went to Porter.  Or is
11   that not going to him?  That's a bad question.
12   Let me rephrase that.
13        So, what is this talking about where you --
14   and who did you go to to deal with this?
15   A    It's talking about me overhearing coworkers,
16   including Stoudemire, talking in a racial -- a
17   negative racial manner, and me going to Porter,
18   telling Porter what was going -- what happened and
19   me just staying away from those people.  That's
20   what I'm talking about there.
21   Q    But you said he addressed it.
22   A    Porter addressed it.  He told me that the --
23   so when I say he addressed it, meaning that they
24   were talked to about it.  And I think I already
25   told you this information before, so it's the

1/8/2025                        ALISHA JOHNSON

```
 1   same.
 2   Q    Okay.
 3   A    So that's what I mean.  I mean the same thing
 4   now in this that I told you previously today.
 5   Q    Okay.
 6   A    And, again, with me -- with Stoudemire, the
 7   reason why I felt like he was coming to me in a
 8   negative racial manner is because it's based on
 9   the fact of what I overheard with my ears and the
10   fact that I stayed away from them because of this.
11   Q    Okay.  So you received a Informative Contact
12   for us?
13   A    I did.
14        (DEFENDANT'S EXHIBIT 17 WAS MARKED FOR
15   IDENTIFICATION PURPOSES (1 page) - 01AC000001)
16   Q    And looking at Exhibit 17, have you seen this
17   document before?
18   A    Yes.
19   Q    And is this that Informative Contact you
20   received?
21   A    Yes, it is.
22   Q    Okay.  Are you aware that Terry Stoudemire
23   also received an Informative Contact for this
24   incident?
25   A    I wasn't aware of -- if anything happened to
```

1/8/2025                          ALISHA JOHNSON

1    him, because that's not information that was
2    shared with me.
3    Q    Okay.  Do you dispute that he received an
4    Informative Contact?
5    A    I don't dispute it because now, I see that he
6    did whenever -- with the information that came
7    over.
8    Q    Okay.
9    A    At the time, I did not know.  I did not know
10   until we received it.
11   Q    So he received the same write-up you
12   received?
13         MR. BABB:  Object to the form.
14   A    I'm not going to say he received the same
15   write-up.
16   Q    Well, received the same level of contact.
17   A    Is that one of the exhibits?
18   Q    Do you dispute he received the same level of
19   contact?
20   A    I don't know.
21   Q    Okay.  So in 2021, did you own, either by
22   yourself or with others, any personal businesses?
23   A    I did.
24   Q    What businesses did you own?
25   A    I owned Bea's Place, LLC, and a mobile home

1/8/2025                    ALISHA JOHNSON

```
 1    park.
 2    Q    Okay.  Did you earn any money from those
 3    businesses?
 4    A    When you say any money earned, do you mean
 5    did I make money?
 6    Q    Yes.
 7    A    Not as far as like profit.  I did not profit
 8    at the end of the year.
 9    Q    Were you trying to make money with them?
10    A    Yes.
11    Q    So they were -- even if they weren't
12    profitable, they were operated for profit?
13    A    That's correct.
14         (DEFENDANT'S EXHIBIT 18 WAS MARKED FOR
15    IDENTIFICATION PURPOSES (3 pages) - 01AK000004-6)
16    Q    Okay.  So will you turn to Exhibit 18,
17    please?
18    A    Yes.
19    Q    Have you seen this document before?  It's
20    several pages.
21    A    Yes.
22    Q    What is this?
23    A    That's the Conflict of Interest
24    Questionnaire.
25    Q    You have to fill this out annually at SRNS?
```

1/8/2025                    ALISHA JOHNSON

1     A    That's correct.

2     Q    Is this your Conflict of Interest

3     Questionnaire for 2021?

4     A    That's it.

5     Q    And you filled it out, it looks like, on

6     February 22, 2021?

7     A    That's correct.

8     Q    And it's your name and employee ID at the

9     top?

10    A    That's correct.

11    Q    All right.  Can you look at question ten?

12         So question ten states, "While an employee of

13    SRNS, were you employed by or have you received

14    compensation, directly or indirectly within the

15    last two years, for services rendered to any

16    corporation, partnership, organization, or other

17    business enterprise or individual (this could

18    include a second job)?"  Did I read that

19    correctly?

20    A    That's correct.

21    Q    And how did you respond to that?

22    A    "No."

23    Q    But you did own a business on February 22nd,

24    2021?

25    A    I owned a business, but with reading that at

1/8/2025                          ALISHA JOHNSON

1     that time, I did not totally understand.  What I

2     thought was if I had something that was directly

3     related to SRNS.

4     Q    Okay.

5     A    But I did not clearly understand.

6     Q    So you thought it had to be in competition

7     with SRNS?

8     A    That's correct.

9     Q    Okay.  All right.  Paragraph 11, the first

10    sentence says, "I have read the SRNS Ethics

11    pledge, SRNS Ethics code, SRNS Policy concerning

12    the use of computers on the SRS Ethics website."

13    Did I read that correctly?

14    A    Yes.

15    Q    And then it gives you how to locate the --

16    those policies; is that correct?

17    A    That's correct.

18    Q    And how did you respond to question 11?

19    A    "Yes."

20    Q    So on February 22nd, 2021, you had read and

21    had knowledge of the SRNS policy concerning the

22    use of computers?

23    A    Yes.

24    Q    All right.  And we looked at that policy

25    earlier, didn't we?

1/8/2025                    ALISHA JOHNSON

```
 1    A    Yes.
 2    Q    Okay.  All right.  So question 12, it states,
 3         "I certify that I've read, understood, and agreed
 4         to comply with the SRNS Ethics pledge, the SRNS
 5         Ethics code, and the SRNS Policy concerning the
 6         use of computers."
 7              "I understand that I may be subject to
 8         discipline up to and including termination for
 9         failure to comply with SRNS Ethics pledge, the
10         SRNS Ethics code, and the SRNS Policy concerning
11         use of computers."  Did I read that correctly?
12    A    Yes.
13    Q    And how did you respond to that?
14    A    "Yes."
15    Q    So you agreed that you were going to apply
16         by -- comply with the SRNS policy concerning the
17         use of computers?
18    A    Yes.
19    Q    And you understood that one of the potential
20         consequences for failing to comply with the SRNS
21         policy concerning the use of computers is
22         termination, correct?
23              MR. BABB:  Object to the form of the
24         question.
25    A    Can you...
```

1/8/2025                    ALISHA JOHNSON

```
 1    Q    So, in this thing where you answered "yes,"
 2    is one of the things you answered to was that you
 3    understand that if you don't comply with the SRNS
 4    policy concerning the use of computers, you can be
 5    terminated?
 6    A    Yes.
 7         (DEFENDANT'S EXHIBIT 19 WAS MARKED FOR
 8    IDENTIFICATION PURPOSES (3 pages) - 01AK000001-3)
 9    Q    Okay.  Let's turn to Exhibit 19, please.
10    Have you -- do you know what this document is?
11    A    The same thing, the Conflict of Interest
12    Questionnaire.
13    Q    Is this your Conflict of Interest
14    Questionnaire for 2022?
15    A    Yes.
16    Q    And it looks like you filled it out on
17    April 19th, 2022?
18    A    That's correct.
19    Q    And that's your name and an employee UserID
20    number at the top?
21    A    That's correct.
22    Q    All right.  Do you recall completing this
23    questionnaire on April 19th, 2022?
24    A    I do.
25    Q    Okay.  So let's look at question ten.  Is
```

1/8/2025                    ALISHA JOHNSON

```
 1    that the same question as the previous exhibit we
 2    just looked at?
 3    A    Yes, it is.
 4    Q    And how did you respond to it this time?
 5    A    I responded "yes" to it this time because I
 6    had been explained the meaning of number ten.  So
 7    the questionnaire that I filled out previously
 8    that year, I went back and had to redo it after
 9    understanding.
10    Q    Okay.  So you --
11    A    That me owning a business, that answer would
12    be "yes."
13    Q    Okay.  And question 11, that's the same as
14    the previous exhibit?
15    A    Yes.
16    Q    And you responded?
17    A    "Yes."
18    Q    Okay.  And then question 12 is the same as
19    the previous exhibit?
20    A    Yes.
21    Q    And you responded?
22    A    "Yes."
23    Q    Okay.  And then if we look at the last page
24    of this exhibit, it looks like there's something
25    for you to fill out if you answered "yes" to
```

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                    ALISHA JOHNSON

1    certain questions.  Did you fill out that first

2    box there on the third page of Exhibit 19?

3    A    Yes.

4    Q    What'd you say?

5    A    "I own a small business, a bar."

6    Q    And that's Bea's Place?

7    A    That's correct.

8    Q    Okay.  And then underneath, there's some

9    comments from the ethics office.  Can you read

10   that?

11   A    "Employee's comments on name of business:

12   Good afternoon.  It is a bar called Bea's Place,

13   LLC, 306 Hampton Avenue, Aiken, 29801.  Warm

14   regards, Alisha."

15   Q    And you sent this to the ethics office for

16   them to put that in?

17   A    Yes.

18   Q    Okay.  So why'd you put this statement in on

19   2022 and not 2021?

20   A    Because in 2021, I did not understand that

21   question.  In 2022, that question was made

22   understandable to me.  So I knew that I had to --

23   I knew that me owning a business had to be

24   included, whether it was in direct competition or

25   in relation to SRNS or not.  That's why it's dated

1/8/2025                    ALISHA JOHNSON

```
1    April, because the -- we have to -- when I was
2    working there, you have to complete this form
3    by -- early.  So I think this was a redo for 2022.
4    I'm not...
5    Q    Okay.  But you owned the bar both years, 2021
6    and 2022?
7    A    Right after this, no, I sold the -- I sold
8    the bar May 1st, 2022, because I didn't want
9    anything to interfere with my clearance.
10        And I just had a lot going on personally,
11   still dealing with things with my daughter, and
12   going through a separation with my husband at the
13   time, so I let Bea's Place go.
14   Q    Who'd you sell it to?
15   A    I sold it to my husband at the time.  We were
16   separated.
17   Q    Are y'all back together?
18   A    We got back together after I was fired a few
19   months later.
20   Q    Did y'all have a joint banking account?
21   A    We had one joint banking account, but we had
22   separate accounts, too.
23   Q    Did y'all file taxes together?
24   A    No, we didn't.
25        MR. MCWILLIAMS:  Okay.  I have to go to
```

1/8/2025                              ALISHA JOHNSON

1    the bathroom, so let's take a --
2         MR. BABB:  I was about to ask to take a
3    break.
4         MR. MCWILLIAMS:  Let's take a ten-minute
5    break and then we'll get into the rest of it.
6    Does that sound good to everyone?
7         MR. BABB:  That's fine.
8    (Off the record from 3:13 p.m. to 3:30 p.m.)
9    BY MR. MCWILLIAMS:
10   Q    All right.  Ms. Johnson, during our break,
11   did you talk to anyone about your testimony here
12   today?
13   A    No, I didn't.
14   Q    Okay.  So when we looked at the SRNS
15   handbook, the Rules of Conduct earlier, there was
16   a section that talks about SRNS has tools in place
17   to monitor the use of government-provided
18   equipment; is that right?
19   A    That's correct.
20   Q    Okay.  And in 2021, were you investigated by
21   SRNS for misuse of your government equipment?
22   A    Yes, I was.
23        (DEFENDANT'S EXHIBIT 20 WAS MARKED FOR
24   IDENTIFICATION PURPOSES (31 pages) -
25   01AL000001-31)

1/8/2025                          ALISHA JOHNSON

1     Q    Okay.  Can you look at Exhibit 20, please?

2     A    (Witness complies.)

3     Q    So I'll represent to you -- or, sorry, have

4     you ever seen this before?

5     A    I haven't seen -- well, let me look before I

6     say "yes" or "no."  (Perusing.)  This is -- I

7     didn't see the report in depth, in detail like

8     this, but I did -- I was counseled on it.

9     Q    Okay.  So you were counseled on the forensic

10    examination report of your computer in 2021?

11    A    Yes.

12    Q    Okay.  So I'll represent to you that this is

13    a document maintained in the ordinary course of

14    business by SRNS that we produced to your attorney

15    during discovery and it's the forensic examination

16    of the government equipment, the computer that you

17    were issued when you worked in SRNS.  And looking

18    on the first page, it looks like it was done on

19    April 17th, 2021; is that correct?  That page,

20    yeah.

21    A    April 27th.

22    Q    2021?

23    A    That's correct.

24    Q    Okay.  And it looks like Josh Wright, Joshua

25    Wright was the examiner?

1/8/2025                              ALISHA JOHNSON

1     A    That's correct.

2     Q    Okay.  So on page two, there's a summary of

3     the examination and findings.  And so the first

4     sentence says, "SRNS employee Alisha Johnson, site

5     ID A2765, was included on a report showing users

6     accessing business registration and tax websites

7     in April 2021."  Did I read that correctly?

8     A    Yes.

9     Q    All right.  So is it your understanding that

10    you were included -- your activities were included

11    on a report of multiple people at SRNS who were

12    accessing improper websites with their government

13    computer?

14    A    I don't understand the question.

15    Q    So, is it your understanding that you weren't

16    singled out, that there was a report of various

17    people who were possibly misusing their government

18    equipment and that's how you came to SRNS's

19    attention?

20         MR. BABB:  Object to the form.  You can

21    answer.

22    A    I don't agree with the "misusing" part of

23    what you said in your statement.

24    Q    Okay.  Did your name show up on a report of

25    various individuals that SRNS wanted to look

1/8/2025                          ALISHA JOHNSON

```
1       further into for potential misuse of their
2       government equipment?
3            MR. BABB:  Object to the form.  Answer,
4       if you can.
5       A    I agree that my name came up or was included
6       on a report showing users accessing business
7       registration and tax websites in April 2021.
8       Q    Okay.  So, if you look at the first -- or the
9       second full paragraph, that first sentence, it
10      states, "An examination of Johnson's site computer
11      revealed documents for five businesses, Bea's
12      Place, Deuce's Bar and Lounge, Barnes Mobile Home
13      Park, Mayhem Productions, Mjohnson Enterprises,
14      and FT Squared."  Did I read that correctly?
15      A    Yes.
16      Q    Are you familiar with each one of these
17      businesses?
18      A    I am familiar with each one of the
19      businesses, but I don't own all five of those.  I
20      never owned all five of those businesses.
21      Q    Okay.  So Bea's Place, that's the bar that
22      you used to own.
23      A    That's correct.
24      Q    Okay.  And Deuce's Bar and Lounge, what is
25      that?
```

1/8/2025                           ALISHA JOHNSON

1    A    That's the same as Bea's Place.

2    Q    Did you own it?

3    A    I did.  But it's the same place.

4    Q    You just changed the name?

5    A    That's correct.

6    Q    Okay.  Barnes Mobile Home Park?

7    A    Yes.

8    Q    What is that?

9    A    That's the mobile home park that I referred

10   to earlier.

11   Q    So you own it?

12   A    I don't have it anymore.

13   Q    But you did at the time?

14   A    At the time, yes.

15   Q    Mayhem Productions?

16   A    I didn't own that one.

17   Q    What is it?

18   A    That Mayhem Productions was something that my

19   husband at the time owned, and the Mjohnson

20   Enterprises.

21   Q    What did Mayhem Productions do?

22   A    I'm not completely sure.

23   Q    Was Mjohnson Enterprises the entity that

24   owned the land your bar was on?

25   A    That -- yeah, that's correct.  Mjohnson

1/8/2025                          ALISHA JOHNSON

1    Enterprises, LLC, owns the -- owns the bar, the

2    physical bar and the land.  That's correct.

3    Q    They did in 2021, as well?

4    A    I'm not sure when Mjohnson Enterprises -- it

5    was owned by someone else before.

6    Q    So you're just not sure when they did?

7    A    I'm not sure when Mjohnson Enterprises

8    acquired it.

9    Q    All right.  What's FT Squared?

10   A    That was a business that my twins owned.

11   Q    What did it do?

12   A    They just did event planning.

13   Q    Did they host events at Bea's Place?

14   A    Bea's Place wasn't there when FT Squared was

15   there.  They never hosted any events there.

