2021 WL 2154806

2021 WL 2154806
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina.

Christopher FAIL, Plaintiff,

v.

SAVANNAH RIVER NUCLEAR
SOLUTION, LLC, Defendant.

C/A No. 1:19-cv-2910-JFA-SVH
|
Filed 05/27/2021

**Attorneys and Law Firms**

Elizabeth Marie Bowen, James Lewis Cromer, Cromer Babb
Porter and Hicks, Columbia, SC, for Plaintiff.

Benjamin Patrick James Dudek, Michael Dennis Carrouth,
Fisher and Phillips LLP, Columbia, SC, for Defendant.

**ORDER**

Joseph F. Anderson, Jr., United States District Judge

**I. INTRODUCTION**

*1 In this employment discrimination case, Christopher
Fail ("Plaintiff") sues his former employer, Savannah River
Nuclear Solution, LLC ("Defendant" or "SRNS"), asserting
claims of race discrimination, hostile work environment, and
retaliation in violation of Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), as
well as a claim for defamation. All pretrial proceedings in this
case, including Defendant's motion for summary judgment
(ECF No. 23) were referred to a Magistrate Judge pursuant
to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ.
Rule 73.02(B)(2)(g) (D.S.C.).

After reviewing the motion and all responsive briefs,
the Magistrate Judge assigned to this action [1] prepared a
thorough Report and Recommendation ("Report") and opines
that this court should grant Defendant's motion. (ECF No. 30).

[1]     The Magistrate Judge's review is made in
         accordance with 28 U.S.C. § 636(b) and Local Civil
         Rule 73.02(B)(2) (D.S.C.). The Magistrate Judge
         makes only a recommendation to this Court. The
         recommendation has no presumptive weight, and

the responsibility to make a final determination
remains with the Court. Mathews v. Weber, 423
U.S. 261 (1976). The Court is charged with making
a de novo determination of those portions of the
Report and Recommendation to which specific
objection is made, and the Court may accept, reject,
or modify, in whole or in part, the recommendation
of the Magistrate Judge, or recommit the matter
to the Magistrate Judge with instructions. See 28
U.S.C. § 636(b).

The Report sets forth, in detail, the relevant facts and
standards of law on this matter, and this court incorporates
those facts and standards without a recitation.

Plaintiff timely filed objections to the Report (ECF No. 35),
to which Defendant filed a response. (ECF No. 38). Thus, this
matter is ripe for review.

**II. LEGAL STANDARD**

The court is charged with making a *de novo* determination
of those portions of the Report to which specific objections
are made, and the court may accept, reject, or modify, in
whole or in part, the recommendation of the Magistrate
Judge, or recommit the matter to the Magistrate Judge with
instructions. See 28 U.S.C. § 636(b)(1). However, a district
court is only required to conduct a *de novo* review of the
specific portions of the Magistrate Judge's Report to which
an objection is made. See 28 U.S.C. § 636(b); Fed. R. Civ.
P. 72(b); Carniewski v. W. Virginia Bd. of Prob. & Parole,
974 F.2d 1330 (4th Cir. 1992). In the absence of specific
objections to portions of the Report of the Magistrate Judge,
this court is not required to give an explanation for adopting
the recommendation. See Camby v. Davis, 718 F.2d 198,
199 (4th Cir. 1983). Thus, the court must only review those
portions of the Report to which Petitioner has made a specific
written objection. Diamond v. Colonial Life & Acc. Ins. Co.,
416 F.3d 310, 316 (4th Cir. 2005).

"An objection is specific if it 'enables the district judge
to focus attention on those issues—factual and legal—that
are at the heart of the parties' dispute.' " Dunlap v. TM
Trucking of the Carolinas, LLC, No. 0:15-cv-04009-JMC,
2017 WL 6345402, at *5 n.6 (D.S.C. Dec. 12, 2017) (citing
One Parcel of Real Prop. Known as 2121 E. 30th St., 73
F.3d 1057, 1059 (10th Cir. 1996)). A specific objection
to the Magistrate Judge's Report thus requires more than
a reassertion of arguments from the complaint or a mere
citation to legal authorities. See Workman v. Perry, No.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 2 of 70

Fail v. Savannah River Nuclear Solution, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 2154806

6:17-cv-00765-RBH, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

**\*2** "Generally stated, nonspecific objections have the same effect as would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The court reviews portions "not objected to—including those portions to which only 'general and conclusory' objections have been made—for *clear error*." *Id.* (emphasis added) (citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

The legal standard employed in a motion for summary judgment is well-settled and correctly stated within the Report. Accordingly, that standard is incorporated herein without a recitation.

## III. DISCUSSION

As stated above, the relevant facts and standards of law on this matter are incorporated from the Report. The Report set forth an extremely thorough recitation of the factual background necessary to adjudicate this motion and the Court will not attempt to summarize it again here. In response to the Report, Plaintiff has set forth 11 specific objections. The Court will address them seriatim.

Objection Number 1

Plaintiff's first objection asserts that the Report improperly concludes that the comparators offered by Plaintiff are not similarly situated. When attempting to prove employment discrimination, comparators do not have to be identical; rather, a plaintiff is only required to show that his comparators are "similar in all relevant respects[.]" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *see also Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) ("[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citation omitted)).

Plaintiff avers that he identified several coworkers, of black and Iranian ethnicity, that should be considered valid comparators because they engaged in conduct similar to

Plaintiff's yet suffered no negative consequences. Plaintiff focuses on Wilson in particular as a non-white coworker in the same position as Plaintiff. However, as Defendant avers, Plaintiff's alleged comparators differ in a number of material respects. Specifically, "Plaintiff attempts to transform his co-workers into similarly situated comparators based on statements they made after being called into meetings that were part of the investigation of Plaintiff's misconduct and, more importantly, statements offered to answer direct questions. None of the co-workers whom Plaintiff claims as comparators made any independent, unsolicited statement against employees, management, or subordinates." (ECF No. 38, p. 2).

As stated in the Report, Plaintiff was terminated for actions vastly different than those of his alleged comparators. Specifically, Plaintiff's voluntary unsubstantiated comments included informing multiple people multiple times that Ashley slashed his tire, for maintaining that Wilson was racist, and for stating that Wilson and Holloway improperly used and disposed of Triple-D and that Rose and Vince Bush falsified the applicable report paperwork. Wilson, the alleged comparator, however, merely stated that it was his "impression" that Plaintiff's problems with Taghavipour "may" be race-related. Moreover, this statement was made in response to an inquiry sparked by Plaintiff's allegations and was not an independent complaint.

**\*3** Furthermore, Plaintiff's objection fails to account for the fact that Plaintiff was fired for several reasons other than complaints of racist comments. Those reasons include telling multiple employees that another co-worker slashed his tire and accusing his manager and a planner of falsifying documentation. Plaintiff also admitted to the Disciplinary Review Panel that he made unwarranted assumptions in making independent, unsolicited accusations against other employees. Wilson made no such admissions.

Thus, Wilson's singular comment regarding race in response to an official inquiry is not enough to set Plaintiff and Wilson on equal footing. Thus, Plaintiff's objection on this point must be overruled.

Objection Number 2

Plaintiff next avers that there is a question of fact as to whether the reasons proffered by Defendant were the actual reasons for Plaintiff's termination. Plaintiff contends that he has provided evidence that the proffered reasons were a mere pretext because they have been inconsistent over time, false,

**Fail v. Savannah River Nuclear Solution, LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 2154806

and based on mistakes of fact. In support of this assertion, Plaintiff points to three specific examples of alleged pretext.

Objection 2.1

First, Plaintiff avers that Defendant was aware of racist statements made by Wilson during its early 2018 investigation into Plaintiff's complaints of racism. Thus, Plaintiff's complaints of racism were not untrue and could not have been a valid reason for termination. Plaintiff states that Defendant investigators were aware of racial comments made by Wilson during the course of their investigations prior to Plaintiff's termination yet chose not to adequately question witnesses nor properly investigate Plaintiff's complaints. Thus, Defendant's investigation revealed evidence supporting that Plaintiff was honest in his concerns of inappropriate conversations surrounding race, and that Defendant declined to question witnesses about the substance of the racial conversations when witnesses began to substantiate Plaintiff's claims and indicated that conversations regarding race occurred.

Despite this assertion, a review of the Report indicates that the Defendant's investigations revealed evidence of conversations about politics and race yet showed no indication of inappropriate racist comments directed at Plaintiff. These comments include "only white people would do this" or "only white person's dumb enough to do this," and discussing white privilege. Plaintiff also avers political conversations took place. Merely discussing race or politics is not an indication of racist comments by Wilson sufficient to establish that Plaintiff's allegations of racism were a mere pretext for termination.

Plaintiff appears to agree to this point by arguing that "Defendant obtained evidence of racial conversation in the workplace but chose not to inquire as to the substance of any of the racial conversations." This contention indicates that Defendant was aware of conversations surrounding race that did occur, but Plaintiff believes investigators should have taken a deeper dive into his allegations of racism. Plaintiff's contentions regarding an insufficient investigation are addressed more thoroughly below. Here, Plaintiff has failed to show that the Report improperly characterized the evidence cited by Plaintiff or unfairly credited Defendant's version of events. Thus, this objection must be overruled.

Objection 2.2

Plaintiff next contends that he presented evidence that Defendant had knowledge that Plaintiff did not make false, unfounded, or highly irresponsible statements when he reported concerns surrounding the Activity Hazard Analysis ("AHA") report.

**\*4** Plaintiff argues the investigation revealed that he had reason to believe his coworkers improperly used the chemical Triple D and made changes to the AHA. Despite Plaintiff's assertions, he plainly states in the objections that he responded "yes" to the question, "you made an assumption it was falsely changed" during the disciplinary panel meeting. It is undisputed that assumption was not correct. As stated in the Report, it does not matter whether Plaintiff believed Triple D was improperly used at the job because he had no basis for later assuming his supervisors falsified documentation to cover up the alleged improper use. Thus, Plaintiff's objection on this point must be overruled.

Objection 2.3

Plaintiff next argues that he has presented evidence his termination was not based on his prior statements regarding tire slashing. Plaintiff avers that he has not made any statements that Ashley did in fact slash his tires and therefore this reason was used as a mere pretext for termination. Plaintiff claims he only made "passing statements to friends that he does not know one way or another" if Ashley actually slashed his tires. Plaintiff further avers that he was terminated over a year after the tire slashing incident.

However, the Defendant correctly points out that evidence presented to the disciplinary review panel indicated that Plaintiff told multiple coworkers Ashley slashed his tire. Moreover, this Court agrees with Defendant's proposition that an "allegation, or even the insinuation, that another employee destroyed personal property in a criminal act without any proof is a false, unfounded, and highly irresponsible statement about a co-worker in violation of SRNS's work rule." Thus, Plaintiff's "passing statements" do not show this reason for termination was a mere pretext. Additionally, although a year had passed since the tire slashing, Plaintiff himself reintroduced the tire slashing allegations during a February 2018 interview about continued bullying. Thus, Plaintiff's objections on this point must be overruled.

Objection Number 3

Plaintiff next argues that the Magistrate Judge ignored evidence when concluding that there was no indication of

2021 WL 2154806

an obviously inadequate investigation prior to termination. "Evidence of an obviously inadequate investigation in the employee's misconduct could tend to show that claimed employee misconduct was actually pretext for prohibited animus." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017). Plaintiff avers that "[n]o investigation, no matter how large, can be reasonably called adequate if it fails to even attempt to answer the questions for which it was launched." Plaintiff essentially argues that Defendant's investigators should have conducted additional questioning or interviews regarding Wilson's alleged racist comments.

The Report notes that before the decision to terminate Plaintiff was made and approved, Defendant investigator Austin conducted 34 interviews with 16 employees. Austin also reviewed the relevant documentation. This investigation resulted in a 301-page "investigation file." Despite averring that Defendant should have interviewed more individuals, Plaintiff fails to state what relevant information these proposed interviewees would have given. It is mere speculation to claim an "obviously inadequate" investigation occurred with no single fact to support this other than to say not every possible witness was interviewed. *See Wise v. S.C. Dep't of Rev.*, C/A No. 3:18-2161-MGL-PJG, 2020 WL 4218233 at *5 (D.S.C. July 23, 2020) ("[F]urther, [Plaintiff's] disagreement takes issue with a number of SCDOR's investigative methods, but fails to point to any evidence the outcome of the investigation would have been different, other than her denial of making the threatening statement.").

 **\*5** The Report correctly states that Title VII does not entitle an employee to "an even, fair, or just investigation." *Bennett v. New Foundations Children and Family Servs., Inc.*, C/A No. 8:08-557-HFF-BHH, 2010 WL 517900, at *8 (D.S.C. Feb. 10, 2010). Additionally, this court does not "sit as a super-personnel department, weighing the prudence of employment decisions made by the defendants." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (holding that pretext is not a vehicle for substituting the court's judgment for that of the employer). The court need not decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000) (citing *DeJarnette*, 133 F.3d at 299).

Thus, the evidence here shows that Defendant conducted a thorough investigation which yielded numerous reasons for supporting Plaintiff's termination. Just because Plaintiff

believes more could have been done, does not mean that the investigation was "obviously inadequate". Thus, Plaintiff's objection on this point must be overruled.

Objection Number 4

Plaintiff next contends that the Report improperly dismisses Defendant's shifting and inconsistent reason for Plaintiff's termination which is evidence of pretext. In support of this objection, Plaintiff cites to deposition testimony from MacVean, the President of Defendant's company.

This exact argument was presented to and rejected by the Magistrate Judge. Within the Report, the magistrate judge stated that "[b]ased on MacVean's entire testimony, there is no indication Defendant changed its position regarding its reasons for terminating Plaintiff's employment." Plaintiff here again attempts to take portions from MacVean's explanation of Plaintiff's termination out of context to manufacture a genuine issue as to alleged inconsistencies. However, when viewed in its entirety, MacVean's deposition testimony indicates that the reasons for Plaintiff's termination never shifted. At all times, Plaintiff was terminated for making several statements in violation of Defendant's Rule of Conduct 5.1(N). This argument was properly rejected by the Magistrate Judge and Plaintiff's objection is without merit.

It is worthy of note that the above objections each relate to Plaintiff's claims of racial discrimination. However, Plaintiff, who is white, did not address the fact that 11 of the 13 members of Plaintiff's Disciplinary Review Panel are also white. This fact seriously undermines any assertion of discriminatory animus. (ECF No. 30 at 48–49). *See Collins v. Charleston Place*, LLC, C/A No. 2:15-cv-4465-PMD-BM, 2017 WL 9292232 at *8 (D.S.C. Mar. 24, 2017) ("[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").

Objection Number 5

Plaintiff's fifth objection states that the Report wrongfully asserts that Plaintiff's hostile work environment claim fails because the racist statements of Defendant's employees were not directed at Plaintiff. Plaintiff points to several comments about "us white people" made at varying points in time to indicate he worked in a hostile work environment.

Despite this assertion, Plaintiff has failed to show that his workplace was "permeated with discriminatory intimidation,

1:24-cv-02612-JDA-PJG　　　Date Filed 08/08/25　　　Entry Number 49-5　　　Page 5 of 70

**Fail v. Savannah River Nuclear Solution, LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 2154806

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations omitted).

 **\*6** The Magistrate Judge acknowledged Plaintiff's evidence that co-workers [2] have called white people "stupid," "dumb," and "savages" and noted these comments were in some instances disturbing. However, as the Report makes clear, the majority of these comments were not directed at Plaintiff because of his race or for any other reason, but were discussions that Plaintiff overheard. Additionally, the comments occurred infrequently over the time period at issue. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). Thus, Plaintiff's objection on this point must be overruled.

[2]　　It should be emphasized that the alleged comments were made by Plaintiff's co-workers, not a supervisor. *See Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 278 (4th Cir. 2015) (en banc) ("In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.' ") (quoting *Rodgers v. W.– S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993)).

### Objection Number 6
Plaintiff next argues that the Report wrongfully asserts that Plaintiff's hostile work environment claim fails because the racist statements of Defendant's employees occurred infrequently over the relevant time period. In support of this argument, Plaintiff cites to his own testimony in which he generally asserts that racist comments "got to be pretty regular."

Again, Plaintiff's comments do not show that his place of employment was permeated with discriminatory ridicule that is sufficiently severe or pervasive to alter the conditions of his employment. Simply stating comments were regular does not establish discriminatory changes in the terms or conditions of employment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment."). Thus, Plaintiff's objection on this point must be overruled.

### Objection Number 7
The seventh objection alleges that the Report fails to consider the evidence of Ikner's involvement in and handling of Plaintiff's complaints of racist behavior by his co-workers, as well as Ikner's negative disposition toward Plaintiff throughout the relevant time period. Plaintiff alleges that corrective action taken by Defendant in this case, if any, was not effective and did not stop the racist behavior of Defendant's employees, so liability must attach. In cases of alleged co-worker harassment, liability may only be imposed on an employer "if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 334 (4th Cir. 2003).

Plaintiff essentially avers that Ikner's responsive investigation into Plaintiff's October 2017 complaints about comments involving the Las Vegas mass shooting was insufficient and ineffective in quelling further racial comments. Plaintiff fails to acknowledge that the Report addresses this concern and points out that Plaintiff also confirmed that in the months following his report to Ikner, management routinely followed up to ask if everything was alright, and Plaintiff did not complain about Wilson again until his first interview with Austin in February 2018. Thus, Plaintiff has not shown that Defendant's actions were ineffective or that Defendant was aware of continued harassment. Defendant was not negligent in relying on Plaintiff's representations that he was fine in the months following his complaint and corrective actions [3] placed by Ikner and SRNS. Thus, this objection must be overruled.

[3]　　These corrective actions included warning employees not to discuss current events at work and providing a refresher respectful workplace training to all maintenance mechanics.

### Objection Number 8
 **\*7** Within this objection, Plaintiff complains that the Report wrongfully compares Plaintiff's retaliation to the case of *James v. Cty. Of Florence,* C/A No. 4:18-01857-SAL, 2020 WL 1983220 (D.S.C. 2020). Plaintiff argues that this case is not binding authority and differs factually given that the defendant in that case terminated an employee after a

1:24-cv-02612-JDA-PJG     Date Filed 08/08/25     Entry Number 49-5     Page 6 of 70
Fail v. Savannah River Nuclear Solution, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 2154806

polygraph test revealed that the employee had lied about certain claims.

Here again, the Report specifically cites these arguments made by Plaintiff but rejects them. (ECF No. 30 at 60 n. 33). Despite the factual difference in the use of a polygraph, the instant case has several factual similarities to that of *James*. Both plaintiffs engaged in alleged protected activity. Both employers conducted extensive investigations into the plaintiffs' complaints. Based on the findings of those investigations, both employers had a good faith belief that the reports were false and uncovered other terminable offenses by the plaintiffs. Thus, there was no error in the Report when analogizing the instant action to another factually similar district court decision.

Objection Number 9
Plaintiff next takes aim at the Report because it falsely attributes the fact that no other employee reported hearing Wilson making racial comments as evidence that they did not occur. This objection merely restates those issues raised in objections 2.1 and 3 above. Namely, Plaintiff complains that more questioning into Wilson's alleged conduct may have uncovered racial comments. For the same reasons discussed above, this objection must also fail.

Again, this Court would note that just because a comment involves race, does not necessarily mean it is racist. Plaintiff continually refers to Wilson's testimony that he has made statements such as "that's something that only a white person would do" or "that's something that a black person would do" as examples of harassing or discriminatory comments. There is no indication these comments were made to Plaintiff to harass or discriminate. Thus, this objection is overruled.

Objection Number 10
Plaintiff's tenth objection avers that the Report fails to consider the strong temporal proximity of this case as evidence of pretext. Plaintiff avers that 13 days after he again reported racist and retaliatory behavior in the workplace he was suspended and ultimately fired 6 days later. Plaintiff thus avers this close proximity in time is evidence of pretext which was not properly credited in the Report.

However, it is well-established that temporal proximity, without more, is insufficient to support a finding of pretext. *Steinhilber v. Yanfeng US Auto. Interiors I, LLC*, C/A No. 6-18-cv-2966-TMC-KFM, 2020 WL 6219421 at *10 (D.S.C. May 11, 2020) (citing *Jones v. UnitedHealth Group, Inc.*, 802 F. App'x 780, 782–83 (4th Cir. 2020)). Plaintiff has failed to offer any other evidence of a pretext outside of the temporal proximity.

As discussed above, Plaintiff was terminated after a thorough investigation which revealed three separate reasons for termination. Thus, Plaintiff's reliance on temporal proximity alone fails to elucidate any error in the Report which would warrant amendment.

Objection Number 11
Plaintiff's final objection contests that the Report improperly decided material issues of fact related to Plaintiff's claim of defamation. Plaintiff avers that a supervisor's statement that "We are big - tritium and the company - on honesty and integrity" made after announcing an employee had been terminated was defamatory. To support this argument, Plaintiff takes' Wilson's deposition testimony out of context to build one inference on another. (ECF No. 35, p. 34) ("The surrounding testimony *supports an inference* of the latter. Plaintiff's co-worker stated that based on Defendant's message, *he believed* Plaintiff 'crossed the line.'... *This implies* that Plaintiff's co-worker *believed* that he engaged in inappropriate, unprofessional, or dishonest conduct.") (emphasis added).

 **\*8**  However, Plaintiff fails to recognize that Wilson plainly responded "no, never knew. I never knew the reason until this deposition. Never knew" to the question "So you knew the reason for his [Plaintiff's] termination?". When asked if at the time Aylward made the statement if he believed that it was related to the investigation immediately preceding Plaintiff's being escorted off the site, Wilson testified, "No. Nope, didn't know. I didn't believe that he had done anything that warranted firing at the time." This deposition testimony clearly undermines Plaintiff's contention that Wilson believed Plaintiff was fired due to inappropriate, unprofessional, or dishonest conduct. Thus, Plaintiff's objections are without merit.

IV. CONCLUSION
After carefully reviewing the applicable laws, the record in this case, the Report and Recommendation, and the objections thereto, this Court finds the Magistrate Judge's recommendation fairly and accurately summarizes the facts and applies the correct principles of law. (ECF No. 30). Accordingly, the court adopts the Report and

**Fail v. Savannah River Nuclear Solution, LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 2154806

Recommendation. Thus, Defendant's motion for summary judgment is granted.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2154806

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 1186553

2021 WL 1186553
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina.

Kenneth S. SALES, Plaintiff,

v.

RES-CARE, INC., Arbor E&T, LLC, and
Lisa Giacco, individually and as an employee
and/or agent of Res-Care, Inc., Defendants.

C/A No. 3:18-cv-03591-JFA-JDA
|
Signed 03/30/2021

**Attorneys and Law Firms**

David Nelson Lyon, William C. Freeman, Duff Freeman Lyon
LLC, Columbia, SC, for Plaintiff.

Katie Elizabeth Towery, William H. Foster, III, Jill April
Evert, Littler Mendelson PC, Greenville, SC, for Defendants.


**MEMORANDUM OPINION AND ORDER**

Joseph F. Anderson, Jr., United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Kenneth S. Sales ("Plaintiff") filed this action
against his former employer, Arbor E&T, LLC ("Arbor"),
wholly owned subsidiary of Defendant Res-Care, Inc.
("Res-Care"), and the Regional HR Manager Lisa Giacco
("Giacco") (collectively, "Defendants"). Plaintiff's action
alleges race and sex discrimination and retaliation under Title
VII of the Civil Rights Act of 1964 ("the Act"), as amended;
race discrimination under Title VI of the Act and 42 U.S.C. §
1981; and several state law claims. (ECF No. 11).

All pretrial proceedings in this case, including the instant
motion for summary judgment (ECF No. 52), were referred
to a Magistrate Judge pursuant to the provisions of 28 U.S.C.
§ 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2) (D.S.C.).

The Magistrate Judge assigned to this action[1] prepared
a thorough Report and Recommendation ("Report") and
opines that this Court should grant Defendants' motion for
summary judgment with respect to Plaintiff's federal claims
under Title VI, Title VII, and 42 U.S.C. § 1981 as well as
Plaintiff's state law defamation claim. The Magistrate Judge

also recommends the Court decline to exercise supplemental
jurisdiction over Plaintiff's remaining state law claims. (ECF
No. 62). The Report sets forth, in detail, the relevant facts and
standards of law on this matter, and this Court incorporates
those facts and standards without a recitation.

[1]    The Magistrate Judge's review is made in
      accordance with 28 U.S.C. § 636(b) and Local Civil
      Rule 73.02(B)(2) (D.S.C.). The Magistrate Judge
      makes only a recommendation to this Court. The
      recommendation has no presumptive weight, and
      the responsibility to make a final determination
      remains with the Court. Mathews v. Weber, 423
      U.S. 261 (1976). The Court is charged with making
      a de novo determination of those portions of the
      Report and Recommendation to which specific
      objection is made, and the Court may accept, reject,
      or modify, in whole or in part, the recommendation
      of the Magistrate Judge, or recommit the matter
      to the Magistrate Judge with instructions. See 28
      U.S.C. § 636(b).

Plaintiff timely filed objections to the Report. (ECF No. 67).
Defendants filed their reply. (ECF No. 68). Thus, this matter
is ripe for review.


**II. LEGAL STANDARD**

The court is charged with making a de novo determination
of those portions of the Report to which specific objections
are made, and the court may accept, reject, or modify, in
whole or in part, the recommendation of the Magistrate
Judge, or recommit the matter to the Magistrate Judge with
instructions. See 28 U.S.C. § 636(b)(1). However, a district
court is only required to conduct a de novo review of the
specific portions of the Magistrate Judge's Report to which
an objection is made. See 28 U.S.C. § 636(b); Fed. R. Civ.
P. 72(b); Carniewski v. W. Virginia Bd. of Prob. & Parole,
974 F.2d 1330 (4th Cir. 1992). In the absence of specific
objections to portions of the Report of the Magistrate Judge,
this court is not required to give an explanation for adopting
the recommendation. See Camby v. Davis, 718 F.2d 198,
199 (4th Cir. 1983). Thus, the court must only review those
portions of the Report to which Petitioner has made a specific
written objection. Diamond v. Colonial Life & Acc. Ins. Co.,
416 F.3d 310, 316 (4th Cir. 2005).

**\*2** "An objection is specific if it 'enables the district judge
to focus attention on those issues—factual and legal—that
are at the heart of the parties' dispute.' " Dunlap v. TM

Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 1186553

*Trucking of the Carolinas, LLC*, No. 0:15-cv-04009-JMC, 2017 WL 6345402, at *5 n.6 (D.S.C. Dec. 12, 2017) (citing *One Parcel of Real Prop. Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996)). A specific objection to the Magistrate Judge's Report thus requires more than a reassertion of arguments from the complaint or a mere citation to legal authorities. *See Workman v. Perry*, No. 6:17-cv-00765-RBH, 2017 WL 4791150, at *1 (D.S.C. Oct. 23, 2017). A specific objection must "direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

"Generally stated, nonspecific objections have the same effect as would a failure to object." *Staley v. Norton*, No. 9:07-0288-PMD, 2007 WL 821181, at *1 (D.S.C. Mar. 2, 2007) (citing *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)). The court reviews portions "not objected to—including those portions to which only 'general and conclusory' objections have been made—for *clear error*." *Id.* (emphasis added) (citing *Diamond*, 416 F.3d at 315; *Camby*, 718 F.2d at 200; *Orpiano*, 687 F.2d at 47).

The legal standard employed in a motion for summary judgment is well-settled and correctly stated within the Report. Accordingly, that standard is incorporated herein without a recitation.

## III. DISCUSSION

In the Report, the Magistrate Judge first recommended the Court grant summary judgment as to Plaintiff's claims against Giacco under Title VII and Title VI because Title VII does not permit discrimination or retaliation claims against individual defendants, *see Lissau v. S. Food Serv., Inc.* 159 F.3d 177, 181 (4th Cir. 1998) ("supervisors are not liable in their individual capacities for Title VII violations"), and because Giacco is not a program or activity that has received any federal funds within the meaning of Title VI, *see Windsor v. Bd. of Educ. Of Prince George's Cty.*, No. TDC-14-2287, 2016 WL 4939294, at *9 (D. Md. Sept. 13, 2016) (dismissing Title VI claims against the individual defendants). Plaintiff did not file objections on this ground and Defendants request the Court adopt the Report in full. In the absence of specific objections to the Report of the Magistrate Judge, the Court is not required to give any explanation for adopting the recommendation. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Therefore, the Court adopts the Report and Recommendation on this ground.

Next, the Magistrate Judge recommended granting summary judgment on Plaintiff's claims that he was terminated on the basis of his race in violation of Title VII, Title VI, and 42 U.S.C. § 1981 because he has no evidence of a causal link between his discharge and his race. The Court agrees with the Magistrate Judge's determination that the Plaintiff has not proffered evidence to support an inference that there was a connection between his race and Plaintiff's discharge because Lamb is not a true comparator. As the Fourth Circuit has noted, where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, there must be "enough common features between the individuals to allow [for] a meaningful comparison." *Haywood v. Locke*, 387 F.App'x 355, 360 (4th Cir. 2010) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). *See also Ketema v. Midwest Stamping, Inc.*, 180 F.App'x 427, 428 (4th Cir. 2006) (affirming summary judgment where evidence was insufficient to show proposed comparators were similarly situated). In spite of Plaintiff's accurate assertion in his objections that comparator evidence is not strictly required to prove discrimination, he continues to argue that he was treated less favorably than Lamb. Further, Plaintiff has failed to present any alternative evidence to support his claims. Plaintiff's objection is overruled and the Court adopts the Report on this ground.