16   Q    They hosted at Deuce's or whatever the --

17   A    No, they rented venues.

18   Q    Okay.  So, if you look at the third paragraph

19   down, it states that, "Since December 2020,

20   Johnson printed over 200 documents for Barnes

21   Mobile Home Park (BMP) and Bea's Place (Bea's or

22   B's).  Examples include profit and loss

23   statements, webpages from Clover and Square

24   (credit card processing and point-of-sale

25   companies), restaurant menus, shift and employee

1/8/2025                    ALISHA JOHNSON

```
 1    reports, inventory reports, and business
 2    contracts."  Did I read that correctly?
 3    A    Yes.
 4    Q    And is that a true statement?  Did you print
 5    over 200 documents related?
 6    A    Yes.
 7    Q    Okay.  And then the last paragraph here on
 8    this page, the first two sentences says,
 9    "Johnson's internet activity for March 2021
10    includes frequent visits to Clover.com to manage
11    Bea's Place, in addition to browsing
12    AugustaCrime.com and various news and travel sites
13    (searches indicate a planned trip to Mexico).
14    Other browsing and searches relate to job
15    descriptions for bar staff, employment contracts,
16    and shopping for supplies for a bar."  Did I read
17    that correctly?
18    A    Yes, you did.
19    Q    And is that true?  Did you visit Clover.com
20    often?
21    A    I did visit Clover.com often.
22    Q    Okay.  And did you browse and search related
23    to job descriptions for bar staff, employment
24    contracts, and shopping for supplies for a bar?
25    A    I did browse for the bar staff, but I didn't
```

1/8/2025                          ALISHA JOHNSON

```
1       shop for supplies online for the bar.
2       Q     Okay.  And did you take a trip to Mexico?
3       A     I didn't take a trip to Mexico.
4       Q     Well, you should have.
5       A     I didn't.
6       Q     And so the searches and the visits to
7       Clover.com, that was part of managing Bea's Place?
8       A     That was my POS system, and I would go and I
9       would look at it.
10      Q     And "POS" is point of sales?
11      A     That's correct.
12      Q     Okay.  And the printing of menus and employee
13      reports and everything, that was part of managing
14      those businesses, as well?
15      A     Can you rephrase that?
16      Q     So the one, two, three -- you agreed that
17      third paragraph down starts, "Since December 2020"
18      is accurate, that you printed over 200 documents.
19      And those were all -- those documents you printed,
20      those were related to your outside businesses,
21      Bea's Place and the mobile park, correct?
22      A     And I don't know if it was all 200 documents
23      related just to those, but I did agree to that I
24      know that I printed out over 200 documents.
25      Q     And some of them at least were related to
```

1/8/2025                          ALISHA JOHNSON

1          Bea's Place?

2          A     That's correct.

3          Q     Okay.

4          A     Uh-huh (affirmative response).  Yes.

5          Q     All right.  So page three.  So you see

6          Printed Items and there's a table underneath it?

7          A     Yes.

8          Q     Would you agree that this appears to show the

9          time and date stamp of documents that you printed

10         from your SRNS-issued computer?

11         A     Yes.

12         Q     Okay.  And so it also has the name of what

13         you were printed?

14         A     Yes.

15         Q     Okay.  So it looks like every single one of

16         these is related to one of these outside business

17         entities here on this first page three; is that

18         correct?

19         A     That's correct.

20         Q     And then you even printed some stuff for --

21         what's this M -- if you look on 4/22/21, the first

22         entry, it says "Mjohnson Enterprises, LLC, P&L

23         2020."  What is that?

24         A     To be honest, I'm not sure.

25         Q     Is it a profit and loss statement?

1/8/2025                          ALISHA JOHNSON

```
1    A    P&L stands for profit and loss, but I don't
2    remember exactly what it contained.
3    Q    Okay.  And then you have here Mayhem
4    Productions also on 4/22, it's a couple down, P&L
5    2019.  Is that another profit and loss statement?
6    A    That's what it appears to be.  Again, I don't
7    know exactly.  And one page, I don't know what
8    would...
9    Q    Understand.
10        THE COURT REPORTER:  I'm sorry, can we
11   just pause for a second?  I have a tickle.
12        MR. MCWILLIAMS:  Yes.
13               (Off the Record)
14   BY MR. MCWILLIAMS:
15   Q    All right.  What is these -- you know, the
16   last several entries are Square Dashboard.  What's
17   Square Dashboard?
18   A    Square, that was another point-of-sales --
19   point-of-sales software.  I think I was just
20   looking at it to see what it entailed.
21   Q    Okay.  But all these here on page three had
22   to deal with one of those outside businesses we
23   already discussed, whether owned by you, your
24   husband, or your daughters.
25   A    Yes, that's correct.
```

1/8/2025                        ALISHA JOHNSON

1    Q    All right.  And this goes on for several

2    pages here.  And it looks like every single one of

3    these -- page four, page five, page six, page

4    seven, and page eight, almost every single one of

5    them -- besides I see on page seven, there's

6    something that says "McNamaraGuiltyPlea" -- looks

7    like they have to deal with running one of those

8    outside businesses that we discussed, that either

9    you own, your husband owns, or your twins own; is

10   that correct?

11   A    That's correct.

12   Q    Okay.  All right.  So, page nine.  Starting

13   on page nine, would you agree this looks like we

14   get some excerpts from some of the documents that

15   were discovered, and some brief notes about that

16   from the analyst of what those documents are?

17   A    Yes.

18   Q    All right.  So, on page nine, for example, it

19   looks like this is a facility rental contract for

20   Bea's Place.

21   A    Yes.

22   Q    Okay.  And so you had that on your computer,

23   your SRNS work computer?

24   A    Yes.

25   Q    Okay.  And did you edit it on your work

1/8/2025                    ALISHA JOHNSON

```
 1      computer?
 2      A     Yes.
 3      Q     Okay.  So, then we go to page 16.  And this
 4      shows a screenshot of an email; is that correct?
 5      A     That's correct.
 6      Q     Is that an email that you sent?
 7      A     Yes.
 8      Q     All right.  Is that your picture?
 9      A     That's me.
10      Q     Is that -- so you're sending this from your
11      SRNS email?
12      A     I am.  And I'm looking at the timestamp.
13      It's after work hours.  It's after my normal
14      working hours.
15      Q     Okay.  So you sent it on March 15th, 2021, at
16      4:26 p.m.?
17      A     That's correct.
18      Q     Okay.  And what was this email about?
19      A     It says a menu update doc.  So, it had to be
20      a menu.
21      Q     So, were you updating the menu at Bea's
22      Place?
23      A     Yes.
24      Q     And did you send this email?
25      A     I did.  I sent it after work hours.
```

1/8/2025                          ALISHA JOHNSON

1    Q    Okay.  And who did you -- who's
2    twinsdeeky@yahoo.com?
3    A    That's -- that's my personal email address.
4    Q    So, you sent it to your personal email
5    address, and then who else did you send it to?
6    A    Marvin Johnson, that's my husband, and
7    Dehavelyn Barnes, that's my daughter.
8    Q    Okay.  And you sent this email as part of
9    running Bea's Place?
10   A    I didn't send it as part of running Bea's
11   Place.  I sent the email showing them the updates
12   of the menu after work hours.
13   Q    So, this had nothing to do with facilitating
14   your business, Bea's Place?
15   A    It's the menu for Bea's Place.
16   Q    Okay.
17   A    A potential menu.
18   Q    All right.  And on the next two pages, 17 and
19   18, it looks like there's some further email
20   exchanges about getting quotes about getting the
21   menu printed; is that correct?
22   A    That's correct.
23   Q    And that's -- you're doing that as part of
24   running Bea's Place, right?
25   A    No, not as part of running Bea's Place.

1/8/2025                    ALISHA JOHNSON

```
 1        Q    So, printing menus for Bea's Place has
 2   nothing to do with running the bar?
 3        A    It has nothing to do with running the bar.
 4   It's a menu.
 5        Q    You don't use menus at the bar?
 6        A    Menus are used at the bar.  They were used
 7   there.
 8        Q    Okay.  And this is you making changes and
 9   printing menus for that bar?
10        A    After work hours.  I was doing it after work
11   hours.
12        Q    But that's what you were doing?
13        A    That's correct.
14        Q    Okay.  All right.  So, there's a bunch more
15   of these, but let's go to pages -- sorry, let's go
16   to page 24.  Do you see the table, the second
17   table that's at the bottom of the page?
18        A    I do.
19        Q    Does it appear to be a report of the internet
20   searches that you made on your SRNS-issued
21   computer from January 4th through April 27th,
22   2021?
23        A    Yes.
24        Q    All right.  And it also shows the date you
25   made those internet searches?
```

1/8/2025                        ALISHA JOHNSON

```
 1        A     It does.

 2        Q     And the term that you searched?

 3        A     Yes.

 4        Q     All right.  So, the first search that you did

 5    was for SCDOR; is that correct?

 6        A     That's correct.

 7        Q     Is that the South Carolina Department of

 8    Revenue?

 9        A     That's correct.

10        Q     Why'd you search for SCDOR?

11        A     SCDOR, that's -- I was filing my taxes, and I

12    was -- that's why I searched SCDOR --

13        Q     Okay.  Taxes for --

14        A     -- on this part.

15        Q     Personal taxes or taxes for Bea's Place, LLC?

16        A     Both.

17        Q     Is filing taxes part of running Bea's Place,

18    LLC?

19        A     Filing taxes is part of something that I was

20    required to do.

21        Q     All right.  So, then on the 5th, it looks

22    like you did a couple searches about 1099 forms

23    for independent contractors; is that correct?

24        A     That's correct.

25        Q     Why did you search for those?
```

1/8/2025                    ALISHA JOHNSON

1    A    Again, just trying to figure out what it was
2    and figure out more about it.
3    Q    Why did you need to know more about
4    independent contractors?
5    A    Because I wanted to know the difference
6    between a regular working -- a regular paid
7    employee versus a contracted employee.
8    Q    And you're not -- you weren't a 1099 at SRNS,
9    were you?
10   A    I received a 1099 from SRNS when I received
11   the bonus that year or something.
12   Q    So, that was about your bonus?
13   A    That -- I'm not going to say that was
14   specifically about that, but I did receive a 1099
15   from SRNS before.
16   Q    Okay.  And then, I'm just curious, on the
17   last search on the 6th, you searched, "What is the
18   process if a warrant is issued for your arrest in
19   Aiken, South Carolina;" is that correct?
20   A    That's correct.
21   Q    Why did you search that?
22   A    I always wanted to be a lawyer, and it's just
23   like, just different things.  It wasn't anything
24   specific.  It's -- I'm looking at, you know,
25   certain things, just Google.  If I think about

1/8/2025                    ALISHA JOHNSON

1    certain things, or maybe somebody's talking about
2    something, or maybe I just think about something,
3    I Google it.
4    Q    Okay.  I was just curious.  So, if you go on
5    to the next page, page 25, the very last search on
6    February 11th, do you see that?
7    A    Yes.
8    Q    Is that a search for SBA PPP loan?
9    A    That's correct.
10   Q    Did you run that search?
11   A    I did.
12   Q    Why were you searching for an SBA PPP loan?
13   A    I wanted to find out more about what it was.
14   Q    Were you thinking of getting one for Bea's
15   Place?
16   A    No, I wasn't thinking of getting one for
17   Bea's Place.  Everybody was talking about the PPP
18   loans versus the other loans.  So, I just wanted
19   to educate myself.
20   Q    Did you download documents about it?
21   A    I don't remember downloading any documents
22   about the SB -- about the PPP loan that I can
23   remember.
24   Q    Okay.  And then, if you look down at the
25   bottom, the second -- well, the first two searches

1/8/2025                    ALISHA JOHNSON

```
 1      for -- on March 1st, we have one for employee
 2      contract, and the next one is bartender
 3      description.  Do you see those?
 4      A    I do.
 5      Q    Did you conduct those searches?
 6      A    I did.
 7      Q    What did you conduct them for?
 8      A    Because I was looking up information for a
 9      contract for different jobs and a bartender was
10      one of them.
11      Q    For a bartender possibly that you were going
12      to hire at Bea's Place?
13      A    Just in general, and that could have been a
14      possibility.  But, again, I like to find out more
15      about things, so I Google stuff.
16      Q    Okay.  So, on page 26, we've got -- if you
17      look down, the first search on March 31st, you
18      searched the term "Clover;" is that correct?
19      A    Yes.
20      Q    And did you conduct that search?
21      A    I did.
22      Q    And is that part of just going to the
23      point-of-sale website?
24      A    I'm not sure what it was at that time, but
25      that's very well what it could have been.
```

1/8/2025                    ALISHA JOHNSON

1    Q    Okay.  And I see on April 6th and April 14th,
2    you searched SCDOR again.
3    A    And I probably was trying to check the status
4    of my state income tax.
5    Q    Okay.  But you did --
6    A    I did.
7    Q    -- you made that search?  Okay.  So, we'll go
8    to the page 27, the last...
9         So, it looks like on the second from the top,
10   4/20, another search -- two searches on 4/20 for
11   SCDOR; is that correct?
12   A    That's correct.
13   Q    Okay.  And then 4/22, the first one, profit
14   and loss statement template?
15   A    Yes.
16   Q    And then the last one on 4/22, you did an
17   employee payroll template?
18   A    Yes.
19   Q    And then you also on 4/22 searched, "What are
20   sales returns and allowances on an income
21   statement," "examples of sales returns and
22   allowances on income statement," and, "What are
23   samples of beginning inventory for an income
24   statement;" is that correct?
25   A    That's correct.

1/8/2025                    ALISHA JOHNSON

1    Q    Are those all things that you would need for
2    a PPP loan?
3    A    I don't know what you need for a PPP loan.  I
4    never applied for one.
5    Q    Do you know why you searched for profit and
6    loss statement templates?
7    A    To learn more about profit and loss
8    statements.
9    Q    Did you need to prepare profit and loss
10   statements as part of your job at SRNS?
11   A    No, I didn't.
12   Q    Did you need to prepare profit and loss
13   statements for Bea's Place?
14   A    I didn't.  I had an accountant.
15   Q    Okay.  So, if we can go to the conclusion,
16   which is page 30.  So, the last two paragraphs
17   state, "Forensics reviewed Johnson's computer and
18   identified activity related to managing five
19   outside businesses.  A total of 413 documents
20   relating to operating outside businesses were
21   identified with some files dating back to 2015.
22   Activity since January 2021 was primarily on the
23   management of Bea's Place, a company in Alisha
24   Johnson's name, totaling 11 saved documents and
25   141 print jobs."

1/8/2025                          ALISHA JOHNSON

```
 1              "Evidence was identified showing that Johnson
 2       used the site internet, email, a printer, and
 3       possibly a government iPhone to manage outside
 4       businesses."  Did I read that correct?
 5       A    Yeah, you read that correctly.
 6       Q    And is that true?  Did you do those things?
 7       A    I did not use the government computer to
 8       manage a business that I owned.  What I was told,
 9       my work cell phone, I could use that work -- my
10       work cell phone for anything that I want to use it
11       for.
12              As a matter of fact, during that time, I got
13       rid of my own personal cell phone.  So things that
14       I did on my work cell, I did not understand that
15       anything I was doing to assist with my business on
16       my work cell was outside of the lines.
17       Q    But you used your work cell to assist running
18       your business?
19       A    I'm not saying that I used it to run my
20       business, but I did use -- my work cell was all I
21       had.  I didn't have a regular cell phone.
22       Q    So -- but are you disputing that there were
23       413 documents --
24       A    I'm not disputing that there were --
25       Q    Okay.
```

1/8/2025                     ALISHA JOHNSON

```
 1    A    -- 413 documents.
 2    Q    All right.  And you're not disputing there
 3    were 11 saved documents?
 4    A    I'm not disputing that.
 5    Q    Okay.  And you're not disputing the 141 print
 6    jobs?
 7    A    I'm not disputing that.
 8    Q    You're not disputing that you used the
 9    Internet, your work email, and a printer as part
10    of helping run some outside businesses?
11    A    I do dispute that.  There's no way that I
12    could manage my business from doing those things.
13    Q    Well, I'm not saying that you managed the
14    entire business.  I'm saying did you use it in
15    part to help manage your business?
16    A    I used it in part to help us -- to help me
17    learn more about my business.
18    Q    Okay.  But you didn't do anything -- you're
19    saying that these menus and everything we saw,
20    going to Clover.com, your point-of-sale website,
21    that didn't -- that did not involve the management
22    of your business?
23    A    That didn't involve managing my business.
24    That involved me finding out -- that involved
25    me -- I don't feel like that's managing the
```

1/8/2025                    ALISHA JOHNSON

```
 1    business, what I was doing.  I did not feel like
 2    that's what I was doing at the time was managing
 3    my business.
 4    Q    Okay.  I understand you don't feel like that
 5    those actions were managing the business.
 6         (DEFENDANT'S EXHIBIT 21 WAS MARKED FOR
 7    IDENTIFICATION PURPOSES (5 pages) - 01AF000001-5)
 8    Q    All right.  Let's go to Exhibit 21.  Have you
 9    ever seen this document before?
10    A    I don't remember seeing this document at
11    the -- I don't remember seeing this particular
12    document.
13    Q    Do you remember talking to Investigator Bill
14    Carter?
15    A    I do remember talking to Investigator Bill
16    Carter.
17    Q    And I'm talking about in 2021 talking to him,
18    do you remember that?
19    A    Yes, I do.
20    Q    Okay.  Because I know you talked to him
21    several times, right?
22    A    I talked to him in 2021 and then in 2023.
23    Q    Okay.  So I'll represent to you, this is a
24    report that Investigator Bill Carter prepared that
25    is kept in the ordinary course of business at
```

1/8/2025                    ALISHA JOHNSON

```
 1    SRNS.  We produced it to your attorney.  Do you
 2    see the date on there?
 3    A    May 20, 2021.
 4    Q    Okay.  So that's when he prepared it.  So if
 5    you can go to page three, please.
 6    A    (Witness complies.)
 7    Q    So the first -- or the second paragraph, that
 8    first sentence says that you told him you were
 9    issued a government-owned desktop computer and a
10    government-owned iPhone; is that correct?
11    A    Paragraph one?
12    Q    Paragraph -- the second paragraph.
13    A    Okay.
14    Q    The first sentence.
15    A    (Reading.)  I -- I agree.  I did meet with
16    him and I did tell him that.
17    Q    Okay.  And then the last sentence of the next
18    paragraph, the third paragraph, says you described
19    your role as the owner and manager of Bea's Place.
20    A    That's correct.
21    Q    And did you tell him that?
22    A    I did.
23    Q    And that's accurate?  That's...
24    A    Yes, that's accurate.
25    Q    Okay.  So let's go to the next page, page
```