**\*3** The Magistrate Judge further recommends granting summary judgment as to Plaintiff's claims that he was terminated because of his sex and that he was denied certain resources for the same reason. The Magistrate Judge determined that Plaintiff failed to identify a valid comparator who was treated more favorably for similar offenses. Plaintiff's claims assert that because of his sex, Defendants denied his requests to either provide his office with an in-house human relations representative or provide him with additional human resources ("HR") training. However, Plaintiff failed to provide evidence showing that the denial of his HR requests amounted to an adverse employment action. Further, the Magistrate Judge correctly found that Plaintiff cannot establish his gender discrimination claim because Murphy was not similarly situated. As with Lamb, Murphy was not in a leadership role and the allegations against her at the time of the investigation—that she acted overly familiar with Lamb—were not similar to Plaintiff's statements.

The Report also recommends granting summary judgment as to Plaintiff's claim of retaliation. The Magistrate Judge considered that although Plaintiff complained about the

**Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)**

2021 WL 1186553

denials of his HR requests, he admitted in his deposition that he never made any complaints that he was being treated differently based on his race or sex. Plaintiff also did not point to anything in the record indicating that he did complain of race or sex discrimination. Additionally, the Magistrate Judge noted that even assuming Plaintiff established a prima facie case, Defendants would still be entitled to summary judgment on Plaintiff's discrimination and retaliation claims challenging his termination because Defendants have offered a legitimate nondiscriminatory and nonretaliatory explanation for the termination—Plaintiff's inappropriate statements. Moreover, Plaintiff has not forecasted evidence from which it could be reasonably inferred that this explanation is actually a pretext for discrimination or retaliation.

Plaintiff's objections to the foregoing raise numerous factual arguments to the Report. In their reply, Defendants argue that Plaintiff's objections fail to adhere to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure such that Plaintiff has waived the right to *de novo* review of the Report. Plaintiff's objections aver that the Report fails to consider the facts in a light most favorable to the Plaintiff and that the Magistrate Judge erred in recommending that summary judgment be granted as to Plaintiff's federal discrimination claims and state law defamation claim. (ECF No. 67.) [2] The Court agrees that substantial portions of Plaintiff's objections are nonspecific or conclusory disagreements with the Report and addresses only those arguments warranting *de novo* review.

[2]    Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. However, the district court need not conduct a *de novo* review when a party makes only general and conclusory objections that do not direct the court to a specific error in the Magistrate Judge's proposed findings and recommendations. *Orpiano v. Johnson*, 687 F.2d 44, 47–48 (4th Cir.1982).

Plaintiff objects to the Report on the basis that the Report erroneously fails to analyze the race and sex claims in combination. As an initial matter, a sex plus race claim under § 1981 is not viable because § 1981 does not apply to claims of sex discrimination. *Rutledge v. Sumter County School District*, No. 3:19-CV-03368-JMC, 2020 WL 5742801, at *3 (D.S.C. Sept. 25, 2020) (noting that § 1981 "does not address discrimination based on sex and cannot form the basis of

a cause of action for sex discrimination"). The undersigned is unaware of any binding precedent requiring the court to analyze Plaintiff's attempts to combine protected traits under Title VII. Moreover, even if such an argument were proper, Plaintiff cannot succeed on proving discrimination as a black male for the same reasons that he cannot succeed on claims that he was discriminated against based on his race or gender alone—he has not presented any credible evidence.

**\*4** Plaintiff's objections point to irrelevant background facts that have no bearing on the critical issues of this case, while simultaneously readmitting the truth of the undisputed material facts. As the Supreme Court has stated, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff's failure to distinguish between those facts which have an impact on the outcome of the case and disagreement over minor, immaterial facts is fatal to his argument. *See id.* The Court's review of the Report in light of Plaintiff's objections finds the Magistrate Judge correctly concluded Defendants were entitled to exercise their discretion as to employment matters, and that there was no evidence Defendants made any adverse decision based on Plaintiff's race or gender. [3]

[3]    Defendants maintain that they made their decisions based on the results of Giacco's investigation, which relied heavily on the interviews she conducted. (*E.g.*, ECF. No. 61-9 at 3 (Brown's testimony that she relied on the information Giacco provided her in deciding to discharge Plaintiff)). Plaintiff contends that there are material disputes regarding what was said during these interviews. (ECF No. 57 at 15). However, Plaintiff points to no support in the record for the proposition that Giacco incorrectly reported what was said during the interviews. (*Id.*). Plaintiff also asserts that some of what was said to Giacco during the interviews was incomplete or not true, and he contends that she would have gained a better understanding of the true facts had she investigated more thoroughly. (*Id.* at 13–17). But whether some witnesses lied to Giacco or she would have learned more had she investigated more thoroughly is immaterial; what matters for purposes of proving discrimination is the decision-makers' perception of the underlying facts. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 11 of 70
*Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)*
2021 WL 1186553

Cir. 2003) ("It is the perception of the decision maker which is relevant." (internal quotation marks omitted)). That some of the witnesses may not have been truthful and that a more thorough investigation might even have uncovered the lies are of no moment. *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) ("Even if these investigations were improper or substandard, that does little to help [the plaintiff] establish that the reasons given for her termination were not the actual reasons, and it certainly does not give rise to a reasonable inference that her race or gender was the real reason for the termination."); *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.").

Regardless of his own disagreement, Plaintiff has not presented any evidence to suggest that the Defendants' reason for discharging his employment was a false pretext for discrimination. Furthermore, the Magistrate Judge correctly concluded that Plaintiff failed to show that any of his proposed comparators were similarly situated and that Plaintiff's purported evidence proved insufficient to establish a prima facie case as to his claims under Title VI, Title VII, and 42 U.S.C. § 1981. Accordingly, the Court agrees that Plaintiff cannot meet his burden to defeat summary judgment. Therefore, the Court adopts the Report as to Plaintiff's federal claims under Title VI, Title VII, and 42 U.S.C. § 1981. Plaintiff's objections lack merit and are overruled.

The Court must next determine whether it should exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a). A district court has broad discretion in deciding whether to dismiss, remand, or retain a case after relinquishing all federal claims in the case. [4] *See, e.g.*, *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–41 (2009); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In determining whether to retain, remand, or dismiss the state law claims, a district court should examine the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110 (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir. 1993)). "There are *no* situations wherein a federal court *must* retain jurisdiction over a state law claim, which would not by itself support jurisdiction."

*Shanaghan*, 58 F.3d at 110 (4th Cir. 1995) (alteration in original).

[4]    The Court observes that even though the majority of the Fourth Circuit's cases on this issue are unpublished, the Fourth Circuit tends to be consistent in its holdings. In the vast majority of cases, the Fourth Circuit holds that the district court did not abuse its discretion in deciding to dismiss, remand, or retain the state law claims. Rather, the Fourth Circuit tends to focus its analysis on whether the district court recognized it had discretion and considered whether or not to dismiss, retain, or remand the state law claims. *See Farrell v. Macy's Retail Holdings, Inc.*, 645 F. App'x 246, 249 (4th Cir. 2016) (vacating a district court's dismissal of the state law claims because the court's order was silent regarding its consideration of whether to exercise supplemental jurisdiction over the state law claims). Thus, regardless of whether the court decides to remand or retain the state law claims, the court must provide an analysis of its decision to exercise supplemental jurisdiction in its order. *Id.* (citing *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012) (stating that a "district court's failure to recognize that it had discretion is an abuse of discretion")).

**\*5** The supplemental jurisdiction factors to consider as set forth by the United States Supreme Court in *Carnegie-Mellon University v. Cohill* are judicial economy, convenience, fairness, and comity. 484 U.S. 343, 351 n.7 (1988). District courts in the Fourth Circuit have considered other related factors, including: (1) whether the claim involves straightforward application of well-defined case law, *Caughman v. S.C. Dep't of Motor Vehicles*, C/A No. 3:09-503-JFA-PJG, 2010 WL 348375, at *2 (D.S.C. Jan. 26, 2010); (2) whether the parties have completed discovery, *id.*; (3) whether the complaint was filed in federal court, *Spears v. Water & Sewage Auth. of Cabarrus Cty.*, 1:15cv859, 2017 WL 2275011, at *9 (M.D.N.C. May 24, 2017); and (4) length of time the case has been pending in federal court, *de Reyes v. Waples Mobile Home Park Ltd. P'ship*, 251 F. Supp. 3d 1006, 1023 (E.D. Va. 2017).

Here, Plaintiff alleges state law claims against various combinations of Defendants for tortious interference with contract, defamation, and civil conspiracy. (ECF No. 11). Specifically, Plaintiff asserts state law claims for tortious interference with contract against Giacco and Res-Care and

1:24-cv-02612-JDA-PJG     Date Filed 08/08/25     Entry Number 49-5     Page 12 of 70

Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 1186553

defamation and civil conspiracy against all Defendants. The Magistrate Judge recommends granting summary judgment as to Plaintiff's defamation claim and declining to exercise supplemental jurisdiction as to Plaintiff's remaining state law claims. Plaintiff has not objected to the Magistrate Judge's recommendation as to the disposition of his civil conspiracy or tortious interference claims.

Applying the aforementioned factors, the Court finds that the underlying considerations of whether to retain jurisdiction over Plaintiff's state law claims counsel the court to exercise its supplemental jurisdiction. This case has been pending since December 2018, discovery has concluded, Plaintiff elected to file his complaint in federal court, dismissal would needlessly cause delay if Plaintiff wishes to seek relief in state court, and the state court would need to acquaint itself with a case that this court is already familiar with. Accordingly, the Court rejects the Report's recommendation to dismiss the state law claims of civil conspiracy and tortious interference with contract, electing instead to exercise supplemental jurisdiction over these claims. [5]

[5]    The Magistrate Judge recommended against dismissing the state law claim of defamation, suggesting that the applicable state statute of limitations has run on this claim. In doing so, the Magistrate Judge relied on *Ketema v. Midwest Stamping, Inc.*, 180 F. App'x 427, 427 (4th Cir. 2006). However, the supplemental jurisdiction statute, 28 U.S.C. § 1367(d), provides that any potentially applicable statute of limitations is tolled for thirty days after the dismissal without prejudice of the supplemental state law claim. *See Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) ("Section 1367(d) provides that the 'period of limitations for' refiling in state court a state claim so dismissed 'shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless state law provides for a longer tolling period.' "). Fully aware that the Court could dismiss the remaining state law claims to be refiled in state court, the Court has determined, for reasons set forth above, to retain the claims and address them on their merits.

The Magistrate Judge's Report recommends granting summary judgment as to Plaintiff's defamation claim because Plaintiff showed no evidence that false and defamatory statements were made about him. Plaintiff objects to the

Magistrate Judge's conclusion, but the Court finds Plaintiff's objection lacks merit. Plaintiff has not presented sufficient evidence to show defamation under South Carolina law. Specifically, there is no evidence to support Plaintiff's claim that Brown told a third-party state employee that he had been discharged. Brown testified that she had not made any such statements, and Plaintiff has no other evidence to suggest that she did. Moreover, even if she had made the statements alleged, they were indisputably true—Plaintiff *was* discharged. Plaintiff's disagreement with the reasons for his discharge does not amount to evidence and he cannot show that any false statement was made.

**\*6** Plaintiff's objection on the basis that Defendants are responsible for the statements made by Murphy in the course of the investigation is also unavailing. Plaintiff's insistence that Murphy made false allegations against him, when he admits that the allegations were true, [6] is incongruous. Moreover, as the Report points out, statements made in the course of a harassment investigation are privileged, and there is no evidence that the statements were made in bad faith. *See Constant v. Spartanburg Steel Prod., Inc.*, 316 S.C. 86, 447 S.E.2d 194, 196 (1994). Plaintiff's objections are overruled, and the Court adopts the Magistrate Judge's recommendation as to the Plaintiff's defamation claim.

[6]    Notably, Plaintiff does not dispute that, during a sexual harassment investigation, he made comments to Murphy telling her that "beauty is a gift and a curse," that men are "visually stimulated" and women are "emotional," and that he had daydreams about women in the office. (ECF No. 67).

Plaintiff's remaining state law claims also lack merit. With respect to Plaintiff's civil conspiracy claim, Plaintiff fails to present any colorable argument to challenge the intracorporate conspiracy doctrine, which mandates that there can be no conspiracy between an employer and its employees. *See McMillan v. Oconee Memorial Hosp., Inc.*, 626 S.E.2d 884, 887 (S.C. 2006); *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 843 (D.S.C. 2015). For this reason, Plaintiff's civil conspiracy claim fails as a matter of law. Plaintiff likewise fails to address the pivotal flaw in his claim for tortious interference with contract—that is, Plaintiff was an at-will employee who had no contract for a specific term of employment with Defendants. Without an enforceable contract, there can be no "intentional procurement of its breach." *See Eldeco, Inc. v. Charleston Cty. Scho. Dist.*,

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 13 of 70
Sales v. Res-Care, Inc., Not Reported in Fed. Supp. (2021)
2021 WL 1186553

372 S.C. 470, 480 (2007). Nor has Plaintiff presented any evidence that Giacco was acting as anything other than Defendants' agent during her harassment investigation. An action for tortious interference with contract requires interference by a third party, it does not protect a party to a contract from actions of the other party. *See Dutch Fork Development Group II, LLC v. SEL Properties, LLC,* 406 S.C. 596, 604, 753 S.E.2d 840 (2012) ("[A]n action for tortious interference protects the property rights of the parties to a contract against unlawful interference by third parties ... [t]herefore, it does not protect a party to a contract from the actions of another party.") (citation omitted).

The Court agrees with the Magistrate Judge's thorough analysis and finds for the reasons explained by the Magistrate Judge that Defendants are entitled to summary judgment on Plaintiff's claims of race discrimination, sex discrimination, retaliation, and the state law claim of defamation.

## IV. CONCLUSION

After carefully reviewing the applicable laws, the record in this case, the Report and Recommendation, and the objections thereto, the Court adopts in part and rejects in part the Report and Recommendation. (ECF No. 62). Accordingly, the Court adopts the Report and Recommendation with respect to Plaintiff's federal claims and state law defamation claim. However, regarding Plaintiff's two remaining state law claims, the Court declines to adopt the Report's recommendation. Therefore, in its discretion, the Court retains jurisdiction over these claims in the interest of fairness and convenience and finds Defendants are entitled to summary judgment on these claims. For the reasons stated above, Defendants' motion for summary judgment (ECF No. 52) is granted.

**\*7** IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1186553

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 14 of 70

Capone v. City of Columbia, Not Reported in Fed. Supp. (2020)

2020 WL 3448039

2020 WL 3448039
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Columbia Division.

Terry H. CAPONE, Plaintiff,
v.
CITY OF COLUMBIA, Defendant.

C/A No. 3:19-2490-CMC-PJG
|
Signed 06/24/2020

**Attorneys and Law Firms**

Terry H. Capone, Columbia, SC, pro se.

Jacqueline Marie Pavlicek, Office of the City Attorney, Columbia, SC, for Defendant.

**ORDER AND REPORT AND RECOMMENDATION**

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Terry H. Capone, a self-represented litigant, filed this employment discrimination action. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Defendant City of Columbia's ("the City") motion to dismiss. (ECF No. 36.) Pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the court advised Capone of the summary judgment and dismissal procedures and the possible consequences if he failed to respond adequately to the City's motion. (ECF No. 39.) Capone filed a response in opposition to the motion (ECF No. 56), and a motion to amend the Complaint (ECF No. 84). The City filed a response in opposition to the motion to amend (ECF No. 87), to which Capone replied (ECF No. 90). Having reviewed the record presented and the applicable law, the court denies Capone's motion to amend and finds that the City's motion to dismiss should be granted and this matter be dismissed with prejudice.

**BACKGROUND**

Capone filed this action on September 3, 2019. The Complaint asserts various causes of action against the City,

Capone's former employer, and other parties that were involved in the denial of Capone's workers' compensation benefits. (Compl., ECF No. 1.) The Complaint is filed on a standard complaint form for employment discrimination cases for *pro se* litigants. Capone indicates that he files this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. (Id. at 4.) Capone also indicates he seeks to raise claims of "obstruction of justice," "hand of one hand of all," and "Employer [workers compensation] insurance fraud." (Id.) Capone attaches to the Complaint a charge of discrimination to the South Carolina Human Affairs Commission ("SCHAC") and a Right to Sue Letter from the United States Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1-1 at 1-2.)

Capone also attached a document to the Complaint that he purportedly filed with his EEOC charge of discrimination, and which he incorporates by reference in the Complaint. (ECF No. 1-1 at 3-17.) In that document, Capone asserts that the South Carolina Workers' Compensation Commission is unconstitutional and that the defendants named in this matter violated RICO when they denied his workers' compensation claim. (Id.) In his claim for damages, Capone seeks compensation for workers' compensation benefits that he was denied, medical expenses, and emotional distress. (Compl., ECF No. 1 at 7.)

The court authorized the issuance and service of process against the City, construing the Complaint as asserting claims of race and disability discrimination and retaliation against the City pursuant to Title VII and the ADA in light of Capone's use of the standard employment discrimination complaint form, assertion of employment discrimination claims, and EEOC and SCHAC documentation. (Order, ECF No. 22.) The court also issued a contemporaneous Report and Recommendation that recommended that Capone's claims against the other parties be summarily dismissed as frivolous. (R&R, ECF No. 21.) The court concluded that Capone's Title VII and ADA claims against the other defendants and Capone's claims pursuant to RICO were frivolous, including the RICO claim against the City. (Id.) Senior United States District Judge Cameron McGowan Currie adopted the Report and Recommendation as to the RICO, Title VII, and ADA claims, dismissed a state law claim of obstruction of justice or fraud, and recommitted this matter to the assigned magistrate

Capone v. City of Columbia, Not Reported in Fed. Supp. (2020)

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 15 of 70

2020 WL 3448039

judge for further proceedings as to the surviving Title VII and ADA claims against the City. (Order, ECF No. 34.)

**\*2** On February 14, 2020, the City filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6). (ECF No. 36.) The City argues that Capone's Title VII and ADA claims should be dismissed because Capone failed to timely exhaust his administrative remedies and the factual allegations in his Complaint fail to state a claim upon which relief can be granted. (Id.)

Capone now files a motion to amend his complaint. [1] (Mot. to Amend., ECF No. 84.) Capone's proposed amended complaint includes all of the Title VII, ADA, and RICO claims previously dismissed by the court as frivolous and the defendants previously dismissed by the court. (Proposed Am. Compl., ECF No. 84-1 at 7.) The proposed amended complaint also includes new claims against the City—civil rights violations pursuant to 42 U.S.C. §§ 1981 & 1983 under the Fifth, Eighth, and Fourteenth Amendments; "fraud;" "perjury;" and intentional infliction of emotional distress. (Id. at 9, 39.)

[1]  The court previously denied Capone's first motion to amend the complaint because Capone filed an incomplete draft of a proposed amended complaint and indicated he needed more time to submit a final proposed amended complaint. (ECF No. 79.)

Capone also adds new factual allegations against the City in the proposed amended complaint. Capone asserts that while he was employed as a firefighter, the City discriminated against him in the City's "Promotional Testing Scheme" based on his race and disability, retaliated against him for complaining about racial disparities in the "promotional testing," and improperly paid him overtime wages. [2] (Id. at 3-4.)

[2]  Capone previously filed a lawsuit against the City in which he claimed that his promotion to Battalion Chief in 2011 was delayed because the City's testing system discriminates against African Americans and that his overtime pay was miscalculated. C/A No. 3:12-cv-3369-CMC. The court granted summary judgment to the City.

Further, the proposed amended complaint's prayer for relief includes demands for injunctive relief and damages against the City for its purported violations of Title VII and § 1981.

(Id. at 36-37.) Capone also seeks damages against all of the defendants for purported RICO violations regarding Capone's denial of workers' compensation benefits. (Id. at 38.)

## DISCUSSION

### A. Capone's Motion to Amend

In his proposed amended complaint, Capone includes (1) the Title VII, ADA, and RICO claims and the defendants previously dismissed by the court; (2) new federal civil rights claims and state law claims against the City, and (3) new allegations against the City to support the new claims and the Title VII and ADA claims previously construed by the court. But, as argued by the City in its response in opposition to Capone's motion to amend, (ECF No. 87), Capone's proposed amendment would be futile. See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) ("Under Rule 15 of the Federal Rules of Civil Procedure, a court should freely give leave when justice so requires. Although such motions should be granted liberally, a district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules.") (internal citations and quotation marks omitted).

First, Capone's proposed amended complaint includes all of Title VII, ADA, and RICO claims previously dismissed by the court as frivolous and the defendants previously dismissed by the court. Capone does not add any facts or allegations that would change the court's finding that these claims are frivolous, nor does Capone identify any error in the court's reasoning that would give the court reason to reconsider its previous conclusions. Therefore, Capone's addition of the claims previously dismissed would be futile for the reasons stated in Judge Currie's Opinion and Order adopting the Report and Recommendation. (ECF No. 34.)

**\*3** Second, while the proposed amended complaint includes references to civil rights claims pursuant to 42 U.S.C. §§ 1981 and 1983 and various state law claims, Capone fails to plead facts plausibly showing that the conduct of which he complains violated his rights or entitles him to relief, and no such conduct is apparent on the face of the proposed amended complaint. See Fed. R. Civ. P. 8 (requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); Iqbal, 556 U.S. at 678 (stating Federal Rule of Civil Procedure 8 does not require detailed factual allegations, but it requires more than a plain

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 16 of 70

Capone v. City of Columbia, Not Reported in Fed. Supp. (2020)

2020 WL 3448039

accusation that the defendant unlawfully harmed the plaintiff, devoid of factual support). The City correctly argues that Capone fails to plausibly allege factual allegations that would satisfy the pleading requirements for any of these claims. Therefore, Capone's addition of these claims against the City is futile.

Third, as explained in the court's analysis of the City's motion to dismiss, *infra*, Capone's Title VII and ADA claims are subject to dismissal, even considering the new allegations raised in the proposed amended complaint. Therefore, Capone's addition of these factual allegations against the City is futile.

Accordingly, Capone's motion to amend is denied because his proposed addition of claims, parties, and factual allegations would be futile. (ECF No. 87.)

**B. Rule 12(b)(6) Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. Erickson v. Pardus, 551 U.S. 89, 94 (2007). The court "may also consider documents attached to the complaint, see Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citing Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006)).

Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., Erickson, 551 U.S. 89, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of

material fact where none exists. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

**C. The City's Motion to Dismiss**

The City argues Capone fails to identify any adverse action taken by the City that could support a claim for discrimination or retaliation under Title VII or the ADA. The City also argues that because Capone retired from his employment with the City in 2014, Capone's May 28, 2019 charge of discrimination was not filed within the requisite 300-day statute of limitations. The court agrees.

Although Capone's response in opposition to the motion references an email he sent to the City complaining that it transmitted incorrect wage, salary, and overtime data "in reference to [Capone's] retirement," (Pl.'s Resp. Opp'n Mot. to Dismiss, ECF No. 56 at 4-5), Capone fails to assert facts plausibly suggesting a Title VII or ADA claim connected with his retirement pay. Nor does Capone's proposed amended complaint provide any clarity. Capone alleges he had "overtime pay disputes" and was "improperly paid overtime wages," (ECF No. 84-1 at 3-5), but it appears that refers to claims he already litigated against the City in his 2012 lawsuit. C/A No. 3:12-cv-3369-CMC. The proposed amended complaint also includes one of the two October 2018 emails he sent to city officials regarding the purported miscalculation of his retirement pay. But again, Capone provides no facts indicating that the purported miscalculation of his pay data is connected to his discrimination and retaliation claims. See Weller, 901 F.2d at 391 ("While pro se complaints may represent the work of an untutored hand requiring special judicial solicitude, a district court is not required to recognize obscure or extravagant claims defying the most concerted efforts to unravel them.... Only those questions which are squarely presented to a court may properly be addressed.") (internal quotation marks and citations omitted). Accordingly, the court agrees with the City that Capone has failed to identify an adverse action that could support a Title VII or ADA claim.

## RECOMMENDATION

**\*4** Based on the foregoing, the court recommends the City's motion to dismiss be granted and this action be dismissed with prejudice. (ECF No. 36.)

Further, it is hereby

Capone v. City of Columbia, Not Reported in Fed. Supp. (2020)

2020 WL 3448039

**ORDERED** that Capone's motion to amend is denied. (ECF No. 84.)

**IT IS SO ORDERED.**

*The parties' attention is directed to the important notice on the next page.*

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 3448039

---

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 10705555
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia,
Parkersburg Division.

Jack L. RITCHIE, Plaintiff,
v.
AKER KVAERNER SONGER, INC., et al., Defendant.

CIVIL ACTION NO. 6:07-cv-00959
|
Signed 11/13/2009

**Attorneys and Law Firms**

Anthony M. Catanzarite, Reminger Co., Cleveland, OH, D. Patrick Kasson, Pro Hac Vice, Reminger Co., Columbus, OH, Sam Fox, W.E., II, Flaherty Sensabaugh & Bonasso, Charleston, WV, for Plaintiff.

Jeffrey E. Beeson, Pro Hac Vice, Beeson Terhorst, Healdsburg, CA, Larry J. Rector, Steptoe & Johnson, Clarksburg, WV, for Defendant.

**MEMORANDUM OPINION & ORDER**

Joseph R. Goodwin, Chief Judge

**\*1** Pending before the court are the defendant's Motion for Summary Judgment [Docket 83], the plaintiff's Motion for Partial Summary Judgment [Docket 34], the defendant's motion for Leave to File Amended Answer [Docket 27], and the plaintiff's Motion for Leave to Amend the Complaint [Docket 32]. For the reasons discussed below, the defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, and the plaintiff's Motion for Partial Summary Judgment is **DENIED as moot**. Furthermore, the defendant's Motion for Leave to File Amended Answer is **DENIED**, and the plaintiff's Motion for Leave to Amend the Complaint is also **DENIED**.

**I. Background**

This case arises from the termination of the plaintiff, Jack L. Ritchie ("Ritchie," or the "plaintiff"), by the defendant, Aker Kvaerner Songer, Inc. [1] Ritchie worked as a millwright foreman, and in that position he supervised a staff of anywhere from three to fifteen millwrights, who performed welding, fabrication, and other construction tasks. He also reviewed blueprints for upcoming projects and attended meetings with management. (Ritchie Dep. 13:15-21; 18:19-24; 20-22.) Ritchie alleges that, while working for the defendant, he "developed abnormal physical disorders including a severe lung condition" as a "result of exposure to chemicals at the workplace." (Compl. ¶ 12 [Docket 1].) He further alleges that his "lung condition was a physical impairment which substantially limited his major life activities," that the defendant knew of his impairment, and that one of his managers even asked him when he would retire and apply for disability. (Id. ¶¶ 13-15.) The defendant terminated Ritchie on December 22, 2004. (Id. ¶ 16.) [2] On April 15, 2005, Ritchie filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging wrongful termination in violation of federal law. (Id. ¶¶ 18-19.) The EEOC issued a Notice of Right to Sue letter on October 29, 2007 (id. ¶ 21), and Ritchie filed the Complaint on December 26, 2007.

Ritchie asserts five causes of action. (Id. ¶¶ 22-42.) In the First Cause of Action, he claims that the defendant denied the plaintiff Family Medical Leave Act ("FMLA") leave by terminating his employment (id. ¶ 26) and further violated the FMLA by terminating him "in retaliation for exercising rights available to him under the [Act]" (id. ¶ 27). In the Second and Third Causes of Action, Ritchie asserts that he was terminated in violation of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and West Virginia Code section 5-11-01 et seq., the West Virginia Human Rights Act ("WVHRA"). (Id. ¶¶ 29-36.) The Fourth Cause of Action alleges that the plaintiff's termination "constitutes a wrongful discharge in violation of West Virginia's Public Policy" as set forth in the FMLA, ADA, ADEA, WVHRA, and West Virginia law. (Id. ¶ 38.) Finally, Count Five alleges that the "termination was the result of malicious, willful and intentional conduct for which Defendant knew was in violation of the law and was specifically designed to injure the Plaintiff." (Id. ¶ 41.)

**II. Summary Judgment Standard of Review**

**\*2** To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Instead, the court will

draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, is insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

### III. Defendant's Motion for Summary Judgment

The defendant moved for summary judgment on all causes of action, with the exception of the ADEA claim, which Ritchie has apparently withdrawn. As noted above, in deciding this motion I will take the facts in the light most favorable to the plaintiff. Ritchie worked for the defendant without incident for approximately eight years, received above average evaluations, and never received warnings or discipline concerning his attendance or otherwise. (Compl. ¶ 9, 11.) In 2004, Ritchie had various family and medical issues that caused him to miss work, including the hospitalization and death of his mother and his own hospitalization. (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 5-6 [Docket 85].) Between June and September 2004, Ritchie missed thirty working days that he states were protected FMLA leave days, for which he claims he provided the necessary notice. (*Id.* at 5-6, 14.) Specifically, he states that his absences between June 7 and August 6, 2004, were taken to care for his ailing mother, which is protected by the FMLA and which was approved by the defendant. (*Id.*)

Immediately following his mother's death, the plaintiff missed nearly two weeks of work for what he describes as "mental issues." (*Id.* at 15.) For each day that he missed during this period, Ritchie states that he called in to work and

informed his supervisors why he would not be there. (*Id.* at 16.) He also states that prior to his mother's passing, his supervisor told him that he should take off as much time as he needed to deal with the emotional consequences. It was agreed that Ritchie "would ensure that all his work was covered." (*Id.*) Furthermore, Ritchie asserts that his September and November absences were due to hypertension, which left him hospitalized and required a follow-up doctor visit. (*Id.* at 15.) Between October and December 2004, he missed only one day of work (for the doctor visit) and left early from work on eight occasions. (*Id.* at 5.) According to his doctor, Ritchie's intermittent leave in fall and early winter of 2004 "was appropriate for short term emotional recovery." (*Id.* at 16.) Ritchie "was never written up or disciplined for missing time from work or leaving early without authorization" and, therefore, he claims, there is no evidence that the absences were not approved by the defendant. (*Id.* at 6.)