1/8/2025                    ALISHA JOHNSON

```
 1     four.  And it said -- the last sentence of the
 2     first full paragraph says you denied using
 3     government resources to facilitate the operation
 4     of businesses other than Bea's Place; is that
 5     accurate?  Did you tell him that?
 6          MR. BABB:  Where are you looking?  I'm
 7     sorry.
 8          MR. MCWILLIAMS:  Page four, first full
 9     paragraph, last sentence.
10     A    (Reading.)  I don't understand the question.
11     Q    So the last sentence --
12     A    Okay.
13     Q    -- of paragraph four, this is Investigator
14     Carter's summary of things that you said.  Did he
15     summarize that correctly?
16     A    I'm not sure about that last statement.  I'm
17     not sure if that's correct or not.
18     Q    Okay.  Because you did print documents for
19     Mjohnson Enterprises, correct?
20     A    I printed, yes, something, but I don't know
21     exactly what it was.
22     Q    Okay.  And then the next paragraph, that
23     first sentence says what we've already talked
24     about, that you admitted to Investigator Carter
25     that you used websites, such as Clover and Square,
```

1/8/2025                    ALISHA JOHNSON

```
1    to manage various aspects of Bea's Place using
2    your government computer.
3    A    That's correct, I did.
4    Q    Okay.  And so then the next paragraph, the
5    third full paragraph says that you had loaded a
6    cash app onto your government-issued iPhone that
7    was linked to Bea's Place and I think for your
8    personal use; is that correct?
9    A    That's correct.
10   Q    And you did that?
11   A    Yes.
12   Q    Okay.  So -- and then the last paragraph --
13   last full paragraph says that you didn't know you
14   were violating any rules and that you would remove
15   all personal business documents from your computer
16   and stop using government resources in the
17   operation of your business; is that correct?
18   A    Oh, that's correct.  I didn't realize that,
19   and I removed all of the files that I -- you know,
20   I saw at the time.
21   Q    And you told Investigator Carter you were
22   going to do that?
23   A    That's correct.
24   Q    Okay.  So at the bottom of page four onto
25   page five is Investigator Carter's conclusion,
```

1/8/2025                          ALISHA JOHNSON

```
1     correct?
2     A    That's correct.
3     Q    And if you go onto page five, he determined,
4     the last sentence, that you violated the SRNS
5     Rules of Conduct, didn't he?
6     A    That's what it says here.  However, again, I
7     never saw this while I was working at SRNS.  This
8     was never shown to me in detail like this.
9     Q    Well, the -- I got you.  So you received a
10    Corrective Contact in May 2021 for your --
11    A    I did.
12    Q    -- use of government resources?
13         (DEFENDANT'S EXHIBIT 22 WAS MARKED FOR
14    IDENTIFICATION PURPOSES (2 pages) - 01AB000030-31)
15    Q    Can you turn to Exhibit 22?
16    A    (Witness complies.)
17    Q    Is this that Corrective Contact?
18    A    Yes, this is the Corrective Contact that I
19    received.  But in -- as far as in my defense, when
20    I received this Corrective Contact, I was not
21    aware of the severity of it.
22         Simply because when Eddie and Porter, they
23    called me into the office, into I'm going to say
24    Eddie's office at the time, and whenever they were
25    talking to me about this, it was not like -- it
```

1/8/2025                          ALISHA JOHNSON

```
 1    was -- they didn't have the report that we just
 2    went over.  They didn't have that in there with
 3    them when they were going over it with me.
 4         My takeaway from this Corrective Contact was
 5    just that, "Hey, don't go back to Clover for your
 6    point of sales and don't do your taxes on SCDOR."
 7    That's what I took that as.  I signed it as like,
 8    there's no additional comments in here.
 9    Q    So why did you take away that you could only
10    not visit Clover or SCDOR?
11    A    Because that's basically what I heard from
12    them.  It wasn't like -- this was like my first,
13    like, contact, like, ever, you know, with being on
14    the plant.  And I didn't realize the severity of
15    it because, again, my takeaway was just don't go
16    to those two sites.
17    Q    Do you remember specifically what they told
18    you?
19    A    I don't remember specifically.  I'm telling
20    you that was -- when I tell you that was my
21    takeaway from the conversation, that was just my
22    takeaway:  Don't do that, don't do -- don't go to
23    Clover to access your POS, don't go to SCDOR to do
24    your taxes.
25    Q    Okay.  And did you read this Corrective
```

1/8/2025                          ALISHA JOHNSON

1    Contact before you signed it?

2    A    To be totally honest, I really didn't.  I

3    just -- I signed it.  I didn't -- I did not

4    understand the severity of it.

5    Q    Well, see on -- you see section three on the

6    first page?  Those last two sentences in section

7    three, can you read those to me?

8    A    "You understand that future use of government

9    property for personal business will result in

10   disciplinary action up to and including

11   termination."

12   Q    And the sentence before that, what's that

13   say?

14   A    "You understand all use of government

15   property for running personal business must desist

16   immediately."

17   Q    So section four, that says Recommended

18   Development Actions and Specific Mutually Agreed

19   Upon Goals, right?

20   A    Yes.

21   Q    Okay.  What is the first -- or read that to

22   me.

23   A    "By signing this agreement, you agree to stop

24   using government resources for personal business

25   immediately and you agree to the following."  And

1/8/2025                    ALISHA JOHNSON

```
 1        I can't read those that's like right there.  I
 2   can, "Read the SRNS Ethics Pledge, SRNS Ethics
 3   Code, and SRNS Policy concerning the use of
 4   computers on the SRNS ethics website.  This
 5   information is available at" -- and that's the
 6   website.
 7        "The Ethics Pledge is available on the
 8   introductory screen.  The Ethics Code and Use of
 9   Computers may be accessed via tabs across the top
10   of the webpage."
11        "Complete a correct new Annual Ethics Reading
12   and Conflict of Questionnaire -- Interest
13   Questionnaire and submit it to the legal
14   department for review."
15   Q    Okay.  So they're telling you that you've got
16   to stop using government resources for any
17   personal businesses immediately and to review
18   those policies we reviewed earlier, correct?
19   A    That's what it says.  That's correct.
20   Q    And the policy concerning the use of
21   computers says that it is strictly forbidden to do
22   anything on a government computer for your
23   personal business, correct?
24        MR. BABB:  Object to the form.
25   A    Where is that written at?
```

1/8/2025                    ALISHA JOHNSON

1    Q    Well, we can go back and look at it.  So if
2    you look at Exhibit 4, page 27?
3    A    I'm there.
4    Q    All right.  So Limitations, do you see that?
5    A    I do.
6    Q    And then A, it says?
7    A    "All uses of government computers and network
8    resources for incidental personal use are strictly
9    forbidden to:  Interfere in any way with proper
10   completion of the individual's daily work
11   assignment."
12   Q    We don't need to read all of them.  So it
13   says you're strictly forbidden to, and then it
14   gives a list of things you're strictly forbidden
15   to do, right?
16   A    Yes.
17   Q    All right.  And it says -- three and four,
18   what do they say?
19   A    "Involve personal gain (beyond SIP, banking,
20   or credit union account management); in any way
21   facilitate the individual's outside personal
22   business."
23   Q    All right.  So you're strictly forbidden from
24   using government computers and network resources
25   to in any way facilitate your outside personal

Cola City Reporting
803-530-6703/colacityreporting@gmail.com

1/8/2025                          ALISHA JOHNSON

```
1    business, correct?
2    A    And that's what the policy says.
3    Q    All right.  Let's go back to Exhibit 22.  So
4    Section 4 that we just looked at, is that also why
5    you filled out the new Conflict of Interest
6    Questionnaire?
7    A    That's the only thing that I had to do
8    following this.
9    Q    So you didn't review these sections?
10   A    No, I did not review anything other than do
11   the Conflict of Interest.  Other than that --
12   that's why my takeaway from everything was just
13   not to go to Clover and look at my point of sales
14   or go to SCDOR and do the taxes.
15   Q    Did Eddie Bodie and Porter Youngblood
16   specifically tell you that the only two things you
17   couldn't do was go to SCDOR and Clover?
18   A    That was my takeaway.
19   Q    But did they specifically say that?
20   A    Again, I'm not sure.  That was what my
21   takeaway was.
22        And from my experience being in management,
23   if -- with a disciplinary action like this, they
24   should -- if they would have had all of the
25   policies in front of me and went over everything
```

1/8/2025                    ALISHA JOHNSON

1    and had that report in front of me, I would have

2    understood 1,000 percent what was going on.  None

3    of that was presented during this contact.

4         The only thing -- it was basically a

5    conversation.  And then, again, just like I told

6    them, what I told Porter and Eddie -- it might

7    have been -- I see Ken Gibbons signed this, and I

8    don't even remember Ken being a part of it.

9         But during this time, this period right here,

10   my same daughter that was sexually assaulted, my

11   grandmother passed away.  She went into -- I don't

12   know whatever she went into.  But my daughter was

13   almost sold into a sex trafficking ring earlier in

14   May.

15        So I -- a lot of things, I just kind of like

16   floated through for like almost four months or so.

17   So, again, my takeaway from that meeting was not

18   like it was something significant that I was going

19   to lose my job.  It was just like, "Don't do

20   this."  And you tell me don't do it, I'm not going

21   to do it.

22   Q    Okay.  You would agree this -- this tells

23   you -- this document here tells you that any

24   future use of government property for personal

25   business could result in termination?

1/8/2025                    ALISHA JOHNSON

1    A    Exactly.  I know all of this stuff now.  But

2    at that time, that wasn't what I was

3    understanding.  I didn't understand.

4    Q    Okay.  So in 2023, you were investigated

5    again for using your government-issued computer

6    for your personal businesses, correct?

7    A    I was investigated initially for allegedly

8    applying -- fraudulently applying for and

9    receiving a PPP loan, because -- because General

10   Counsel called me in for that.  That's what made

11   them go back and -- go back through my computer

12   again.

13        So, the initial calls was allegedly a tip, an

14   anonymous tip came and said that Alisha used her

15   government computer to fraudulently apply for and

16   obtain a PPP loan.  And it just so happened that

17   that anonymous tip came in October or November of

18   2022, when I was going through all of the

19   discrimination things that I was going through in

20   my job.

21        So I was told on February or January 31st, or

22   something like that, that I needed to go meet

23   General Counsel -- maybe February 1st or

24   February 2nd, like two days before I was supposed

25   to go meet General Counsel -- and that's where all

1/8/2025                          ALISHA JOHNSON

1     this started from.

2          I was interrogated by three lawyers for

3     hours.  And I told them over and over again that I

4     did not apply for, nor did I receive a PPP loan.

5     They told me repeatedly that I did.  They had

6     the -- they had the paperwork where I did.

7     Q    Who were the lawyers?

8     A    General Counsel for SRNS.

9     Q    Do you know any names?

10    A    I can't remember, but I do have emails that I

11    sent to them to substantiate me not applying for

12    or receiving a PPP loan.

13         And after being interrogated for -- by them

14    for hours, without an attorney, I was so

15    distraught and upset, I didn't know what to think

16    or how to think after that.

17    Q    Okay.  So you said an anonymous tip came in.

18    Who told you an anonymous tip came in?

19    A    General Counsel.  They told me that's why

20    they were calling me in, because they received an

21    anonymous tip.

22    Q    Do you know who -- do you have an idea who

23    the anonymous tip was?

24    A    I think that it was my employer, somebody --

25    either Terry Stoudemire, could have been Porter.

1/8/2025                        ALISHA JOHNSON

1    I think it was somebody there trying to retaliate.

2    That's my personal opinion, after being able to

3    sit back and kind of absorb everything.

4    Q     Uh-huh (affirmative response).  Did you

5    eventually speak with Bill Carter about --

6    A     I spoke with Bill Carter right after the

7    inquiry.  He called me in right after I had been

8    in there with them over three and a half hours,

9    and I was really upset.

10         And he was asking me questions, "Have you

11   been on your computer doing anything?"  And at the

12   time, I told him about the email that I sent to

13   SCDOR back in October, and I told him I hadn't

14   been doing anything related to a business.  I did

15   not own any businesses anymore at all.

16   Q     So you -- you didn't tell him that you had --

17   so let me ask you this.  Are you aware that your

18   conversation with Bill Carter was recorded?

19   A     I was.

20   Q     Okay.  Did you tell him after the Corrective

21   Contact you received you hadn't been back to

22   Clover or the SCDOR website?

23   A     No, what I told him was this.  I had sent an

24   email -- I had went to SCDOR.  I downloaded a form

25   that I needed to send to SCDOR.  I emailed that

1/8/2025              ALISHA JOHNSON

1    form.  And I told him that I had received

2    whatever -- I received something from Clover in an

3    email that appeared to be like I was -- I could

4    have been being hacked or something.

5    Q    Uh-huh (affirmative response).

6    A    So I went to -- just to the Clover website,

7    not to check in the POS, but I went to get some

8    information, a number or something, and I did tell

9    him that.

10       But, again, I had been interrogated.  I

11    didn't know what I was going into.  I really

12    didn't know what was happening to me for three and

13    a half hours.

14       And as soon as I got out of that, he called

15    me into his office and I was -- you know, I was

16    trying to think about everything all at once to be

17    as honest as I possibly could, and that's what I

18    did.

19    Q    Okay.  Did you tell him that as of May 2022,

20    you had let all your businesses go?

21    A    I did.

22    Q    Okay.  And did you tell him, kind of similar

23    to what you just told me, that your takeaway from

24    the Corrective Contact you received was you

25    weren't supposed to go to Clover or the DOR

1/8/2025                     ALISHA JOHNSON

1    website?

2    A    I did because that's the truth.

3    Q    And when you told him you hadn't been on

4    those websites again, you were referring to Clover

5    and the SCDOR, right?

6    A    That's correct.

7    Q    Okay.  So your husband took over Bea's Place

8    and changed the name to 306 On York, correct?

9    A    That's correct.

10   Q    And so your Facebook page is named "Threeosix

11   Onyork," correct?

12   A    Now it is.

13   Q    So that started in January of...

14   A    That started in -- this is 2025 -- 2024.

15   That just started in like March of 2024 --

16   Q    Okay.

17   A    -- that I did that.  Because, again, like I

18   told you, my husband and I had separated because

19   of everything that was going on and I wasn't

20   mentally there.  I had to just concentrate on what

21   I needed to concentrate on and that was pretty

22   much my daughter and my job.  That's why I let the

23   business side go and I let my husband go.  I was

24   not in...