**\*3** After being terminated on December 22, 2004, and after receiving a Right to Sue letter from the EEOC, Ritchie brought this action. He alleges that his termination violated the FMLA, ADA, WVHRA, and West Virginia public policy. According to Ritchie, his managers knew, at least generally, that he had lung problems and believed that these problems made it difficult for him to perform his employment duties. (*Id.* at 7.) He asserts that his preexisting lung problems either were a disability under the ADA and WVHRA, or, at the very least, his supervisors perceived him as having a disability. He contends that his health problems rendered him unable to do "mindless entry level type physical work," but that he could still perform the essential functions of his job, which was supervisory in nature. (*Id.* at 2-3.) Additionally, Ritchie has presented evidence showing that he "was 'laid off' due to lack of work [and as part of a reduction in work force], not absenteeism." (*Id.* at 8.) This reason was given, he asserts, because the defendant "believed, correctly, that a lawsuit arising out of a reduction in force was easier to defend." (*Id.*) The day after Ritchie was terminated, the defendant hired a replacement, but that person was contacted about the job in early December. (*Id.*)

On December 28, 2004, the plaintiff applied for and was later awarded Social Security Disability Insurance ("SSDI") benefits. Thereafter, he also applied for and was awarded a disability pension with the Ohio Carpenter's Pension Fund (the "Pension Fund") and compensation from Ohio Workers' Compensation. Ritchie states that the mental anguish of being terminated from his job, the mental issues he suffered as

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 20 of 70

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

a result of his mother's passing, and his ongoing physical impairments caused him to become totally disabled for purposes of SSDI. (*Id.* at 3-4.) Accordingly, it was only *after* his termination that he became totally disabled and, therefore, eligible for SSDI benefits and the Pension Fund, which is contingent on an award of SSDI. (*Id.*)

### A. Admissibility of Medical Evidence

As an initial matter, I must address the admissibility of certain evidence that the defendant relies on in its motion. Namely Ritchie has renewed a previous Motion to Strike [Docket 54] that I denied as moot in a prior Order. In that motion, Ritchie objected to the defendant's references to his medical records. (Pl.'s Mem. Supp. Mot. Strike 1 [Docket 55].) He now incorporates that motion into his summary judgment response and challenges the defendant's exhibits at appendices G, J, K, N, P, R, and W. (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 1.) Ritchie argues that the medical records in these appendices must be stricken for three reasons. First, he contends that the medical records contain doctors' opinions, which is hearsay, and, "none of the medical records ... are accompanied by a written declaration of its custodian, or other qualified person, certifying the records." (Pl.'s Mem. Supp. Mot. Strike 3.) Second, the defendant does not qualify any of the individuals who prepared the records as experts, and it never listed any of those people as experts it intended to rely upon at trial. (*Id.* at 4-5.) Third, the defendant has failed to offer testimony of the experts who wrote the reports that the opinions are based on sufficient facts, reliable medical principles, and that those principles were applied reliably in this case. (*Id.* at 5.) As such, Ritchie argues, the court cannot rely upon the allegedly inadmissible medical records in deciding the summary judgment question.

"[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The question, therefore, is whether the defendant is attempting to rely on inadmissible evidence in its summary judgment motion. Ritchie challenges appendices containing injury reports completed by a physician, letters from a doctor certifying that Ritchie can return to work, a psychiatric record attached to a letter to a Workers' Compensation Administrative Law Judge, Ritchie's Pension Fund file regarding his application for Total and Permanent Disability Benefits, records from the Social Security Administration (the "SSA") pertaining to Ritchie, and expert reports sent from plaintiff's counsel to defense counsel.

**\*4** Of the appendices that Ritchie challenges, I rely only on Appendix R, which contains the SSA's certified copies of records pertaining to him. The plaintiff's argument that the statements in Appendix R are inadmissible is without merit. First, I rely on these statements only to show inconsistencies between Ritchie's submissions to the SSA and his submissions made to this court. As such, the statements are not hearsay because they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) (defining hearsay as a statement "offered in evidence to prove the truth of the matter asserted"). Furthermore, whether the physicians evaluating Ritchie for purposes of SSDI benefits are qualified or whether they used reliable medical principles is of no moment for purposes of my analysis. The plaintiff submitted these items to the SSA for purposes of showing that he was disabled. He cannot now argue that they are somehow unfounded. For these reasons, the plaintiff's request to strike Appendix R—the only appendix relied upon in this opinion —is **DENIED**.

### B. The FMLA Claim

Turning to the plaintiff's claims, his first cause of action alleges that the defendant violated his FMLA rights in two ways: he was denied appropriate leave under the FMLA, and he was terminated in retaliation for exercising his rights under the FMLA. (Compl. ¶¶ 26-27.) Ritchie asserts, without dispute, that he is an eligible employee under the FMLA and that the defendant was covered by it. (*Id.* ¶ 23.) He also claims that his "serious health condition," which was caused by "abnormal physical disorders, including a severe lung condition" due to exposure to chemicals in the workplace, entitled him to FMLA leave. (*Id.* ¶¶ 12, 24.) According to the plaintiff, the defendant had actual knowledge of his health condition and denied the plaintiff his entitled leave "by terminating his employment." (*Id.* ¶¶ 25-26.)

The FMLA is intended "to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999). Under the FMLA, a qualified employee is entitled to a total of twelve workweeks of leave during any twelve-month period for qualifying medical or family reasons. 29 U.S.C. § 2612(a) (1); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 381-82 (4th Cir. 2001). One of the acceptable qualifying reasons is "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is "an

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

illness, injury, impairment, or physical or mental condition that involves — (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). The Act "ensures that [covered] employees will be restored to their same or an equivalent position upon returning to work." *Rhoads,* 257 F.3d at 382.

The defendant asserts three reasons why Ritchie's FMLA cause of action fails as a matter of law: Ritchie cannot satisfy the essential elements for FMLA protected leave; he was terminated for a legitimate business reason; and he has no damages recoverable under the FMLA because it provides no remedy to someone who is unable to perform any job.

### 1. Ritchie cannot satisfy the essential elements of the portion of his First Cause of Action that asserts a denial of FMLA protected leave.

The defendant argues that Ritchie cannot meet the necessary elements for denial of leave under the FMLA. The plaintiff must show not only that he was entitled to FMLA leave, but also that the employer "interfere[d] with, restrain[ed], or den[ied] the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a).

Because the Complaint only asserts denial of leave violations in relation to Ritchie's "serious health condition," I read the defendant's argument to be that Ritchie cannot meet the elements to establish denial of leave under the FMLA for his own health problems only. [3] Indeed, the only serious health condition mentioned in the Complaint is a "severe lung condition." (Compl. ¶ 12.) Ritchie is unable, however, to recall what days he left work early due to his lung problems, if any. (Ritchie Dep. 147:17-24; 148:1-5.) In fact, he cannot identify a single minute that he missed work due to his lung condition, as alleged in his Complaint. (*Id.* at 213:10-24; 216:4-10.) Furthermore, there is no evidence that the plaintiff specifically requested time off for his lung problem and that such a request was denied by the defendant. Taking the facts in the light most favorable to the plaintiff, the defendant is owed summary judgment with respect to the plaintiff's claim that the defendant interfered with, restrained, or denied his attempt to exercise his FMLA rights. Accordingly, the defendant's Motion for Summary Judgment is **GRANTED** as to paragraph 26 of the Complaint, which sets out the plaintiff's claim under the FMLA based on his serious health condition.

### 2. Ritchie's claim for FMLA retaliation survives because there are issues of material fact as to whether the defendant's actions were pretextual.

*5 The FMLA also prohibits an employer from discriminating or retaliating against an employee for asserting rights under the Act. *See* 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c) (providing that employers are prohibited from "retaliating against [employees] for having exercised or attempted to exercise FMLA rights"); *Dotson v. Pfizer,* 558 F.3d 284, 294 (4th Cir. 2009) (observing that the FMLA "protect[s] employees from ... retaliation for exercising their substantive rights under the [Act]" (internal quotation marks omitted) ). Paragraph 27 of the Complaint asserts such a violation. This broader claim survives the defendant's Motion for Summary Judgment, because a reasonable jury could decide that Ritchie was terminated because of absences related to his mother's illness and death, or other protected FMLA leave.

To establish a prima facie case of retaliation under the FMLA, the plaintiff must prove the following: (1) that he engaged in a protected activity; (2) that an adverse employment action was taken against him; and (3) that there was a causal link between the protected activity and the adverse employment action. *Wright v. Sw. Airlines,* 319 F. App'x 232, 234 (4th Cir. 2009) (citing *Mackey v. Shalala,* 360 F.3d 463, 469 (4th Cir. 2004) ). Once the plaintiff establishes the elements of a prima facie case, the burden shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 270-71 (4th Cir. 2001) ). If the defendant carries its burden, the plaintiff must then prove by a preponderance of the evidence that the proffered reason was pretextual. *Id.* (citing *Matvia,* 259 F.3d at 271); *see also Yashenko v. Harrah's NC Casino Co.,* 446 F.3d 541, 551 (4th Cir. 2006) (adopting burden-shifting framework for FMLA retaliation cases).

Here, the record contains evidence that Ritchie took approved leave, at least for his mother's illness and death and his own hospitalization for hypertension. He can identify specific days that he missed because of these events (*see* Pl.'s Mem. Contra Def.'s Mot. Summ. J. 5), and he presents evidence that the defendant knew why he was missing those days and approved his leave (*see, e.g.,* Washington Dep. 64-65 (recollecting that the plaintiff asked for time off for his mother's illness) ). Whether Ritchie specifically asked for FMLA leave is

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 22 of 70

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

immaterial. See *Dotson*, 558 F.3d at 295 ("[T]he [FMLA] regulations do not require the employee to 'expressly assert rights under the FMLA or even mention the FMLA'; instead, the employee may only state that leave is needed for an expected birth or adoption, for example" (quoting 29 C.F.R. § 825.302(c) ).). There is also evidence of a causal connection, as one of the defendant's proffered reasons for Ritchie's termination was absenteeism. The facts, taken in the light most favorable to the plaintiff, could support a finding that Ritchie requested FMLA leave, was granted that leave, took the days off as approved, and was then fired in retaliation for missing those days of work.

Because the plaintiff can prove a prima facie case of retaliation under the FMLA, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for Ritchie's termination. There are two such reasons in the record. First, the defendant stated that the plaintiff was terminated due to a reduction in force. (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 8; Morocco Dep. 24.) However, in its filings throughout the course of this litigation, the defendant has claimed that the plaintiff was terminated "because of attendance problems and leaving work early without permission." (Def. Resp. Pl.'s First Combined Set Interrogs. Nos. 4, 5.) The defendant stated, "Between June 7, 2004 and September 27, 2004, [the plaintiff] missed 32 days of work, came in late 2 days, and left early 12 days. ... Between October 12, 2004 and December 6, 2004, he left work early without permission on 8 more days and missed work on one day. On December [22], 2004 he left work at noon without permission and was subsequently discharged." (*Id.*)

**\*6** Because the defendant can provide legitimate, non-discriminatory reasons, the burden shifts back to Ritchie to prove by a preponderance of the evidence that these proffered reasons are pretextual. First and foremost, the defendant is inconsistent in its proffered reasons, and offering "different justifications at different times ... is, in and of itself, probative of pretext." *EEOC v. Sears Roebuck Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001). And although the defendant contends that it only submitted that Ritchie was terminated as part of a reduction in force in order to help him earn benefits, this issue is hotly disputed. Furthermore, the record shows that another employee, Cecil Kaiden, was hired immediately to replace the plaintiff, and that he was contacted about the job "the first week in December," weeks before the plaintiff was terminated. (Kaiden Dep. 11-12.) Kaiden further testified that there was plenty or work to be done when he took over the plaintiff's job, only one day after he was fired. (*Id.* at 23,

30-31.) All of this refutes the defendant's first reason—that the plaintiff was terminated for reduction in force—and could lead a reasonable jury to find pretext.

Second, assuming the defendant terminated the plaintiff for his absenteeism, an issue of fact remains regarding whether Ritchie requested and received FMLA leave for his absences. Should a jury decide that he did, and that the defendant fired him anyway, this is not a "legitimate and non-discriminatory" reason for termination, and the pretext issue is not reached. See *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) ("The explanation provided must be *legally sufficient* to justify a judgment for the defendant." (emphasis added) ). Even if the jury decides that terminating the plaintiff for absenteeism was legitimate and non-discriminatory, however, there is enough evidence for a reasonable jury to find the defendant's actions were pretextual. See *id.* at 256 (holding that a plaintiff in a discrimination suit may succeed in showing pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence" (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973) ) ). In addition to the fact that the defendant has provided inconsistent reasons for termination, a reasonable jury could find that Ritchie was treated differently than others who were terminated for absenteeism. For example, the union steward at the time Ritchie was terminated stated that the defendant's policies required a verbal and written reprimand before termination, and that to his knowledge — and he was required to be present as a union representative at every reprimand — Ritchie was never reprimanded in any way. (LaComb Aff. ¶¶ 3-4.) [4] Finally, multiple witnesses have stated that one of Ritchie's supervisors (indeed, one who was involved in his termination) made repeated comments about the plaintiff's lung condition, referring to it as a disability and doubting whether Ritchie could complete his work because of it. (*See, e.g.*, Hayman Aff. ¶¶ 3-4 (asserting that supervisor Newell told the plaintiff on several occasions that he needed to take disability retirement and told him he could not perform a welding operation because his lungs were "shot"); Fordyce Aff. ¶ 2 (stating that he heard Newell "tell Mr. Ritchie that he should go on and retire"); Ritchie Aff. (June 2, 2009) ¶ 17 (stating that Newell made numerous comments that Ritchie should take disability retirement and that his lungs were "shot").) All of this evidence could lead a reasonable jury to conclude that, even if absenteeism is a legitimate, non-discriminatory reason for the plaintiff's termination, it was merely a pretext.

**\*7** Accordingly, the defendant's Motion for Summary Judgment on the FMLA retaliation claim, paragraph 27 of the Complaint, is **DENIED**.

### 3. The plaintiff could recover damages under the FMLA.

In challenging Ritchie's FMLA claims, the defendant argues that "[w]here a plaintiff is completely and permanently incapable of performing his job, an FMLA claim fails as a matter of law because he cannot prove the essential element of an injury or damages recoverable under the Act." (Mem. Supp. Def.'s Mot. Summ. J. 14.) The plaintiff admits that he "is not seeking compensatory damages for his FMLA claim" because those damages "are available for [his] other claims." (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 12 & n.10.) Rather, he seeks front pay and back pay for the alleged FMLA violations, along with costs and fees.

Ritchie's main argument here is that he became so mentally distraught after his termination that he was unable to work; therefore, he is eligible for, at least, front pay. In other words, but for his termination by the defendant, he would still be capable of working and could be reinstated in his former job. If the jury believes Ritchie on this point, and believes that he was terminated in retaliation for exercising his FMLA rights, then he may be entitled to damages under the FMLA. Although reinstatement is a preferred remedy when feasible, "[i]n cases in which reinstatement is not viable ... because of psychological injuries suffered by the plaintiff as a result of ... discrimination, courts have ordered front pay as a substitute for reinstatement." *Pollard v. Du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). *See also Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999) ("[A]wards of front pay are appropriate when it is impossible to reinstate the plaintiff[.]" (internal quotation marks omitted) ). Therefore, the defendant's argument on this point is rejected.

### C. The ADA Claim

Ritchie also alleges that the defendant terminated him "at least in part" because he was "disabled and/or perceived as disabled." (Compl. ¶ 31.) However, despite his disability or the defendant's perception of his disability, Ritchie asserts that "could safely and substantially perform the essential functions of his job with reasonable accommodation,"

namely, "additional leave." (*Id.*) As such, he claims that his termination violates the ADA.

The ADA prohibits a covered employer from discriminating "against a qualified individual on the basis of disability ... in regard to ... discharge of employees." 42 U.S.C. § 12112(a). To prove his case, the plaintiff must show that (1) he has a disability, (2) he is a "qualified individual" for the employment in question, and (3) the defendant took an adverse employment action against him because of his disability. *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions" of his job. 42 U.S.C. § 12111(8). If the plaintiff can prove his prima facie case, the burden of production shifts to the defendant to establish a legitimate, non-discriminatory reason for the termination. *McDonnell Douglas*, 411 U.S. at 802; *Raytheon Co. v Hernandez*, 540 U.S. 44, 50 n.3 (2003) (noting that courts use the *McDonnell Douglas* methodology for ADA claims). Once such a reason is proffered, the burden "reverts to the plaintiff to establish that the employer's non-discriminatory rationale is a pretext for intentional discrimination." *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 258 (4th Cir. 2006).

**\*8** At the heart of the defendant's summary judgment argument is the assertion that Ritchie applied for SSDI benefits after his termination, and, in doing so, he made representations that he was totally disabled and unable to perform his job before his termination. These representations, the defendant claims, are inconsistent with Ritchie's submissions to this court pursuant to his ADA claim, as they tend to show that he is not a "qualified individual" under the ADA. If the defendant is correct, then Ritchie fails to prove an element of the prima facie case, which entitles the defendant to summary judgment on the ADA claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (plaintiff must make a showing sufficient to establish a genuine issue of material fact on the "element essential to [his] case, and on which [he] will bear the burden of proof at trial").

The Supreme Court has addressed this issue and held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999). Nonetheless, "an ADA plaintiff cannot simply ignore [his] SSDI contention that [he] was too disabled to work." *Id.* at 798. To survive a defendant's motion for summary judgment, the plaintiff must explain why an SSDI contention that he is

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 24 of 70

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

totally disabled "is consistent with [his] ADA claim that [he] could 'perform the essential functions' of [his] previous job, at least with 'reasonable accommodation.' " *Id.* [5]

In this situation, the first step in determining if the defendant is entitled to summary judgment on the ADA claim is deciding whether the positions taken by Ritchie in his SSDI application and his ADA claim genuinely conflict. *See Detz v. Greiner Indus., Inc.,* 346 F.3d 109, 118 (3d Cir. 2003). If so, then the next step is to determine if he has "adequately reconciled the two positions." *Id.* at 120. In his application to the Pension Fund, [6] Ritchie represented that "[o]n the 22 day of Dec, 2004, I became Totally and Permanently Disabled as a result of Brething [sic] Chemical and Other Fumes and Ect [sic] and will be continuously and wholly prevented thereby for life from pursuing any and all gainful occupations...." (Pl.'s Mom. Contra Def.'s Mot. Summ. J. Ex. FF.) He has testified that, at the time he submitted the application, he believed he met the requirements of the Pension Fund to obtain benefits, *i.e.*, that he was totally and permanently disabled. (Def.'s Mot. Summ. J. App. A 116:6-14 (Ritchie Dep.); App. Q 12 (requiring Pension Fund benefits recipients to be "totally and permanently disabled").) In the same application, he listed the following physicians who treated him for his alleged disability: Dr. Gary Sarver, a clinical psychologist and neuropsychologist from Athens, Ohio; Dr. Peter Ottaviano of the outpatient clinic at Saint Mary's Hospital in Huntington, West Virginia; and Dr. Scott Smith of the Holzer Clinic in Gallipolis, Ohio. (Pl.'s Mom. Contra Def.'s Mot. Summ. J. Ex. FF.)

 **\*9** Attached to the application was an "Attending Physician's Statement of Disability," signed by Dr. Ottaviano, which stated that as of March 8, 2005, the plaintiff was "permanently continuously and wholly prevented for life from engaging in any occupation and performing any work for wage or profit." (*Id.*) The Statement of Disability listed only "asthma" as a diagnosis to support this conclusion, and stated that the symptoms first appeared in 2001. It also specifically indicated that the disability did not involve a mental condition. (*Id.*) Furthermore, Ritchie submitted an application to the SSA in early 2005. When asked to "[e]xplain how your illnesses, injuries, or conditions affect[ ]" everyday tasks, the plaintiff responded as follows:

- "(Lifting) - can't do"

- "(Standing) - too long - back hurts"

- "(Climbing stairs) - out of breath"

- "(Using hands) - go numb"

- "(Reaching) - very limited"

- "(Walking) - short winded"

(Def.'s Mot. Summ. J. App. R 89.) [7] Similarly, when asked "[w]hat are the illnesses, injuries, or conditions that limit your ability to work?" the plaintiff responded, "Lungs, back problems, nerves, hypertension" and then explained further, "[m]y breathing is very labored. I work in a chemical plant and I am exposed to [chemicals]." (*Id.* at App. R 57.) On the same page, he admitted, "I cannot keep working. This has bothered me for the past 3 years but I kept working anyway." (*Id.*)

In the same application, Ritchie submitted a series of reports from Dr. Sarver in support of his SSDI claim. The January 20, 2005 report included the following representations:

- Ritchie "has recently been dismissed from his long-term employment due to his alleged inability to function appropriately." (*Id.* at App. R 189.)

- Ritchie reports "significant, *perpetual*, depression from multiple causes; he fell and had a severe back injury about 10 years ago which causes him continual pain, he was laid off from work in 1980 and 'lost everything,' and his mother recently died." (*Id.* at App. R 190 (emphasis added).)

- Ritchie's "ability to relate to others, including supervisors, appears to be seriously limited secondary to his major depression/hypomania/obsessive-compulsive personality disorder." (*Id.* at App. R 192)

- Ritchie's "recent loss of his job was somewhat of a relief to him as he recognized that his attentional/functional problems might have led to an employee injury." (*Id.*)

Nowhere, in any of the submissions to the SSA or Pension Fund did Ritchie mention that his termination set off, exacerbated, or caused any type of disability. [8]

Turning to the submissions made pursuant to his ADA claim, it is clear that Ritchie's representations conflict with those of his SSDI and Pension Fund applications. Here, he contends that "there is substantial evidence that [his] total disability did not begin until, and was caused by, his termination...." (Pl.'s Mom. Contra Def.'s Mot. Summ. J. 1.) He admits that he

had "some disabling conditions prior to the termination" but was not "*totally* disabled until the termination caused him a catastrophic emotional injury." (*Id.* at 1-2.) He cites several exhibits wherein coworkers and managers testified to his ability to perform his job as a millwright foreman, which was "not very physical in nature, but rather, [was] supervisory" and simply required him "to use his mind." (*Id.* at 2; *see also id.* ("Obviously, [Ritchie] had preexisting lung and back issues which disabled him from mindless entry level type work. Now [his] mental functioning had deteriorated to the point where he could not do supervisory type work. He thus became *totally* disabled, for the first time, after and because of the termination." (internal citations omitted) ).) Despite Ritchie's arguments to the contrary, his representations to the SSA and the Pension Fund conflict with the submissions he makes to this court. *Cf. Detz,* 346 F.3d at 119 (concluding that representations were conflicting where the plaintiff indicated to the SSA that it was a hand and arm injury that caused his disability, but then asserted to the court "that it was not his physical limitations, but rather the fact that [the defendant] laid him off, that rendered him 'unable to work' ").

**\*10** The next step, then, is to determine if Ritchie has "adequately reconciled the two positions." *Id.* at 120. In attempting to do so, Ritchie cites his own deposition and affidavits, in which he claims that "his inability to work was multifactorial, including his mental injury." (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 4.) Ritchie also submits a July 31, 2009 affidavit of Dr. Ottaviano, which undercuts statements he made in 2005 in support of the plaintiff's disability application. Whereas his 2005 report listed asthma as the only disability Ritchie had, and even explicitly ruled out mental conditions, in his 2009 affidavit, Dr. Ottaviano states that

> my understanding is that Mr. Ritchie was able to perform his position ... up until his termination. ... It is clear to me that [the plaintiff's] disability claim was multifactorial and based upon both physical and mental conditions. The information I provided for Mr. Ritchie in connection with his disability applications was based upon my understanding that [he] was disabled from the combined effects

of multiple conditions, including his asthma.

(*Id.* at Ex. GG, ¶¶ 3, 5.) Finally, Ritchie provides the affidavit of Dr. Lee Howard, who performed a psychological examination of the plaintiff on February 23, 2009, over four years after his termination. Dr. Howard stated that Ritchie's termination "substantially worsened his pre-existing depression resulting in his being precluded from sustained remunerative employment after his termination" and "a two month bereavement process following the death of a loved one is appropriate and psychologically necessary. ... I would expect Mr. Ritchie to have gotten better over time and returned to his normal functioning and attendance at work." (*Id.* at Ex. T, ¶¶ 6, 7.) [9]

The sufficiency of the required explanation is to be measured as follows:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of [his] job, with or without "reasonable accommodation."

*Cleveland,* 526 U.S. at 807. *Cleveland* also offers ways in which a plaintiff might explain the inconsistencies. For example, "the SSA sometimes grants SSDI benefits to individuals who not only can work, but are working," *i.e.*, "to facilitate a person's reentry into the workforce." *Id.* at 805. An inconsistency may also be reconciled in a case where an individual "merely applied for, but has not been awarded, SSDI benefits." *Id.* Finally, "an ADA suit claiming that the plaintiff can perform [his] job *with* reasonable accommodation may well prove consistent with an SSDI

claim that the plaintiff could not perform [his] own job (or other jobs) *without* it." *Id.* at 803. In considering a plaintiff's explanation, courts must be mindful that "each case must be decided on its unique facts." *Motley v. N.J. State Police,* 196 F.3d 160, 164 (3d Cir. 1999).

**\*11** In *Stowe-Pharr Mills,* the Fourth Circuit reversed a district court's grant of summary judgment for the defendant on an ADA claim because, despite the plaintiff's seemingly conflicting statements to the SSA and the court, she "told the SSA intake officer that she could work with reasonable accommodation" but the officer advised her to state on the application that she was simply unable to work. 216 F.3d at 379. Indeed, the SSDI application in that case did not (and generally, does not) "take into account whether she could have worked with reasonable accommodation." *Id.* The court concluded,

> [t]his explanation is sufficient for a reasonable juror to conclude that [the plaintiff's] SSDI statement does not contradict her assertion in this (the ADA) case that she could have worked if [the defendant] had accommodated her.... Accordingly, [the plaintiff's] statement in her SSDI application does not preclude the EEOC from establishing a triable question on the "qualified individual" element of the ADA claim....

*Id.*

In *Detz,* however, the Third Circuit affirmed summary judgment for the defendant after concluding that the plaintiff did not sufficiently explain the inconsistencies between the plaintiff's SSDI application and his age discrimination claim (which also requires that the plaintiff show he was a qualified individual). 346 F.3d at 111. Detz was laid off from his job as a millwright and subsequently filed for disability benefits. In his application, he described his "disabling condition" as "loss of use of left hand and arm; high blood pressure; lung problems, depression" and indicated that he stopped working because of this condition on the date of his layoff. *Id.* at 112. When asked to explain how his condition kept him from working, Detz responded, "I can't lift over 20 lbs. Can't use left repetatively [sic]. I drop things easily with left hand." *Id.*

The SSA granted Detz's application on December 2, 1998, and he began receiving disability benefits. On October 9, 2001, he filed suit under the ADEA and the Pennsylvania Human Rights Act, asserting that he was fifty-nine years old at the time of his discharge and was replaced by someone under forty. He specifically alleged that he had "performed in his position for over nine ... years and was fully qualified for the position." *Id.* at 114.

In his response to the defendant's motion for summary judgment, Detz attempted to reconcile the conflicting statements by maintaining that he "became 'disabled,' for SSDI purposes, by virtue of his discharge by [the defendant]." *Id.* at 114. In a somewhat convoluted argument, Detz explained that before his termination, the defendant had moved him to a job in the "Tool Room," which did not require extensive use of his hand or arm, and "because he was no longer allowed to continue performing *that* job [after his discharge], he would not be able to find another job similarly tailored to his physical limitations." *Id.* The court rejected the plaintiff's explanation, stating that

> [t]he fatal flaw in this attempt by Detz to explain some consistency in his positions is that it ignores the statements he made repeatedly to the SSA regarding his disability. ... Detz indicated repeatedly on various forms submitted to the SSA that he was unable to work—and specifically that he was unable to perform his previous job—*due to his disability.* ... He did not inform the SSA that he would be physically capable of continuing to perform his job in the Tool Room but for his discharge by [the defendant], as he asserts now in the context of his ADEA claim. Thus, his explanation would not allow a reasonable juror to find in the first instance that Detz had a good faith belief in his entitlement to SSDI benefits, and then still conclude that he was qualified for his position..., as *Cleveland* requires.

**\*12** *Id.* at 120.

1:24-cv-02612-JDA-PJG     Date Filed 08/08/25     Entry Number 49-5     Page 27 of 70

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

Like Detz, and unlike the plaintiff in *Stowe-Pharr Mills*, Ritchie never mentioned in his disability applications that he "remained physically able to continue doing [his former] job, or that it was his discharge that rendered him 'disabled.'" *Id.* at 119. To the contrary, Ritchie's psychologist submitted that Ritchie's "recent loss of his job was somewhat of a relief to him as he recognized that his attentional/functional problems might have led to an employee injury." (Def.'s Mot. Summ. J. App. R 192.) Even in places where the application mentioned depression and other mental issues, his termination was never mentioned, and these illnesses were couched in terms of "perpetual" and long-term mental conditions, not ones that were brought on by an event that occurred six days before his first disability application was submitted. *Cf. Williams v. London Util. Comm'n*, 375 F.3d 424, 429 (6th Cir. 2004) (rejecting an explanation from the plaintiff's doctor that "the termination and its emotionally devastating effects upon [the plaintiff] rendered him unable to work when combined with his pre-existing physical conditions" because the doctor did not explain how the plaintiff's health "declined to the point where he became unable to work ... one day after his termination").