25   Q    So just to clarify, May 2021 is when you

1/8/2025                    ALISHA JOHNSON

```
 1    stopped operating Bea's Place?
 2    A    May 2022 is when I stopped.
 3    Q    Excuse me, thank you, May 2022.
 4    A    Really, like almost January of that year, but
 5    May is when everything was finalized.
 6    Q    Okay.  So, as part of this investigation, did
 7    SRNS conduct another forensic examination of your
 8    work computer?
 9    A    They did.
10         (DEFENDANT'S EXHIBIT 23 WAS MARKED FOR
11    IDENTIFICATION PURPOSES (18 pages) -
12    01AM000001-18)
13    Q    Okay.  Can you turn to Exhibit 23?
14    A    (Witness complies.)
15    Q    Have you seen this before?
16    A    I haven't seen this before.
17    Q    All right.  So you haven't seen it before?
18    A    I haven't.
19    Q    Okay.  So I'll represent to you that this
20    document that SRNS has maintained in the ordinary
21    course of business is a forensic examination of
22    your computer conducted on January 30th, 2023, by
23    Joshua Wright, and we produced it to your attorney
24    in discovery.  Can you look at the first page,
25    please?
```

1/8/2025                           ALISHA JOHNSON

```
 1      A    Yes.
 2      Q    All right.  So does it appear to you that --
 3      oh, you got to go back more, one more page.
 4      A    (Witness complies.)
 5      Q    Does it appear to you that this -- the date
 6      of the examination was January 30th, 2023?
 7      A    Yes.
 8      Q    And the same person, Joshua Wright, conducted
 9      this examination?
10      A    Yes.
11      Q    Okay.  On page two is the summary.  So if you
12      look at the last sentence, it says, "On
13      January 30th, 2023, OGC requested a follow-up
14      examination of the user's activity since June 2021
15      to identify similar misuse."
16           "Forensics discovered various documents and
17      emails pertaining to the user's business,
18      including a January 2023 expense spreadsheet for
19      the Bar 306 On York."  Did I read that correctly?
20      A    Yes.
21      Q    Okay.  So the follow-up examination was only
22      for activity since June of 2021, correct?
23      A    Yes, that's what that says.
24      Q    So these results are from the period after
25      you received your Corrective Contact in May 2021,
```

1/8/2025                    ALISHA JOHNSON

```
 1      correct?
 2      A    That's --
 3           MR. BABB:  Object to the form.  You can
 4      answer.
 5      A    Okay.  Repeat the question, sorry.
 6      Q    So the -- this document says that it was an
 7      examination from June 2021 on, so that's only the
 8      period after you received a Corrective Contact in
 9      May 2021, correct?
10      A    That's correct.
11      Q    So page three of this document is titled
12      "Evidence, Internet Searches," and it says "last
13      six months," correct?
14      A    That's correct.
15      Q    Does this appear to be internet searches that
16      you've conducted within the last six months?
17      A    It should be since 2021.
18      Q    Yeah, but for just this little page, it says
19      last six months, right?
20      A    Yes.
21      Q    Okay.  And if you look at this page, it looks
22      like you've got -- one, two, three, four -- five
23      searches on -- one on the 10th, one on the 12th,
24      one on the 24th, one on the 5th, and one on the
25      9th for a YouTube spreadsheet for a small business
```

1/8/2025                    ALISHA JOHNSON

```
 1    tutorial; is that correct?
 2    A    I have -- I have those YouTube spread -- I
 3    did go to those sites.
 4         However, before I went to those sites, I
 5    emailed Talent Management, Lightburn, Malik
 6    Lightbourne -- Lightbourne or Lightburn.  He was
 7    head of Talent Management.  It was another guy in
 8    Talent Management with him that was leaving, I
 9    forget his name, and I sent them several emails
10    requesting additional assistance with Excel.
11         Because for my job, we were moving from a
12    software system called PRT to a new one called
13    Power BI.  Power BI was mostly Excel, and I did
14    not have the experience needed to be able to
15    perform my job efficiently.
16         So we used to have something called
17    "PeopleSoft Skills."  That was additional training
18    that we could access on the database that would
19    give us additional help or tutorials on
20    different -- different systems or different
21    activities, such as it would give you tutoring or
22    additional information on the interviewing
23    process.  We had it for all the Microsoft things.
24         So I could not find PeopleSoft on the
25    database.  So I sent emails to Talent Management
```

1/8/2025                    ALISHA JOHNSON

1    explaining that, "Hey, I can't find this software
2    anymore."  I explained what was going on and that
3    I needed additional help.  Malik Lightburn ended
4    up giving me permission to go to YouTube and do
5    the Excel tutorials via YouTube.
6        So, as you see, I did not go to any -- I
7    didn't do anything really on the Internet from
8    2021.  2023, he gave me permission to actually go
9    and access YouTube to help me.
10   Q    Why didn't you tell any of this to
11   Investigator Carter?
12   A    I did.
13   Q    You did not mention Malik Lightburn to
14   Investigator Carter.
15   A    Okay.  So they -- it's just like, again, I
16   know that I brought this up to them and I told
17   them, I know -- maybe I didn't tell him during
18   that time, but I told -- I told somebody.
19       Because this is what happened.  That's why
20   they kept saying that I was lying, and I was not
21   lying, because I got permission before I even did
22   anything.
23   Q    Did you tell the Disciplinary Review Panel
24   that you got permission from Malik to do this?
25   A    I don't remember telling them that.  Malik

1/8/2025                    ALISHA JOHNSON

```
 1   was actually on that Disciplinary Review Board.
 2   Q    Do you have an idea of why Malik didn't speak
 3   up and say --
 4   A    I don't know.
 5   Q    -- he gave you permission?
 6   A    But I have emails and they can be
 7   substantiated.
 8   Q    Have you given those emails to your attorney?
 9   A    He's asked for them.  He's requested for them
10   and we haven't received it yet, as far as I know.
11   Q    So, if I tell you that in the recording of
12   your conversation with Bill Carter you never
13   mentioned Malik, do you have an explanation for
14   that?
15        MR. BABB:  Object to the form.  Has the
16   recording been produced?
17        MR. MCWILLIAMS:  Yes, you have them.
18   A    I don't -- I don't remember exactly whatever
19   I did or did not say, but I know that that's what
20   happened.
21        MR. BABB:  Can we go off the record one
22   second?  Can we take a quick break?
23   (Off the record from 4:33 p.m. to 4:40 p.m.)
24   BY MR. MCWILLIAMS:
25   Q    All right.  So, Ms. Johnson, you were saying
```

1/8/2025                          ALISHA JOHNSON

```
 1          that Malik had granted you permission.
 2                 So I'll represent to you that in these
 3          recordings with Bill Carter, you never mentioned
 4          being given permission to do these.  Do you have
 5          any explanation for that?
 6          A    No, other than when talking with Bill, I
 7          mean, I don't -- I was for sure that I told him
 8          that I had reached out to Talent Management --
 9          Q    Uh-huh (affirmative response).
10          A    -- and they had given me the go-ahead, since
11          PeopleSoft wasn't there anymore, to go to YouTube.
12                 You know what?  I do -- I did mention this,
13          because let me tell you what he told me.
14          Q    Okay.
15          A    He said, "If you're" -- he said, "That's
16          fine, because we can go back and backtrack
17          exactly, you know, what you're telling us."
18          Q    Okay.
19          A    So I know for a fact that I did mention -- I
20          may not have said Malik Lightburn --
21          Q    Uh-huh (affirmative response).  Okay.
22          A    -- but I did say Talent Management.
23          Q    So -- but did you say Talent Management gave
24          you permission?
25          A    I -- well, maybe I said the go-ahead.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q    Okay.
 2      A    I insinuated that I was told that I could do
 3      those things.
 4      Q    Okay.  So, the question about these searches
 5      here, why were they all for small business
 6      tutorials?
 7      A    And this is, again, the truth.  I -- whenever
 8      I learn something and I'm having to learn it on my
 9      own, I learn better for something that I kind of
10      know something about already.
11           What I was doing, I did the small business,
12      but what I was learning, or what I was trying to
13      learn, is how to do formulas.  I was learning --
14      trying to learn how to format.
15           Everything that I did did not -- was not used
16      outside of SRNS.  It was -- when I say it was not
17      used outside, it was not used to help with
18      anything, except for me trying to teach myself how
19      to work efficiently in Excel.
20      Q    Do you see how someone looking at these
21      searches, after knowing about your history of
22      using the government computer prior to run Bea's
23      Place, would think that these spreadsheets are
24      part of you continuing to run an outside business?
25      A    And I --
```

1/8/2025                          ALISHA JOHNSON

```
1              MR. BABB:  Object -- hold on.  Object to
2       the form of question.  Now you answer.
3       A    I understand that.  However, that's why I
4       told the investigator what I was doing and why I
5       was doing it.
6              What I got from the Internet was that I was
7       not being truthful.  That's what came out in my --
8       in the board -- the...
9       Q    Disciplinary Review Panel?
10      A    Yeah.  He said then that I was not being
11      truthful.  And I cannot make somebody believe me,
12      but what I do stand on is, I'll be the first one
13      to raise my hand, and I was being as truthful as I
14      could be.
15             And I get what you're saying, hypothetically
16      looking.  But, again, from me and how I operate,
17      and how I learn and comprehend, that's what I had
18      to do for me.
19             You can look back and see.  If I would have
20      been on the computer doing anything from June
21      up -- it would be right there, but I wasn't.
22      Q    So, on the second page, if you look at the
23      top here, October 5th, 2022, there's a search for
24      SCDOR legal counsel.  Do you see that?
25      A    And what page is that?
```

1/8/2025                    ALISHA JOHNSON

1    Q    Page two, right there.

2    A    Okay.  So -- and I told Bill about that that

3    day.  I had to go to SCDOR because it was a form

4    that I needed to sign to get over to SCDOR.

5         I was in execution that week.  I worked in a

6    limited area, meaning I cannot have a personal

7    cell phone, I can't have a personal iPad, or a

8    personal computer.  They needed that document

9    right away.

10   Q    Do you remember what document it was?

11   A    It was -- I had to -- I was on the phone.

12   They told me how -- whatever the form number was.

13   And I just typed in the number, got the document,

14   signed the document, and I emailed it to them.

15        All of this took maybe two or three minutes,

16   and, to me, I didn't own the business anymore.  I

17   wasn't -- didn't do it for, like, any -- for

18   personal gain on my part.  It was de minimis use,

19   and I thought that it was okay.

20   Q    The policy, though, doesn't say -- excuse de

21   minimis use, does it?

22   A    I don't understand what you're saying.

23   Q    You said this is de minimis use, is what you

24   thought, but the policy doesn't excuse de minimis

25   use.

1/8/2025                          ALISHA JOHNSON

```
1              MR. BABB:  Object to the form.
2     Q    It says strictly forbidden, right?
3              MR. BABB:  Same objection.
4     A    So, from what I -- what I'm understanding, it
5     says completely forbidden if you're operating your
6     business.  At this time, I did not own the
7     business anymore.
8     Q    You got rid of the business when?
9     A    May 2022.
10    Q    Okay.
11    A    October 2022, I did not own that business
12    anymore.
13    Q    So, that was to facilitate your husband
14    owning the business?
15    A    That was -- that was to facilitate -- not
16    to -- it didn't sell.  It was just a form that was
17    needed.
18    Q    For what?
19    A    It was needed for my husband to do something
20    with that, with the business.
21    Q    So, for him to run the business.
22    A    Not to run the business, no.
23             MR. BABB:  Object to the form.
24    A    The form he needed, it's a form that had to
25    be signed with the selling of the business that --
```

1/8/2025                    ALISHA JOHNSON

```
 1    I cannot remember the exact form it was.  But,
 2    again, it went directly to SCDOR.
 3    Q    So, it was part of transferring the business
 4    to him?
 5    A    I don't -- I don't know how to answer that.
 6    Let me see.  The business was already in his name.
 7    He already owned the business.  This had nothing
 8    to do with the sale of the business.
 9         I started the sale of the business in January
10    of 2022.  It concluded in May of 2022.  The
11    business was sold.  It was gone in May '22.
12    May 1st, 2022, Bea's Place, LLC, no longer
13    existed.  My husband and I were separated.  We
14    were not -- we were not really, like,
15    communicating like that.
16         So, something was going on.  I cannot
17    remember exactly what it was.  It was some type
18    of -- it was some type of legal form, and they
19    needed it.
20    Q    Needed it for the business?
21    A    SCDOR needed it.
22    Q    If you hadn't given it to them, would the
23    business have been just fine?
24    A    The business was already sold.  The business
25    would have been just fine, I guess.  You know, I
```

1/8/2025                    ALISHA JOHNSON

```
 1    am --
 2    Q    I mean, you said it was urgent.  You had to
 3    do it right then.  You're in this restricted area.
 4         MR. BABB:  Object to form.  She's
 5    already asked -- answered she doesn't recall
 6    exactly what the form was.
 7    BY MR. MCWILLIAMS:
 8    Q    Okay.  All right.  So let's go to the next
 9    page, page five, please.
10    A    Okay.
11    Q    So, we've got some searches on December 20th
12    for profit and loss template, small business tax
13    returns, what is considered material for business
14    tax purposes.  Do you see that?
15    A    I see it.
16    Q    Did you make those searches?
17    A    I'm sure I did.
18    Q    What were those searches for?
19    A    Again, Google searches just for my -- just
20    for me to get some information.  Just a search.
21    Q    I mean, you searched a profit and loss
22    template a lot.  You had several of them on the
23    last one.  You're that interested in profit and
24    loss templates?
25    A    What's the question?
```

1/8/2025                    ALISHA JOHNSON

1    Q    I mean, so just every once in a while you

2    want to -- I'm asking why you search so many times

3    for profit and loss templates.

4    A    Because I can't understand it, and I'm trying

5    my best to try to understand exactly what it is.

6    Q    Okay.

7    A    So, I just -- just for my knowledge.

8    Q    Why would you need to know what is considered

9    material for business tax purposes?

10   A    I'm not sure.  Maybe I was having a

11   conversation with somebody about it.  I don't

12   know.  But, again, I did not own a business at

13   that time and....

14   Q    So, on December 28th and 29th, there's two

15   searches for Clover.  Do you see that?

16   A    I do.

17   Q    Did you make those searches?

18   A    I did.

19   Q    What was that for?

20   A    I received an email from Clover that appeared

21   to be like -- I don't -- since I didn't have

22   Clover anymore, however the email came in, it

23   seemed to be like somebody could have been trying

24   to hack me or something.

25        So, what I did is, I didn't go to a Clover

1/8/2025                          ALISHA JOHNSON

```
 1    point of sale, because I didn't have a Clover
 2    account or anything anymore.  I went to try to
 3    find maybe a good phone number or something, and I
 4    told Bill about that, too.
 5    Q    Okay.  So, bottom of page five through page
 6    seven are YouTube videos you searched, or that's
 7    what it appears to be.  Would you agree with that?
 8    A    Yes.
 9    Q    Okay.  So, on page six, we've got several
10    things for bookkeeping for small businesses.  I
11    see three of those.  Would that be what we talked
12    about already?
13    A    As far as me trying to figure out how to work
14    Excel and all the -- all of that that comes with
15    it.  I was trying to just get it together.
16    Q    What about cash flow statements basics on
17    January 9th?
18    A    I'm not sure.
19    Q    Did you go to that -- did you watch that
20    video?
21    A    It says ten seconds, so I don't think I
22    watched anything.
23    Q    Okay.  How about January 9th, as well?
24    There's a bookkeeping for small businesses DIY,
25    22 minutes and 57 seconds.
```

1/8/2025                          ALISHA JOHNSON

```
 1    A    I did watch that video.

 2    Q    You didn't watch it?

 3    A    I said I did watch that video.  And, again,

 4    all the videos that I watched, to me, I was trying

 5    to gain more knowledge on the concept of Excel,

 6    how to get into it, the background, and all

 7    different aspects of it, too.

 8    Q    So, all these that are talking about

 9    bookkeeping basics, all those things -- there's a

10    lot of them -- you're saying all those are you

11    trying to train yourself on Excel?

12    A    Okay.  So, if you look at some of them, when

13    the video comes up, maybe it's -- I'm not going to

14    tell you that I watched every one of them.

15    Q    Uh-huh (affirmative response).

16    A    But anything that I accessed, I accessed it

17    with the intent on trying to better myself and

18    better my knowledge on Excel.

19    Q    Okay.  Let me turn to page eight.  So, we

20    look at the very first email on there.  Does this

21    appear to be a list of emails you sent, either to

22    or from your SRNS?

23    A    Did we already go over the 2021?

24    Q    So, that was only through May of 2021.  Your

25    Corrective Contact was in May, so this started
```

1/8/2025                          ALISHA JOHNSON

```
 1      again in June after your Corrective Contact.
 2      A    So, with the emails, again, I did not know
 3      that I could not send or receive emails.  That's
 4      not what I took away from the contact.
 5      Q    Well, SRNS's policy says that ignorance of a
 6      rule isn't an excuse, correct?  We looked at that
 7      earlier?
 8      A    We looked at that rule earlier.  But, again,
 9      with using my email, it didn't -- I was not trying
10      to operate a business with using my emails.
11      Q    Okay.
12      A    And, again --
13      Q    I understand.
14      A    It's just --
15      Q    I understand.
16      A    It's so --
17      Q    Let me -- please let me ask the questions.  I
18      understand that you -- your position on it.  Now,
19      please let me ask my specific questions.
20           So, June 30th, 2021, looks like there was an
21      email from beasplacellc@gmail.com to your SRNS
22      website; is that correct?
23      A    That's correct.
24      Q    Who has the email for Bea's Place, LLC?
25      A    That was my email.
```

1/8/2025                          ALISHA JOHNSON

1    Q    Okay.  So you sent an email to your SRNS
2    website [sic]?
3    A    I had that Bea's Place email on my cell
4    phone.
5    Q    And -- but you sent it to your SRNS website,
6    correct?  I mean, email address.
7    A    And, again, I had that on my cell phone.
8    Q    And what's the subject of that?
9    A    TreSounds/Walker contract.
10   Q    What's that?  What was that for?
11   A    (Reading.)
12   Q    Is it a contract for something with Bea's
13   Place?
14   A    It says TreSounds/Walker contract, so.  I'm
15   not sure exactly what that is.
16   Q    Okay.  So, on July 14th, 2021, you see an
17   email from ahaltiwanger@securityfederalbank.com?
18   A    That's the insurance.  That's who all the
19   insurance is through.
20   Q    Okay.  And that was the insurance that was --
21   and it was sent to your SRNS government email,
22   correct?
23   A    That's correct.
24   Q    And it looks like that's some sort of
25   insurance policy to do with Mjohnson Enterprises,

1/8/2025                    ALISHA JOHNSON

```
1    LLC, correct?
2    A    That's correct.
3    Q    Okay.  And then on the 16th, ahaltiwanger
4    sent your SRNS email something that says --
5    something they wanted either you or your husband
6    to sign.  It doesn't look like your husband's
7    email is on there, that August 16th, 2021 email,
8    is it?
9    A    No, his email is not on there.
10   Q    Okay.  So it was sent to you.
11   A    Yeah, it was sent to me.
12   Q    Okay.
13   A    And it was sent to all the email addresses.
14   I mean, my other email address, my personal email
15   address, as well as my government email address.
16   Q    Uh-huh (affirmative response).  So, on
17   August 30th, 2021 -- or, sorry, the June 30th and
18   the July 14th -- or never mind.  It's a bad
19   question.
20       So, August 30th, 2021, looks like your
21   personal Gmail address, you sent something to your
22   SRNS email address; is that correct?
23   A    That's correct.
24   Q    And it's something to do with Mjohnson
25   Enterprises?
```

1/8/2025                    ALISHA JOHNSON

1    A    That's what it says.

2    Q    Okay.  And did you send that email?

3    A    If it's on here, I'm sure I did.  I just

4    don't know exactly what it is.