Also, as in *Detz*, nowhere in his application did Ritchie mention that he could have performed his job with reasonable accommodation, and unlike *Stowe-Pharr Mills*, there is no evidence that he even believed it was true at the time of his application. Even though in this action, Ritchie states in his Complaint that he "could safely and substantially perform the essential functions of his job with reasonable accommodation," namely, additional time of (Compl. ¶ 31), this bare allegation is insufficient to survive summary judgment. Indeed, the record fails to reflect that Ritchie ever requested time off specifically for his lung condition, and Ritchie admits that he never requested any accommodation for his disability. (Def.'s Mot. Summ. J. App. I (EEOC Charge form, wherein Ritchie stated "I never asked for any kind of accommodation"); App. T (ADA Intake Questionnaire, wherein Ritchie stated "I never asked for any special accommodation").) His efforts to provide his own affidavits and deposition testimony, a 2009 statement from Dr. Ottaviano that clearly recants his 2005 affidavit, and an affidavit from a doctor who examined Ritchie over four years after his termination is not enough to reconcile the inconsistencies between his disability applications and his submissions to this court. *See Cleveland*, 526 U.S. at 806 ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement...."); *Opsteen v. Keller*

*Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005) (rejecting the plaintiff's attempt "to maintain both gloomy and optimistic medical evaluations at the same time, and to benefit from different sources based on these incompatible positions," and observing that "[t]his is exactly the sort of factual contradiction that *Cleveland* forbids"). The plaintiff has failed to show that he is a qualified individual under the ADA and *Cleveland*, and the defendant's motion for summary judgment on the ADA claim is thus **GRANTED**.

#### D. The WVHRA Claim

**\*13** Like the ADA, the WVHRA "prohibit[s] employment discrimination against a qualified individual with a disability." *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 573 (W. Va. 1996). West Virginia Code section 5-11-9(1) states that "it shall be an unlawful discriminatory practice ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is ... disabled." To establish a prima facie case of discriminatory discharge because of a disability under the WVHRA, the plaintiff must prove that (1) he meets the definition of "disabled," (2) he is a "qualified disabled person," and (3) he was discharged from his job. *Hoops v. Elk Run Coal Co.*, 95 F. Supp. 2d 612, 617 (S.D. W. Va. 2000) (alterations omitted). Again, my analysis will focus on whether Ritchie is precluded from arguing that he is a qualified person under the WVHRA because of his representations to the SSA and the Pension Fund.

There are only a couple of WVHRA cases that have considered the *Cleveland* rule, but those cases indicate that it can be used to challenge a prima facie case under the WVHRA. In *Alley v. Charleston Area Medical Center, Inc.* ("CAMC"), the Supreme Court of Appeals of West Virginia entertained an argument by CAMC that the plaintiff had a duty to explain a "facial contradiction created when a plaintiff swears that he or she is totally disabled and unable to work at any job for the purpose of obtaining [SSDI] benefits, ... and subsequently claiming that he or she could perform the essential functions of his or her job for the purpose of asserting a claim under the [WVHRA]." 602 S.E.2d 506, 519 (W. Va. 2004). The court did not determine that the lower court abused its discretion in refusing the instruction, but reasoned, after quoting *Cleveland*, that the plaintiff was permitted to explain the inconsistency by telling the jury how she could have done her job with reasonable accommodation. *Id.* Similarly, in *Calef v. FedEx Ground Package Systems*, the

defendant argued in its motion for summary judgment that Calef should have been "judicially estopped" from bringing a disability discrimination claim under the WVHRA because "she previously represented to the [SSA] that she was 'unable to work because of her disabling condition.'" 2007 U.S. Dist. LEXIS 54404, *33 (N.D. W. Va. Jul. 26, 2007). The court rejected the defendant's argument, but did so after quoting *Cleveland* with approval and providing ways in which Calef sufficiently explained the inconsistencies. *See id.* at *37 (observing that Calef claimed she was unable to work because her supervisor required her to perform tasks that were not included in her job description and the SSA did not require a job description or summary of the essential functions or her job, and that she only applied for SSDI benefits because her employer's long-term disability plan required her to do so). As such, I accept that the *Cleveland* estoppel rule applies to WVHRA claims as well.

Ritchie's prima facie claim under the WVHRA likewise fails because he has not sufficiently explained the inconsistencies in his benefit applications and his representations to this court. [10] Notably, he has failed to provide evidence that he could perform his job with reasonable accommodation, or that he requested or required such accommodation, as stated above.

**\*14** For these reason, the defendant's motion for summary judgment on the WVHRA claim is **GRANTED**.

### E. The Wrongful Discharge Claim

Ritchie's Fourth Cause of Action asserts a wrongful discharge claim in violation of West Virginia public policy. He claims that his termination violates West Virginia public policy as set forth in the FMLA, ADA, WVHRA, and "West Virginia law." (Compl. ¶ 38.) The defendant relies on the argument that, because the other claims fail, this claim must fail as well because there was clearly no violation of public policy. It also contends that Ritchie "has not identified any sources of the public policy for this claim other than the cited statutes providing the causes of action in the complaint." (Mem. Supp. Def.'s Mot. Summ. J. 19.) Because I have found that only Ritchie's FMLA retaliation claim goes forward, I will address this cause of action in regard to that claim alone.

The general rule that an employer has an absolute right to discharge an at-will employee "must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy

principle," the employer may be liable to the employee. *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 718 (W. Va. 2001). In determining if a plaintiff's wrongful discharge claim should proceed under West Virginia law, the West Virginia Supreme Court has set forth four elements to be "particularly instructive": (1) whether a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) whether dismissing employees under similar circumstances would jeopardize the public policy; (3) whether the plaintiff's dismissal was motivated by conduct related to the public policy; and (4) whether the employer lacked overriding legitimate business justification for the dismissal. *Id.* at 723; *see also Tiernan v. Charleston Area Medical Center, Inc.*, 506 S.E.2d 578, 584-85 (W. Va. 1998) ("In reviewing public policy wrongful discharge cases by this Court, we have found the vast majority of our cases involved public policy that was clearly articulated by statutes or common law."). The public policy at issue must be "substantial," *Feliciano*, 559 S.E.2d at 716, and whether the public policy is sufficient is a matter of law, *Kanagy v. Fiesta Salons, Inc.*, 541 S.E.2d 616, 619 (W. Va. 2000).

As to the first and second elements above, Ritchie does not explain whether or how a public policy exists against terminating an employee in retaliation for exercising FMLA rights. It is clear, however, that West Virginia has a substantial public policy against discriminatory and retaliatory terminations. *See, e.g.*, W. Va. Code § 5-11-2 ("It is the public policy of the state of West Virginia to provide all of its citizens equal opportunity for employment...."); *Peters v. River's Edge Mining, Inc.*, 680 S.E.2d 791, 811 (W. Va. 2009) (observing that it is "a contravention of public policy" for an employer to discharge an employee in retaliation for filing a worker's compensation claim). I conclude that West Virginia law furthers a substantial public policy against the type of discrimination alleged in the plaintiff's retaliation cause of action, and dismissing employees under such circumstances would jeopardize this policy. As to the other two *Feliciano* elements above, there exist issues of fact as to the motive and reason behind the plaintiff's termination, as explained previously. Therefore, I **DENY** the defendant's Motion for Summary Judgment as to the plaintiff's wrongful discharge claim, as it relates to the FMLA retaliation cause of action.

### F. The Malicious, Willful, and Intentional Conduct Claim

**\*15** Ritchie's Fifth Cause of Action asserts that he was terminated as a "result of malicious, willful and intentional

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

conduct for which Defendant knew was in violation of the law and was specifically designed to injure the Plaintiff." (Compl. ¶ 41.) The defendant argues that this count fails to state a claim upon which relief may be granted. This cause of action appears to be a request for punitive damages based on the other claims, but a separate cause of action for punitive damages does not exist under West Virginia law. *Cook v. Heck's Inc.*, 342 S.E.2d 453, 461 n.3 (W. Va. 1986). Accordingly, the defendant's Motion for Summary Judgment is **GRANTED** as to the Fifth Cause of Action because it fails to state a claim for which relief may be granted.

## IV. Ritchie's Motion for Partial Summary Judgment

In his motion for partial summary judgment, Ritchie seeks judgment on whether his ADA claim is barred because of failure to timely file a claim with the EEOC within 300 days of his termination. (*See* Answer 4; Pl.'s Mot. Partial Summ. J. 5-6.) Because the defendant's motion for summary judgment with respect to this claim has been granted, there is no need to address this argument. Consequently, the Ritchie's motion for partial summary judgment is **DENIED as moot**.

## V. Statute of Limitations Arguments and Motions to Amend

### A. Defendant's Argument and Motion for Leave to File Amended Answer

The defendant argues in its Motion for Summary Judgment that Ritchie's FMLA and wrongful discharge claims are time-barred. It failed, however to raise these statute of limitations defenses in its Answer. Federal Rule of Civil Procedure 8(c) provides that "[i]n responding to a pleading, a party must affirmatively state any ... affirmative defense, including ... statute of limitations." Generally, under Rule 8(c), if a party "fails to raise an affirmative defense in its answer, the defense is waived." *Ray v. City Motors, Inc.*, 1998 U.S. Dist. LEXIS 22809, *9-10 (S.D. W. Va. June 30, 1998). *See also S. Lyme Prop. Owners Ass'n v. Town of Old Lyme*, 539 F. Supp. 2d 547, 554 (D. Conn. 2008) (holding that the statute of limitations defense "must be asserted in a party's responsive pleading at the earliest possible moment and is a personal defense that is waived if not promptly pleaded" (internal quotation marks omitted) ). The defendant has, however, filed a Motion for Leave to File Amended Answer [Docket 27] to add these affirmative defenses, and I will address the merits of that motion now.

Federal Rule of Civil Procedure 15(a)(2) states that leave to amend a pleading should be "freely give[n] when justice so requires." However, the motion to amend in this case was filed more than five months after the deadline set in the scheduling order for this case. "Once the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b). If the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under Rule 15(a)." *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D. W. Va. 1995). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* (internal quotation marks omitted). In other words, "the touchstone of 'good cause' ... is diligence." *Id.* at 255.

The defendant asserts that it has good cause to amend because "[i]t was not until Plaintiff's April 15, 2009 deposition that it became apparent that his First and Third Causes of Action were time barred." (Def.'s Reply Mem. Leave File Amended Answer [Docket 39] 1.) I disagree. I cannot find good cause for the defendant's delay in amending the Answer. The defendant has known since the initiation of this action both the day that the plaintiff was terminated and the day that the Complaint was filed. Any argument that the plaintiff's claims did not satisfy the applicable statute of limitations could have been made in the initial Answer. The defendant's argument that it was not aware until April 15, 2009, that the plaintiff's FMLA and wrongful termination claims did not arise after the date of termination simply shows a lack of diligence. Instead, the defendant did not move for an amendment until the last day that summary judgment motions were due. Accordingly, the defendant cannot show good cause and cannot meet the standard required by Rule 16(b). As such, the defendant's Motion for Leave to File Amended Answer [Docket 27] is **DENIED**, and the statute of limitations defenses are waived.

### B. Plaintiff's Motion for Leave to Amend the Complaint

**\*16** Ritchie has also requested to amend its initial pleading to add two causes of action: a Fair Labor Standards Act ("FLSA") claim and an intentional infliction of emotional distress claim. Ritchie's Motion for Leave to Amend the Complaint was also filed well after the deadline listed in the scheduling order for amending pleadings. Accordingly, the plaintiff also "first must satisfy the good cause standard of Rule 16(b) ... [before] pass[ing] the tests for amendment

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 30 of 70

Ritchie v. Aker Kvaerner Songer, Inc., Not Reported in Fed. Supp. (2009)

under Rule 15(a)." *Marcum*, 163 F.R.D. at 254. Ritchie argues that he has good cause because he did not know that a claim under FLSA or a claim for intentional infliction of emotional distress existed until the end of discovery. Ritchie cannot show good cause to amend the Complaint to add an FLSA claim at this stage in the litigation. Notably, in explaining his argument for good cause—the delay of the defendant—Ritchie shows that he did not act diligently in seeking to amend the Complaint. He stated that "this claim surrounded Mr. Ritchie's attendance" and because documents were produced late, he did not know it had an FLSA claim. However, because the case is about Ritchie's attendance at work, and he knew this since before he filed the Complaint, it follows that Ritchie had enough information at the time he filed the Complaint to know that an FLSA claim may exist. As the defendant notes, Ritchie "has long had complete information about his work hours and his pay which underlie his FLSA claim." (Def.'s Mem. Opp'n Pl.'s Mot. Leave Amend Compl. [Docket 44] 5.)

Furthermore, even if Ritchie had shown good cause to amend, amendment of the Complaint to add an FLSA claim may be futile. As noted above, Ritchie was terminated in December 2004 and did not file suit until December 2007. The FLSA has a two-year statute of limitations for all claims unless the plaintiff alleges a willful violation of the FLSA, in which case there is a three-year limit on the filing of claims. *See* 29 U.S.C. § 255(a). The plaintiff's proposed amended complaint does not allege a willful violation of FLSA; therefore, it appears that the two-year limitation applies in this case. Ritchie cannot satisfy the two-year limitation, and such an amendment would be futile.

Although I am skeptical that the plaintiff could show good cause to amend his Complaint to add the intentional infliction of emotional distress claim at this late stage in the litigation, I need not address that question because, even assuming

there is good cause, such an amendment would be futile. A claim for intentional infliction of emotional distress is a claim under West Virginia tort law, which carries a two-year statute of limitations. *See* W. Va. Code § 55-2-12(b). The events surrounding the alleged intentional infliction of emotional distress occurred at the time of the plaintiff's dismissal. As such, any amendment to the Complaint to add an intentional infliction of emotional distress claim would be futile because the Complaint was filed a full three years after the dismissal occurred. For all these reasons, Ritchie's Motion for Leave to Amend the Complaint [Docket 32] is **DENIED**.

## VI. Conclusion

For the reasons discussed above, the defendant's Motion for Summary Judgment [Docket 83] is **GRANTED in part** and **DENIED in part**. It is **GRANTED** insofar as the plaintiff asserts a claim that the defendant denied the plaintiff leave under the FMLA in his First Cause of Action at paragraph 26; and it is **GRANTED** as to the ADA claim and the WVHRA claim. Furthermore, the Motion for Summary Judgment is **GRANTED** as to the plaintiff's Fifth Cause of Action because there is no separate cause of action for malicious, willful, and intentional conduct. The defendant's Motion for Summary Judgment is **DENIED** as to the plaintiff's claim for retaliation under the FMLA, as stated in paragraph 27 of the Complaint, and the wrongful discharge claim under West Virginia law.

Additionally, the plaintiff's Motion for Partial Summary Judgment [Docket 34] is **DENIED as moot**. The defendant's Motion for Leave to File Amended Answer [Docket 27] is **DENIED**, and the plaintiff's Motion for Leave to Amend the Complaint [Docket 32] is also **DENIED**.

### All Citations

Not Reported in Fed. Supp., 2009 WL 10705555

---

### Footnotes

1    Although the plaintiff sued a number of unnamed defendants, I refer to the defendants collectively as "the defendant" for ease of reference.

2    The Complaint states that the plaintiff's termination date was December 23, 2004, but later filings by both parties indicate that the termination date was actually December 22, 2004. For the sake of consistency, and because the weight of the evidence supports it, in this opinion I will use December 22 as the termination date.

3       Ritchie discusses his use of FMLA leave during his mother's illness and after her death, as well as for his own hospitalization, in several briefs filed with the court, but not in the Complaint. The Complaint asserts specifically that the plaintiff was denied FMLA leave for his own serious health condition, *i.e.* lung problems. But the Complaint also asserts that the plaintiff was unlawfully fired in retaliation for exercising "rights available to him under the [FMLA]." (Compl. ¶ 27.) I read the Complaint's FMLA retaliation claim to assert a retaliatory firing for use of any and all FMLA leave that the plaintiff used and not just the leave relating to his lung problems.

4       I take issue with the plaintiff's characterization of some of the other evidence in the record on this point. For example, he cites the deposition of Raymond Adams for the proposition that "the only way [the defendant] would have known than an individual previously had excessive or unapproved absences is the employee would have been written up." (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 6 (citing Adams Dep. 54).) In actuality, Adams was asked if there would be "written evidence" of a reprimand for leaving work early, and he replied, "[i]n some cases," but indicated that in other cases, there would not be. (Adams Dep. 54:19-24; 55:1-3.) In addition, he asserts that the defendant had a policy that employees had to be "100% healthy before they were allowed to work at the facility." (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 7.) This also misstates the evidence. The evidence actually shows that the defendant required a "100% release" from a doctor after an illness in order to return to work. (*See* Mullins Dep. 46; Dillon Dep. 7.) This is quite different than requiring employees to be "100% healthy."

5       Ritchie's contention that *Cleveland* does not apply here is without merit. He argues that *Cleveland* was limited to facts in which an employee files for disability benefits before termination. (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 1.) The opinion was not so limited, and lower courts have consistently applied it to cases in which an employee is terminated and subsequently files for disability benefits, as the plaintiff did here. *See, e.g., Stowe-Pharr Mills*, 216 F.3d at 376-77; *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 111 (3d Cir. 2003).

6       Ritchie applied for disability benefits to the SSA, as well as the Pension Fund. He was approved by both entities and is currently receiving benefits from both. (*See* Ritchie Dep. 8:21-23, 9:20-23.) Ritchie argues that only his representations to the SSA should be considered here, but there is no authority, and Ritchie does not provide any, that *Cleveland*'s mandate is only applicable to SSDI applications. In fact, other courts have looked to representations made to other entities. *See, e.g., Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005) (considering submissions to the SSA and ERISA board). Furthermore, because Ritchie's two applications were submitted within days of one another, and receipt of Pension Fund benefits is dependent upon receipt of SSDI benefits, I believe it is essential to address both applications.

7       As part of his SSDI application, Ritchie also represented that on each day, his job required him to spend three hours walking, five hours standing, four hours sitting, and one hour bending down and forward from the waist. (Def.'s Mot. Summ. J. App. R 58.)

8       The defendant points to the fact that Ritchie's SSDI application stated that his disabling condition began on December 20, 2004. (*See* Def.'s Mot. Summ. J. App. R 83-91.) The plaintiff counters that this was simply a typographical error, and that his total disability began on December 22, 2004, the day he was terminated. (Pl.'s Mem. Contra Def.'s Mot. Summ. J. 3 n.3.) Viewing the facts in the light most favorable to the plaintiff, I will accept that this was an error.

9       The defendant also highlights a representation that the plaintiff made in relation to his claim for Ohio Workers' Compensation benefits, which he had been receiving from the time of a 1980 back injury. In his August 28, 2006 renewal of those benefits, Ritchie submitted a letter from an Ohio psychologist that stated his "impairments are permanent and preventative of return to work and of retraining .. due to his 9/27/1980 industrial injury and will never be able to pursue sustained gainful employment." (Def.'s Mot. Summ. J. App. V 2.) Without addressing the differences in the disability and worker's compensation fora, it is not necessary

for me to rely on the plaintiff's submissions to the Ohio Workers' Compensation division. The plaintiff's other submissions have created enough of a conflict under *Cleveland* to prompt an explanation.

10    I am mindful that under the WVHRA, an employer has an "affirmative duty" to accommodate a qualified individual with a disability. *See Skaggs,* 479 S.E.2d at 575. But even if Ritchie was not precluded from proving that he is a qualified individual, he has not provided evidence sufficient to prove that he "required an accommodation in order to perform the essential functions of the job" or that the employer "knew or should have known of the plaintiff's needs and of the accommodation." *Id.*

---

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

2019 WL 3416616
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Florence Division.

Timothy MATUSIEWICZ, Plaintiff,
v.
FLORENCE COUNTY SHERIFF'S OFFICE;
William Kenney Boone; Mark E. Fuleihan;
Anderson J. Beane; and Brooks A. Urquhart, in
their respective individual capacities, Defendants.
Tyler Matusiewicz, Plaintiff,
v.
Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.
Ronald Basile, Plaintiff,
v.
Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.
Diane Basile, Plaintiff,
v.
Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.

C/A No. 4:16-cv-01595-DCC-KDW, C/A No. 4:16-
cv-01596-DCC-KDW, C/A No. 4:16-cv-01597-
DCC-KDW, C/A No. 4:16-cv-01598-DCC-KDW
|
Signed 05/30/2019

## Attorneys and Law Firms

David Ellis Roberts, Monoc Roberts LLC, Jacqueline LaPan
Edgerton, Michael T. Cooper, W. Mullins McLeod, Jr.,
McLeod Law Group LLC, W. Stephen Harris, Harris and
Huge, Charleston, SC, for Plaintiff.

J. Scott Kozacki, Willcox Buyck and Williams, Florence, SC,
for Defendants.

## REPORT AND RECOMMENDATION

Kaymani D. West, United States Magistrate Judge

**\*1** Plaintiffs Timothy Matusiewicz, Tyler Matusiewicz,
Ronald Basile, and Diane Basile (collectively "Plaintiffs")
filed this action under 42 U.S.C. § 1983 alleging that
Defendants Florence County Sheriff's Office, Sheriff William
Kenney Boone, and Deputies Mark E. Fuleihan ("Dep.
Fuleihan"), Anderson J. Beane ("Dep. Beane"), and Brooks
A. Urquhart ("Dep. Urquhart") (collectively "Defendants")
violated their Fourth Amendment rights during the execution
of an arrest warrant for Tyler Matusiewicz ("Tyler"). Against
Deputies Fuleihan, Beane, and Urquhart, Plaintiffs bring
section 1983 claims for unlawful entry and excessive force
under the Fourth Amendment. Plaintiffs also bring state
law claims against all Defendants for false imprisonment,
invasion of privacy, trespass, and negligence and gross
negligence.

Presently before the court is Defendants' Motion for Summary
Judgment. [1] ECF No. 117. [2] The undersigned recommends
that Defendants' Motion for Summary Judgment be granted
in part and denied in part. All pretrial proceedings in
this case were referred to the undersigned pursuant to the
provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local
Civil Rule 73.02(B)(2)(f) (D.S.C.). Because these Motions
are potentially dispositive of Plaintiff's claims, this R&R is
entered for review by the district judge.

[1]     On September 13, 2018, Defendants filed a Motion
       to Dismiss claims filed by Timothy Matusiewicz.
       ECF No. 92. Timothy attached to his Response
       in Opposition to Defendants' 12(b)(6) Motion
       excerpts of deposition transcripts. See ECF No. 94.
       Pursuant to Fed. R. Civ. P. 12(d), the undersigned
       therefore recommends that Defendants' 12(b)(6)
       Motion to Dismiss, ECF No. 92, be converted into
       one for summary judgment and, as a result, be
       deemed **moot**.

[2]     Defendants filed the same Motion for Summary
       Judgment in all four cases. In case No. 16-
       cv-01595, the designated lead case, the docket
       entry for the Motion for Summary Judgment is ECF
       No. 117. In the remaining three cases, the Motion
       for Summary Judgment is docketed at ECF No.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 34 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

113. The court will refer to the docket entry for the lead case herein.

### I. Factual and Procedural Background

#### a. Factual Background

The following facts are viewed in a light most favorable to Plaintiffs. On March 18, 2016, Timothy Matusiewicz ("Timothy") was attending a bond hearing at the Florence County Detention Center related to charges of violating a restraining order brought against him by his ex-girlfriend Campbell Jacobs in the aftermath of a stalking and vandalism charge. ECF No. 125 at 3.

Tyler Matusiewicz ("Tyler"), Timothy's twin brother was also present at the bond hearing to lend Timothy his support. As Timothy's alleged victim Campbell Jacobs was walking out of the courtroom with her mother Jenny Jacobs, and Leighanna Driggers, she reported that she heard Tyler cursing and that he stated "[y]'all are fake and you're a drunk." ECF No. 125-1 at 3.

Captain Brunson of the Florence County Sheriff's Office ("FCSO") initiated the investigation of Tyler's alleged disorderly conduct and contacted Investigator Farrah Turner about the matter. ECF No. 125-1 at 3. Investigator Turner accompanied Captain Brunson to a conference room in the Florence County Detention Center to meet with Campbell Jacobs, Jenny Jacobs, and Leighanna Driggers. ECF No. 125-1 at 3. Campbell Jacobs told Investigator Turner about Tyler's cursing and his statement that "[y]'all are fake and you're a drunk." ECF No. 125-1 at 3.

**\*2** Investigator Turner then spoke with Investigator Odette Akers who had witnessed the incident when she was standing in the Detention Center Lobby. ECF No. 125-1 at 4. Investigator Akers reported that she noticed Tyler cursing and being disorderly. ECF No. 125-1 at 4. She stated that she advised Tyler to stop cursing and that he complied. *Id.* Investigator Akers also stated that she heard Tyler say "look at those fake tears" about three times. *Id.*

Investigator Turner presented the matter, listed as "90C Nuisance/Nuisance, Common" in the Officer Case Notes Form, to Judge Timmons on March 28, 2016. ECF No. 125-1 at 8. Judge Timmons decided that there was insufficient probable cause to issue an arrest warrant for Tyler. *Id.* In the

Officer Case Notes form, Investigator Turner wrote that the case was closed and that the matter was "completed." *Id.*

On April 5, 2016, at the instruction of Deputy Sheriff Kirby, Dep. Fuleihan re-opened Tyler's disorderly conduct case. Fuleihan Dep. 88, ECF No. 125-6 at 3. He went to a different Magistrate, Judge Roger Langley, about 25 miles from the Judge who initially denied the arrest warrant. Dep. Fuleihan sought to obtain an arrest warrant based on Tyler's alleged disorderly conduct at the Florence County Detention Center on March 18, 2016. ECF No. 125-1 at 6. Dep. Fuleihan attested that Tyler used "loud and profane language to the victim in his brother's pending criminal case" and "was further observed to act in the same loud and boisterous manner using extreme vulgar language inside the [Law Enforcement Complex] until such time a Lake City Police Officer asked the defendant to leave the location." ECF No. 125-2 at 1. Dep. Fuleihan attested that Tyler left the Center when officers asked him to. *Id.* He then averred that Florence County officers were dispatched to the center and that "[Tyler] fled in a motor vehicle." ECF No. 125-2 at 1.

Judge Langley approved the arrest warrant for Tyler on April 5, 2016. ECF No. 125-2 at 1. On that same evening, after obtaining approval for the arrest warrant, Defendants Fuleihan, Urquhart, and Beane then set out to serve the warrant. They did not have a search warrant for Plaintiffs' home nor did they have an arrest warrant for Timothy, Mrs. Diane Basile, or Mr. Ronald Basile, Timothy and Tyler's mother and step-father. However, despite having only an arrest warrant for Tyler, Dep. Fuleihan stated "[t]he one we really want it's a 50-50 whether he's there because he could be driving that white vehicle." ECF No. 125-8. He continued, "the target that I've got is more than likely there, but we need to sit and wait." *Id.*

Deputies Fuleihan, Urquhart, and Beane arrived at Plaintiffs' home at around 11:00pm, knocked on the door, and said they had an arrest warrant for Tyler. Tyler Dep. 38, ECF No. 125-9 at 2. Tyler saw that Florence County Sheriff's deputies were at the door and answered it. Tyler Dep. 39, ECF No. 125-9 at 2. The deputies asked for his name, and Tyler identified himself. *Id.* The deputies told Tyler that they had an arrest warrant for him, and he said maybe you want my brother Timothy. Tyler Dep. 39, ECF No. 125-9 at 2. The officers said no and that Tyler was the subject of the arrest warrant. *Id.* One of the officers also confirmed that they had Tyler and identified him as the "broader" one. *Id.* Deputies Beane and Urquhart then moved Tyler off the porch and into the yard. *Id.*

2019 WL 3416616

As the deputies were arresting Tyler, Timothy and Tyler's mother, Mrs. Diane Basile ("Mrs. Basile"), appeared at the door and asked what they were doing to her son. Tyler Dep 39, ECF No. 125-9 at 2; Mrs. Basile Dep. 81, ECF No. 125-10 at 3. At the time, she was standing inside her home and looking out at the officers. *Id.* Dep. Fuleihan then opened the screen door to Plaintiffs' home where Mrs. Basile was standing, came "nose to nose" with Mrs. Basile, and entered the home. Mrs. Basile Dep. 81, ECF No. 125-10 at 3. Dep. Fuleihan then "chest bumped" Mrs. Basile and backed her further into the house and all the way to her couch while stating that she was under arrest. Mrs. Basile Dep 81-82, ECF No. 125-10 at 3. Dep. Fuleihan then told Ms. Basile that she was under arrest for touching a police officer. Mrs. Basile Dep. 82, ECF No. 125-10 at 3.

**\*3** Soon thereafter, Timothy began recording the incident with his smartphone. Mrs. Basile Dep. 82, ECF No. 125-10 at 3; ECF No. 113-10. Once Deputies Urquhart and Beane were also inside the home, Ronald Basile ("Mr. Basile"), the twins' step-father, Mrs. Basile, and Timothy vociferously protested the officers' entry into their home. ECF No. 117-10. Timothy also used profanity. Fuleihan Dep. 150, ECF No. 125-6 at 19. Once Timothy and Tyler were arrested and handcuffed, they were transported to jail. ECF No. 117-2 at 4.