5    Q    Okay.  But it had something to do with

6    Mjohnson Enterprises?

7    A    That's what's in the subject.

8    Q    Okay.  So, on December 14th, 2021, you sent

9    something from your personal email address, it

10   looks like, to your SRNS email address at 11:29,

11   and the subject is Bea's Place, TBD.

12   A    That's what it says.

13   Q    Did you send that?

14   A    I had to.

15   Q    Does it appear --

16   A    That's what it says.

17   Q    Does it appear to be about Bea's Place?

18   A    That's what the subject is.

19   Q    Do you remember what the email is?

20   A    I don't remember what the email is.

21   Q    Okay.  So, the next page, we've got

22   January 26th, 2022, another -- at 10:32, there's

23   a -- beasplacellc@gmail.com sent an email to your

24   SRNS website titled "Frontline price list;" is

25   that correct?

1/8/2025                    ALISHA JOHNSON

1    A    That's correct.

2    Q    Does that sound like something to do with

3    pricing at Bea's Place?

4    A    I don't know what a "frontline" is, but it's

5    something to do with pricing as far as the

6    subject.

7    Q    And then, later that same day, you sent

8    another email from beasplacellc to your SRS --

9    SRNS email saying, "I am sharing 2021-2 Front Line

10   Price Sheet with you;" is that correct?

11   A    That's correct.

12   Q    Any idea what that was about?

13   A    Again, I'm not sure what "frontline" is.  I

14   can't tell you without looking at the document.

15   Q    Would you agree that these emails that we

16   just -- the specific ones we just talked about, at

17   least appear to look like they deal with either

18   running Bea's Place or Mjohnson Enterprises?

19   A    I don't agree that they appear to look like I

20   was running or they're running Bea's Place or

21   Mjohnson Enterprises.  I don't.

22   Q    So, you would disagree with that?

23   A    I disagree with that.

24   Q    Okay.  So, when you first spoke with Bill

25   Carter about this, you said that a lot of the

1/8/2025                          ALISHA JOHNSON

```
 1    emails had to do with you wrapping up or
 2    transferring the businesses you owned, correct?
 3    A    From what I can remember -- and I don't
 4    remember a lot about the emails, because I didn't
 5    know that -- I wasn't aware that emails -- I
 6    couldn't send or receive emails.
 7    Q    About Bea's Place or Mjohnson Enterprises?
 8    A    Yeah, because whenever -- from what I was
 9    told, that our emails had opened up and we could
10    email whomever, you know, as long as with the
11    emails -- if the email couldn't be received,
12    there's a firewall there.  Or if we couldn't send
13    them, it was a firewall on the email system.
14         So -- and it's not -- to me, it's not
15    ignorance.  It's just that's what I understood
16    because that's what I was told.
17    Q    Who --
18    A    We could use our cell phones and emails.
19    Q    Who told you that you could send emails for
20    Bea's Place and Mjohnson Enterprises?
21    A    Nobody specifically said I could send emails
22    pertaining to Bea's Place or Mjohnson Enterprises.
23    What I was told, that I could send any emails that
24    were not, like, gambling-related, porn-related.
25    Those were the things that were off-limits.
```

1/8/2025                    ALISHA JOHNSON

```
1     Q    Who told you that?
2     A    I can't remember exactly who told me that,
3     but that's what I was aware of.  And you can
4     almost ask anybody else that works out there.
5     It's the same thing.
6     Q    Okay.  These emails that we just looked at
7     that happened in June of '21, December of '21,
8     those were before you transferred the business
9     over, correct?
10    A    That's correct.
11    Q    Okay.
12    A    But, again, if I thought that I was doing
13    something outside of the lines, I would not have
14    done it.
15    Q    Uh-huh (affirmative response).
16    A    So, I did not think that anything was wrong
17    with receiving or sending emails.  I had my
18    personal email on the cell phone.  I had my SRNS
19    email on the cell phone.  Nothing was ever
20    triggered saying, "There's a firewall.  You can't
21    receive this or --
22    Q    I understand --
23    A    -- you can't send that."
24    Q    I understand your position of what your
25    knowledge was.
```

1/8/2025                    ALISHA JOHNSON

1           You met with Investigator Carter twice for
2    this 2023 investigation, correct?
3    A    Yes, I met with him right after I was
4    interrogated for over three and a half hours, and
5    then I had to go back.
6    Q    Okay.  So you met with him again, like, later
7    in February?
8    A    I did.
9    Q    Okay.  And you explained some of these items
10   like you've been explaining to me at that time,
11   correct?
12   A    Right, but we did not go over these emails.
13   Like, I didn't know anything about them.
14   Q    When you were talking to Investigator Carter,
15   did you say you knew you were in a, quote, red
16   zone about your visits to Clover and the
17   Department of Revenue website?
18   A    Those two, I did.
19   Q    Okay.
20   A    And I went to SCDOR one time and I went to
21   Clover twice.  I did not -- when I told him the
22   "red zone," I was not going to handle any type of
23   business for myself.
24   Q    And did you tell him that you were smart
25   enough to know you were in violation of the

1/8/2025                    ALISHA JOHNSON

```
 1    policy?
 2          MR. BABB:  Object to the form of the
 3    question.  You can answer.
 4    A    I don't remember saying that and -- I don't
 5    remember saying that.  If I said -- I don't
 6    remember saying that.
 7    Q    Okay.  Did you tell him that you knew you
 8    were in jeopardy of losing your job?
 9    A    I did tell him that when I went back.
10    Because after talking with legal, General Counsel
11    for three and a half hours, just the things that
12    they were telling me in there, that's what I was
13    going by.
14    Q    Uh-huh (affirmative response).  So can you
15    turn to Exhibit 24, please?
16    A    24?
17    Q    So, real quick, before we to get that, in
18    your --
19    A    What's 24?
20    Q    24 is the next one.
21          In your conversations with Investigator
22    Carter in 2023, did you ever tell him that you
23    felt you were being targeted because of your race?
24    A    I didn't talk to him about that as far as I
25    can remember.
```

1/8/2025                           ALISHA JOHNSON

1    Q     Did you ever tell him that you felt you were

2    being targeted because of your sex?

3    A     Not that I remember.

4          (DEFENDANT'S EXHIBIT 24 WAS MARKED FOR

5    IDENTIFICATION PURPOSES (9 pages) - 01AF000006-15)

6    Q     Okay.  All right.  So Exhibit 24, have you

7    ever seen this before?

8    A     I think I looked over this before.

9    Q     Okay.

10   A     And...

11   Q     Well, I'll represent to you, this is a report

12   that Investigator Carter prepared as part of the

13   2023 investigation into your misuse of government

14   resources and it's maintained in the ordinary

15   course of business by SRNS, and we produced it to

16   your attorney during discovery.

17         Can you look at page one, please?

18   A     Yes.

19   Q     All right.  If you look under the heading

20   Concern, it states, "On January 27, 2023, Alison

21   Maurer, Special Agent, Office of the Inspector

22   General, contacted this investigator to request

23   assistance with setting up an interview for an

24   SRNS employee, identified by Maurer as Alisha

25   Johnson, Work Window Coordinator, HB Line WPMC."

1/8/2025                    ALISHA JOHNSON

1          "Maurer advised that Johnson was the subject
2     of an OIG criminal investigation.  She declined to
3     offer details but explained that the investigation
4     was loosely related to the misuse of government
5     resources."  Did I read that correctly?
6     A    Yes.
7     Q    So Alison Maurer, do you know her?
8     A    I don't know her.  She was one of the General
9     Counsel personnel that interrogated me.
10    Q    So is it your understanding that the Office
11    of the Inspector General is separate from SRNS?
12    A    I don't know.
13    Q    Okay.  So, if I told you it was an outside
14    government entity, you wouldn't know?
15    A    No.
16    Q    Okay.
17    A    But are you telling me that?
18    Q    Well, I'm not under oath here, so.
19    A    I mean, I'm just asking.  I don't know.  I
20    seriously don't know.
21    Q    No, that's fine.  I just wanted to know what
22    your knowledge was.  That's the point of the
23    deposition, is to get your knowledge on what's
24    happened.
25         So based on this statement here in

1/8/2025                    ALISHA JOHNSON

1    Investigator Carter's report, it was Alison Maurer
2    who went to the Office of General Counsel to start
3    an investigation; is that correct?
4    A    That's correct.
5    Q    Okay.  Do you have anything -- any evidence
6    to substantiate your hunch that you had that it
7    was someone from your workplace that provided an
8    anonymous tip?
9    A    I don't have anything concrete.
10   Q    Okay.  So, earlier, when we were looking at
11   SRNS's rules in the handbook, you agreed that SRNS
12   employees have to comply with an OIG
13   investigation, correct?
14   A    I agree.
15   Q    Yeah.  And so -- and that SRNS is obligated
16   to investigate issues presented to it by the OIG,
17   correct?
18   A    Correct.
19   Q    Okay.  So when Alison Maurer came to
20   Investigator Carter, under SRNS's Rules of
21   Conduct, he was obligated to investigate that,
22   correct?
23   A    Correct, I agree.
24   Q    Okay.  So if we go to page eight.  So, if you
25   look at page eight, the second to last paragraph,

1/8/2025                          ALISHA JOHNSON

1    it states, "The previous SRNS internal
2    investigation was then brought up by Johnson.  She
3    alleged that she had stayed away from the websites
4    that the reason that investigation was initiated,
5    Clover and SCDOR.  She stated she realizes that
6    she is in a red zone because she has done some
7    things and looked at some things."  Did I read
8    that correctly?
9    A    Yes.
10   Q    Is that accurate?  Did you say those things
11   to Investigator Carter?
12   A    I don't recall that verbiage as far as the
13   "red zone," but I do -- I did tell him that I had
14   went to Clover and I told him why, and I told him
15   I had went to SCDOR and I told him why.
16        "Stated that she was in the red zone because
17   she has done some things and looked at some
18   things."  If I said that, that was referring to
19   things I had done previously, so that could make
20   it look bad.  If that's -- if I said "red zone,"
21   that's what I meant by it.
22   Q    Okay.
23   A    Not that I did some things now.  I don't
24   think that's what I meant.
25   Q    Okay.  So next page, page nine.  And you'll

1/8/2025                    ALISHA JOHNSON

```
1    see the second full paragraph in there, a little
2    more than halfway down, starting after "she
3    continued."  Do you see where I am?
4    A     "She continued," I see it.
5    Q     Okay.  So right after that, he quotes you as
6    saying, "So I know what it looks like and I know
7    how it is.  I'm smart enough and I've got enough
8    sense enough to know that, yeah, I have -- I am in
9    violation, I am, and I cannot make any more
10   explanations just to tell you that I did not go
11   into it thinking that I'm sneaking doing
12   something."  Did I read that correctly?
13   A     You read that correctly.
14   Q     Does he quote you correctly?
15   A     And, again, all of this was done after three
16   and a half hours of being interrogated in that
17   room.  When I left out of there, I thought I was
18   the worst person in the world.
19         I told them over and over again that I didn't
20   do something.  They kept telling me that I did.
21   So now I think that I'm in trouble everywhere.  I
22   don't know exactly what.  So things that I was
23   saying, I don't remember exactly what I said.  I
24   can't even tell you exactly what I -- what I
25   meant.
```

1/8/2025                          ALISHA JOHNSON

```
1          To me, this looks like some jarvish
2     (phonetic) because, again, in the state of mind
3     that I was in after coming out of the
4     interrogation room, going right into this room,
5     all I'm thinking now is, I'm about to lose my job
6     because I got these three people in blue jackets
7     that are like in here acting like I've done the
8     worst thing in the world.
9          Me, I'm somebody that's never really been in
10    any real trouble, never really looked -- never
11    been on the bad side before.  So, again, I got
12    mixed emotions.  I'm everywhere.  So I don't -- I
13    cannot say that I was in the right state of mind
14    to even be talking to Carter.
15    Q    Do you dispute that you said that?
16    A    If it's on -- if it's on tape, I can't
17    dispute that I said it if I can listen to what I
18    said.  But all I'm giving you is behind it.
19    Q    Do you know if you said that on the one --
20    the first interview with Investigator Carter,
21    which would have been after your meeting with OIG,
22    or did you say it on the second one?
23    A    On the second interview with him, I was in a
24    more frenzied state of mind after that because I
25    already knew, I saw the writing on the wall, I was
```

1/8/2025                    ALISHA JOHNSON

```
1    getting ready to lose my job.  And it was just a
2    frenzy from everything that was going on and
3    everything started coming back, so it was a
4    whirlwind.  So, no, I don't know which one it was,
5    sir.  I don't.
6    Q     Would you agree in here, though, that the
7    phrase "I am in violation" --
8    A     If you're --
9    Q     -- says that you're in violation of SRNS's
10   rules?
11         MR. BABB:  Object to the form of the
12   question.
13   A     If I said that, it's because that's what --
14   for the last three and a half hours, that's what I
15   had been told.  I was in violation.  I'm in
16   violation.  I'm in violation.  That's what I
17   was -- in that -- when I was being interrogated.
18   Q     Was the OIG -- when they interrogated you,
19   they weren't interrogating you about SRNS rules.
20   They were interrogating you about the PPP loan,
21   correct?
22   A     Oh, that went together for me as far as when
23   I was sitting in there talking to Bill right after
24   that.  Everything just ran together for me.
25   Q     Okay.  So the last line of the paragraph,
```

1/8/2025                          ALISHA JOHNSON

1    that same paragraph, he has you saying, "I know
2    that I am in jeopardy of possibly losing my job."
3    Is that true?  Did you make that statement to him?
4    A    Yes, I did.
5    Q    Okay.  So we've got the Conclusion here down
6    at the bottom of page nine onto page ten.  Do you
7    see that?
8    A    I see it.
9    Q    And starting with the second sentence, which
10   goes onto page ten, it says, "Clear and convincing
11   evidence was obtained proving that Johnson used
12   her government-issued computer and
13   government-issued email account to conduct
14   operations solely related to her personal
15   business, Bea's Place, and her husband's personal
16   business, 306 On York."  Did I read that
17   correctly?
18   A    Yes.
19   Q    All right.  And I know that you dispute that
20   you did that, but that conclusion is a violation
21   of our SRNS's rules, correct?
22   A    And that's Bill's conclusion.
23   Q    Yeah, and the conclusion that he came to was
24   that you violated SRNS's rules, correct?
25   A    That was Bill's conclusion that he came to.

1/8/2025                          ALISHA JOHNSON

```
1     Q     Yes.  So -- and then the next -- the full --
2     the full paragraph on page ten, he goes on to say
3     that you gave inconsistent and false statements to
4     him, specifically stating that you told him you
5     had not visited Clover or the SCDOR since
6     receiving your Corrective Contact, but the
7     indisputable evidence shows that you had visited
8     those websites; is that correct?  Is that the
9     conclusion that he reached?
10    A     That's what he reached, but it contradicts,
11    because I did tell him that I did go back to
12    Clover on the grounds that I went back to Clover
13    for, were not to access anything pertaining to
14    trying to run a business.
15    Q     Uh-huh (affirmative response).
16    A     I told him exactly what happened, and
17    whenever you pulled -- they pulled it up, they can
18    see I was only on the -- on the website for maybe
19    a minute or two.
20    Q     Okay.
21    A     I told him again I went to SCDOR.  I did not
22    lie to him.  I told him that before.  I said, "I
23    went to Clover and I went to SCDOR."  I told him
24    that.
25    Q     And so this conclusion that he reached --
```

1/8/2025                          ALISHA JOHNSON

1    A    Uh-huh (affirmative response).

2    Q    -- also is a violation of SRNS's rules,

3    correct?

4         MR. BABB:  Object to the form.

5    A    I'll need you to re-ask that.

6    Q    I understand that you dispute the conclusion

7    he reached, but --

8    A    I dispute it.

9    Q    But the conclusion that he reached

10   constitutes a violation of SRNS's rules, correct?

11        MR. BABB:  Object to the form.

12   A    The -- in my opinion, the conclusion that he

13   reached directly -- he's saying that, basically --

14   I don't agree with the conclusion that he reached.

15   Q    I understand you don't agree with the

16   conclusion.  I'm not asking you to say that his

17   conclusion is correct.  I'm asking you to say,

18   this conclusion, that what he's -- what he

19   concluded you did, whether you agree you did it or

20   not, is a violation of the SRNS's rules, what he

21   said you did.