Judge Tommy G. Mourounas dismissed the Disorderly Conduct charges against Tyler on July 24, 2017. ECF No. 125-13 at 2. He also ordered that Tyler's record be expunged. *Id.* Timothy, however, was ultimately convicted on a charge of Breach of the Peace-non Aggravated on May 22, 2018 related to his conduct in his home during the incident at the center of his case. ECF No. 117-2.

#### b. Procedural Background

Plaintiffs filed their Complaints on May 18, 2016. ECF No. 1. Defendants filed their Motions for Summary Judgment on March 4, 2019, ECF No. 117, and Plaintiffs filed their Responses on April 4, 2019. ECF No. 125.

### II. Legal Standard
In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 251. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).

### III. Plaintiffs' Fourth Amendment Claims for Unreasonable Search and Seizure under section 1983
In general, Defendants argue that summary judgement is appropriate because "any arrest was made pursuant to a facially valid arrest warrant for Plaintiff Tyler." ECF No. 117-1 at 16. Plaintiffs argue that Defendants unlawfully seized them in violation of the Fourth Amendment. *See* ECF No. 125 at 15-20.

The Fourth Amendment provides in pertinent part, "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." Consequently, "an arrest warrant must be supported by probable cause to comply with the Fourth Amendment. Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (internal citation omitted).

#### a. Tyler's section 1983 claim for Unlawful Seizure

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 36 of 70
Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3416616

**\*4** Tyler argues that "no reasonable law enforcement officer would have obtained an arrest warrant" for him. ECF No. 125 at 15-17. Defendants argue that the facially valid arrest warrant in their possession justified Tyler's arrest. ECF No. 117-1 at 17-19. Defendants rely principally on *Payton v. New York*, 445 U.S. 573 (1980), which held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603.

A facially valid arrest warrant provides the arresting officer with sufficient probable cause to arrest the individual identified in the warrant. *Baker v. McCollan*, 443 U.S. 137, 143–44 (1979). Therefore, "[a] public official cannot be charged with false arrest when he arrests a defendant pursuant to a facially valid warrant.... Thus, we recognize implicitly that a claim for false arrest may be considered only when no arrest warrant has been obtained." *Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998) (citing *Brooks v. City of Winston–Salem*, 85 F.3d 178 (4th Cir. 1996)).

Here, Dep. Fuleihan obtained an arrest warrant; however, Tyler argues that the affidavit used to secure the arrest warrant is invalid because it contains false or misleading statements, internal inconsistencies, or material omissions of facts relevant to the situation. ECF No. 125 at 15-17. To demonstrate that an officer seized an individual pursuant to an arrest warrant without probable cause, a plaintiff must show that the officer "deliberately or with a reckless disregard for the truth made material false statements in his affidavit or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007) (internal citations and quotation marks omitted). To demonstrate a "reckless disregard," a plaintiff must show, in light of all of the evidence, that an officer had "serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* With regard to alleged omissions from an affidavit, a plaintiff must establish that the officer failed to inform the magistrate of facts that the officer knew would negate a finding of probable cause. *Id.* However, allegations of negligence or honest mistake are insufficient. *Id.* at 627–28; *see also Street v. Surdyka*, 492 F.2d 368, 373-74 (4th Cir. 1974) ("Mere negligence is not sufficient to sustain the claim under the Civil Rights Act. Defendant's activity must have been intentional or reckless, characterized by gross or culpable negligence."). Additionally, "the false statements

or omissions must be material, that is, necessary to the neutral and disinterested magistrate's finding of probable cause." *Miller*, 475 F.3d at 628 (internal citations and quotation marks omitted). Notably, "obtaining an arrest warrant does not provide per se evidence" that the warrant was proper or that the officer was objectively reasonable in believing it so. *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991); *Mixson v. Metrejean*, No. CA 2:11-1369-DCN-PJG, 2012 WL 3716950, at \*2 (D.S.C. Aug. 10, 2012), report and recommendation adopted, No. CA 2:11-1369 DCN, 2012 WL 3757371 (D.S.C. Aug. 28, 2012).

In this case, Tyler was arrested pursuant to a warrant signed by Magistrate Judge Roger Langley. ECF No. 121-2 at 1. In the warrant, Dep. Fuleihan provided and signed the following affidavit:

> **\*5** On or about 3/18/2016 the defendant Tyler Matusiewicz did commit the offense of Public Disorderly Conduct. Matusiewicz who was at the Florence County Law Enforcement Complex located in (Florence County) Effingham, SC waiting for his brother Timothy Matusiewicz to have a bond in Magistrate's Court. Matusiewicz was observed by a Law Enforcement Officer to use loud and profane language to the victim in his brothers pending criminal case. Matusiewicz was further observed to act in the same loud and boisterous manner using extreme vulgar language inside the LEC until such time a Lake City Police Officer asked the defendant to leave the location. Deputies from the Florence county Sheriff's Office were dispatched to respond to the incident location. Subject fled in a motor vehicle. The case was investigated by Inv. Turner but was turned over to Special Operations Division of the FCSO for further investigation. Case # 2016-03-0453.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 37 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

ECF No. 121-2 at 1. Magistrate Judge Langley signed the arrest warrant based on his finding that there was probable cause to arrest Tyler for the offense of Disorderly/Public Disorderly Conduct. *Id.; see also* S.C. Code Ann. 16-17-530.

In his affidavit in support of the arrest warrant for Tyler, Dep. Fuleihan averred that Tyler used "loud and profane language to the victim," and that he acted "in the same loud and boisterous manner using extreme vulgar language until such time a Lake City Police Officer asked the defendant to leave the location." ECF No. 121-2 at 1. Dep. Fuleihan went on to attest that "[d]eputies from the Florence county Sherriff's Office were dispatched to respond to the incident location." *Id.* And at the conclusion of his affidavit, in the penultimate sentence, he averred, "Subject fled in a motor vehicle." *Id.*

But in his deposition testimony given later, Dep. Fuleihan was asked about his attestation that Tyler fled the Detention Center. Fuleihan Dep. 115-116, ECF No. 125-6 at 5-6. In response to the question, "[w]ould you agree with me if [Tyler] was asked to leave, then he would not be fleeing?" Dep. Fuleihan answered, "Correct." Fuleihan Dep. 116, ECF No. 125-6 at 6. He was then asked, "and if he were asked to leave, then he would be complying with the requests of law enforcement?" Again, Dep. Fuleihan answered, "Correct." Fuleihan Dep. 116, ECF No. 125-6 at 6. Dep. Fuleihan provided no explanation why he represented that Tyler fled the location after he attested that deputies were dispatched to the "incident location."

Tyler maintains that in addition to lacking probable cause for the warrant, the warrant contains "internal contradictions and misleading statements" because of Dep. Fuleihan's representation that Tyler fled the scene. ECF No. 125 at 16. It is Tyler's burden to demonstrate that the arresting officer "deliberately or with a 'reckless disregard for the truth' made material false statements in his affidavit or omitted from that affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made the affidavit misleading." *See Miller*, 475 F.3d at 627 (internal citations omitted). *Miller* instructs: " 'Reckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is 'when viewing all the evidence the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (internal citations omitted).

In addition, "in order to violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause. *Id.* at 628. *Miller* further instructs: "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.' If the 'corrected' warrant affidavit establishes probable cause, no civil liability lies against the officer." *Id.* at 628 (internal citations omitted).

**\*6** The undersigned recommends a finding that after excising "[s]ubject fled in a motor vehicle,"—the "offending inaccuracy[ ],"—from Dep. Fuleihan's affidavit as presented to the Magistrate Judge, the Judge is left with the impression that Tyler left as requested instead of fleeing in an attempt to escape to avoid the authorities. The affidavit as "corrected" therefore establishes probable cause that Tyler's conduct violated the disorderly conduct statute. Under South Carolina law,

> Any person who shall (a) be found on any highway or at any public place or public gathering ... conducting himself in a disorderly or boisterous manner, (b) use obscene or profane language on any highway or at any public place or gathering or in hearing distance of any schoolhouse or church ... shall be deemed guilty of a misdemeanor and upon conviction shall be fined not more than one hundred dollars or be imprisoned for not more than thirty days.

S.C. Code Ann. § 16-17-530. Consistent with the incident report compiled by Investigator Turner, the affidavit specifically indicated the results of an investigation that concluded that Tyler was observed by law enforcement officers and other witnesses to curse and to be "very disorderly and irate" in the detention center. ECF No. 117-2 at 1-2; ECF No. 121-2 at 1. Accordingly, the undersigned recommends that with the representation that Tyler fled the scene removed, probable cause remains to support the constitutionality of the arrest warrant and that Defendants' Motion for Summary Judgment with respect to Tyler's unlawful seizure claim be granted.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 38 of 70

Matisiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

### b. Timothy's section 1983 claim for Unlawful Seizure

Defendants argue that *Heck v. Humphrey*, 512 U.S. 477 (1984) bars Timothy's claims for money damages for unlawful seizure under section 1983 because Timothy was ultimately convicted for his disorderly conduct offense. ECF No. 117-1 at 12-14. Defendants contend that under the rule in *Heck*, a section 1983 action for damages is "not an appropriate vehicle for challenging the validity of outstanding criminal judgments." ECF No. 117-1 at 13 (quoting *Heck v. Humphrey*, 512 U.S. at 481). Timothy responds that Defendants unlawfully arrested him "for voicing his displeasure at their trampling his right to privacy under the guise of a breach of peace." ECF No. 125 at 20.

In *Heck v. Humphrey*, the Supreme Court held that a state prisoner's claim for damages is not cognizable under § 1983 when success of the action would implicitly question the validity of the conviction or duration of the sentence, unless the prisoner can demonstrate that the conviction or sentence has been previously invalidated. *Heck*, 512 U.S. at 486–87. Subsequently, the Court held that *Heck* also applies to civil rights actions that do not directly challenge confinement, but instead allege procedural defects that necessarily imply the invalidity of the punishment imposed. *See Edwards v. Balisok*, 520 U.S. 641, 648–49 (1997).

Defendants provided public records as an attachment to their motion, and according to those records, Timothy was convicted on May 22, 2018 of a charge of "0891-Breach/Breach of Peace, non-Aggravated Nature." ECF No. 117-13 at 1. There is nothing in the record to indicate that Timothy's conviction has been overturned or invalidated. Timothy's claim for relief for unlawful seizure, if granted, would therefore implicitly invalidate his disorderly conduct conviction. The undersigned therefore recommends that *Heck* bars his section 1983 claim for money damages for unlawful seizure and recommends granting Defendants' Motion for Summary Judgment with respect to this claim.

### c. Mrs. Basile's section 1983 Claim for Unlawful Seizure

*7  Defendants also rely on *Payton*'s holding that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within...."

as justification of their unlawful restraint of Mrs. Basile. *Payton v. New York*, 445 U.S. at 603; ECF No. 117-1 at 16-19. Mrs. Basile argues that Defendants did not have a warrant for her arrest and that her seizure was both unlawful and unreasonable. ECF No. 125 at 17-18.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause exists if the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person ... in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). "The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id.* at 36. "In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). "Probable cause requires more than 'bare suspicion' but requires less than evidence necessary to convict." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (internal citations omitted).

" 'Whether probable cause exists in a particular situation ... always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.' " *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)). A court's inquiry should be made based on the information actually possessed by the officer during the arrest or that was reasonably available to him at the time of arrest and "in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Pritchett*, 973 F.2d at 312. Reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky v. Siwinsky*, 942 F.2d 257, 264 (4th Cir. 1991). As a result, in order to prove an absence of probable cause, Plaintiff "must allege a set of facts which made it unjustifiable for a reasonable officer to conclude" Plaintiff was involved in the charged offense. *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002).

In his account of the events leading up to Mrs. Basile's alleged seizure, Dep. Fuleihan gave inconsistent testimony

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 39 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

about whether anyone in the home was in imminent danger as they arrived at the house. Fuleihan Dep. 122, ECF No. 125-6 at 8. He stated that it seemed there was a domestic disturbance going on inside the house, but he also admitted that he did not include such information in his reports. *Id.* As for the actual arrest, Dep. Fuleihan testified that he stepped into the house because, despite having one of the twins in custody, he and his colleagues did not know which one they had. Fuleihan Dep. 126-127, ECF No. 125-6 at 9-10. He testified that he was met by Mrs. Basile at the door and that he was struck by her twice on the chest. Fuleihan Dep. 127-128, 130-131; ECF No. 125-6 at 10-13. He then told her that she was under arrest. Mrs. Basile Dep. 81-82, ECF No. 125-10 at 3.

 *8  According to Mrs. Basile, after the knock on the door, Timothy got up and opened it, stepped outside, and closed it behind him. Mrs. Basile Dep. 79, ECF No. 125-10 at 2. She then got up and stood at the door. Mrs. Basile Dep. 80, ECF No. 125-10 at 2. Mrs. Basile testified that Dep. Fuleihan was the only officer on the porch, and he announced that they had a warrant for Tyler. *Id.* Tyler identified himself, put his hands behind his back, and was arrested. Mrs. Basile Dep. at 80-81, ECF No. 125-10 at 2-3. According to Mrs. Basile, she opened the door and remained inside while Dep. Fuleihan stepped in front of Beane and Urquhart and opened her screen door. Mrs. Basile Dep. 81, ECF No. 125-10 at 3. After opening her screen door, Mrs. Basile testified that Dep. Fuleihan came "nose to nose" with her and into her house and chest bumped her into the house while walking her back to her couch with his handcuffs out saying, "you're under arrest." Mrs. Basile Dep. 81-82, ECF No. 125-10 at 3.

Plaintiffs also allege facts and circumstances that shed light on the information the officers had in hand at the time of Mrs. Basile's arrest. For example, Defendants only had an arrest warrant for Tyler and did not have a search warrant for or consent to enter their home. *See* Mrs. Basile Compl. at 4 ¶ 17, 20, 23-24, ECF No. 1 at 4-6. Mrs. Basile also alleges that despite having an arrest warrant for Tyler, Defendants sought Timothy as "the one they really want[ed]." ECF No. 125-8. She maintains that despite claiming that they needed to verify the identity of each twin, they knew the differences between them because when, as she testified, Tyler exited the house, identified himself as Tyler, and submitted to arrest, one of the officers confirmed that they had the subject of the warrant in custody because he was the "broader one." She further argues that because *Payton* allows officers to enter "when there is reason to believe the suspect is *within*," once the officers knew they had Tyler under arrest and in the yard,

they had no justification to enter the home or to come face to face with Mrs. Basile. *Payton v. New York*, 445 U.S. at 603 (emphasis added); *see also* Mrs. Basile Compl. at 5 ¶ 22; ECF No. 1 at 5, ¶ 22.

Given Mrs. Basile's allegations and testimony, there is a genuine dispute whether, under the totality of the circumstances, the officers had probable cause to seize Mrs. Basile for allegedly assaulting Dep. Fuleihan. Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment on Mrs. Basile's claim for unlawful seizure be denied.

### d. Mr. Basile's section 1983 claim for Unlawful Seizure

Mr. Basile testified that Defendants did not place him in handcuffs and that at no point during the incident did he have an understanding that he was under arrest. Mr. Basile Dep. 56, ECF No. 117-16 at 4. In addition, in his Response in opposition to Defendants' Motion for Summary Judgment, Mr. Basile did not respond to Defendants' argument that there are no genuine issues of fact regarding whether he was unlawfully seized and that summary judgment in Defendants' favor on his claim should be granted. *See* ECF No. 113 at 16-19; ECF No. 121. Where a party fails to respond to the opposing party's argument in support of the opposing party's motion for summary judgment, the party who fails to respond will be found to have conceded to that argument. *See Petrucelli v. Dep't of Justice*, No. 11-1780 (RBW), 2014 WL 2919285, at *7 (D.D.C. June 27, 2014) (prisoner case; citing *Maydak v. DOJ*, 579 F. Supp. 2d 105, 107) (D.D.C. 2008); *see also Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). Accordingly, the undersigned recommends granting Defendants motion on Mr. Basile's unlawful seizure claim.

### IV. Plaintiffs' 1983 Fourth Amendment Claims for Unlawful Search

Defendants argue that they were justified in entering Plaintiffs' home because they had a valid arrest warrant for Tyler. ECF No. 117-1 at 17-18. Again, Defendants rely on *Payton v. New York* for the proposition that under the Fourth Amendment, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to

believe the suspect is within." 445 U.S. 573, 603 (1980). Defendants further argue that consent is not required when officers possess a valid warrant. *Id.* According to Defendants, the person who answered the door matched Tyler and Timothy's description because they are identical twins. ECF No. 117-1 at 6. They maintain that they did not enter the home until they saw both identical twins and therefore had a duty to confirm that the correct individual—Tyler—was in custody. ECF No. 117-1 at 18.

**\*9** Plaintiffs counter by pointing to evidence that Defendants knew the difference between the twins. For example, they point to the audio recording of the deputies who knew that "[t]he one we really want it's a 50-50 whether he's there because he could be driving that white vehicle," and that, "the target that I've got is more than likely he's there." ECF No. 125-8. Tyler testified that when the deputies told him they had an arrest warrant for him, he asked whether they were sure he was the one they wanted and whether the warrant had his name on it. Tyler Dep. 39; ECF No. 125-9 at 2. Tyler testified that they confirmed that he was the one they wanted. *Id.* Tyler then testified that "[he] heard someone ... say, yeah, that's him because he's the broader one." *Id.*

Again, Plaintiffs contend that Defendants ignore *Payton's* requirement that the "limited authority to enter a dwelling" exists "when there is reason to believe the suspect is within." ECF No. 125 at 12. Plaintiffs argue that Tyler answered the door, went outside to greet the deputies, identified himself, confirmed that he was the person that they were actually looking for, and allowed himself to be handcuffed. Tyler Dep. 39, ECF No. 125-9 at 2; Mrs. Basile Dep. 79-80, ECF No. 125-10 at 2. As a result, according to Plaintiffs, the deputies had no further reason or justification to enter their home. ECF No. 125 at 13.

Plaintiffs are correct that under *Payton*, Defendants must have had reason to believe that Tyler was inside the Plaintiffs' home to justify their entry into the house. *See Payton*, 445 U.S. at 603. Thus, the question is whether, when Defendants entered Plaintiffs' home, Tyler was in the house thereby arguably justifying their entry. Again, Plaintiffs point to evidence that Tyler answered the door after Dep. Fuleihan knocked, he went out of the door and onto the porch, identified himself, was arrested and handcuffed on the porch, and was then escorted into the Plaintiffs' yard. Plaintiffs deny that Tyler was attempting to trick the deputies into believing that he was Timothy, and they have pointed to evidence that Defendants knew the difference between the twins. The undersigned

therefore recommends that Plaintiffs have raised a genuine issue of material fact as to whether Defendants knew they had Tyler in custody when they entered the house.

With respect to Timothy, Defendants claim that *Heck* also bars Timothy's claim for unlawful entry and search of his home since Timothy's success on this claim would imply the invalidity of his disorderly conduct conviction. ECF No. 92 at 4-7; ECF No. 117-1 at 12-14. Timothy contends that "[w]hether or not Defendants violated Plaintiff's Fourth Amendment right against intrusion into his home does not in any way whatsoever call into question the validity of Plaintiff's conviction for breach of peace. Plaintiff's claim for unlawful search is independent and separate from Plaintiff's claim for unlawful arrest and seizure." ECF No. 94 at 4.

According to the Fourth Circuit, "civil claims based on unreasonable searches do not necessarily imply that the resulting criminal convictions were unlawful." *Covey v. Assessor of Ohio County*, 777 F.3d 186, 197 (4th Cir. 2015) (citing *Heck*, 512 U.S. at 487 n. 7). In footnote seven, the Supreme Court stated:

> For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned).

**\*10** *Heck*, 512 U.S. at 487 n. 7 (internal citations omitted).

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 41 of 70
Matisiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3416616

Under these rules, Timothy's Fourth Amendment claim for unreasonable search is not barred by *Heck* because the search did not "encompass the 'injury' of being convicted...." *Id.* As a result, the undersigned recommends that Defendants' Motion for Summary Judgment on each Plaintiffs' claim for unreasonable search be denied.

**V. Plaintiffs' section 1983 claim for Excessive Force**
Defendants assert that Plaintiffs' excessive force claim should fail because the force applied was minimal and appropriate under the circumstances. ECF No. 117-1 at 20. They point out that they did not use firearms, tasers, or chemical munitions of any sort. *Id.* They also deny that Mr. and Mrs. Basile were ever arrested, but they contend that to the extent the court may find that they were arrested, they too were arrested with a minimal degree of force. *Id.* Finally, they argue that Plaintiffs did not suffer any significant injuries. *Id.* Plaintiffs respond that they did nothing illegal and that the use of any amount of force to carry out an unlawful arrest is excessive. ECF No. 125 at 20-21.

The parties correctly reference *Graham v. Connor*, 490 U.S. 386, as the test for evaluating the degree of force used during an arrest. There, the Court established that claims against law enforcement for excessive force in the course of an arrest, investigatory stop, or other "seizure" of a person are properly analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395. The Supreme Court recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, the Court held that there is not a precise mechanical application of the standard, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Additionally, the Court instructs that an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Therefore, guided by the authority in *Graham*, the

undersigned must examine the totality of the circumstances and the uncontested facts, viewed in the light most favorable to Plaintiffs, to determine whether Defendants' use of force was reasonable. In taking this view, the undersigned finds that whether excessive force was used remains a question of fact.

The force used by an officer is not excessive if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397; *Schultz v. Braga*, 455 F.3d 470, 477 (4th Cir. 2006). "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Gandy v. Robey*, 520 F. App'x 134, 140 (4th Cir. 2013) (citing *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)). The United States Supreme Court, the Fourth Circuit, and other circuits have consistently held that officers may use a reasonable amount of force to secure a suspect. *See e.g., Scott v. Harris*, 550 U.S. 372 (2007); *Graham*, 490 U.S. 386; *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 939 (2014). *Graham* instructs that in analyzing the amount of force used, the court should consider three factors: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *490 U.S. at 396.* In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996). A law enforcement officer has the legal right to use deadly force if the officer has reasonable cause to believe that the suspect poses an immediate threat to the safety of the officer or others, and that deadly force is needed to avoid that threat. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

**\*11** Given these principles, the undersigned first considers whether *Heck* bars Timothy's excessive force claims. "To the extent an excessive force claim represents a collateral attack on a Plaintiff's criminal convictions, it is barred." *Benson v. DeLoach*, C/A No. 8:09-00041, GRABHH, 2009 WL 3615026, \*4 (D.S.C. October 28, 2009) (citing *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005)). "If, however, there is no legal nexus between the officer's alleged force and the plaintiff's resistance; that is, the alleged excessive force occurred, independently, either before the plaintiff [breached the peace], or after his [breach of the peace] had clearly ceased, then a successful § 1983 suit for excessive force would not imply invalidity of the conviction." *Id.* at \*5 (citing *Smith v. City of Hemet*, 394 F.3d 689,

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 42 of 70
Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3416616

697-99 (9th Cir. 2005) ("[A] § 1983 action is not barred by *Heck* unless the alleged excessive force occurred at the time the offense ... was being committed. [If the officers'] alleged acts of excessive force ... occurred before or after the [plaintiff] committed the acts to which he pled, [they] would not invalidate his conviction....")).

An examination of Timothy's Complaint reveals he makes general allegations of excessive force without specifying the nature and kind of force used or the injuries he suffered. Timothy's Compl. at 6-7, ¶¶ 33, 36; ECF No. 1 at 6-7, ¶ 33, 36. Viewed in a light most favorable to Timothy, however, he was placed in handcuffs after his disorderly conduct, and there is therefore no nexus between his disorderly conduct offense and the alleged use of force. The undersigned thus recommends that *Heck* does not bar Timothy's excessive force claim. Nevertheless, the undersigned does recommend granting Defendants' summary judgment on Timothy's excessive force because in his deposition testimony, Timothy conceded that Defendants used "no force" in handcuffing him. Timothy Dep. 95, ECF No. 117-14 at 5.

Tyler likewise alleges that the Defendants subjected him to excessive force when he was arrested, placed in handcuffs, and moved into the yard in front of his house. Although he conceded that the "only thing [Defendants] did in terms of force was place [him] in handcuffs," he also testified that it felt like Defendants were trying to take him down as they were arresting him. Tyler Dep. 59-60, ECF No. 113-11 at 6-7; Tyler Dep 113-114, ECF No. 125-9 at 4. Tyler further testified that while the handcuffs felt "a little bit too tight," he could not be sure that he told anyone besides his brother about how the handcuffs felt. Tyler Dep. 60, ECF No. 117-11 at 7. He also testified that he never asked the Defendants to loosen the handcuffs. Tyler Dep 60, ECF No. 117-11 at 7. Furthermore, when asked whether he suffered any bruising, Tyler testified that he did not. Tyler Dep. 61, ECF No. 117-11 at 8. However, Tyler did testify that he suffered such emotional injuries as emotional distress, difficulty sleeping, and nightmares, but the record contains no supporting evidence for these claims. Tyler Dep. 61, ECF No. 117-11 at 8. The undersigned recommends a finding that Tyler has not presented evidence of injury sufficient to raise a genuine issue of material fact on his excessive force claim and that his claim in this regard should be dismissed.

Mr. Basile alleges that Defendants caused him "to suffer tremendous irreparable emotional and mental harm ..." Mr.

Basile Compl. at 7, ¶ 36. But Mr. Basile provides no evidence in support of these allegations. Mr. Basile Compl. at 6-7, ¶ 33, 36. In his deposition testimony, he concedes that he was not placed in handcuffs. Mr. Basile Dep. 54, ECF No. 113-16 at 4. He also concedes that no law enforcement officer touched him during the incident. *Id.* Because Mr. Basile has offered no evidence that he sustained any physical harm and only alleges that he sustained emotional harm, the undersigned recommends that Defendants' Motion for Summary Judgment on Mr. Basile's claim of excessive force be granted.

**\*12** Mrs. Basile testified that Dep. Fuleihan "chest bumped [her] into [her] house...." and pushed her out of the way as he was entering their home. Mrs. Basile Compl. at 5, ¶ 23, ECF No. 1 at 5, ¶ 23; Mrs. Basile Dep. 81-82, ECF No. 121-10 at 3. She argues that since she was known to suffer from "brain injury," chest bumping a person in such a condition also gives rise to excessive force on Dep. Fuleihan's part. ECF No. 125 at 21. Despite her deposition testimony, Mrs. Basile points to no evidence that establishes that she suffered significant injury as a result of the alleged chest bumps. Accordingly, the undersigned recommends that her claim for excessive force be dismissed.

In sum, the undersigned recommends that all claims for excessive force against Defendants be dismissed.

### VI. Qualified Immunity

#### a. Law

The Supreme Court in *Harlow v. Fitzgerald* established the standard the court is to follow in determining whether a defendant is protected by this immunity. 457 U.S. 800 (1982). That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818. When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 43 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and internal quotation omitted).

As the first step of the qualified immunity inquiry, the court must determine whether Defendants' conduct violated a constitutional right. *See Gould v. Davis,* 165 F.3d 265, 269. The question for the second step is whether a right allegedly violated was "clearly established at the appropriate level of inquiry and at the time of the challenged conduct is always a matter of law for the court[.]" *Pritchett*, 973 F.2d at 313. Having considered the arguments of the parties, the undersigned finds that, at the time of the alleged misconduct, the following constitutional rights were clearly established: (1) to arrest someone without probable cause violates the Fourth Amendment, *see, e.g., United States v. Watson*, 423 U.S. 411, 417 (1976) (noting if an officer effects an arrest in the absence of probable cause, he violates the arrestee's Fourth Amendment right to be free from unreasonable seizure); *Miller v. Prince George's Cnty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007) (quoting *Brooks v. City of Winston–Salem*, 85 F.3d 178, 183 (4th Cir. 1996)) (" '[T]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.' "); and (2) "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is *within*." *Payton v. New York,* 445 U.S. at 603 (emphasis added). As the Fourth Circuit has noted, however, although the purely legal question of whether the constitutional right at issue was clearly established "is always capable of decision at the summary judgment stage," a genuine question of material fact regarding "[w]hether the conduct allegedly violative of the right(s) actually occurred ... must be reserved for trial." *Pritchett*, 973 F.2d at 313.

**\*13** In a qualified immunity analysis, the court is not supposed to recognize a constitutional right in the abstract "but at the level of its application to the specific conduct being challenged." *Pritchett,* 973 F.2d at 312. In *Saucier,*

the Supreme Court explained that whether a right is clearly established should be "undertaken in light of the specific context of the case, not as a broad general proposition." 533 U.S. at 201. The undersigned will consider the two steps of the qualified immunity test in turn for each of the alleged Fourth Amendment violations.

### b. Qualified Immunity: Plaintiffs' Fourth Amendment Claims for Unlawful Seizure

#### i. Qualified Immunity: Tyler, Timothy, and Mr. Basile's Unlawful Seizure Claims

The undersigned recommended above, in section III. a., that Defendants did not violate Tyler's Fourth Amendment rights because they arrested him pursuant to an arrest warrant supported by probable cause. In section III. b. above, the undersigned recommended that Defendants' Motion for Summary Judgment be granted with respect to Timothy's claim for unlawful seizure because that claim is barred by *Heck v. Humphrey,* 512 U.S. at 481. In section III. d. above, the undersigned recommended that Defendants' Motion for Summary Judgment on Mr. Basile's claim for unlawful seizure be granted because Mr. Basile did not contest the motion and because he conceded that Defendants did not unlawfully restrain him or place him under arrest. Mr. Basile Dep. 56, ECF No. 117-16 at 4. With respect to these three Plaintiffs, the undersigned recommends that Defendants are entitled to Qualified Immunity.