22        MR. BABB:  Object to the form.

23   A    (Reading.)  So as I understand correctly,

24   you're asking me about the last sentence.  "These

25   actions are in violation of the SRNS HR rules," is

1/8/2025                          ALISHA JOHNSON

```
 1      that what you're asking me about?
 2      Q    Yes, I'm saying that -- I understand you're
 3      saying you didn't do what he said you had done.
 4      A    Okay.
 5      Q    But he -- he's saying you did.  And if you
 6      had, if, that would constitute a violation of
 7      SRNS's rules.
 8      A    And that would --
 9           MR. BABB:  Same objection.
10      A    And I agree, what he's saying does go against
11      SRNS rule.
12      Q    Uh-huh (affirmative response).  Okay.
13           So, after you met with Investigator Carter
14      the second time, did you receive a notice that
15      you're going to a Disciplinary Review Panel?
16      A    Yes.
17           (DEFENDANT'S EXHIBIT 25 WAS MARKED FOR
18      IDENTIFICATION PURPOSES (1 page) - 01AB000025)
19      Q    Okay.  Turn to Exhibit 25, please.
20      A    Yes.
21      Q    Have you seen this before?
22      A    Yes.
23      Q    What is it?
24      A    That's the invite.
25      Q    To your --
```

1/8/2025                    ALISHA JOHNSON

1    A    The Disciplinary Review Board.

2    Q    Okay.  That you -- for your potential

3    discipline?

4    A    That's correct.

5    Q    And does this tell you what the purpose of

6    the meeting is?

7    A    Yes, the purpose, it does.

8    Q    What is the purpose of the meeting?

9    A    To allow you the opportunity to present your

10   case to the panel regarding providing false

11   information during a company investigation and

12   misuse of government resources.

13   Q    Okay.  And did you attend the Disciplinary

14   Panel meeting?

15   A    I did.

16   Q    And the meeting was held on February 22nd,

17   2023, correct?

18   A    Yes.

19   Q    Had you ever been to a Disciplinary Panel

20   meeting before?

21   A    No.

22   Q    So were you in the meeting the whole time?

23   A    I don't understand.

24   Q    So, the Disciplinary Panel meeting, were you

25   in the meeting the whole time, or did you only go

1/8/2025             ALISHA JOHNSON

```
1    in for part of the time?
2    A    I went in for my part.  I'm not sure how it
3    works.  I don't know if -- so I was in there for
4    the whole time that they had me in there.
5         (DEFENDANT'S EXHIBIT 26 WAS MARKED FOR
6    IDENTIFICATION PURPOSES (7 pages) - 01AB000003-9)
7    Q    Okay.  So I'm going to ask you to look at
8    Exhibit 26, please.
9    A    Okay.
10   Q    So, I'll just tell you that -- maintain to
11   you that this is a document that SRNS maintained
12   in the ordinary course of business and they -- we
13   produced it to your attorney during discovery.
14        And it's the meeting minutes or the record of
15   the Disciplinary Review Board meeting for your
16   disciplinary review.  And at the top, does this
17   say it's the Disciplinary Review Board Meeting
18   Record?
19   A    Yes.
20   Q    All right.  And it says the date is
21   February 22nd, 2023?
22   A    Yes.
23   Q    And it's got your name and employee ID?
24   A    That's correct.
25   Q    And it says "Previous Discipline Record,
```

1/8/2025                          ALISHA JOHNSON

```
 1      5/21," meaning May 2021, you received a Corrective
 2      for unauthorized use of government equipment?
 3      A    Yes.
 4      Q    And that's accurate, you received that?
 5      A    That's correct.
 6      Q    Okay.  And then the discipline issue was
 7      "providing false information during a company
 8      investigation and misuse of government resources"?
 9      A    That's correct.
10      Q    And that's what the panel was convened for?
11      A    Yes.
12      Q    Okay.  So, it looks like down here, starting
13      below the chart, that it's kind of got, "Hey, this
14      is the actions that happened during the meeting."
15      Is that what it looks like to you?
16      A    A meeting overview?
17      Q    So, it kind of looks like this is -- this is
18      what happened during the meeting.  So we've got
19      Introduction of Panel, Meeting Overview, Overview
20      of Employee Background, and then it goes onto the
21      next page.
22      A    Okay.  Understand.
23      Q    Does that -- is that what it appears like to
24      you?
25      A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
 1     Q    Okay.

 2     A    Yes.

 3     Q    And so you weren't there for the introduction

 4     of the panel?

 5     A    (No response.)

 6     Q    The first thing on here, it says Introduction

 7     of Panel.  You weren't -- you weren't present in

 8     the meeting during that time, were you?

 9     A    I think I was.

10     Q    You think you were there?

11     A    I'm -- they introduced the panel.

12     Q    Okay.  So you were there for the introduction

13     of the panel.  What about the Meeting Overview,

14     were you there for that?

15     A    Is that the meeting that I was...

16     Q    I think there's another part where you speak.

17     This is not the part where you speak.

18     A    Okay.  Well, I'm not sure.

19     Q    Okay.  So, if we go on to the second page --

20     A    Okay.

21     Q    -- it does look like -- it says Employee

22     Briefing.  And underneath it's got some bullet

23     points, and it looks like those are things that

24     maybe you said during this meeting.  Does those

25     bullet points look like things you said during the
```

1/8/2025                    ALISHA JOHNSON

```
 1    meeting?
 2          MR. BABB:  Object to the form.
 3    A    Oh, those are the things that I said during
 4    the meeting.
 5    Q    So that's a "yes," they are?
 6    A    Yes, they are.
 7    Q    Okay.  So the first bullet point says,
 8    "Employee stated she wasn't totally sure why she
 9    was at the DRB, felt that she did not provide
10    false information, however misuse of government
11    resources could be warranted."  Did I read that
12    correctly?
13    A    You read that correctly.
14    Q    Is that what you said at the DRB?
15    A    That's what I said.
16    Q    Okay.  And then if you look further down,
17    it's the -- under Employee Briefing, it's the one,
18    two -- seventh bullet point down.  It says,
19    "Admitted to responding to personal emails onsite
20    using government equipment."  Did I read that
21    correctly?
22    A    Yes.
23    Q    And is that true?  Did you tell that to the
24    DRB?
25    A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
1    Q    Okay.  And then the next one says, "The two
2    takeaways from the first Corrective was not to
3    visit the POS sales site and SCDOR.  Stated she
4    had not used these since May 2021, however OGC
5    investigation determined she had visited these
6    more than twice."  Did you say that?
7    A    I told them -- I told the investigator that I
8    had went to Clover, not to access POS, but because
9    I had received this email that seemed like it
10   could be hacked.  I went to Clover just to get a
11   phone number or like a point of contact with
12   somebody that I could call to see what was going
13   on.
14        I went to South Carolina DOR, not to do any
15   taxes or anything like that.  I just had to get a
16   form so that I could email it.  And I told the
17   investigator that before the search.  I told --
18   you know, so that was my stance and that's the
19   truth.
20        And that's what I said over and over again.
21   I did not know why I was there as far as I didn't
22   lie about anything.  That's why I told them I did
23   not know why I was at a Disciplinary Review Board,
24   because I didn't feel like my -- I didn't feel
25   like I had did anything so detrimental that I
```

1/8/2025                          ALISHA JOHNSON

```
1    should be at a Disciplinary Review Board.
2    Q    Okay.  Did you tell the panel that you felt
3    you were being retaliated against because you
4    brought up issues related to your race?
5    A    I did not tell the panel anything along those
6    lines.  I was trying to be as humble as I could be
7    and just concentrate on trying to keep my job, and
8    bringing up any type of negative connotation, that
9    would have, in my mind, solidified that I -- or it
10   would make me seem confrontational.  I don't know.
11        I didn't tell the panel that.  Nobody asked
12   me that during the panel.  I never told anybody on
13   that panel on that day anything about what I was
14   going through with the discrimination process.
15   Q    Okay.  And that includes anything with --
16   related to sex discrimination?
17   A    I didn't tell them anything that I was going
18   through.
19   Q    Okay.  You had a character witness speak on
20   your behalf, correct?
21   A    That's correct.
22   Q    Who was that?
23   A    John Litchfield.
24   Q    Why'd you choose John Litchfield?
25   A    Because of -- he's a very truthful person.  I
```

1/8/2025                    ALISHA JOHNSON

1    worked with him, I trained him, and he knows the
2    person that I am.  He's had interaction with my
3    children.  I've had interaction with his children.
4    Q    Okay.  And it looks like here we have what he
5    said.  It says, "Alisha trained him on the job.
6    She's always a hundred percent on her numbers,
7    always willing to help the team.  What she brings
8    to the table is very important.  Drive to do the
9    right thing, both personally and professionally."
10   Did I read that correctly?
11   A    That's correct.
12   Q    Does that accurately reflect what he told the
13   panel?
14   A    It does.
15   Q    Okay.  So, if we turn to the next page, then
16   you can see what's highlighted there.  It says,
17   "Dismiss management, advisors, and HRBP."  Do you
18   see that?
19   A    I do.
20   Q    Is HRBP the HR Business Partner?
21   A    I have no clue.
22   Q    Okay.  Well, does it look like, based on this
23   document, that at this point in the Disciplinary
24   Review Panel, management, advisors, and whatever
25   HRBP is were dismissed from the meeting?

1/8/2025                         ALISHA JOHNSON

1   A    Yes.

2   Q    Okay.  So, then underneath that we see DRB

3   Panel Recommendation, and it states, "Panel

4   members met following the DRB, and again the next

5   day to discuss and make a final decision."  Did I

6   read that correctly?

7   A    Yes.

8   Q    So, based on this document, it sounds like

9   after all these people were dismissed, panel

10  members met and then they met again the next day

11  to try to determine a decision to make; is that

12  correct?

13  A    That's correct.

14  Q    Okay.  So, let's go to the sixth page.

15  A    Page six?

16  Q    Uh-huh (affirmative response).  You see it

17  right here?  No, you went too far, I think.

18  A    Oh, I thought you said the sixth page.

19  Q    Oh, page four, sorry.

20  A    Okay.

21  Q    I was looking at the wrong number.

22       All right.  So, I will represent to you that

23  these three people at the top are the three

24  members of your Disciplinary Review Panel.  The

25  first is Natalie [sic] Johnson.  Do you know

1/8/2025                     ALISHA JOHNSON

1        Natalie Johnson?

2        A     I do.

3        Q     Is Natalie Johnson a woman?

4        A     Yes.

5        Q     What's her race?

6        A     Black.

7        Q     Okay.  How do you know Natalie?

8        A     We worked together in -- during ARRA.  She

9        worked -- I think she was a scientist and I was a

10       firstline.  And we bumped heads on a few occasions

11       over like different aspects of the job over in the

12       burial ground.  We were not on good terms.

13       Q     What year was that?

14       A     2010-11, somewhere around that.

15       Q     Okay.  So, you weren't on good terms.  So,

16       you bumped heads just based on what the nature of

17       the job was and y'all's personalities or...

18       A     Yeah, that we -- it, to me, appeared she

19       didn't care for me; I didn't care for her.

20       Q     Okay.  All right.  So, then the next one, it

21       looks like it's Adryan Henderson.  Do you know who

22       that is?

23       A     That was -- I don't know who she is or he is.

24       I don't know if it's a girl or a guy.

25       Q     So, you don't know gender or race?

1/8/2025                    ALISHA JOHNSON

```
 1      A    No.

 2      Q    Okay.  What about Steve Whitcomb?

 3      A    No, don't know him, either.

 4      Q    So, you don't know if that's a guy or a girl?

 5      A    Well, Steve would appear to be a guy.  Adryan

 6      is -- could be either or, so.

 7      Q    Okay.  And you don't know Steve's race or

 8      anything?

 9      A    No, I don't know him.

10      Q    Okay.  So, then it appears the second -- the

11      box right across from them is their comments.

12      Natalie Johnson said, "If this was the first time,

13      would consider being more lenient.  Onsite

14      25 years, should know better.  Management has lost

15      trust in her.  Final decision is to terminate."

16      Did I read that correctly?

17      A    Yes.

18      Q    So, then Adryan Henderson said, "Management

19      has already given her a second chance.  As a

20      25-year employee, she should know the importance

21      of following procedure.  She knows the SRNS

22      culture and has worked in SRTE.  Using government

23      equipment for personal business is never okay.

24      Decision is to terminate."  Did I read that

25      correctly?
```

1/8/2025                    ALISHA JOHNSON

```
1    A    Yes.
2    Q    And then across from Steve Whitcomb, it says,
3    "Even though she's a 25-year employee, she's
4    already been extended grace less than 18 months
5    ago for the same behavior.  Based on totality of
6    circumstances, decision is to terminate."  Did I
7    read that correctly?
8    A    Yes.
9    Q    So, it sounds like, to me, the panel really
10   took into consideration the fact that you were a
11   longtime employee.  Would you agree with that?
12        MR. BABB:  Object to the form.
13   A    I feel like if they would have taken into
14   consideration that I was a longtime employee, that
15   they would not have terminated me.
16   Q    Well, based on what we've read here, one of
17   the things they've placed a lot of emphasis on was
18   the fact that you're a longtime employee, correct?
19   A    And also management has lost trust in her.
20   Q    So, one person said that.  Was one of the
21   things that you were a longtime employee?
22   A    I agree that each one of the -- each one of
23   these people said I was a longtime employee.
24   Q    Uh-huh (affirmative response).  And did
25   they -- each one of them also say -- or, sorry, at
```

1/8/2025                    ALISHA JOHNSON

```
 1      least -- yes, each one of them said, this is your
 2      second time with this same violation, correct?
 3      A    (Reading.)  All of them referenced that, yes.
 4      Q    Okay.  So, they felt the correct decision was
 5      to terminate you, correct?
 6           MR. BABB:  Object to the form of the
 7      question.
 8      A    They all said terminate.
 9      Q    Is there anything based on this or any
10      evidence you have at all that Natalie Johnson,
11      Adryan Henderson, and Steve Whitcomb decided to
12      terminate you because of your race?
13      A    Not either of them, no.
14      Q    Is there -- do you have any evidence at all
15      that Natalie Johnson, Adryan Henderson, and Steve
16      Whitcomb decided to terminate you because of your
17      sex?
18      A    No, I don't.
19      Q    Do you have any evidence that Natalie
20      Johnson, Adryan Henderson, and Steve Whitcomb
21      decided to terminate you because you made
22      complaints about racial slurs at work?
23      A    No, I don't have any evidence.
24      Q    Do you have any evidence they even know that
25      you made complaints about racial slurs at work?
```

1/8/2025                    ALISHA JOHNSON

1    A    Natalia -- I'm not for certain, but Natalia
2    may know something about that.
3    Q    How would Natalia know something about that?
4    A    She could have been privy to talking to
5    somebody else that knew something about it.
6    Q    Do you have any evidence that she was privy
7    to talking to someone else about it?
8    A    I don't have any concrete evidence.
9    Q    Do you have any evidence, even if it's
10   non-concrete?
11   A    Not that I can produce at this time.
12   Q    Are you actively looking for evidence that
13   Natalie Johnson spoke to someone about your
14   complaints?
15   A    Not at this moment.  Not at this time.
16   Q    Okay.  And when I asked -- do you have any
17   evidence that Natalie Johnson, Adryan Henderson,
18   and Steve Whitcomb terminated you because you
19   complained about being overlooked for the SPOC or
20   the Lead Planner position?
21   A    I don't have any evidence.
22   Q    Do you have any evidence they even knew that
23   you were overlooked for the SPOC or Lead Planner
24   position?
25   A    Not that I know of.

1/8/2025                        ALISHA JOHNSON

```
 1      Q    Okay.  So, after the Disciplinary Review
 2   Panel met -- or, sorry, when did you meet with
 3   management about -- when they informed you of your
 4   termination?
 5      A    It was either February 28th or March 1st, one
 6   of those days.
 7           (DEFENDANT'S EXHIBIT 27 WAS MARKED FOR
 8   IDENTIFICATION PURPOSES (2 pages) - 01AB000027-28)
 9      Q    Okay.  Will you look at Exhibit 27, please?
10   Do you recognize this?
11      A    I do.
12      Q    What is this?
13      A    That's the -- that's the form I signed when I
14   was terminated.
15      Q    And so this is your termination form?
16      A    That's correct.
17      Q    Okay.  And under Section 3, it lists the
18   rules that you are -- you were found by SRNS to
19   have violated; is that correct?
20      A    That's correct.
21      Q    Okay.  And if you look at -- it says that you
22   violated Manual 5B, Procedure 1-4, Section
23   5.23.3(2)(A)(4), which states, "All users of
24   government computers and network resources for
25   incidental personal use is strictly forbidden to,
```

1/8/2025                    ALISHA JOHNSON

```
1    in any way, facilitate the employee's outside
2    personal business."  Did I read that correctly?
3    A    Yes.
4    Q    And we looked at that rule earlier, correct?
5    A    Yes.
6    Q    Okay.  And then it also says, "Manual 5B,
7    Procedure 1-4, Section 5.15(Q), which prohibits
8    failure to fully cooperate and/or provide
9    requested information, including but not limited
10   to, making false statements or intentionally
11   misleading management or investigation [sic]
12   during the course of a company investigation."
13   Did I read that correctly?
14   A    Yes.
15   Q    And we looked at those rules before, correct?
16   A    That's correct.
17   Q    And SRNS has a rule that says ignorance of a
18   rule is not an excuse for not violating it,
19   correct?
20   A    That's correct.
21   Q    Okay.  And those policies we looked at,
22   there's no requirement for you to intend to
23   violate the rule, is there?
24       MR. BABB:  Object to the form of the
25   question.  Answer, if you can.
```

1/8/2025                          ALISHA JOHNSON

1    A    Can you rephrase that?

2    Q    Sure.  Do these rules require you to

3    intentionally violate them to be in violation?