#### ii. Qualified Immunity: Mrs. Basile's Unlawful Seizure Claim

Under the first prong of the qualified immunity test, the undersigned recommended above, in section III. c., that Mrs. Basile has alleged a constitutional violation of her Fourth Amendment right to be free from an unreasonable seizure. The question under the second prong is whether the right was clearly established that a person is entitled to be free from an arrest when there is no probable cause.

The undersigned finds that, when viewing material facts in the light most favorable to Mrs. Basile, a question of fact exists as to whether Defendants violated her clearly established constitutional rights. The court cannot determine at the summary judgment phase that the Defendants' actions

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3416616

were objectively reasonable for purposes of granting qualified immunity. Accordingly, the undersigned recommends that Defendants be denied qualified immunity with respect to Mrs. Basile's claim for unlawful seizure.

### c. Qualified Immunity: Unlawful Entry Analysis

In determining whether Defendants should be afforded qualified immunity for unlawful entry, the court must determine whether a reasonable officer armed with the information Defendants possessed at the time of the arrest warrant's execution would have believed that his actions were lawful. *See Graham*, 831 F.3d at 184 (internal citations omitted) ("In determining what conduct of Graham's was known to the officers, we consider only 'information actually possessed by the officer[s] at the critical time, or that was then reasonably available to [them], and in light of any exigencies of time and circumstance that reasonably may have affected the officer[s'] perceptions.' "). Additionally, though the test "focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d at 173. The *Rowland* court held: "[s]uch a perspective serves two purposes: First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived." *Id.* (internal citations omitted).

*14  Here, Defendants knew that they did not have a search warrant for the home or an arrest warrant for Timothy, Mr. Basile, or Mrs. Basile, but instead had only an arrest warrant for Tyler. When Dep. Fuleihan knocked on the door of Plaintiff's home, Tyler answered the door. The deputies asked him his name, and he identified himself as Tyler. Tyler did ask them whether or not they might be looking for his brother Timothy, but, when viewed in a light most favorable to Tyler, this is a reasonable question given Timothy's arrest for stalking and the related bond hearing approximately a month earlier. The audio evidence also indicates that Defendants were able to identify the twins before they arrived at the house. On the audiotape provided, Dep. Fuleihan states "[t]he one we really want it's a 50-50 whether he's there because he could be driving that white vehicle." ECF No. 125-8. He continues, "The target that I've got is more than likely there, but we need to sit and wait." *Id.* When Tyler asked whether

he was indeed the subject of the warrant, they said that he was and one of the officers confirmed that "yeah, that's him because he's the broader one." Tyler Dep. 39; ECF No. 125-9 at 2.

Nevertheless, as discussed earlier, Tyler identified himself, and Deputies Beane and Urquhart handcuffed him and took him off the porch and into the yard. Mrs. Basile, while still in the house, opened the door and asked Defendants what they were doing to her son. Dep. Fuleihan concedes that without a search warrant he "stepped into the house...." Fuleihan Dep. 127, ECF No. 125-6 at 10. Accordingly, the undersigned recommends that Defendants are not entitled to qualified immunity on the unlawful entry claim because the law was clearly established that a law enforcement officer cannot enter a dwelling without consent or a search warrant when they have the subject of their arrest warrant in custody. *See Payton v. New York*, 445 U.S. at 603.

Therefore, the undersigned finds that, when viewing material facts in the light most favorable to Plaintiffs, a question of fact exists as to whether Defendants violated their clearly established constitutional rights. The court cannot determine at the summary judgment phase that the Defendants' actions were objectively reasonable for purposes of granting qualified immunity. Accordingly, the undersigned recommends that Defendants be denied qualified immunity with respect to each Plaintiff's claim for unlawful entry.

### d. Qualified Immunity: Excessive Force

In section V. above, the undersigned recommended granting Defendants' Motion for Summary Judgment on each Plaintiff's claim for excessive force because Plaintiffs failed to raise a genuine issue of material fact that there was a constitutional violation in this regard. As for the record before the court with respect to Plaintiffs' allegations of excessive force, these Defendants performed the discretionary functions of their respective official duties in an objectively reasonable fashion. They did not transgress the constitutional rights of Plaintiffs to be free from excessive force in the course of the discretionary exercise of their respective professional judgment. Thus, to the extent the court finds that a constitutional violation occurred, the undersigned recommends that these Defendants be granted qualified immunity on Plaintiffs' excessive force claims.

**Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)**

2019 WL 3416616

## VII. Supervisory Liability

Sheriff Boone argues that he cannot be held liable as a supervisor in a section 1983 action. ECF No. 117-1 at 26-27. Sheriff Boone also maintains that Plaintiffs have not proffered evidence supporting an allegation that he authorized or was otherwise indifferent to violations of Plaintiffs' constitutional rights. ECF No. 117-1 at 27.

At some time before the events the giving rise to Timothy's stalking and vandalism charge, former Florence County Sheriff's Office deputy Archie Woodberry and/or his wife asked Florence County Sheriff Kenny Boone to investigate the matter related to Timothy. Sheriff Boone Dep. 17-21, ECF No. 125-4 at 6-10. According to Sheriff Boone, [he] and the Woodberry's "[had] been friends for a long time and based on the fact that [the Woodberrys] were very upset, he asked Deputy Chief Kirby to investigate the matter related to Timothy." Sheriff Boone Dep. 18, ECF No. 125-4 at 7. Despite thinking that a different law enforcement agency was investigating the matter, Sheriff Boone stated that "I just don't think we were the first call because, you know, I took it as, you know, we need help, you know, we're wit's end and can you help us? And I was like, let me see what we can do." Sheriff Boone Dep. 21, ECF No. 125-4 at 10. Sheriff Boone eventually instructed Deputy Sheriff Glen Kirby to "take care of this." Sheriff Boone Dep. at 18; ECF No. 125-4 at 7.

 **\*15** Plaintiffs argue that Sheriff Boone's abuse of power, violation of Florence County Sheriff's Office policy, and insufficient knowledge of what the Fourth Amendment requires caused the constitutional harms they suffered. Specifically, Plaintiffs argue that Sheriff Boone set the events giving rise to their lawsuit in motion when, at the request of a friend, he instead instructed Deputy Chief Kirby to order Deputies Fuleihan, Urquhart, and Beane to pursue this case. ECF No. 125 at 34. Plaintiffs argue that Sheriff Boone's actions violated FCSO policy which states, "No employee will participate in an investigation in which he/she, a member of his/her immediate family, or personal friend, is involved either as a suspect or a witness. The employee will immediately report any such relationship(s) to his/her supervisor." ECF No. 125-3 at 3, ¶ 11.

Plaintiffs also argue that Sheriff Boone is liable not only because he set in motion the "continuous sequence" of events leading to their constitutional injuries but also because he allegedly suffers from serious deficiencies in his knowledge of what the Fourth Amendment requires. ECF No. 125 at 33-34. For example, Plaintiffs point to an exchange during

Sheriff Boone's deposition in which they asked him, "Are you aware of how the Fourth Amendment relates whatsoever to policing or law enforcement?" Sheriff Boone Dep 12, ECF No. 125-4 at 5. Sheriff Boone answered, "No, sir, not in this particular case." *Id.* Plaintiffs continued, "Generally speaking, are you aware of how it relates to policing or law enforcement?" *Id.* Sheriff Boone answered, "Not right offhand." *Id.* Plaintiff then asked, "Do you have any understanding as to why the Fourth Amendment is important to American society?" *Id.* Sheriff Boone replied, "No sir." *Id.*

To assert a plausible § 1983 claim against any particular public official, a "causal connection" or "affirmative link" must exist between the conduct of which the plaintiff complains and the official sued. *See Kentucky v. Graham, 473 U.S. 159 (1985); Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983).* As a general rule, the doctrine of vicarious liability or *respondeat superior* is not available to a § 1983 plaintiff as a means to create liability of a state-actor supervisor for the acts or his/her subordinate. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).* A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances. *See Love-Lane v. Martin, 355 F.3d 766, 782-83 (4th Cir. 2004)* (no vicarious liability under § 1983); *Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001).* There is a limited exception to the prohibition against imposing *respondeat superior* or vicarious liability on supervisory personnel in § 1983 cases, which has been enunciated in cases such as *Slakan v. Porter, 737 F.2d 368, 370-75 (4th Cir. 1984).*

Supervisory officials like Sheriff Boone may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates so long as the facts alleged satisfy the Fourth Circuit Court of Appeals' established three-part test for supervisory liability under section 1983: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)* (citations omitted).

In *Randall v. Prince George's County, 302 F.3d 188, 206 (4th Cir. 2002),* the Fourth Circuit concluded that, "[u]nder

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

the first prong of *Shaw*, the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.' " Furthermore, in establishing "deliberate indifference" under *Shaw's* second prong, a plaintiff "[o]rdinarily ... cannot satisfy his burden of proof by pointing to a single incident or isolated incidents ... for a supervisor cannot be expected ... to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373); *see also Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013) (alleged failure of supervisory officials to investigate grievances not sufficient to establish liability under § 1983).

**\*16** The *Slakan* exception is not adequately pleaded in this case because there are no allegations that Sheriff Boone had personal knowledge of Deputies Fuleihan, Urquhart, and Beane's alleged constitutional violation. Likewise, there is no allegation that the violations alleged were widespread or posed a "pervasive and unreasonable risk" of constitutional harm. *See Shaw*, 13 F.3d at 799. Plaintiffs merely allege that "Fuleihan, Urquhart, and Beane arrived a Plaintiffs' residence under the direction and command of Sheriff Boone." Tyler Compl. at 4, ¶ 19; ECF No. 1 at 4. A mere command of this sort is not unconstitutional because the officers were executing a lawful arrest warrant on Tyler. *Slaken* also requires that Plaintiffs point to more than a single, isolated incident of the alleged violations. Plaintiffs have failed in this regard despite providing some evidence that Sheriff Boone might have anticipated the unconstitutional conduct of his subordinates, especially given that he testified that he did not know, "right offhand," how the Fourth Amendment relates to law enforcement nor, according to his testimony, did he understand why the Fourth Amendment was important to American society. This may demonstrate a lack of understanding of the Fourth Amendment, but it does not establish a causal connection between such deficiencies and Plaintiffs' injuries for the purposes of *Slaken*. Accordingly, the undersigned recommends granting Sheriff Boone's Motion for Summary Judgment for supervisory liability.

## VIII. Eleventh Amendment Immunity

Defendants contend that they are entitled to immunity under the Eleventh Amendment to the United States Constitution from Plaintiffs' claims because Plaintiffs are suing them in their official capacities. ECF No. 117-1 at 31. Plaintiffs respond that they are suing Defendants in their individual capacities as reflected by their use of descriptive language

about Defendants' status in the caption and in the text of the complaint. ECF No. 125 at 28-29; ECF No. 1 at 1-2. The undersigned's review of the Complaint discloses that Defendants are being sued in their individual capacities. ECF No. 1 at 1-2. Plaintiffs' allegations are sufficiently clear where they state, "in their respective individual capacities" after the Defendants' names in the caption and in "Factual Background" section where they allege that particular Defendants were "... acting individually and under color of state law." ECF No. 1 at 2, ¶¶ 9-11. Thus, Defendants are not entitled to Eleventh-Amendment Immunity. *Brown v. Lieutenant Governor's Office on Aging*, 697 F. Supp. 2d 632, 635 (D.S.C. 2010). Accordingly, Defendants' Motion for Summary Judgment on Eleventh Amendment grounds should be denied.

Additionally, Plaintiffs' Complaints fail to state any plausible claim for relief against Defendant Florence County Sheriff's Office because, to the extent that the allegations may be liberally construed as an official-capacity claim against the Florence County Sheriff, this Defendant is entitled to Eleventh Amendment Immunity from federal lawsuits such as this one. The State of South Carolina and its governmental agencies are immune from suit in this court under the Eleventh Amendment to the United States Constitution. Immunity from suit under the Eleventh Amendment to the United States Constitution is so well settled that precedents are almost too numerous to cite. *See, e.g., Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000); *Alden v. Maine*, 527 U.S. 706 (1999); *Coll. Savs. Bank v. Fla. Prepaid Educ. Expense Bd.*, 527 U.S. 666 (1999). The United States Court of Appeals for the Fourth Circuit has considered the role of sheriffs in the state of South Carolina and has specifically determined that, in their official capacities, South Carolina's sheriffs are immune from federal lawsuits seeking damages and/or retrospective injunctive relief as agents of the government of South Carolina. *See Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996) (South Carolina sheriffs are arms of the state and entitled to Eleventh Amendment immunity from a claims for damages in their official capacity); *Drake v. Ham*, No. 3:06-1611-MJP, 2007 WL 2580629, at \*5 (D.S.C. Aug. 16, 2007)(same).

Also, no plausible constitutional claim under 42 U.S.C. § 1983 is stated against Defendant Florence County Sheriff's Office because it is not a "person" who may be sued under that statute. It is well settled that only "persons" may act under color of state law; therefore, a defendant in a § 1983 action must qualify as a "person." *See* 5 Charles Alan Wright

& Arthur R. Miller, *Federal Practice and Procedure* § 1230 (3d ed. 2014). To the extent Plaintiff's Complaint is against the physical Sheriff's Office, the Sheriff's Office is a room in a building or facility, and several courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law. *See Preval v. Reno*, 57 F. Supp. 2d 307, 310 (E.D. Va. 1999) ("[T]he Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983."); *Brooks v. Pembroke City Jail*, 722 F. Supp. 1294, 1301(E.D.N.C. 1989) ("Claims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit."). Thus, because Plaintiffs fail to state a plausible § 1983 claim against the Sheriff's Office, the Complaint should be summarily dismissed insofar as it seeks to impose liability on this Defendant.

### IX. State Law Claims

**\*17** Plaintiffs also brought claims against Defendants for false imprisonment/false arrest, invasion of privacy, trespass, and negligence. The South Carolina Tort Claims Act ("SCTCA") grants to the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability for any tort, except as waived therein. S.C. Code Ann. § 15-78-20(b). Section 15-78-70(a) provides that "[t]his chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefore except as expressly provided for in subsection (b)." However, an employee does not have immunity from suit "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b).

"[I]f the plaintiff proves that 'the employee's conduct ... constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude,' then the governmental agency is not liable, and the employee is personally liable." *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995) (quoting S.C. Code § 15-78-70(b)). "[T]he SCTCA is not intended to protect state employees from liability for intentional torts." *Anthony v. Ward*, 336 F. App'x 311, 317 (4th Cir. 2009) (unpublished).

#### a. False Imprisonment/False Arrest

As for Timothy, Defendants argue that *Heck v. Humphrey*, 512 U.S. 477 (1984) bars his false imprisonment/ false arrest claims because any deprivation of his liberty was justified during his lawful arrest for breach of peace. ECF No. 117-1 at 14-16. Timothy argues that his arrest for voicing his displeasure with Defendants' actions while in his home is a violation of not only the Fourth Amendment but also the First Amendment. ECF No. 125 at 8, 20.

Under South Carolina law, to recover in an action for false imprisonment, a Plaintiff must show that "(1) the defendant[s] restrained him; (2) the restraint was intentional; and (3) the restraint was unlawful." *Jones v. Will-Dixie Greenville, Inc.*, 456 S.E. 2d 429, 432 (S.C. Ct. App. 1995). In other words, "[f]alse imprisonment is the deprivation of one's liberty without justification." *Id.*

Here, Timothy fails to raise a genuine issue of material fact with respect to the third element concerning the lawful nature of his restraint. Deputies Fuleihan, Urquhart, and Beane arrested Timothy because of his disorderly conduct. Timothy was later convicted on that charge. His conviction establishes "conclusive evidence of probable cause" for the arrest, which is thereby justified. *See Powers v. Sickler*, CIV. A. No. 93-CV-617(RSP), 1995 WL 146272, at \*6 (N.D.N.Y. Mar. 31, 1995); *see also Zurcher v. Bilton*, 666 S.E.2d 224, 226-27 (S.C. 2008) (finding that like a defendant who has been convicted, "a defendant who enters a guilty plea may be collaterally estopped from litigating the same issue in a subsequent civil suit."). Therefore, the undersigned recommends granting Defendants' Motion for Summary Judgment on Timothy's claim for false imprisonment/false arrest.

With respect to Tyler, the undersigned recommended in section III. a. above a finding that probable cause supported the arrest warrant for Tyler. For this reason, the undersigned recommends that Defendants' Motion for Summary Judgment be granted on Tyler's claim for False Imprisonment/False Arrest.

For the reasons outlined in section III. d. above, the undersigned recommends granting Defendants' Motion for Summary Judgment on Mr. Basile's claim for False Imprisonment/ False Arrest.

Finally, for the reasons outlined in section III. c. above, the undersigned recommends denying Defendants Motion for Summary Judgment as to Mrs. Basile's claim for False

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 48 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3416616

Imprisonment/False Arrest because there are genuine issues of material fact regarding whether Defendants lawfully restrained her.

### b. Invasion of Privacy

**\*18** Under South Carolina law, to recover in an action for invasion of privacy, Plaintiffs must establish " '[t]he unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.' " *Meetze v. Associated Press*, 230 S.C. 330, 335 (1956) (citing *41 Am. Jur., Privacy Section 2*).

Because the undersigned recommended that Defendants' Motion for Summary Judgment be denied with respect to Plaintiffs' Fourth Amendment claims for unlawful search, the undersigned recommends that summary judgment be denied on each Plaintiffs' invasion of privacy claim.

### c. Trespass

" 'Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property.' " *Coll. of Charleston Found. v. Ham*, 585 F. Supp. 2d 737, 750 (D.S.C. 2008) (quoting *Hedgepath v. Am. Tel. & Tel. Co.*, 348 S.C. 340, 357, 559 S.E.2d 327, 337 (S.C. Ct. App. 2001)). "The essence of trespass is the unauthorized entry onto the land of another." *Ravan v. Greenville Cty.*, 315 S.C. 447, 464, 434 S.E.2d 296, 306 (S.C. Ct. App. 1993).

Because the undersigned recommends that Defendants' Motion for Summary Judgment be denied with respect to Plaintiffs' Fourth Amendment claims for unlawful search of their home, the undersigned recommends that summary judgment be denied on each Plaintiffs' trespass claim.

### d. Negligence and Gross Negligence

Plaintiffs allege negligence with regard to claims of unlawful seizure, unlawful search, and excessive force. In South Carolina, "[t]o establish a cause of action in negligence, a plaintiff must prove the following three elements: (1) a duty of care owed by defendant to plaintiff; (2) breach of

that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000). Plaintiff is required to show negligence with reasonable certainty, not through mere conjecture, and he may not attempt to prove negligence through the doctrine of *res ipsa loquitur*. *Ajaj v. United States*, 479 F. Supp.2d 501, 549 (D.S.C. 2007).

Under South Carolina law, gross negligence is defined as "a failure to use even slight care or as 'negligence so gross and reckless as to amount to willfulness.' " *Craven v. Southern Ry. Co.*, 412 F.2d 835 (4th Cir. 1969). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000) (citing *Clyburn v. Sumter Cnty. Dist. Seventeen*, 451 S.E.2d 885 (S.C. 1994); *Richardson v. Hambright*, 374 S.E.2d 296 (S.C. 1988)). In other words, "[i]t is the failure to exercise slight care." 534 S.E.2d at 277 (citation omitted). "Gross negligence has also been defined as a relative term and means the absence of care that is necessary under the circumstances." *Id.* (citing *Hollins v. Richland Cnty. Sch. Dist. One*, 310 S.E.2d 486, 427 S.E.2d 654 (1993)). Normally, the question of what activity constitutes gross negligence is a mixed question of law and fact. *Id.* However, "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *Id.* (citation omitted).

Defendants argue that the Public Duty Rule bars Plaintiffs' negligence claims. Under the Public Duty Rule, public officers have no duties to individual members of the general public in cases in which a statute creates the relevant duty. *See Edwards v. Lexington Cty. Sheriff's Dept.*, 386 S.C. 285 (2010). An examination of Plaintiffs' Complaints reveal that they do not rely on a statutory duty; therefore, the Public Duty Rule does not apply in this case to bar Plaintiffs' negligence claims. *See e.g., Arthurs ex Rel. Estate of Munn v. Aiken Cty.*, 551 S.E.2d 579, 582 (2001)("When, and only when, the plaintiff relies upon a statute as creating the duty does a doctrine known as the 'public duty rule' come into play.").

**\*19** For the reasons discussed in sections III. a, III. b. and III. d., the undersigned recommends granting Defendants' Motion for Summary Judgment for negligence and gross negligence as it relates to Tyler, Timothy, and Mr. Basile's claims for unlawful seizure. For the reasons outlined in section III. c., the undersigned recommends denying Defendants' Motion for

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3416616

Summary Judgment as it relates to Mrs. Basile's claim for unlawful seizure.

Because the undersigned recommended that Defendants' Motion for Summary Judgment be denied with respect to Plaintiffs' Fourth Amendment claims for unlawful search, the undersigned recommends that summary judgment be denied on Plaintiffs' negligence and gross negligence claims in this respect.

And because the undersigned recommending granting Defendants' Motion for Summary Judgment as to Plaintiffs' claims for excessive force, the undersigned recommends granting Defendants' motion for negligence and gross negligence as it relates to this claim.

### X. Punitive Damages

Defendants argue that section 15-78-120(b) of the South Carolina Tort Claims Act precludes an award of punitive damages. ECF No. 117-1 at 40. Plaintiffs respond that Defendants are subject to punitive damages under section 1983. ECF No. 125 at 26-27.

Defendants are correct that section 15-78-120(b) of the S.C. Tort Claims Act precludes an award of punitive damages. *See* S.C. Code Ann § 15-78-120(b). However, punitive damages "are available in section 1983 actions for conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Here, Plaintiffs have alleged that "[the] Defendants conspired, planned and intended to harass, intimidate, and otherwise harm [Plaintiffs]. The Defendants had ulterior motives when they went to this family's home. Even though they had no lawful purpose, the Defendants waited until Timothy arrived home to serve the arrest warrant for Tyler." ECF No. 1 at 4, ¶ 20. In support of this allegation, Plaintiffs point to the audio evidence discussed above in sections I. a, III. c, IV., and IV. c: "the one we really want is a 50-50 whether he's there ..." and that "the target that I've got is more than likely there, but we need to sit and wait. I want them both there. I want them all there at the same time." ECF No. 125-8. The undersigned recommends that this evidence raises a genuine issue of material fact whether Deputies Fuleihan, Beane, and Urquhart acted with "reckless or callous indifference to the federal protected rights of" Plaintiffs or with "evil intent." *See Cooper*, 814 F.2d at 948. The undersigned therefore recommends that Defendants' Motion for Summary Judgment

with respect to the availability of punitive damages under § 1983 be denied.

### XI. Conclusion

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment, ECF No. 117, be granted in part and denied in part.

With regard to the claims for unlawful seizure, the undersigned recommends **granting** Defendants' Motion for Summary Judgment as to Tyler Matusiewicz, Timothy Matusiewicz, and Mr. Ronald Basile. The undersigned recommends **denying** Defendants' Motion for Summary Judgment with respect to Mrs. Diane Basile's claim for unlawful seizure.

The undersigned recommends **denying** Defendants' Motion for Summary Judgment as to each Plaintiffs' claim for unlawful search.

**\*20** The undersigned recommends **granting** Defendants' Motion for Summary Judgment as to each Plaintiffs' claim for excessive force.

The undersigned recommends **granting** Defendants' Motion for Summary Judgment as to Tyler Matusiewicz, Timothy Matusiewicz, and Mr. Ronald Basile's state law claim for False Imprisonment/False Arrest. The undersigned recommends **denying** Defendants' Motion for Summary Judgment as to Mrs. Basile's claim for False Arrest/False Imprisonment.

The undersigned recommends **denying** Defendants' Motion for Summary Judgment as to each Plaintiffs' claim for Invasion of Privacy and Trespass.

With respect to Plaintiffs' claims for negligence and gross negligence, the undersigned recommends **granting** Defendants' Motion for Summary Judgment on Tyler Matusiewicz, Timothy Matusiewicz, and Mr. Ronald Basile's negligence and gross negligence claims as those claims relate to their claims of unlawful seizure. The undersigned recommends that the Motion for Summary Judgment be **denied** as to Mrs. Basile's claims for negligence and gross negligence as associated with her claim for unlawful seizure.

And with respect to Plaintiffs' claims for negligence and gross negligence as those state law claims are associated with

their claim for unlawful search, the undersigned recommends **denying** Defendants' Motion for Summary Judgment.

The undersigned recommends **granting** Defendants' Motion for Summary Judgment on Plaintiffs' claims for negligence and gross negligence as they relate to Plaintiffs' claim for excessive force.

The undersigned recommends **denying** Defendants' Motion for Summary Judgment regarding the availability for punitive damages under 42 U.S.C. § 1983.

The undersigned recommends **granting** Sheriff William Kenney Boone and the Florence County Sheriff's Office's Motion for Summary Judgment.

Finally, the undersigned recommends denying Defendants' Motion to Dismiss, ECF No. 92 in C/A No. 4:16-cv-01595, as **moot**.

**IT IS SO RECOMMENDED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3416616

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 51 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3413385

2019 WL 3413385
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Florence Division.

Timothy MATUSIEWICZ, Plaintiff,
v.

FLORENCE COUNTY SHERIFF'S OFFICE;
William Kenney Boone; Mark E. Fuleihan;
Anderson J. Beane; and Brooks A. Urquhart, in
their respective individual capacities, Defendants.

Tyler Matusiewicz, Plaintiff,
v.

Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.

Ronald Basile, Plaintiff,
v.

Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.

Diane Basile, Plaintiff,
v.

Florence County Sheriff's Office; William
Kenney Boone; Mark E. Fuleihan; Anderson
J. Beane; and Brooks A. Urquhart, in their
respective individual capacities, Defendants.

Case No. 4:16-cv-01595-DCC, Case No.
4:16-cv-01596-DCC, Case No. 4:16-
cv-01597-DCC, Case No. 4:16-cv-01598-DCC
|
Signed 07/29/2019

## Attorneys and Law Firms

David Ellis Roberts, Monoc Roberts LLC, Jacqueline LaPan Edgerton, Michael T. Cooper, W. Mullins McLeod, Jr., McLeod Law Group LLC, W. Stephen Harris, Harris and Huge, Charleston, SC, for Plaintiff.

J. Scott Kozacki, Willcox Buyck and Williams, Florence, SC, for Defendants.

## ORDER

Donald C. Coggins, Jr., United States District Judge

**\*1** This matter is before the Court on Defendants' Motion for Summary Judgment.[1] ECF No. 117.[2] Plaintiffs filed a response in opposition. ECF Nos. 125, 128. In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2), (D.S.C.), this matter was referred to United States Magistrate Judge Kaymani D. West for pre-trial proceedings and a Report and Recommendation ("Report"). On May 30, 2019, the Magistrate Judge issued a Report recommending that the Motion for Summary Judgment be granted in part and denied in part. ECF No. 137. The Magistrate Judge advised the parties of the procedures and requirements for filing objections to the Report and the serious consequences if they failed to do so. All parties have filed objections and replies. ECF Nos. 141, 143, 145.

[1]    For the reasons stated by the Magistrate Judge in the Report and Recommendation, Defendants' motion to dismiss is moot. See ECF No. 137 at 2 FN. 1.

[2]    For clarity, the Court will use the docket entry numbers from the lead case for citations in this Order.

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. See Mathews v. Weber, 423 U.S. 261 (1976). The Court is charged with making a de novo determination of any portion of the Report of the Magistrate Judge to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. See 28 U.S.C. § 636(b). The Court will review the Report only for clear error in the absence of an objection. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." (citation omitted)).

The Magistrate Judge provided a thorough recitation of the procedural history, facts, and applicable law in the case, which

the Court incorporates by reference. Based on the numerous claims and the lengthy record of this case, the Court will follow the structure of the discussion used in the Report to rule on the parties' objections.

### Plaintiffs' Fourth Amendment Claims for Unreasonable Search and Seizure Under § 1983

#### Tyler's § 1983 Claim for Unlawful Seizure

The Magistrate Judge determined that there was probable cause to arrest Tyler, and recommends that the motion for summary judgment be granted with respect to this claim. In making her recommendation, the Magistrate Judge considered that some of Fuleihan's statements to the state court magistrate judge were misleading but ultimately determined that they were not material. Accordingly, considering the affidavit without the misleading statements, she found that it established probable cause that Tyler's conduct violated the disorderly conduct statute. Plaintiffs object and argue that the warrant presents only conclusory statements and is devoid of a substantial basis to find probable cause. [3]

[3]    The Court notes Defendants' reply to Plaintiffs' objections in which they argue that Plaintiffs' failed to present specific objections. The Court will address Plaintiffs' numbered objections. However, to the extent they intend to raise other objections by stating that their prior filings are incorporated into their objections, it is not proper for the Court to search for any and all possible objections by combing through Plaintiffs' previously filed documents.

**\*2** While the Court does not condone Fuleihan's exaggeration that Tyler fled the scene, the Court agrees with the Magistrate Judge's discussion of the existence of probable cause after that statement is omitted from the affidavit. The affidavit's statements that Tyler "was observed by a Law Enforcement Officer to use loud and profane language to the victim ... [and] was further observed to act in the same loud and boisterous manner using extreme vulgar language inside the LEC until such time a Lake City Police Officer asked the defendant to leave the location" are sufficient to establish probable cause that Tyler violated the disorderly conduct statute. Accordingly, the Court agrees with the recommendation of the Magistrate Judge and overrules Plaintiffs' objection.