4    A    If I can recall, one of the rules, and I'm

5    not sure which one, it says, just paraphrasing,

6    intentionally -- to intentionally do something.

7    Q    Intentionally misleading?

8    A    I'm not sure exactly what it says, but one

9    of -- it's -- it's along the lines -- it has

10   "intentional" in it.  I'm not sure which one it

11   is.

12   Q    Okay.  On the second page of this, that's

13   your signature, correct?

14   A    That's correct.

15   Q    Okay.

16   A    And that's also my statement that I wrote.

17   Q    Uh-huh (affirmative response).  And your

18   statement -- read your statement to me.

19   A    "I fully understand what's happening, but I

20   don't feel like I intentionally misled or violated

21   the policy.  I also don't feel like I should be

22   terminated."

23   Q    Okay.  So going back, the CEO of SRNS when

24   you were terminated, do you know who that was?

25   A    I'm not sure.

1/8/2025                                    ALISHA JOHNSON

```
1    Q    Do you have any evidence that shows the CEO
2    would have approved your termination because of
3    your race?
4    A    No, I don't.
5    Q    Do you know who the COO was of SRNS at that
6    time?
7    A    No, I don't.
8    Q    Do you have any evidence that the COO would
9    have approved your termination because of your
10   race?
11   A    I don't.
12   Q    Do you have any evidence that the CEO or COO
13   would have approved your termination because of
14   your sex?
15   A    I don't.
16   Q    Do you have any evidence that the CEO or COO
17   approved your termination because you made
18   complaints about racially derogatory comments
19   being made at work?
20   A    I don't.
21   Q    Do you have any evidence that the CEO or COO
22   approved your termination because you complained
23   about not getting the SPOC or Lead Planner
24   position?
25   A    I don't.
```

1/8/2025                          ALISHA JOHNSON

1   Q    Okay.  Do you know if the CEO or COO even

2   knows that you made complaints about work?

3   A    After, after I was terminated, I sent them an

4   email.

5   Q    Before you were terminated, do you have any

6   evidence that they had knowledge about any

7   complaints?

8   A    No, I don't.

9        MR. MCWILLIAMS:  Okay.  Jay, you want to

10  take like ten minutes?

11       MR. BABB:  Yeah.  I mean, I think you

12  got a little more time, but we are getting

13  close, so.

14       MR. MCWILLIAMS:  I think I -- I mean, we

15  took a couple breaks in there, so I think

16  we're good, but I don't have much left, so.

17       MR. BABB:  I'm just giving you a

18  heads-up.

19  (Off the record from 5:45 p.m. to 5:55 p.m.)

20  BY MR. MCWILLIAMS:

21  Q    Okay.  Just a few more questions,

22  Ms. Johnson.  If we could get back to your

23  interrogatory responses, which were -- if we can

24  go to Exhibit 11, please.  If you see on page two

25  of Exhibit 11...sorry.

1/8/2025                    ALISHA JOHNSON

```
 1          All right.  It asks for -- well, let me start
 2     with this.  What are you seeking in this lawsuit?
 3     A    (No response.)
 4     Q    If a judge came to you and said,
 5     "Ms. Johnson, you win.  SRNS has to pay you X,"
 6     what are you seeking?
 7          MR. BABB:  Object to the form of the
 8     question to the extent you have to disclose
 9     any discussions with counsel.
10     BY MR. MCWILLIAMS:
11     Q    Please don't tell me anything you said
12     with --
13          MR. BABB:  But you can -- you can
14     answer.
15     A    Back pay.  To get the termination off my
16     record, because I was able to retire and if they
17     had let me retire, I may have been able to get a
18     job by now.
19          Because being terminated after 25 years at a
20     company such as that, nobody wants to touch me
21     because they don't believe what I'm telling them,
22     about the misuse of a government computer and --
23     and just like my reputation.  I was a damn good
24     employee.  I gave my all to that company and then
25     some.
```

1/8/2025                        ALISHA JOHNSON

1    Q    Okay.  What -- do you have a calculation of
2    what your back pay is?
3    A    It's been two years and in that two years,
4    I -- right before I was fired, I was about to
5    receive a promotion.  And I just -- I need -- I
6    would, again, just love to be able to continue my
7    career.  If not -- not at SRNS, but at any DoD
8    complex.
9    Q    Okay.  But, again, have you calculated what
10   your back pay would be?
11   A    Close to about 300,000.
12   Q    So you made 150k a year?
13   A    I made 180 a year before I left and then with
14   that promotion I was getting, it was going to be a
15   grade 35, and I think it was going to go up to
16   about 118 or 119.
17   Q    All right.  So here, and we're looking at
18   Exhibit 11, it says that you've made $18,000
19   commission from selling life insurance for Global
20   Life [sic]; is that correct?
21   A    That's correct.
22   Q    Have you made any more commissions since you
23   turned that in?
24   A    No, I haven't.  I don't work for them
25   anymore.  They --

1/8/2025                          ALISHA JOHNSON

```
1    Q    Why did you stop working for them?
2    A    Through -- somebody died that had a policy
3    and they died March -- in March of 2023 and they
4    still haven't paid the policy.  Then somebody else
5    just died September 14th of this year, and they
6    have not paid that policy out.  So I don't know if
7    the company is credible.
8    Q    So you quit?
9    A    Yes, I stopped working for them.  I lost
10   credibility with the people I wrote these policies
11   from once they haven't been paid.
12   Q    Have you found other work since you quit your
13   job with -- with GlobeLife?
14   A    No.  Since I have been -- since I was
15   terminated, I've applied for over 180 jobs.
16   Q    Do you have any of the applications?
17   A    I sent all of them.
18   Q    You sent them all to your attorney?
19   A    I did.
20   Q    Did you ever get any interviews?
21   A    I had about 42 interviews.
22   Q    What happened in those 42 interviews?
23   A    I get to the background part -- not all 42
24   offered positions, but during the pre-offering
25   process, when I have to fill out the paperwork of
```

1/8/2025                          ALISHA JOHNSON

1   what I did last and I put I was terminated, and

2   then they ask me why was I terminated and I tell

3   them, it doesn't -- they really don't go anywhere.

4        But I did have somebody from Edgewater, one

5   of the recruiting guys, he's like, "You know,

6   Ms. Johnson, you know, just off the record," he

7   said, "It's really getting to my colleagues and I.

8   You have an impeccable resume.  What in the hell

9   did you do at SRNS?"  It's like nobody would touch

10  me.  He said, "Being terminated after 25 years and

11  you had the opportunity to retire?  You know,

12  something's just not adding up."  So I just have

13  not been able to secure a job.

14       Just like right now, same thing, SRMC,

15  they're trying -- you know, I have like -- when I

16  say a pre-offer, it's just in that stage again,

17  filling out paperwork to try to get access, access

18  to a site, access to a clearance, and it gets

19  there and it stops.

20  Q    So is every place you're applying to kind of

21  a DOE site?

22  A    Well, I applied for Boeing and I applied for

23  Dominion Energy, and I got -- not with Boeing, but

24  with Dominion Energy, I got to the pre-offer,

25  access.

1/8/2025                              ALISHA JOHNSON

```
 1          And then even with them, they held that
 2     position, and when my year was up, they called me
 3     back to re-interview and to retry again.  But
 4     whatever they're looking at, and I don't know what
 5     they see, it won't let them get past to give me
 6     access to the different sites.
 7     Q    So is everything that you're applying to
 8     require a security clearance?
 9     A    Most of the jobs that I am applying to -- I'm
10     sorry.
11          MR. BABB:  Go off the record.
12               (Off the Record)
13          THE WITNESS:  Most of the -- everything
14     that I -- I feel like I qualify for, pretty
15     much are along the lines.  That's why I can
16     only get a job selling life insurance.  Even
17     with life insurance, I had to do a
18     background, but I got through that one.
19     BY MR. MCWILLIAMS:
20     Q    So I'm asking, I guess, a different, like --
21     I know to work on the Savannah River site, you had
22     to have a security clearance, which is different
23     than a regular background check.
24     A    You don't have to have a security clearance
25     to actually work out there.  You just have to get
```

1/8/2025                          ALISHA JOHNSON

```
1    access to the site.
2    Q    Okay.  But I'm talking about -- so, is this
3    just a regular background check that people are
4    looking, or is this a different type of clearance,
5    or you don't know?
6    A    It's -- I don't know.  And I'll just give you
7    some of the places that I applied.  Most of the
8    places are DoD sites, except for Dominion Energy
9    and except for Boeing.
10        I did apply for Vogel, and I got to that pre
11   for one of the jobs.  I couldn't even get an
12   operator job.
13   Q    Have you applied for any jobs that -- I know
14   you're saying you're trying to apply what you
15   think is commiserate with your skill level -- any
16   that are under your skill level, just to get
17   something?
18   A    Life insurance.
19   Q    Anything else besides life insurance?
20   A    I'm not sure that I can answer that, because
21   under my skill level, that's vast.  I mean, I have
22   not applied to work at Walmart.
23   Q    Okay.  So you haven't done anything like
24   retail or anything like -- you haven't tried to
25   apply to those positions, okay.
```

1/8/2025                          ALISHA JOHNSON

```
 1              So have you performed any work for relatives
 2      or friends or any -- relatives or friends or
 3      anyone else that you've received compensation for?
 4      A    Not that I've received money for, no.
 5      Q    Okay.  When did you first start applying for
 6      jobs outside of SRNS?
 7      A    March 1st.
 8      Q    Okay.  And you said you've had about
 9      40-something interviews?
10      A    Forty-two interviews.
11      Q    Okay.  And would you consider all the jobs
12      you've applied for professional jobs?
13      A    Yes.
14      Q    Okay.
15      A    I consider myself as a professional.
16      Q    All right.  So were these jobs all similar to
17      your job at SRNS or different?
18      A    It just depends.  Some of them are similar,
19      some of them are actually the same, and some of
20      them are different.
21      Q    Did any of the companies who rejected you
22      provide a reason for their rejection?
23      A    Not on the book, no.
24      Q    Okay.  So the only reason you've gotten is
25      from the recruiter from Edgewater?
```

1/8/2025                      ALISHA JOHNSON

```
 1    A    And that was off the record.
 2    Q    Okay.  And did he say that multiple companies
 3    had told him this, or just this was his own
 4    personal opinion or...
 5    A    That was his personal opinion, along with
 6    peers, his peers.  They had been discussing it.
 7    Because, again, he said my resume is impeccable.
 8    Q    Uh-huh (affirmative response).
 9    A    They should be able to place me almost
10    anywhere.
11    Q    Did you apply for unemployment benefits?
12    A    I did.
13    Q    Did you receive them?
14    A    No, I was denied.
15    Q    Are you seeking emotional damages as part of
16    this lawsuit?
17    A    Yes.
18    Q    Do you have any evidence showing the amount
19    of emotional damages you're seeking?
20    A    I don't understand.
21    Q    Do you have anything that shows, like, "Hey,
22    this is how much money my emotional damages are"?
23    A    I don't have anything as of yet.
24    Q    Are you claiming the termination caused you
25    emotional damages?
```

1/8/2025                          ALISHA JOHNSON

```
 1      A    The discrimination caused me emotional
 2    damages, as well as the termination.
 3      Q    Had you been seeing a psychologist or a
 4    medical professional for emotional issues prior to
 5    the discrimination?
 6      A    Yes.
 7      Q    How long before prior?
 8      A    Let me -- let me take that back.  When I was
 9    in -- what time I started when Fredericka -- 2017.
10     Yes, it was before the discrimination.
11      Q    Because you had some trauma from your time in
12    the Navy, correct?
13      A    I have disabilities from the military.
14      Q    But you saw a shipmate get killed, right?
15      A    I did.
16      Q    And that was part of your emotional trauma?
17      A    Yes.
18      Q    Okay.  And then, obviously, the situation
19    with your daughter is horrific.  That's caused you
20    emotional trauma, as well, correct?
21      A    Yes.
22      Q    Okay.  Have you gone to see a mental health
23    professional purely because of the discrimination
24    you're alleged occurred with SRNS?
25      A    Yes.
```

1/8/2025                    ALISHA JOHNSON

1    Q    During that time, you didn't discuss any of
2    your other trauma with your daughter or your
3    husband, potentially -- you were separated, I know
4    you're back together -- or the trauma from your
5    Navy?
6    A    I discuss multiple things during my sessions.
7    It's not where I just talk about one thing.
8    Sometimes I might ramble and talk about something
9    that happened when I was three years old, so.
10   Q    Uh-huh (affirmative response).  And your
11   termination, I mean -- let me go back.  I mean,
12   did anyone yell at you when they terminated you?
13   A    No one yelled at me during termination, but
14   during the Disciplinary Review Board, the -- one
15   of the lawyers, he was very irate.  He made me
16   feel inferior.  He made me feel less than a
17   person.  At one time, his body language, it was
18   just like he was disgusted with me.
19   Q    Do you know who the lawyer was?
20   A    I forget his name.
21   Q    Did he -- did he -- he was irate, but was he
22   irate directly towards you or was he just talking
23   in generally irate?
24   A    He was talking directly to me.
25   Q    What did he say?

1/8/2025                          ALISHA JOHNSON

```
 1    A    I don't remember verbatim, but it was because
 2    I kept telling him that I was being truthful and
 3    he kept saying that I was not, that I was being
 4    untruthful, maybe even use the word "lying," I'm
 5    not sure, but he was extremely intimidating.
 6    Q    Okay.  What specific acts of SRNS caused you
 7    emotional harm?
 8    A    The discrimination; then having to actually
 9    train the person for the position that I should
10    have received; being not heard as far as when --
11    especially with the situation with Terry
12    Stoudemire.
13         And when I say I wasn't being heard, it's
14    because, to me, it didn't matter to them that he
15    came over into my space, even after I asked him to
16    leave several times, but it still turned out that
17    I was in the wrong, no matter what.
18    Q    Okay.  When you say the discrimination, are
19    there any acts of discrimination that you allege
20    on the part of SRNS that we have not discussed
21    today?
22    A    Not that I'm aware of at this time.
23    Q    Okay.  When you say discrimination, do you
24    mean the racial slurs that you overheard, as well
25    as the being passed over for the SPOC and Lead
```

1/8/2025                          ALISHA JOHNSON

```
1    Planner position?
2    A    The racial slurs and all of that stuff that I
3    overheard, to me, that was a hostile work
4    environment.  It wasn't discrimination.
5    Q    So you haven't asserted a hostile work
6    environment claim in your Complaint, have you?
7         MR. BABB:  Object to the form of the
8    question.
9    A    No, I don't -- it's not in there.
10   Q    Okay.  Are you claiming physical injuries as
11   part of your lawsuit against SRNS?
12   A    No, not that I'm aware of.
13   Q    Okay.  How much income did you receive in
14   2023, approximately?
15   A    When you say income, what does that all
16   entail?
17   Q    Any money that came to you from any source.
18   A    Okay.  I received -- I took all the money
19   that I had in my 401(k) out, and it was like only
20   126,000.  And that was taxed, and I only received
21   like maybe 90.  And then I received two months'
22   pay, which was about 19,000.
23   Q    So that's all the income you received in
24   2023?
25   A    Oh, no, no, no, no.  And I received $2,098 a
```

1/8/2025           **ALISHA JOHNSON**

```
 1    month starting in July for my pension.  So, two,

 2    four, six, eight -- and another 10,000.

 3    Q    Okay.  But only 19,000 of that was from SRNS

 4    as an employee?

 5    A    Yes, that's correct.

 6    Q    Okay.  What about 2024, how much income have

 7    you received?

 8    A    Just my pension, $2,098 a month.  So about,

 9    what, 24,000?  25,000?

10    Q    And in 2025, you're going to -- so far,

11    you're going to be receiving the $2,098 a month?

12    A    That's correct.

13    Q    Okay.  Is there anything else that you're

14    claiming in this lawsuit that SRNS did wrong that

15    we have not discussed today?

16    A    Not that I'm aware of.

17    Q    Okay.  Did you understand all my questions,

18    besides the ones you asked for clarification on?

19    A    I was going to say, most of it.  Yes, sir, I

20    did.

21         MR. MCWILLIAMS:  Okay.  Jay, I might

22    have, if I look over my notes, something, but

23    if you've got any questions, you can go

24    ahead.

25         MR. BABB:  Okay.  Hold on one second.
```

1/8/2025                          ALISHA JOHNSON

```
 1                    CROSS-EXAMINATION

 2    BY MR. BABB:

 3    Q    If you will, please look at Exhibit 4.

 4    A    (Witness complies.)

 5    Q    On the first page, it has Effective Date.  Do

 6    you see that?

 7    A    Yes.

 8    Q    It has 1/29/2024?

 9    A    Yes.

10    Q    And would that have been after your

11    termination?

12    A    That's correct.

13    Q    Okay.  If you'll flip to page 27, and I'm

14    looking at the Bates number down here.  There'll

15    be a 27 at the end.  I know there's lots of

16    different page numbers, but that's what I'm

17    looking at.  Okay, so the Bates number 27.

18         Counsel asked you a lot of questions about

19    under 5.24.3(2), Limitations, okay?  But 5.24.3(1)

20    is the General Policy, correct?

21    A    That's correct.

22    Q    Okay.  And you've talked a lot today about de

23    minimis.  Is that listed in 1(A)?

24    A    Yes.

25    Q    Okay.  And, specifically, 1(A) says, "The Use
```

1/8/2025                         ALISHA JOHNSON

```
 1      of Unclassified Information Technology Resources
 2      Policy allows the personal use of government IT
 3      equipment by personnel when such use is a de
 4      minimis," parentheses, "insignificant," end
 5      parentheses, "expense to the government."  Did I
 6      read that correctly?
 7      A    Yes.
 8      Q    Okay.  So in your testimony today about your
 9      understanding of "de minimis use," is this what
10      you're referring to?
11      A    That's correct.
12      Q    Okay.  And it's your understanding there's
13      not a general prohibition against any personal use
14      whatsoever?
15      A    Correct, that's what I understand.
16      Q    On -- hold on one second.  Bear with me,
17      because I'm trying not to cover ground we've
18      already tread, so I'm going to jump around a
19      little bit.
20           All right.  In Exhibit 5, is there an
21      Effective Date on this first page?
22      A    11/15/2023.
23      Q    Is that after your termination?
24      A    Yes.
25      Q    Okay.  You talked earlier with counsel about
```

1/8/2025                          ALISHA JOHNSON

1    the racial comments related to the Insurrection or

2    January 6th incident, and regarding the comments

3    surrounding this riot that you talked about

4    earlier.  I'm kind of paraphrasing, but you

5    understand the two events that you had discussions

6    with earlier or testimony earlier today about?