#### Timothy's § 1983 Claim for Unlawful Seizure

The Magistrate Judge found that Timothy's claim is barred by the Supreme Court's ruling in *Heck v. Humphrey*, 512 U.S. 447 (1984). Specifically, she determined that Timothy was convicted of "Breach/Breach of Peace, non-Aggravated Nature," that his conviction has not been overturned, and that a finding that he was unlawfully seized would implicitly invalidate his conviction. Accordingly, she recommends granting Defendants' motion with respect to his § 1983 claim for money damages for unlawful seizure.

Plaintiffs object and contend that Defendants Fuleihan, Beane, and Urquhart ("the Individual Defendants") did not have any legal justification to be inside Timothy's home where he was arrested. They state that Timothy was arrested for exercising his First Amendment rights to object to their unlawful entry. Therefore, they argue that this claim is not barred by *Heck*.

*Heck* provides that a § 1983 claim cannot be pursued based on allegations of unlawful circumstances surrounding a criminal prosecution until the conviction has been set aside or the charges have been dismissed without the possibility of revival. Here, as discussed by the Magistrate Judge, a favorable determination on the merits of Timothy's § 1983 claim would implicitly invalidate his criminal conviction; accordingly, his claim is barred under *Heck*. Plaintiffs' objection is overruled, and summary judgment is granted with respect to this claim.

#### Mrs. Basile's § 1983 Claim for Unlawful Seizure

The Magistrate Judge determined that there is a genuine issue of material fact with respect to whether there was probable cause to seize Mrs. Basile for allegedly assaulting Fuleihan. Accordingly, she recommends denying summary judgment with respect to this claim.

Defendants object and argue that there is nothing in the record to support Mrs. Basile's version of events. They further contend that she was not arrested, taken into custody, or handcuffed.

In her Report, the Magistrate Judge lays out the different versions of events offered by Mrs. Basile and Fuleihan, which the Court specifically incorporates into this Order. *See* ECF No. 137 at 15. Upon de novo review of the record and the pleadings in this case and viewing the facts in the light most favorable to Plaintiffs, the Court agrees that there is a genuine

1:24-cv-02612-JDA-PJG     Date Filed 08/08/25     Entry Number 49-5     Page 53 of 70

Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)

2019 WL 3413385

issue of material fact with respect to whether there was probable cause to seize Mrs. Basile. Accordingly, summary judgment is denied with respect to this claim. [4]

> [4]    Regarding Defendants' argument that Mrs. Basile was not arrested, there is evidence in the record that Fuleihan stepped inside the house and told her she was under arrest. Under these circumstances, a reasonable person may not have felt free to leave or terminate the encounter. Therefore, the fact that she was not actually arrested, taken into custody, or handcuffed at this procedural posture is insufficient to preclude a finding that her constitutional rights were violated. *See United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (" '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' ") (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).

### *Mr. Basile's Claim for Unlawful Seizure*

**\*3** The Magistrate Judge determined that Defendants were entitled to summary judgment with respect to this claim because there was no indication that he was ever under arrest. Neither party has objected to this recommendation. Upon review of the record, applicable law, and Report for clear error, the Court agrees with the recommendation of the Magistrate Judge. Defendants' motion is granted with respect to this claim.

### *Plaintiffs' 1983 Fourth Amendment Claims for Unlawful Search*

The Magistrate Judge recommends that Defendants' motion be denied as to all Plaintiffs regarding this claim. She states that the issue to be decided is whether the Individual Defendants had reason to believe that Tyler was inside the house when they entered the home without a warrant. She concludes that there is a genuine issue of material fact with respect to whether the Individual Defendants knew the difference between the twins such that they knew that they had the correct brother in custody and entered the home anyway.

Defendants object and contend that there is undisputed evidence that clearly reflects that they did not know they had Tyler in custody. Accordingly, pursuant to *Payton v. New York*, 445 U.S. 573 (1980), they assert the Individual Defendants had authority to enter the home to confirm that they had the correct twin in custody.

Here, there is a genuine issue of material fact regarding whether the Individual Defendants knew that they had Tyler in custody. Tyler testified that he identified himself and one of the officers stated, "yeah, that's him because he's the broader one." [5] ECF No. 125-9 at 2. Because there is a genuine issue of material fact as to whether the Individual Defendants knew they had Tyler in custody, at this procedural posture they may not rely on *Payton* to justify their entrance into the house. Accordingly, summary judgment is denied with respect to this claim.

> [5]    Defendants repeatedly state that Tyler and Timothy are identical, not merely similar, twins in support of their argument that they had authority to enter the house. While it is undisputed that Tyler and Timothy are identical twins, that does not necessarily mean that they are identical-looking adults without any discernable differences.

### *Plaintiffs' § 1983 Claims for Excessive Force*

The Magistrate Judge recommends granting summary judgment on the excessive force claims as to all Plaintiffs because the force applied was minimal and appropriate under the circumstances. Plaintiffs object only as to Mrs. Basile's excessive force claim. [6] They argue that she did nothing illegal; accordingly, any amount of force was unreasonable. Plaintiffs contend that the Magistrate Judge mistakenly determined that substantial physical injury was necessary to maintain a claim for excessive force and state that the proper standard was articulated in *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness standard.' ").

> [6]    The Court notes that at the end of the section labeled "Excessive Force Used Against Diane Basile," Plaintiffs briefly state that "should the jury find that the seizure and arrest of Tyler Matusiewicz and the other Plaintiffs were unreasonable and unlawful, any amount of force used in that

2019 WL 3413385

seizure would correspondingly be unlawful and unreasonable." ECF No. 143 at 7. Summary judgment is granted as to those claims; accordingly, the Court will not address this statement further.

**\*4** As an initial matter, the Magistrate Judge cited to and applied the standard articulated in *Graham*. Further, while Plaintiffs argue that any force used against Mrs. Basile was unreasonable because she did nothing illegal, they provide no legal support such a bright-line rule. Moreover, in their objections, Plaintiffs fail to allege that Mrs. Basile suffered any injury. *See Cooper v. City of Virginia Beach*, 817 F. Supp. 1310, 1314 (E.D. Va. 1993) ("[T]he presence, nature, and extent of any resulting injury constitute important elements in the reasonableness calculus."). Accordingly, this objection is overruled.

With respect to Tyler, Timothy, and Mr. Basile, the Court has reviewed the Report for clear error. Finding none, the Court agrees with the recommendation of the Magistrate Judge. Defendants are entitled to summary judgment regarding each Plaintiff's claim for excessive force.

### Qualified Immunity

#### Plaintiffs' Fourth Amendment Claims for Unlawful Seizure

##### Tyler, Timothy, and Mr. Basile's Unlawful Seizure Claims

The Magistrate Judge recommends finding that the Individual Defendants are entitled to qualified immunity regarding Tyler's, Timothy's, and Mr. Basile's claims for unlawful seizure under the Fourth Amendment. Plaintiffs object as to Tyler's and Timothy's claims and argue that there was no probable cause to arrest them; accordingly, the Individual Defendants are not entitled to qualified immunity. The Court has addressed the question of probable cause above. Accordingly, this objection is overruled.

The Court has reviewed the record, applicable law, and Report for clear error with respect to the Magistrate Judge's recommendation as to Mr. Basile. Finding none, the Court adopts the recommendation of the Magistrate Judge and finds that the Individual Defendants are entitled to qualified immunity as to this claim.

##### Mrs. Basile's Unlawful Seizure Claim

The Magistrate Judge determined that the Individual Defendants are not entitled to qualified immunity with respect to Mrs. Basile's claim for unlawful seizure. Defendants object and argue that the Individual Defendants were not incompetent and did not knowingly violate Mrs. Basile's constitutional rights. They further argue that she made brief contact with Fuleihan and was not arrested.

Qualified immunity offers complete protection "from liability for civil damages" for government officials sued in their individual capacities as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In resolving qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]' " *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). For the second prong, " 'the salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.' " *Id.* (quoting *Hope*, 536 U.S. at 741). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

**\*5** Mrs. Basile's right to be free from unlawful seizure was clearly established at the time of these events. With respect to whether her federal rights were violated, the Court has already determined that there exists a genuine issue of material fact. A finding of qualified immunity may indeed be appropriate as more facts are established, but not at this juncture. *See Tolan*, 572 U.S. at 656 (holding that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"); *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 179–80 (4th Cir. 1998) (denying summary judgment where disputed facts existed as to events surrounding the alleged constitutional violation). Accordingly, Defendants' objection is overruled.

#### Unlawful Entry

The Magistrate Judge recommends finding that the Individual Defendants are not entitled to qualified immunity because there is a genuine issue of material act with respect to whether

2019 WL 3413385

the officers knew that they had the correct twin in custody. She states that the law was clearly established that a law enforcement officer cannot enter a dwelling without consent or a search warrant when they have the subject of their arrest warrant in custody.

Defendants object and argue that the Individual Defendants believed they had a duty to determine whether they had the correct twin in custody. As stated above, there remains a genuine issue of material fact with respect to this argument. Accordingly, a finding that the Individual Defendants are entitled to qualified immunity with respect to this claim is inappropriate. Defendants' objection is overruled.

*Excessive Force*

The Magistrate Judge recommends finding that Defendants are entitled to qualified immunity regarding Plaintiffs' excessive force claims because there remains no genuine issue of material fact with respect to whether there was a constitutional violation. Plaintiffs object only as to Mrs. Basile and raise the same arguments addressed above. Because the Court has found that Defendants did not violate Mrs. Basile's rights by subjecting her to excessive force, the Court overrules the objection.

With respect to Tyler, Timothy, and Mr. Basile, the Court has reviewed the Report for clear error. Finding none, the Court agrees with the recommendation of the Magistrate Judge that Defendants are entitled to qualified immunity on the excessive force claim brought by these Plaintiffs.

**Supervisory Liability**

The Magistrate Judge recommends granting Defendants' motion for summary judgment as to the claim for supervisory liability against Sheriff Boone. She states that Plaintiffs failed to establish a causal connection between any action of knowledge of Sheriff Boone and Plaintiffs' injuries.

Plaintiffs object and "incorporate by reference the arguments fully set forth previously in Plaintiffs' response in opposition to summary judgment in this issue" and cite to the docket entry number of their response in opposition. The Court has reviewed the record, including the response in opposition, the applicable law, and the Report de novo. Upon review, the Court agrees with the recommendation of the Magistrate Judge. Because additional arguments were not raised in their objections, the Court need not restate the relevant facts and legal analysis already thoroughly considered by

the Magistrate Judge. The Court incorporates the Magistrate Judge discussion of this claim into this Order and overrules Plaintiffs' objection. Sheriff Boone is dismissed from this action.

**Eleventh Amendment Immunity**

The Magistrate Judge recommends a finding that Defendants are not entitled to Eleventh Amendment Immunity because all claims were brought against Defendants in their individual capacities. Neither party has objected to this recommendation. Upon review for clear error, the Court agrees that Plaintiffs are suing the individual Defendants in their individual capacities and denies this portion of the motion for summary judgment.

 **\*6** The Magistrate Judge further recommends that the Florence County Sheriff's Office should be dismissed because Plaintiffs fail to state any plausible claim against it. In their objections, Plaintiffs agree to the dismissal. ECF No. 143 at 3 FN 1. Accordingly, the Florence County Sheriff's Office is dismissed from this action without prejudice.

**State Law Claims**

*False Imprisonment/False Arrest*

The Magistrate Judge recommends granting Defendants' motion with respect to Timothy's, Tyler's, and Mr. Basile's claims for false arrest for the same reasons provided in the analysis of their Fourth Amendment claims for unlawful seizure. The Magistrate Judge recommends denying summary judgment with respect to Mrs. Basile's claim for false arrest because there exists a genuine issue of material fact as to whether Defendants lawfully restrained her.

Plaintiffs object to the Magistrate Judge's recommendation regarding Timothy's and Tyler's claims for false arrest. Plaintiffs incorporate the same arguments articulated in response to the Magistrate Judge's recommendation as to Timothy's and Tyler's Fourth Amendment claims for unlawful seizure. The Court overrules these objections for the same reasons stated in its discussion of their unlawful seizure claims.

Defendants object to the Magistrate Judge's recommendation regarding Mrs. Basile. First, they contend that there is no genuine issue of material fact with respect to whether she was arrested or imprisoned. The Court has already discussed this argument; accordingly, their objection is overruled for the same reasons stated above.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 56 of 70
Matusiewicz v. Florence County Sheriff's Office, Not Reported in Fed. Supp. (2019)
2019 WL 3413385

Defendants also argue that the Individual Defendants are immune from suit under the South Carolina Tort Claims Act ("SCTCA") because at all times they were acting within the scope of their official employment. As stated by the Magistrate Judge, the SCTCA grants to the States, its political subdivision, and employees, while acting within the scope of official duty, immunity from liability for any tort, except as waived therein. S.C. Code Ann. § 15-78-20(b). An employee is not immune from suit "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b). "[I]f the plaintiff proves that 'the employee's conduct ... constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude,' then the government agency is not liable, and the employee is personally liable." *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995 (quoting S.C. Code Ann. § 15-78-70(b))). Because genuine issues of material fact remain with respect to Mrs. Basile's claim that she was unlawfully seized, including whether the violation of her rights was intentional, the Court overrules Defendants' objection and denies their motion for summary judgment as to her state law claim for false arrest/false imprisonment.

In the absence of a specific objection as to Mr. Basile's claim for false arrest, the Court has reviewed the Magistrate Judge's Report for clear error. Finding none, the Court adopts the recommendation of the Magistrate Judge and Defendants' motion is granted with respect to Mr. Basile's claim for false arrest/false imprisonment.

### *Invasion of Privacy*
The Magistrate Judge recommends denying Defendants' motion for summary judgment as to Plaintiffs' claims for invasion of privacy for the same reasons she recommended denying the motion as to Plaintiffs' claims for unlawful search under the Fourth Amendment. Defendants object and assert the same argument articulated in response to the Magistrate Judge's recommendation on the Fourth Amendment claim—that the Individual Defendants had a duty to determine which twin they had in custody. The Court overrules this objection for the same reasons stated above. [7]

[7]    Defendants also argue that the Individual Defendants are immune from suit under the SCTCA. The Court overrules this objection for the

same reasons stated in its prior discussion of the SCTCA.

### *Trespass*
**\*7** The Magistrate Judge recommends denying Defendants' motion as to Plaintiffs' claims for trespass. Defendants object and, again, argue that they believed they had a duty to enter the house to determine which twin was in their custody. For the reasons stated above, the Court overrules this objection. [8]

[8]    Defendants also argue that the Individual Defendants are immune from suit under the SCTCA. The Court overrules this objection for the same reasons stated in its prior discussion of the SCTCA.

### *Negligence and Gross Negligence*
The Magistrate Judge recommends that summary judgement should be granted as to Tyler's, Timothy's, and Mr. Basile's claims for negligence and gross negligence relating to their claims for unlawful seizure and as to all Plaintiffs' claims for negligence and gross negligence relating to their claims for excessive force. She recommends that summary judgment be denied as to Mrs. Basile's claims for negligence and gross negligence relating to her claim for unlawful seizure and as to all Plaintiffs' claims for negligence and gross negligence relating to their claims for unlawful search.

Plaintiffs object with respect to Tyler's and Timothy's claims for negligence and gross negligence relating to unlawful seizure and refer to their prior arguments on these claims. For the reasons previously stated by this Court, the undersigned overrules these objections. Neither party raised specific objections with respect to the Magistrate Judge's recommendation that summary judgment be granted as to Plaintiffs' claims for negligence and gross negligence relating to their claims for excessive force. The Court has reviewed this portion of the Report for clear error; finding none, the Court adopts the recommendation of the Magistrate Judge.

Defendants object to the Magistrate Judge's recommendation with respect to Mrs. Basile's claims for negligence and gross negligence relating to her claim for unlawful seizure. They again argue that she was not arrested. The Court again overrules this argument. Defendants also argue that her conclusory allegations of negligence and gross negligence are insufficient to survive summary judgment. Upon de novo review of the record, applicable law, and Report, the

2019 WL 3413385

Court disagrees, overrules this objection, and adopts the recommendation of the Magistrate Judge.

Defendants object to the Magistrate Judge's recommendation regarding Plaintiffs' claims for negligence and gross negligence relating to their claims for unlawful search. They argue that the Individual Defendants believed they had a duty to determine which brother was in custody. For the reasons previously stated, this objection is overruled, and Defendants' motion is denied with respect to these claims.

***Punitive Damages***

The Magistrate Judge recommends denying Defendants' motion for summary judgment with respect to Plaintiffs' claim for punitive damages under 42 U.S.C. § 1983. Defendants object and argue that there is no evidence that Defendants' conduct was recklessly or callously indifferent to Plaintiffs' federally protected rights or motivated by evil intent. The Court has conducted a de novo review of the record, applicable law, and Report; upon consideration, the Court adopts the recommendation of the Magistrate Judge, specifically incorporates her analysis of this claim into this Order, and overrules Defendants' objection. [9]

[9]    Defendants assert in their objections that Plaintiffs have failed to establish proximate cause through expert medical testimony. There are no medical causal relation issues in this case requiring such expert testimony. Accordingly, this objection is overruled.

**CONCLUSION**

**\*8**    Accordingly, Defendants' Motion for Summary Judgment [117] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** with respect to Tyler Matusiewicz's, Timothy Matusiewicz's, and Mr. Ronald Basile's claims for unlawful seizure; each Plaintiffs' claim for excessive force; Tyler Matusiewicz's, Timothy Matusiewicz's, and Mr. Ronald Basile's state law claims for False Imprisonment/False Arrest; Tyler Matusiewicz's, Timothy Matusiewicz's, and Mr. Ronald Basile's negligence and gross negligence claims as those claims relate to their claims of unlawful seizure; each Plaintiffs' claims for negligence and gross negligence as they relate to Plaintiffs' claim for excessive force; and claims against Sheriff William Kenney Boone. The motion is **DENIED** with respect to Mrs. Diane Basile's claim for unlawful seizure, each Plaintiffs' claim for unlawful search, Mrs. Basile's claim for False Arrest/False Imprisonment, each Plaintiffs' claim for Invasion of Privacy and Trespass, Mrs. Basile's claims for negligence and gross negligence as associated with her claim for unlawful seizure, each Plaintiffs' claims for negligence and gross negligence as those state law claims are associated with their claim for unlawful search, the availability for punitive damages under 42 U.S.C. § 1983. The Florence County Sheriff's Office is **DISMISSED** without prejudice. Defendants' Motion to Dismiss, ECF No. 92 in C/A No. 4:16-cv-01595, is **FOUND as MOOT**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3413385

---

**End of Document**                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 58 of 70

**Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)**

2024 WL 4486462

🚩 KeyCite Red Flag

Report and Recommendation Adopted in Part, Rejected in Part by   Brunson
v. Benedict College,   D.S.C.,   September 25, 2024

2024 WL 4486462
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Columbia Division.

Dr. Isaac BRUNSON, Plaintiff,

v.

BENEDICT COLLEGE; Dr. Roslyn Clark Artris; Dr.
Janeen Witty; Dr. Kimberly Haynes-Stephens; Mrs.
Martha Smith; Gina Moore; Dr. Nuria Rojas, Defendants.

C/A No. 3:22-3921-JDA-PJG
|
Signed April 30, 2024

**Attorneys and Law Firms**

Dr. Isaac Brunson, Sumter, SC, Pro Se.

Thomas Kennedy Barlow, Mark C. Watkins, Jr., Halligan
Mahoney and Williams PA, Columbia, SC, for Defendants.

**REPORT AND RECOMMENDATION**

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

**\*1** Dr. Isaac Brunson, a self-represented litigant, filed this
employment discrimination action raising claims of race
discrimination and retaliation pursuant to 42 U.S.C. § 1981
and Title VII of the Civil Rights Act of 1964 ("Title VII"),
42 U.S.C. §§ 2000e et seq. Dr. Brunson also raises state
law claims of breach of contract, wrongful termination, and
defamation. This matter is before the court pursuant to 28
U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for
a Report and Recommendation on the defendants' motion for
summary judgment. (ECF No. 87.) Pursuant to Roseboro v.
Garrison, 528 F.2d 309 (4th Cir. 1975), the court advised Dr.
Brunson of the summary judgment and dismissal procedures
and the possible consequences if he failed to respond
adequately to the defendants' motion. (ECF No. 92.) Dr.
Brunson filed a response in opposition to the motion (ECF
No. 101), and the defendants filed a reply (ECF No. 108).[1]
Having reviewed the record presented and the applicable
law, the court recommends that the defendants' motion for

summary judgment be granted as to Dr. Brunson's Title VII
and § 1981 claims and the state claims be dismissed.

[1]     Dr. Brunson also filed a sur-reply. (ECF No.
112.) The court observes that the Local Rules
make no provision for sur-reply memoranda and
Dr. Brunson did not seek leave of the court to
file a sur-reply. Accordingly, the sur-reply was
not considered in the court's recommendation.
However, consideration of the sur-reply would not
have changed the court's recommendation.

**BACKGROUND**

The following facts are either undisputed or are taken in
the light most favorable to the plaintiff, to the extent they
find support in the record. This case arises out of Dr.
Brunson's termination from the faculty at Benedict College,
an Historically Black College in Columbia, South Carolina.
Dr. Brunson, who is African American, claims he was
terminated after he complained about the way his Caucasian
supervisor, Gina Moore, treated Dr. Brunson and the choir
program he led.

Benedict College hired Dr. Brunson in August 2021 to serve
as an assistant professor and as Benedict's Concert Choir
Director. Dr. Brunson's direct supervisor, Moore, was the
Communications and Arts Department Chair. On November
23, 2021, in his first semester at the school, Dr. Brunson
sent a letter to Dr. Kimberly Haynes, the Acting Dean of
the School of Arts and Sciences, to explain why he believed
Benedict's treatment of music students was poor. The letter
outlined several issues with the music school's curriculum and
facilities that Dr. Brunson believed impaired the education
of the music students. The letter included an example of two
students' recitals that were, according to Dr. Brunson, not
properly supported or evaluated by the faculty.

On December 7, 2021, Dr. Haynes sent an email to the music
faculty to address an apparent controversy surrounding two
students' recitals.[2] Dr. Brunson and Moore were among
the recipients of the email. Moore replied to the email with
criticisms of Dr. Brunson unrelated to the students' recitals,
but Moore clicked "reply all," which sent the email to all of
the recipients on the original email—the entire music faculty.
Moore's email included a list of "new issues" Moore was
having with Dr. Brunson—(1) "taking unapproved leave," (2)
"missing another department meeting," (3) "insubordination

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 59 of 70
**Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)**
2024 WL 4486462

by refusing to record/provide unit minutes as directed," and (4) "unresponsive to emails." (Defs.' Mot. Summ. J., ECF No. 87-8 at 1-2.) Dr. Brunson, in turn, responded to Moore's email by replying to all, providing a point-by-point refutation of Moore's criticisms. Later, Moore would claim she mistakenly replied to all rather than just replying to Dr. Haynes. Moore was formally reprimanded over the incident by Benedict's Vice President for Academic Affairs.

2    It is unclear from the record whether Dr. Haynes' email was addressing the example cited by Dr. Brunson in his letter.

**\*2** On December 9, 2021, Dr. Brunson sent a letter to Benedict's Human Resources Director Martha Scott Smith, stating that he believed Moore demonstrated prejudice against African-American faculty members. Dr. Brunson provided the names of three other current and former African-American Benedict professors who, according to Dr. Brunson, left the school or were planning to leave the school because of Moore's prejudicial treatment. Dr. Brunson also stated that while he was criticized by Moore when he had to cancel a rehearsal to seek medical attention, a Caucasian colleague was allowed to teach voice lessons remotely for the entire academic year. Further, Dr. Brunson asked that Moore be reprimanded for her attempt to defame him. (Am. Compl. Ex. V., ECF No. 30-2 at 36-37.)

Smith conducted an investigation into Dr. Brunson's allegations by interviewing the faculty members named by Dr. Brunson. Smith was able to reach three of the six, and in notes Smith took from the conversations, she did not find any evidence that Moore treated faculty differently based on race. (Def.'s Mot. Summ. J., ECF No. 87-11 at 1.) During this time, Smith also attempted to host an interactive reconciliation meeting with Dr. Brunson and Moore, but Dr. Brunson refused to participate. In a letter explaining his refusal, Dr. Brunson accused Moore of being "biased [against] Blacks in general, and at worse, a racist who perpetrates discriminatory acts against Blacks." (Def.'s Mot. Summ. J., ECF 87-12 at 2.) Dr. Brunson stated that he believed Moore's criticisms of him were motivated by racial animus and Brunson's criticism of how the music program at Benedict is run. Dr. Brunson continued that Moore's actions were calculated to damage Dr. Brunson's reputation and to have his employemnt terminated, or his contract not renewed, in retaliation for criticizing the music program. Dr. Brunson also reiterated that he believed Moore treated former African-American faculty members the same way as she treated Brunson and that she treated Caucasian faculty members more favorably.

On March 2, 2022, Moore wrote to Dr. Janeen Witty, Vice President for Academic Affairs, to share complaints from Dr. Brunson's students about his teaching methodology. The complaints were submitted by multiple students from two of Dr. Brunson's Spring 2022 courses. Basically, the students complained that Dr. Brunson was teaching through group activities where students learned from printed materials that they taught to each other and then were immediately tested on. The students also complained that Dr. Brunson did not adhere to the course outlines' schedules or syllabi, nor did Dr. Brunson properly use Benedict's electronic teaching system —"Canvas."

Dr. Witty created a performance improvement plan for Dr. Brunson on April 1, 2022. Dr. Witty wrote a letter to Dr. Brunson providing him notice of the improvement plan. The letter stated that Dr. Brunson had not been performing his assigned work in accordance with Benedict's expectations. It also noted that Dr. Brunson was counseled about his performance in a March 18, 2022 meeting in the Office of Human Resources, and on several dates with his supervisors. The plan listed four areas for Dr. Brunson to demonstrate immediate improvement: (1) proper, effective, and timely use of Canvas; (2) proper, effective, and timely use of email; (3) utilization of appropriate learning materials for the classes he taught; and (4) demonstration of teaching approaches other than student-led instruction. The plan also listed four corrective actions that Dr. Brunson was required to complete within one week: (1) post his students' grades and attendance in Canvas; (2) post corrected syllabi for his courses on Canvas; (3) remove copyrighted material from Canvas; and (4) stop scheduling classes, applied lessons, and other meetings during restricted hours on Tuesdays and Thursdays. Finally, the letter warned Dr. Brunson that his failure to meet the objectives of the plan would result in disciplinary action, including separation from employment. Dr. Brunson did not sign the performance improvement plan.

**\*3** On June 17, 2022, Dr. Witty and Smith met with Dr. Brunson to review his spring semester performance. Dr. Brunson had not completed his performance improvement plan objectives by that time, nor had he submitted his end-of-semester clearance or closeout, which is standard protocol for Benedict's faculty members. Dr. Brunson refused to provide an explanation for those failures, instead claiming that his attorney instructed him to remain silent about those issues. On July 27, 2022, Dr. Witty sent a letter to Dr. Roslyn Clark-Artis, President and CEO of Benedict, recommending that

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 60 of 70

Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)

2024 WL 4486462

Dr. Brunson's employment be terminated for his refusal to comply with Benedict's policies. Both Dr. Witty and Dr. Clark-Artis are African American. Dr. Clark-Artis terminated Dr. Brunson for cause due to his lack of performance, insubordination, and failure to complete the performance improvement plan. Dr. Brunson appealed his termination to the Faculty and Staff Grievance and Appeals Committee. A hearing was held on the appeal on September 22, 2022, which Dr. Brunson did not attend, and the committee upheld his termination.

Dr. Brunson pursued his administrative remedies in the South Carolina Human Affairs Commission, and after receiving a right-to-sue letter, he filed this case. In the Amended Complaint, Dr. Brunson raises claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Dr. Brunson also raises state law claims of breach of contract, wrongful termination, and defamation.

## DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact.*" Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr.,

Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., Erickson v. Pardus, 551 U.S. 89 (2007), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

### B. Methods of Proof in Employment Cases

**\*4** A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, he may attempt directly to prove discrimination with direct or circumstantial evidence. Alternatively, when direct proof is lacking, a plaintiff may proceed under the McDonnell Douglas burden-shifting framework. See Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (stating that the McDonnell Douglas burden-shifting framework, developed for Title VII, has been applied to § 1981 claims); Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000) (holding that the McDonnell Douglas framework applies to retaliation claims under Title VII). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 61 of 70

Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)

2024 WL 4486462

burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non.*" Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext for discrimination." Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of ... whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

## C. The Defendants' Motion for Summary Judgment

### 1. Title VII and § 1981—Race Discrimination and Retaliation [3]

3    It is unclear precisely what claims are raised in the Amended Complaint because while Dr. Brunson expressly lists Title VII and § 1981 as the bases for his claims, he does not specify precisely which claims are brought under each statute. Regardless, the court finds that both Dr. Brunson's discrimination and retaliation claims fail as a matter of law under both statutes.

**\*5** The defendants argue that Dr. Brunson cannot show that the legitimate, non-discriminatory reasons Benedict gave for terminating him were pretext for discrimination or retaliation. Specifically, the defendants argue that Dr. Brunson fails to identify any evidence Benedict did not actually believe that Dr. Brunson's purported poor job performance warranted his termination or that the stated reason was actually pretext for discrimination or retaliation. The court agrees.

Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. [4] 42 U.S.C. § 2000e-2(a)(1); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003). Generally, a plaintiff can demonstrate a *prima facie* case of race discrimination by showing: (1) the plaintiff is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (Title VII) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)); see also Tillery v. Piedmont Airlines, Inc., 713 F. App'x 181, 184 (4th Cir. 2017) (Title VII) (quoting Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007)); see also Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002) (§ 1981). Whereas Title VII discrimination claims require a showing that discrimination was a motivating factor in the termination, Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 359 (2013), § 1981 requires the plaintiff to show that race was the but-for cause, Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 341 (2020).