7    A    I do.

8    Q    Okay.  Are you aware of any of those

9    individuals involved in either one of those

10   conversations or making the comments in those

11   conversations being formally disciplined in any

12   way?

13        MR. MCWILLIAMS:  Object to the form.

14   A    No, I don't recall any of them being formally

15   disciplined.

16   Q    And are you aware of any of those individuals

17   being terminated for being a participant and/or

18   making those comments?

19   A    No, I'm not aware that either one of them

20   were terminated.

21   Q    Okay.  And, in fact, did those individuals,

22   at least in the short term, continue to work there

23   after you reported these events?

24   A    Yes, they did.

25   Q    Okay.  And I know you had some trouble

1/8/2025                    ALISHA JOHNSON

```
 1      earlier trying to recall some names about
 2      individuals, but I believe you said you knew them
 3      at the time.
 4           So, at the time these events happened that
 5      you talked to Mr. Youngblood, you knew the names
 6      of those individuals, correct?
 7      A    I gave him all of the names when I talked to
 8      him.
 9      Q    Okay.  And that was my next question.  You
10      told him those names?
11      A    I gave him everybody's name.
12      Q    Okay.  And, in fact, at least after the first
13      situation with the Insurrection, he claimed to
14      have gone and talked to these individuals.
15      A    That's correct.
16      Q    Okay.  Did you ever talk to Tamara
17      Blankenship about the Stoudemire situation?
18      A    Yes.
19      Q    Okay.  Do you feel like you were disciplined
20      more harshly than males or Caucasians?
21           MR. MCWILLIAMS:  Object to the form.
22      A    Yes, I do.
23      Q    And is that part of the disparate treatment
24      that you've alleged as part of this --
25      A    That's correct.
```

1/8/2025                         ALISHA JOHNSON

1    Q    -- action?

2    A    That's correct.

3    Q    When you were called into this meeting with

4    these attorneys that you talked about, this

5    interrogation I believe you referred to it as

6    earlier in your testimony, did anyone advise you

7    you were under a criminal investigation?

8    A    I didn't know that at the time, no, that I

9    can remember.  I just -- I didn't know what was

10   going on.  I just knew I was in some type of

11   trouble.

12   Q    Okay.  Sitting here today, you can't recall?

13   A    I can't recall.  I just know that it was

14   trouble.  I mean...

15   Q    Did anyone advise you that you could be

16   arrested or criminally charged with anything?

17   A    I think I remember that -- I remember that

18   maybe that was said that -- again, I can't recall

19   all of everything.  I just knew that it was

20   trouble.

21   Q    But were you ever told you could have an

22   attorney there in that meeting?

23   A    I think I was -- I don't know if I was told

24   that I could have an attorney, but I -- if I can

25   remember, I was told that maybe I didn't have to

1/8/2025                          ALISHA JOHNSON

```
 1    answer?  I'm -- again, I'm not clear.  I'm not
 2    sure.
 3         MR. BABB:  That's fine.  That's all the
 4    questions I have.
 5         MR. MCWILLIAMS:  Got a few -- just a few
 6    follow-ups.  I think we'll be out of here
 7    pretty quick.
 8                  REDIRECT EXAMINATION
 9    BY MR. MCWILLIAMS:
10    Q    So Exhibit 4, is this policy -- the policies
11    we looked at, are they substantially the same as
12    the policies that you reviewed while you were
13    employed by SRNS?
14    A    I -- I don't know.
15    Q    Do you know of any changes to the policies we
16    reviewed from what the policies were when you were
17    employed?
18    A    I see that it was revised to Rev. 41 on
19    1/29/24.  I don't know what the Rev. was whenever
20    I was terminated.
21    Q    Does it say on the front the description of
22    the revision?  It says -- do you see that?
23    A    I do.
24    Q    So, it looks like Section 5.18 was "Revised
25    and reordered steps in Prescription Safety Glasses
```

1/8/2025                    ALISHA JOHNSON

1    Policy;" is that correct?

2    A    That's correct.  That's correct for this Rev.

3    Again, I don't know what revision was there.  It

4    could have been Rev. 38 when I was fired or

5    something.

6    Q    Okay.  But those -- that's what you see was

7    revised in this, this version?

8    A    That's for -- that's for Revision 41.

9    Q    Uh-huh (affirmative response).

10   A    That's correct.

11   Q    Okay.  And so, Exhibit 5, is this

12   substantially the same as what you recall the

13   policy being when you were employed?

14   A    Again, I -- I'm not sure.

15   Q    Okay.  Does it show you what the revisions

16   were?

17   A    It says that Rev. 20, it was revised on

18   11/15/2023, that was after I was terminated, and

19   it says that Section 5.4 was revised for that Rev.

20   But, again, I don't know what Rev. it was when I

21   was fired.

22   Q    Okay.  And -- all right.  Give me a sec.  Can

23   you pull out, just take it out, Exhibit 27 out of

24   your binder?  I want you to go to Exhibit 4.

25   A    (Witness complies.)

1/8/2025                          ALISHA JOHNSON

```
1    Q    Sorry, I want to make sure I'm at the right
2    exhibit.  Give me a sec.  Okay.  If you look at
3    5.24.3, which is on page 27 of Exhibit 4 -- are
4    you there?
5    A    I am.
6    Q    Section 2, all right, A, says, "All users of
7    government computers and network resources for
8    incidental personal use are strictly forbidden
9    to..."
10        And does that correspond with under Section 3
11   of Exhibit -- what exhibit did we just pull this
12   from -- 27?  Yeah, from Exhibit 27, does that
13   correspond to the first line there of what was
14   Section 5.23.3?  It says, "All users of government
15   computers and network resources for incidental
16   personal use are strictly forbidden to."  Are
17   those -- is that language the same?
18   A    It is.
19   Q    All right.  So then we turn the page in
20   Exhibit 4 and we look at bullet point four, and it
21   says, "In any way facilitate the individual's
22   outside personal business."  Is that the exact
23   same language that then follows up here on
24   Exhibit 27?
25   A    Yes.
```

1/8/2025                    ALISHA JOHNSON

```
 1      Q     Okay.  So the policy is the same.
 2            MR. BABB:  Object to the form.
 3      A     It appears to be.
 4      Q     Okay.  So, when a supervisor at -- or a
 5      manager at SRNS disciplines one employee, do they
 6      go around and tell other employees of the
 7      discipline that they instituted?
 8      A     They're not supposed to.
 9      Q     Okay.  So if employees were disciplined for
10      those two incidents, the racial slurs, the
11      January 6th, and then the -- when the riots
12      happened, would it be normal for Porter to come
13      around and tell you, "Hey, this is the discipline
14      I gave those employees"?
15      A     No, it would not be normal.
16      Q     Okay.  And your attorney asked you if you
17      felt like you were more -- disciplined more
18      harshly than males or Caucasians and you answered
19      "yes," correct?
20      A     That's correct.
21      Q     So, you've only been disciplined three times,
22      correct?
23      A     That's correct.
24      Q     So, one was you received a Corrective Contact
25      for the Stoudemire incident?
```

1/8/2025                    ALISHA JOHNSON

```
 1     A     That's correct.
 2     Q     He got the exact same Corrective you did,
 3     didn't he?
 4     A     It is what it appears to be.
 5     Q     So, if he got the exact same discipline, how
 6     were you disciplined more harshly than him?
 7     A     I don't feel I should have been disciplined
 8     in that.  I feel like if I was a white female and
 9     Stoudemire approached me, the way -- if he would
10     have approached a white female the way he
11     approached me, it would have been totally
12     different.
13     Q     Are you aware of any non-African American
14     females who violated the policy on using
15     government resources for personal businesses that
16     didn't receive any discipline at all?
17     A     I am not aware of this -- at this time.
18     Q     Okay.
19     A     But I'm pretty sure that there are for
20     instances out there.
21     Q     So, you're just speculating?
22     A     Not speculating.  When I -- when I started
23     working at SRNS in Tritium, 1998, early 2000, it
24     was certain incidents that took place that were
25     totally off -- you know, off board.
```

1/8/2025                        ALISHA JOHNSON

1    Q    Did they involve -- did these incidents that
2    were off board involve the use of government
3    resources for personal business?
4    A    It was not personal business, but I know of a
5    few cases that it was involving the personal use
6    of government computer for porn with white males
7    and they didn't lose their jobs.
8    Q    Okay.  But that's different than using
9    government resources for your personal business,
10   correct?
11   A    Still misuse of a government computer.
12   Q    Okay.  And who are these white males who used
13   their computer for porn?
14   A    At this time, I can't give you any names.
15   Q    What year did this occur?
16   A    It was different years and, again, at this
17   time, I cannot give you a definite year.
18   Q    Okay.  Are you aware of anyone -- so the
19   first time you were caught misusing government
20   equipment, you received a Corrective Contact; is
21   that correct?
22   A    I received a Corrective Contact.
23   Q    Yeah.  Are you aware of anyone who was found
24   to have misused their government equipment for a
25   Corrective Contact where they did -- that's a

1/8/2025                    ALISHA JOHNSON

```
 1    terrible question.  Let me rephrase that.
 2          Are you aware of anyone who was found to have
 3    misused their government equipment for personal --
 4    their personal business that did not receive a
 5    Corrective Contact?
 6    A    I'm not aware at this time.
 7    Q    Okay.  All right.  I had one more question,
 8    sorry.  These employees that -- or these
 9    attorneys, excuse me, that brought you in and
10    questioned you about a potential criminal
11    investigation, do you even know if they're SRNS
12    employees?
13    A    Again, I think I already answered that.  I
14    told you I don't know.
15          MR. MCWILLIAMS:  Okay.  That's all I
16    got, Jay.
17                    RECROSS-EXAMINATION
18    BY MR. BABB:
19    Q    Really quick, do you still have that page
20    from Exhibit 27?
21    A    I do.
22    Q    All right.  And do you still have Exhibit 4,
23    page 28?
24    A    I do.
25    Q    Okay.  The second part, if you look at
```

1/8/2025                    ALISHA JOHNSON

```
1      Section 3 on the page you've pulled from
2      Exhibit 27, it has the reference on this exhibit
3      to Section 5.23.3(2)(A)(4).  Counsel went over
4      that with you.  The second part of that after the
5      ellipses, or dot, dot, dot --
6      A    Uh-huh (affirmative response).
7      Q    -- says, "In any way facilitate the
8      employee's outside personal business."  In
9      Exhibit 4, does it say the "individual's
10     outside"...
11     A    It says "individual's" instead of
12     "employee's," that's correct.
13     Q    Okay.  So there's some difference in whatever
14     they've written in this Exhibit 27 and Exhibit 4
15     you've been presented?
16     A    That's correct.
17     Q    All right.  And sitting here today, do you
18     know if there's any other differences in this
19     policy or not?
20     A    I'm not sure.
21          MR. BABB:  Okay.
22             FURTHER REDIRECT EXAMINATION
23     BY MR. MCWILLIAMS:
24     Q    Final few follow-ups there.  Does that
25     change, from the term "employee" to "individual,"
```

1/8/2025                    ALISHA JOHNSON

1    change the meaning of that statement of what

2    you're prohibited from doing?

3    A    "Individual" could be anybody.

4    Q    But you're still prohibited from doing that,

5    right?

6    A    "Individual" and "employee" are not the same.

7    Q    Okay.  But does it change what you are

8    prohibited from doing under this policy?

9    A    It changed what the employee versus the

10   individual can do.

11   Q    So "individual" is broader.  So under the new

12   policy, it's broader.  So there was actually less

13   restrictions under the policy that you were

14   terminated under.

15   A    And can you rephrase that?

16   Q    So I'm saying here, the one word was changed,

17   "individual" and "employee."  That doesn't change

18   the meaning of what it's saying that you're not

19   allowed to do; is that correct?

20   A    It doesn't change the meaning of what I'm

21   allowed to do?

22   Q    So under -- whether it says "individual" or

23   "employee," are you still not -- is it still

24   strictly forbidden for you to use a government

25   computer and network resources to facilitate an

1/8/2025                    ALISHA JOHNSON

```
 1    outside personal business?
 2    A    My training with SRNS, if it's not
 3    verbatim -- if it doesn't match, it's not
 4    verbatim.
 5    Q    I'm not asking if it's verbatim.  I'm asking
 6    if it changed the meaning.  So you're saying that
 7    because this was changed to "individuals," you're
 8    now allowed to use government resources and
 9    everything for your outside personal business?
10        MR. BABB:  Object to the form of the
11    question.  You can answer.
12    A    All I'm saying is that the two don't match.
13    Q    Okay.  But they still have the same meaning,
14    is what I'm asking.  Do they still restrict you
15    from doing the same thing?
16    A    The individual versus the employee are both
17    restricted.
18        MR. MCWILLIAMS:  Okay.  I don't have any
19    other questions, Jay.  Do you?
20        MR. BABB:  Nope.
21        (There being no further questions, the
22    deposition concluded at 6:40 p.m.)
23
24
25
```

1/8/2025                          ALISHA JOHNSON

1              CERTIFICATE OF REPORTER

2          I, Cassandra E. Vance, Court Reporter
    and Notary Public in and for the State of
3   South Carolina, do hereby certify that I
    reported the deposition of ALISHA JOHNSON on
4   the 8th day of January, 2025; that the
    witness was first duly sworn by me, and that
5   the foregoing 284 pages constitute a true and
    correct transcription of the said deposition.

6
           I further certify that I am neither
7   attorney nor counsel for, nor related to or
    employed by, any of the parties connected
8   with this action, nor am I financially
    interested in said cause.

9
           I further certify that the original of
10  said transcript shall be hereafter sealed and
    delivered to Phillips L. McWilliams, Esq.,
11  Fisher & Phillips, LLP, 1320 Main Street,
    Suite 750, Columbia, South Carolina 29201.

12
           This sealed original transcript shall be
13  retained by the above party, who shall be
    responsible for filing same with the Court
14  prior to trial or any hearing which might
    result in a final order on any issue.

15
           IN WITNESS WHEREOF, I have hereunto set
16  my hand and seal this 17th day of January,
    2025.

17

18

19

20          _____
            Cassandra E. Vance, Court Reporter
21          Notary Public for South Carolina
            My commission expires:  12-13-2027
22

23

24

25

1/8/2025                          ALISHA JOHNSON

```
 1                 VERIFICATION OF DEPONENT

 2

 3            I, ALISHA JOHNSON, have read the

 4       foregoing deposition testimony, which was

 5       reported by Cassandra E. Vance, Court

 6       Reporter and Notary Public in and for the

 7       State of South Carolina, on January 8, 2025.

 8

 9            I find the transcript of the deposition

10       to be a true and accurate transcript

11       according to my testimony on that date, with

12       the exception of _____ corrections as

13       listed on the attached errata page, which was

14       filled in by me.

15

16

17

18            _____

19            ALISHA JOHNSON

20            _____, 20_____.

21

22

23

24

25
```

1/8/2025                    ALISHA JOHNSON

```
 1              E R R A T A   P A G E

 2  Page # Line #  Change/Correction (and Explanation)

 3  _____    _____

 4  _____    _____

 5  _____    _____

 6  _____    _____

 7  _____    _____

 8  _____    _____

 9  _____    _____

10  _____    _____

11  _____    _____

12  _____    _____

13

14

15

16          The above changes were noted by me on

17      this errata page before signing the attached

18      Verification of Deponent.  I have retained a

19      copy of this errata page for my records, and

20      the court reporter is to attach this page and

21      my verification to the original transcript.

22

23

24

25      Dated:  _____  _____
```