4    Benedict argues that to the extent Plaintiff seeks damages against the individual defendants pursuant to Title VII, the claims fail as a matter of law. The

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 62 of 70
Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)
2024 WL 4486462

court agrees. See *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) (holding that there is no individual liability under Title VII). On the other hand, § 1981 permits a cause of action against individuals for damages. See *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 283 (E.D.N.C. 2016), aff'd, 986 F.3d 332 (4th Cir. 2021).

Title VII and Section 1981 also make it unlawful for an employer to retaliate against an employee for opposing race discrimination. See 42 U.S.C. § 2000e-3(a); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (§ 1981). The requisite elements for a *prima facie* case of retaliation typically include: (1) the employee engaged in a protected activity; (2) the employer acted adversely against him or her; and (3) there was a causal connection between the protected activity and the asserted adverse action. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (Title VII); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (Title VII); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (§ 1981). Further, "retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *Ali v. BC Architects Engineers, PLC*, 832 F. App'x 167, 172 (4th Cir. 2020) (applying the but-for causation standard to § 1981 retaliation claims).

**\*6** Here, in the absence of direct evidence of discrimination, for Dr. Brunson to make a *prima facie* case or demonstrate pretext under the burden-shifting framework, he must show that Benedict's asserted reason for terminating him—his purported poor job performance—was a pretext to terminate him based on his race or in retaliation for his allegations of discrimination against Moore. See, e.g., *Lyons v. City of Alexandria*, 35 F.4th 285, 289 (4th Cir. 2022) ("When an employer attacks the essential factual premise of the employee's discrimination claim, the same evidence is germane to both the prima facie case and pretext inquiries.") (internal quotation marks omitted). The relevant inquiry then is whether the person who decided to terminate Dr. Brunson had a legitimate, honestly held belief that he was not meeting the employer's expectations. See *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)); *Addison v. CMH Homes, Inc.*, 47 F. Supp. 3d 404, 420 (D.S.C. 2014) ("An employer's expectations of its employees

are considered 'legitimate' when they are honestly held; whether the employee agrees with those expectations is not the test.... As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers."). In other words, a plaintiff's testimony that he believed he was meeting the employer's expectations cannot create a genuine issue of material fact in the face of substantial documentation of the plaintiff's poor performance by the employer. See *King*, 328 F.3d at 149; *Addison*, 47 F. Supp. 3d at 421.

That is precisely the situation in this case. Benedict provided substantial documentation of Dr. Brunson's poor work performance. Moore sent multiple student complaints to Dr. Haynes-Stevens documenting Dr. Brunson's failures to properly use Canvas, respond to emails, and adhere to proper course curricula and syllabi, which were documented in performance assessments. (Defs.' Mot. Summ. J., ECF Nos. 87-5 at 1-10, 87-8 at 1-3.) Moore's concerns were substantiated by complaints from many of Dr. Brunson's own students. (Id., ECF No. 87-14 at 1-6.) When these issues were raised to Dr. Brunson, Dr. Witty placed him on a performance improvement plan, but Dr. Brunson failed to complete it. (Id., ECF No. 87-13 at 3-4.) Therefore, Dr. Witty and Dr. Clark-Artis had substantial documentation to support terminating Dr. Brunson for poor performance. [5]

[5]    Notably, Dr. Witty and Dr. Clark-Artis, are the same race as Dr. Brunson, which generally negates any inference of discrimination. See generally *Coggins v. Gov't of D.C.*, 173 F.3d 424, \*4 (4th Cir. 1999) (unpublished) (stating, in a Title VII case, that the fact that the ultimate decision-makers were of the same race as the plaintiff made it unlikely that their decision was motivated by racial animus); *Demesme v. Montgomery Cnty. Gov't*, 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation."), aff'd, 208 F.3d 208 (4th Cir. 2000); *Ferguson v. Waffle House, Inc.*, 18 F. Supp. 3d 705, 711 (D.S.C. 2014) ("[T]he fact that some of the individuals who allegedly discriminated against the Plaintiff are the same race as the Plaintiff is not a dispositive fact when determining whether discrimination occurred. Nevertheless, ... it is a relevant consideration in light of all of the evidence....").

1:24-cv-02612-JDA-PJG    Date Filed 08/08/25    Entry Number 49-5    Page 63 of 70

Brunson v. Benedict College, Not Reported in Fed. Supp. (2024)

2024 WL 4486462

Dr. Brunson argues that the student complaints, performance improvement plan, and performance assessments were "contrived and manufactured" (Pl.'s Resp., ECF No. 101 at 13), but Dr. Brunson fails to point to any evidence in the record to support that assertion. Dr. Brunson's argument amounts to a mere disagreement with Moore, Dr. Witty, and Dr. Clark-Artis about Dr. Brunson's performance, but it is the decision-makers' honestly held belief that matters. See Addison, 47 F. Supp. 3d at 421. Dr. Brunson forecasts no evidence showing that Dr. Witty or Dr. Clark-Artis did not honestly believe that Dr. Brunson's poor job performance justified his termination.[6] See King, 328 F.3d at 149. Dr. Brunson's own belief in the adequacy of his job performance is not sufficient to create a genuine issue of material fact as to whether Benedict's stated justification for terminating him—poor job performance—was a mere pretext for race discrimination or retaliation. See, e.g., Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (stating that it is not enough to show that the employer's performance-based reason for terminating the plaintiff was not wise, fair, or correct, the plaintiff must show that the decision-maker "actually believed" the plaintiff was meeting the employer's expectations). Consequently, and in the absence of direct proof of discrimination, Dr. Brunson cannot show a dispute of material fact from which a reasonable jury could conclude that he was discriminated against based on race or that he was retaliated against for complaining about racism from his supervisor. Therefore, Dr. Brunson's Title VII and § 1981 claims fail as a matter of law and the defendants are entitled to summary judgment on those claims.

[6]    Nor has Dr. Brunson pointed to any evidence suggesting that Dr. Witty's or Dr. Clark-Artis's actions were influenced by Moore's purported racial animus. See generally Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 290 (4th Cir. 2004) ("When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within the parameters of the discrimination statute's definition of an employer or agent of the employer."), overruled on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 169 (2009); id. at 291 (providing that to succeed on a cat's paw theory of liability, the plaintiff cannot merely show

the subordinate had a substantial influence on the challenged decision, rather, the plaintiff must show "sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer").

**2. State Law Claims**

*7    In light of the recommendation that the defendant's motion for summary judgment be granted as to Dr. Brunson's federal claims, the court should decline to exercise supplemental jurisdiction over Dr. Brunson's state law claims. See 28 U.S.C. § 1367(c) (authorizing a district court to decline to exercise jurisdiction over a supplemental claim); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349-50 (1988) (discussing the factors in deciding whether to exercise supplemental jurisdiction after removal). Here, Dr. Brunson raises several state law claims that, in the interest of comity, are more appropriate for consideration in South Carolina's courts because they include complex issues of state law. See 28 U.S.C. § 1367(c) (listing bases for declining supplemental jurisdiction, including the presence of novel or complex issues of state law and the dismissal of federal claims); Hinson v. Nw. Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (finding the district court did not abuse its discretion to remand the case to state court where the federal claims were no longer at issue, the state claims predominated, and the state claims involved interpretations of complex state statutes on which there was no state precedent).

## RECOMMENDATION

Based on the foregoing, the court recommends that the defendants' motion for summary judgment (ECF No. 87) be granted as to Dr. Brunson's Title VII and § 1981 claims. The court also recommends that the court decline to exercise supplemental jurisdiction over Dr. Brunson's state law claims.

### Notice of Right to File Objections
### to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need

2024 WL 4486462

not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court

901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4486462

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4284657
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Columbia Division.

Dr. Isaac BRUNSON, Plaintiff,

v.

BENEDICT COLLEGE, Dr. Roslyn Clark Artis, Dr.
Janeen Witty, Dr. Kimberly Haynes-Stephens, Mrs.
Martha Smith, Gina Moore, Dr. Nuria Rojas, Defendants.

Case No. 3:22-cv-03921-JDA
|
Signed September 24, 2024
|
Filed September 25, 2024

**Attorneys and Law Firms**

Dr. Isaac Brunson, Sumter, SC, Pro Se.

Thomas Kennedy Barlow, Mark C. Watkins Jr., Halligan
Mahoney and Williams PA, Columbia, SC, for Defendants.

## OPINION AND ORDER

Jacquelyn D. Austin, United States District Judge

**\*1** This matter is before the Court on Defendants' motion
for summary judgment. [Doc. 87.] In accordance with 28
U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2), D.S.C.,
this matter was referred to United States Magistrate Judge
Paige J. Gossett for pre-trial proceedings.

On April 30, 2024, the Magistrate Judge issued a
Report and Recommendation ("Report") recommending that
Defendants' motion for summary judgment be granted as to
Plaintiff's claims under Title VII of the Civil Rights Act of
1964 ("Title VII") and 42 U.S.C. § 1981, and that the Court
decline to exercise supplemental jurisdiction over Plaintiff's
state law claims for breach of contract, wrongful termination,
and defamation. [Doc. 116.] The Magistrate Judge advised
the parties of the procedures and requirements for filing
objections to the Report and the serious consequences if
they failed to do so. [*Id.* at 15.] Plaintiff filed objections
to the Report along with additional exhibits, Defendants filed
a response, and Plaintiff subsequently filed a letter with
additional supporting documents. [Docs. 119; 120; 121; 122.]

## BACKGROUND

The Magistrate Judge provided an accurate and thorough
recitation of the facts and, therefore, the Court includes only
the factual information recounted by the Magistrate Judge that
is necessary to address Plaintiff's objections.

This dispute arises out of Plaintiff's termination from the
faculty at Benedict College ("Benedict"), a Historically Black
College in Columbia, South Carolina. [Doc. 116 at 2.]
Plaintiff, who is African-American, contends that he was
terminated because he complained about the manner in which
his Caucasian supervisor, Gina Moore, treated him and the
choir program that he led. [*Id.*] However, an investigation
by Benedict into Plaintiff's complaints about Moore did not
result in any evidence that Moore treated faculty differently
on the basis of race. [*Id.* at 3.] Martha Smith, Benedict's
Human Resources Director, attempted to host an interactive
reconciliation meeting between Plaintiff and Moore, but
Plaintiff refused to participate, and Plaintiff continued to
maintain that Moore was racially biased. [*Id.* at 3–4.]

In March 2022, Moore wrote to Dr. Janeen Witty, Vice
President for Academic Affairs, and shared complaints about
Plaintiff's teaching methodology from some of his students.
[*Id.* at 4.] The primary complaints were that Plaintiff was
teaching through group activities in which students learned
from printed materials that they taught to each other and
then were tested on shortly thereafter. [*Id.*] Other complaints
included that Plaintiff did not adhere to the schedules in
course outlines or syllabi, nor did he properly use Benedict's
electronic teaching system, "Canvas." [*Id.*]

On April 1, 2022, Dr. Witty created a performance
improvement plan ("PIP") for Plaintiff and wrote Plaintiff
a letter providing him notice of the PIP. [*Id.*] In the letter,
Dr. Witty stated that Plaintiff had not been fulfilling his
duties in accordance with the school's expectations, and she
noted that Plaintiff had been counseled about his performance
in a March 18, 2022, meeting in the Office of Human
Resources, and on several prior dates by his supervisors.
[*Id.*] The PIP identified four areas where Plaintiff would
need to demonstrate immediate improvement: (1) proper,
effective, and timely use of Canvas; (2) proper, effective, and
timely use of email; (3) utilization of appropriate learning
materials for his classes; and (4) demonstration of teaching
approaches that were not student led. [*Id.* at 4–5.] The PIP

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

specifically listed four corrective actions that Plaintiff was required to complete in one week: (1) post his students' grades and attendance on Canvas; (2) post corrected syllabi for his courses on Canvas; (3) remove copyrighted material from Canvas; and (4) stop scheduling classes, applied lessons, and other meetings during restricted hours on Tuesdays and Thursdays. [*Id.* at 5.] The letter warned that Plaintiff's failure to meet the PIP's objectives would result in disciplinary action, including termination. [*Id.*] Plaintiff refused to sign the PIP, however. [*Id.*]

**\*2** On June 17, 2022, Dr. Witty and Smith met with Plaintiff to review his performance for the prior semester. [*Id.*] Plaintiff had not completed the objectives set out in the PIP, nor had he submitted his end-of-semester clearance or closeout, which is required of all Benedict faculty. [*Id.*] Plaintiff refused to explain those failures and instead maintained that his attorney had instructed him not to discuss those issues. [*Id.*]

On July 27, 2022, Dr. Witty sent a letter to Benedict's CEO and President, Dr. Roslyn Clark-Artis, recommending that Plaintiff be terminated due to his refusal to comply with the school's policies. [*Id.*] Dr. Clark-Artis subsequently terminated Plaintiff for cause, alleging that the termination was due to Plaintiff's lack of performance, insubordination, and failure to complete his PIP. [*Id.*] Plaintiff then appealed his termination to the Faculty and Staff Grievance and Appeals Committee, which held a hearing on September 22, 2022, and upheld the termination. [*Id.*]

Plaintiff filed a charge with the South Carolina Human Affairs Commission and received a right-to-sue letter. [*Id.*] He subsequently filed this case. [*Id.*] His Amended Complaint alleges federal claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), and state law claims of breach of contract, wrongful termination, and defamation. [Doc. 116 at 5–6.]

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The Court is charged with making a de novo determination of any portion of the Report to which a specific objection is made. The Court may accept, reject, or modify, in

whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b). The Court will review the Report only for clear error in the absence of an objection. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" (internal quotation marks omitted)).

Although "objections need not be novel to be sufficiently specific," *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023), "a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection," *Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017) (internal quotation marks omitted); *see Regassa v. Warden of FCI Williamsburg*, No. 8:22-cv-466-SAL, 2023 WL 2386515, at *2 (D.S.C. Mar. 7, 2023) (concluding objection was non-specific because the petitioner "ignore[d] the magistrate judge's analysis and repeat[ed] the arguments he made in his opposition brief"); *Velez v. Williams*, No. 9:19-cv-03022-JMC, 2021 WL 837481, at *5 (D.S.C. Mar. 5, 2021) (reviewing for clear error only when the petitioner's objections were "rehashed, general, and non-specific"), *appeal dismissed*, 2021 WL 5879177 (4th Cir. Dec. 13, 2021); *Hart v. Warden of Broad River Corr. Inst.*, No. CA009-997-HMH-PJG, 2010 WL 2232213, at *2 (D.S.C. June 3, 2010) (declining to individually analyze objections that were "non-specific," "unrelated to the dispositive portions" of the Report, or "merely restat[ed]" the petitioner's claims), *appeal dismissed*, 397 F. App'x 879 (4th Cir. Oct. 14, 2010). "Even so, when confronted with the objection of a pro se litigant, [courts] must also be mindful of [their] responsibility to construe pro se filings liberally." *Martin*, 858 F.3d at 245.

## APPLICABLE LAW

### Liberal Construction of Pro Se Pleadings

**\*3** Plaintiff is proceeding pro se, which requires the Court to liberally construe his pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines*, 404 U.S. at 520. The mandated liberal construction means only that if the Court

can reasonably read the pleadings to state a valid claim on which the party proceeding pro se could prevail, it should do so. *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not construct the pro se party's legal arguments for him. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

## Title VII and § 1981

Title VII makes it unlawful for an employer "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (1). Additionally, Title VII's retaliation provision forbids an employer from taking action that discriminates against an individual because that individual has either "opposed any practice made an unlawful employment practice by this subchapter" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). And 42 U.S.C. § 1981 outlaws race discrimination in the making and enforcement of private contracts. 42 U.S.C. § 1981(a). Like Title VII, § 1981 encompasses retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008). The elements to establish race discrimination and retaliation are the same under Title VII and § 1981. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (explaining that "the elements required to establish [race discrimination] are the same under [Title VII and § 1981]"); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (explaining that the "elements of [Title VII and § 1981] retaliation claims are identical").

Absent direct or indirect evidence of discrimination or retaliation in violation of Title VII or § 1981, a plaintiff may proceed under the *McDonnell Douglas* "pretext" framework to establish claims of discrimination and retaliation. *Dickerson v. NHC Healthcare-Charleston, LLC*, No. 2:21-cv-2170-DCN-MGB, 2023 WL 6057394, at *5 (D.S.C. Sept. 18, 2023). Under this framework, an employee must first prove a prima facie case of discrimination or retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, the burden then shifts to the employer to produce evidence of some legitimate, nondiscriminatory and nonretaliatory reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). By providing such an explanation, the employer rebuts the presumption of discrimination or retaliation created by the prima facie case,

and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *Id.* at 510–11. If the employer produces evidence of a legitimate, nondiscriminatory and nonretaliatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 804.

## DISCUSSION

### The Report

**\*4** Concluding that Plaintiff has not forecasted direct evidence to support his Title VII and § 1981 claims, the Report analyzes them under the *McDonnell Douglas* burden-shifting framework. [Doc. 116 at 11–13.] The Report concludes that to succeed on either his Title VII or his § 1981 claims, Plaintiff must "show that Benedict's asserted reason for terminating him—his purported poor job performance—was a pretext to terminate him based on his race or in retaliation for his allegations of discrimination against Moore." [*Id.* at 11.] Accordingly, the Report concludes that the relevant inquiry is whether the people who decided to terminate Plaintiff— Dr. Witty and Dr. Clark-Artis—"had a legitimate, honestly held belief that [Plaintiff] was not meeting the employer's expectations." [*Id.*]

The Report notes that although Plaintiff asserts "that the student complaints, [PIP], and performance assessments were 'contrived and manufactured,'" he "fails to point to any evidence in the record to support that assertion" and he "forecasts no evidence showing that Dr. Witty or Dr. Clark-Artis did not honestly believe that [Plaintiff's] poor job performance justified his termination." [*Id.* at 12–13.] Additionally, to the extent that Moore bore purportedly racial animus toward Plaintiff, Plaintiff failed to point to evidence that would sustain liability under a cat's paw theory, which would require "sufficient evidence that [Moore] possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." [*Id.* at 13 n.6 (internal quotation marks omitted).] The Report also notes that when substantial issues regarding Plaintiff's performance were raised to Plaintiff, "Dr. Witty placed him on a [PIP], but [Plaintiff] failed to complete it." [*Id.* at 12.] Accordingly, the Magistrate Judge recommends that summary judgment be granted to Defendants on both Plaintiff's Title VII and his § 1981 claims. [*Id.* at 13.]

\*    The Magistrate Judge also concluded that "to the extent Plaintiff seeks damages against the individual defendants pursuant to Title VII, the claims fail as a matter of law" because "there is no individual liability under Title VII." [Doc. 116 at 9 n.4.]

As for Plaintiff's state law claims, the Report recommends that the Court decline to exercise supplemental jurisdiction because, in the interest of comity, those claims are more appropriately resolved in South Carolina's courts because they involve complex issues of state law. [*Id.* at 14.]

**Objections**

In his 36 pages of objections to the Magistrate Judge's 14-page Report, Plaintiff takes a shotgun approach in which he largely reiterates the factual allegations in his Complaint. Some of the pro se Plaintiff's arguments are difficult to discern, but the Court has considered them all and overrules them with one exception identified in this Order.

Plaintiff first argues that several of the exhibits referenced in Defendants' summary judgment motion cannot be considered because they do not satisfy the authenticity rules of the Federal Rules of Evidence and, in any event, they were fabricated by Moore or otherwise based on her lies. [Doc. 119 at 10–16.] On that basis, Plaintiff maintains that the Magistrate Judge erred in concluding that Defendants "gave legitimate, non-discriminatory reasons for [Plaintiff's] termination." [*Id.* at 19–21 (internal quotation marks omitted).] The Court overrules this objection. Importantly, Defendants' burden under the *McDonnell Douglas* burden-shifting framework to articulate a legitimate, nondiscriminatory and nonretaliatory reason for the challenged adverse action "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). The ultimate burden of persuasion remains at all times with Plaintiff to show that Defendants intentionally discriminated against him. *See id.* at 143.

**\*5**  Plaintiff's filings, by themselves, were sufficient to satisfy Defendants' burden, regardless of whether any of the documents attached to Defendants' summary judgment motion are considered. Plaintiff attached to his Complaint his PIP, the response he sent to Dr. Witty, and his termination letter, which outlined Benedict's claimed grounds for his termination. [Doc. 30-2 at 31–35, 58–59; *see* Doc. 30-1 at 9–10.] Plaintiff's Complaint confirms that some of his students complained about him and that Moore, his supervisor, also reported shortcomings in his performance. [Doc. 30-1 at 1–2, 7–9.] In his response to Dr. Witty regarding the PIP, Plaintiff also acknowledges some of the problems that the PIP sought to address, and Plaintiff seeks only to offer excuses for those deficiencies. [*E.g.*, Doc. 30-2 at 33 (acknowledging his inability to learn how to effectively use the school's learning management system but blaming the confusing nature of the system and the poor quality of the instruction he had received); *id.* at 33–34 (blaming his alleged failure to respond promptly to emails on a problem with his computer or with the school's computer system).] In his response to the PIP, Plaintiff also confirms that some students complained that he was "conducting only peer teaching in [his] classes." [*Id.* at 34.] Plaintiff's tone in his response was defiant and disrespectful, and he accused Dr. Witty of disingenuousness and dishonesty. [*E.g.*, *id.* at 35 ("[Y]our standard of review for my progress appears to be no more than a veiled attempt at creating a no-win situation for me and a means for you to create a plausible reason not to offer me a contract for the coming year.").] Accordingly, even Plaintiff's allegations and the documents that Plaintiff himself presented were sufficient, on their own, to satisfy Defendants' burden of production regarding its legitimate, nondiscriminatory and nonretaliatory basis for his termination. The Magistrate Judge therefore correctly concluded that the burden shifted to Plaintiff to create a genuine dispute as to a material fact regarding whether the asserted reasons were a pretext for discrimination or retaliation.

Plaintiff also objects to the Magistrate Judge's statement in a footnote that Dr. Witty and Dr. Clark-Artis "are the same race as [Plaintiff], which generally negates any inference of discrimination." [Doc. 116 at 12 n.5; *see* Doc. 119 at 27–28.] The Court overrules this objection. Although it was in an unpublished opinion, the Fourth Circuit has held that the fact that the ultimate decision-makers and the plaintiff were the same race made it "unlikely" that racial animus motivated the decision. *Coggins v. Gov't of D.C.*, No. 97-2263, 1999 WL 94655, at \*4 (4th Cir. 1999). There is no indication in the Report that the Magistrate Judge placed undue weight on this factor, and, in any event, this factor plays no part in this Court's decision that Defendants are entitled to summary judgment regarding Plaintiff's federal claims challenging his termination.

Plaintiff next objects that the Magistrate Judge refused to consider evidence that clearly proves Moore's "racial-bias tendencies and actions." [Doc. 119 at 28–31.] However, the Magistrate Judge explained that even assuming that Moore was biased against Plaintiff because of his race, it would not affect Defendants' entitlement to summary judgment on his federal claims. Specifically, the Magistrate Judge stated:

> Nor has [Plaintiff] pointed to any evidence suggesting that Dr. Witty's or Dr. Clark-Artis's actions [in terminating Plaintiff] were influenced by Moore's purported racial animus. *See generally Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004) ("When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within the parameters of the discrimination statute's definition of an employer or agent of the employer."), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169 (2009); *id.* at 291 (providing that to succeed on a cat's paw theory of liability, the plaintiff cannot merely show the subordinate had a substantial influence on the challenged decision[;] rather, the plaintiff must show "sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer").

[Doc. 116 at 13 n.6.] Plaintiff does not acknowledge the Magistrate Judge's analysis on this point, let alone offer any argument that it is erroneous, and, in any event, the Court discerns no error. As such, to the extent Plaintiff's federal claims are based on his termination, his objection is overruled.

Plaintiff next argues that the Magistrate Judge erred in recommending dismissal of the individual Defendants as to his § 1981 claim on the basis that only employers can be liable under § 1981. [Doc. 119 at 34–35.] This objection is overruled because the Report does not contain such a recommendation. Rather, the Report notes that "§ 1981 *permits* a cause of action against individuals for damages." [Doc. 116 at 9 n.4 (emphasis added).] It is only Title VII that the Magistrate Judge concludes does not allow damages against individual defendants. [*Id.*]

**\*6** Plaintiff also objects to the Magistrate Judge's recommendation that summary judgment be granted to Defendants on his § 1981 retaliation claim. [Doc. 119 at 22–

26.] Defendants, in arguing for summary judgment on that claim, appear to acknowledge only his claims of retaliatory *termination*, and do not present arguments against Plaintiff's § 1981 retaliation claim based on other actions. [Doc. 87-1 at 13.] The Court has already addressed Plaintiff's other objections regarding his claims that his termination violated Title VII and § 1981. However, the Court understands Plaintiff's argument here to encompass the contention that his § 1981 retaliation claim was not based only on his termination, but on many other acts as well, including: "Moore's libelous and defamatory public email," "Moore's verbal accusation against Plaintiff to his student on May 6, 2022," "Moore's and administrators' changing the final grade of one of Plaintiff's choral students, Moore's making a change in Benedict's vendor payroll system to change an approved request for leave of absence to a denied request, and Dr. Witty's placing Plaintiff on a PIP. [Doc. 119 at 25–26.]

The Court concludes that, construed liberally, the Amended Complaint bases Plaintiff's § 1981 retaliation claim on acts in addition to his termination that were perpetrated by Moore alone or in conjunction with others. Those include "[h]arassing, disrespectful, and demanding emails daily"; "[r]efus[al] to fund any activity or efforts associated with [Plaintiff]," including teaching materials, choir needs, and attendance at choral conferences; baiting his students to make false accusations against him to the Vice President of Academic Affairs; trying to make it appear that Plaintiff was responsible for his students' actions and lack of responsibility; creating a bogus reason to monitor his class; denying him approval for a requested leave of absence; and undertaking a "campaign of defamation, harassment, and the manufacture of bogus documents that damaged [his] character and reputation." [Doc. 30-1 at 7–9, 13.] Because Defendants did not address these aspects of the claim in their summary judgment motion, the Court agrees that the Magistrate Judge erred in recommending that summary judgment be granted on Plaintiff's § 1981 retaliation claim to the extent it is not based on his termination. *See Goodine v. Robert Bosch, LLC*, No. 8:19-cv-1701-DCC-KFM, 2021 WL 4691736, at \*10 n.9 (D.S.C. Jan. 19, 2021) (denying summary judgment on a claim that the defendant failed to address in its summary judgment motion), *Report and Recommendation adopted by* 2021 WL 4316971 (D.S.C. Sept. 23, 2021); *Hepstall v. United States*, No. 8:20-cv-00877-DCC-JDA, 2020 WL 13787522, at \*5 (D.S.C. Dec. 9, 2020) (denying a motion to dismiss to the extent that the plaintiff's claims were based on conduct not addressed in the motion), *Report and Recommendation adopted by* 2021 WL 5578093

**Brunson v. Benedict College, Slip Copy (2024)**

2024 WL 4284657

(D.S.C. Nov. 29, 2021), *appeal dismissed*, 2022 WL 2383872 (4th Cir. July 1, 2022). Although the Court denies Defendants' summary judgment motion as to the § 1981 retaliation claim to the extent it is not based on Plaintiff's termination, given the lack of clarity in the Amended Complaint, the Court will allow Defendants another opportunity to file a dispositive motion as to this claim.

Plaintiff finally objects to the Magistrate Judge's recommendation that the Court decline supplemental jurisdiction as to Plaintiff's claims of breach of contract and defamation. [Doc. 119 at 31–32.] Plaintiff's contention is that the Magistrate Judge erred by not addressing the supplemental jurisdictional issue earlier in the litigation at a time when the statute of limitations would not have barred him from filing the claims in state court. [*Id.*] Initially, the Court notes that because Defendants' summary judgment motion is denied as to Plaintiff's § 1981 retaliation claim based on conduct other than his termination, that extinguishes—at least for the time being—the basis on which the Magistrate Judge recommends declining to exercise supplemental jurisdiction. In any event, the Court overrules this objection because the supplemental jurisdiction statute, 28 U.S.C. § 1367(d), provides that any potentially applicable statute of limitations is tolled for 30 days after the dismissal without prejudice of the supplemental state law claim. *See Artis v. Dist. of Columbia*, 583 U.S. 71, 74 (2018). Accordingly, even if the Court eventually declines to exercise supplemental jurisdiction over these state-law claims, Plaintiff will have an opportunity to re-file them in state court.

## CONCLUSION

**\*7** For the reasons discussed, the Court accepts in part and rejects in part the Report and Recommendation of the Magistrate Judge and incorporates it by reference to the extent consistent with this Order. For the reasons discussed, Defendants' motion for summary judgment [Doc. 87] is GRANTED IN PART and DENIED IN PART. The motion is DENIED as to Plaintiff's § 1981 retaliation claim to the extent that the claim is based on conduct other than his termination and as to Plaintiff's state-law claims, and the denial is without prejudice to Defendants' right to file a second summary judgment motion. Defendants' summary judgment motion is otherwise GRANTED. The Court RECOMMITS this matter to the Magistrate Judge for consideration of Plaintiff's § 1981 claim and his state-law claims, including establishing a briefing schedule for a second summary judgment motion if necessary.

IT IS SO ORDERED.

## NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

**All Citations**

Slip Copy, 2024 WL 4284657

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.